1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT  OF TEXAS
2                    AMARILLO DIVISION

3    UNITED STATES OF AMERICA      §
                                   §          CRIMINAL ACTION
4    VS.                           §
                                   §     NO. 2:21-CR-025-Z (01)
5    BART WADE REAGOR              §

6    ============================================================

7            TRANSCRIPT OF CRIMINAL TRIAL BY JURY
          BEFORE THE HONORABLE MATTHEW J. KACSMARYK
8                UNITED STATES DISTRICT JUDGE

9                    OCTOBER 12, 2021

10                   VOLUME I OF IV

11                   AMARILLO, TEXAS

12   ============================================================

13                 A-P-P-E-A-R-A-N-C-E-S

14

15   FOR THE GOVERNMENT:      MR. JEFFREY R. HAAG and
                              MS. AMANDA R. BURCH
16                            Assistant United States Attorneys
                              1205 Texas Ave., 7th Floor
17                            Lubbock, Texas  79401

18                                   AND

19                            MR. JOSHUA FRAUSTO
                              Assistant United States Attorney
20                            500 South Taylor, LB 238
                              Amarillo, Texas  79101-2442

21

22   FOR THE DEFENDANT:      MR. DAN L. COGDELL and
                             MR. NICHOLAS HAMILTON NORRIS
23                           Jones Walker, LLP
                             811 Main Street, Suite 2900
24                           Houston, Texas  77002

25                                   AND

```
 1    ALSO FOR DEFENDANT:        MR. DARREN TRAY PAYNE and
                                 MR. MATTHEW DANE POWELL
 2                               Payne, Powell & Truitt Law Group
                                 2529 74th Street
 3                               Lubbock, Texas  79423

 4

 5    COURT REPORTER:           MS. STACY MAYES MORRISON
                                Official Court Reporter
 6                              205 E. 5th, LB #F13263
                                Amarillo, Texas  79101
 7                              (806) 672-6219

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings reported by mechanical stenography; transcript
25    produced by computer.
```

```
 1                VOLUME I (PAGES 1 - 346)

 2

 3            PROCEEDINGS FOR OCTOBER 12, 2021

 4                                                        PAGE

 5  CAPTION/APPEARANCES..................................    1

 6  INDEX...............................................    3

 7  VOIR DIRE PROCEEDINGS HELD AND FILED UNDER SEPARATE SEALED VOLUME    5
    IN JURY VOIR DIRE VOLUME I OF I.....................
 8

 9  PROCEEDINGS FOR OCTOBER 12, 2021....................    5

10  HOUSEKEEPING MATTERS................................    5

11  RULE INVOKED........................................    6

12  COURT'S PRELIMINARY INSTRUCTIONS TO THE JURY........    7

13  OPENING STATEMENT BY THE GOVERNMENT.................   15

14  OPENING STATEMENT BY THE DEFENDANT..................   23

15  GOVERNMENT'S EXHIBIT 56 STIPULATION.................   40

16  PRE-ADMITTED EXHIBITS...............................   41

17

18                GOVERNMENT'S EVIDENCE

19

20  GOVERNMENT'S EXHIBIT 56 STIPULATION READ............   46

21
    WITNESSES:            DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE
22
    WILLIAM PATRICK SCHONACHER   43      69        86        88
23
    THOMAS HUTCHISON             94     104       137       140
24
    WILLIAM WOODRING            141     162       191
25
```

```
1                                                              PAGE

2    COURT'S ORDER IN LIMINE, SHANE SMITH DISCUSSION.................... 192

3    COURT'S LIMITING INSTRUCTION TO THE JURY.......................... 201

4

5                       GOVERNMENT'S EVIDENCE (RESUMED)

6

     WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS  VOIR DIRE
7
     SHANE SMITH               202     254
8

9

     BENCH CONFERENCE NO. 1 FILED UNDER SEPARATE SEALED VOLUME............ 292
10

11

12                      GOVERNMENT'S EVIDENCE (RESUMED)

     WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS  VOIR DIRE
13
     SHANE SMITH (RESUMED)             292      311
14

15

     BENCH CONFERENCE NO. 2 FILED UNDER SEPARATE SEALED VOLUME........... 326
16

17

18                      GOVERNMENT'S EVIDENCE (RESUMED)

     WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS  VOIR DIRE
19
     SHANE SMITH (RESUMED)                                327
20

21

22   COURT'S INSTRUCTIONS TO THE JURY.................................... 332

23   HOUSEKEEPING MATTERS (OUTSIDE JURY'S PRESENCE)..................... 333

24   REPORTER'S CERTIFICATE............................................. 346

25
```

(Outside of the Jury's Presence)

1     (Voir Dire Proceedings held and filed under separate

2     sealed volume in Jury Voir Dire Volume I of I.)

3                   ------------------------

4                   <u>PROCEEDINGS FOR OCTOBER 12, 2021</u>

5          (The following took place in open court with the

6     defendant present, but without the jury.)

7          **THE COURT**:  Please be seated.  The Court calls Case

8     No. 2:21-CR-25-Z, United States of America versus Bart Wade

9     Reagor.

10         Are the parties ready to proceed?

11         **MR. HAAG**:  Jeffrey Haag on behalf of the United

12    States.  We are ready to proceed, Your Honor.

13         **MR. COGDELL**:  Dan Cogdell on behalf of Mr. Reagor.

14    We are ready, Your Honor.

15         **THE COURT**:  The parties are present.  At this

16    point, I'll take care of any housekeeping before we invite

17    the jury in, do preliminary instructions, and then proceed

18    with opening statements.

19         Is there any housekeeping matters that the Court

20    may attend to at this time?

21         **MR. HAAG**:  Yes, Your Honor.  Just briefly, for the

22    record, the Defense has invoked the rule.  We have both by

23    mutual agreement allowed to exclude from the rule our case

24    agent, John Whitworth, as well as the expert witnesses for

25    both parties.

(Outside of the Jury's Presence)

1          **THE COURT**:  Okay.  And, Mr. Cogdell, are you in

2   agreement with Mr. Haag's assessment of the invocation of the

3   rule and how it will be applied in this case?

4          **MR. COGDELL**:  Yes, sir.

5          **THE COURT**:  Okay.   The rule is invoked.  It will

6   be applied.  Any witnesses who are not testifying should be

7   excluded from this courtroom.  I'll instruct Court Security

8   Officers and Marshals to apply the rule to all witnesses

9   except as excluded by Mr. Haag's representation to the Court

10  and Mr. Cogdell's assent thereto.

11         At this point, may we call in the jury?

12         **MR. HAAG**:  Yes, Your Honor.

13         **THE COURT**:  Mr. Cogdell?

14         **MR. COGDELL**:  Yes, sir.

15      **(Pause.)**

16         **THE COURT**:  Okay.  And I do apologize for the

17  delay.  We are moving furniture and jurors at the same time

18  this morning.  You may have noticed the truck out front, so

19  security is stressed today.

20         **MR. HAAG**:  Yes.

21         **MR. COGDELL**:  How did you get by without furniture,

22  if I could ask?

23         **THE COURT**:  Just camping out in the catacomb on the

24  second floor.

25         **MR. COGDELL**:  Gotcha.

1          **(The jury returned to the courtroom.)**

2                    **COURT SECURITY OFFICER:**  All rise for the jury.

3                    **THE COURT:**  Please be seated.  Members of the Jury,

4     as we discussed at the close of business yesterday, I will

5     continue with preliminary instructions.  Some of this may be

6     repetitive, but I want to make certain that we follow the

7     Fifth Circuit patterns on this.

8                    As I explained, the Fifth Circuit Court of Appeals

9     is my boss, and they have promulgated certain instructions

10    that should be used in instructing jurors on their role, and

11    those rules of the road will guide all parts of the case and

12    then carry forward into your deliberations.

13                 <u>**COURT'S PRELIMINARY INSTRUCTIONS TO JURY**</u>

14                   **THE COURT:**  Members of the Jury, having been sworn,

15    I will now give you some preliminary instructions to guide

16    you in your participation in the trial.

17                   It will be your duty to find from the evidence what

18    the facts are.  You, and you alone, will be the judges of the

19    facts.  You will then have to apply those facts to the law as

20    the Court will give it to you.  You must follow that law

21    whether you agree with it or not.  Perform these duties

22    fairly.  Do not let any bias, sympathy, or prejudice that you

23    may feel toward one side or the other influence your decision

24    in any way.  In particular, do not let racial, ethnic,

25    national origin or other bias influence your decision in any

1    way.

2            Nothing the Court may say or do during the course

3    of the trial is intended to indicate or should be taken by

4    you as indicating what your verdict should be.

5            Regarding evidence, the evidence from which you

6    will find the facts will consist of the testimony of

7    witnesses, documents, and other items received into record as

8    exhibits, and any facts that the lawyers agree to or

9    stipulate to or that the Court may instruct you to find.

10            Certain things are not evidence and must not be

11    considered by you.  I will list them for you now.

12            No. 1.  Statements, arguments, and questions by

13    lawyers are not evidence.

14            No. 2.  Objections to questions are not evidence.

15    Lawyers have an obligation to their clients to make

16    objections when they believe evidence being offered is

17    improper under the rules of evidence.  You should not be

18    influenced by the objection or by the Court's ruling on it.

19    If the objection is sustained, ignore the question.  If it is

20    overruled, treat the answer like any other.  If you are

21    instructed that some item of evidence is received for a

22    limited purpose only, you must follow that instruction.

23            No. 3.  Testimony that the Court has excluded or

24    told you to disregard is not evidence and must not be

25    considered.

 1              No. 4.  Anything you may have seen, heard, or read
 2    outside the courtroom is not evidence and must be
 3    disregarded.  You are to decide the case solely on the
 4    evidence presented here in the courtroom.
 5              There are two kinds of evidence:  direct and
 6    circumstantial.  Direct evidence is direct proof of a fact,
 7    such as testimony of an eyewitness.  Circumstantial evidence
 8    is proof of facts from which you may infer or conclude that
 9    other facts exist.  I will give you further instructions on
10    these as well as other matters at the end of the case, but
11    keep in mind that you may consider both kinds of evidence.
12              It will be up to you to decide which witnesses to
13    believe, which witnesses not to believe, and how much of any
14    witness' testimony to accept or reject.  I will give you some
15    guidelines for determining the credibility of witnesses at
16    the end of the case.
17              Now, rules for criminal cases.
18              As you know, this is a criminal case.  There are
19    three basic rules about a criminal case that you must keep in
20    mind.
21              First, the defendant is presumed innocent until
22    proven guilty.  The Indictment brought by the Government
23    against the defendant is only an accusation, nothing more.
24    It is not proof of guilt or anything else.  The defendant
25    therefore starts out with a clean slate.

1          Second, the burden of proof is on the Government

2    until the very end of the case.  The defendant has no burden

3    to prove his or her innocence or to present any evidence or

4    to testify.  Since the defendant has the right to remain

5    silent, the law prohibits you from arriving at your verdict

6    by considering that the defendant may not have testified.

7          Third, the Government must prove the defendant's

8    guilt beyond a reasonable doubt.  I will give you further

9    instructions on this point later, but bear in mind that in

10   this respect a criminal case is different from a civil case.

11         I'll now provide a summary of applicable law.

12         In this case, the defendant is charged with Bank

13   Fraud, two counts, and False Statement to a Bank.

14         I will give you detailed instructions on the law at

15   the end of the case, and those instructions will control your

16   deliberations and decision.  But in order to help you follow

17   the evidence, I will now give you a brief summary of the

18   elements of the offense that the Government must prove beyond

19   a reasonable doubt to make its case.

20         Bank Fraud:

21         First, that the defendant knowingly executed a

22   scheme or artifice;

23         Second, that the scheme or artifice was executed to

24   obtain money or other property from a financial institution

25   as alleged in the Indictment;

1          Third, that the scheme or artifice was executed by

2     means of false or fraudulent pretenses, false or fraudulent

3     representations, or false or fraudulent promises; and

4          Fourth, that the false or fraudulent pretenses,

5     representations or promises were material.

6          Next, False Statements to a Bank:

7          First, that the defendant made a false statement to

8     International Bank of Commerce as charged;

9          Second, that the defendant knew the statement was

10    false when the defendant made it;

11         Third, that the defendant did so for the purpose of

12    influencing a lending action of the institution, that is,

13    convincing the bank to give the defendant a loan for working

14    capital; and

15         Fourth, the International Bank of Commerce was

16    federally insured.

17         Regarding the conduct of the jury, now a few words

18    about your conduct as jurors in this process.

19         During the course of the trial, do not speak with

20    any witness, or with the defendant, or with any of the

21    lawyers in the case.  Please do not talk with them about any

22    subject at all.  You may be unaware of the identity of

23    everyone connected with the case.  Therefore, in order to

24    avoid even the appearance of impropriety, do not engage in

25    any conversation with anyone in or about the courtroom or the

courthouse.  It is best that you remain in the jury room during breaks in the trial and do not linger in the hall.

In addition, during the course of the trial, do not talk about the trial with anyone else, not your family, not your friends, not the people with whom you work.  Also, do not discuss this case among yourselves until I have instructed you on the law, and you have gone to the jury room to make your decision at the end of the trial.  Otherwise, without realizing it, you may start forming opinions before the trial is over.  It is important that you wait until all of the evidence is received, and you have heard my instructions on rules of law before you deliberate among yourselves.

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom.  This means that during the trial you must not conduct any independent research about this case, the matters in this case, and the individuals or corporations involved in this case.  In other words, you should not consult dictionaries or reference materials, search the Internet, websites, or blogs, or use any other electronic tools to obtain information about this case or to help you decide the case.  Please do not try to find out information from any source outside the confines of this courtroom.

I know that many of you use cell phones, the

1    Internet, and other tools of technology.  You also must not

2    talk to anyone at any time about this case or use these tools

3    to communicate electronically with anyone about the case.

4    This includes your family and friends.  You may not

5    communicate with anyone about the case through any means,

6    including your cell phone, through e-mail, Blackberry,

7    iPhone, text messaging, or on Snapchat or Twitter, or through

8    any blog or website, including Facebook, Google+, Myspace,

9    LinkedIn, or YouTube.  You may not use any similar technology

10   of social media, even if I have not specifically mentioned it

11   here.  I expect you will inform me as soon as you become

12   aware of another juror's violations of these instructions.

13          A juror who violates these restrictions jeopardizes

14   the fairness of these proceedings, and a mistrial could

15   result, which would require the entire trial process to start

16   over.

17          Course of trial:

18          I will now give you a roadmap to help you follow

19   what will happen over the entire course of this trial.

20   First, the Government will make an opening statement, which

21   is simply an outline to help you understand the evidence as

22   it is admitted.  Next, the defendant's attorney may, but does

23   not have to, make an opening statement.  Opening statements

24   are neither evidence nor arguments.

25          The Government will then present its witnesses, and

1     Counsel for the Defendant may cross-examine them.  Following

2     the Government's case, the Defendant may, if he wishes,

3     present witnesses whom the Government may cross-examine.  If

4     the Defendant decides to present evidence, the Government may

5     introduce rebuttal evidence.

6           After all the evidence is in, the attorneys will

7     present their closing arguments to summarize and interpret

8     the evidence for you, and the Court will instruct you on the

9     law.  After that, you will retire to deliberate on your

10    verdict.

11          Now, if there is nothing else, the trial will now

12    begin.

13          The attorneys have invoked the rule under Rule of

14    Evidence 615.  Except for the defendant and the identified

15    special agents who are exempted as necessary, any persons who

16    are witnesses or potential witnesses who will be testifying

17    in this case must now leave the courtroom until they are

18    called by the Court.  And, again, I'm exempting those parties

19    that were identified by Mr. Haag and Mr. Cogdell.

20          And, also, counsel are instructed that you should

21    notify the Court if at any point you recognize anybody in the

22    presence of the courtroom in violation of the rule.

23          At this point, who will be making opening statement

24    from the Government?

25          **MR. FRAUSTO:**  I will, Your Honor.

1    **THE COURT**:  Mr. Frausto, you may proceed, and you

2    have thirty minutes.  I will give you a one-minute reminder.

3              <u>OPENING STATEMENT BY THE GOVERNMENT</u>

4    **MR. FRAUSTO**:  This case is about a plan, a plan

5    that the defendant, Bart Wade Reagor, wanted to keep secret.

6    As the defendant stated in his own words, 100,000,000 percent

7    confidential, and that secret led to IBC Bank suffering the

8    largest loss related to a default in the bank's history.

9              Now, throughout this trial, you're going to hear

10   about a businessman who told and represented to a bank that

11   he needed more money to run and operate his business.  And

12   when the bank gave his business the money for that purpose,

13   the businessman took a portion of the money for himself.

14             After you see and hear all the evidence in this

15   trial, you're going to learn that the defendant, Bart Wade

16   Reagor, is this businessman.  The defendant told and

17   represented to IBC Bank that his business needed more working

18   capital.  And when IBC Bank provided his business with a

19   $10,000,000 business loan, the defendant took over

20   1.7 million dollars and placed it in his personal account

21   outside of the business for his personal use.

22             The defendant lied to IBC Bank because he intended

23   all along to take a portion of this money, as evidenced by an

24   e-mail he drafted six weeks before closing on the loan.  The

25   lie was material, because you will learn that IBC Bank would

1    not have approved this loan if they knew the defendant was

2    going to take a personal distribution for his personal use.

3            On May 31st, 2017, the defendant sent an e-mail to

4    his chief financial officer, Shane Smith, and his business

5    partner, Rick Dykes.  Subject line was handling capital.  And

6    in this e-mail, the defendant explained how he wanted to

7    handle the IBC loan proceeds.

8            The defendant instructed his chief financial

9    officer and directed him that he wanted one-third of the loan

10   proceeds from IBC Bank to be split between the defendant and

11   his business partner.  The defendant made it clear in this

12   e-mail that the one-third in loan proceeds was theirs, and

13   the leftover amount was to be kept in the business and used

14   for the business.

15           At the end of this e-mail, the defendant stated:

16   How we are going to handle this capital is 100,000,000

17   percent confidential between us and is not — in bold and in

18   all caps — anyone else's business.  Nobody's.  No bankers or

19   anyone else.  Our business.  Game on.

20           Now, other than the chief financial officer and the

21   defendant's business partner, no other person, no one from

22   IBC Bank and no other person from Reagor-Dykes Auto Group was

23   copied on this e-mail.

24           Now, this trial this week will focus on the one and

25   only defendant on trial, and that's Bart Reagor.

```
 1              For the remaining of my opening statement and
 2      throughout this trial, I will refer to Reagor-Dykes Auto
 3      Group as RDAG.  RDAG is the informal name of the defendant's
 4      business entities, and RDAG entities were primarily car
 5      dealerships engaged with selling new and used vehicles.
 6              RDAG started with one dealership in 2003 with a few
 7      employees and grew at a rapid pace to over thirteen to
 8      fifteen dealerships, several other business entities, and
 9      hundreds and hundreds of employees by 2017.  And in early
10      spring of 2017, there was a need for working capital to
11      continue to operate and run the business.
12              All three counts in this Indictment, two counts of
13      Bank Fraud and one count of False Statement to a Bank, stem
14      from a $10,000,000 working capital loan that IBC Bank
15      provided to D and R Acquisitions, LLC, an RDAG entity.
16              You will hear through this trial what working
17      capital is.  Working capital is the cash cushion for a
18      business to operate and cover day-to-day expenses.  Working
19      capital is to be kept in the business and used for the
20      business.
21              You're going to hear from several witnesses through
22      this trial, and one of those witnesses is going to be Bill
23      Schonacher, IBC Bank president, Oklahoma, and William
24      Woodring, the prior vice president for IBC Bank and who was
25      the main loan officer on this loan.
```

 1          Both of them will testify and tell you that had

 2   they known of the defendant's intention to divert the working

 3   capital loan proceeds to his personal account for his

 4   personal use then they would not have extended this loan.

 5   Both will testify that at no time did either of them advise

 6   the defendant or any RDAG representative that the working

 7   capital loan proceeds could be used for the defendant's

 8   personal use.

 9          The purpose of the loan was specific in the loan

10   agreement.  The borrower shall use the proceeds of the loan

11   to provide working capital to the borrower group, which was

12   for the business.

13          Woodring and Schonacher will testify that in early

14   April 2017, a month before the defendant's e-mail, IBC

15   representatives traveled to Lubbock, Texas to meet with RDAG

16   representatives.  Both Schonacher and Woodring met with the

17   defendant, Bart Reagor; the CFO, Shane Smith; and his

18   business partner, Rick Dykes, along with other RDAG

19   representatives.  And the defendant represented that RDAG

20   needed a working capital loan because of the rapid growth to

21   provide a cash cushion for the RDAG entities and for the

22   possibility of going public in the near future.

23          Other RDAG representatives relayed the same

24   information to IBC Bank, but no one, including the defendant,

25   ever informed IBC Bank that the defendant intended to take

1    some of the working capital loan proceeds for his personal

2    use as a personal distribution.

3           After the April 2017 meeting, IBC began gathering

4    information from RDAG to approve and structure the loan.

5    Woodring, again the main loan officer on behalf of IBC Bank,

6    prepared what they called a commercial loan memorandum, which

7    included representations that the defendant and other RDAG

8    representatives made, which included the need for working

9    capital.

10          Woodring also received information on ways RDAG

11   tried to improve cash flow, which included that owners

12   eliminated all distributions as of March 2017.  Ultimately,

13   the loan agreement was structured as a $10,000,000 working

14   capital loan, $5,000,000 to be disbursed after the first

15   closing, and $5,000,000 to be disbursed at the second closing

16   along with a real estate refinance loan.

17          Woodring had to present the loan for approval to

18   several committees and board of directors based on the size

19   of this loan.  And each time he presented it, he stated the

20   purpose of the loan was to provide working capital for the

21   business.  At no time did he inform the committees or board

22   of directors that the defendant intended to divert one-third

23   of the funds as directed in the defendant's May 2017 e-mail,

24   because nobody, nobody at IBC Bank knew that was the

25   defendant's intention, and because that was not the purpose

1    of the loan.

2         In fact, Schonacher, the bank president, is going

3    to testify and tell you he would not have even allowed this

4    to be brought to the table and presented for approval to any

5    committee, any board of director at IBC Bank if he had known

6    of the defendant's intention to take a personal distribution.

7         We plan to call Shane Smith, the prior CFO for

8    RDAG, and you're going to hear about his own fraudulent

9    activity.  And Smith will tell you that he was copied on the

10   May e-mail, and he complied with the defendant's directions

11   as soon as IBC provided RDAG with the loan proceeds.

12        You'll also hear from Steven Reinhart and about his

13   own fraudulent activity as well.  Steven Reinhart was the

14   legal/compliance director for RDAG, and he was part of what

15   they called the RDAG deal team, who helped review these IBC

16   loan documents.  And Reinhart is going to tell you, based on

17   his review, he understood that the loan proceeds were to be

18   used for working capital to continue to operate and run the

19   business.

20        Reinhart, the legal/compliance director, will tell

21   you he did not know that the defendant took a portion of the

22   loan proceeds for his personal use.  He didn't even know that

23   was the defendant's intention.  In fact, Steven Reinhart is

24   going to tell you the first time he learned that the

25   defendant took some of these loan proceeds was in this

1    criminal case.

2            You're going to hear from Thomas Hutchison, an

3    attorney who represents IBC Bank, and he's the attorney who

4    drafted this loan agreement, and he's going to tell you that

5    the purpose of the loan was to provide a $10,000,000 working

6    capital loan for the business, and the money could only be

7    used for that purpose.

8            FBI Investigator John Whitworth, he's going to

9    testify about his tracing of the working capital loan

10   proceeds from the IBC loans as soon as they released it all

11   the way down to the defendant's personal banking account at

12   Prosperity Bank.  Investigator Whitworth will tell you how

13   the defendant diverted over $1.7 million from the working

14   capital loan proceeds into his Prosperity Bank account, which

15   was his personal bank account outside of the business.

16           He will also tell you how the defendant spent and

17   used some of those proceeds for his personal use, including

18   on the defendant's mansion on 19th Street and not working

19   capital as the defendant represented to IBC Bank.

20           Steve Dawson, a certified public accountant and

21   certified fraud examiner, he will tell you what working

22   capital is, and that the defendant's immediate distribution

23   of the working capital loan proceeds into his personal

24   account is inconsistent with working capital.

25           At the end of this trial, it will be clear IBC

1  provided the defendant with a business loan for working

2  capital based on the defendant's statements and

3  representations to the bank, including at the April 2017

4  meeting.  IBC did not provide a personal loan to the

5  defendant.

6       The defendant's representation to the bank was

7  false, because it omitted a material fact; that is, that the

8  defendant intended to take a part of the loan for his

9  personal use as evidenced by his e-mail in May 2017,

10 approximately six weeks before closing on the loan.

11      Not only did he omit a material fact, he actively

12 concealed that omission.  He instructed his chief financial

13 officer and his business partner not to tell anyone about

14 diverting the funds to the personal accounts, keep it

15 100,000,000 percent confidential and make sure not to tell

16 the banks.

17      And the defendant ultimately directed and caused

18 the loan proceeds to be placed in his personal banking

19 account for his personal use.  After each disbursement, his

20 CFO complied and cut him a check for his one-third as the

21 defendant instructed in that May e-mail.

22      So, at the conclusion of this case, we will ask you

23 to return a verdict of guilty as to all three counts.  Thank

24 you.

25           **THE COURT**:  And, at this time, Mr. Cogdell, I know

1   it is the defendant's prerogative to hold opening statement

2   until its case-in-chief.  Do you intend to proceed with

3   opening statement at this time?

4           **MR. COGDELL**:  I do, Your Honor.

5           **THE COURT**:  You may proceed, and you have

6   thirty minutes.  I will give you a one-minute warning.

7   <u>**OPENING STATEMENT BY THE DEFENDANT**</u>

8           **MR. COGDELL**:  Thank you.  Good morning.  My battery

9   is running low.  I assure you my internal battery is not

10  running low.

11          My name is Dan Cogdell.  I am one of the lawyers,

12  along with my associate, Nick Norris, Matt Powell, and Tray

13  Payne, who are representing Bart Reagor.

14          It is my honor to give this opening statement.  I'm

15  going to walk you through our version of the events.

16          What the evidence is going to show at the end of

17  the day is, there was no crime.  Bart Reagor committed no

18  crime, period, full stop.  He is not guilty of these charges.

19  He didn't commit bank fraud.  He didn't make any false

20  statements to anyone at IBC, and he always believed he could

21  use the funds exactly as he did.

22          Bart is an interesting character, and I think

23  before we get into the evidence -- well, he did place his

24  trust in his CFO, Shane Smith, but, before we get into the

25  evidence, I want to talk about who Bart is.

1         You're going to hear Bart on some speeches, some

2    pep rallies, some colorful language.  He is an inspirational,

3    motivational, Type A personality to the extreme, but it's

4    important to know where he came from, so we can find out who

5    he is today.  It's important to focus on his journey, to take

6    a look at where he came from, and to find out how he got

7    here.

8         It was very humble beginnings.  He grew up in

9    Richardson, Texas, which, as most of you know, is a little

10   bedroom community outside of the Dallas area.  He came from

11   two working-class parents, both very humble, very decent

12   people.  His dad was involved in sporting goods.  His mother

13   was a stay-at-home mom.

14        Sports were very, very important to Bart.  He --

15   they were his alpha and his omega in high school and college.

16   He was told he was too small to play college football.  Bart

17   went on to play without a scholarship, walked on, and got a

18   scholarship and lettered for four years at Texas Tech.  He

19   worked for the Texas Tech coach legend Spike Dykes, which is

20   how we get into the firm Reagor-Dykes later on, but Spike

21   would have a very, very strong influence on Bart Reagor.

22        The car business.  He worked to put himself through

23   college selling cars.  He married his high school sweetheart

24   — actually, I think they met in the 8th grade; she's here

25   today — when he was a junior and at Texas Tech, and he went

1   to work almost as a lark selling cars.  He discovered the car

2   business, and he discovered that he was very, very, very good

3   at it.  After his first two or three days selling cars, Bart

4   decided that he could make more money selling cars in two or

5   three days than he could make at any other job in two or

6   three months.

7         He worked for a number of dealerships.  He worked

8   at Pollard Ford from 1987 to 1992.  He started in '93 his own

9   small used car dealership in Lubbock.  In '93, he was hired

10   by a dealership in Virginia.  His wife hated living in

11   Virginia, so they didn't stay there long.

12         He came back, returned to Pollard Ford, worked

13   there for a couple of years.  In -- from '96 to 2003, he

14   worked for Gene Messer Auto Group.  That's one of the largest

15   auto groups in the Panhandle area.

16         In 2003, he opened the Reagor Auto Mall.  It was a

17   small shop.  He had one employee, Connie Campbell, his office

18   manager, but this time his business flourished very, very,

19   very well and grew quickly.

20         He joins forces with Rick Dykes in 2006.  Reagor

21   was the marketing and sales guru.  Dykes was the financial

22   and business and capital guru.  They hired Shane Smith.

23   You're going to hear a lot from Shane Smith and a lot about

24   Shane Smith.  He was the CFO that was hired in 2008.  Shane

25   was leaving his job at Ford Motor Credit.  Smith had an MBA

1   and was well respected in the industry, and he impressed

2   Dykes and Reagor.

3          I hearken back to a thing that Mr. Frausto said

4   early on in his opening statement.  He said that these -- the

5   conduct by Mr. Reagor caused the largest loss in IBC's loan

6   history.  I think you're going to find that to be an

7   absolutely incorrect statement.  You're going to find out

8   what caused the massive frauds and the massive losses, but it

9   wasn't Bart Reagor.

10         Dykes and Reagor hired Shane Smith, the CFO.  He

11  was the only CFO they ever had.  His initial salary was -- it

12  was 70,000 in 2008.  Ten years later, he's making $800,000 a

13  year.  Let me repeat.  $800,000 a year as a CFO.

14         The Reagor-Dykes Auto Group dominates the market.

15  They're all dealerships in North and West Texas.  They had an

16  amazing growth.  The business model would stay lean and mean.

17  No fancy showrooms, no gimmicks.  They simply outperformed

18  the competition.

19         In 2018, they amassed a total of twenty-one

20  dealership rooftops.  They had a dedicated e-commerce

21  location, 700 full-time employees.  In a little longer than

22  fifteen years, that man, through his sweat, through his

23  effort, through his intensity, through his training, created

24  this beast.  700 full-time employees.

25         His payroll was $11,000,000 a month.  He didn't

1   come from money.  He didn't come from a fancy school, no

2   offense to Texas Tech.  He's no -- he's no financial genius.

3   What he is, is really, really, really good at selling cars

4   and motivating people and requiring his people to do the

5   right thing.

6          Two Ford franchises, two Lincoln franchises, one

7   Toyota franchise, one Mitsubishi franchise, two Chevy

8   franchise, one GMC franchise, one Cadillac franchise.  I

9   assure you that that enterprise would have never been created

10  but for Bart Reagor, no way, no how.

11         Sales numbers were literally off the chart.  In

12  2016, they sold $600,000,000 worth of vehicles, 600,000,000

13  in West Texas.  In 2017, 740,000,000 in sales in West Texas.

14  We're talking Snyder, Pampa, Dumas.  We're not talking --

15  we're not talking River Oaks in Houston or Highland Park in

16  Dallas.  We're talking blue-collar, hardworking country

17  living people where they're selling $740,000,000 worth of

18  cars.

19         In 2018, they were on pace for an $800,000,000

20  year.  The numbers were simply staggering because of the

21  success that Bart Reagor, in large part, and his financial

22  and capital partner, Rick Dykes, contributed and created.

23         But something was rotten in the woodpile, and

24  that's a fellow by the name of Shane Smith, and we're going

25  to get to that.

 1          But how did Bart and RDAG succeed?  He hired almost

 2     all college-educated personnel and paid them well.  He

 3     inspired his companies to sell and focus on the customer to

 4     succeed.

 5          You're going to hear some comments that are going

 6     to offend you, and you have the right to be offended.  At

 7     some of these sales meetings, he talks like Glengarry Glen

 8     Ross.  He's motivating his people with improper language,

 9     sell, sell, sell, dropping words that shouldn't be heard in a

10     district courtroom, but that's how he motivated his people.

11     Whether it was the puritanical or Christian or perfect way or

12     not, it was working.  There wasn't another car guy in the

13     country that was as successful as he was at motivating

14     people.  He was in the middle of nowhere kicking behind and

15     taking names.

16          Reagor believed and trusted in his employees and

17     his business executives to do the right thing.  He paid them

18     extremely well and motivated them extremely well.

19          In 2017, Bart believed his dealerships were great.

20     In fact, the dealerships were selling cars at astronomical

21     rates.  RDAG dealerships were among the top 10 in the

22     country, top 10 in the country, sometimes higher in multiple

23     categories.  Think about that.  In Lubbock, Texas — that's

24     your centerpiece store — you're in the top 10 in the

25     country.  He's doing something right.

1        He had received numerous president's awards for the

2    sale from Ford, Toyota, et cetera, et cetera, et cetera.

3    Bart believed the future —— future, lawyer misspells the word

4    "future" —— to be extremely ripe.

5        Reagor and Dykes invested -- there was an audit

6    that came, and we'll get to it, but they invested their own

7    funds into RDAG after the 2017 audit.  There's an audit that

8    we'll talk about in a little bit that wasn't great.  Those

9    things happen in the automobile business, and they decided to

10    invest their own funds before they applied for the IBC loan.

11        Bart believed that the dealerships were still in

12    great shape based upon Shane Smith's representations, and

13    Reagor believed that by investing his personal funds into

14    RDAG he had the right under the loan agreement —— and we'll

15    get into the weeds of the loan agreement —— to reimburse

16    himself for those funds that he had invested.

17        Reagor is not a banker, a lawyer, an accountant.

18    He relied heavily on Shane Smith.  Shane Smith is a smart

19    guy.  He's a Master's, he's clever, he's overwhelming, he's

20    overpowering, according to some folks.  He's -- whatever he

21    is, Bart believed in him and relied on him completely.  He

22    trusted Shane Smith like a brother.  Unfortunately, Shane

23    Smith was Judas.  He wasn't a brother.  He defiled Bart and

24    the company in ways that we'll get into that were

25    astronomical.

```
 1          Reagor is a car salesman.  He's not an accountant.

 2    He built a 700-person company on trust and delegation.  He

 3    expected his employees to do the right thing.  He trusted his

 4    CFO, Shane Smith, expressly on matters of finance.  Smith

 5    betrayed Reagor's trust in the worst possible way, and you'll

 6    hear about it.

 7          Bart Reagor and Rick Dykes enter into a loan

 8    agreement with IBC in 2017.  Bart absolutely believed that

 9    the financial disclosures and the loan application were

10    accurate.  He believed that those loan applications were

11    accurate because he was relying upon Shane Smith to tell him

12    the truth.  Reagor believed the loan agreement allowed him to

13    take the distributions as he did.

14          Shane Smith is a person that led the discussions

15    with IBC and led the loan negotiations for months before the

16    deal was done.  Let's stop there.  Shane Smith was the CFO.

17    He unquestionably knew -- all right.  I was going to do it

18    too.  He unquestionably knew of Bart's plans and Rick Dykes'

19    plans to take some of the loan distributions from this loan

20    from IBC.

21          He was the person; that is, Shane Smith was the

22    person that was negotiating with the IBC folks, not Bart

23    Reagor, Shane Smith.  Reagor and Dykes enter into a loan

24    agreement with the IBC Bank.  Smith personally presents the

25    financials to IBC.  Smith was aware all along that Reagor and
```

 1    Dykes were going to use the loan proceeds to reimburse

 2    themselves for their capital contributions.

 3             Guess who gave them the checks to do that?  Shane

 4    Smith.  At no time did Smith ever advise Reagor he couldn't

 5    use the proceeds as he had planned to do.  Smith is the

 6    articulate guy.  Smith is the person with the MBA.  Smith is

 7    the CFO.  Smith is the person that Reagor relied on most

 8    significantly for financial decisions.  Bart asked Smith,

 9    told Smith:  Can I do this?  Smith said:  You can do it.

10    Here's the check.

11             The facts:  The IBC loan language actually allows

12    these distributions.  Reagor believed the IBC loan agreement

13    allowed him to do what he did.  Reagor took distributions to

14    reimburse himself for money he put into his company.  Rick

15    Dykes took the same loan proceeds distributions as did

16    Reagor.

17             Let's stop for a minute.  There's this suggestion

18    that Mr. Reagor took money from the IBC loan for personal

19    purposes or personal reasons.  Guess who was personally

20    liable on that loan?  Bart Reagor.  He signed personally.  He

21    was personally liable on the loan.  It wasn't if the company

22    was on the hook and Bart was not.  The banks required him to

23    be personally liable.

24             The all-caps e-mail, we've already heard a little

25    bit about it, but Bart always uses all caps.  I mean, when he

1    sends an e-mail to his wife, let's go to dinner, it's

2    exclamation point, all caps, boom, bang, let's get it done.

3    I mean, to emphasize something in all caps is about as

4    unusual as the sun coming up in the east and setting in the

5    west.  He always uses all caps.  That's just his

6    overenthusic -- overenthusiastic and sometimes annoying

7    nature.  That's what he does.

8         The idea that he sent an e-mail to his capital

9    partner, Mr. Dykes, stating his intention, after conferring

10   with Dykes, Reagor then sent directions to Smith, and Reagor

11   wanted -- wanted privacy for business reasons, not for

12   criminal reasons.  He doesn't want any people inside the

13   company knowing that he's getting a million nine, a million

14   six, a million seven.  It's a small company all things

15   considered.  He doesn't need everybody there to know, oh, I'm

16   getting 1.6.  He doesn't need the people of Lubbock to know

17   that he's getting 1.6 or 1.7.  He does it for business

18   reasons, not for criminal reasons.

19        I suggest to you, if you're going to commit a

20   crime, you don't put it in an e-mail, but you will see e-mail

21   after e-mail after e-mail where he is telling his partners,

22   his CFO, his employees:  Do the right thing, do the right

23   thing, do the right thing.  We run this business the right

24   way.

25        Reagor did not knowingly lie to IBC, make a false

1    statement to IBC, or commit bank fraud.

2           Shane Smith, the government witness --

3           How much time do I have left, Your Honor?

4           **THE COURT**:  Twelve minutes.

5           **MR. COGDELL**:  Thank you.  Shane Smith, the

6    government witness, is testifying in hopes of reducing his

7    exposure.  He has pled guilty to a frankly horrific offense.

8           The guidelines calculations under the sentencing

9    guidelines that judges, like our fine Judge Kacsmaryk, use in

10   setting his sentence are titanic.  I think he's looking at a

11   25-year calendar year sentence.

12          There's one absolute certainty about Mr. Smith.

13   Just as sure as today is Tuesday, he's a liar.  He made a

14   written statement to -- after Reagor-Dykes blew up, for lack

15   of a better description, he met with a lawyer, and he made a

16   written statement to that lawyer telling that lawyer that

17   Bart was unaware of any fraud.  When he met with the

18   Government, one of the first things he told the Government

19   was:  Yes, that statement that I made to the lawyer where I

20   said Bart was unaware of fraudulent activity was true.  He

21   said everything in that statement was true.

22          Well, apparently, now he's going to come in here

23   and say:  Well, I lied to the lawyer.  I lied to the

24   Government.  I lied to the FBI, but I'm telling you the

25   truth.  It can't be true that he's telling you the truth.

 1   His truth changes every single time he changes -- he

 2   testifies.

 3            Family.  Bart treated Shane Smith like family.  He

 4   loved him.  He loved him like a brother.  Shane had a special

 5   needs child that Bart took extremely good care of and was

 6   extremely attentive to.  He loved Shane Smith, and he loved

 7   Shane Smith's family.

 8            I would like to thank everyone, Shane Smith writes.

 9   Sincerely I appreciate the team work that everyone shows in

10   this company.  People talk about their company being like

11   family all the time.  This proves and lives it.  Family is

12   what we are.  Thank you all, Shane Smith.

13            Well, here's what his idea of family is:  He has

14   pled guilty with a plea agreement represented by a lawyer,

15   Gerry Morris, who's one heck of a good lawyer, and he is

16   seeking a sentence reduction on what's called a 5K1.1 motion

17   for substantial assistance.

18            The only way he can get his sentence reduced is by

19   coming here and testifying in front of you.  In fact, the

20   only way that he can get his sentence reduced is by coming

21   here testifying in front of you, testifying favorably for the

22   Government and for the Government, who has the sole

23   discretion in this matter, to file a Motion for Downward

24   Departure for substantial assistance.

25            That's a bunch of lawyer words that explain to me,

1   he's going to come in here and say whatever suits him best,

2   whatever pleases the prosecution the best gets him the best

3   result.  I'm not throwing darts at these lawyers.  They're

4   lawyers.  They're ethical lawyers.  They're appropriate

5   lawyers.  I'm not suggesting for a second they're doing

6   anything wrong.  I am suggesting that Shane Smith will come

7   in and say the cow jumped over the moon if it thinks -- if he

8   thinks it will benefit him in terms of getting a sentence.

9         Family.  Shane Smith.  Bart relied on Smith's

10  financial reports, which we now know were fake.  IBC relied

11  on Shane Smith's financial reports or financial statements,

12  which we now know are inaccurate.

13        Now the Government will ask you to rely on Smith.

14  His financial reports were fake.  His financial statements

15  were fake, and he is a fake.

16        The 2017 audit.  In March of 2017, there was an

17  audit, and there was -- as I mentioned earlier, there was

18  some need for additional contributions to be put into the

19  Reagor Auto Dykes Group [*sic*] by Mr. Reagor and by Mr. Dykes.

20        This is an e-mail that Shane Smith sends to Bart

21  about the bank balances saying, you know, basically we just

22  need to get 400 now, 400 later, and we'll be good.  Wrong.

23  The numbers were way, way worse than that.

24        Then he sends more information from Smith, which is

25  still not the whole truth.  Shane, Bart writes.  Again, all

Case 2:21-cr-00025-Z-BR  Opening Statement of Defendant M. Crandell  Document 168 Filed 03/22/22  Page 36 of 346  PageID 1608

36

```
 1   caps.  I said it was about as unsurprising as the sun setting
 2   in the west that he writes in all caps.  This is all caps.
 3   Shane, it makes me concerned that you were concerned.
 4   Shouldn't we be ready to have a floor-plan audit on any given
 5   day?  If not, let's get the RDAG to a point that we are ready
 6   for a floor-plan audit every day.  I want us to operate clean
 7   at every dealership every day.
 8           This is the man who the Government contends is
 9   making false statements to benefit himself to a bank.  That
10   is completely inconsistent with the e-mails that he is
11   sending to Shane Smith at the very relevant time.
12           Shane Smith gives him some more information.  It's
13   still not true.  On March 29th, the audit is complete, and
14   Smith offers an apology:  Thank you, Bart.  I blame this on
15   me as much as anyone or more.  I apologize for letting anyone
16   down.  I know I have learned and grown from this, and I will
17   get better.
18           You know what he got better at?  Lying and
19   cheating.  It only got worse for Shane Smith from then on in.
20           Let's look at what Smith did.  Relying upon Smith's
21   promises that the business were doing well, Reagor put in
22   millions of his own money back into RDAG before the IBC loan
23   funded.  Based on the audit, Reagor needed to invest his own
24   funds back in the business, and he relied on Shane, on
25   Smith's representations that the companies were doing well.
```

1        What did Shane Smith do?  He continues the lie.  He

2   continues the numbers-pumping.  He's telling people gross

3   profit was up 24 percent.  781,000,000 is a 20 -- 21

4   increase.  What he's not doing is telling them the underbelly

5   of what's actually going on.

6        The loan agreement.  The bank executives and their

7   lawyers negotiated this agreement with the RDAG staff, their

8   lawyers, and CFO Shane Smith.  Neither Reagor nor Dykes was

9   involved in the negotiation.  The bank lawyers redlined or

10  changed different sections to make the deal better for the

11  bank.  Bart was not aware.  Bart was not involved.  That was

12  not Bart's doing.

13       The key is Section 7.12.  You're going to hear more

14  about Section 7.12 than you ever wanted to in your entire

15  life, I assure you.  This is the loan agreement.  It went

16  through a number of iterations changing 7.12, this and that,

17  but here is the bottom line:  Distributions.  Borrower will

18  not, and will not permit any other borrower group member to,

19  declare, or make, or pay any distributions, either in cash or

20  in property, or redeem, retire, repurchase, or otherwise

21  acquire its equity interests, if a default or event of

22  default exists or would result therefrom.

23       Isn't that -- isn't that a mouthful?  I'll have

24  some experts that explain what that really means.  But Reagor

25  was on none of those e-mails on the back and forth about the

1    critical section of the loan agreement, which is

2    Section 7.12.  Again, he didn't redline or negotiate the

3    agreement.  He completely trusted his CFO, Shane Smith, who

4    had -- and had told him of the plans to utilize portions of

5    the funds in the celebrated all-caps e-mail.  Reagor believed

6    all the folks who were working on this deal to tell him if he

7    couldn't do it if he wasn't permitted to do so.  He was

8    relying upon people he paid and paid well.

9            The point, Section 7.12, we believe it always

10   allowed for distributions.  They're going to have their

11   experts.  We're going to have our experts.  I assure you each

12   expert will probably have a different opinion as to exactly

13   what their opinion of 7.12 is.  Again, the experts will

14   testify as to what this actually means.

15           Reagor believes, and the evidence will show, he was

16   permitted, he was allowed, it was permissible for him to do

17   what he did.

18           Working capital.  We heard the phrase "working

19   capital loan, working capital loan, working capital loan" a

20   number of times in Counsel's opening statement.  It's

21   defined -- it's mentioned once.  I have two minutes.  It's

22   mentioned one time in the loan agreement.  It's not defined.

23           Working capital is simply a number you get when you

24   subtract current liabilities from current assets.

25           The offenses charged.  Two counts of Bank Fraud,

1    one count of Making False Statements to a Financial

2    Institution, both require specific mental requirements on the

3    part of Mr. Reagor. You cannot accidentally commit these

4    crimes. In other words, you have to intentionally,

5    knowingly, willfully commit these crimes.

6          The Government has the burden of proving the intent

7    that Bart Reagor -- that -- the intent of Bart Reagor beyond

8    a reasonable doubt. There is no captain-of-the-ship doctrine

9    in criminal law. What I mean by that, there is no, well, he

10    should have known because he's the captain of the ship. No,

11    they have to prove their case against Bart Reagor beyond a

12    reasonable doubt.

13          Bank fraud, the defendant knowingly executed a

14    scheme or artifice to defraud. Knowingly, as that term has

15    been used, is voluntarily and intentionally and not because

16    of mistake or accident.

17          False statement to a bank, he knew the statement

18    was false when he made it.

19          Reasonable doubt is the kind of doubt -- is proof

20    of such a convincing character that you would be willing to

21    rely and act upon it without hesitation in the most important

22    decisions of your own affairs. It is the highest standard --

23    we'll get to this in argument, but it is simply the highest

24    standard recognized in the law.

25          And what the evidence will show very simply, very

1  clearly, very truthfully is Bart Reagor is not guilty of what
2  he's charged with, period, full stop.

3  　　　　　Thank you for your patience.  Thank you for your
4  time.  We look forward to presenting our case to you.  Thank
5  you.  Thank you, Your Honor.

6  　　　　THE COURT:  That concludes opening statements.
7  Before the Government opens its case-in-chief and calls its
8  first witness, I will take inventory of the exhibits that
9  have been pre-admitted.

10  　　　　　The attorneys in this case worked hard with the
11  Court to go through the voluminous proposed exhibits in this
12  case.  We adjudicated all objections, and we have a list of
13  exhibits that have been pre-admitted.

14  　　　　　I believe, Mr. Haag, there is a stipulation in ECF
15  No. 62 on Government's Exhibit 56.  Is that correct?

16  　　　　THE HAAG:  It is, Your Honor, and that stipulation
17  was signed this morning.  It's in the original exhibit book,
18  and if I may approach, I do have a copy --

19  　　　　THE COURT:  You may --

20  　　　　MR. HAAG:  -- for the Court.

21  　　　　THE COURT:  -- approach.  And, Mr. Cogdell, is that
22  your understanding too that Government's Exhibit 56 is
23  stipulated?

24  　　　　MR. COGDELL:  It is, Your Honor.

25  　　　　THE COURT:  Okay.  Thank you.  And, at this time,

1   I'll instruct counsel to track with the Court as I announce

2   into the record the exhibits that have been pre-admitted and

3   may be presented to the witnesses and published to the jury

4   without further authentication or foundation.

5          Government's Exhibits 1 through 3, 4, 5 through 25,

6   26, 27 through 30, 33 through 38, 39, 41 through 47, 48, 49,

7   51, 56 and 57, 51 in the redacted form agreed to at the

8   Pretrial Conference, and then 31 and 32 for demonstrative

9   purposes only.

10         The following exhibits for the Defendant are

11  pre-admitted.  They may be presented to the witness and

12  published to the jury without further foundation or

13  authentication.  1 through 3, 5, 7 through 15, 20 through 35,

14  47, and then as discussed at the Pretrial Conference and

15  agreed, Defendant's Exhibit 6, 16, 17, 18, and 19 are

16  conditionally admitted pending authentication.

17         Mr. Haag, does that listing reflect your

18  understanding of which exhibits are pre-admitted or

19  conditionally admitted?

20         **MR. HAAG**:  Yes, Your Honor, it does.

21         **THE COURT**:  Okay.  And, Mr. Cogdell, will you

22  confirm that that list reflects your notes on which exhibits

23  are pre-admitted or conditionally admitted?

24         **MR. COGDELL**:  Yes, sir.

25         **THE COURT**:  Okay.  Mr. Haag, you may call your

1  first witness.

2                    <u>GOVERNMENT'S EVIDENCE</u>

3        **MR. HAAG:**  Thank you, Your Honor.  The United

4  States calls William Patrick "Bill" Schonacher.

5        **THE COURT:**  Mr. Schonacher, you may approach the

6  witness chair.

7        **AGENT ANDRESEN:**  He had to step into the restroom

8  quickly.

9        **THE COURT:**  Okay.

10        **MR. HAAG:**  May I have just one moment, Your Honor,

11  real quick?

12        **THE COURT:**  Yes, you may.  And I'll remind counsel,

13  if you need to approach, just briefly request permission.

14  Please make certain that opposing counsel has copies of any

15  documents that you're presenting to the witness, and then

16  I'll also allow publication to the jury.  Just make certain

17  that opposing counsel has copies of anything you are

18  presenting.

19        **MR. HAAG:**  Yes, Your Honor.

20     **(Pause.)**

21        **THE COURT:**  Mr. Schonacher, you may approach the

22  witness chair.  I ask that you remain standing for

23  administration of the oath.

24        **THE WITNESS:**  Yes, sir.

25        **THE COURT:**  And my courtroom deputy will administer

```
 1    the oath.
 2         (The witness was sworn by the courtroom deputy.)
 3              THE COURT:  Please take a seat.  I'll admonish you
 4    to speak clearly into the microphone both for record purposes
 5    and clarity.
 6              And, Mr. Haag, you may proceed with your direct
 7    examination.
 8              MR. HAAG:  Thank you, Your Honor.
 9                   WILLIAM PATRICK SCHONACHER,
10         having been first duly sworn, testified as follows:
11                        DIRECT EXAMINATION
12    BY MR. HAAG:
13    Q.   Good morning, Mr. Schonacher.
14    A.   Good morning, sir.
15    Q.   Would you please state your name.
16    A.   William Patrick Schonacher.
17    Q.   How are you employed?
18    A.   I'm the president and CEO of IBC Bank Oklahoma.
19    Q.   How long have you been the president and CEO of IBC
20    Bank?
21    A.   Seven and a half years.
22    Q.   How long have you been employed by IBC Bank?
23    A.   Since 2004.
24    Q.   How long have you been in the banking industry?
25    A.   About thirty years.
```

1    Q.    Where do you office out of?

2    A.    Oklahoma City.

3    Q.    How many IBC Bank locations do you supervise?

4    A.    Forty-six.

5    Q.    In general, what geographic area do those forty-six

6    location serve?

7    A.    The entirety of the State of Oklahoma and North Texas.

8    Q.    Are the deposits of IBC Bank insured by the Federal

9    Deposit Insurance Corporation?

10   A.    Yes, sir.

11   Q.    And during the time period from 2016 until 2018, were

12   the deposits of IBC Bank insured by the Federal Deposit

13   Insurance Corporation?

14   A.    Yes, they were.

15         **MR. HAAG**:  Your Honor, at this time, I would ask to

16   read Government's Exhibit 56 into the record, which is the

17   signed stipulation.

18         **THE COURT**:  It is stipulated by the parties.  You

19   may proceed.

20         **MR. HAAG**:  Thank you, Your Honor.  If we can bring

21   up Government's 56, please.

22         Now, what we see here is an unsigned version of

23   this stipulation, but that was signed this morning and is in

24   part of your exhibit book, but I will go ahead and read the

25   stipulation now.

Government's 56 Stipulation Read

1          The United States of America, by and through Prerak

2    Shah, Acting United States Attorney for the Northern District

3    of Texas, and Joshua Frausto, Assistant United States

4    Attorney, and defendant, Bart Wade Reagor, individually and

5    by and through his attorney, Dan Cogdell, hereby stipulate

6    and agree as follows:

7          1.  That International Bank of Commerce is a

8    financial institution whose deposits were insured by the

9    Federal Deposit Insurance Corporation;

10         2.  That IBC was federally insured during the dates

11   alleged in the Indictment; and

12         3.  That this stipulation be admitted into evidence

13   without objection as Government's Exhibit 56.

14   Q.   **(By Mr. Haag)**  Does IBC Bank handle commercial loans?

15   A.   Yes, sir, we do.

16   Q.   We're going to discuss one commercial loan in

17   particular, so let's turn directly to that loan.

18        Do you know Bart Wade Reagor?

19   A.   Yes, sir, I do.

20   Q.   Do you see him in the courtroom today?

21   A.   Yes, sir, I do.

22   Q.   Would you please point him out.

23   A.   That gentleman right there (indicating).

24        **THE COURT**:  Let the record reflect that the witness

25   identified the defendant, who is present.

1    Q.    **(By Mr. Haag)**  What company was the defendant affiliated
2    with?
3    A.    Reagor-Dykes Auto Group and affiliated companies.
4    Q.    What was his role with the Reagor-Dykes Auto Group?
5    A.    He was the founder, president, and CEO.
6    Q.    What business sector was the Reagor-Dykes Auto Group
7    involved in?
8    A.    Automotive, the automotive industry.
9    Q.    When did you first meet the defendant?
10   A.    I first met the defendant in a meeting in his office in
11   Lubbock.  I don't recall the date exactly.
12   Q.    Do you recall the month and the year?
13   A.    Sometime in 2017 possibly.  I don't recall the exact
14   date.
15   Q.    If I were to say April 4th, 2017, would that be
16   consistent with your recollection?
17   A.    That would be consistent, yes, sir.
18   Q.    Where did you meet the defendant at?
19   A.    In his office in Lubbock.
20   Q.    Who all was there at that meeting on behalf of the
21   Reagor-Dykes Auto Group?
22   A.    Mr. Reagor, Mr. Dykes, Shane Smith, and a few other of
23   their management team.
24   Q.    Who on behalf of IBC Bank was present at that meeting?
25   A.    Myself; the president of my bank in Tulsa, Andrew

1  Levinson; the vice president in our Tulsa office, Mr. William

2  Woodring.  We brought an analyst along.  I can't remember

3  which one.  And I think John Thompson was there as well, who

4  is an investment advisor.

5  Q.  Was John Thompson affiliated with the Reagor-Dykes

6  entities, or is he an independent consultant?

7  A.  He's independent.

8  Q.  What was John Thompson's role in this transaction?

9  A.  He was making an introduction.  We had a relationship

10  with John Thompson for many years through a different --

11  different group, and he had moved into Lubbock with some

12  investment ideas and possibilities, and I think met Mr.

13  Reagor and thought we might benefit meeting.

14  Q.  Before this April 2017 meeting, had any bankers with IBC

15  Bank other than yourself met with the Reagor-Dykes Auto

16  Group?

17  A.  Yes, they had.

18  Q.  Who were those bankers?

19  A.  It was Mr. Levinson, Mr. Woodring, and the team in Tulsa

20  who was underwriting the possible loan opportunity.

21  Q.  Why did you go in April 2017 to meet with the defendant

22  and his group at the Reagor-Dykes Auto Group?

23  A.  Well, this was a large loan transaction, and we didn't

24  know these people, so I wanted to put my eyeballs on them.

25  Q.  You said it's a large loan transaction.  Approximately

1  how much was at stake with this loan?

2  A.   More than $35,000,000.

3  Q.   Who did most of the talking on behalf of the

4  Reagor-Dykes Auto Group during that April 2017 meeting?

5  A.   Mr. Reagor and Mr. Smith did most of the talking.

6  Q.   According to the defendant and the other Reagor-Dykes

7  representatives, why did Reagor-Dykes need a loan?

8  A.   They needed -- they needed working capital because their

9  business was growing so rapidly.

10  Q.   Now, there's going to be two components of this loan

11  that we'll be discussing here today.  What was the first

12  component of the loan?

13  A.   The first component was a $10,000,000 working capital

14  loan.

15  Q.   And what was the stated purpose or need for that loan?

16  A.   It was really to inject capital into the business so it

17  could continue to grow.

18  Q.   What was the second component of the loan?

19  A.   It was a real estate consolidation loan.

20  Q.   How would a real estate consolidation loan have

21  benefited the defendant and the Reagor-Dykes Auto Group?

22  A.   Well, it benefited the defendant in many ways.  They had

23  currently -- at the time they had had real estate loans

24  all -- at many, many banks, and consolidating it really

25  provides for efficiency, less cost, and the possibility that

1    you can utilize that asset to finance additional working

2    capital, which is the way we had proposed it.

3    Q.   Was there any discussions during the April 2017 meeting

4    about Reagor-Dykes having an eye to going public?

5    A.   There was -- there was discussion as it related to them

6    wanting to be the largest auto dealership group in the United

7    States, and going public was one of those possible ideas.

8    Q.   Did the Reagor-Dykes representatives tell you that they

9    needed the working capital in order to march towards that

10   objective?

11   A.   Yes.

12         **MR. COGDELL**:  Objection, hearsay, Your Honor.  The

13   Reagor-Dykes representative, who?

14         **THE COURT**:  Mr. Haag?

15   Q.   **(By Mr. Haag)**  Did the defendant make representations

16   that they needed working capital to move towards that vision?

17   A.   Yes, they did.

18         **THE COURT**:  And the witness may respond as that

19   question was reformulated.  You may proceed.

20         **MR. HAAG**:  Thank you, Your Honor.

21   Q.   **(By Mr. Haag)**  Did the defendant at any time during the

22   April 2017 meeting tell you that he intended to take part of

23   the working capital loan for his own personal use and

24   benefit?

25   A.   He did not.

1  Q.   If the defendant had told you in April 2017 that he

2  intended to take a portion of the working capital loan for

3  his own personal use and benefit, would you have approved the

4  loan?

5  A.   I would not have.

6  Q.   And why would you not have approved the loan?

7  A.   Well, the intent of a working capital loan is to put the

8  money in the business, not to take the money out of the

9  business, and it wouldn't -- the business wouldn't have

10 gotten any benefit had the money -- we'd known the money was

11 going to be removed.

12 Q.   As a banker, when you make a loan, do you look towards

13 the borrower's ability to repay that loan?

14 A.   That is a critical component of evaluating a loan

15 request.

16 Q.   If a borrower takes money from a business, how does that

17 impact the bank's ability to get the loan repaid?

18 A.   Well, it makes it much more difficult, in that, the

19 money that was intended to be put into the business is not

20 being utilized to support the business operating cycle and,

21 as such, gives you a lower chance of repayment.

22 Q.   Would you describe in very basic terms for the jury what

23 working capital is.

24 A.   In most basic terms, the term "working capital" means

25 the money that is required to operate every single day, to

1    pay your bills and to continue to see your product being sold

2    and turned into revenue.  That is the most basic way to put

3    it.

4    Q.    After the meeting with the defendant and others at the

5    Reagor-Dykes group, did you decide whether to make a working

6    capital loan to the defendant?

7    A.    Yes, we did.

8    Q.    What did you decide?

9    A.    We decided to proceed in somewhat of a more cautious

10   way.  We had a dual advance feature on the working capital

11   loan.

12   Q.    Let's go ahead, and we're going to turn next and talk

13   about the loan underwriting process.

14         So in April 2017, you've decided that you want to move

15   forward for the loan.  What does loan underwriting mean?

16   A.    Loan underwriting is the bank's internal effort to

17   understand exactly what the loan request is and how it will

18   be repaid.

19   Q.    What is the purpose of loan underwriting?

20   A.    To uncover all of the details relative to loan

21   repayment.

22   Q.    What are the first steps in the loan underwriting

23   process?

24   A.    The gathering of financial statements.

25   Q.    In general, how does IBC gather that sort of

1    information?  Do they gather it from the borrower?

2    A.    Yes, sir, we do.

3    Q.    What about outside sources; is there any resorting to

4    outside sources?

5    A.    If a -- if a company has outside accountants, we may

6    receive information from outside accountants as well.

7    Q.    How important is the purpose of the loan in the

8    underwriting process?

9    A.    It's absolutely critical.

10   Q.    And you've covered this a little bit already, but

11   describe for the jury, why is it so critical?

12   A.    Well, there are multiple aspects of the loan purpose.

13   First and foremost, we are required by regulatory author --

14   regulatory agencies to describe the purpose of any particular

15   loan that we make.  That is job one for us.

16        The second is, is -- most importantly for us, is how do

17   we get repaid.  If we don't know the purpose of the loan, we

18   don't really know how we're going to be repaid.

19   Q.    At IBC Bank, once the underwriting process is concluded,

20   what happens next?

21   A.    It's then presented to a series of committees, depending

22   on the size.

23   Q.    For the working capital loan that we're going to be

24   discussing here this morning, how many layers of approval

25   were required for the IBC working capital loan to the

1    Reagor-Dykes Auto Group?

2    A.    Three.

3    Q.    Let's discuss those three layers.  What's the first

4    layer of review?

5    A.    The first layer of review is called lender's committee.

6    Q.    How many people sit on that committee?

7    A.    It entails the entire -- the total group of lenders that

8    are -- that have loan authority at the bank at the time.

9    Q.    Ballparking it, during this time frame, approximately

10   how many were sitting on that committee?

11   A.    Ten to twelve.

12   Q.    How many of those ten to twelve individuals had to

13   approve the loan for it to go forward to the next level?

14   A.    Only me.

15   Q.    What's the next layer of review?

16   A.    The next layer of review is the executive committee or

17   the board.

18   Q.    Who sits on the executive committee?

19   A.    Two of our outside directors rotate, myself and then the

20   president of our bank in Tulsa and the president of our bank

21   in Oklahoma City.

22   Q.    How many of the executive committee have to approve the

23   loan before it can go forward?

24   A.    Only three of those members are voting members, myself

25   and the two outside directors, so two of the three must vote

1    yes for a loan to be moved on.

2    Q.    What's the next layer of review?

3    A.    Our board.

4    Q.    How many people sit on the board?

5    A.    Currently we have seven.

6    Q.    How many of the board of directors have to approve the

7    loan for it to be finally approved?

8    A.    It would be a majority, so four.

9    Q.    Let's look at some of the documents that were used in

10   that loan approval process.  We're going to go to

11   Government's Exhibit 4.  You should have an exhibit book in

12   front of you.  Would you please turn to that exhibit.

13           THE COURT:  And, Mr. Cogdell, do you have a copy of

14   that exhibit?

15           MR. COGDELL:  We should, Your Honor, yes, sir.

16           THE COURT:  Okay.  You may proceed.

17           MR. HAAG:  All right.  If we could, let's go ahead,

18   and we're going to first highlight that top section, the

19   header, and take a look at that.

20           I'm not sure.  Can everyone see that from where

21   you're at?

22           Your Honor, if I may inquire about the jury's

23   ability to --

24           THE COURT:  And, Mr. Haag, you may pull that close,

25   but please make certain that Defense Counsel has line of

1    sight to the witness table. You may pull it a bit closer.

2          MR. HAAG: Your Honor, may I inquire of the jury if

3    they can see?

4          THE COURT: Sure.

5          THE JURY: (Jurors' heads nodding.)

6          MR. HAAG: My apologies. I know I'm going to be

7    blocking some of you, so I'll try and move so that you can

8    see it.

9          Let's go ahead, and we're going to talk first about

10   this top section here. Do you see that?

11         THE JURY: (Jurors' heads nodding.)

12   Q.  **(By Mr. Haag)** All right. Mr. Schonacher, what is

13   Government's Exhibit 4?

14   A.  This is a copy -- Page 1 of our commercial loan

15   memorandum. It's the approval document.

16   Q.  Was this the commercial loan memorandum that was used in

17   the working capital loan that we've been discussing this

18   morning?

19   A.  Yes, sir, it is.

20   Q.  Let's go ahead and first turn. What's the date that

21   this document was prepared?

22   A.  The date of preparation is April 14th, 2017.

23   Q.  So that would have been shortly after your meeting in

24   Lubbock with the defendant and Reagor-Dykes; is that correct?

25   A.  That is correct.

1  Q.   All right.  We're going to go here to the borrower.  It

2  says, RD7 Investments, LLC.  What business entity was that

3  affiliated with?

4  A.   That was affiliated with the Reagor-Dykes Auto Group.

5  Q.   Did this entity later change in the final version to

6  D and R Acquisitions?

7  A.   Yes, it did.

8  Q.   Was that entity likewise affiliated with the

9  Reagor-Dykes Auto Group?

10  A.   Yes, sir, it was.

11  Q.   Let's go over here where it says "officer."  It says,

12  William Woodring.  What does it mean when it says officer,

13  William Woodring?

14  A.   So William Woodring is the officer on the account.  He

15  is the primary contact and the person responsible for the

16  content of this document.

17  Q.   And it says prepared by WKW,CS,ET,AJL.  What does that

18  mean?

19  A.   These are the people who participated in the preparation

20  of the document.  In this case, it was William Woodring; a

21  credit analyst, C.J. Sidorakis; another credit analyst, L.E.

22  Tolleson (phonetic); and the president of the bank in Tulsa,

23  Andrew Levinson.

24        **MR. HAAG**:  All right.  Let's go ahead and close out

25  of that.

1        We're going to go, and if we could please highlight
2    this middle section right here.  I'm sorry.  One up where
3    it's got the numbers.
4    Q.   **(By Mr. Haag)**  All right.  We see here on this top line,
5    it says:  Proposed Loan 1, Current Balance, Unused
6    Commitment, and Total.  What is Proposed Loan No. 1?
7    A.   Proposed Loan No. 1 is the working capital loan.
8    Q.   Proposed Loan No. 2, 29.8 million dollars.  What was
9    that?
10   A.   That was the proposed real estate loan.
11   Q.   What was the total loan commitment that was going to be
12   made in this case?
13   A.   39.8 million dollars.
14   Q.   And is that reflected over here with this number
15   (indicating)?
16   A.   Yes, sir.
17        **MR. HAAG**:  All right.  Let's go ahead, and we're
18   going to X out.  All right.  Let's go to use of funds, if we
19   could highlight that portion.
20        If we can, Ms. Burch, could we please highlight
21   this first half right here, so from here to about here
22   (indicating).
23        All right.  Hopefully, jurors can see it.  I'm
24   going to have Mr. Schonacher read it for you.
25   Q.   **(By Mr. Haag)**  But, Mr. Schonacher, starting at the

1    second paragraph, would you please read the first few

2    sentences.

3    A.    The entirety of the proposed $10,000,000 equity term

4    loan will be used to inject equity (reflected as an

5    investment in RD7) into the various entities underneath the

6    Reagor-Dykes Automotive Group (RDAG) umbrella.

7         The borrower and its related entities have achieved

8    remarkable growth since inception in 2003, becoming the

9    nation's seventh largest privately-held automotive dealership

10   in the United States with annual sales of 650,000,000 in

11   2016.

12        The borrower has achieved over 500 percent sales growth

13   over the last five years and projects for sales growth to

14   continue in 2017 at a similar pace (estimating 20-plus

15   percent organic sales growth in 2017; March 2017

16   company-prepared financials indicate a 20.6 percent increase

17   in sales versus March of 2016 and a 17 percent increase in

18   EBITDA).

19   Q.    All right.  And if you would, let's go ahead and just

20   read that next section right there, and we'll stop after this

21   sentence (indicating).

22   A.    Due to the enormous growth over the last several years,

23   the borrower has been forced to operate with a working

24   capital position it believes to be inadequate as company

25   growth has eaten up excess cash flow to this point.

1  Q.   That sentence there, does that summarize your
2  understanding of why the Reagor-Dykes Auto Group needed the
3  working capital loan?
4  A.   Absolutely.
5  Q.   We're going to go to Page 14 of Government's Exhibit
6  No. 4.
7        **THE COURT**:  And, Mr. Cogdell, do you have
8  Government's Exhibit 4 before you?
9        **MR. COGDELL**:  I do, Your Honor.
10        **THE COURT**:  You may proceed, Mr. Haag.
11        **MR. HAAG**:  We're going to go to actions taken to
12  improve cash flow, and if we could please highlight that.
13  Q.   **(By Mr. Haag)**  Would you please read for the jury Item
14  No. 1 in Government's Exhibit 4.
15  A.   Owners have eliminated all withdrawals as of March 2017.
16  Monthly savings $90,000.
17  Q.   Let's go ahead and break that down for the jury.  Where
18  would this information be obtained from?
19  A.   It would have been obtained from the borrower.
20  Q.   And it says:  Eliminated all withdrawals as of
21  March 2017.  Monthly savings 90M.  Is that 90,000,000 or
22  90,000?
23  A.   $90,000.
24  Q.   So 90,000 a month was being withdrawn before March 2017?
25  A.   Correct.

1    Q.   Did that statement further reinforce your belief that

2    the loan was for working capital and not for withdrawal?

3    A.   Yes, sir, it did.

4         **MR. HAAG**:  All right.  We can take that down.

5    Thank you.

6    Q.   **(By Mr. Haag)**  Was the Reagor-Dykes working capital loan

7    presented to all three of the approval committees that we

8    have discussed here this morning?

9    A.   Yes it was.

10   Q.   Did all three committees approve the Reagor-Dykes

11   working capital loan?

12   A.   Yes, they did.

13   Q.   In presenting the Reagor-Dykes working capital loan to

14   the approval committee, what was represented as the sole

15   purpose of the loan?

16   A.   To inject working capital into the company.

17   Q.   Was it ever represented to the approval committees that

18   part of the loan would be diverted to the defendant for his

19   personal use and benefit?

20   A.   It was not.

21   Q.   And earlier you said that you would not even have

22   presented the loan if you had known part of it was going to

23   be diverted to the defendant for his personal use.

24        Would the committees have approved that loan if they

25   knew the defendant intended to divert part of the working

1    capital to his own personal bank account?

2    A.   It wouldn't have gotten to the committees, because I

3    wouldn't have allowed it to get that far, so the answer is

4    no.

5    Q.   In approving the working capital loan, did the approval

6    committees rely upon the information and the representations

7    in Government's Exhibit 4?

8    A.   Yes, they did.

9    Q.   Did IBC provide Government's Exhibit 4 to its attorneys?

10   A.   Yes, we did.

11   Q.   Why does IBC give the working capital loan memorandum to

12   its attorneys?

13   A.   We provide our loan -- approved loan memorandums to our

14   attorneys so that they can prepare documentation for loan

15   closing.

16   Q.   For this loan of working capital to the Reagor-Dykes

17   Auto Group, what law firm represented IBC Bank?

18   A.   Gable Gotwals.

19   Q.   Do you know which attorney prepared the loan documents

20   for that loan?

21   A.   Thomas Hutchison.

22   Q.   Let's turn to the closing of the working capital loan.

23   Were you personally present at the first closing of the

24   working capital loan?

25   A.   I was not.

1  Q.  Do you know where it took place?

2  A.  It took place at Gable Gotwals' office in Tulsa.

3  Q.  Do you know when it took place?

4  A.  As I recall, it was July-ish.

5  Q.  I'll ask you to turn to Government's Exhibit 2.  What is

6  Government's Exhibit 2?

7  A.  July 13th.  It is -- I'm sorry, it's the loan agreement

8  dated July 13, 2017.

9       THE COURT:  And just briefly, Mr. Cogdell, do you

10  have a copy of Government's Exhibit 2?

11       MR. COGDELL:  Yes, sir.

12       THE COURT:  You may proceed, Mr. Haag.

13  Q.  **(By Mr. Haag)**  If the front page of the loan agreement

14  reflects July 13th, is that the date of closing for the first

15  closing?

16  A.  Yes, sir.

17  Q.  What loan is covered in this loan agreement?

18  A.  I want to make sure I give you the right information.

19  One moment.

20  Q.  I think if it may assist, we'll go to Section 2.01, if

21  we could turn there in the exhibit.

22  A.  Okay.

23  Q.  All right.  Let's go ahead, and we're going to go to

24  Section 2.01(a).  First, Section 2.01(a), Advances.  How was

25  the working capital loan to be distributed to the

1  Reagor-Dykes Auto Group?

2  A.   In two different components of $5,000,000 each.

3  Q.   Let's go to Subsection 2.01(b).  And we can -- if we

4  would -- if you would, please read the purpose of the loan,

5  and we can omit that second sentence as inapplicable here,

6  but read the purpose that's stated in the loan agreement.

7  A.   The purpose.  Borrower shall use the proceeds of the

8  advancing term loan to provide working capital to the

9  borrower group.

10  Q.   All right.  So we see the term here "borrower" and

11  "borrower group."

12       Let's go to Schedule 5.01(c).  I'm sorry, Schedule 5.01,

13  and that's going to be at the end of the agreement.

14            MR. HAAG:  All right.  If we can highlight Schedule

15  5.01.

16  Q.   (By Mr. Haag)  Is Schedule 5.01 a list of all the

17  borrower group members?

18  A.   Yes, sir.

19  Q.   We don't need to read all of these out loud, but, in

20  general, are all of these the various Reagor-Dykes Auto Group

21  entities?

22  A.   Yes, sir, they are.

23  Q.   Is the defendant listed as a borrower group member?

24  A.   No, he is not.

25  Q.   We read here in Section 2.01(b) that the sole purpose of

1  the loan was to provide working capital; is that correct?

2  A.   That is correct.

3  Q.   Is that consistent with your purpose of the loan since

4  your meeting with the Reagor-Dykes representatives in April

5  of 2017?

6  A.   Yes, sir, it is.

7  Q.   Is making a distribution to the defendant for his

8  personal use a purpose of the loan?

9  A.   It is not.

10  Q.   Let's go to the signature page of that document.  Would

11  you please describe for the jury who signed this document on

12  behalf of the borrower, D and R Acquisitions.

13  A.   Bart Reagor, president/manager.

14  Q.   Let's go to Government's Exhibit 5, please.  We see here

15  Government's Exhibit 5.  What is this?

16  A.   It's a promissory note for $10,000,000.

17  Q.   In laymen's term, what is a promissory note?

18  A.   A promissory note is a promise to pay.

19  Q.   All right.  Let's go ahead, and we're going to turn to

20  the end of that.  Who signed on behalf of the borrower, D and

21  R Acquisitions, LLC?

22  A.   Mr. Bart Reagor.

23  Q.   Let's go to Government's Exhibit 6.  What is

24  Government's Exhibit 6?

25  A.   It's a guaranty agreement, personal guaranty by Bart

1    Reagor.

2    Q.    Would you describe in layperson's term what is a

3    guaranty or a guarantor of a loan.

4    A.    In laymen's terms, the guarantor is a person who is

5    accepting responsibility for a loan to be repaid.  Should the

6    primary obligor — in this case, the D and R Acquisitions —

7    not be able to pay this individual would pay.

8    Q.    Let's go to the signature page.  Who signed as the

9    guarantor on this loan?

10   A.    Bart Reagor.

11   Q.    Finally, I want to move forward to August 1st of 2018.

12   Do you remember that day?

13   A.    Yes, sir, I do.

14   Q.    Without discussing the specific event that happened, did

15   you learn of something that would impact Reagor-Dykes'

16   ability to repay the property loan and the working capital

17   loan?

18   A.    Yes, I did.

19   Q.    Had you received a communication about that event from

20   any Reagor-Dykes Auto Group members?

21   A.    I did not.

22   Q.    Did the Reagor-Dykes entities later default on the

23   working capital loan and the property loan?

24   A.    Yes, they did.

25   Q.    As a result, how much did IBC Bank lose on those two

1  loans?

2          MR. COGDELL:  Objection, relevancy, Your Honor.

3          THE COURT:  Response, Mr. Haag?

4          MR. HAAG:  Yes, Your Honor.  It's going to go to --

5  in this case, it completes the story.  It's intrinsic to the

6  completion of the story about the failure to repay.

7          THE COURT:  The Court finds that it's relevant.

8  The Court further finds that the probative value does not

9  outweigh the risk of prejudice or confusion.  You may

10 proceed.

11         MR. HAAG:  Thank you, Your Honor.

12         THE COURT:  And next time, I'll use my microphone.

13 Q.   **(By Mr. Haag)**  As a result, how much did IBC Bank lose

14 on the property loan and the working capital loan?

15 A.   At this point, it's more than $28,000,000.

16 Q.   Let's put that into context.  How does that default

17 compare with other defaults in IBC Bank's history?

18         MR. COGDELL:  Objection, relevancy.

19         THE COURT:  Response from Mr. Haag?

20         MR. HAAG:  Again, Your Honor, it is intrinsic to

21 the story, completes the story about the loan.

22         THE COURT:  The Court will overrule Defendant's

23 objection for the same reason.  I'll afford some latitude,

24 but stay near the line.

25         MR. HAAG:  Yes, Your Honor.  This is the last

1  question, for what it's worth.

2          THE COURT:  Okay.  You may proceed.  Overruled.

3  Q.  **(By Mr. Haag)**  How does that compare in terms of other

4  defaults that IBC Bank has suffered?

5  A.  At the time, it was the single largest default in the

6  history of IBC Oklahoma and the single largest loss.

7  Q.  I want to talk about how that's affected you personally?

8          MR. COGDELL:  I'm sorry, objection, relevancy, Your

9  Honor.

10          THE COURT:  Okay.  I'm going to need you to make a

11  little more argument on the relevancy.

12          MR. HAAG:  Yes, Your Honor.  It goes to bias.

13          THE COURT:  Okay.  On that limited basis, I'll ask

14  that you confine your questions to the defendant's [*sic*]

15  personal knowledge and go no further, and if you get close to

16  any statements that might resemble hearsay, we'll take up

17  that objection at this time.  So with that instruction,

18  overruled.

19          MR. HAAG:  Yes, Your Honor.

20  Q.  **(By Mr. Haag)**  Let me repeat.  The default by the

21  Reagor-Dykes Auto Group, on a personal level, does that

22  bother you?

23  A.  Yes, it does.

24  Q.  Why?

25          MR. COGDELL:  Same objection, Your Honor.  Why

1   is --

2           **MR. HAAG**:  Your Honor, it's relevant to show the

3   bias of this witness.  It's something that we're going to

4   obviously get into with Mr. Cogdell, so I am fronting that

5   information.  I've disclosed it in my *Giglio* disclosures to

6   Mr. Cogdell.  It shows the bias of the witness.

7           **THE COURT**:  Okay.  I will allow you one more

8   question.  Please limit it to defendant's personal knowledge.

9   If the Defendant opens the door on cross, I'll allow redirect

10  on the impact, but as far as relevance, please limit it to

11  how this defendant may be biased because of the impact on his

12  person and his personal knowledge, but let's not venture

13  afield into hearsay and what other people in IBC said or were

14  affected by.

15          **MR. HAAG**:  Yes, Your Honor.

16          **THE COURT**:  Overruled.

17  Q.   **(By Mr. Haag)**  How does the loan default affect you

18  personally?  Why does it bother you?

19  A.   It bothers me because I am the gatekeeper to our

20  organization.  I am responsible to my shareholders, my board,

21  my depositors to make good strong, solid decisions, so I am

22  personally affected by this because I failed.  I did not

23  recognize what was going to happen to us.

24          **MR. HAAG**:  No further questions, Your Honor.

25          **THE COURT**:  Okay.  Mr. Cogdell, you may proceed

1    with cross-examination.  You may do so from counsel table or

2    the podium.  I'll just admonish you to keep a microphone near

3    for the court reporter and record purposes.  And you may

4    avail yourself of any technology that is in the courtroom.

5            MR. COGDELL:  Thank you.

6            THE COURT:  You may proceed.

7                    <u>CROSS-EXAMINATION</u>

8    BY MR. COGDELL:

9    Q.   Good morning, Mr. Schonacher.

10   A.   Good morning, sir.

11   Q.   I don't think you and I have ever had the pleasure or

12   the displeasure of seeing each other.

13   A.   I don't believe we have.

14   Q.   My name is Dan Cogdell.  I'm one of the lawyers

15   representing Mr. Reagor.  Sorry for your financial loss, let

16   me just (chuckles) -- let me start there.

17        When was the first time, Mr. Schonacher, that you were

18   interviewed by law enforcement in this case?

19   A.   I don't recall the date.  I'm --

20   Q.   Was --

21   A.   -- sorry.

22   Q.   -- it this year?

23   A.   Again, I don't recall a date, but I know I was

24   interviewed this year.

25   Q.   Okay.  Do you recall being interviewed before then?

1    A.    I do not recall.  I'm sorry.

2    Q.    If I suggested to you, Mr. Schonacher, that you were

3    interviewed for the first time by the FBI in April of this

4    year, would that be consistent with your memory?

5    A.    Generally consistent, yes, sir.

6    Q.    And you've got kind of a soft voice, so make sure you

7    either lean in or pull that microphone towards you.  I --

8    A.    First time I've ever been accused of that, but go ahead.

9    Q.    I --

10   A.    I'll make sure.

11   Q.    I understand.  And if I -- if I represented to you, Mr.

12   Schonacher, that Mr. Reagor was indicted before the first

13   time that you were interviewed, would that be of any moment

14   to you?

15   A.    No, sir.  I don't recall one way or the other.

16   Q.    Fair -- fair enough.  You didn't testify at the grand

17   jury?

18   A.    I did not.

19   Q.    Didn't give any statements before April of 2021, as far

20   as you know?

21   A.    As far as I know.

22   Q.    Fair enough.  Now, the first time you met Mr. Reagor and

23   Mr. Smith was in 2017, right?

24   A.    Yes, sir.

25   Q.    And who all can you recall, Mr. Schonacher, was present

1  from the RDAG team?

2  A.   As I stated earlier, I recall Mr. Reagor, Mr. Dykes,

3  Mr. Smith, and there were a couple of others in the meeting

4  that I don't recall.

5  Q.   And you stated I think in direct examination, sir, that

6  Reagor did most of the talking up front?

7  A.   Yes, sir, he did.

8  Q.   And he was talking about the success of his companies,

9  how well they were doing, how he wanted to be the biggest

10  automobile dealership in the U.S.  He was an enthusiastic

11  promoter of his brand, for lack of a better description;

12  agree with me?

13  A.   That is correct.

14  Q.   Did he seem sincere in his belief about his

15  representations?

16  A.   I believed him to be.

17  Q.   And you said, I think, when it got into matters of

18  financial issues, Mr. Smith seemed to take over and fill in

19  the details.  Am I putting words in your mouth, or is that

20  accurate with your memory?

21  A.   That is accurate.

22  Q.   And describe just real quickly, Mr. Schonacher,

23  Mr. Reagor's personality generally speaking and Mr. Smith's

24  personality generally speaking?

25  A.   Well, Mr. -- Mr. Reagor's personality is extremely

1  effusive and outgoing, and he's very proud of his

2  organization.  He spent quite a bit of time talking about his

3  sales -- his sales philosophy and how he, you know, led his

4  team from in front.

5      Mr. Smith is very reserved and more along the lines of

6  an accountant, I would say.

7  Q.   So from both their personalities and your conversations

8  with them, was it clear to you that Bart Reagor was a sales-

9  driven personality type, and that's what he was focused on?

10 A.   Yes.

11 Q.   And certainly less focused on the daily nits and gnats

12 of the financial or the economic issues, right?

13 A.   Well, he was the president of the company.  He should be

14 in tune with all of it.

15 Q.   And I'm not suggesting he's turning a blind eye, but his

16 focus was on sales?

17 A.   I would say that, yeah.

18 Q.   Okay.  And he was proud of the sales techniques, and I

19 think you suggested that he even demonstrated or explained

20 his sales techniques to you in a shorthand way?

21 A.   Yes, he did.

22 Q.   And what was that?  How did he do that?

23 A.   Well, I think the front -- the front component, the

24 first component of that was that he wanted to be the one-shop

25 solution for a customers's auto need; that his team could

1   provide any car at any time to any customer.

2   Q.   24/7/365 --

3   A.   24/7/365, cell phones, text, e-mail, whatever, his guys,

4   his team were out front.

5   Q.   Now, in a post-pandemic world, we see more of that sort

6   of intended accessibility these days, right?

7   A.   That is correct.

8   Q.   But back in 2017, it was a little more unusual and a

9   little more cutting edge for a car dealer to take that

10  position; agree with me?

11  A.   Yes, it was very novel.

12  Q.   Very what?

13  A.   It was very novel.  It was leading edge.

14  Q.   Okay.  And you were impressed by that?

15  A.   I was.

16  Q.   And it's true to say, is it not, Mr. Schonacher, you

17  were impressed by, not only Mr. Reagor's enthusiasm and

18  commitment, but, as far as you could tell, the way those

19  stores were being ran?

20  A.   Yes, I was very impressed.

21  Q.   I mean, again, without denigrating Lubbock or this area,

22  I mean, they were selling a bunch of cars largely in the

23  middle of nowhere, relatively speaking?

24  A.   Yes.  They sold cars all over the place, yeah.

25  Q.   Okay.  And that's impressive to you?

1   A.    It was very impressive to me.

2   Q.    So there was one other meeting I think you indicated,

3   Mr. Schonacher, that was -- that the IBC folks had before

4   this meeting.  This meeting was the second?

5   A.    I will say this to be clear:  My team had been meeting

6   with the Reagor-Dykes group prior to this meeting.  I don't

7   know how many meetings there were.  I don't know how much --

8   Q.    Gotcha.

9   A.    -- communication there was.

10  Q.    Okay.  But you weren't at those meetings?

11  A.    I was not.

12  Q.    You don't really know what was discussed one way or the

13  other at those meetings?

14  A.    Only from what I was told.

15  Q.    Okay.  Now, how many people does IBC employ?

16  A.    Um, today, we currently employ around 3,000.

17  Q.    And how many locations do you have?

18  A.    About 187.

19  Q.    Okay.

20  A.    Throughout the company.

21  Q.    And it's in Oklahoma and North Texas?

22  A.    Oklahoma and Texas.  Our holding company goes from the

23  border -- the Texas/Mexico border --

24  Q.    Gotcha.

25  A.    -- all the way to Oklahoma.

1  Q.   I've got to ask.  What does IBC stand for?

2  A.   International Bank of Commerce.

3  Q.   Gotcha.  Is it safe to say that IBC makes a bunch of

4  loans out, makes a bunch of loans every year?

5  A.   Yes, sir.

6  Q.   I mean, that's how a bank makes money?

7  A.   It's one of the ways.

8  Q.   Now, once you came to Lubbock and met with Mr. Dykes and

9  Mr. Reagor and Mr. Smith, did you have any day-to-day

10 communications, e-mails, correspondence with any of those

11 folks?

12 A.   Not me in particular, no.

13 Q.   In fact, is it accurate to say that you left that to

14 others in terms of how to negotiate or the details of

15 negotiating and executing the loan, you left that to other

16 folks?

17 A.   Yes.  I left that -- I left that component to the

18 creation of the document you saw earlier, the commercial loan

19 memorandum, yes.

20 Q.   Right.  And who is Will Woodring for the record?

21 A.   He was a vice president of our Tulsa lending group.

22 Q.   And where did he fit in in the hierarchy there?

23 A.   Will was our number two guy in Tulsa.

24 Q.   And was it his responsibility or was this loan largely

25 delegated to Mr. Woodring?

1    A.   It was -- it was his responsibility, yes.

2    Q.   Okay.  And when you're the head of a large organization,

3    that comes with the territory?  You -- I mean, as a

4    president, you can't marshal every single loan that comes

5    through, right?

6    A.   That's correct.

7    Q.   You stay on -- you stay involved in some of the big

8    ones, but you can't possibly stay in the loop on the smaller

9    ones?

10   A.   This one isn't small.

11   Q.   Sir?

12   A.   This one is not small.

13   Q.   Fair enough.  Fair enough.  But even the size of this

14   one, I guess, fairly put, you delegated this one to Woodring,

15   right?

16   A.   I look at every loan that's approved in my organization

17   on a commercial side.

18   Q.   Now, how many other times before this loan was approved

19   did you speak with, communicate with, e-mail with Bart

20   Reagor?

21   A.   I don't believe that I did.

22   Q.   Okay.  So, as far as your recollection is today, you met

23   with him the one time in the spring of '17, right?

24   A.   Yes.  And I -- and I think I invited him to a football

25   game, and I don't know when that communication was.

1  Q.   Did he come?

2  A.   No, he did not.

3  Q.   And what football game did you invite him to?

4  A.   Texas Tech/Oklahoma.

5  Q.   Who won that game?

6  A.   I think Oklahoma won.

7  Q.   And that was 2018?

8  A.   I don't recall the date.  That's the only other

9  conversation I recall having with him.

10  Q.   Okay.  So a football invitation, which he didn't attend,

11  notwithstanding, the one and only other time you ever spoke

12  with Mr. Reagor was in Lubbock on that one occasion?

13  A.   As I recall.

14  Q.   That's fair enough.  Would it surprise you to learn,

15  given the introduction that you had with Mr. Reagor and Mr.

16  Smith, that it was Mr. Smith, on behalf of the RDAG entities,

17  that really sort of chaired the communication between the

18  RDAG entities and IBC in terms of getting this loan pushed

19  through?

20  A.   That wouldn't surprise me.

21  Q.   Why not?

22  A.   Because I perceived him to be the point person for

23  Reagor-Dykes, just as Mr. Woodring was the point person for

24  IBC.

25  Q.   Okay.  Now, I think you're aware that this loan itself

Case 2:21-cr-00025-Z-BR Document 163 Filed 03/22/22 (Page 78 of 346) Brian Patrick Schonacher (Cross - Coodell) PageID 1650

78

1  mentions working capital one time in the document?

2  A.  I know where it does say it one time.  I don't -- I'm

3  not sure where it might say it or might not in other areas.

4  Q.  Will you trust me to the extent that I tell you it's

5  mentioned but one time?

6  A.  Okay.

7  Q.  And it's not defined in the loan agreement.

8  A.  Is there a question?

9  Q.  Yes.  Well, yes.  It's true -- thank you.  It's true, is

10 it not, Mr. Schonacher, that the term "working capital" is

11 not defined in the loan agreement?

12 A.  Working capital is not defined in the loan -- in the --

13 in the approval document or the loan agreement?

14 Q.  Loan agreement.

15 A.  I would have to look.

16 Q.  Okay.  As you sit there today, you don't know one way or

17 the other?

18 A.  I don't know one way or the other.

19 Q.  Okay.  And working capital has, for lack of a better

20 association, a common meaning from a GAAP perspective, right?

21 A.  It has a defined meaning, yes.

22 Q.  And what is that defined meaning?

23 A.  Working capital is the differential between current

24 assets and current liabilities.

25 Q.  Meaning, once you subtract liabilities from the

1    company's assets, that is working capital?

2    A.    Yes, sir.

3    Q.    And that can be used for legitimate purposes, right?

4    A.    General business purpose, yes.

5    Q.    General business purpose, that's fair.

6              **THE COURT:**  Mr. Cogdell?

7              **MR. COGDELL:**  Sir?

8              **THE COURT:**  You used an abbreviation there.  I'll

9    just allow you to spell it out for recordkeeping purposes and

10   also the benefit of the witness and --

11             **MR. COGDELL:**  GAAP.

12             **THE COURT:**  -- the jury, GAAP.

13             **MR. COGDELL:**  Generally accepted accounting

14   principles.

15             **THE COURT:**  Okay.

16             **MR. COGDELL:**  I think.

17             **THE WITNESS:**  Yes, sir.

18             **THE COURT:**  I know the two of you know, but I want

19   the jury to --

20             **MR. COGDELL:**  That's --

21             **THE COURT:**  -- have the benefit of that.

22             **MR. COGDELL:**  That's fair.

23   Q.    **(By Mr. Cogdell)**  Were you monitoring the distributions

24   from these loan proceeds?

25   A.    Me personally?

1  Q.   Yes, sir.
2  A.   No.
3  Q.   Was anyone?
4  A.   Our bank officer should have been.
5  Q.   And what bank officer would that have been or should
6  that have been?
7  A.   William Woodring.
8  Q.   And is it common for a bank officer then to monitor the
9  distributions; that would have been a normal course and scope
10 of business aspect?
11 A.   From the bank or the business?
12 Q.   From the bank.
13 A.   The bank -- the bank monitors advances?
14 Q.   Yes, sir.
15 A.   Yes, they do.
16 Q.   And, in this case, were they monitoring how the
17 distributions were being used?
18 A.   No.  We monitor the distribution from the bank.  And
19 then once it becomes general working capital, money is
20 fungible, and so it will be used for, in theory, general
21 working -- general business use.
22 Q.   Got you.  Is -- who is Thomas Hutchison?
23 A.   He's one of IBC's counsel.
24 Q.   And he was one of the lawyers that worked on this loan
25 fairly substantially, right?

1   A.   Yes, sir.

2   Q.   And do you believe him to be a competent lawyer?

3   A.   I do.

4   Q.   And how long have you used either him or his firm?

5   A.   I have used Gable Gotwals since approximately 1995.

6   Q.   All right.  And --

7   A.   Predating my time at IBC.

8   Q.   I'm sorry?

9   A.   Predating my time at IBC.

10  Q.   Got you.  How usual is it for IBC to make a working

11  capital loan?

12  A.   Fairly common.

13  Q.   How many you make a year, ballpark?

14  A.   I wouldn't -- couldn't venture a number, but it's in the

15  hundreds of millions.

16  Q.   Okay.  Large number of loans?

17  A.   Yes, sir.

18  Q.   Large number of dollars?

19  A.   Yes, sir.

20  Q.   Not an unusual event at all?

21  A.   Not at all.

22  Q.   Okay.  Since counsel brought it up, I think you

23  indicated you learned of an event in July or August of 2018

24  that made the repayment of the loans impossible?

25  A.   Yes, I did.

Bench Conference

1          MR. COGDELL:  May we approach, Your Honor?

2          THE COURT:  You may approach.

3      **(The following took place at the bench and outside the**

4  **hearing of open court.)**

5          MR. COGDELL:  They came in and shut the dealership

6  down.  Right?

7          MR. HAAG:  That was the day that Reagor-Dykes filed

8  the bankruptcy.

9          MR. COGDELL:  I think that goes -- that was the day

10  that Ford Motor Credit --

11          COURT REPORTER:  I can't hear you.

12          MR. COGDELL:  That was the -- talk over this?

13          THE COURT:  Yes.

14          MR. COGDELL:  That was the day that Ford Motor

15  Credit came in and shut the dealership down.  I think they

16  have opened the door to that, because they went right there.

17          MR. HAAG:  Actually, Your Honor, that was the day

18  that Reagor-Dykes filed for bankruptcy.  Oh, I'm sorry.  That

19  was the day that Reagor-Dykes entities filed for bankruptcy,

20  and I specifically said "event" so that I wouldn't run afoul

21  of the Court's order, and so I don't think I opened the door

22  in any way.  In fact, I have strictly abided by the Court's

23  limine order and just said event.

24          THE COURT:  This is what the Court's Order in

25  Limine -- well, the Court will not allow this line of

United States v. Thomas Patrick Schnack (Cross - Mr. Cogdell)

Bench Conference

1    questioning, and I do not find that the reference to the word

2    "event" opened the door on this.  The Court has been clear

3    that we are not going to try this case based on bankruptcy

4    proceedings, floor-plan schemes, any of the parallel civil or

5    criminal or bankruptcy proceedings, so that question will not

6    be asked at this point.

7          If the Government gets into it, I will allow for

8    cross-examination, but at this point, the Court does not

9    discern that that door has been opened.

10         MR. COGDELL:  May I be able to ask the witness if

11   it was an event unrelated to the distribution of the loan

12   proceeds?  Because it truly was.  The reason they stopped --

13   couldn't pay was not because of the disbursement of the

14   proceeds of the loan.  The reason that they couldn't pay was

15   that they filed for bankruptcy after Ford Motor Credit shut

16   them down.

17         THE COURT:  Mr. Haag?

18         MR. HAAG:  Your Honor, I would prefer just no

19   further questioning along this.  I mean, I think we've --

20   less is sufficient and ambiguous.  I don't think that

21   ambiguity prejudices the defendant at all.

22         THE COURT:  No.  I think that would -- that too

23   would run afoul of the Court's Order of Limine.  We're not --

24   and as long as -- as long as the Government has used the term

25   "event," you may reference an event, but we're not going to

 1   delve into the details of bankruptcy, Ford Motor Credit, or

 2   any of the parallel civil proceedings.

 3          MR. COGDELL:  And to be clear, I didn't -- I don't

 4   intend to delve into it.  I simply would like to ask the

 5   witness to confirm or ratify that the reason that the loan

 6   went into default was not because of the disbursements to Mr.

 7   Reagor and to Mr. Dykes.

 8          THE COURT:  I don't think he can testify to that.

 9   Does he know?

10          MR. HAAG:  No, Your Honor, he doesn't know that.

11          THE COURT:  Okay.  He doesn't have personal

12   knowledge.  That would call for speculation.

13          You can ask the question directly, do you know why

14   the loan defaulted?

15          MR. HAAG:  That's -- he's going to have to answer

16   it's because they filed bankruptcy.

17          THE COURT:  Okay.

18          MR. HAAG:  There's just no way to get into it, Your

19   Honor.

20          THE COURT:  Okay.  I'll disallow this line of

21   questioning for those reasons stated in the order.

22          MR. COGDELL:  Yes, sir.  Can I have a minute with

23   my team?

24          THE COURT:  Yes.

25       (Defense attorneys' sotto-voce conference.)

1    **(The following took place in the hearing of open court.)**

2    Q.   **(By Mr. Cogdell)**  One final area, Mr. Schonacher.  Did

3    you review the loan agreement before it was finalized?

4    A.   I did not.

5    Q.   Why not?

6    A.   It was not part of my process.

7    Q.   Who did review the loan agreement before it was

8    finalized on behalf of the bank?

9    A.   It would have been the loan officer and the market --

10   the market president.

11   Q.   So that would have been Mr. Woodring?

12   A.   Yes, sir.

13   Q.   And then, of course, the lawyers at -- that were

14   representing the bank, they likewise would have reviewed the

15   document before it was finalized?

16   A.   That is correct.

17   Q.   So, as you sit there today, you certainly have your

18   recollections, none of them very good, about the occurrence

19   but you were not involved in the creation of the loan

20   documents, agreed?

21   A.   That is agreed, yes, sir.

22   Q.   Did not review them before it was executed, correct?

23   A.   That is correct.

24   Q.   And had little to no conversation or had actually no

25   conversation or communication with Bart Reagor about the loan

1   after the first meeting that you previously discussed?

2   A.   That is correct.

3            MR. COGDELL:  Thank you, sir.  That's all I have.

4            THE WITNESS:  Thank you.

5            THE COURT:  And, Mr. Haag, redirect?

6            MR. HAAG:  Briefly.

7            THE COURT:  And I'll just admonish counsel for both

8   sides, on redirect, please limit your questions to anything

9   that was educed or elicited during cross-examination.  And

10  you may approach.

11           MR. HAAG:  Thank you, Your Honor.

12                    <u>REDIRECT EXAMINATION</u>

13  BY MR. HAAG:

14  Q.   Mr. Schonacher, I've got just a few questions for you.

15  You talked about the defendant speaking excitedly about his

16  vision for the company; is that correct?

17  A.   That is correct.

18  Q.   And you said that it was a novel approach to the car

19  industry, in your opinion?

20  A.   I believe it to be unique, yes.

21  Q.   Did that reinforce your belief that injecting money into

22  that business would be a good investment for the bank in

23  terms of the business' ability to repay the loan?

24  A.   Yes, it did.

25  Q.   Mr. Cogdell got into delegation.  Let's talk a little

1    bit about that.  You're the president and CEO of IBC Bank

2    Oklahoma; is that correct?

3    A.    That is correct.

4    Q.    Are you responsible for everything that happens for IBC

5    Bank Oklahoma?

6    A.    I am.

7    Q.    Are you responsible for everything that fails to happen

8    for IBC Bank Oklahoma?

9    A.    I am.

10   Q.    Mr. Cogdell brought up GAAP and the definition of

11   working capital in GAAP.  Does that GAAP working capital

12   definition apply to businesses only?  Or let me ask it this

13   way:  Is it used only in terms of a business?

14   A.    Generally accepted accounting principles have multiple

15   tiers and types.  GAAP, standard GAAP is applied to

16   businesses.

17   Q.    All right.  Finally, Mr. Cogdell talked about the

18   discussions that you had with the defendant and then what was

19   relayed to the lawyers.

20         Was Government's Exhibit 4, the working capital loan

21   memorandum, provided to the attorneys for IBC Bank?

22   A.    Yes, it was.

23   Q.    And, again, what do the attorneys have to do or need to

24   do with that working loan memorandum?

25   A.    They take all of the details in that loan memorandum and

1    create the documents set for closing of the transaction.

2    Q.    As the president and CEO of IBC Bank, do you expect the

3    attorneys to effectuate your purposes and your intent in the

4    working capital loan memorandum in drafting the agreement?

5    A.    Yes, we do.

6              MR. HAAG:  No further questions.

7              THE COURT:  And any recross, Mr. Cogdell?

8              MR. COGDELL:  Just briefly.

9                     RECROSS-EXAMINATION

10   BY MR. COGDELL:

11   Q.    The working capital loan agreement does not control the

12   parties.  It is the contract that controls the parties,

13   correct?  Let me put it another way.

14   A.    The working capital loan document?

15   Q.    Yes, sir.

16   A.    It is part of the documents that control the parties.

17   Q.    Okay.  Well, the parties sign the contract, the loan

18   agreement, right?

19   A.    Yes.

20   Q.    So, by definition, the parties are bound by that

21   contract or that loan agreement, right?

22   A.    Yes, sir.

23   Q.    If Mr. Reagor didn't sign the working capital document

24   that Mr. Haag referred to earlier, he wouldn't be bound by

25   that; agree with me?

1          MR. HAAG:  Your Honor, if I may, I think there's

2   some confusion, and I would object to the misleading line of

3   questioning.  There's two documents.  Government's Exhibit 2

4   is the loan agreement.  Government's Exhibit 4 is the loan

5   memorandum.  That is an internal document.

6          I would respectfully ask counsel to refer to those

7   two as such so that the witness is not --

8          THE COURT:  Okay.  Just for purposes of avoiding

9   witness confusion or juror confusion, just identify the

10  documents --

11         MR. COGDELL:  Fair enough, and I --

12         THE COURT:  -- by name and number.

13         MR. COGDELL:  -- appreciate the --

14         THE COURT:  And you may --

15         MR. COGDELL:  -- cue.

16         THE COURT:  You may proceed.

17  Q.   (By Mr. Cogdell)  Mr. Reagor is not bound by 4.  Mr.

18  Reagor is bound by 2, right?

19  A.   Correct.

20  Q.   Thank you.

21  A.   Yes, sir.

22         MR. COGDELL:  Thank you, Judge.

23         THE COURT:  Okay.  At this time, the Court is

24  inclined to take the morning break unless, Mr. Haag, you

25  believe your next witness can complete their testimony and

```
 1    any cross-examination by Mr. Cogdell in fifteen minutes.

 2         MR. HAAG:  (Chuckles.)  I think Mr. Cogdell might

 3    mess that plan up, Your Honor, so I'd ask for a break at this

 4    time.

 5         THE COURT:  Okay.  We are going to take our morning

 6    break at this point.  It is -- the Court will call it at

 7    10:20.  I'll instruct the attorneys to be back at 10:35.

 8         The jurors should recall this Court's instructions

 9    about discussing this case during breaks.  Please do not do

10    so even among yourselves.  At all times keep your jury badge

11    so the Court personnel can identify you and also people in

12    the courthouse.

13         And I'll just admonish you again don't conduct any

14    independent research.  Don't use your cell phones and don't

15    talk to anybody in the hallways and admonish those

16    instructions that the Court gave you.  You are dismissed at

17    this time.

18         COURT SECURITY OFFICER:  All rise.

19       (The jury leaves the courtroom.)

20         THE COURT:  And the Court stands in recess until

21    10:40.  I'll just instruct the attorneys and agents to be

22    present then.

23         MR. HAAG:  Yes, Your Honor, I apologize.  May this

24    witness be excused?

25         THE COURT:  Any objection to excusing this witness,
```

Housekeeping Matters
(Outside of the Jury's Presence)

1    Mr. Cogdell?

2            **MR. COGDELL**:  No, sir.

3            **THE COURT**:  This witness may be excused.

4            **THE WITNESS**:  Thank you, Your Honor.

5            **THE COURT**:  You may leave the courthouse if you

6    choose to do so.

7       **(Witness excused.)**

8            **THE COURT**:  We will return at 10:40 -- I'm sorry,

9    10:35.

10           Mr. Haag, who is your next witness?

11           **MR. HAAG**:  It's going to be Mr. Hutchison, Your

12   Honor.

13           **THE COURT**:  Okay.  We will plan for that.  Actually

14   I'll give a little more time.  Be back by 10:40.

15           **MR. HAAG**:  Yes, Your Honor.

16           **THE COURT**:  And we'll resume at that time.  The

17   Court stands in recess.

18      **(Recess taken; after which, the following took place in**

19   **open court with the defendant present but without the jury**

20   **present.)**

21           **THE COURT**:  Please be seated.  And we're back on

22   the record in Criminal Action No. 2:21-CR-25, U.S. versus

23   Bart Wade Reagor.

24           Before we bring the jury back, a bit of

25   housekeeping.  So these attorneys and both parties have

(Outside of the Jury's Presence)

1    worked diligently to abide the Court's Order in Limine.

2         I'll just admonish both sides, if there are

3    references to events without clarity, this Court may be

4    forced to rule that a door has been opened and then allow for

5    reference to parallel proceedings that we have worked hard to

6    keep out of this trial.

7         So I'll admonish counsel for both sides, please

8    tailor your references to events to exhibits and witnesses

9    that will come into evidence, not to anything that was

10   ordered out of bounds by the Order in Limine.

11        Also, on Defendant's Document No. 46, this Court

12   did deny separate settings for the witness that will follow,

13   but I will instruct the Government to bifurcate its line of

14   questioning to make clear questions that are rooted in

15   defendant's expert capacity under Rule 702 and facts that

16   reflect his personal knowledge.

17        I did deny Defendant's Motion in Limine on that

18   point, but it will benefit the jurors as a matter of

19   confusion to keep those lines of questioning as distinct as

20   possible.  So separate the oil and water to the greatest

21   extent possible and try to bifurcate those lines of

22   questioning.  That way, we can have this witness on once and

23   only once.

24        So, with that, we will bring in the jury.

25        **COURT SECURITY OFFICER**:  All rise for the jury.

1      **(The jury returned to the courtroom.)**

2             THE COURT:  Please be seated.  Mr. Haag, you may

3      call your next witness.

4             **MR. HAAG:**  Thank you, Your Honor.  The United

5      States calls Thomas Hutchison.

6             THE COURT:  Mr. Hutchison, you may approach.

7      Please remain standing near the witness chair for

8      administration of the oath.  My courtroom deputy will

9      administer the oath.

10      **(The witness was sworn by the courtroom deputy.)**

11             THE COURT:  You may be seated.  I'll remind you to

12      speak clearly into the microphone.

13             And, just briefly, Mr. Haag, I'll give a quick

14      instruction to the jury.  Again, the attorneys in this case

15      have worked diligently to pre-admit witness testimony and

16      exhibits.  This witness has been pre-admitted as both an

17      expert and a fact witness.  I've instructed the Government to

18      keep those questionings separate to the greatest extent

19      possible.

20             I'll instruct the attorneys to approach if there

21      are any questions about that, but you should know that he has

22      been pre-admitted as both an expert witness and a fact

23      witness.

24             You may proceed.

25             **MR. HAAG:**  Thank you, Your Honor.

Thomas Hutchison - Direct (Mr. Haag)

1                   THOMAS HUTCHISON,

2         having been first duly sworn, testified as follows:

3                   DIRECT EXAMINATION

4   BY MR. HAAG:

5   Q.   Please state your name.

6   A.   Thomas James Hutchison.

7   Q.   How are you employed?

8   A.   I'm an attorney and shareholder at Gable Gotwals.

9   Q.   How long have you been with Gable Gotwals?

10  A.   Fourteen years in September.

11  Q.   Is Gable Gotwals the only law firm that you've worked

12  for?

13  A.   That's correct.

14  Q.   Where is Gable Gotwals located?

15  A.   We have offices in Tulsa and Oklahoma City and San

16  Antonio.

17  Q.   What type of law do you practice at Gable Gotwals?

18  A.   I do corporate and business transactions, including loan

19  documentation and financing.

20  Q.   Do you have a law degree?

21  A.   I do.

22  Q.   From what university?

23  A.   The University of Oklahoma.

24  Q.   Do you do legal work for IBC Bank?

25  A.   I do.

1    Q.   How long have you done legal work for IBC Bank?

2    A.   Approximately since I started with the law firm about

3    fourteen plus years ago.

4    Q.   Approximately how much does Gable Gotwals bill IBC Bank

5    for legal work in a typical year?

6    A.   In an average year, roughly between 100 and 200 thousand

7    dollars.

8    Q.   We're going to discuss one commercial loan agreement in

9    particular, so let's turn to that agreement.

10        Are you familiar with the $10,000,000 working capital

11   loan from IBC Bank to the Reagor-Dykes Auto Group entities?

12   A.   I am familiar with that loan.

13   Q.   What was your role in that loan?

14   A.   I was the primary draftsman of the loan agreement and

15   also assisted in negotiating the loan agreement on IBC's

16   behalf.

17   Q.   Did IBC Bank give you any documents in order to prepare

18   the loan agreement?

19   A.   They did.

20   Q.   What documents did they give you?

21   A.   I received a loan memorandum that included key business

22   terms for the loan.

23   Q.   I'm going to ask that you look at Government's

24   Exhibit 4, if we can pull that up, just the face page.

25        **THE COURT**:  And, Mr. Cogdell, do you have

1    Government's Exhibit 4?

2            **MR. NORRIS**:  We do have it, Your Honor.

3            **THE COURT**:  Okay.  You may proceed.

4    Q.   **(By Mr. Haag)**  We've gone through this in extensive

5    detail with Mr. Schonacher.  Would you describe for the jury

6    what this document is?

7    A.   This is an internal credit memorandum prepared by IBC,

8    including the approval of a loan and the key business points.

9    Q.   Is this the document that you used to prepare the loan

10   agreement?

11   A.   Yes.

12   Q.   In preparing the loan agreement, did you speak with IBC

13   Bank representatives to get additional information?

14   A.   Yes.

15   Q.   Who did you speak with?

16   A.   I would have spoken to Will Woodring, who was the vice

17   president and a loan officer at IBC at the time; also Andy

18   Levinson, who as the Tulsa market president for IBC at the

19   time; and David Moore, who was the chief credit officer for

20   Oklahoma at the time.

21   Q.   In preparing the loan agreement, did you work with

22   anyone at the Reagor-Dykes Auto Group?

23   A.   I did.

24   Q.   Who did you work with?

25   A.   Primarily Shane Smith, who was the CFO at Reagor-Dykes

1    at the time.

2    Q.    Did you work with an individual named Jack Driskill?

3    A.    Jack Driskill was outside legal counsel for IBC -- I'm

4    sorry, for Reagor-Dykes at the -- in the initial closing, but

5    I -- my recollection is that Shane was primarily responsible

6    for negotiating the loan agreement.

7    Q.    Did you work directly with a man named Steven Reinhart?

8    A.    I have no recollection of Steven Reinhart or ever

9    working with him.

10   Q.    What about a woman named Rachel Reagor; did you work

11   with her?

12   A.    I recall the name and remember that she had some minor

13   comments, I think, to the loan documents, and so -- but Shane

14   was the primary contact I had.

15   Q.    In preparing the working capital loan agreement, what

16   was the purpose of the loan?

17   A.    Working capital for the borrower and the other members

18   of the borrower group as defined in the loan agreement.

19   Q.    During your discussions with IBC Bank or representatives

20   from Reagor-Dykes, was there ever any purpose other than

21   working capital discussed about the loan?

22   A.    Not to my recollection.

23   Q.    Was there ever a discussion that the loan would be used

24   for the defendant, Bart Reagor's, personal use?

25   A.    Not to my recollection.

 1          **MR. HAAG**:  All right.  Your Honor, at this time,

 2    we're going to be referencing Government's Exhibit 2, and we

 3    will be calling upon the defendant's expertise in explaining

 4    the provisions of Government's Exhibit 2.

 5          **THE COURT**:  Okay.  And, Mr. Norris, do you have a

 6    copy of that Exhibit 2?

 7          **MR. NORRIS**:  We do, Your Honor.

 8          **THE COURT**:  Okay.  You may proceed.  And from this

 9    point forward, please focus on expert testimony that this

10    witness may provide.

11          **MR. HAAG**:  Yes, Your Honor.

12    Q.   **(By Mr. Haag)**  What is Government's Exhibit 2?

13    A.   It is the loan agreement dated July 13th, 2017 between

14    D and R Acquisitions, LLC and IBC Bank.

15    Q.   What was the purpose of the working capital loan?

16    A.   As provided in Section 2.01(b), borrower shall use the

17    proceeds of the advancing term loan to provide working

18    capital to the borrower group.

19    Q.   All right.  So we've got up here on the screen purpose,

20    and, if you would, please read the first sentence of the

21    purpose of the loan.

22    A.   Borrower shall use the proceeds of the advancing term

23    loan to provide working capital to the borrower group.

24    Q.   And, if you would, please read that second sentence,

25    and, if you could, in laymen's terms, describe what that

1   second sentence is discussing.

2   A.   Borrower shall not use any advancing term loan proceeds,

3   directly or indirectly, for the purpose of purchasing or

4   carrying any margin security or margin stock within the

5   meaning of Regulation U of the Board of Governors of the

6   Federal Reserve.

7   Q.   What does that mean?

8   A.   It just expands on the first part and provides a

9   specific reason for which the borrower cannot use the

10  proceeds.

11       There's a federal regulation about -- they can get banks

12  in trouble if borrowers use loan proceeds for margin security

13  or margin stock.

14  Q.   All right.  So we see here the references borrower and

15  borrower group.  Is borrower group defined in the loan

16  agreement?

17  A.   It is.

18  Q.   Where is it defined at?

19  A.   It is explicitly defined in the definition section,

20  Section 1.01, and then by reference borrower group refers to

21  Schedule 5.01 --

22  Q.   Let's go ahead --

23  A.   -- which is attached.

24  Q.   -- and move to Section 5.01.

25  A.   I'm sorry, Schedule 5.01, which is near the end.

 1    Q.   All right.  Let's look at Schedule 5.01.  You don't have
 2    to read all the names of the entities, but, to your
 3    understanding in general, were these all business entities
 4    affiliated with the Reagor-Dykes Auto Group?
 5    A.   That is my understanding.
 6    Q.   Is the defendant, Bart Reagor, listed as a borrower
 7    group member of the loan?
 8    A.   He is not.
 9    Q.   We're going to turn now to Section 7.12 of the working
10    capital loan agreement.
11         **MR. HAAG:**  And let's go ahead one more forward.
12    There you go.  We're going to highlight Section 7.12.
13    Q.   **(By Mr. Haag)**  Mr. Hutchison, would you please read
14    Section 7.12 for the jury.
15    A.   7.12.  Distributions.  Without lender's prior written
16    consent, borrower will not, and will not permit any other
17    borrower group member to, declare, make, or pay any
18    distributions, either in cash or any other property, or
19    redeem, retire, repurchase, or otherwise acquire any of its
20    equity interests, if a default or event of default exists or
21    would result therefrom.
22    Q.   All right.  Let's go ahead and break that down into a
23    couple different sections.  What's one way that a borrower
24    could get a distribution from the working capital loan?
25    A.   If the lender provides its written consent.

```
1    Q.   And is that referenced in these first five words of
2    Section 5 -- excuse me, 7.12?
3    A.   That's correct.
4    Q.   Now, we see here it says:  May not make a distribution
5    if a default or event of default exists or would result
6    therefrom.  What does default mean?
7    A.   A default is an event or occurrence that would become an
8    event of default with notice or the passage of time.
9    Q.   An event of default, is that defined in the working
10   capital loan agreement?
11   A.   It is defined in Section 8.01.
12           MR. HAAG:  All right.  Let's go ahead and X out of
13   7.12.  We will go to Section 8.01.  Specifically, let's
14   highlight subsection (e).
15   Q.   (By Mr. Haag)  If there was a distribution for a purpose
16   other than what's in Section 2.01(b), would that be an event
17   of default?
18   A.   Yes.  It would be under this section because 2.01(b)
19   states the borrower shall use the advancing term loan for
20   working capital only, which is a covenant for an agreement of
21   the borrower or the borrower group member, and so if those
22   working capital -- if the loan is used for any other purpose,
23   it would constitute a default or event of default under this
24   subsection (e).
25   Q.   Do you recall any discussions with the Reagor-Dykes Auto
```

1  Group about removing Section 7.12 from the loan agreement?

2  A.   I do not independently recall.  I've been provided with

3  an e-mail from somebody at the Reagor-Dykes group requesting

4  to move that, I think, to the bank.

5  Q.   Was that section removed?

6  A.   It was not.

7  Q.   Now, what if someone were to come up here and say, well,

8  I know the loan agreement says this, but look at these prior

9  drafts, and we had this side verbal deal that no one knew

10  about; what if someone were to say that that governed the

11  terms of the loan agreement?

12  A.   Section 9.16 of the loan agreement explicitly provides

13  that side oral agreements or prior drafts will not -- are not

14  enforceable as between the parties and explicitly states that

15  this loan agreement is the only agreement among the parties.

16  Q.   All right.  So let's highlight Section 9.16.  Would you

17  please read that for the jury.

18  A.   Section 9.16.  Entire Agreement.  This written agreement

19  and the other loan documents represent the final agreement

20  between the parties and may not be contradicted by evidence

21  of prior, contemporaneous, or subsequent oral agreements of

22  the parties.  There are no unwritten oral agreements between

23  the parties.

24  Q.   Would it be fair to translate this section as saying the

25  only agreement between the parties is what's in Government's

1    Exhibit 2 and nothing else?

2    A.   That's right, or anything else subsequently agreed in

3    writing.

4    Q.   Have you previously drafted loan agreements that allow

5    owners to take personal distributions from a loan?

6    A.   I have.

7    Q.   Have you in the past drafted loan agreements that allow

8    IBC Bank borrowers to take a personal distribution from a

9    loan?

10   A.   On at least one occasion, I drafted a loan agreement for

11   IBC that allowed the borrower to make a distribution to its

12   equity owners for personal purposes.

13   Q.   And how would that type of loan agreement differ from

14   what's seen in Government's Exhibit 2?

15   A.   Section 2.01(b) would explicitly state that the borrower

16   may make a distribution to the holders of its equity interest

17   for whatever the stated purpose may be.

18   Q.   So that would be in the purpose section of the loan if

19   it allowed a distribution to an owner?

20   A.   That's correct.

21           MR. HAAG:  No further questions, Your Honor.

22           THE COURT:  And, Mr. Norris, are you taking

23   cross-examination of this witness?

24           MR. NORRIS:  I am, Your Honor.

25           THE COURT:  You may do so from counsel table or the

 1    podium.  I just admonish you to speak clearly into the
 2    microphones.
 3                MR. NORRIS:  Thank you, Your Honor.
 4                THE COURT:  You may approach.  And just please
 5    carefully identify any exhibits that you're referencing or
 6    presenting so that opposing counsel may have a copy.
 7                MR. NORRIS:  Certainly, Your Honor.
 8                         CROSS-EXAMINATION
 9    BY MR. NORRIS:
10    Q.   Good morning, Mr. Hutchison.
11    A.   Good morning.
12    Q.   Now, the Government has previously qualified you as an
13    expert witness in this case.  Am I getting that right?
14    A.   That's my understanding.
15    Q.   And, specifically, you would be an expert in terms of
16    your experience as an attorney?
17    A.   Correct.
18    Q.   Now, I think you also mentioned with the Government that
19    you've been an attorney for fourteen years?
20    A.   A little over fourteen years now.  Fourteen years in
21    September.
22    Q.   Now, have you worked with this same law firm, Gable
23    Gotwals, that entire fourteen years?
24    A.   Since I graduated law school, yes.
25    Q.   And at Gable Gotwals, was your primary client, for lack

```
 1   of a better term, always IBC?
 2   A.   No, they're not my primary -- I don't know what primary
 3   client means, but I have many --
 4   Q.   This is the client you do the most work for?
 5   A.   No.
 6   Q.   Who's the client -- well, I won't ask that.  Have you
 7   worked -- have you done work for IBC while you've been at
 8   Gable Gotwals --
 9   A.   Yes.
10   Q.   -- your entire fourteen years?
11   A.   Yes.
12   Q.   And you've since been promoted, I think, to shareholder;
13   is that what it was called?
14   A.   Correct.
15   Q.   Is that the same thing as partner?
16   A.   Yes.
17   Q.   That would be a little bit higher title than associate?
18   A.   Yes.
19   Q.   Okay.  Now, you also testified that you -- specifically
20   you worked on drafting the agreement in question here today,
21   right?
22   A.   Correct.
23   Q.   I think you called it you were the primary draftsman?
24   A.   I think that's accurate.
25   Q.   Have you ever heard the term "disinterested expert," Mr.
```

1    Hutchison?

2    A.   Maybe.  I don't recall hearing that term no, but --

3    Q.   You never heard of the idea of an expert not having an

4    interest in the case one way or another?

5    A.   Conceptually, the term makes sense to me.

6    Q.   You agree with the concept of the term?

7    A.   Yes.

8    Q.   Would you describe yourself as a disinterested expert in

9    this case?

10   A.   I have no interest in the outcome of this proceeding.

11   Q.   Okay.  Let's talk about that.  Is it fair to say, Mr.

12   Hutchison, that if your -- if your opinions today are wrong,

13   in other words, if this loan agreement did, in fact, allow

14   Mr. Reagor and Mr. Dykes to take these distributions, then

15   that means that the advice you gave to IBC and the drafting

16   you did with IBC was also incorrect?

17   A.   I don't think that's fair to say, no.

18   Q.   Why not?

19   A.   I think -- I think people might disagree on the

20   interpretation of the language, but that doesn't mean I

21   drafted it correctly -- incorrectly.

22   Q.   So you're disagreeing with me that, if you perhaps had

23   drafted the contract a little bit tighter, there wouldn't be

24   as much room for disagreement?

25   A.   I think you could always draft something tighter, and

1  every time I do a deal, there's always things that I could do

2  differently, but I don't -- I'm comfortable with the advice I

3  gave and the opinions I'm rendering.

4  Q.   Okay.  Well, let's go back to -- and walk through some

5  of the sections that you did with the Government, if that's

6  okay with you, Mr. Hutchison.

7  A.   Sure.

8         MR. NORRIS:  Could I trouble y'all to pull

9  Government's Exhibit 2 back up, please, 2.01(b).

10  Q.   (By Mr. Norris)  Now, Mr. Hutchison, you testified on

11  direct with the Government that -- and correct me if I'm

12  paraphrasing you incorrectly, but basically you testified

13  that this says that the proceeds of the advancing term loan

14  can only be used for working capital, right?

15  A.   That's correct.

16  Q.   Then there's this second sentence:  Borrower shall not

17  use any advancing term loan proceeds, directly or indirectly,

18  for the purpose of purchasing or carrying any margin security

19  or margin stock within the meaning of Regulation U of the

20  Board of Governors of the Federal Reserve system.  Am I

21  reading that right?

22  A.   That's correct.

23  Q.   Can I ask you, what is a margin security or margin stock

24  within the meaning of Subsection U?

25  A.   A margin security or margin stock is a security that's

1   held as security for itself.  You might be familiar with the

2   concept of margin calls when somebody's trading actively.

3   Q.   Let me stop you there.  Let's pretend that I'm not

4   because I'm not.  What does that mean briefly?

5   A.   We don't want you to buy stock that you're going to use

6   as security to buy more stock, because that's a leverage

7   situation, and the market goes up and down.

8        And if you do that, it creates a host of bad things for

9   the lender, and there are regulations, Regulation U, that

10  gets banks in trouble if they violate this.

11  Q.   So, again, correct me if I'm misquoting you, but what

12  this second sentence says is, we don't want you to use this

13  working capital loan proceeds to buy stock with which you

14  could basically bet on and buy more stock?

15  A.   I think that's a fair summary.

16  Q.   It's pretty specific, don't you think?

17  A.   Yes.

18  Q.   It's a pretty specific use of the loan proceeds, don't

19  you think?

20  A.   That's right.

21  Q.   Was that your idea to put that in there, or is that a

22  stock thing that you would put?

23  A.   It's a fairly standard provision in loan agreements.

24  Q.   Okay.  So this says, shall use it for working capital,

25  right?  Then it says, shall not use it — again, correct me

1  if I'm misquoting you — to buy stock with which you would

2  then buy more stock?

3  A.    That's an accurate summary.

4  Q.    So do you disagree with me if I say that, as long as

5  you're using it for working capital and as long as you're

6  using it -- not using it to buy stock with which you would

7  buy more stock, then it's a permissible purpose under this

8  2.01(b)?

9  A.    I think if the borrower and the borrower group is using

10  it for working capital, yes, it's permissible use, and you're

11  not using it for margin stock, yes, I think it's a

12  permissible purpose.

13  Q.    Okay.  Is this the only place where the term "working

14  capital" is used in the loan agreement?

15  A.    I don't recall.  It's a lengthy document that I drafted

16  four plus years ago, so I can't speak.

17  Q.    Now, you're a contracts guy, so you're probably better

18  at this than I am.  You ever use something called Control F

19  on PDF or Word?

20  A.    I have used that before, but I don't have my computer

21  with me right now.

22  Q.    Fair enough.  Well, would you be willing to venture with

23  me down the road a little bit and accept that I have Control

24  F'd this document, and if I told you that, when I Control F'd

25  that document and put in working capital, it only came up

```
 1    once.
 2    A.   Okay.
 3    Q.   And it only came up in 2.01(b).
 4    A.   Okay.
 5    Q.   Are you willing to agree with me there?
 6    A.   I mean, I have no basis for disagreeing with you.
 7    Q.   Okay.
 8    A.   I've not independently done a Control F in sometime on
 9    this.
10    Q.   Fair enough.  Now, the con -- the loan agreement, excuse
11    me, also says that -- this is in a different section now, but
12    it also says that where these terms in the loan agreement are
13    not defined you have to turn to the generally accepted
14    accounting principles.  Do you recall putting that in there?
15    A.   Not specifically, no, but that's sounds like something
16    that would be in a loan agreement.
17         MR. NORRIS:  Would you guys take me to 1.02, I
18    believe it is.  I'm sorry.  I think it's O2.
19         MR. HAAG:  1.02.
20    Q.   (By Mr. Norris)  Can you see -- well, you have it in
21    front of you, Mr. Hutchison?
22    A.   Yes, I do.
23    Q.   Okay.  So down at the bottom, I believe, is where it
24    says, hey, if we didn't define something, we're going to use
25    generally accepted accounting principles.  Are you with me?
```

```
1   A.   I don't agree that that's specifically what it says,
2   but --
3   Q.   Okay.  What does it say?
4   A.   It says:  Accounting and financial terms used but not
5   otherwise defined with respect to borrower's financial
6   statements and financial position have the meanings provided
7   under GAAP.
8   Q.   Okay.  So is this not -- is working capital not a term
9   that's a financial term?
10  A.   I don't think it's being used in this context with
11  respect to borrower's financial statements and financial
12  position, no.
13  Q.   Okay.  Well, let me back up.  How would you define
14  working capital sitting here today as an expert?
15  A.   Capital of the borrower group used for general business
16  purposes.
17  Q.   Okay.  Have you ever heard of -- I'm sure you've heard
18  of the generally accepted accounting principles, GAAP?
19  A.   I'm familiar with GAAP, yes.
20  Q.   Okay.  Probably --
21  A.   I'm not an accountant, so --
22  Q.   Probably more familiar with GAAP than I am, to be fair?
23  A.   Well, I'm not an accountant, so I wouldn't profess to be
24  an expert in GAAP, but I'm familiar with that they exist.
25  Q.   You're generally familiar.  Okay.  So are you then
```

1   familiar with the fact that GAAP defines working capital as

2   current assets minus current liabilities?

3   A.   That's a financial statement definition, so that sounds

4   correct to me.

5   Q.   You're willing to agree with me on that?

6   A.   Sure.

7   Q.   So then whatever is left over once you pay out all of

8   your current liabilities is then working capital?

9   A.   I'm not an accountant, so I can't -- I'm not -- I can't

10  speak to GAAP definitions.

11  Q.   I'm not either, but, to be fair, you are an expert on

12  drafting these, you know, fairly complex legal instruments,

13  so --

14  A.   Sure.

15  Q.   -- are you willing to agree with me that under GAAP

16  that's what working capital is defined as?

17  A.   I mean, I have no definition -- I don't know what the

18  definition of GAAP is, so I'll take your word for it, but I

19  can't speak to whether that's the definition or not.

20  Q.   Okay.

21          MR. NORRIS:  Can you guys take me to 7.12.

22  Q.   (By Mr. Norris)  Okay.  Now, you remember testifying

23  with the Government about 7.12, right?

24  A.   I do.

25  Q.   I think it was kind of implied, but would you agree with

1    me that 7.12 governs distributions?

2    A.   Yes.  It governs the borrower and the borrower group

3    members ability to make distributions during the term of the

4    loan.

5    Q.   Okay.  Now, I won't make you read the whole thing again

6    since you did it with the Government, but this last phrase at

7    the bottom, the last sentence, if a default or event of

8    default exists or would result therefrom, do you see that?

9    A.   I do.

10   Q.   Now, are you willing to agree with me that, if a default

11   or event of default would result, that language means that

12   everything that comes before that means that, as long as you

13   don't create an event of default, everything else is okay?

14   A.   No.  If you're in a state of default otherwise, it would

15   not be okay.

16   Q.   Help me out with that.  What do you mean by that?

17   A.   If an event of default or a default exists, so if you

18   were to do something that triggered one of these events of

19   default or default that could become an event of default

20   under 8.01, you couldn't make any distributions.

21   Q.   Right.  But as long as you don't trigger an event of

22   default, you could make these distributions?

23   A.   If you don't trigger one or you're not already in a

24   state of default.

25   Q.   Then you could make a distribution?

```
 1   A.   That's right.
 2   Q.   Okay.  Now, with the Government, you went back to
 3   Section 8.01, subsection (e)?
 4   A.   Right.
 5   Q.   To say that, hey, an event of default is any time you
 6   use working capital in some other way that I don't think is
 7   working capital, right?
 8   A.   If you -- if you default in any covenant or agreement in
 9   any loan document, which includes this agreement, and a
10   covenant or agreement would be the Section 2.01(b) we
11   previously discussed, it shows the borrower shall use for
12   working capital.
13   Q.   So, in other words, what you are saying is ── and,
14   again, correct me if I misquote you ── hey, borrower, if you
15   use something not as working capital at least as we
16   understand it, then that equals an event of default, which
17   then triggers back to -- so that's Section 8.01(e) to
18   Section 2.01(b) to Section 7.12 to equal it's a bad
19   distribution.  Is that about right, the math?
20   A.   That's accurate.
21   Q.   Three different sections of this loan agreement that you
22   drafted to ultimately get to that conclusion all while you
23   and I, I think it's fair to say, we're both struggling with
24   the definition of working capital?
25   A.   I wouldn't say that I'm struggling with it.  I would say
```

```
 1   I can't answer a GAAP question because I'm not an accounting
 2   expert.
 3   Q.   Let's shift gears a little bit.  I'll ask you an easier
 4   question I think for both of us.  Have you ever met -- let me
 5   get out of the way so you can see him.  Have you ever met
 6   Bart Reagor?
 7   A.   Only once at closing.
 8   Q.   So that was at the very -- well, when was that, let me
 9   ask?  Which closing?
10   A.   It was the first closing, which would have been on or
11   about July 13, 2017.
12   Q.   And that was the one time?
13   A.   The one time I met him in person, that's right.
14   Q.   So you weren't at the second closing?
15   A.   We did the second closing virtually, I believe, via
16   exchange of signature pages, so I was not there, no, to the
17   extent there was an in-person closing.  Often closings are
18   not done where everybody's in the room together.
19   Q.   But the first one was?
20   A.   That's right.
21   Q.   Now, did you meet him back at this April -- I think it
22   was April 2017 meeting, or were you not there?
23   A.   I was not there.
24   Q.   Now, I think you've testified to this, but are you
25   willing to agree with me that Shane Smith, the CFO for RDAG,
```

 1    was the lead or primary negotiator on this loan?

 2    A.   Yes, I would testify to that.

 3    Q.   Do you think it's fair to say that IBC Bank was relying

 4    on the representations of Shane Smith regarding the

 5    financials of Reagor-Dykes?

 6    A.   I couldn't --

 7              MR. HAAG:  Objection --

 8    A.   -- speak to that.

 9              MR. HAAG:  -- Your Honor, calls for speculation.

10              THE COURT:  Sustained.

11    A.   I couldn't speak to that.

12              THE COURT:  Oh, I'm sorry, sustained.  The witness

13    is instructed that you do not need to answer that.  You may

14    reformulate your question.

15              MR. NORRIS:  Your Honor, I'm happy to reformulate

16    it.

17    Q.   (By Mr. Norris)  Were you -- did you rely on the

18    financial statements and documents that Shane Smith sent?

19              THE COURT:  The witness may answer that question.

20    A.   I mean, I -- I did not rely on them, no, in drafting the

21    documents.

22    Q.   (By Mr. Norris)  Did you see them?

23    A.   They were -- I believe there's some attached to the loan

24    memo, but those are not something that, as the draftsman of a

25    loan agreement, I review in any kind of great detail.

1    Q.   Let's talk about that loan memo for a minute.  That's an

2    internal IBC memorandum, right?

3    A.   That's correct.

4    Q.   Meaning that's something that IBC prepares on its own?

5    A.   Yes, that's my understanding.

6    Q.   Now, is it also your understanding that there's several

7    people involved in preparing that document for IBC?

8    A.   That's consistent with my understanding, but I'm not

9    involved in that part of the process.

10   Q.   Okay.  Well, let's talk about this one.  So is it also

11   your understanding that Will Woodring for IBC would have been

12   the lead guy on the loan for IBC?

13   A.   Yes, that's my understanding.

14   Q.   He would have been the lead guy on preparing that

15   internal loan memorandum you testified about?

16   A.   That's my understanding; although, I can't speak to

17   personal knowledge on that.

18   Q.   Okay.  Would it be un -- well, to your knowledge, did

19   Shane -- did Bart -- excuse me.  To your knowledge, did Bart

20   Reagor prepare anything that went into that internal loan

21   memorandum?

22   A.   No, not to -- not to my knowledge.

23   Q.   Now, but to be fair, Shane Smith, the CFO, would have

24   provided information that went into that loan memorandum, if

25   you know?

1    A.   I can't speak to that either.  I don't know.  I don't

2    know -- I don't know how the baby's made, so to speak.

3    That's --

4    Q.   Okay.  That would be a question we would need to ask

5    Will Woodring, I guess?

6    A.   Yeah.  The final product comes to me, so I don't --

7    Q.   You just get that internal loan memorandum?

8    A.   That's accurate.

9    Q.   Okay.  But on the internal loan memorandum, to be clear,

10   it says Will Woodring prepared it?

11   A.   That's accurate.

12   Q.   Got it.  Now, you were on a number of e-mails with Shane

13   Smith during the negotiations process?

14   A.   That's right.

15   Q.   And who else was on those e-mails, just generally

16   speaking?

17   A.   I can't recall in great detail.  I'm sure some of the

18   other IBC folks were on there.  I can't recall who all got

19   copied on the Reagor-Dykes side.  I know Jack Driskill was

20   involved at times, but not every time.

21   Q.   Okay.  Well, let me -- let me assist you a little bit.

22   If I'd suggested you -- to you that Will Woodring was also on

23   those, is that -- would that be consistent?

24   A.   That would be consistent with my recollection.

25   Q.   With your recollection?

```
 1   A.   That's right.
 2   Q.   So Shane Smith, Will Woodring, Thomas Hutchison, those
 3   three people would have been on most, if not all, of these
 4   loan negotiation e-mails?
 5   A.   I would think so.
 6   Q.   Is it consistent with what you remember?
 7   A.   Consistent with what I remember.
 8   Q.   Okay.  Now, was Bart Reagor on any of those loan
 9   negotiation e-mails to what you can remember?
10   A.   I don't recall Mr. Reagor being copied or included on a
11   lot of those e-mails, no.
12   Q.   Okay.  Well you said a lot.  I got to kind of pressure.
13   Do you remember --
14   A.   Sure, sure.
15   Q.   -- him being on --
16   A.   No, I -- I don't recall.  I guess he could be on some
17   that I don't recall, but I don't recall him being on many.
18   Q.   Okay.  Now, by many, if I suggested to you that he
19   wasn't on any, would you disagree with that?
20   A.   I would not disagree.  I just can't specifically recall.
21   Q.   Okay.  We'll talk more in more specifics about those in
22   just a second.
23        What does due diligence mean in this loan preparation
24   setting, Thomas?
25   A.   Both the bank and, to some extent, outside counsel's
```

```
 1   review of information provided by the borrower and
 2   confirmation on things.
 3   Q.   So, in this case, if you know, IBC's due diligence
 4   lasted for somewhere between six to eight months.  Are you
 5   aware of that?
 6   A.   I was not aware of that, no.
 7   Q.   Okay.  Do you have any reason to disagree with me about
 8   that?
 9   A.   No, no reason to disagree.
10   Q.   All right.  Now, typically during due diligence in these
11   kinds of deals, that would involve reviewing the financials
12   of the borrower?
13   A.   That's right.
14   Q.   And I think you've already said this, but you didn't
15   actually get to review those?
16   A.   No.  That's typically handled internally by the bank.
17   Q.   That's not something you would normally ever do?
18   A.   That's right.
19   Q.   Okay.  Now, are you also aware that there was real
20   estate involved in this loan?
21   A.   I am.
22   Q.   And there was a refinancing of real estate to help
23   secure the loan; is that your understanding?
24   A.   Now, to be clear, there were two loans.  We have been
25   talking about the $10,000,000 working capital line, but there
```

```
 1   was also a refinance loan that --
 2   Q.   Sure.
 3   A.   -- was another roughly $30,000,000, so that one's the
 4   real estate loan you're speaking to.
 5   Q.   Okay.  And that real estate loan, the borrower, I guess,
 6   there was D and R?
 7   A.   Yeah.  The borrower on both was D and R Acquisitions.
 8   Q.   Okay.  Are you aware, Thomas, that D and R Acquisitions
 9   is wholly owned by Bart Reagor and Rick Dykes?
10   A.   Yes, I'm aware of that.
11   Q.   How are you aware of that?
12   A.   We would have reviewed the organizational documents of
13   borrower or any other borrower members before closing to see
14   who owned it.
15   Q.   This is kind of going back to this due diligence
16   thing --
17   A.   Sure.
18   Q.   -- we were talking about?
19   A.   Sure.
20   Q.   So due diligence, like the name implies, is pretty
21   thorough?
22   A.   It varies, but, yeah, I mean, we -- we certainly do a
23   diligence on the borrower in trying to figure out who the
24   owners are.
25   Q.   So a thorough search through the borrower's financials,
```

1   right?

2   A.   I wasn't involved in the search of the borrower's

3   financials, so --

4   Q.   Just speaking --

5   A.   -- I can't speak to whether it was thorough or not, but,

6   yes, I would expect a bank would do a thorough review of

7   financials.

8   Q.   Okay.  And also you would expect that the bank --

9   because there was real estate here, you would expect that the

10  bank would do a pretty thorough review of the real estate

11  underlying the loan?

12  A.   Yes.

13  Q.   Would that include title surveys?

14  A.   Title -- title -- we got title commitments, I believe,

15  on everything.

16  Q.   In this case you mean?

17  A.   That's right.

18  Q.   Title insurance?

19  A.   Yes.

20  Q.   So for six to eight months, the bank, your client, is

21  going through financials, title insurance, title surveys,

22  real estate, the list, I guess, goes on as part of due

23  diligence, right?

24  A.   Yep.

25  Q.   And, to your knowledge, Bart Reagor didn't provide any

 1   financials or other information in that process, did he?

 2   A.   I have no way of knowing whether he provided it or not,

 3   so --

 4   Q.   Well, you said Shane Smith was, again, as --

 5   A.   Sure.

 6   Q.   -- far as you recall --

 7   A.   In my --

 8   Q.   -- he was the lead --

 9   A.   -- involvement, no.  I have -- Bart didn't provide

10   anything that I was involved in.

11   Q.   Okay.  Shane Smith was the lead financial guy, right?

12   A.   That's correct.

13   Q.   Shane Smith was the lead negotiator, right?

14   A.   That's correct.

15   Q.   So would it be logical that Shane Smith probably also

16   provided the underlying documentation for this due diligence?

17   A.   Yeah, that would be -- that would be logical.

18   Q.   Okay.  Now, I'm sure you're also aware that, in addition

19   to being the sole owners of D and R, Bart Reagor also had to

20   sign a personal guaranty to get this loan, right?

21   A.   I am aware of that.

22   Q.   So, ultimately, that means that the bank can come after

23   him personally if he doesn't repay it, right?

24   A.   That's right.

25   Q.   So, ultimately, no matter how Bart and Rick -- if

1    they're personally liable, no matter how they use the loan

2    proceeds, if they can't make their payments, the bank's

3    coming after them personally, right?

4    A.   The bank has that right, yes.

5    Q.   Kind of just like how, if I don't pay my mortgage next

6    month, the bank's going to come after me and probably kick me

7    out at some point, right?

8    A.   Yes.

9    Q.   Same principle?

10   A.   Well, you're probably a primary obligor on your mortgage

11   as opposed to a guarantor, but generally it's the same thing,

12   yeah.

13   Q.   At the end of the day, I'm losing my house just like

14   they would lose what they got?

15   A.   That's -- that's accurate.

16   Q.   Now, it sounds like you also looked at the D and R, LLC

17   setup; am I getting that right?

18   A.   That's right.

19   Q.   Now, it was an LLC setup?

20   A.   That's accurate, yes.

21   Q.   Did it have pass-through taxation, if you will?

22   A.   That's consistent with my recollection.

23   Q.   Sure.

24   A.   But I haven't looked at that in some time.

25   Q.   Okay.  So if it's consistent with your recollection that

```
 1    D and R was an LLC that had pass-through taxation, wouldn't
 2    that also mean that, as soon as Bart Reagor and Rick Dykes
 3    took these distributions, they would have been liable for
 4    taxes on them as well personally?
 5    A.   Well, I'm not a tax expert.  If it's a pass-through,
 6    they would have tax liability whether they took the
 7    distributions or not, if there were a tax -- if there was
 8    taxable income --
 9    Q.   If they got money from --
10    A.   -- is my understanding.  Sorry.  As a pass-through, if
11    they didn't take the distributions out, they would have
12    got -- they would have got tax liability regardless.
13    Q.   Well, so let me back up.  Ultimately, they're going to
14    have to pay the taxes on this either way, right?
15    A.   I think that's right.
16    Q.   So, in addition to personally guaranteeing the loan,
17    they're also ultimately on the hook for the taxes?
18    A.   To the extent there is taxable income attributable to
19    their ownership, yes.
20    Q.   Sure.  Okay.  Now, Thomas, help me out.  Shifting gears
21    a little bit.  Help me out with what we mean -- when I say
22    the term "redlining" in this contract-negotiation world, what
23    does that mean?
24    A.   Yeah.  There's a feature on Word that you can use to
25    show -- to highlight changes that are made to a Word document
```

1   as you are trading drafts.

2        You can also run -- there's various softwares to do it.

3   There's compareDocs.  There's PDFCompare; there's ways you

4   can run them in a PDF form and send them across.

5        But, effectively, it's so that, when you send me a

6   document and I make changes to it and I send it back to you,

7   you can see the changes that are made.

8   Q.   Kind of like track changes?

9   A.   Yeah, absolutely.

10  Q.   Now, redlining helps in this negotiation process, and I

11  think you said this, but it helps because, that way, we send

12  it back and forth, both sides can see what we're changing?

13  A.   That's right.

14  Q.   Now, if we're using track changes during redlining, then

15  there's also a little button on Microsoft Word where I can

16  either accept or reject the track changes, right?

17  A.   That's right.

18  Q.   Okay.  And these track changes also show up in both red

19  and green all over the document?

20  A.   Yeah, I'm not the best with IT, but they are settings

21  you can change it, but usually it's red and blue in my

22  setting, but I think you can change the colors to your

23  preference, but --

24  Q.   Okay.  But fair to say it's easy to see what's being

25  changed because that's kind of the whole point?

Case 2:21-cr-00025-Z-BR   Document 163   Filed 08/22/22   Page 127 of 346   PageID 1699
Thomas Hutchison (cross by Mr. Norris)
127

```
1    A.   That's right.
2    Q.   Okay.  Now, in this case, there was redlining back and
3    forth of the loan agreement, right?
4    A.   Yes.
5    Q.   You were on some of those e-mails?
6    A.   Yes.
7    Q.   Okay.
8              MR. NORRIS:  Matt, can you pull up Defense
9    Exhibit 30 for me.
10             MR. POWELL:  Which one?
11             MR. NORRIS:  30.
12             MR. POWELL:  I need your password, Nick.
13             MR. COGDELL:  Nick, what's your password?
14             MR. NORRIS:  It's embarrassing to say out loud.
15             MR. COGDELL:  Roger, the cat.
16        (Laughter.)
17             THE COURT:  And, Counsel, just to protect the
18   record and also for common courtesy, I'll just ask that you
19   refer to the witness as Mr. Hutchison, or by his last name.
20   I think you slipped --
21             MR. NORRIS:  I apologize.
22             THE COURT:  I think you've slipped into some
23   informal Thomas and Tom here and there, but just --
24             MR. NORRIS:  I did.  I apologize --
25             THE COURT:  -- be mindful --
```

1        MR. NORRIS:  -- Your Honor.

2        THE COURT:  -- of that and the record that we're

3   keeping here.

4   Q.   **(By Mr. Norris)**  So, Mr. Hutchison -- and it's

5   Hutchison, right, not Hutchinson?

6   A.   Yes.  Thank you.

7   Q.   Okay.

8   A.   Nobody gets that right, so I appreciate that.

9   Q.   I want to make sure I got that right at the very least,

10  because I already said your first name.

11       MR. NORRIS:  Okay.  So this is Defense Exhibit 30

12  for the record, Your Honor.

13  Q.   **(By Mr. Norris)**  Do you recognize this, Mr. Hutchison,

14  as one of the redlines loan agreements?

15  A.   Not from memory, no, but it looks consistent with what a

16  redline would look like.

17       THE COURT:  Just very quickly, I want to make

18  certain that the Government has a copy, and --

19       MR. NORRIS:  Oh, I'm sorry.

20       THE COURT:  -- it's before the Government counsel.

21       MR. HAAG:  Yes, Your Honor.

22       THE COURT:  Okay.  You may proceed.

23       MR. NORRIS:  Matt, can we go back to the first page

24  to help him identify this.  Yep.  Down.  Yep.

25  Q.   **(By Mr. Norris)**  So you see where July -- June is

```
 1   crossed out and then it says --
 2   A.   Sure.
 3   Q.   -- July?
 4        Would it be, again, to the best that you can remember,
 5   July 6, 2017?  If I told you that's when this document was
 6   created, would you agree?
 7   A.   The timing is consistent with when this was negotiated.
 8   Q.   Okay.
 9             MR. NORRIS:  Now, let's go, sorry, back to Page 29,
10   Matt.
11   Q.   (By Mr. Norris)  Now, earlier on direct with the
12   Government, you talked about the merger clause, right?
13   A.   Yes.  I don't think we used that term, but that's --
14   that's what it is.
15   Q.   I'm sorry, am I misusing it?
16   A.   No, I think that's right.
17   Q.   That is right?
18   A.   Very good.
19   Q.   Good.  So --
20             MR. NORRIS:  Oh, you had it, Matt.
21             MR. POWELL:  No, not yet.  29, is that the page?
22             MR. NORRIS:  Yeah.  Yep.
23   Q.   (By Mr. Norris)  Okay.  So help me out with this, Mr.
24   Hutchison.  And can you please read this version of 7.12?
25   A.   When you say "this version," do you mean with the
```

1    stricken language that --

2    Q.   Yeah, go ahead and please read the language that's

3    struck out so we can then talk about it.

4    A.   Borrower will not, and will not permit any other

5    borrower group member to, declare, make, or pay any

6    distributions, either in cash or any other property, or

7    redeem, retire, repurchase, or otherwise acquire in its

8    equity interests, except that, so long as no default or event

9    of default exists or would result therefrom, any borrower

10   group member that is taxed as a partnership or Subchapter S

11   corporation for federal and state income tax purposes, may

12   pay cash distributions to its members, partners, and

13   shareholders (as applicable) an amount not exceeding their

14   federal and state income tax liability for any fiscal year

15   arising out of a direct -- arising as a direct result of

16   reported taxable income for such year.

17   Q.   Okay.  So agree with me that, if you ignore this part

18   that's crossed out, you're left with the part that actually

19   stays in the ultimate document, right?

20   A.   Yep.

21   Q.   And this part that's crossed out, can you help me with

22   what that means?

23   A.   It means that a borrower can make distributions to a

24   member in the amount of their tax liability for -- resulting

25   from ownership of that entity in a given year.

1  Q.   So, in other words, this originally said, hey, you can

2  pay distributions only for the purpose of your members of the

3  borrower group paying their tax liability, right?

4  A.   If a default or event of default does not exist.

5  Q.   Okay.  Let me make sure I get it right.

6  A.   Yeah.

7  Q.   It says, as long as an event of default does not exist

8  or would not happen, then you can pay your taxes with

9  distributions?

10  A.   That's right.

11  Q.   Okay.  Then this language gets removed, hence the red

12  strike-through, right?

13  A.   Yep.

14  Q.   Once this language is removed, it looks like y'all also

15  added the two words "if a," right?

16  A.   Well, in place of "except that so long as no."

17  Q.   Okay.  So you added the word "if a" and then devault --

18  default or event of default exists or would result therefrom?

19  A.   That's right.

20  Q.   And that leaves you with what is ultimately executed and

21  signed by the parties?

22  A.   That's right.

23  Q.   So we take out "except that" and the tax language to get

24  to, as long as you don't default, you can take distributions,

25  right?

1    A.   As long as you don't default or there's no other default

2    that exists.

3    Q.   You can take distributions.  So that would be the

4    redlining that we were just talking about?

5    A.   Yes.

6    Q.   And this would be the prior back and forth that I think

7    you mentioned on direct with the Government, right?

8    A.   Yep.

9    Q.   Now, you also mentioned on direct with the Government

10   Section 9.16.  That's the merger agreement, right?

11   A.   Yes.

12   Q.   And it means what?

13   A.   This is the parties' final agreement, and it can't be

14   contradicted by any prior, contemporaneous, or subsequent

15   oral agreements, and there are no written oral agreements.

16   Q.   In other words, when we say this is the final agreement,

17   this language about you can take a distribution as long as it

18   does not default or you're not in default or you don't create

19   a default, that is the final executed language, right?

20   A.   That's correct.

21   Q.   And that's the entire agreement?

22   A.   That's right.

23   Q.   That is what controlled IBC and Reagor-Dykes, right?

24   A.   That's right.

25   Q.   In other words, if anyone -- the whole purpose of this

1    merger agreement is that, if anyone else wants to wonder

2    about or look at what happened or what matters under this

3    agreement, they just look at the agreement?

4    A.    Correct.

5    Q.    Now, I'm going to shift gears a little bit.  You

6    mentioned earlier that you've been working for fourteen years

7    at Gable Gotwals?

8    A.    That's correct.

9    Q.    You mentioned that you've done a number of these working

10   capital type loans?

11   A.    I've done a number of loans, working capital and

12   otherwise, for IBC and other banks.

13   Q.    Well, let's go back to 2017.

14   A.    Okay.

15   Q.    Was this the first working capital loan that you'd

16   helped out on?

17   A.    I don't recall.  Probably not.

18   Q.    So how long had you been practicing at Gable Gotwals at

19   that point?

20   A.    Thirteen -- ten years.

21   Q.    Ten years.  So this would not have been the first

22   working capital loan you had done?

23   A.    No.

24   Q.    Likely not the first working capital loan you had done

25   for IBC?

1    A.    That's right.

2    Q.    Now, I think you kind of alluded to this with the

3    Government, but isn't it also true that, if IBC was so

4    concerned about these uses of working capital, that there

5    could have been additional language that y'all put into the

6    contract to control that?

7    A.    I'm not sure I understand the question.

8    Q.    Well, let me back up.  We've already established that

9    working capital, Control F thing, was mentioned once in the

10   con -- in the loan agreement.

11   A.    Sure.

12   Q.    If IBC, the lender, was really that concerned about how

13   Reagor-Dykes was going to use the working capital, they could

14   have added additional provisions into the contract about it,

15   right?

16   A.    Yes, I agree that they could have added additional

17   provisions in the contract.

18   Q.    Would you say in your experience it's uncommon that

19   additional provisions would be added about how working

20   capital is supposed to be used?

21   A.    Yeah, I think that is fairly uncommon.  I think this

22   definition -- this formulation is fairly common.

23   Q.    So it's your testimony that normally you would just

24   mention working capital once in the loan agreement and move

25   on?

1  A.   Yes, I think that's -- that's accurate.

2  Q.   Now, Mr. Hutchison, you're familiar, aren't you, with

3  this contract legal principle that, once you add in language

4  to exclude something specifically, then potentially at least

5  you're also including, including other things?

6  A.   I have heard of the principle, yes.

7  Q.   I think there's a Latin term for it; do you know?

8  A.   I don't.

9  Q.   Expressio unius, something to that effect?

10  A.   I don't know a lot of Latin.

11  Q.   I don't either.  But safe to say that there is a risk

12  of, once you go down that path of excluding one thing, you do

13  open yourself up to potentially including other things in the

14  contract?

15  A.   I've heard of that argument before, yes.

16  Q.   Sure.  I'll give you an example.  So let's say I was

17  going to go lease an apartment, and you're my lawyer, and I

18  say, well, I got this lease agreement, and it doesn't say

19  anything about pets in the lease agreement.

20       And I come to you, and I say:  What do you think; can

21  I -- can I bring my dog?  You're probably going to say, well,

22  I really don't know; it doesn't -- it doesn't say anything in

23  the contract, right?

24  A.   Sure.

25  Q.   But then maybe I bring you a lease agreement, and it

 1   says, hey, here's a pet provision; no cats allowed, and I come

 2   to you, you would say, I can probably bring my dog, right?

 3   A.   I would unless the preceding sentence said no pets

 4   allowed.

 5   Q.   Sub -- it says pets, and then it says, we don't allow

 6   cats.  Dogs would be allowed, right?

 7   A.   I don't know that I agree with that.

 8   Q.   You wouldn't agree with that?

 9   A.   The lease said there are no pets allowed, and then also

10   said there are no cats allowed?

11   Q.   No, no, no.  There's a -- there's a pet provision, and

12   it says -- all it says is no cats allowed.

13   A.   Then I would agree dogs are fine.

14   Q.   They're letting dogs in, right?

15   A.   Yeah.

16   Q.   Or if it says, dogs above 50 pounds are not allowed, my

17   little Chihuahua probably would be allowed, right?

18   A.   If that's the only language, then yeah, I would agree

19   that your --

20   Q.   Sure.

21   A.   -- Chihuahua is probably allowed.

22   Q.   So, in other words, by putting in this provision about

23   no cats, even if you didn't necessarily intend to do so, as

24   long as the agreement controls, the landlord has now opened

25   himself up to he's going to have some dogs in there?

1    A.   If that's the only language regarding pets in the

2    agreement, yes.

3    Q.   Pets is only mentioned one time in this agreement we're

4    talking about.

5    A.   Sure.

6    Q.   Dogs are allowed?

7    A.   I think so.

8    Q.   Okay.

9         **MR. NORRIS:**  Your Honor, I don't have any further

10   questions at this time.  Pass the witness.

11        **THE COURT:**  Okay.  Redirect by Mr. Haag?  And feel

12   free to define expressio unius est exclusio alterius, if

13   necessary.

14        **(Laughter.)**

15        **MR. HAAG:**  Mr. Powell, you can leave that up.

16        **MR. NORRIS:**  Oh, I'm sorry.

17        **MR. HAAG:**  No, no, you're good.  You want to leave

18   that up, Mr. Powell.

19        **MR. POWELL:**  Oh, leave it up.  I'm sorry.

20                    <u>REDIRECT EXAMINATION</u>

21   BY MR. HAAG:

22   Q.   I've just got two lines of questioning for you, Mr.

23   Hutchison.

24        So Mr. Norris talked a little bit about this prior

25   version of Section 7.12.  What's the relevance of a prior

1    version in your mind?

2    A.    There is none.

3    Q.    Because that's not the final agreement?

4    A.    That's right.  That's not the agreement the parties

5    signed and agreed to.

6    Q.    So this could have said, except anybody that the

7    borrower deems appropriate can take the money and all go to

8    Vegas and have a grand ole time?

9    A.    That's right.

10   Q.    Doesn't matter?

11   A.    Irrelevant.

12   Q.    All right.  Let's talk next about -- a little bit about

13   business entities as much as I hate venturing on that topic.

14   But, just to clear up any confusion, Mr. Norris talked about

15   D and R Acquisitions, LLC, and it was wholly owned by the

16   defendant and one other person; is that correct?

17   A.    That's right.

18   Q.    Now, do businesses have to keep the business entity

19   separate from the individual?

20   A.    That's right.

21   Q.    Does the law require that?

22   A.    The law -- the law -- I mean, that's the law behind a

23   business entity.  It is a separate -- it's a fiction, but

24   it's a person for legal purposes and is wholly separate, and

25   there are consequences to -- to owners who don't keep an

1    entity separate.

2    Q.   Okay.  And we're going to talk about one of those

3    consequences.  For liability purposes, what's the major

4    advantage of an LLC or a company?

5    A.   It protects the owners from legal liability for

6    liabilities of the company itself, the entity --

7    Q.   So if D --

8    A.   -- LLC or corporation.

9    Q.   I'm sorry?

10   A.   LLC, corporation, partnership, whatever it may be.

11   Q.   All right.  So just to take an example here, D and R

12   Acquisitions, let's say that it runs an auto dealership, and

13   something happens where D and R Acquisitions gets sued.  It

14   would just be D and R Acquisitions that would be liable for

15   that suit; is --

16   A.   Right.

17   Q.   -- that fair?

18   A.   That's right.

19   Q.   They could not go back against any of the wholly -- or

20   the owners of that company because it's a separate entity?

21   A.   That's right.

22           MR. HAAG:  No further questions, Your Honor.

23           THE COURT:  Recross, Mr. Norris?

24           MR. NORRIS:  Briefly, Your Honor.

25           THE COURT:  You may approach.

1    MR. NORRIS:  Thank you, Your Honor.

2                    RECROSS-EXAMINATION

3    BY MR. NORRIS:

4    Q.   Now, you just discussed with Mr. Haag the D and R issue,

5    so I want to be real clear here.  In addition to signing on

6    behalf of D and R, which is what Mr. Reagor did, right?

7    A.   Yeah.

8    Q.   In addition to that, he also signed a personal guaranty

9    on this loan, right?

10   A.   That's correct.

11        MR. NORRIS:  Okay.  Thank you.  Nothing further,

12   Your Honor.

13        THE COURT:  And, at this time, Mr. Haag, may this

14   witness be excused?

15        MR. HAAG:  Yes, Your Honor.

16        THE COURT:  And, Mr. Norris, any objection to

17   excusing this witness?

18        MR. NORRIS:  No, Your Honor.

19        THE COURT:  Okay.  The witness may step down.  You

20   are excused.

21      (Witness excused.)

22        THE COURT:  Mr. Haag, please call your next witness.

23        MR. FRAUSTO:  The Government would call William

24   Woodring, Your Honor.

25        THE COURT:  My apologies, Mr. Frausto.  You may

1  conduct your direct examination from counsel table or the

2  podium.

3          Please be advised that the Court is looking at a

4  target lunch time of 12:15.  Lunch will be provided to the

5  jury by the Court, and we are approaching that target.  So if

6  there's a natural break or if we can finish it by then, we'll

7  do it at that time.

8          **MR. FRAUSTO**:  Okay.

9          **THE COURT**:  Okay.  And, Mr. Woodring, you may

10 approach.  Please stand near the witness chair and remain

11 standing for administration of the oath.  My courtroom deputy

12 will administer the oath, and you may temporarily remove your

13 mask if you feel comfortable doing so.

14         **(The witness was sworn by the courtroom deputy.)**

15         **THE COURT**:  Mr. Woodring, you may take your seat.

16 I will admonish you to speak directly into the microphone.

17         And, again, I'll just direct counsel to identify

18 any exhibits you're referencing so that opposing counsel may

19 follow.  You may proceed, Mr. Frausto.

20         **MR. FRAUSTO**:  Thank you, Your Honor.

21                      **WILLIAM WOODRING,**

22     having been first duly sworn, testified as follows:

23                      <u>**DIRECT EXAMINATION**</u>

24 BY MR. FRAUSTO:

25 Q.  Can you please state your name for the record.

```
1    A.   William Woodring.

2    Q.   And what is your educational background?

3    A.   I have a finance degree from Texas Wesleyan University.

4    Q.   And have you completed graduate banking school?

5    A.   Yes.

6    Q.   And how are you currently employed?

7    A.   I'm commercial banking senior vice president at Bank7.

8    Q.   And how long have you been employed at Bank7?

9    A.   Two and a half years.

10   Q.   And prior to your employment at Bank7, where were you

11   employed?

12   A.   IBC Bank.

13   Q.   And was that in Oklahoma?

14   A.   Yes.

15   Q.   And how long did you work for IBC Bank?

16   A.   Approximately eleven years.

17   Q.   And do you recall the years?

18   A.   2018 to -- or 2008 to 2019.

19   Q.   And why did you leave IBC Bank?

20   A.   To pursue a different opportunity.

21   Q.   And what was your last position you held at IBC Bank?

22   A.   Vice president of commercial banking, commercial

23   lending.

24   Q.   And was that at the Tulsa branch?

25   A.   Yes.
```

1  Q.  And what did you specialize in at IBC Bank?

2  A.  Commercial lending.

3  Q.  And what do you currently specialize in?

4  A.  Commercial lending.

5  Q.  And, as a loan officer that specializes in commercial

6  lending, do you make loans to businesses?

7  A.  Yes.

8  Q.  And, in determining whether to make a loan to a

9  business, how important is it -- is the business's ability to

10  repay the loan?

11  A.  Very important.

12  Q.  Do you typically discuss the purpose of the loan with a

13  business?

14  A.  Yes.

15  Q.  When you make a loan to a business, do you demand the

16  business to use the loan proceeds for that intended purpose?

17  A.  Absolutely.

18  Q.  Now, I'd like to turn your attention to one commercial

19  loan in particular when you were employed with IBC Bank.  Do

20  you know Bart Wade Reagor?

21  A.  Yes.

22  Q.  Do you see him in the courtroom today?

23  A.  Yes.

24  Q.  Can you point him out and describe an article of

25  clothing he's wearing.

1    A.   He's sitting over there on the end of that table.  He's

2    wearing a blue suit with a blue tie and a white shirt.

3         **THE COURT**:  Let the record reflect that the witness

4    has identified the defendant.

5    Q.   **(By Mr. Frausto)**  Who first introduced you to the

6    defendant?

7    A.   A customer of IBC Bank.

8    Q.   And when did you first meet the defendant?

9    A.   It was October of 2016 at a football game.

10   Q.   And where was that football game at?

11   A.   Texas Tech.

12   Q.   And was that game in Lubbock, Texas?

13   A.   Yes.

14   Q.   Were you the first IBC representative to meet with the

15   defendant?

16   A.   Yes.

17   Q.   And did you talk about doing business with the defendant

18   at the football game?

19   A.   No.

20   Q.   And I don't know if you mentioned, but when was that

21   football game?

22   A.   October 2016.  It was against OU.

23   Q.   At some point, did you return to Lubbock to meet with

24   the defendant and other RDAG representatives?

25   A.   Yes.  It was several months later.

```
1   Q.   And do you recall when you returned to Lubbock?

2   A.   I believe it was April the following year.

3   Q.   So April of 2017?

4   A.   Yes, sir.

5   Q.   Who attended this meeting on behalf of IBC Bank?

6   A.   Myself and two superiors or bosses at IBC.  Andy

7   Levinson, he was the president of IBC Tulsa, and then Bill

8   Schonacher, our CEO of IBC Oklahoma.

9   Q.   And who was present and participated at the meeting on

10  behalf of RDAG?

11  A.   Bart; Shane Smith, their CFO; Rick Dykes, and then

12  throughout the course of the business, we met a few other

13  what I would call executives or kind of high-ranking people

14  at Reagor-Dykes.

15  Q.   And why did Bill Schonacher and Andy Levinson attend

16  this meeting with you on behalf of IBC Bank?

17  A.   It was typical for, you know, larger client meetings or,

18  you know, larger prospects of the bank for, you know, more

19  than just kind of the, I guess, the customer level one

20  officer to go, so they would typically accompany, you know, a

21  CEO, regional president, et cetera.

22  Q.   And this meeting in April of 2017, how long did this

23  meeting last?

24  A.   Approximately a half a day.

25  Q.   And was it at the RDAG headquarters?
```

```
1    A.   Yes.

2    Q.   In Lubbock, Texas?

3    A.   Yes.

4    Q.   What was the purpose of this meeting?

5    A.   Just to see if there was any way that IBC could be a

6    good banking partner for Reagor-Dykes.

7    Q.   And who did most of the talking on behalf of RDAG?

8    A.   Mostly Bart and Shane.

9    Q.   And, according to the defendant, why did RDAG need a

10   loan?

11   A.   Well, they had grown at a rapid pace for several years

12   or really since inception of the company, and they had --

13   basically, you know, they would use excess cash flow to fuel

14   the growth and to sustain that growth they would, you know,

15   need a loan for working capital.

16   Q.   And did the defendant tell you about his ambitions of

17   possibly going public?

18   A.   Yes.

19   Q.   At some point after this meeting, did IBC decide to do

20   business and provide a loan based on the representations that

21   were made to IBC Bank at that April 2017 meeting?

22   A.   Yes.

23   Q.   And were you assigned as the main loan officer on behalf

24   of IBC to deal with RDAG?

25   A.   Yes.
```

1    Q.    And, ultimately, did IBC agree to provide a $10,000,000

2    working capital loan to RDAG?

3    A.    Yes, in two separate loans or tranches.

4    Q.    And is tranche just a fancy word of disbursement?

5    A.    Yes.

6    Q.    And who drafted the loan agreement on behalf of IBC

7    Bank?

8    A.    Gable Gotwals.

9    Q.    And who was the attorney who actually drafted it?

10   A.    Tom Hutchison.

11   Q.    Now, why would a company need a working capital loan if

12   it was successful as RDAG represented to you?

13   A.    Just when you grow, you use cash to kind of fuel the

14   growth.  Fueling the growth means you're hiring extra people,

15   you know, acquiring properties, et cetera, et cetera, so, you

16   know, extra fuel or working capital is necessary to be able

17   to sustain that growth.

18   Q.    Did the defendant tell you that he intended to take a

19   part of the working capital loan for his personal use and

20   benefit?

21   A.    No.

22   Q.    Did any other RDAG representatives relay to IBC Bank

23   that the defendant intended to take a part of the working

24   capital loan for his personal use?

25   A.    No.

1    Q.    Now let's discuss the approval process.  Based on the

2    size of the loan, did you have to present the loan for

3    approval to several committees and board of directors?

4    A.    Yes.  So whenever we're approving loans, especially

5    loans of that size, it typically goes through several

6    different committee levels; the first being the executive

7    committee, which is just in Tulsa at our kind of local bank

8    teleconference with Oklahoma City.

9         If it gets approved there, then it would go to the next

10   level, which would be the IBC Oklahoma board level.  And if

11   the loan is large enough, it will also require approval at

12   the holding-company level, which is out of IBC Laredo.

13   Q.    And each time you presented the loan and sought approval

14   from these committees and board of directors, did you provide

15   information on how the funds were to be used?

16   A.    Yes.

17   Q.    And how were the funds to be used based on the

18   $10,000,000 working capital loan?

19   A.    Working capital to be able to sustain the growth that

20   they saw that they would experience over the next 18 to 24

21   months, kind of in that time frame of between us making the

22   loan and them going public, and basically as a cash cushion

23   during that time frame.

24   Q.    Now, there's a notebook in front of you.  If you could

25   turn to Government's Exhibit 4.

```
1    A.   Okay.
2              THE COURT:  And, Mr. Cogdell, do you have a copy of
3    Government's Exhibit 4?
4              MR. NORRIS:  We do, Your Honor.
5              THE COURT:  Okay.
6    Q.   (By Mr. Frausto)  And, Mr. Woodring, what is this
7    exhibit?
8    A.   It's a commercial loan memorandum, so it's essentially a
9    summary of the loan request along with a summary of
10   financials for the borrower, the people involved, et cetera.
11   Q.   And who prepared this memorandum?
12   A.   I did, along with the help of a few others at the bank.
13   Q.   Now, let's turn to the use of funds section.  And if you
14   could please read the first two sentences starting with "the
15   entirety."
16   A.   The entirety of the proposed $10,000,000 equity term
17   loan will be used to inject equity (reflected as an
18   investment on Reagor-Dyke or RD7's financial statements) into
19   the various entities underneath the Reagor-Dykes Automotive
20   Group umbrella.  The borrower and its related entities have
21   achieved remarkable growth since inception in 2003 becoming
22   the nations seventh largest privately-held automotive
23   dealership in the U.S.A. with annual sales of 650,000,000 in
24   2016.
25   Q.   And can you please read the sentence five lines down
```

 1   starting with "due to enormous growth," and, Mr. Woodring, if

 2   you could just slow down a tad and speak into the microphone

 3   so --

 4   A.   Oh, sorry.

 5   Q.   -- that the court reporter can type it.

 6   A.   Due to the enormous growth over the last several years,

 7   the borrower has been forced to operate with a working

 8   capital position it believes to be inadequate as company

 9   growth has eaten up excess cash flows to this point.

10   Q.   And could you please read the last sentence starting

11   with "the proposed equity term loan."

12   A.   The proposed equity term loan provides an immediate cash

13   injection to Reagor-Dykes Automotive Group to sustain growth

14   goals over the next 18 to 24 months and provides each entity

15   with a sizeable cash cushion to eliminate the need for

16   intercompany transfers of funds as it internally works to

17   consolidate the operating entities under one holding company.

18   Q.   Who provided you this information to include in the use

19   of funds section?

20   A.   It was communicated to myself and the rest of us at the

21   bank from the borrower.

22   Q.   And does that include statements and representations the

23   defendant made to you at the April 2017 meeting?

24   A.   Yes.

25   Q.   Was this information in the use of funds section also

1   consistent with what other Reagor-Dykes representatives made

2   to you and other IBC representatives?

3   A.   Yes.

4   Q.   Did this use of funds section have any information about

5   the defendant placing some of the loan proceeds to his

6   personal account for his personal use?

7   A.   No, it did not.

8   Q.   Why not?

9   A.   Because that was never communicated to us as an intended

10   purpose of the loan.

11   Q.   Did you ever tell any of the committees or board of

12   directors who you sought approval for this particular loan

13   that the loan proceeds for the working capital loan were

14   going to the defendant's personal account for his personal

15   use?

16   A.   No.

17   Q.   Why not?

18   A.   Again, that was never communicated to us that that would

19   happen or was the intention or the purpose of the loan

20   request.

21   Q.   Now, who was your primary point of contact after this

22   April 2017 meeting?

23   A.   Mostly Shane Smith.

24   Q.   And did he provide you a lot of the financials that you

25   included in this commercial loan memorandum?

```
1    A.   Yes.
2    Q.   What do you consider the most important section of your
3    commercial loan memorandum?
4    A.   The use of funds, which is why it's right on the first
5    page.
6    Q.   And do you provide that to your attorney, such as Thomas
7    Hutchison, to draft the loan agreement for that purpose?
8    A.   Yes.
9    Q.   And did that section -- did you receive information from
10   the defendant to include in the most important section of
11   that commercial loan memorandum?
12            MR. NORRIS:  Objection, Your Honor, leading.
13            THE COURT:  Okay.  Mr. Frausto, a response from the
14   Government?
15            MR. FRAUSTO:  I'll rephrase, Your Honor.
16            THE COURT:  Please rephrase.
17   Q.   (By Mr. Frausto)  Did the defendant provide you
18   information that you ultimately included in that use of fund
19   section?
20   A.   Yes.
21            MR. NORRIS:  Objection.  I'm going to object again,
22   Your Honor, leading.
23            THE COURT:  Okay.  Mr. Frausto, just refer to
24   actions that are within the personal knowledge, but don't --
25   but don't make any insinuation as to anything said by persons
```

1    who are not here.

2          I will overrule the objection if you reformulate it

3    as to his personal knowledge of the event, but don't make any

4    insinuation about what persons -- well, any hearsay.

5          **MR. FRAUSTO**:  Yes, Your Honor.

6    Q.   **(By Mr. Frausto)**  Did the defendant make representations

7    to you at the April 2017 meeting?

8    A.   Yes.

9    Q.   And were those representations included in this

10   commercial loan memorandum?

11   A.   Yes.

12   Q.   And where was it included in this commercial loan

13   memorandum?

14   A.   They are summarized throughout the package, including

15   the use of funds.

16   Q.   Now, let me turn your attention to the closing dates of

17   the working capital loan.  When did the first loan closing

18   occur?

19   A.   I believe July of that same year.

20   Q.   Can you turn to Government's Exhibit 2.

21   A.   Yes.

22   Q.   Does that refresh your memory when the first closing

23   occurred?

24   A.   Yes.

25   Q.   And when did that occur?

1    A.   July 13th, 2017.

2    Q.   And where did the closing take place?

3    A.   Tulsa, Oklahoma at Tom Hutchison, Gable Gotwals office

4    there in downtown.

5    Q.   And when was the second closing?

6    A.   The following February --

7    Q.   And was that --

8    A.   -- in 2018.

9    Q.   Sorry for interrupting you.  Can you repeat it.

10   A.   The following February, 2018.

11   Q.   And where was the second closing?

12   A.   It was done remotely.

13   Q.   When did you first learn that the defendant diverted

14   some of the working capital loan proceeds from both

15   disbursements into his personal account?

16   A.   I was told while I was being interviewed.

17   Q.   Was that part of the criminal case?

18   A.   Yes.

19   Q.   Before then, did you have any idea that the defendant

20   intended to take a personal distribution from the loan

21   proceeds?

22   A.   Can you say that one more time.

23   Q.   Before this criminal case, did you have any idea that

24   the defendant intended to take a personal distribution from

25   the working capital loan proceeds?

1  A.   No.

2  Q.   And if defendant had told you at the initial meeting in

3  April 2017 that he planned to take a personal distribution of

4  the working capital loan proceeds, would you have approved

5  this loan?

6  A.   No.

7          MR. FRAUSTO:  I'll pass the witness.

8          THE COURT:  And, just for purposes of the record,

9  the Court did overrule the objection based on the rephrasing

10 of the statement, did he.  At that point, the Court

11 determined that it was not leading.

12          And, Mr. Norris, you may continue with

13 cross-examination, and I'll just admonish you that we're

14 looking to a 12:15 stop time, so keep that in mind.  If

15 there's a natural break, we can break at that time.

16          MR. NORRIS:  Yes, Your Honor.  I was going to say,

17 I'm probably going to take more than fifteen minutes, so if

18 the Court wants to break now, that's fine, or I can start.

19          THE COURT:  Okay.  Do counsel have a preference on

20 lunch break?  We can start a little bit early and then resume

21 early, or we can get midway through cross-examination?

22          MR. HAAG:  We have no preference, Your Honor,

23 whatever the Court and the jury deem most appropriate.

24          THE COURT:  Okay.  Determining that the morning did

25 start fairly early for all involved, the Court will take a

Morning Recess Matter

(Outside of the Jury's Presence)

1    break.  This is the Court's anticipated lunch break.

2            The Court is providing lunch to the jury.  It will

3    be made available through court staff, so please follow the

4    Court Security Officers, the Marshals and the staff as you

5    reassemble there.

6            The same admonishments and instructions apply that

7    you've heard previously.  Do not discuss this case when you

8    assemble for lunch.  Do not use your Internet devices, your

9    cell phones, any iPads that you may have to research this

10   case.  Do not do any separate investigation into the persons,

11   the names, or the facts of this case.  And also please wear

12   your jury badge at all times in this courthouse and outside,

13   so that you're identified to anybody who may be connected to

14   this case.

15           We will adjourn now at approximately noon and then

16   reconvene at 1:00, and I'll just ask you to make preparations

17   for that.

18           You may leave your notepads in your desk.  We'll

19   place those under lock and key.

20           **COURT SECURITY OFFICER**:  All rise.

21       **(The jury leaves the courtroom.)**

22           **THE COURT**:  And please be seated.  A bit of

23   housekeeping before I dismiss the attorneys and the parties.

24   Because we're approaching testimony that may address issues

25   covered by the Court's Order in Limine, I'm going to --

(Outside of the Jury's Presence)

```
 1          MR. COGDELL:  Do you wish the witness to be here,
 2   Your Honor?
 3          THE COURT:  Sorry.  You are excused.  You are not
 4   excused, but you may remove yourself from the courtroom for
 5   this attorney time, and then we will -- you're subject to
 6   callback at 1:00.
 7          (Witness leaves the courtroom.)
 8          THE COURT:  Mr. Cogdell, thank you for that catch.
 9   My peripheral vision isn't what it used to be.
10          Okay.  Very briefly to the attorneys.  I know I
11   want to compliment Mr. Cogdell for approaching on sensitive
12   questions.  The attorneys in this case and the Court have
13   worked diligently in formulating orders in limine that
14   protect this case from irrelevant and inadmissible material.
15   Both sides, Mr. Haag and Mr. Cogdell, have done an
16   exceptional job in approaching the Court any time that we're
17   nearing that line.
18          I do have a proposed solution on references to
19   events or events of default, but I will not impose it upon
20   the parties unless we can reach some agreement on that.
21          In Government's Exhibit 2, Section 8.01, there is a
22   definition of event of default that appears throughout this
23   trial.  It is an admitted exhibit.  Neither party objects to
24   it.
25          There are headers there which might provide a
```

1    guidepost or some terminology that could help in direct and

2    cross examination.  So terms like nonpayment, casualty loss,

3    insolvency, things like that, if we were to use just those

4    headers approaching something that might potentially

5    reference a parallel proceeding and thereby run afoul of the

6    Order in Limine.

7            If we were to just use the headers in that section

8    to identify points in a chronology without going into any

9    ancillary civil or criminal proceedings, would that be a

10   workable solution to use that as a term sheet for events of

11   default, because we do have to talk about this defined term

12   in the contract?

13           Mr. Haag?

14           **MR. HAAG**:  I think it would, Your Honor.  For what

15   it's worth, we don't anticipate discussing the event any

16   further, so I think as a practical matter it's going to be a

17   moot issue, but I agree referring to Section point A1 -- 8.01

18   and the various events of default would be appropriate.

19           **THE COURT**:  Okay.  And, Mr. Cogdell, my idea there

20   is, if you need to reference an event that is in the

21   chronology of events and in the story of this case, for

22   example, 8.01, subsection (f), there can be a reference to an

23   event of default and insolvency, but we would not need to get

24   into any details about parallel proceedings, parties, or how

25   those were litigated.

(Outside of the Jury's Presence)

1          **MR. COGDELL**:  Well, if they're not going to get

2    close to it, let me reserve my opinion on it, Judge.  In my

3    mind, it kind of cuts us short, because what I believe is

4    what caused this loan to default, the loan in question to

5    default was not any disbursements or utilization of the

6    disbursements of these funds, but the implosion of

7    Reagor-Dykes because of the misconduct of their next witness.

8          **THE COURT**:  Right.  Okay.  I'll just instruct the

9    parties to approach.

10          I understand, Mr. Haag, you don't intend to use

11    that terminology again, but because the legal term event of

12    default does appear in the contract, I would allow some

13    latitude in making references to any of the headers appearing

14    in 8.01(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k),

15    (l), (m), (n), (o).  So there's your alphabet for the day,

16    Sesame Street.

17          So if we can -- if that does happen again, I want

18    you to have notice that I will grant some latitude in using

19    those terms because they are in the contract; they're agreed

20    to; it's an exhibit; nobody objected to that phraseology.  I

21    think that may -- that may solve some of the tension in that

22    testimony.

23          Is there any housekeeping from the Government that

24    the Court can address at this time?

25          **MR. HAAG**:  No, Your Honor.

Morning Session Matters

(Outside of the Jury's Presence)

1    **THE COURT**:  Any housekeeping from the Defendant

2    that the Court may address at this time?

3    **MR. COGDELL**:  Other than to put the Government on

4    notice that the -- or the Court rather on notice that Mr.

5    Smith's testimony is likely -- I guess he's coming next, and

6    the Government has marked his Plea Agreement and his Factual

7    Resumé as evidence, and, of course, that goes into the floor-

8    plan fraud, check-kiting, and all that, so the door will be

9    open when that comes in.

10   **THE COURT**:  Okay.  We're on notice, and this Court

11   is on notice of that.

12   Mr. Haag, you understand how rules of evidence

13   work.  If you open that door, he may proceed with

14   cross-examination.

15   I'm also amenable to any redactions if the parties

16   want to do that, but we've already been through some of these

17   exhibit fights.  So I'm on notice.  The Government is on

18   notice.  If there's any proposed working solution that's

19   negotiated in the interim, please advise the Court.  We'll

20   take it outside the presence of the jury.

21   **MR. COGDELL**:  Thank you.

22   **THE COURT**:  Okay.  Thank you for that heads-up, Mr.

23   Cogdell.

24   And I do want to thank counsel for both parties in

25   being very diligent on preserving the evidence and the

(Outside of the Jury's Presence)

1  testimony in this case and approaching when we were nearing a

2  line.  I find that that was very capable and effective

3  assistance for both the Government and the Defendant, so I

4  appreciate the excellent legal work here today.

5          MR. COGDELL:  My bar card is safe today.

6          THE COURT:  Do what?

7          MR. COGDELL:  My bar -- my bar card is safe for

8  today.

9          THE COURT:  Okay.  Yeah, it's safe for today.  So

10  we will reconvene promptly at 1:00, and you may leave your

11  materials in the courtroom, any exhibits, binders.  It will

12  be under lock and key until 1:00.

13          MR. COGDELL:  Thank you.

14          COURT SECURITY OFFICER:  All rise.

15      **(Recess taken; after which, the following took place in**

16  **open court with the defendant present but without the jury**

17  **present.)**

18          THE COURT:  Please be seated.  Court is back on the

19  record in Criminal Action No. 2:21-CR-25, United States of

20  America versus Bart Wade Reagor.

21          And, Mr. Norris, you may begin your

22  cross-examination of this witness.  I'll just remind the

23  witness that you are under oath at this point and for the

24  duration of your testimony.  You may begin.

25          I'm trying to break land speed records, but we

1    don't have a jury.

2            **COURT SECURITY OFFICER:**  All rise for the jury.

3            **MR. COGDELL:**  He does some of his best work outside

4    the jury.

5            **THE COURT:**  I was going to say, he was going to be

6    a killer.  I apologize.

7        **(Jury returned to the courtroom, and the following took**

8    **place in open court with the defendant and jury present.)**

9            **THE COURT:**  And please be seated.  Now that we do

10   have a jury.  I apologize, jurors.  I knew that I was running

11   late and tried to begin and make up time by starting without

12   you.  So nothing was said of any import, so just settle in,

13   and we will resume cross-examination of this witness.

14           Mr. Norris, you may proceed.  I'll just remind you

15   to stay near a microphone at all times and to present any

16   exhibits by number when you do so.

17           **MR. NORRIS:**  Yes, Your Honor.  Thank you.

18                    <u>CROSS-EXAMINATION</u>

19   BY MR. NORRIS:

20   Q.   Good afternoon, Mr. Woodring.  You and I have never met

21   before, have we, Mr. Woodring?

22   A.   No.

23   Q.   Now, I think you testified to this earlier, but correct

24   me if I'm wrong.  You were the lead banker for IBC throughout

25   this negotiation of this agreement; is that fair to say?

1    A.    That's fair to say.

2    Q.    So what exactly was your title at the time?

3    A.    Vice president.

4    Q.    And would you have been considered the loan officer; is

5    that -- was that the -- how you were referred to in the

6    process?

7    A.    Yes.

8    Q.    Okay.  And taking you back to 2017, how old were you at

9    the time you were negotiating this deal?

10   A.    Um, I was -- would have been thirty-two.

11   Q.    First deal that was this big?

12   A.    No.

13   Q.    You had done others?

14   A.    Yes.

15   Q.    Bigger?

16   A.    Yes.

17   Q.    How much bigger?

18   A.    Um, a little -- or size -- sizably bigger.

19   Q.    How many?

20   A.    Um, a few.

21   Q.    At thirty-two, you had already done a few

22   multimillion-dollar loans like this?

23   A.    Yes.

24   Q.    Were those all working capital loans?

25   A.    Um, no.

1  Q.   So this -- was this the first working capital loan of

2  this size that you had done?

3  A.   Of this size, of 10,000,000?  No.

4  Q.   Working capital-wise?

5  A.   No.  That would not have been the first one.

6  Q.   Second, third?  Help me out.

7  A.   Probably between five and ten.

8  Q.   Okay.  So between five and ten.  Help me out with the

9  procedure that IBC goes through.  It seems like it's fairly

10 extensive; is that fair?

11 A.   Yes.

12 Q.   So it kind of starts out with you on the ground kind of

13 as the action officer, for lack of a better term?

14 A.   Yes.

15 Q.   And that's, I guess, how you met Mr. Reagor early on in

16 the process?

17 A.   Yes.  I was a guest to a football game, and he was at

18 the same place I was.

19 Q.   So you get the loan -- you get -- first of all, you meet

20 with Mr. Reagor, get an idea of the loan, and kind of the

21 parameters of it, maybe we can do business.  And then at some

22 point you put together an internal loan memorandum; am I

23 getting that right?

24 A.   Yes.

25 Q.   And I think you testified earlier that the internal loan

1  memo is based off of -- and that's -- to be clear, sorry,

2  that's Government's Exhibit 4.  You testified earlier that's

3  based off what the borrower, in this case Reagor Dykes Auto

4  Group, tells you?

5  A.   Tells you via e-mail, you know, information they send

6  you, information they verbally provide to you, just basically

7  a summary of everything that we know or have been made to

8  know about the company.

9  Q.   And I guess the whole purpose of this loan memorandum is

10 so that you can show it to kind of your superiors, the loan

11 committee; is that fair?

12 A.   Yes.

13 Q.   Because ultimately they're going to sign off on it?

14 A.   Yes.

15 Q.   And it goes up to another loan committee; am I getting

16 that right?

17 A.   Yes.

18 Q.   Then it goes up to the board, and Mr. -- in this case,

19 Mr. Shownaker (phonetic) Schonacher?

20 A.   Yes.

21 Q.   So multiple levels of review?

22 A.   Yes.

23 Q.   Now, this loan memorandum, it's fair to say that you

24 based most, if not all, of the financial information in that

25 based off of what Shane Smith would have submitted to y'all,

1    right?

2    A.    Yes.  He was the one that provided us the financial

3    information.

4    Q.    Okay.  And kind of the whole point behind this in-depth

5    process is to make sure that the borrower is able to repay

6    the loan, right?

7    A.    Yes.

8    Q.    So the loan -- IBC is going to be careful, especially in

9    a loan of this size; they're going to take a close look at

10   this loan memorandum?

11   A.    Yes.

12   Q.    You guys are going to take a close look at the

13   financials?

14   A.    Yes.

15   Q.    And in this case -- well, let me back up.  You'd call

16   that due diligence, right?

17   A.    Yes.

18   Q.    Y'all did a lot of due diligence in this case; is that

19   fair to say?

20   A.    Yes.

21   Q.    Eight months or so of due diligence?

22          MR. FRAUSTO:  Your Honor, at this time, I'm going

23   to object, outside of the direct examination, and

24   additionally I'll object to relevance as it's not in line

25   with any elements to this offense.

1          THE COURT:  I will overrule as to relevance, but I
2    will direct counsel to wrap up this line of questioning on
3    diligence.  That's been established by multiple witnesses.
4    We're approaching a point that it is cumulative, so a couple
5    of questions on the due diligence, and then please move
6    forward.
7          MR. NORRIS:  Sure, Your Honor.
8    Q.   (By Mr. Norris)  Let's get -- let's get specific but
9    briefly about the kind of financial information.  Okay?  So
10   y'all are collecting balance sheets?
11   A.   Yes.
12   Q.   That would have been provided by Shane Smith?
13   A.   Yes.
14   Q.   Y'all are collecting income statements?
15   A.   Yes.
16   Q.   Provided by Shane Smith?
17   A.   Yes.
18   Q.   Y'all have collected cash flow statements; am I getting
19   that right?
20   A.   Yes.
21   Q.   Provided by Shane Smith?
22   A.   Yes.
23   Q.   Y'all would have collected statements of shareholders'
24   equity?
25   A.   Yes.

1   Q.   Provided by Shane Smith in this case?

2   A.   Yes.

3   Q.   And you would have done your own internal calculations

4   about cash flow coverage, I guess, based at least in part on

5   those documents that they provided, right?

6   A.   Those, along with tax returns and all the other

7   information that was provided.

8   Q.   I skipped over the tax returns.  Those were also

9   provided by Shane Smith?

10   A.   Yes.

11   Q.   Okay.  And then this was a real estate refinance loan as

12   well, right?

13   A.   Yes.

14   Q.   So that involved y'all doing appraisals of all the

15   property?

16        **MR. FRAUSTO**:  Your Honor, I'm going to object

17   again, same objections, outside the direct and going towards

18   due diligence.

19        **THE COURT**:  At this point, I will sustain the

20   objection, and for the additional reasons that it is now

21   cumulative of evidence that's already been elicited from

22   other witnesses and already in evidence.  So please move on.

23   Q.   **(By Mr. Norris)**  Mr. Woodring, since we're moving on,

24   you gave an interview to the FBI on November 14th of 2018

25   about this case, right?

1   A.   Yes.

2   Q.   That was with Special Agent Whitworth?

3   A.   Yes.

4   Q.   Was that in person?

5   A.   Yes, it was.

6   Q.   So you recognize Agent Whitworth sitting in the

7   courtroom?

8   A.   Yes.

9   Q.   Okay.  And during that interview, Agent Whitworth told

10  you that IBC was the victim in this case?

11  A.   Yes.

12  Q.   Because you asked him, hey, what's going on; why am I

13  being interviewed by the FBI, fair?

14  A.   Sure.

15  Q.   You were concerned about getting called in to get

16  interviewed by the FBI; is that fair to say?

17  A.   Well, I mean, it's not anything anyone ever wants to do,

18  so yes.

19  Q.   Right.  But the agents never suggested to you that they

20  suspected you personally of any crimes, right?

21  A.   No.

22  Q.   Okay.  They didn't ever ask you either whether you had

23  made any mistakes in the negotiation of the loan, right?

24  A.   No.

25  Q.   Now, even though you and the bank were technically the

1   victim, you took an attorney into the room with you for this
2   interview; am I getting that right?
3   A.   The bank provided the attorney.
4   Q.   IBC provided the attorney?
5   A.   Yes.
6   Q.   So that attorney also was from Gable Gotwals?
7   A.   Yes.
8   Q.   That would not have been Thomas Hutchison, would it?
9   A.   No.
10  Q.   Mark Sanders; does that sound right?
11  A.   I believe so.
12  Q.   So he works at the same law firm as does Mr. Hutchison,
13  right?
14  A.   Yes.
15  Q.   Okay.  Now, let's go back to -- we kind of mentioned it,
16  but let's go back to that first meeting that you -- well, let
17  me ask this:  When did you first meet Shane Smith?
18  A.   It would have been I believe at that -- I don't remember
19  if I met him at the football game or not, but for sure met
20  him at the meeting that we had in Lubbock at their office
21  several months later.
22  Q.   The April 2017 meeting?
23  A.   Yes.
24  Q.   So on direct with the Government, I think you mentioned
25  that Bart Reagor did a fair amount of the talking in that

1    meeting?

2    A.    Yes.

3    Q.    But, also, Shane Smith did some talking, right?

4    A.    Yes.

5    Q.    And, to be clear, Smith was the guy who had the answers

6    on all the financials, right?

7    A.    Yes.

8    Q.    As the -- I guess as the chief financial officer, that

9    would kind of make sense, no?

10   A.    Yes.

11   Q.    Okay.  And would you agree with the statement that Bart

12   Reagor was not focused on the financials; he was focused on

13   sales, high-level motivation type stuff?

14   A.    I would say that's a fair statement.

15   Q.    Would you also agree with me that Shane, as the CFO, was

16   IBC's main point of contact throughout this entire

17   negotiation process?

18   A.    Main point, yes.

19   Q.    In other words, Shane Smith was on most, if not all, of

20   the negotiation e-mails flying back and forth between you

21   guys?

22   A.    Yes.

23   Q.    Do you recall Bart Reagor being on any of those

24   negotiation e-mails?

25   A.    I believe so.

```
1    Q.   You do?

2    A.   Yes.

3    Q.   A lot?

4    A.   I know that most of the e-mails would come from Shane,

5    but I do remember, you know, other people being -- you know,

6    from Reagor-Dykes being on those e-mails.

7    Q.   Can you think of -- I'm not talking about other people

8    from Reagor-Dykes; I'm talking about Bart in particular.  You

9    sure you remember Bart being on those e-mails?

10   A.   I remember Bart being on, like, high-level management

11   summary-type e-mails that they would send out on a quarterly

12   basis.

13   Q.   Let me be more specific then in my question.  You don't

14   remember Bart being on any of the actual negotiation e-mails

15   where you guys are sending e-mails back and forth trying to

16   talk about, here's what the loan agreement should say; here's

17   what it shouldn't say?

18   A.   I don't remember.

19   Q.   Would you disagree with me if I said that he was on none

20   of those e-mails?

21   A.   I don't -- honestly I don't remember.  It's been four

22   years, so --

23   Q.   So do you remember -- you -- do you remember him being

24   on any of the redlining negotiation e-mails?

25            MR. FRAUSTO:  Your Honor --
```

```
 1   Q.   (By Mr. Norris)  Yes or no?
 2           MR. FRAUSTO:  -- I'm going to object, basically
 3   asked and answered three times.
 4           THE COURT:  Sustained.  Asked -- the question has
 5   been asked and answered.  Move to your next question.
 6   Q.   (By Mr. Norris)  Okay.  Mr. Woodring, now, as a banker,
 7   it's fair to say that you review the sort of financial
 8   information that we were talking about all the time?
 9   A.   Yes.
10   Q.   You have a -- you went to school for business?
11   A.   Yes.
12   Q.   Like undergraduate for business?
13   A.   Yes.
14   Q.   Where did you go to school?
15   A.   Texas Wesleyan University.
16   Q.   I think you said that earlier, and I missed it.  I
17   apologize.  Do you also have a Master's degree?
18   A.   No.
19   Q.   But you've taken some Master's classes; am I getting
20   that right?
21   A.   Graduate banking school, yes.
22   Q.   Okay.  What does that mean briefly?
23   A.   It's a professional type of business program or I guess
24   executive development type of banking program.
25   Q.   Okay.  And you also had to pass the Series 7 exam; is
```

```
 1   that right?
 2   A.   Not for this job.  I passed it previous when I was
 3   reviewing -- or when I was considering going to work as a
 4   broker before I started working at IBC.
 5   Q.   Okay.  So you have --
 6   A.   Yes.
 7   Q.   -- passed the Series 7 exam to be clear?
 8        What about Series 66; you took that as well, right?
 9   A.   Yes.
10   Q.   Passed that?
11   A.   Yes.
12   Q.   It's for investment advisors?
13   A.   Yes.
14   Q.   I'm assuming, because it's for investment advisors, that
15   would also involve financial accounting type material?
16   A.   Yeah.  I mean, yes.
17   Q.   Okay.  So it's fair to say you have a pretty good
18   background in finance, banking, et cetera?
19   A.   Yes.
20   Q.   Now, you reviewed all of the materials that we were
21   talking about earlier that Mr. Smith provided on the
22   financials of Reagor-Dykes, right?
23   A.   Yes.
24   Q.   You, in reviewing those, did not pick up on any problems
25   with those Reagor-Dykes financials, did you?
```

1    **MR. FRAUSTO:**  Your Honor, I'm going to object again

2 going towards the due diligence, which has been cumulative

3 and not relevant at this point.

4    **THE COURT:**  Response?

5    **MR. NORRIS:**  This is a totally different section.

6 I'm not going into how much due diligence.  I'm going into

7 the fact that Shane Smith misrepresented these financials and

8 a financial professional was unable to catch it, Your Honor.

9    **THE COURT:**  Was that addressed during direct

10 examination?

11    **MR. NORRIS:**  I believe it was.  The loan approval

12 process was addressed.  Many claims were made about what Bart

13 Reagor and Reagor-Dykes provided to them, et cetera.  Yeah, I

14 believe it was.  Yes, sir.

15    **THE COURT:**  Okay.  Sustained.  But I'll ask that

16 you formulate your questions to make specific reference to

17 either this witness' personal knowledge of events and to

18 please steer clear of any hearsay that wouldn't involve party

19 opponents.  You may proceed.

20 Q. **(By Mr. Norris)**  Did you review the financials, all the

21 financials in this case from Reagor-Dykes?

22 A. Yes.

23 Q. You did not pick up on any issues, problems?

24 A. No.

25 Q. Okay.  Is it fair to say that you were impressed by the

1  growth that you saw in all of that financial information?

2  A.   Yes.

3  Q.   No cash flow problems picked up by --

4  A.   What --

5  Q.   -- you?  Sorry.  You didn't pick up on any cash flow

6  issues, right?

7  A.   No.  The cash flow issues were communicated to us by the

8  borrower, and that's why their loan request.

9  Q.   Okay.  Now, we've already talked briefly about the --

10  there was real estate underlying the loan, right?

11  A.   Yes.

12  Q.   The actual borrower on this loan was D and R

13  Acquisitions, LLC, correct?

14  A.   Yes.

15  Q.   That was the real estate holding company for all of the

16  Reagor-Dykes Auto Group properties?

17  A.   I think for most of them.

18  Q.   Okay.  A lot, yeah.  A lot of money involved in those

19  properties, right?

20  A.   Yes.

21  Q.   So Bart personally signed that loan agreement, right?

22  A.   Yes.

23  Q.   And when he signed, he was signing on behalf of D and R;

24  fair to say?

25  A.   Yes.

1    Q.   And, surely, you're aware, aren't you, that Bart and

2    Rick Dykes both owned 50/50 D and R Acquisitions, right?

3    A.   Yes.

4    Q.   Meaning, effectively they were both personally liable

5    for the money that they were borrowing from the bank, IBC,

6    right?

7    A.   Yes.

8    Q.   In other words, no matter what happened with the money,

9    they were on the hook to pay it back?

10   A.   Yes.

11   Q.   Now, I want to talk about the actual distributions.

12   Now, it's not normal for your bank to monitor working capital

13   money once it's actually handed out to a borrower, is it?

14   A.   No, it's not normal.  We -- we make the loan, and the

15   funds are disbursed at closing, and we don't put a tracker or

16   anything on the funds after closing.

17   Q.   Well, and let's -- help me out with that.  So I think

18   earlier someone mentioned money is fungible.  Do you agree

19   with that?

20   A.   Could you use another word.

21   Q.   Well, I was hoping you could explain what fungible means

22   to me, because I was sitting over there scratching my head.

23   Basically it means -- what I think it means, and you help me

24   out, is --

25            MR. FRAUSTO:  Your Honor, I'm going to object.

1    This is outside the scope of direct.

2            **THE COURT:**  So the initial question in this line

3    involves actual distributions and whether it is typical for

4    the borrower to monitor working capital.  I'll just ask you

5    to return to that.  The distributions are relevant.

6            But if we slip in and out of how much diligence was

7    done or anything like that, we're running afoul of some

8    cumulative problems.

9            So I will sustain the objection in limited form.

10   I'd just ask you to return to this witness' personal

11   knowledge of distributions as it relates to his work with

12   IBC.

13           **MR. NORRIS:**  Yes, sir.

14   Q.   **(By Mr. Norris)**  Now, I don't want to go -- don't

15   mistake me; I don't want to go back to the due diligence

16   thing.  I'm talking about after the loan is agreed to, right?

17   A.   Meaning the loan is, like, closed, originated?

18   Q.   You closed the loan.  Money goes into the borrower's

19   bank account, right?

20   A.   Yes.

21   Q.   Now, once it goes into the borrower's bank account, you

22   don't know what happens to it, right?

23   A.   Typically, we do not.

24   Q.   Typically, you're not monitoring this deposit, that

25   withdrawal, out of the borrower's bank account, right?

1    A.    Yes.

2    Q.    And so you guys didn't do that here, did you?

3    A.    No, we did not.

4    Q.    In other words, once that money goes into the account,

5    it belongs to the business, right?

6    A.    Yes.

7    Q.    And in the working capital case, it's being used by the

8    business.  I think the term you used was, it's the lifeblood

9    of the business or cash cushion, something to that effect?

10   A.    Yes.

11   Q.    It's fair to say the business has a lot of discretion

12   about how they use their working capital, right?

13   A.    It's ultimately dictated by, you know, what they agree

14   to with the bank, but yes.

15   Q.    Well, help me out with that, what they agreed to.  So

16   you agree or disagree that the term working capital is only

17   mentioned once in the loan agreement here?

18   A.    I would have to reread the loan agreement to say -- to

19   agree with you.

20   Q.    Let me help you out.  Will you agree with me that, if

21   you were to Control F search the document for the term

22   working capital, it would only appear once?  Do you have any

23   reason to disagree with me on that?

24   A.    No.

25   Q.    Now, would you also agree with me that it's really not

1    defined in that agreement?

2    A.    Um, I -- I can't agree with you or disagree with you.

3    Q.    Why not?

4          **MR. FRAUSTO**:  Your Honor, I'm going to object at

5    this time.  It's again outside the scope of the direct.  We

6    didn't go directly into the provisions of the loan agreement.

7    We focused on the commercial loan memorandum.

8          Mr. Hutchison already had testified as to what the

9    loan agreement said.

10          **THE COURT**:  I'll sustain that objection, and I'll

11    instruct counsel to focus only on the documents that were

12    raised during direct examination.

13          Again, the Court finds that much of this

14    cross-examination is flirting with a cumulative problem, so

15    make sure that your next question relates to a document that

16    was addressed during direct examination by this witness.

17          **MR. NORRIS**:  Okay.

18    Q.    **(By Mr. Norris)**  Can you agree with me, Mr. Woodring,

19    that Bart and Rick Dykes took their first distribution from

20    this loan in July of 2017?

21    A.    The -- say that one more time.

22    Q.    They took the distribution, meaning the personal money

23    that they took out that we're talking about, they took that

24    in -- around July 2017; does that sound right?

25    A.    That's what I was told.

```
1   Q.   By the FBI?

2   A.   Yes.

3   Q.   Okay.  So if you had to be told that by the FBI, then I

4   guess at the time, July of 2017, you didn't know it was

5   happening, did you?

6   A.   No.

7   Q.   The bank didn't know it was happening?

8   A.   No.

9   Q.   Up until -- well, scratch that.  Let me go back.  You

10  didn't know that there was an issue with this loan until

11  July, August 2018; is that fair to say?

12  A.   Yes.

13  Q.   So basically a year had lapsed -- elapsed?

14  A.   Yes.

15  Q.   And, in that year, Bart Reagor, Rick Dykes, the

16  entities, they were making their payments back to the bank,

17  right?

18  A.   Yes.

19  Q.   And because they were making their payments back to the

20  bank, the bank would have been making a little money off of

21  the interest, right?

22  A.   Yes.

23  Q.   And, therefore, the bank had no concerns about what was

24  going on with this working capital money, right?

25  A.   We had no reason to have a concern.
```

1    Q.   Because you were getting paid back?

2    A.   Yes.  I mean, yes, but everything that we had been

3    provided gave us no reason to have a concern.

4    Q.   You didn't think about it or it didn't trigger any

5    concerns for you because the bank is getting repaid; is that

6    not fair to say?

7    A.   Well, borrowers routinely provide, you know, financials

8    on a, you know, somewhat routine basis, every month

9    sometimes, every three months.

10        So, you know, it -- just because someone's making the

11   payment doesn't make us feel warm and fuzzy inside that

12   everything is good.  We still collect information and

13   monitor, I guess, the borrowers.

14   Q.   But I thought you said earlier that you didn't monitor

15   the borrower's bank account and what they were doing with the

16   money?

17   A.   Not the bank account.

18   Q.   So what other information would you be collecting if

19   you're getting paid on time routinely with interest?

20   A.   Financial statements.

21   Q.   You would still collect financial statements even though

22   you're getting repaid on the loan?

23   A.   Yes.

24   Q.   Is that what you did here?

25   A.   Yes.

1  Q.   So you got more financial statements from Shane Smith

2  after you had already given the loan out?

3  A.   We would get financial statements, inventory reports,

4  receivable reports.  I mean, there's a lot that --

5  Q.   You were getting that here in this case?

6  A.   Yes.

7  Q.   From Reagor-Dykes?

8  A.   Yes.

9  Q.   After July 2017?

10  A.   Yes.

11  Q.   Who was sending it to you?

12  A.   Shane Smith was the one sending it.

13  Q.   And you said inventory reports; did I get that right?

14  A.   Yes, because, you know, someone who sells cars, I mean,

15  that's kind of a -- you know --

16  Q.   Sure.

17  A.   -- it's one of the main components of the business.

18  Q.   So Shane Smith was also sending you inventory reports

19  after July 2017?

20         MR. FRAUSTO:  Your Honor, objection, asked and

21  answered and cumulative.

22         MR. NORRIS:  Your Honor, can we approach?  This is

23  new.

24         THE COURT:  Okay.  I'll just instruct counsel to

25  approach, to use the microphone near the bench, and also

1    instruct court staff to turn on the white noise machine.

2        **(The following took place at the bench and outside the**

3    **hearing of open court.)**

4            **MR. NORRIS:**  This is the first I'm hearing or

5    seeing of anything about Shane Smith continuing to send --

6            **THE COURT:**  Let me make sure Stacy's able to hear.

7            **COURT REPORTER:**  I can't hear.

8            **THE COURT:**  We are going to use this.  Is that

9    okay?

10           **COURT REPORTER:**  Yes, that, as long as they get

11   near it.  I still can't hear you.

12           **THE COURT:**  Okay.  Well, I'm not talking yet.

13           **COURT REPORTER:**  Oh, okay.

14           **THE COURT:**  Sealed Exhibit No. 1 to the Pretrial

15   Conference yesterday confirmed that defendant is waiving

16   previous allegations of prosecutorial misconduct.  At the

17   time I inquired about disclosures, discovery, different

18   allegations that were made up to this point in trial, and

19   that has now been resolved, that Defendant doesn't allege

20   that.

21           Is there anything about this response that's

22   inconsistent with your statements to this Court that the

23   Government has complied with its discovery and disclosure

24   obligations?

25           **MR. NORRIS:**  I'm not necessarily alleging that they

```
 1  haven't complied, Your Honor.  I am saying this is the first
 2  I'm hearing that there were continued inventory statements
 3  sent from Shane Smith to IBC after the loan was actually
 4  closed, which relates to the stuff we're really not supposed
 5  to talk about regarding Shane Smith and the floor-plan fraud.
 6  I'm not saying they have it and we don't.  I have no idea
 7  what they have.
 8          THE COURT:  Okay.
 9          MR. FRAUSTO:  Well, one, how is it even relevant if
10  it's after the loan?  Two, I'm not -- we don't know -- I
11  mean, we've given them all of our discovery.
12          MR. HAAG:  Yes, Your Honor.  Everything in
13  Government's Exhibit 1 is the entire file from IBC Bank, the
14  entire file.
15          THE COURT:  Okay.  So are you familiar with the
16  inventory statements from Shane Smith?
17          MR. HAAG:  No, Your Honor, because it's not
18  relevant to this case.  What's relevant is March, April of
19  2017, and then the second disbursement in February of '18.
20  Anything beyond that is irrelevant.  The fraudulent intent
21  was --
22          MR. NORRIS:  Right.  So he --
23          MR. HAAG:  -- March 2017.
24          MR. NORRIS:  Sorry to interrupt you.
25          THE COURT:  No crosstalk.  Go ahead.  Respond.
```

1    **MR. NORRIS:**  So if that's the relevant time period,

2  that year, which is what we were talking about, and he was

3  still sending it during that year, which I think is what he

4  testified to, then I think it is relevant because that means

5  that Shane Smith was continuing to deceive IBC regarding

6  their inventory and other financial --

7    **THE COURT:**  Why is it not relevant, Mr. Frausto?

8    **MR. FRAUSTO:**  Because the purpose of the loan was

9  to use for working capital, so just the fact that they're

10  trying to get into due diligence or trying to blame Shane

11  Smith for them not catching it ahead of time --

12    **MR. COGDELL:**  I think --

13    **MR. FRAUSTO:**  -- well, they didn't know.  The bank

14  also didn't know of the defendant's e-mail.

15    **MR. COGDELL:**  I think we're talking about cross

16  purposes to some extent.  I think Mr. Norris' point is, it is

17  not necessarily relevant to the IBC bank fraud allegation; it

18  would be relevant to -- for impeachment as to continued

19  misconduct on the part of Shane Smith.

20    **MR. HAAG:**  If you ask Mr. Smith if he continued to

21  send it, that's fine.

22    **MR. COGDELL:**  Oh, I will.

23    **MR. HAAG:**  Well, I know, and that's why I'm saying

24  let's move --

25    **MR. FRAUSTO:**  And it's outside the scope of direct.

1      **THE COURT**:  I will give an -- I will sustain the

2      objection as to this witness, but because we're about to open

3      the door with the next witness, I'll give a limiting

4      instruction, and I'll instruct the jury that there will be

5      reference to these inventory statements since it was elicited

6      on cross-examination, but that will be directed to the origin

7      of those inventory statements, Mr. Smith.

8              As to this witness, I don't see that it's relevant

9      to the documents at issue.

10      **MR. COGDELL**:  Well, I think he should be -- with

11      all due respect, I think he should be at least allowed to

12      confirm that this witness believes that Shane Smith

13      continued.

14      **THE COURT**:  Yes.  That one final question to

15      confirm that, and then I will instruct the jury that they can

16      anticipate that the next witness will testify to which

17      documents he did or did not send.

18              The parties have worked with this Court diligently

19      to identify through discovery and other mechanisms which of

20      those should be admitted, and the appropriate time for going

21      into further depth as to what Shane Smith sent or did not

22      send would be there.  So I'll ask you -- I'll allow you to

23      ask that last follow-up question, and then we'll move on to

24      the next --

25      **MR. COGDELL**:  To be fair, it's not really opening a

1  door.  It's more like Pandora's Box, but --

2           **THE COURT:**  I've been trying to keep a lid on it

3  this whole time, and you know that.

4           **MR. COGDELL:**  You have.

5      **(The following took place in the hearing of open court.)**

6           **THE COURT:**  Okay.  Mr. Norris, one final question

7  on this, and then I'll give the jury the instruction that we

8  discussed at the bench conference.

9           **MR. NORRIS:**  Yes, Your Honor.  Thank you.

10  Q.   **(By Mr. Norris)**  So, to be clear, Mr. Woodring, is it

11  your testimony that Shane Smith was continuing to send, I

12  think you called it, inventory reports to you guys at IBC

13  from July of 2017 after the loan closed onward?

14  A.   Yes.  I mean, it was everything.  I mean, everything

15  that we basically reviewed before we made the loan, it was

16  sent to us on a regular basis after we made the loan.

17           **THE COURT:**  Okay.  And with that question, I do

18  want to give the jury an instruction.  This in essence is a

19  limiting instruction.

20           The Court anticipates — and I've confirmed with

21  counsel — that the next witness that the Government calls is

22  Shane Smith.  He is the alleged or actual origin of a lot of

23  the documents that you've been hearing about.

24           I've instructed the parties to direct this line of

25  inquiry to that witness.  This witness is relevant to the

```
 1   loan documents that were discussed and other documents that
 2   were discussed during direct examination.  For that purpose,
 3   I've instructed Defense Counsel to limit his questions about
 4   documents that another witness knows about and originated.
 5            So, from this point forward, I'll just ask you to
 6   abide that.  And there will come a time where I'll give you
 7   another limiting instruction on the nature of impeachment
 8   evidence, and I anticipate doing that prior to the next
 9   witness or during the course of that testimony.
10            So from this point forward, let's restrict this
11   line of questioning to documents that were addressed during
12   direct examination, but I will allow Defense Counsel to
13   inquire about inventory reports with Mr. Smith when he is on
14   the stand.
15            Does that work for the Government?
16            MR. HAAG:  Yes, Your Honor.  I think that's --
17            THE COURT:  Does that work for the Defense?
18            MR. COGDELL:  Yes.
19            THE COURT:  Okay.  You may proceed, Mr. Norris,
20   with those instructions.
21            MR. NORRIS:  Your Honor, may I have a moment of the
22   Court's time to confer with my co-counsel?  I apologize.
23            THE COURT:  Yes, and I understand that was a bit of
24   an interruption in your chain, so please take as much time as
25   you need.
```

```
 1        (Defense Attorneys' sotto-voce conference.)
 2            MR. NORRIS:  I apologize, Your Honor.  Thank you.
 3            THE COURT:  And you may continue.
 4            MR. NORRIS:  Thank you, Your Honor.
 5    Q.   (By Mr. Norris)  I want to go back briefly to
 6    Government's Exhibit 4.  Okay?
 7    A.   Okay.
 8    Q.   That's the loan memorandum, I believe, we spoke briefly
 9    about earlier.
10    A.   Yes, sir.
11    Q.   Now, agree with me that that loan memorandum is an
12    internal document to IBC?
13    A.   Yes.
14    Q.   In other words, you don't take that loan memorandum and
15    then show it to Reagor-Dykes after you prepare it, do you?
16    A.   No.
17    Q.   And also agree with me that that -- because they didn't
18    even see it, that loan memorandum is not binding on
19    Reagor-Dykes, is it?
20    A.   The loan memorandum?
21    Q.   The loan memorandum.
22    A.   It's just a presentation of basically facts and
23    information that we gathered.
24    Q.   That you as IBC have gathered?
25    A.   Yes.
```

 1   Q.   So what would govern for Reagor-Dykes and IBC is the

 2   loan agreement, right?

 3   A.   Yes.

 4          MR. NORRIS:  Your Honor, I pass the witness.

 5          THE COURT:  And redirect by the Government?

 6                   **REDIRECT EXAMINATION**

 7   BY MR. FRAUSTO:

 8   Q.   Just one question, Mr. Woodring.  Prior to your

 9   interview with the FBI, did you have any clue of the

10   defendant's intention or knowledge whether or not the

11   defendant diverted some of the working capital loan proceeds

12   to his personal account?

13   A.   No.

14          MR. FRAUSTO:  Pass the witness.

15          THE COURT:  And recross limited to that question?

16          MR. NORRIS:  No, Your Honor.  Thank you.

17          THE COURT:  Okay.  May this witness be excused?

18          MR. FRAUSTO:  Yes, Your Honor.

19          THE COURT:  And does the Defense object to this

20   witness being excused?

21          MR. NORRIS:  No objection, Your Honor.

22          THE COURT:  Okay.  You may step down.  You are

23   excused.

24      **(Witness excused.)**

25          THE COURT:  And the Government may call its next

(Outside of the Jury's Presence)

1    witness.

2          **MR. HAAG**:  Yes, Your Honor.  The United States

3    calls Shane Smith.

4          I have a feeling that we are going to get into

5    several of the issues in the limine order.  I'm trying to be

6    respectful of the jury's time, so I don't know if the Court

7    wants to take it up now and give them an early break and get

8    started, or how the Court would prefer to do it.

9          **THE COURT**:  Okay.  Let's -- let's take a break

10   until 2:00.  We will excuse the jury, but counsel will be

11   instructed to remain.

12         I'll remind all of the attorneys involved that we

13   have invoked the rule, so be mindful of the limits that I

14   have set forth, so we will address those issues outside the

15   presence of the jury until 2:00, at which time they will be

16   expected to return.

17         **COURT SECURITY OFFICER**:  All rise.

18      **(The jury leaves the courtroom.)**

19         **THE COURT**:  Okay.  Please be seated.  And, Mr.

20   Haag, since you are the party calling this witness,

21   essentially the movant, I'll let you begin.  I understand

22   that we're approaching some bright lines in the Order in

23   Limine, and let's -- let's discuss that and where those lines

24   are drawn for purposes of direct.

25         And then I will invite argument from Defense

(Outside of the Jury's Presence)

 1    Counsel in response.  You may proceed.

 2        **MR. HAAG**:  Yes, Your Honor.  There's really two

 3    lines of testimony that in my mind are relevant, but are at

 4    least in some way touched by the limine order.

 5        First of all, we're going to discuss with Mr. Smith

 6    the reason for the absence of working capital within

 7    Reagor-Dykes.  And I believe that he's going to testify that,

 8    since he joined Reagor-Dykes as CFO in 2008, there was never

 9    enough working capital in Reagor-Dykes because the owner

10    distributions sucked up all the working capital inside the

11    company.

12        I think also the other area that I'm going to get

13    into is -- it's certainly fair grounds for Mr. Cogdell to get

14    into, and I don't dispute that, but we're going to get into

15    the collateral conviction of Mr. Smith who has pleaded guilty

16    to Conspiracy to Commit Fraud, Wire Fraud.

17        We're going to get into -- and I'm just going to

18    front it, Your Honor.  I'm going to talk about he lied to

19    pretty much everybody in the auto industry.  He lied to every

20    bank.  We're going to go in detail with all the lies he told,

21    and there's several.  I'm not disputing that or trying to

22    hide that.  So I'm going to front all of that information

23    because I believe it is fair cross-examination and

24    impeachment, and, therefore, we're going to bring that up

25    with the witness on our own.

(Outside of the Jury's Presence)

1      **THE COURT**:  Okay.  And, here, the Order of Limine

2  makes specific reference to eliciting testimony, evidence or

3  arguments related to extrinsic conduct of RDAG employees

4  convicted of check-kiting, floor-plan fraud, or wire fraud.

5  You did approach.  We've done this outside the presence of

6  the jury.

7      I'll hear now from Defense Counsel, understanding

8  that the Government will open the door with this witness.  I

9  am inclined to allow the line of questioning from the

10  Government, cross-examination by the Defendant, but would

11  still prefer to avoid extrinsic conduct and any references to

12  the adjudication of the parallel proceedings that are

13  referenced in Section B and Section C of the Order in Limine

14  with the exception of Mr. Smith's conviction and the Plea

15  Agreement paperwork attendant thereto.

16      **MR. COGDELL**:  I respectfully disagree because it

17  was Mr. Smith's conduct in many of those additional cases

18  that caused those individuals to be convicted.  It's not

19  enough that the jury knows that he was convicted.  The jury

20  needs to know, frankly put, or simply put, how evil he was.

21      He directed, ordered, mandated his employees to

22  commit crimes.  That goes directly to his credibility, his

23  believability, his character, and so forth.  The jury is

24  entitled to know that.

25      **THE COURT**:  And we have pre-admitted —— and I

(Outside of the Jury's Presence)

 1   assume you will use it aggressively in cross-examination —

 2   Shane Smith's Plea Agreement, Factual Resumé, which includes

 3   some of that terminology addressed by the Order in Limine,

 4   and then also the Plea Agreement Supplement.

 5          But there are not additional exhibits in evidence

 6   relevant to bankruptcy cases, civil litigation, tort actions,

 7   and the rest.  Do you anticipate needing to go into any

 8   judgments or court documents or facts from those proceedings

 9   and what was adjudicated there?  Because then I'm refereeing

10   all sorts of evidentiary problems.

11          MR. COGDELL:  I don't intend to go into the civil

12   cases unless they are otherwise raised.  I don't intend to go

13   to parallel proceedings on other related civil cases.  I

14   don't intend to go into the bankruptcy issues.

15          I do intend to ask him about his conduct regarding

16   requiring other Reagor-Dykes employees to become involved in

17   criminal conduct.  And there doesn't have to be documents or

18   anything in evidence before I ask him those questions.  They

19   go to his character.  They go to his -- frankly, they just go

20   to how evil he is.

21          His crimes don't stop with him; that's my point.

22   His crimes begin with him.  It stops with, there were 14 or

23   15 others that ended up pleading guilty as a result of what

24   he directed them to do.

25          THE COURT:  Okay.  And, Mr. Cogdell, here, the

(Outside of the Jury's Presence)

1    Factual Resumé does reflect stipulated facts.  This was

2    admitted without objection.  The elements of the offense are

3    set forth, and then those stipulated facts follow in

4    Paragraphs 1 through 30.  The Plea Agreement Supplement also

5    includes additional facts relevant to the Government's

6    prosecution of Mr. Smith.

7            As long as the Court discerns that the parties are

8    referencing what appears in Government's Exhibit 33, 34, and

9    35 and does not need reference to additional or ancillary

10   proceedings or documents to lay a foundation for impeachment,

11   then I think, if that door is open, the Defendant may

12   aggressively cross-examine, and that to include what the

13   Order in Limine addressed check-kiting, floor plans, and wire

14   fraud.

15           **MR. COGDELL**:  Yes, sir.

16           **THE COURT**:  I also want to admonish Defense Counsel

17   to be mindful of Paragraph H and L, which pertain to whether

18   persons should be federally prosecuted or not, and then, of

19   course, the selective prosecution section of that order and

20   the caselaw cited therein, and also I'll incorporate by

21   reference here the Government's briefing on selective

22   prosecution.

23           I know there's a temptation, because of all the

24   actors involved, to approach those lines, if you think that

25   you are getting close to Paragraph H or Paragraph L, please

(Outside of the Jury's Presence)

```
 1    approach for a ruling.
 2              MR. COGDELL:  I don't intend to, Your Honor.  But,
 3    just as an example of where I'm going to go, I would ask him,
 4    you know, on the check-kiting or the floor-planning, it's
 5    true that, not only you engaged in this; you required your
 6    employees, Pepper Hamilton, you ordered her to do it; this
 7    person, you ordered them to do it.  I mean, I think that's
 8    fair game.
 9              THE COURT:  Okay.  Response from the Government?
10              MR. HAAG:  Yes, Your Honor.  I disagree.  There's a
11    difference between someone joining in a crime and agreeing to
12    do a crime and someone forcing someone to do a crime.  If
13    they were forced to do a crime, then there would be a
14    justification defense.
15              None of the defendants in this case had a
16    justification defense.  They were not threatened.  They were
17    not coerced.  They were not bullied.  They fully did those
18    criminal acts of their own will and volition.  And,
19    therefore, I don't believe that it's fair game to try and
20    blame Shane Smith for the other conduct.
21              If Mr. Cogdell wants to say, was this your idea,
22    was this your scheme, was this your plan, did you develop it,
23    I think that's fair game, but the --
24              MR. COGDELL:  I can also ask him --
25              MR. HAAG:  -- insinuation that he somehow forced
```

(Outside of the Jury's Presence)

1    others to do it --

2         **THE COURT:**  Yeah, I would -- I would agree with

3    that.  And I didn't hear that from Mr. Cogdell in his

4    response.  I'll be certain to mind that gap.

5         An element of this offense is scheme, schema and

6    artifice, and so if it's the defense theory of the case that

7    this is the architect --

8         **MR. COGDELL:**  It is.

9         **THE COURT:**  -- of that schema and artifice, I'll

10   allow cross-examination as long as it's moored to documents

11   in evidence, discovery that's been disclosed.

12        Here, we've had much litigation about the nature of

13   the documents and discovery in this case.  The parties are

14   now in agreement that this is the body of evidence.  This is

15   the testimony we're going to court on.

16        I don't want to dive into sentencing files in the

17   defendants I have sentenced before this Court.  As I've

18   explained before, I know the denominator of malfeasance is

19   much broader than the case that has been indicted here, and

20   I'm doing this to the Government and the Defendant, trying to

21   try this case on the Indictment, and not the 15 or so

22   sentencing hearings that I've had where relevant conduct and

23   things like that are admissible and have been addressed by

24   this Court.

25        So, as a guiding principle, just moor yourself to

(Outside of the Jury's Presence)

1  those government documents and then also those paragraphs in

2  the Order in Limine.  If you think you're getting close,

3  please approach.

4          When we get to the point on the limits of

5  impeachment evidence, I will give that instruction.  I can

6  actually give that when the jury returns since we're going to

7  get into it pretty quickly.

8          Is that the parties' preference, that when they

9  return, I can explain the limits of impeachment evidence and

10  what it can be considered for?

11          **MR. HAAG**:  Yes, Your Honor.

12          **MR. COGDELL**:  I'm fine with whatever you want to

13  do.

14          **THE COURT**:  Okay.  And because it's going to happen

15  pretty quick, we'll just give that instruction.

16          So, with that admonishment that you moor your

17  questions to Government's Exhibits 34 -- I think it's

18  Government's Exhibits 33, 34, and 35, anything in there is

19  fair game, fair game to the Government, fair game to the

20  Defendant.

21          This obviously, in essence, is an exception now by

22  Court ruling to the Order in Limine, which requested that the

23  parties not delve into parallel proceedings, criminal

24  proceedings or the terms floor-plan fraud --

25          **MR. COGDELL**:  Check-kiting.

(Outside of the Jury's Presence)

1        THE COURT:  -- check-kiting or wire fraud.  So the

2    Court has now ruled.  The parties have approached.  We have

3    adjudicated.  You may address those terms, those

4    terminologies, and especially as they appear in those three

5    Government documents.

6        If the Government puts that on, it's fair game.

7    You may use anything that appears in those documents, but

8    please be mindful of the remaining paragraphs of that Order

9    in Limine, and I will instruct the jury on the limits of

10   impeachment evidence when they return.

11       MR. COGDELL:  Yes, Your Honor.

12       MR. HAAG:  Yes, Your Honor.

13       THE COURT:  Is that acceptable to the Government?

14       MR. HAAG:  It is, Your Honor.

15       THE COURT:  Acceptable to the Defense?

16       MR. COGDELL:  Yes, sir.

17       THE COURT:  Okay.  We will proceed.  Please call

18   back the jury.

19       MR. COGDELL:  Could we have a five-minute break

20   before we start back up?

21       THE COURT:  That might be good.  So how about --

22       MR. COGDELL:  Ten-minute break.  You said --

23       THE COURT:  Yeah, we'll return at --

24       MR. COGDELL:  -- return at 2:00.

25       THE COURT:  Yeah.  I think we said 2:00.

 1          MR. COGDELL:  Yeah.

 2          THE COURT:  So the Court will stand in recess, but

 3    the jury will not return until that 2:00 start time.

 4          MR. COGDELL:  Thank you.

 5          COURT SECURITY OFFICER:  All rise.

 6       (Recess taken.)

 7          THE COURT:  Please bring in the jury.

 8       (The jury returned to the courtroom, and the following

 9    took place in open court with the defendant and jury present.)

10          THE COURT:  Please be seated.  Members of the Jury,

11    in moments you will hear testimony and questions about the

12    witness, Shane Smith's, prior conduct, some of which is

13    criminal in nature.

14          You are instructed only to consider information

15    about other crimes and conduct in weighing the credibility of

16    the witness.  The defendant has not been charged in the same

17    schemes or crimes as this witness.  This case is not about

18    those crimes or acts.

19          His prior history and current criminal charges are

20    only relevant to the witness' credibility and should only be

21    considered for those limited purposes.  You should not

22    consider Shane Smith's prior criminal conduct as evidence of

23    Bart Reagor's guilt or his innocence.

24          And with those instructions which are grounded in

25    the Fifth Circuit Pattern 1.12 and then also the Federal

 1    Rules of Evidence 609(a) and 608, Mr. Haag, you may call your

 2    next witness.

 3            MR. HAAG:  Thank you, Your Honor.  The United

 4    States calls Shane Smith.

 5            THE COURT:  Mr. Smith, please take your place near

 6    the witness chair, remain standing for administration of the

 7    oath.  You may remove your mask for the duration of your

 8    testimony.  Please raise your right hand.

 9        **(The witness was sworn by the courtroom deputy.)**

10            THE COURT:  You may take your seat.  I'll admonish

11    you to speak clearly into the microphone.  You are now under

12    oath.

13            You may proceed, Mr. Haag.

14            MR. HAAG:  Thank you, Your Honor.

15                        **SHANE SMITH,**

16        having been first duly sworn, testified as follows:

17                    <u>DIRECT EXAMINATION</u>

18    BY MR. HAAG:

19    Q.   Mr. Smith, let me orient you real quick.  So in front of

20    you, there is a microphone.  If you'll please speak into the

21    microphone, just to make sure that the court reporter and the

22    jury hear you clearly.

23            You'll also see a Government's exhibit book in front of

24    you.  I'll be referencing those exhibits.

25            Additionally, there's a screen that's to your front, and

```
 1   those exhibits will come up on the screen.  Okay?

 2   A.   Yes, sir.

 3   Q.   All right.  Please state your name.

 4   A.   Shane Andrew Smith.

 5   Q.   We're going to be talking about the time period from

 6   October 2016 until August 1st of 2018.  How were you employed

 7   during that time?

 8   A.   I was the CFO for the Reagor-Dykes Auto Group.

 9        THE COURT:  Just briefly, Mr. Haag.  You may pull

10   that microphone closer to you.

11        THE WITNESS:  Okay.

12        MR. HAAG:  Mr. Smith, if you want, you can move

13   that exhibit book off to the side if that would help you

14   bring the microphone closer.

15        THE WITNESS:  That's okay.  Is that better?

16        MR. HAAG:  Well, or -- may I approach, Your Honor?

17        THE COURT:  You may approach.

18      (Mr. Haag/Mr. Smith sotto-voce conference.)

19        THE COURT:  And if at any point you're dissatisfied

20   with the amplification, we can always use a separate

21   microphone.

22        MR. HAAG:  Thank you, Your Honor.

23        THE COURT:  You may proceed.

24   Q.   (By Mr. Haag)  During that time frame, how were you

25   employed?
```

```
 1   A.   I was the CFO for the Reagor-Dykes Auto Group.
 2   Q.   What does CFO stand for?
 3   A.   Chief financial officer.
 4   Q.   Were you fired from Reagor-Dykes?
 5   A.   Yes, sir.
 6   Q.   When were you fired?
 7   A.   August 1st of 2018.
 8   Q.   When did you become the chief financial officer of
 9   Reagor-Dykes?
10   A.   February of 2008.
11   Q.   Who was your supervisor at the Reagor-Dykes Auto Group?
12   A.   Bart Reagor.
13   Q.   During your time as CFO, how often would you interact
14   with Bart Reagor?
15   A.   Oh, every day just about.
16   Q.   How often did you interact with the defendant's business
17   partner, Rick Dykes?
18   A.   Once or twice a week on average.
19   Q.   As between Bart Reagor and Rick Dykes, who gave you the
20   most direction on a day-to-day basis?
21   A.   Bart Reagor did.
22   Q.   What percentage of the time would you say that Mr.
23   Reagor, as opposed to Mr. Dykes, gave you direction in your
24   day-to-day activities?
25   A.   99 percent of the time.
```

```
 1    Q.   As to who?
 2    A.   Bart did.
 3    Q.   Did Mr. Reagor ever object to you bringing issues to
 4    Rick Dykes?
 5    A.   Yes, sir.
 6    Q.   Would you describe for the jury when that happened and
 7    how it happened.
 8    A.   If I brought something up to Rick or Rick asked me to do
 9    something without going through Bart first, he'd -- he'd get
10    upset about it.
11    Q.   Did the defendant tell you to stop that?
12    A.   Yes.
13    Q.   Do you see Bart Reagor in the courtroom today?
14    A.   Yes, sir.
15    Q.   Would you please point him out.
16    A.   He's over there in the blue suit at that table.
17         THE COURT:  Let the record reflect that the witness
18    has identified the defendant.
19    Q.   (By Mr. Haag)  What is working capital?
20    A.   Working capital is essentially the cash that a business
21    has to handle its operations day to day.
22    Q.   When you started as the chief financial officer at
23    Reagor-Dykes back in 2008, did it have sufficient working
24    capital?
25    A.   No, sir.
```

1   Q.   In the ten years that you were chief financial officer,

2   did it ever have sufficient working capital?

3   A.   No, sir.

4   Q.   Why not?

5   A.   There was never enough money between the owner draws and

6   the tax withdrawals.

7   Q.   Let's go ahead and talk about some of those expenses.

8   When you first started working at Reagor-Dykes, how many

9   stores did it have?

10  A.   It had two stores.

11  Q.   And when I say "stores," what kind of business was

12  Reagor-Dykes?

13  A.   It was car dealerships.

14  Q.   When you left in 2018, how many dealerships did it have,

15  or stores?

16  A.   It had over twenty locations of some sort, between sales

17  and service.

18  Q.   When you first started as chief financial in 2000 -- or,

19  I'm sorry, chief financial officer in 2008, how many

20  employees did Reagor-Dykes have?

21  A.   Had about fifty, maybe a little more.

22  Q.   And when you left in 2018, how many employees did

23  Reagor-Dykes have?

24  A.   When I left, they had over 600.

25  Q.   Did the acquisition of those dealerships cost money?

1   A.   Yes, sir.

2   Q.   Did the payment and the salaries for all of those

3   employees cost money?

4   A.   Yes, they did.

5   Q.   How did the Reagor-Dykes employees' salaries compare

6   with other employees in similar positions at other auto

7   dealerships?

8   A.   They were higher.

9   Q.   How much higher?

10   A.   I would say 20 to 30 percent higher.

11   Q.   And that included you, correct?

12   A.   Yes, sir.

13   Q.   How much did you make in 2017 as chief financial officer

14   with the Reagor-Dykes Auto Group?

15   A.   My total compensation was close to $800,000.

16   Q.   You also talked about owner draws and owner

17   distributions out of the Reagor-Dykes entities; is that

18   correct?

19   A.   Yes, sir.

20   Q.   How much did the defendant and his partner take out of

21   the Reagor-Dykes auto dealerships for distribution to them

22   and for taxes?

23   A.   Over $25,000,000 total.

24   Q.   That's 25,000,000 over the time frame that you were the

25   chief financial officer?

1   A.   Some of that started before I was there.

2   Q.   But a total of $25,000,000?

3   A.   Yes, sir.

4   Q.   How much of a draw were they taking each month during

5   the time frame from approximately when you started to

6   approximately 2013?

7   A.   Well, it varied over the years, but, you know, on

8   average, over 35,000 each a month.

9   Q.   From 2013 until 2017, which is going to be the IBC loan

10  that we're talking about here today, what percentage of

11  Reagor-Dykes working capital went to the defendant and to

12  Rick Dykes for their personal use and benefit?

13  A.   Over 50 percent of the working capital went to those

14  draws.

15  Q.   When you combined those draws, plus the acquisition of

16  the dealerships, plus the salaries, did that create a

17  shortage of working capital for the Reagor-Dykes Auto Group?

18  A.   Yes, sir, it did.

19  Q.   All right.  We're going to stop there, and let's turn

20  and talk about the crimes that you committed to pay for all

21  of this.

22  A.   Okay.

23  Q.   You committed fraud to keep Reagor-Dykes alive, didn't

24  you?

25  A.   Yes, sir, I did.

1  Q.   Let's look at Government's Exhibits 33 through 35.

2           THE COURT:  Those exhibits are pre-admitted without

3  objection.  You may make reference to them without laying

4  foundation, and you may publish without permission -- well,

5  without seeking additional permission, I should say.

6           MR. HAAG:  Thank you, Your Honor.

7  Q.   (By Mr. Haag)  Let's start with Government's Exhibit 33.

8  What is --

9  A.   Yes, sir.

10 Q.   What is this document?

11 A.   This is the Plea Agreement I have with the United States

12 Government.

13 Q.   What's the date of your Plea Agreement?

14 A.   The date here?

15 Q.   Yes, sir, up at the top.

16 A.   June 18th, 2019.

17 Q.   In this Plea Agreement, what crime did you plead guilty

18 to?

19 A.   I pleaded guilty to Conspiracy to Commit Wire Fraud.

20 Q.   All right.  Let's go to Page 2.  And we'll highlight

21 Paragraph 3.  If you would, please read for the jury the

22 maximum penalties that you face with this guilty plea.

23 A.   (A) imprisonment for a period not to exceed 20 years;

24      (B) a fine not to exceed $250,000, or twice any

25 pecuniary gain to the defendant or loss to the victims;

1          A term of supervised release of not more than three

2     years, which may be mandatory under the law, and will follow

3     any term of imprisonment.  If the defendant violates the

4     conditions of supervised release, the defendant could be

5     imprisoned for the entire term of supervised release;

6          (D) a mandatory special assessment of $100;

7          (E) restitution to victims or to the community, which is

8     mandatory under the law, and which the defendant agrees may

9     include restitution arising from all relevant conduct, not

10    limited to that arising from the offense of conviction alone,

11    and which the defendant agrees is in an amount of at least

12    $50,108,784.70, which is the total amount of loss to FMCC and

13    victim banks from returned deposits;

14         (F) costs of incarceration and supervision; and

15         (G) forfeiture of property.

16    Q.   Let's go now to Government's Exhibit 35.  What is

17    Government's Exhibit 35?

18    A.   This is the Plea Agreement Supplement.

19    Q.   As part of your Plea Agreement Supplement, have you

20    agreed to cooperate with the United States by providing

21    truthful and complete information and testimony?

22    A.   Yes, sir.

23    Q.   Do you understand that, if you do provide truthful and

24    complete testimony, then the United States may ask the Court

25    to reduce your sentence?

1  A.   Yes, sir, I do.

2  Q.   Do you understand that that reduction is solely within

3  the discretion of the United States to ask for and solely

4  within the discretion of the Court here to grant?

5  A.   Yes, sir, I understand.

6  Q.   Do you understand that, if you lie or fail to disclose

7  material information, then the United States will not ask the

8  Court to reduce your sentence?

9  A.   Yes, sir, I do.

10  Q.   Do you understand that, if you lie or fail to disclose

11  material information, then you may have been found to have

12  obstructed justice and could be subject to a higher sentence

13  and additional charges?

14  A.   Yes, sir.

15  Q.   Do you understand that, if you lie or fail to disclose

16  material information, then you may be charged with perjury or

17  making a false statement?

18  A.   Yes, sir.

19  Q.   Let's go to Government's Exhibit 34 now.  What is

20  Government's Exhibit 34?

21  A.   This is the Factual Resumé that identifies the crimes I

22  committed.

23  Q.   How many pages is Government's Exhibit 34?

24       MR. HAAG:  I'll tell you what, if you'd scan

25  through the number of pages.

1  A.    Thirteen.

2  Q.    **(By Mr. Haag)**  We won't go into detail and have you read

3  all of this, but let's just talk about some of the fraud that

4  you committed.

5        Would it be fair to say that you have committed just

6  about every sort of fraud imaginable with respect to your

7  position?

8  A.    Yes, sir.

9  Q.    You defrauded automobile lenders?

10  A.    Yes, sir.

11  Q.    You defrauded banks?

12  A.    Yes, I did.

13  Q.    You lied about when cars were sold?

14  A.    Yes.

15  Q.    You lied about what cars were sold?

16  A.    Yes.

17        MR. COGDELL:  Judge, I realize the purpose, but

18  he's still leading.

19        MR. HAAG:  It's impeachment, Your Honor, which does

20  allow for leading questions.

21        THE COURT:  I will allow for leading questions here

22  as long as each question identifies a different category and

23  is not cumulative.  You may proceed.

24        MR. HAAG:  Yes, Your Honor.

25        THE COURT:  Overruled.

1        **MR. HAAG**:  Thank you.

2    Q.   **(By Mr. Haag)**  You lied about what cars were sold?

3    A.   Yes, sir.

4    Q.   You lied about what cars were in your inventory?

5    A.   Yes, sir.

6    Q.   You got loans for the same car from two different

7    lenders, didn't you?

8    A.   Yes.

9    Q.   You committed a fraud scheme called check-kiting,

10   correct?

11   A.   Correct.

12   Q.   And we're going to not try and get in the weeds on

13   check-kiting, but let's say we have a Bank A and a Bank B,

14   how does check-kiting work using a Bank A and a Bank B?

15   A.   We write checks from Bank A to deposit into Bank B, and

16   then you write checks from a different bank or Bank B to go

17   back into Bank A to cover the negative balances that you

18   wrote those checks from.

19   Q.   All right.  So just as a simplistic example, if I've got

20   $100 in Bank A, and I write a check for deposit into Bank B,

21   are those funds immediately available in Bank B?

22   A.   Yes, they are.

23   Q.   So you've now got $100 that you can use from Bank B.

24   What about the subtraction of $100 from Bank A; is that

25   immediate?

```
 1    A.    No, sir.
 2    Q.    How long does that take to reflect with the banking
 3    system?
 4    A.    Two to three days.
 5    Q.    Okay.  So you would write a check from Bank B back to
 6    Bank A to cover the $100 shortfall, and you would just
 7    increase those amounts in a roundabout circle; would that be
 8    fair to say?
 9    A.    Yes.
10    Q.    And it's not just two banks that you did it with; you
11    did it with several banks?
12    A.    That's correct.
13    Q.    You never told the defendant about these fraudulent
14    schemes, did you?
15    A.    No, sir.
16    Q.    You never told the defendant's partner about the
17    fraudulent schemes?
18    A.    No, sir.
19    Q.    The defendant relied upon you as the chief financial
20    officer, didn't he?
21    A.    Yes, he did.
22    Q.    Did he ever review documents personally, or did he rely
23    on you to review those documents?
24    A.    He relied on me to review them.
25    Q.    Did he trust you to review those documents?
```

```
 1    A.   Yes, sir.

 2    Q.   Let's go now to Government's Exhibit 57.

 3              THE COURT:  That exhibit is pre-admitted.  Mr.

 4    Cogdell, do you have your copy of that exhibit?

 5              MR. COGDELL:  I have it in front of me, Your Honor.

 6    Yes, sir.

 7              THE COURT:  Okay.  You may proceed.

 8    Q.   (By Mr. Haag)  What is Government's Exhibit 57?

 9    A.   This is an e-mail that I wrote to Danny Hurley.

10    Q.   What is the date that is on that e-mail?

11    A.   Monday, July 30th, 2018.

12    Q.   Would this be approximately two days before you were

13    terminated from Reagor-Dykes?

14    A.   Yes, sir.

15    Q.   All right.  Back up.  And, again, we won't go into all

16    of the details of that, but, in short, do you admit to all

17    the fraudulent schemes that are reflected in Government's

18    Exhibits 33 through 35?

19    A.   Yes, I did.

20    Q.   You had a temper when you worked at Reagor-Dykes, didn't

21    you?

22    A.   Yes, sir.

23    Q.   You would yell at people?

24    A.   Yes.

25    Q.   Throw things against the wall?
```

1    A.    Yes, sir.

2    Q.    You've been sued by three banks civilly; is that

3    correct?

4    A.    Yes, sir.

5    Q.    FirstCapital Bank of Texas sued you for a $590,000 loan

6    that you defaulted on; is that correct?

7    A.    That is correct.

8    Q.    And they have a judgment against you for that amount,

9    correct?

10   A.    Yes, sir.

11           **MR. COGDELL:**  Your Honor, may we approach?

12           **THE COURT:**  Yes, please approach.

13        **(The following took place at the bench and outside the**

14   **hearing of open court.)**

15           **MR. COGDELL:**  I'm not upset that he did it, but

16   clearly he's opened the door to the civil litigation.

17           **THE COURT:**  Right.  So now we're making reference

18   to the paragraphs that I identified in the Order in Limine.

19           **MR. HAAG:**  Your Honor, this is private civil

20   litigation between the banks and Shane Smith individually, so

21   the 590 is the mortgage.  The other one is the account where

22   he's a cosigner.

23           And so this has nothing to do with the civil

24   litigation in the limine order.  These are personal judgments

25   against him.

1          **THE COURT**:  Okay.  Can he clarify that on the

2     record, and then we can continue to operate by Paragraph H

3     and L?

4          **MR. COGDELL**:  Sure.  I'm not sure he --

5          **THE COURT**:  I'll let you go into these personal

6     judgments, of course, now that he has --

7          **MR. COGDELL**:  Yes.  And I'm not sure he hasn't

8     otherwise opened the door.  I just wanted to bring it to the

9     Court's attention.  He's just cutting with a finer scalpel

10    than I am.

11         **MR. HAAG**:  I'm just trying to help you out.

12         **(Laughter.)**

13         **THE COURT**:  Okay.  So let's clarify --

14         **MR. COGDELL**:  Dismiss it.

15         **THE COURT**:  To make certain that we are on the same

16    page about Order in Limine Paragraphs H and L, which I still

17    want to mind that line --

18         **MR. HAAG**:  Yes, Your Honor.

19         **THE COURT**:  -- let's make clear that these are

20    personal judgments, so that that scope is made clear to both

21    the jury and all involved.

22         **MR. HAAG**:  Yes, Your Honor.

23         **THE COURT**:  Okay.

24         **MR. HAAG**:  And I'll quit this line of questioning.

25    That's fine.

          1              THE COURT:  Thank you, Mr. Cogdell.

          2              MR. COGDELL:  Yes, sir.

          3         **(The following took place in the hearing of open court.)**

          4    Q.   **(By Mr. Haag)**  Now, just to clarify, these civil suits,

          5    these are suits against you in your personal capacity as

          6    opposed to Reagor-Dykes; is that correct?

          7    A.   That is correct, yes, sir.

          8    Q.   All right.  We'll go ahead and move on.  You owe

          9    $100,000 in federal income taxes for 2018; is that correct?

         10    A.   Yes, sir.

         11    Q.   And you are currently working with the IRS for a

         12    repayment plan of that amount?

         13    A.   That's correct.

         14    Q.   All right.  Let's get back to the reason why we're here

         15    today, the IBC working capital loan.

         16         In March 2017, did Ford Motor Credit audit the

         17    Reagor-Dykes dealerships?

         18    A.   Yes, sir.

         19    Q.   In general terms, would you describe for the jury what

         20    happens during an audit by Ford Motor Company.

         21    A.   During an audit, they will arrive at each location and

         22    touch all the cars that are physically on the lots.  Then

         23    they will reconcile what is not there, and they will get with

         24    the office or the sales managers to determine where those

         25    vehicles are, if they're at a body shop, if they've been

```
 1    sold, if they're on a test drive, trying to identify where
 2    every vehicle is that is assigned to that floor plan.
 3    Q.   Did any problems arise from the March 2017 audit?
 4    A.   Yes, sir.
 5    Q.   What happened?
 6    A.   We had millions of dollars of vehicles sold that had not
 7    been paid off.
 8    Q.   And let's try and explain a little bit about the cash-
 9    flow cycle of the car business so the jury understands how
10    that could happen.
11         We'll use Ford Motor Credit just as an example.  So
12    Reagor-Dykes, when it has a car on its lot from the Ford
13    Motor Credit Company, does Reagor-Dykes own that vehicle?
14    A.   No, sir.
15    Q.   Who owns that vehicle?
16    A.   Ford Motor Credit Company owns that vehicle.
17    Q.   And do they lend Reagor-Dykes the money to sell that
18    vehicle?
19    A.   Yes.
20    Q.   How long do you have -- how long do you have when you
21    sell the car from -- how long do you have when you sell the
22    car from Reagor-Dykes to pay Ford for that car?
23    A.   We had seven days.
24    Q.   Let's talk about the buyer.  How long does the buyer
25    have to pay Reagor-Dykes for the car that it just bought?
```

1    A.   Well, it depends.  Most of the people finance the cars

2    through a bank or a lending institution, so it's just however

3    long it takes the dealership and that institution to finalize

4    the contract and get the funds.

5    Q.   What's the shortest amount of time in general that a

6    bank would pay Reagor-Dykes for a consumer loan to buy a car?

7    A.   Probably three days.

8    Q.   What is the longest it could take?

9    A.   I've seen it take more than thirty days.

10   Q.   So that period of time between seven days when you have

11   to pay Ford and thirty days when you get the money from the

12   buyer to buy the car, is that what causes the need for

13   working capital to keep that process going?

14   A.   Yes, sir.

15   Q.   Did the defendant understand the cash-flow process for a

16   car sale?

17   A.   Yes, sir.

18   Q.   Who taught him that process?

19   A.   He learned it over the years being in the car business,

20   and he also watched me do a class that I taught to our new

21   people.

22   Q.   After this March 2017 audit, did the defendant propose

23   to take any actions to correct the situation with the March

24   audit?

25   A.   Yes, sir.

1   Q.   What did he propose?

2   A.   He proposed to stop expanding, to cut expenses, and to

3   raise capital.

4   Q.   So cut expenses, number one; raise capital, number two;

5   is that correct?

6   A.   Yes.

7   Q.   Did Reagor-Dykes accomplish that?

8   A.   We accomplished one.  We raised capital.

9   Q.   Let's talk about that.  What steps did you take in

10  March 2017 to raise capital?

11  A.   We hired a gentleman that had worked on Wall Street and

12  had some connections with banks that used to raise money for

13  companies.

14  Q.   What was that individual's name?

15  A.   John Thompson.

16  Q.   Where was Mr. Thompson based out of?

17  A.   Austin.

18  Q.   We're going to talk about one lender in particular.

19  When did you first meet with representatives from IBC Bank?

20  A.   April 6th of 2017.

21  Q.   Where did you meet with those IBC representatives at?

22  A.   We met in Bart's office at the corporate headquarters.

23  Q.   Who all from the Reagor-Dykes entities attended that

24  meeting?

25  A.   Bart Reagor, Rick Dykes, and myself.

1   Q.   Who all from IBC Bank attended that meeting?

2   A.   William Woodring, Andrew Levinson, and Bill Schonacher.

3   Q.   What was Mr. Woodring, Mr. Levinson, and Mr.

4   Schonacher's role with IBC Bank, if you know?

5   A.   Mr. Woodring, I believe, was the vice president at the

6   time.  Mr. Levinson was a market president, and Mr.

7   Schonacher, I believe, was the CEO or a president of some

8   sort.

9   Q.   What was the purpose of that meeting in April 2017 with

10  IBC Bank?

11  A.   It was to start the process of raising funds for the

12  Reagor-Dykes Auto Group.

13  Q.   In particular, what type of loan -- let me ask it this

14  way:  Was there one loan you were seeking or two loans?

15  A.   There was two.

16  Q.   And what type of loans were you seeking from IBC Bank?

17  A.   We were seeking a refinance of all the company's real

18  estate and also a working capital loan.

19  Q.   Let's talk about those in order.  Why did Reagor-Dykes

20  need to refinance its property loan?

21  A.   Well, we had several properties with various banks that

22  all had different terms, maturity dates, payments, and

23  different interest rates.

24  Q.   How would consolidating those real estate loans with IBC

25  Bank help Reagor-Dykes?

1  A.   We could get better terms.  We could get a better rate,

2  consolidated payment, and it would reduce the number of

3  payments we had to send every month along with the total

4  amount we sent out every month.

5  Q.   Let's talk about the second need.  What was the second

6  loan needed for?

7  A.   The working capital.

8  Q.   Why did the Reagor-Dykes Auto Group need working

9  capital?

10  A.   We did not have sufficient working capital to operate

11  properly every day.

12  Q.   What was the discussed amount in general terms for the

13  real estate loan?

14  A.   I believe it was about 35,000,000.

15  Q.   What was the discussed amount for the working capital

16  loan?

17  A.   $10,000,000.

18  Q.   Now, again, what is working capital?

19  A.   Working capital is the cash that a company has to

20  operate its business every day.

21  Q.   Was there any discussions with IBC Bank about using the

22  $10,000,000 working capital loan with an eye towards

23  Reagor-Dykes going public?

24  A.   It was discussed that that would be a stepping stone.

25  Q.   And how would that benefit Reagor-Dykes and IBC for

 1   Reagor-Dykes to go public?

 2   A.   It would provide much more cash for the auto group to

 3   expand.

 4   Q.   Who did most of the talking during your April 2017

 5   meeting with IBC Bank?

 6   A.   Bart did.

 7   Q.   Did you do any of the talking?

 8   A.   Yes, I did some.

 9   Q.   Did you provide the financial information during that

10   meeting?

11   A.   Yes, sir.

12   Q.   Did yourself, the defendant, and other representatives

13   of Reagor-Dykes tell IBC Bank that the working capital loan

14   would be used for working capital?

15   A.   Yes.

16   Q.   Was there any other purpose stated for that loan other

17   than working capital?

18   A.   No, sir.

19   Q.   During that meeting, did the defendant, or anyone else,

20   ever tell IBC Bank that the working capital loan proceeds

21   will be used for the defendant's personal use or benefit?

22   A.   No, sir.

23   Q.   Was that ever discussed at all?

24   A.   No, sir, not with them.

25           MR. COGDELL:  Did he say, I don't think?

1   Q.   **(By Mr. Haag)**  I'm sorry.  Let me get that -- is that --

2   A.   Not with IBC, no, sir.

3   Q.   After that April 2017 meeting with IBC Bank, did IBC

4   Bank agree to make a working capital loan to Reagor-Dykes?

5   A.   Yes, sir.

6   Q.   Did IBC request information from Reagor-Dykes before it

7   loaned the money?

8   A.   Yes, it did.

9   Q.   What type of information did it request?

10  A.   It requested current financial statements, previous

11  year-end tax returns, and audited financial statements,

12  requested bank statements of our current bank accounts,

13  appraisals for the real estate, debt schedules.

14  Q.   Who from the Reagor-Dykes side provided that

15  information.

16  A.   I provided that.

17  Q.   Did you have to provide financial information for the

18  Reagor-Dykes auto dealerships?

19  A.   Yes.

20  Q.   Did you have to provide personal financial information

21  for the defendant?

22  A.   Yes, sir.

23  Q.   Why -- I'm sorry, let me back up.  Did you have to

24  provide a copy of the defendant's personal federal income tax

25  return to IBC Bank?

```
1    A.    Yes, sir.

2    Q.    Why did you have to provide personal financial

3    information for the defendant to IBC Bank?

4    A.    Because he was listed as one of the guarantors on the

5    loan.

6    Q.    What is a guarantor?

7    A.    A guarantor is someone who also signs for a loan that

8    will make a payment if a payment is not made by the original

9    borrower.

10   Q.    While you were providing all of this information to IBC

11   Bank, did you ever tell them that there was the intention

12   that part of the working capital loan will be used for the

13   defendant's personal use and benefit?

14   A.    No, sir.

15   Q.    Did anyone else, to your knowledge, ever tell IBC Bank

16   that part of the working capital loan will be used for the

17   defendant's personal use and benefit?

18   A.    No, sir.

19   Q.    On May 31st, 2017, did you receive an e-mail from the

20   defendant about how he intended to use the working capital

21   loan proceeds?

22   A.    Yes, sir, I did.

23   Q.    Before that date, had the defendant ever discussed with

24   you taking a large portion of the working capital loan

25   proceeds?
```

```
1    A.   No, sir.
2    Q.   Now, as the chief financial officer, where did you want
3    the $10,000,000 from IBC to go?
4    A.   I wanted it to go into the checking accounts of the
5    dealerships.
6    Q.   Why?
7    A.   So they could operate on a day-to-day basis with more
8    cash than what we had.
9    Q.   Did you ever tell the defendant that?
10   A.   No, sir, not after that e-mail.
11   Q.   Let's talk about that e-mail.  If we can pull up
12   Government's Exhibit 41.
13          THE COURT:  Government's Exhibit 41 is
14   pre-admitted.  And, Mr. Cogdell, do you have your copy?
15          MR. COGDELL:  I do.
16          THE COURT:  You may proceed.
17          MR. HAAG:  All right.  We're going to start up here
18   at the top with the header if we can bold that or highlight,
19   I'm sorry.
20   Q.   (By Mr. Haag)  Who is this e-mail from?
21   A.   It's from Bart Reagor.
22   Q.   And is that an e-mail account associated with the Bart
23   Reagor that you recognize?
24   A.   Yes, sir.
25   Q.   Who was the e-mail to?
```

1  A.   That e-mail was to Shane Smith and Rick Dykes and Bart

2  Reagor.

3  Q.   What was the date that e-mail was sent?

4  A.   May 31st, 2017.

5  Q.   What was the subject line of the e-mail?

6  A.   Handling capital.

7  Q.   With regard to the date, just to put it in context for

8  the jury, as of May 31st, 2017, had the first closing

9  commenced for the IBC working capital loan?

10  A.   No, sir.

11  Q.   About how far back from that closing was this e-mail

12  sent?

13  A.   About six weeks.

14  Q.   Let's take a look about who is not included.  I'm sorry,

15  we'll go back to the header.

16       You mentioned who was listed as a recipient of this

17  e-mail.  Was Steven Reinhart a recipient of this e-mail?

18  A.   No, sir.

19  Q.   Who is Steven Reinhart?

20  A.   Steve Reinhart was the facilities manager and the legal

21  and compliance director for the Reagor-Dykes Auto Group.

22  Q.   Is Mr. Reinhart an attorney?

23  A.   Was.

24  Q.   Was he part of the RDAG deal team?

25  A.   Yes, sir.

1   Q.   Is Rachel Reagor listed as a recipient of this e-mail?

2   A.   No, sir.

3   Q.   Who is Rachel Reagor?

4   A.   Rachel Reagor is Bart's daughter, and she was an

5   attorney for the Reagor-Dykes Auto Group.

6   Q.   Is Jack Driskill listed on this e-mail?

7   A.   No, sir.

8   Q.   Who is Jack Driskill?

9   A.   He's an attorney for McWhorter, Cobb & Johnson that we

10  used.

11  Q.   Was he involved in reviewing the IBC working capital

12  loan documents?

13  A.   Yes, sir, he was.

14  Q.   We've talked a little bit about a RDAG deal team.  Let's

15  go to Government's Exhibit 44.

16          **THE COURT**:  Exhibit 44 is pre-admitted.  Mr.

17  Cogdell, do you have your copy?

18          **MR. COGDELL**:  I do.

19          **THE COURT**:  You may proceed, Mr. Haag.

20  Q.   **(By Mr. Haag)**  All right.  Let's go up here.  We'll do

21  the header.  All right.  Who is this e-mail from?

22  A.   The e-mail's from Bart Reagor.

23  Q.   Who is this e-mail to?

24  A.   This e-mail is to John Thompson, Shane Smith, Steve

25  Reinhart, Rachel Reagor, Rick Dykes.

```
1    Q.   What is the date this e-mail was sent?
2    A.   July 6th, 2017.
3    Q.   And, to put it in context, is that about one week prior
4    to the first closing of the working capital loan from IBC?
5    A.   Yes, sir, it was.
6    Q.   Let's go ahead, and we're going to go to Paragraphs 2
7    and 3 now.  If you would read Paragraphs 2 and 3 of that
8    e-mail for the jury.
9    A.   I am sending this e-mail to all of you because I think
10   it would be very smart for everyone involved in this
11   transaction and future transactions to use this e-mail group
12   to communicate any concerns or feelings about the agreements
13   that we make going forward.  It gives me great comfort to
14   know that I have your eyes and minds protecting me and my
15   family from any potential negative consequences.  I am naming
16   this group the RDAG deal team.
17        I think great communication between all involved is
18   critical in almost everything that you want to do at a high
19   level.  Let's make sure that we communicate openly on this
20   IBC deal and all future deals going forward to ensure that we
21   end up with the deal we want and a deal that we are all happy
22   with.  Obviously, we will compromise on some things, but
23   there are also some things that we will not compromise on.
24   Q.   All right.  Let's go back to Government's Exhibit 41
25   now.  All right.  Let's go ahead, and we're going to go up
```

1    here, and we're going to read this -- we'll do the first part

2    of the e-mail all the way down to "springboard to the

3    future."

4         All right.  If you would, Mr. Smith, let's go ahead, and

5    we're just going to read this e-mail in its entirety.  Would

6    you please read starting from the top, and I'll stop you at

7    various points and ask you questions, but please proceed.

8    A.   Okay.  Shane, I e-mailed Rick, and we have discussed.

9    This is how we want to handle loans from Zurich, FMCC, and

10   IBC.

11        In March, we had to scramble to protect the company,

12   and, in doing so, the Reagor family and the Dykes family took

13   a substantial reduction to our liquid assets we had built

14   over the last several years.  We are fine with that because

15   we are thinking long term.

16        I am proud of how we stuck together and how we have

17   bounced back nicely, and we have made some nice moves.

18        These moves are great, but they create do huge liability

19   for the Reagor family and the Dykes family long term.  We

20   will answer the call, and we will use this as a springboard

21   to our future and long-term goals.

22        When the RDAG borrows capital as we are doing now or

23   sells equity, the Reagors and the Dykes are losing equity,

24   and with debt we are acquiring great personal liability to

25   our estates.

1        To protect the liquidity, equity, and security of our

2   estates, Rick and I think it is critical that the three of us

3   work together to make sure we have peace of mind related to

4   how we allocate and use every dollar we borrow for RDAG

5   capital.

6            MR. HAAG:  All right.  We'll stop right there, and

7   go ahead and highlight the next portion.  It should be right

8   down here (indicating).  There you go.

9   A.   As an offset for our risk and equity dilution and to

10  keep reserves off the table, Rick and I have decided to pay

11  ourselves the first 33.3 percent of every dollar we borrow

12  against equity for capital in the RDAG so we can maintain

13  strong personal leverage.  33.3 percent of loan -- of all

14  loan proceeds will be split between Bart Reagor and to Rick

15  Dykes as a personal equity offset reserve.

16  Q.   **(By Mr. Haag)**  Let's go ahead and stop right there.

17  What is a personal equity offset reserve?

18  A.   I don't know.  It's not an official accounting term that

19  I know of.

20  Q.   Have you ever heard it used in your time as a chief

21  financial officer?

22  A.   No, sir, not that.

23  Q.   All right.  Let's keep going.

24  A.   Doing this will help us replenish already injected

25  capital and will also reward us for our personal guaranties,

1    which dilute our personal equity in the RDAG.

2    Q.    All right.  Let's stop for just a second.  There's been

3    some discussion about the defendant putting in personal funds

4    for the March 2017 capital raise.

5         Did the defendant put in any personal funds for the

6    March 2017 capital raise?

7    A.    Yes, sir.

8    Q.    How much did the defendant put in of his personal assets

9    in that fund raise?

10   A.    I'm aware of $500,000.

11   Q.    What was that $500,000 used for?

12   A.    It was used towards the line of credit at Vista Bank to

13   be able to draw cash out and inject into the Reagor-Dykes

14   Auto Group.

15   Q.    And the defendant and his business partner, they each

16   put in 500,000, and they bought what?

17   A.    They bought a CD.

18   Q.    And with that CD, what did they secure from Vista Bank?

19   A.    A line of credit.

20   Q.    With regard to the other funds that were raised during

21   the March 2017 capital raise, did any other funds besides the

22   500,000 from the defendant come from his personal assets?

23   A.    Not that I recall, no.

24   Q.    Where did those assets come from, the rest of the

25   capital raise?

1   A.   Most of it came from other entity accounts that were set

2   up, some mutual funds and some other investment accounts.

3   Q.   Were those accounts all in the name of Reagor-Dykes Auto

4   Group entities?

5   A.   Yes.  Yes, sir.

6   Q.   Those were not accounts in the name of the defendant

7   personally?

8   A.   No, sir.

9   Q.   And, in fact, did the defendant owe the Reagor-Dykes

10  entities at that time about $5.4 million?

11  A.   Yes, sir.

12  Q.   Let's go to Government's Exhibit 4, Page 25.

13          **THE COURT**:  Exhibit 4 is pre-admitted.  Mr.

14  Cogdell, do you have your copy?

15          **MR. COGDELL**:  I do.

16          **THE COURT**:  You may proceed, Mr. Haag.

17          **MR. HAAG**:  All right.  Let's blow up this section

18  here (indicating).  Well, I'm sorry.  Let's go to the top.

19  Q.   **(By Mr. Haag)**  What is this exhibit?

20  A.   This is a personal financial statement for Bart and

21  Annette Reagor as of December 31st, 2016.

22          **MR. HAAG**:   All right.  Let's X out of here, and

23  we're going to go to liabilities.

24  Q.   **(By Mr. Haag)**  What does liabilities mean in laymen's

25  terms?

1    A.   That's the amount of money you owe someone or some
2    company.
3    Q.   So taking out the mortgage payable (residence), income
4    taxes current year balance, approximately how much of the
5    $6.2 million in debt that the defendant had was owed to
6    Reagor-Dykes entities?
7    A.   It was over $5,000,000.
8    Q.   Let's go back to Government's Exhibit 41.
9         THE COURT:  And Exhibit 41 is pre-admitted.  Mr.
10   Cogdell, you have your copy?
11        MR. COGDELL:  Yes.
12        MR. HAAG:  All right.  We're going to go to the
13   next page, and we're going to go to the IBC portion, and
14   we're going to highlight that.
15   Q.   (By Mr. Haag)  According to the defendant's instructions
16   in this e-mail, how did he want you to distribute the working
17   capital loan proceeds of the first $5,000,000 tranche?
18   A.   1.667 million to Bart and Rick, 3.333 million to the
19   Reagor-Dykes Auto Group company.
20   Q.   Did you understand this to mean distribution to the
21   defendant and his business partner in their personal
22   capacity?
23   A.   Yes, sir.
24   Q.   Was it for his personal use and benefit?
25   A.   That's my understanding.

```
 1   Q.   All right.  We'll X out of that.  Now, we've seen this
 2   long e-mail.  Is there any other section of this e-mail
 3   besides the one we're going to get to with the bottom two
 4   paragraphs that's in bold?
 5   A.   No, sir.
 6   Q.   Is there any other section of this e-mail that is in all
 7   caps?
 8   A.   No, sir.
 9            MR. HAAG:  Let's highlight this last portion here.
10   Q.   (By Mr. Haag)  Would you please read what is highlighted
11   on the screen.
12   A.    How we are going to manage this capital is 1,000,000
13   percent confidential between us and is not anyone else's
14   business.  Nobody's.  No bankers or anyone else.  Our
15   business.  Game on.  This plan will prepare us for the next
16   level.
17   Q.   When you read that, did you understand that you were not
18   to tell anyone how you were going to distribute the capital?
19   A.   Yes, sir.
20   Q.   Did you follow that instruction and not tell anybody?
21   A.   No, sir.
22   Q.   Did you tell anybody at all that part of the working
23   capital loan was going to go to the defendant personally?
24   A.   Yes, sir.
25   Q.   Who did you tell?
```

1    A.   I told my wife.

2    Q.   Did you tell anybody at the Reagor-Dykes Auto Group?

3    A.   No, sir.

4    Q.   Did you tell anybody at IBC Bank?

5    A.   No, I did not.

6    Q.   Was it your understanding from this e-mail that

7    yourself, the defendant, and his business partner were the

8    only three to know about this distribution of capital?

9    A.   Yes, sir, that was my understanding.

10   Q.   Did the defendant specifically state one entity that he

11   did not want to know about the distribution?

12   A.   No.

13   Q.   Oh, I'm sorry, let me back up.  Did he state in here no

14   bankers?

15   A.   Yes, he did.

16   Q.   Did you take that to mean that specifically he didn't

17   want the bankers to know how he was doing the distributions?

18   A.   Yes, I did.

19   Q.   All right.  Let's go ahead, and we're going to talk

20   about your reaction when you got this e-mail and then your

21   response.

22        How did you feel when you got this e-mail?

23   A.   I was frustrated.

24   Q.   Do you remember where you were at when you got this

25   e-mail?

1    A.    Yes, I do.

2    Q.    Where?

3    A.    I was sitting in my bedroom.

4    Q.    Why were you frustrated?

5    A.    Because I was really hoping we could get the whole money

6    to be used for the Reagor-Dykes Auto Group entities that

7    needed it.

8    Q.    Did you ever tell the defendant that?

9    A.    No, sir.

10   Q.    That next day, did you try and talk to the defendant

11   about the e-mail and talk him out of this plan?

12   A.    I did not try to talk him out of it.

13   Q.    All right.  Did you try to talk to the defendant about

14   the e-mail the next day?

15   A.    No.  Well, we did talk about it.

16   Q.    All right.  Describe for the jury the next day what

17   happened.

18   A.    I was just in his office, and he asked me if I

19   understood how this was to be executed, and I said, yes, I

20   did.

21   Q.    Who was in the office when the defendant said that?

22   A.    It was just he and I.

23   Q.    And where was the office -- I'm sorry, what office was

24   it?

25   A.    In Bart Reagor's office.

1   Q.   And you didn't raise any objections?

2   A.   No, I did not.

3   Q.   You didn't tell him, hey, you can't do that?

4   A.   No, sir.

5   Q.   Why?

6   A.   Because I was frustrated trying to raise money over the

7   years.

8   Q.   Well, why didn't you just tell the defendant, hey, you

9   can't do that; the loan agreement won't let you do that; the

10  company needs the money, leave it there?

11  A.   I don't know.  I just didn't.

12  Q.   All right.  Let's talk about your response.  Let's go to

13  Government's Exhibit 42.

14       **THE COURT**:  Exhibit 42 is pre-admitted.  Mr.

15  Cogdell, do you have your copy?  Do you have your copy

16  present, Mr. Cogdell?

17       **MR. COGDELL**:  Yes, sir.

18       **THE COURT**:  Okay.

19       **MR. HAAG**:  All right.  Let's go ahead and highlight

20  this top part of 42.

21       All right.  So this is your response that evening

22  to the defendant's e-mail.  And let's go ahead, and we'll

23  highlight your response.  Right there (indicating).

24  Q.   **(By Mr. Haag)**  Would you please read how you responded

25  in e-mail.

1  A.    Yes.  Awesome.  I will ensure it is executed exactly as

2  written, reviewing and getting approval from you each step

3  along the way, and I will work to see if we can get that FMCC

4  line paid off before they finalize the 5,000,000 loan

5  documents.  I have not heard back on an ETA for those FMCC

6  documents.

7        I have also advised Will at IBC to use D and R as the

8  entity borrowing the equity money.  He seems fine with it.

9  He said he would flip-flop D and R to borrower and have RD7

10  as one guarantor.

11        Thank you for your leadership and guidance.  I am sorry

12  I let you guys down.  All I have worked toward, since you

13  brought me onboard day one, was to enrich your lives, build

14  your net worth, and have your back.  I have made my share of

15  mistakes but I try very hard to make decisions to better this

16  company and protect your positions in life every time.

17        I'll not stop doing that ever.  I would protect you and

18  your families with my life, I swear I would.  No different

19  than if I was to protect mine.  You have brought me into your

20  family, and the loyalty, appreciation and dedication I have

21  for you guys and your families cannot be given justice if I

22  tried to express it in words.

23        Me and all the employees of the RDAG owe you so very

24  much.  Thank you for everything.

25  Q.    Did you ever try and discuss with the defendant on

1   previous occasions to change course or to do something

2   different?

3   A.   Yes, sir.

4   Q.   How did those discussions go?

5   A.   Most of the time not very well.

6   Q.   What do you mean?

7   A.   He wanted to do what he wanted to do related to the

8   company's funds and didn't want to hear about changes to the

9   income he was taking.

10  Q.   Did he get mad at you if you brought the subject up?

11  A.   He had.

12  Q.   Is that part of the reason why you didn't try and

13  persuade him to take a different approach with the working

14  capital loan?

15  A.   Yes, sir, it is.

16  Q.   All right.  Let's talk about the loan proceeds.  We're

17  going to do the first tranche.  We've already talked with the

18  other witnesses.  So let's go directly to the closing of the

19  first working capital loan.

20       Were you present at the closing, the first closing

21  rather of the working capital loan?

22  A.   Yes, sir, I was.

23  Q.   Where did that closing take place?

24  A.   That was at IBC's attorney's office in Tulsa, Oklahoma.

25  Q.   Were you present?

1    A.   Yes.

2    Q.   Do you know what date it happened?

3    A.   I believe it was July 13th, 2017.

4    Q.   Did the defendant agree to pay any bonuses from the

5    working capital loan?

6    A.   Yes, he did.

7    Q.   To whom and in what amounts?

8    A.   He paid a bonus to me.  He paid a bonus to John

9    Thompson.  He paid a bonus to Steve Reinhart, and a bonus to

10   Rachel Reagor.

11   Q.   What were the amounts of those bonuses?

12   A.   I received 25,000.  John Thompson's company received

13   25,000.  Steve and Rachel each received 5,000.

14   Q.   Government's Exhibits 43 and 45, have you reviewed those

15   before testing today -- or, I'm sorry, before testifying

16   today?

17   A.   Yes, sir.

18   Q.   We won't go into them here before the jury, but, in

19   general, do those lay out the bonus amounts and the bonus

20   structures?

21   A.   Yes.

22   Q.   Who wrote those e-mails?

23   A.   Bart.

24   Q.   With regard to the bonuses, how did you receive your

25   bonus?

1    A.   Via check.

2    Q.   And how was it reflected upon your wages or salary?

3    A.   A copy of it was given to the human resource team to

4    increase the gross amount for that pay period so that the

5    taxes were taken out.

6    Q.   So it was added on to your regular salary and wages and

7    taken out in that manner?

8    A.   That's correct.

9    Q.   We've talked about this with other witnesses, but how

10   were the two tranches to be distributed, in what amounts?

11   A.   5,000,00 and 5,000,000.

12   Q.   All right.  Let's go to Government's Exhibit No. 11,

13   please.

14             THE COURT:  Exhibit 11 is pre-admitted.

15             MR. HAAG:  We're going to go right up here

16   (indicating).

17   Q.   **(By Mr. Haag)**  Mr. Smith, what is Government's

18   Exhibit 11?

19   A.   This is the deposit slip for the D and R Acquisitions

20   account at IBC Bank.

21   Q.   Now, as part of the loan agreement, did you have to open

22   a bank account at IBC Bank?

23   A.   Yes, we did.

24   Q.   And once you got the first tranche of $5,000,000, where

25   was the working capital loan proceeds of 5,000,000 deposited

1    into?

2    A.    Into that account at IBC.

3    Q.    Would you read the amount that is deposited into the IBC

4    D and R Acquisitions account.

5    A.    There's $4,967,555.54.

6    Q.    Why wasn't it $5,000,000?

7    A.    They had some application fees that they took out, I

8    believe.

9    Q.    That same day that you received the loan distributions

10   from the working capital loan, did you wire $2,000,000 from

11   the D and R Acquisitions account at IBC Bank to the D and R

12   Acquisitions account at FirstBank and Trust -- I'm sorry,

13   FirstCapital Bank of Texas?

14   A.    Yes, I did.

15   Q.    Why did you do that?

16   A.    That was where we were going to cut the bonus checks and

17   the checks to Bart and Rick from, the FirstCapital account.

18   Q.    Let's go ahead, and we're going to go to Government's

19   Exhibit 12.

20          THE COURT:  Exhibit 12 is pre-admitted.

21          MR. HAAG:  All right.  Let's go ahead, and we're

22   going to do sender and receiver, highlight that.

23   Q.    (By Mr. Haag)  All right.  What does this document

24   reflect?

25   A.    This is a confirmation of the outgoing wire from the IBC

1    Bank account to the FirstCapital Bank account.

2    Q.   What is the amount of the transfer?

3    A.   $2,000,000.

4    Q.   We're going to turn now to Government's Exhibits 18 and

5    19.  We'll go first to 18.

6           THE COURT:  Those exhibits are also pre-admitted.

7    Q.   **(By Mr. Haag)**  All right.  What is Government's

8    Exhibit 18?

9    A.   This is the confirmation from FirstCapital Bank of the

10   incoming wire for $2,000,000.

11          MR. HAAG:  All right.  We're going to go next to

12   Government's Exhibit 19.  All right.  Let's go ahead, and

13   we're going to highlight right here (indicating).

14   Q.   **(By Mr. Haag)**  What is Government's Exhibit 19?

15   A.   This is a copy of the check that was made to Bart Reagor

16   from the D and R Acquisitions account at FirstCapital Bank of

17   Texas.

18   Q.   Who drafted this check?

19   A.   I did.

20   Q.   Who signed this check?

21   A.   Bart and I signed this check.

22   Q.   Who is it made payable to?

23   A.   Bart Reagor.

24   Q.   What is the amount on the check?

25   A.   $766,277.77.

1    Q.   Was that check written using proceeds from the IBC
2    working capital loan?
3    A.   Yes, sir.
4    Q.   Did you give that check to Bart Reagor?
5    A.   Yes, I did.
6    Q.   Let's turn to the second closing of the working capital
7    loan.  Were you present during the second closing in February
8    of 2018?
9    A.   Yes, sir.
10   Q.   Was it done in person or virtually?
11   A.   It was a virtual closing.
12   Q.   Did the defendant pay bonuses from working capital for
13   that loan?
14   A.   Yes, he did.
15   Q.   What was the amount of bonuses?
16   A.   It was 25,000 to myself, 25,000 to John Thompson's
17   company, 5,000 to Steve Reinhart, 5,000 to Rachel Reagor, and
18   5,000 to Ashley Dunn.
19   Q.   What was Ashley Dunn's role?
20   A.   She was my assistant.
21   Q.   What did she do?
22   A.   She managed that particular entity, the accounting for
23   that, and other financial transactions for myself.
24   Q.   And we won't discuss it here with this jury, but does
25   Government's Exhibit 46 detail the instructions to pay that

1  bonus?

2  A.   Yes, sir.

3  Q.   Who drafted that e-mail?

4  A.   Bart did.

5  Q.   All right.  We're going to go next to Government's

6  Exhibits -- we'll go to 14.

7         THE COURT:  Exhibit 14 is pre-admitted.

8  Q.   (By Mr. Haag)  All right.  Back to the second closing,

9  did you get another $5,000,000, Tranche 2, from the working

10  capital loan?

11  A.   Yes, sir.

12  Q.   What is shown here in Government's Exhibit --

13         MR. HAAG:  Which number is that?

14         MS. BURCH:  14.

15  Q.   (By Mr. Haag) -- Government's Exhibit 14?

16  A.   This is a deposit slip to D and R Acquisitions IBC Bank

17  account.

18  Q.   What is the amount of the deposit?

19  A.   It's $4,845,782.12.

20  Q.   Does this represent the loan proceeds from the second

21  tranche of the working capital loan?

22  A.   Yes, sir.

23  Q.   Why was it not an even 5,000,000?

24  A.   It included the rest of the application fees, the bank

25  fees, and the appraisal fees for all the real estate

1    appraisals.

2    Q.   The next day, did you wire a little over $2,000,000 from

3    the D and R Acquisitions account at IBC Bank to the IB -- I'm

4    sorry, the D and R Acquisitions account at FirstCapital Bank

5    of Texas?

6    A.   Yes, I did.

7    Q.   Why did you do that?

8    A.   To cover the outgoing bonuses and the payments to Bart

9    and Rick from these proceeds.

10   Q.   All right.  Let's talk about that.  Let's go now to

11   Government's Exhibit 20.

12           THE COURT:  And that exhibit is also pre-admitted.

13           MR. HAAG:  I'm sorry, 21.

14           THE COURT:  Also pre-admitted.

15           MR. HAAG:  All right.  Let's go ahead and go

16   actually to 22.  I think that would be the easiest way to do

17   it.

18   Q.   (By Mr. Haag)  All right.  What does Government's

19   Exhibit 22 show?

20   A.   This is an incoming wire confirmation to FirstCapital

21   Bank D and R account from the IBC Bank account.

22   Q.   And there's a little bit over $2,000,000, about

23   2,000,064 that you transferred from IBC Bank to FirstCapital

24   Bank of Texas; is that correct?

25   A.   Yes, sir, that's correct.

1   Q.   Did you do it all as one lump sum, or did you divide it

2   into three separate wires?

3   A.   I divided these by three different wires.

4   Q.   Do you know why you did that?

5   A.   I don't remember the rationale for that.

6   Q.   Okay.

7   A.   It might have been wire fees saved.  I don't know.

8   Q.   Why did you distribute $2,000,000 or wire $2,000,000

9   from the IBC account to the FirstCapital of Texas -- excuse

10  me, FirstCapital Bank of Texas account?

11  A.   To cut the check to Bart Reagor and to the bonuses

12  and --

13  Q.   And who directed --

14  A.   -- also transfer the money to Rick Dykes.

15  Q.   Who directed you to do that?

16  A.   Bart did.

17  Q.   All right.  Let's go ahead and go now to Government's

18  Exhibit 23.  And we're going to right there.  What is at the

19  bottom of Government's Exhibit 23?

20  A.   This is a copy of the check from the D and R

21  Acquisitions account at FirstCapital Bank.

22  Q.   Who wrote this check out?

23  A.   I believe Ashley Dunn actually printed it out.

24  Q.   Who signed the check?

25  A.   Bart Reagor and myself.

1   Q.   What is the amount?

2   A.   $1,000,000 even.

3   Q.   Who is it made payable to?

4   A.   Bart Reagor.

5   Q.   Did you give this check to Bart Reagor?

6   A.   Yes, I did.

7   Q.   Special Agent John Whitworth is going to discuss the

8   $1,766,277.77 in working capital loan proceeds once they

9   reached the defendant's bank account, so we won't go into

10  that.

11       But I want to turn your attention to some things the

12  defendant has said over the years.  Did Reagor-Dykes have

13  meetings?

14  A.   Yes, sir.

15  Q.   How frequently?

16  A.   Almost every day except Sunday.

17  Q.   What kind of meetings did they have?

18  A.   On Monday, Tuesday, Thursday, and Friday, we had a

19  manager's meeting from all locations via Skype, and on

20  Wednesday and Saturday, he typically had a sales meeting for

21  all the salespeople and sales managers.

22  Q.   All right.  We're going to look first at Government's

23  51.

24           MR. COGDELL:  Judge, if you recall, we had some

25  pretrial litigation on this, and I'll re-urge my same

1    objections that I raised.

2              THE COURT:  Okay.  Just briefly, because we did

3    deal with some redactions, this form of the exhibit is the

4    redacted form that we discussed at the Pretrial Conference?

5              MR. HAAG:  Yes, Your Honor.  It starts at

6    26 seconds in.

7              THE COURT:  Okay.  And even with that redaction,

8    Defendant renews his objection?

9              MR. COGDELL:  Correct.

10             THE COURT:  Okay.  The Court finds that that

11   objection was preserved both at the Pretrial Conference as

12   well as at trial.  It is preserved for appellate review.

13             MR. COGDELL:  Thank you.

14             THE COURT:  You may proceed.  That objection is

15   overruled.

16   Q.   **(By Mr. Haag)**  With regard to Government's Exhibit 51,

17   have you listened to that exhibit before testifying today?

18   A.   Yes, sir.

19   Q.   And was that an exhibit -- is that the defendant

20   speaking during one of the meetings with Reagor-Dykes

21   individuals?

22   A.   Yes, sir, it was.

23             MR. HAAG:  All right.  Let's go ahead, and we're

24   going to play Government's Exhibit 51.

25        **(Government's Redacted Exhibit 51 played to jury.)**

1    Q.    **(By Mr. Haag)**  We're going to turn now to Government's

2    Exhibit 48.

3         Is Government's Exhibit 48 a clip from a sales meeting

4    the defendant had on January 31st of 2018?

5              MR. COGDELL:  We'd likewise raise our --

6              THE COURT:  Okay.  The Court --

7              MR. COGDELL:  Renew the --

8              THE COURT:  -- finds that --

9              MR. COGDELL:  -- same objection.

10             THE COURT:  -- the Defendant has preserved his

11   objection both at the Pretrial Conference and at trial.  It

12   is overruled, but the Court finds that it is preserved for

13   appellate review.

14             MR. COGDELL:  Thank you.

15             THE COURT:  You may proceed.

16             MR. HAAG:  Thank you, Your Honor.

17   Q.    **(By Mr. Haag)**  So, with that timing, is this going to be

18   after the distribution of the first tranche of the working

19   capital loan but before the distribution of the second

20   tranche?

21   A.    Yes, sir.

22             MR. HAAG:  All right.  At this time, we'll play

23   Government's 48.

24        **(Government's Exhibit 48 played to jury.)**

25             MR. HAAG:  No further questions, Your Honor.

```
 1              THE COURT:  At this point, Mr. Cogdell, you may
 2   proceed with your cross-examination unless you think this is
 3   an advisable point for our afternoon break.
 4              MR. COGDELL:  Given my 65-year-old bladder, yes.
 5              THE COURT:  Okay.  We will resume in approximately
 6   fifteen minutes, so I'll instruct the attorneys to be back in
 7   the courtroom and ready at about 3:25, and then --
 8              MR. COGDELL:  Thank you.
 9              THE COURT:  And we'll have the jury in by 3:30.
10              MR. COGDELL:  Yes, sir.
11              THE COURT:  We are excused.
12              COURT SECURITY OFFICER:  All rise.
13          (Recess taken; after which, the following took place in
14   open court with the defendant present but without the jury
15   present.)
16              COURT SECURITY OFFICER:  All rise.
17              THE COURT:  Please be seated.  The Court is back on
18   the record.
19              And, at this point, Mr. Cogdell, you may proceed
20   with your cross-examination of this witness, and --
21              MR. COGDELL:  Without the jury?
22              MR. HAAG:  No objection, Your Honor.  He can
23   proceed.
24              THE COURT:  You would prefer --
25              MR. COGDELL:  Touché.
```

1          THE COURT:  You would prefer a bench trial, I

2     realize that.

3          (Laughter.)

4          COURT SECURITY OFFICER:  All rise for the jury.

5          (The jury returned to the courtroom.)

6          MR. COGDELL:  I thought I was sleep deprived.

7          THE COURT:  Oh, my gosh.  Please be seated.

8          And, for the second time today, we -- I tried to

9     start this proceeding without you.  No substantive content

10    was divulged.  Thank you, jury, for returning to the jury

11    box.  I'm trying to keep pace with the attorneys here, and I

12    was moving too fast, so thank you for returning.

13         Mr. Cogdell, you may begin your cross-examination

14    subject to the rules we discussed.

15         MR. COGDELL:  Thank you.

16                    <u>CROSS-EXAMINATION</u>

17    BY MR. COGDELL:

18    Q.   Mr. Smith, I don't think -- is this on or off?  Now it's

19    on.  Can you hear me okay, sir?

20    A.   Yes, sir.

21         MR. COGDELL:  Everybody else hear me okay?

22    Q.   **(By Mr. Cogdell)**  I don't think you and I have ever met

23    before, Mr. Smith.  My name is Dan Cogdell.  I am one of the

24    lawyers that represents your former employer, Bart Reagor.

25         I want to begin at the end when the Government showed

1  you, I think it was, Government's Exhibit 48.

2         **MR. COGDELL**:  If you could cue that up.  Thank you.

3         **MR. HAAG**:  You want me to play it?

4     **(Government's Exhibit 48 played to jury.)**

5         **MR. COGDELL**:  Stop.  Thank you.

6  Q.  **(By Mr. Cogdell)**  Were you there that day?

7  A.  I believe so.

8  Q.  And to put it in context for the jury, Mr. Reagor was

9  talking to a bunch of high school kids, wasn't he?

10 A.  No, sir.

11 Q.  Who was he talking to?

12 A.  He was talking to the employees of the Reagor-Dykes Auto

13 Group.

14 Q.  Sales people?

15 A.  Yes, sir.

16 Q.  Now, OPM is a parlance that Mr. Reagor uses.  Let me

17 just see if we can agree on the obvious.  If I sell my house

18 to somebody, I'm getting paid with other people's money,

19 right?

20 A.  Yes, sir.

21 Q.  If I sell my car to somebody, I'm getting paid with

22 other people's money, right?

23 A.  Yes, sir.

24 Q.  When my law firm pays me the incredibly low salary that

25 they pay me, I'm still getting paid with other people's

1  money, right?

2  A.  I guess so.  I don't know about your law firm.

3  Q.  Okay.  Well, the point is, there's nothing particularly

4  nasty or insidious about the phrase "other people's money."

5  If you get paid for anything by anybody else by definition,

6  it's other people's money, right?

7  A.  Yes, sir.

8  Q.  Now, I appreciate you correcting me.  I was -- I thought

9  it was a different setting that he was in.

10      But he had those sales meetings every day or almost

11  every day, right?

12  A.  He had managers' meetings four days a week and sales

13  meetings twice a week.

14  Q.  Okay.

15  A.  Yes, sir.

16  Q.  The conduct that we saw there, there's nothing unusual

17  or out of -- it may be unusual, but it's -- there was nothing

18  out of the ordinary for Bart Reagor to engage in that sort of

19  conduct, right?

20  A.  Correct.

21  Q.  He was, for lack of a better description, Mr. Smith, a

22  cheerleader on steroids when it came to trying to rev up his

23  crowd, rev up his employees sell, sell, sell, sell, sell,

24  right?

25  A.  Yes, sir.

1    Q.    And he would frequently watch movies and engage in bits

2    that he paraphrased or stole from movies; do you recall that?

3    A.    Yes, sir.

4    Q.    One of them is Glengarry Glen Ross, Alec Baldwin's

5    coffee-is-for-closers scene.  Remember that?

6    A.    Yes, sir.

7    Q.    I mean, it's just a favorite of the way that Bart

8    conducted business.  Whether you like it or not, there was

9    nothing evil intended, as far as you could tell, by him

10   revving up the troops to go out there and sell cars; agree

11   with me?

12   A.    Yes, sir.

13   Q.    Now, do you know how the Government came into possession

14   of those tapes that we just saw?

15   A.    I do not.

16   Q.    If I suggested to you that the way they got those was

17   Mr. Reagor's former lawyer actually bundled up every one of

18   those things and delivered them to the Government, could you

19   contradict me on that?

20   A.    No, sir.

21   Q.    Okay.

22         MR. HAAG:  Your Honor, I apologize, but I do want

23   to -- there was a subpoena issued for those documents, so I

24   don't want to make --

25         THE COURT:  Okay.  Just so that the process of

```
 1   discovery is understood by the jury, that's how it works when
 2   the United States is the prosecuting entity.  But, yes, with
 3   that correction.
 4           MR. COGDELL:  If I could go one step further, there
 5   was no motion to quash; there was no argument about it.  You
 6   subpoenaed them and they produced them?
 7           MR. HAAG:  Yes.
 8           THE COURT:  And I'll represent to the jury, just
 9   having reviewed this case from start to finish, there was no
10   fight about these CDs.  So you may continue, Mr. Cogdell.
11   Q.  (By Mr. Cogdell)  Let me see if I can get you to agree
12   to a few things, and then we'll get to some more difficult
13   matters.
14       I know it sounds trite, Mr. Smith, but I assume you're
15   in a very difficult position here today, right?
16   A.  Yes, sir.
17   Q.  One that you never thought you would be in five, ten
18   years ago?
19   A.  No, sir.
20   Q.  Never imagined you would be testifying in a courtroom
21   against Mr. Reagor, right?
22   A.  No, sir.
23   Q.  Never imagined you would end up pleading guilty to an
24   offense that has an exposure of 20 years, right?
25   A.  Right.
```

1  Q.  Now, you are represented by a very fine lawyer by the

2  name of Gerry Morris, correct?

3  A.  Yes, sir.

4  Q.  Is Mr. Morris here today?

5  A.  No, sir.

6  Q.  Okay.  Is there anyone here assisting you emotionally or

7  just giving you emotional -- emotional — he can't talk all

8  of a sudden — emotional support today?

9  A.  No, sir.

10 Q.  Do you care about -- about Bart Reagor?

11 A.  Yes, I do.

12 Q.  At one time you guys were -- were like brothers, right?

13 A.  Similar, yes.

14 Q.  You loved him?

15 A.  I did.

16 Q.  He loved you?

17 A.  Yes, sir.

18 Q.  Do you still love him?

19 A.  Yes, sir.

20 Q.  Do you think he still loves you?

21 A.  I don't know.

22 Q.  Fair point.  Let me see if I can get you to agree to a

23 few things that you testified to on direct.

24     The first is, you never told Bart Reagor about the

25 floor-plan fraud, correct?

1    A.   Correct.

2    Q.   How long had that gone on?

3    A.   I believe within the last two years before the --

4    Q.   So from '16 to '18?

5    A.   I believe that's correct.

6    Q.   Ballpark?

7    A.   Yes, sir.

8    Q.   But you never told Mr. Reagor about that?

9    A.   No.

10   Q.   You likewise never told him about the check-kiting,

11   correct?

12   A.   That's correct.

13   Q.   I can -- you --

14   A.   That's correct.

15   Q.   Thank you.  You knew that Bart Reagor trusted you and

16   relied on you either extensively or exclusively on financial

17   matters?

18   A.   Yes, sir.

19   Q.   You were the guy he looked to?

20   A.   That's correct.

21   Q.   I'm going to say, he relied on me and trusted me.  Do

22   you agree with me?

23   A.   I do agree.

24   Q.   And you violated that trust?

25   A.   Yes, I did.

1   Q.   Um, you were the guy that -- I say "you were the guy."

2   I shouldn't resort to that vernacular.  You were the person,

3   Mr. Smith, who was most involved on behalf of Reagor-Dykes in

4   submitting the financial information to IBC on these loans

5   we've talked about, right?

6   A.   Yes, that's correct.

7   Q.   Would you agree with me, Mr. Smith, that at no time did

8   Bart Reagor ever ask you to submit any false financial

9   documents on his behalf?

10  A.   Yes, I would agree to that.

11  Q.   Did you, Mr. Smith, submit false financials to IBC?

12  Were there inaccurate information in the materials that you

13  eventually submitted to IBC?

14  A.   I submitted them as accurately as I knew to submit them.

15  Q.   Okay.  So, to answer my question, there was nothing that

16  you did intentionally to submit anything that was inaccurate

17  to IBC?

18  A.   No, sir, I did not.

19  Q.   It is also true, is it not, that Bart was never told by

20  you that he couldn't use the funds in the manner that he did,

21  right?

22  A.   That's correct.  I never told him that.

23  Q.   Mr. Smith, you were close to Mr. Reagor.  You were

24  familiar with his custom, habit, and practice.  You knew how

25  he ran his life, how he ran his businesses.

```
 1        Do you know of your own personal knowledge whether or
 2   not, Mr. Smith, Bart Reagor even read that loan agreement?
 3   A.   I don't believe he did.
 4   Q.   And you say you don't believe he did because why?
 5   A.   Because it was assigned to a bunch of rest of us to read
 6   and edit as needed.
 7   Q.   And to those of you who it was assigned to be vetted as
 8   needed, to your knowledge, Mr. Smith ─ and you're the
 9   Government's witness ─ to your knowledge, did anyone say,
10   Bart, you can't do that?
11   A.   Yes, sir.
12   Q.   Sir?
13   A.   Yes, sir.
14   Q.   Who's that?
15   A.   Rachel Reagor.
16   Q.   All right.  And when was that?
17        MR. HAAG:  Your Honor, I would object to this line
18   of questioning.  I understand the witness' answer, but we're
19   going into one of the matters that's barred by the limine as
20   far as counsel, so I'd move --
21        MR. COGDELL:  That's fair.  That's --
22        THE COURT:  Okay.  The objection is sustained, and
23   I'll just ask you to --
24        MR. COGDELL:  I guess I need to move to disregard
25   the answer under those circumstances then.
```

1      **THE COURT**:  That's right.  Okay.

2      **MR. COGDELL**:  We'll move to disregard the answer.

3      **THE COURT**:  Yes, I will -- well, did he answer?

4      **MR. COGDELL**:  He did.

5      **THE COURT**:  Okay.  I will instruct the jury to

6   disregard that answer.  I should have had an opportunity to

7   interject in response.

8        That objection is sustained.  It's subject to one

9   of the Court's orders in this case, and you will disregard

10   the witness' response.

11        You may proceed with your next question.

12      **MR. COGDELL**:  Thank you.

13   Q.  **(By Mr. Cogdell)**  Back to the matter at hand, you

14   certainly never had or took the time to say you can't do

15   that?

16   A.   No, sir, I did not.

17   Q.   And you were the person he was most relying upon for

18   that answer, right?

19   A.   Yes, sir, I would assume.

20   Q.   All right.  Now, I want to go through a few lists.  If

21   you might discern right now, I'm a list maker.

22        I want to make a list of the topics you have lied about

23   during your employment at Reagor-Dykes.  You following me?

24   A.   Yes, sir.

25   Q.   You've lied about, I guess, floor-planning fraud?

1    A.    Correct.

2    Q.    You've lied about check-kiting?

3    A.    Yes, sir.

4    Q.    You've lied about true condition of the books and

5    records at Reagor-Dykes?

6    A.    Yes, sir.

7    Q.    What else?

8    A.    I'm not sure what else there is.

9    Q.    Give me just one second, Mr. Smith.  Well, the floor-

10   planning fraud ran up to the twenty-three, twenty-four,

11   twenty-five million dollar number?

12   A.    Yes, sir.

13   Q.    Check-kiting a similar number?

14   A.    I believe so.

15   Q.    And we'll get into the weeds of it, Mr. Smith, but in

16   your Plea Agreement, I think you agreed to a stipulated loss

17   amount of -- in the $50,000,000 range?

18   A.    Yes, sir.

19   Q.    Does it strike you as ironic that the Government is

20   using a fellow that has pled guilty to a $50,000,000 fraud to

21   attempt to convict a person who is charged with a much

22   smaller accusation in terms of the loss amount?

23   A.    I don't understand the question, I guess.  I'm sorry.

24   Q.    That's fair.  When is the last time you've seen Bart

25   Reagor?

1   A.   2018.

2   Q.   The day you were fired?

3   A.   Yes, sir.

4   Q.   And that was a Monday?

5   A.   I think it was a Wednesday.

6   Q.   Okay.  Let's go back there for -- for just a second.

7   Okay.  You had a surprise audit by Ford Motor Credit in July,

8   late July of 2018, right?

9   A.   Yes, sir.

10  Q.   And unlike some of your other audits -- and we'll get to

11  the meat of those in a minute, but, unlike some of your other

12  audits, you didn't get a heads-up?

13       Typically in the past or not infrequently in the past

14  someone at Reagor-Dykes would get a heads-up that a

15  surprise -- that an audit team was coming, right?

16  A.   Yes, sometimes they did.

17  Q.   Who was that person?

18  A.   I've heard that it was Pepper Rickman.

19  Q.   Okay.  And she was a reportee to you?

20  A.   Yes, sir.

21  Q.   So one of your reportees would get the word, for lack of

22  a better description, that Ford Motor Credit's coming, and

23  y'all would begin to try to prepare for that audit as best

24  you could under those circumstances?

25  A.   Yes, sir.

1    Q.   And having a heads-up was important, right?

2    A.   Yes, sir.

3    Q.   Why?

4    A.   It helped us get ready for the audit, like you said.

5    Q.   Okay.  In any event, you didn't get the heads-up.  And

6    backing up, they are supposed to be by nature surprise

7    audits, right?

8    A.   Yes, for the most part.

9    Q.   I mean, they -- they're done three, four times a year.

10   They're done quarterly.  But you're not supposed to know the

11   date for the very obvious reasons that the Ford Motor Credit,

12   or whomever the lender is, they don't want you guys to have

13   time to get your ducks in a row or provide fake shucks or

14   whatever; agree with me?

15   A.   Yes, sir.

16   Q.   On this particular time, Mr. Smith, you didn't get the

17   advance warning, Bart Reagor was on vacation, right?

18   A.   Yes.

19   Q.   And that's when it all hit the fan, right?

20   A.   Yes, sir.

21   Q.   And, again, Mr. Reagor was unaware of the floor-plan

22   fraud, at least as far as you know?

23   A.   As far as I know, yes, sir.

24   Q.   But you weren't unaware of the floor-plan fraud because

25   you were the mastermind behind it, right?

1  A.  Yes, sir.

2  Q.  So it's an emotional day, and he comes back early from

3  his vacation.  He's upset.  Mr. Dykes is upset.  You're

4  upset.  The staff is upset.  Everybody is upset, because of

5  the allegations that Ford is making towards the dealership

6  because of the then discovered floor-plan fraud; agree with

7  me?

8        MR. HAAG:  Your Honor, I would object to counsel's

9  characterization about other's attitudes.  He has no personal

10  knowledge of that.

11        THE COURT:  Yes.  And that objection is sustained.

12  If you can reformulate the question --

13        MR. COGDELL:  Sure.

14        THE COURT:  -- to focus on this witness' personal

15  knowledge --

16        MR. COGDELL:  Fair enough.

17        THE COURT:  -- and recollection of events.

18  Q.  (By Mr. Cogdell)  Based upon your seeing Bart Reagor

19  coming back early from his vacation and being confronted with

20  this, he was obviously very upset, right?

21  A.  Yes, sir.

22  Q.  So was Mr. Dykes, right?

23  A.  Yes, sir.

24  Q.  So were you, right?

25  A.  I was.

1    Q.   So were the people at Ford Motor Credit, right?

2    A.   I'm assuming they didn't seem happy, but I only spoke

3    with one person, so --

4    Q.   Okay.  And --

5              THE COURT:  And I'll just briefly instruct the

6    witness, if you find yourself assuming, don't make

7    assumptions.  Just testify to what you can recall from

8    personal knowledge, facts, events, and if you need direction

9    from the Court, I can provide guidance.  So don't make

10   assumptions.  Let's just testify to facts that are known to

11   you.

12             THE WITNESS:  Yes, sir.  Yes, sir.

13   Q.   (By Mr. Cogdell)  And let me keep it a little more

14   narrow in a fair way, if I can.  Bart comes back and asks

15   you, what the hell's going on here, right?

16   A.   Yes.

17   Q.   Probably in those words or something even more spicy,

18   right?

19   A.   Actually he heard it from someone else before he asked

20   me about it.

21   Q.   Okay.  But he asked you about it, and you said, it's no

22   big deal; we can cover it; we can cover it; we can cover it,

23   right?

24   A.   I don't remember saying that.

25   Q.   Okay.  Did you tell him -- let me ask it to you this

```
 1   way, Mr. Smith:  Did you come clean with Mr. Reagor at that
 2   time and tell him about the floor-plan fraud that you had
 3   been engaged in for two years?
 4   A.   I did.
 5   Q.   You did?
 6   A.   Yes.
 7   Q.   Okay.  And that was -- as far as you know, that was the
 8   first he heard of it?
 9   A.   He had heard from it from somebody the day before.
10   Q.   Okay.
11   A.   And the next day, he and Rick called me to Mr. Reagor's
12   house and said -- and told me they already knew.
13   Q.   Okay.  Got you.  They heard about it from somebody else
14   that weekend?
15   A.   Yes.
16   Q.   Okay.  Now, at some point, you ended up at the office of
17   this fine lawyer with the mask on, Danny Hurley, shortly
18   after the -- I'm going to call it the implosion at
19   Reagor-Dykes, for lack of a better reason -- explanation,
20   right?
21   A.   That's correct.
22            MR. COGDELL:  Can I have that exhibit?
23        (Mr. Cogdell/Mr. Haag sotto-voce conference.)
24            MR. COGDELL:  57, I think.
25            THE COURT:  And just to be clear, Mr. Cogdell, this
```

1    is Government's 57?

2              MR. COGDELL:  It is Government's 57.

3              THE COURT:  Okay.  That is pre-admitted.

4              MR. COGDELL:  If you could zoom in on the first

5    couple of paragraphs, please, ma'am.

6    Q.   (By Mr. Cogdell)  And you write Mr. Hurley.  First, let

7    me state that Bart Reagor and Rick Dykes had absolutely no

8    idea or any knowledge of the actions taken that resulted in

9    this situation.  I did not tell them, and there was really no

10   way for them to have access to anything that would alert them

11   to these issues.  I'm happy to testify as necessary that

12   they had no knowledge of this whatsoever.

13        You wrote that as true back in 2018.  Do you still

14   contend that's true?

15   A.   Yes, sir.

16   Q.   And, in fact, Mr. Smith, at one of your very first

17   meetings with the FBI and counsel, you were questioned about

18   the contents of that e-mail that you sent to Mr. Hurley

19   shortly after the implosion, and you told them at that point,

20   I stand by that; everything in there is true, to the best of

21   my knowledge?

22   A.   Yes, sir.

23   Q.   And it's still true today?

24   A.   Yes, sir.

25   Q.   The situation started within the past year or so.  As a

1    result of our growth and the number of sales and transactions

2    we have, our capital to operate the business was inadequate.

3        We attempted to correct that last March when we had an

4    equity loan, as well, at IBC.  This injection was not enough

5    for us to be able to keep pace from a cash-flow standpoint,

6    we continued [*sic*] with our sales growth.

7        Now, you say the injection was not enough there in this

8    e-mail.  You mentioned nothing about Mr. Reagor and, to be

9    fair, Mr. Dykes having taken a portion of those loan

10   distributions in this e-mail, right?

11   A.   No, I did not.

12   Q.   When is the first time, if you recall, Mr. Smith, that

13   you had discussions with law enforcement about the IBC loan?

14   A.   Um, probably a couple of months later maybe.

15   Q.   Okay.  To be clear, do you recall whether or not you

16   brought that loan up to them or they brought that loan up to

17   you, or do you remember?

18   A.   I don't remember who --

19   Q.   Fair enough.

20   A.   -- actually brought it up.

21   Q.   Now, it's true looking back at it, is it not, Mr. Smith,

22   that the $5,000,000 working capital, whether it was two

23   tranches of 5,000,000 or whatever, given the true financial

24   condition of the Reagor-Dykes entities as you now know them

25   to be, y'all would have needed way more than that to have

1  survived?

2  A.   I don't know that.

3  Q.   Okay.  Ford Credit also gave us $5,000,000 as working

4  capital.  In an attempt to satisfy the covenants of our

5  floor-plan agreement with Ford Credit, I instructed some of

6  our offices to find whatever vehicles that we owned,

7  previously owned, or had records to advance on the floor plan

8  for credits, to pay for the vehicles we know were due to be

9  paid for per the provisions of the agreement.  This escalated

10  to an amount that was not manageable.

11       Is it true, Mr. Smith, that at the time this fraud

12  began, specifically the floor-planning fraud, you hoped to

13  sort of power your way through it and get on the other side

14  safely without causing further harm?  Is that putting words

15  in your mouth, or --

16  A.   Yeah, I would have liked to.

17  Q.   Okay.  I mean, I guess I'm going to ask it another way.

18  When you started that fraud, did you intend to commit a

19  federal offense, or did you just intend to do whatever you

20  could to keep the wheels on the bus?

21  A.   No, I did not intend to commit a crime.

22  Q.   Let me go there.  Did Bart Reagor ever ask you to commit

23  a crime?

24  A.   No, sir.

25  Q.   At any time?

1    A.   Not that I can recall.

2    Q.   Well, that's something I would think, Mr. Smith, that

3    you would recall.  If somebody asked you to commit a crime,

4    that would likely be something that would stick out in your

5    memory.

6    A.   He did not specifically ask me, hey, I want you to

7    commit this crime that I --

8    Q.   Fair --

9    A.   -- can recall.

10   Q.   Fair enough.  I also instructed them to provide sale

11   dates during audits that allowed us more time to pay for

12   vehicles, funded or not.  Ford Credit discovered these

13   practices during an accelerated floor-plan audit they started

14   on July 26th.  They completed their audit on July 27, and

15   demanded payoff on all vehicles they showed had basically not

16   been inspected in those two days.

17        Now, in this time frame, that is, the 27th, 28th of

18   July, the very beginning of August, do you remember a moment

19   when Chuck Darter, who was Bart Reagor's -- who is Bart

20   Reagor's CPA, coming to you and saying, what the hell

21   happened; what's going on here?

22             MR. HAAG:  Your Honor, objection, calls for

23   hearsay.

24             MR. COGDELL:  No, it's a question.

25             THE COURT:  Sustained, but I will direct the

```
 1  witness to answer as to a recollection of the event, not any
 2  particular statements.
 3           MR. COGDELL:  Right.
 4  Q.   (By Mr. Cogdell)  Do you remember -- let me put it --
 5  let me ask it this way:  Do you remember, do you remember
 6  telling Mr. Daughter -- Darter in response to a question, I
 7  went to the dark side, and I couldn't find my way back?
 8  A.   I don't remember saying that to him.
 9  Q.   Okay.  Are you sure you didn't, or are you just --
10  A.   I'm not sure that I did, but I don't remember -- I
11  remember having a conversation, a very short conversation
12  with him --
13  Q.   Okay.
14  A.   -- after a meeting.
15  Q.   And some of us, Mr. Smith, would use language like that
16  and some of us wouldn't.  Is that the sort of language that
17  you might use?
18  A.   Maybe.  I don't know.
19  Q.   Okay.  I appreciate your --
20  A.   I guess if I said it, but I don't recall saying that
21  specifically.
22  Q.   Fair enough.
23           MR. COGDELL:  You can take that down.
24  Q.   (By Mr. Cogdell)  Now, we talked about the --
25  generically the things that you lied about, right?
```

1    A.   Yes.

2    Q.   Can we put together a quick list of folks that you lied

3    to.  You lied to, I guess, Ford Motor Credit, right?

4    A.   Yes, sir.

5    Q.   You lied to FirstCapital Bank and Trust?

6    A.   Yes.

7    Q.   You lied to AimBank?

8    A.   Yes, sir.

9    Q.   You lied to FirstBank and Trust?

10   A.   Yes, sir.

11   Q.   You lied to Vista Bank?

12   A.   Yes, sir.

13   Q.   I guess it's true that you lied to Mr. Reagor, right?

14   A.   Yes.

15   Q.   Also true that you lied to Rick Dykes, the partner?

16   A.   Yes.

17   Q.   Also true, I suppose, that you lied to a number of

18   employees that were -- that were working for RDAG?

19   A.   Yes, sir.

20   Q.   Can you estimate for us, just in a general way, Mr.

21   Smith, how many RDAG employees you lied to?

22   A.   I have no idea how I would do that.

23   Q.   More than ten?

24   A.   Possibly.

25   Q.   Did you lie to your friends and family, sir?

1    A.   Yes, sir.

2    Q.   And what specifically did you lie to your friends and

3    family about with respect to these transactions?

4    A.   I don't know that I told them an exact lie.  It was more

5    of a lie of omission.

6    Q.   I guess -- and I apologize for the intrusiveness of this

7    question, but I would assume, Mr. Smith, given what was truly

8    going on at Reagor-Dykes, your wife and your family had no

9    idea the true financial condition or what was going on or the

10   check-kiting or the floor-plan fraud or all of that, right?

11   A.   No, they did not.

12   Q.   You have one child?

13   A.   Yes.

14   Q.   And we'll get into this, but do you agree with me that,

15   generally speaking, Bart Reagor treated you well?

16   A.   Yes.

17   Q.   I mean, he treated you like an equal?

18   A.   Yes, many times.

19   Q.   Treated you like a friend?

20   A.   Yes, he did.

21   Q.   Cared about your family?

22   A.   Yes.

23   Q.   You have a special needs child.  To rip that band-aid

24   off, I'm sorry for going there, but there was a --

25            MR. HAAG:  Your Honor, if I may, I think this is --

1          THE COURT:  I'll sustain --

2          MR. HAAG:  -- outside of --

3          THE COURT:  I'll sustain this objection as to

4    children as irrelevant and potentially confusing to the jury,

5    and I will instruct the witness not to answer.

6          I will also instruct the jury not to consider the

7    witness' impromptu response to that.  So references to

8    children, special needs or otherwise, will not be a part --

9          MR. COGDELL:  Fair enough.

10         THE COURT:  -- of this line of questioning.

11         MR. COGDELL:  Fair enough.

12         THE COURT:  You may continue.

13         MR. COGDELL:  Thank you.

14   Q.   (By Mr. Cogdell)  Now, you indicated, and we'll get to

15   this -- he keeps saying we'll get to this.  You indicated

16   that at one point when you learned that Bart wanted to use

17   portions of the loan proceeds in the manner that he did, you

18   were very frustrated, right?

19   A.   Yes.

20         MR. COGDELL:  Can we see that e-mail that's in

21   response to Bart's e-mail how we're going to use the funds.

22   Do you have that number handy?  If you could -- and I thank

23   you for helping me.

24   Q.   (By Mr. Cogdell)  So he tells you that he wants to use a

25   portion of the proceeds from the loan distribution for his

1  own personal purposes, right?

2  A.   Yes, he did.

3  Q.   And I think your recall was specific enough to remember

4  that you were at home when you got that e-mail, and you were

5  frustrated at receiving that e-mail because you wanted all

6  the funds to go back into the Reagor-Dykes car dealerships

7  and not to see any of them go anyplace else, right?

8  A.   Yes, sir.

9        THE COURT:   Just briefly, Mr. Cogdell, which

10  exhibit number is this?

11        MR. HAAG:   42.

12        MR. COGDELL:   42.

13        THE COURT:   Okay.  Government Exhibit 42 is

14  pre-admitted.  You may proceed.

15  Q.   (By Mr. Cogdell)  Now, would you agree with me that it

16  is the job of the CFO to manage the financial wherewithal of

17  the company?

18  A.   Yes, I would agree with that.

19  Q.   I'm just going to pull out a definition and see if you

20  agree with it.  The chief financial officer is the officer of

21  a company that has primary responsibility for managing the

22  company's finances, including financial planning, management

23  of financial risks, recordkeeping and financial reporting.

24  In some sectors, the CFO is also responsible for the analysis

25  of data.  The CFO directly assists the chief operating

```
 1   officer on all -- on all business matters relating to budget
 2   management, cost benefit analysis, forecasting needs, and
 3   securing of new funding.
 4        Would you generally agree with that description of a
 5   CFO?
 6   A.   I would.
 7             MR. COGDELL:  Can we see 40 whatever that was back?
 8             THE COURT:  And which exhibit number is this?
 9             MS. BURCH:  42.
10             MR. COGDELL:  42.
11             THE COURT:  Okay.  That is pre-admitted.  You may
12   proceed.
13   Q.   (By Mr. Cogdell)  So as the CFO agreeing with the job
14   description we just heard, instead of saying, what are you
15   doing; you can't do that; you've lost your mind --
16             MR. COGDELL:  If you could blow up that first --
17   the top half of it.
18   Q.   (By Mr. Cogdell)  -- you say:  Awesome.  I will ensure
19   it is executed exactly as written, reviewing and getting
20   approval from each -- from you each step along the way, and I
21   will work to see if we can get that FMCC, Ford Motor Credit
22   Company, line paid off before they finalize the $5,000,000
23   loan back [sic].
24        And I won't go into all of it, but you say:  All I have
25   worked towards, since you brought me onboard on day one, was
```

        1   to enrich your lives, build your net worth, and have your

        2   back.  I've made my share of mistakes, but I try very hard to

        3   make decisions to better this company, protect your positions

        4   in life every time.  I'll never stop doing that ever.  I

        5   would protect you and your families with my life, I swear I

        6   would.  No different than if I was to protect mine.  You have

        7   brought me into your family, and the loyalty, appreciation

        8   and dedication I have for you guys and your families cannot

        9   be given justice even if I tried to express it in words.

       10       Me and all employees of the RDAG family owe you so very

       11   much.  Thank you for everything.

       12       Were these words true when you wrote them?

       13   A.   Yes.

       14   Q.   So, Mr. Smith, as the Government's -- one of the

       15   Government's key witness in this particular case, you would

       16   have to agree with me that, if Mr. Reagor is relying upon you

       17   as the CFO to give him the proper advice, trusting your

       18   advice, he would have been given no clue by you that he

       19   shouldn't do what he told you he was going to do; agree with

       20   me?

       21   A.   Could you restate the question.  I don't think I

       22   understand what you're asking me.

       23   Q.   I'm perfectly capable of asking a poor question, so if I

       24   ask you one that you don't understand, I'll try again.

       25       If Mr. Reagor, who looked and relied on you and trusted

1   you on -- for financial advice, particularly reached out to

2   you and told you what he was going to do with those loan

3   proceeds, and the answer that he got back was this, he

4   wouldn't have had a clue that what he was doing was wrong?

5   A.   I don't know if he did or not.

6   Q.   Well, you certainly didn't say, no, no, you can't do

7   that, right?

8   A.   Mr. Reagor did not always agree with what I wanted to do

9   financially.

10  Q.   And my wife doesn't always agree with what I want to do

11  financially, but that's beside the point.  You never told

12  him, don't do this, and you were the CFO that he was relying

13  upon, right?

14  A.   Correct.

15  Q.   And, as far as you know, once again, Mr. Smith, he

16  hadn't even read the contract, the loan agreement?

17  A.   I don't know if he did or not, but I don't think he did.

18  Q.   Yes, sir.  So if he is reaching out to you as the CFO

19  for the go, no-go, you're -- on taking these distributions,

20  it's pretty clear, from reading your reply to him, that

21  you're telling him, go, you can do this?

22  A.   He didn't ask we that in that e-mail.  He just said what

23  was going to happen.

24  Q.   Okay.  But you say:  Awesome.  I will ensure it is

25  exactly -- there's nothing in your reply back to him to

1    indicate he shouldn't do that; he can't do that; that's a bad

2    idea; there's not a whiff of that in your reply to him,

3    right?

4    A.   Correct.

5              MR. COGDELL:  May I have the witness step down

6    briefly, Your Honor?

7              THE COURT:  For what purposes?

8              MR. COGDELL:  Just physicality.

9              THE COURT:  Any objection from the Government?

10             MR. COGDELL:  I'm not going to challenge him.

11             MR. HAAG:  I was -- (chuckles).

12             MR. COGDELL:  I'm way too old for that.

13             THE COURT:  We're not doing -- we don't have an

14   octagon.  We're not doing a cage match, I promise you that.

15        (Laughter.)

16             THE COURT:  Is it only to demonstrate the physical

17   stature of --

18             MR. COGDELL:  Yes, sir.

19             THE COURT:  You may --

20             MR. HAAG:  No objection --

21             THE COURT:  -- stand up, but --

22             MR. HAAG:  -- to that, Your Honor.

23             THE COURT:  -- just in the witness chair, and the

24   Court can take judicial notice of your stature.

25        (Witness stands up.)

1    Q.   **(By Mr. Cogdell)**  You're a big guy?

2    A.   I guess so.

3    Q.   Fair (chuckles).

4    A.   Yes, sir.

5    Q.   What are you?  Six three, six four?

6    A.   Six three.

7    Q.   275?

8    A.   240.

9    Q.   240.

10        **MR. COGDELL**:  Mr. Reagor, stand up.

11   **(Defendant stands up.)**

12   Q.   (By Mr. Cogdell)  He's five seven, five eight?

13        **THE DEFENDANT**:  Come on now.

14   A.   I don't know how tall he is.

15   Q.   **(By Mr. Cogdell)**  You're a bigger, taller guy than Bart?

16   A.   I am taller than Bart, yeah.

17        **MR. COGDELL**:  Okay.  Both of y'all have a seat,

18   please.

19   Q.   **(By Mr. Cogdell)**  Okay.  Mr. Haag indicated that you had

20   a bad temper from time to time?

21   A.   Yes, sir.

22   Q.   And, believe me, I sympathize and I understand, but,

23   surely, even though you suggest, Mr. Smith, that Mr. Reagor

24   didn't always follow your advice, did he ever try to threaten

25   you physically?

```
1   A.   No.  He did not try to hit me or anything like that.

2   Q.   Okay.  You, on the other hand, did operate from time to

3   time now looking back on it with some physicality?

4   A.   I never touched anyone physically or harmed anyone.

5   Q.   I mean --

6           THE COURT:  Please rephrase the question for

7   clarity.

8           MR. COGDELL:  Sure.  Poorly phrased on me.

9   Q.   (By Mr. Cogdell)  You never physically hit anybody,

10  right?

11  A.   No, sir.

12  Q.   But you weren't above throwing a fit, throwing a phone,

13  having an explosive moment or two?

14  A.   No, I'm not above that.

15  Q.   Okay.  Now, let's go back in time when you were hired

16  by --

17          MR. COGDELL:  And, Nick, I'm running out of

18  battery, of course.

19  Q.   (By Mr. Cogdell)  I want to go back in time when you

20  were first hired by Mr. Reagor and Mr. Dykes.  That was 2006?

21  A.   2008.

22  Q.   2008.

23          (Pause.)

24          MR. COGDELL:  (To Mr. Norris)  Thank you.

25  Q.   (By Mr. Cogdell)  You were hired as CFO at RDAG, right?
```

1   A.   Yes, sir.

2   Q.   You were the first, and I guess the only, CFO at RDAG,

3   right?

4   A.   Yes, sir.

5   Q.   So from the ten years that you were there, Mr. Smith,

6   you saw that company grow stratospherically in terms of

7   sales, employees, volume, success?  I mean, it was a -- it

8   was a machine; agree with me?

9   A.   I would agree.

10  Q.   Mr. Reagor was integral to that success; would you agree

11  with me?

12  A.   Yes, sir.

13  Q.   And even though you had your failings at the end in '16

14  or '18, you yourself worked very, very, very hard for that

15  company?

16  A.   I did.

17  Q.   I think you were initially paid something like $70,000 a

18  year?

19  A.   I believe that's correct.

20  Q.   And by the end of your time there when you were

21  terminated, Mr. Smith, you were making $800,000 a year or

22  thereabouts?

23  A.   Pretty close, yes.

24  Q.   That's a lot of money?

25  A.   Yes, it is.

1  Q.   Do you think you could have made that kind of money at

2  any other car dealership or working anyplace else?

3  A.   I don't know.

4  Q.   Okay.

5  A.   I mean, I would think, but probably rare.

6  Q.   Okay.  Fair enough.  Now, one of -- one of the reasons

7  that Mr. Reagor and Mr. Dykes hired you is that you had had

8  previous experience at Ford Motor Credit Company, right?

9  A.   Correct.

10  Q.   That's important when you're running a car dealership,

11  right?

12  A.   Yes, it is.

13  Q.   It's even more important when you're running a series of

14  car dealerships; agree with me?

15  A.   I agree.

16  Q.   Because, as important as sales are — and they are very

17  important — unless you get the money coming in, it doesn't

18  really matter how many you're selling if you're not getting

19  paid and you're not paying your manufacturers, right?

20  A.   That's correct.

21  Q.   It is true, is it not, that Mr. Reagor's focus was

22  almost exclusively on sales?

23  A.   Yes, sir.

24  Q.   And I think I said earlier he's a sales guy on steroids,

25  but, in addition to your experience at Ford Motor Credit, you

1   had an undergraduate, BBA and an MBA?

2   A.   That's correct.

3   Q.   Where's your BBA from, Mr. Smith?

4   A.   University of Central Oklahoma.

5   Q.   Where is that?

6   A.   In Edmond, Oklahoma.

7   Q.   Edmond.  And your MBA?

8   A.   Oklahoma City University.

9   Q.   Okay.  And you had both of those degrees before you went

10  to work for Reagor-Dykes?

11  A.   I did.

12  Q.   Would you agree with me that certainly, at least by

13  comparison, Mr. Reagor is less financially sophisticated than

14  you?

15  A.   I don't know that I can say that.

16  Q.   Okay.

17  A.   Just because he doesn't have a degree doesn't mean

18  he's --

19  Q.   Fair --

20  A.   -- not smart.

21  Q.   -- enough.  Do you know if he can, for example, read a

22  financial statement with some acuity?

23  A.   I believe so.

24  Q.   Okay.  When you were the CFO, you would provide Mr.

25  Reagor with financial documents showing, for example, the

1  bank balances?

2  A.   Yes.

3  Q.   Showing the inventory?

4  A.   Correct.

5  Q.   Did there come a time when the information that you were

6  providing Mr. Reagor was inaccurate?

7  A.   Yes, sir.

8  Q.   And when did that happen?

9  A.   In the last two or three years.

10  Q.   Okay.  And when you say you were providing him

11  inaccurate information, exactly what inaccurate information

12  were you providing him?

13  A.   The bank balances every Friday I would send a report, I

14  would not include the uncollected balances.

15  Q.   Bank balances.  Well, you were sending him inaccurate

16  bank balances on a weekly basis?

17  A.   Yes, sir.

18  Q.   Do you know if he relied upon those?

19  A.   I'm assuming.

20  Q.   Okay.  Did you ever sit down and discuss those

21  inaccurate bank balances with him?

22  A.   No, sir.

23  Q.   Did you ever tell him, oh, by the way, those bank

24  balances I'm giving you aren't accurate?

25  A.   I've discussed with him before that they change daily or

```
 1   weekly, I mean --
 2   Q.   Well --
 3   A.   -- by minute, I should say.
 4   Q.   Fair enough.
 5   A.   Yeah.
 6   Q.   And I want to make sure we're on the same page here, Mr.
 7   Smith.  I'm not suggesting -- what I want to understand is if
 8   you are giving him intentionally inaccurate bank balances,
 9   not something that changes day to day.  My bank balances,
10   their bank balances change day to day.
11        But were you intentionally providing him with inaccurate
12   documents?
13   A.   It was an e-mail.
14   Q.   Okay.
15   A.   An inaccurate e-mail, yes, sir.
16   Q.   But the call of the question is yes?
17   A.   Yes.
18   Q.   You were intentionally providing him with inaccurate
19   information?
20   A.   Yes, sir.
21   Q.   Did you ever tell him --
22   A.   No, sir.
23   Q.   -- that?  Did you ever tell him?
24   A.   No, sir.
25   Q.   The same question with respect to inventory.  Maybe I
```

1   heard it in my mind, maybe you said it, but were you also

2   providing Mr. Reagor and, I guess, Mr. Dykes inaccurate

3   inventory information?

4   A.   No, sir.  I didn't change any inventory information.

5   Q.   Okay.  So, as far as you know sitting there today, the

6   only inaccurate financial information that you're sending Mr.

7   Reagor, whether it's e-mail or otherwise, is the bank

8   balances?

9   A.   Correct.

10  Q.   And, as between Mr. Reagor and Mr. Dykes, would you care

11  to share who was more financially literate or sophisticated

12  as between Reagor and Dykes?

13  A.   Well, I guess it depends on what you're specifically

14  asking.

15  Q.   That's a fair question.

16  A.   There's different aspects and --

17  Q.   That's fair.

18  A.   -- categories, but --

19  Q.   Mr. Dykes was financially successful before he became

20  partners with Mr. Reagor?

21  A.   Yes, he was.

22  Q.   He had, I think, some RE/MAX investments, right?

23  A.   Yes, sir.

24  Q.   What -- and what else?  He had his hands in a few

25  different pies, for lack of a better description.  RE/MAX.

1    What else?

2            **MR. HAAG**:  Your Honor, I would object.  That goes

3    outside the scope of direct, and, additionally, it goes into

4    matters that teeter on the edge of what the Court has already

5    ruled on in limine.

6            **THE COURT**:  That objection is sustained.  I'll

7    admonish counsel to abide the Court's instruction on the

8    Order in Limine.

9            And, also, if this witness is called and presented,

10   we will take up any matters then, and the Defense, of course,

11   will have an opportunity for direct at that point.

12           **MR. COGDELL**:  Fair enough.  If I skirted towards

13   the motion in limine, I didn't realize it, so I apologize,

14   Your Honor.

15           **THE COURT**:  And, you know, we've worked diligently

16   with counsel and the Court to define those lines, so you may

17   make reference to Mr. Dykes in explaining the chronology, but

18   let's not delve into any material that needs to be elicited

19   through testimony at that time.

20           **MR. COGDELL**:  That's fair.

21   Q.    **(By Mr. Cogdell)**  Mr. Dykes' role was what at

22   Reagor-Dykes?

23   A.    Mr. Dykes was a partner, an owner.

24   Q.    Okay.  He was a 50-percent owner?

25   A.    Yes, sir.

1   Q.   And if Bart Reagor was CEO, and you were CFO, what was

2   Rick Dykes?

3   A.   He was just always listed as a partner/owner.

4   Q.   Okay.  That was just as far as it got?

5   A.   Yes.

6   Q.   And what was his contribution?  As I understood it or as

7   I understand it, Mr. Smith, Mr. Dykes took home an equal

8   amount of pay as Mr. Dykes [*sic*]?

9           THE COURT:  Okay.  At this point, I'm going to

10  instruct the witness not to respond.  This is subject to the

11  Court's Order in Limine.

12          MR. COGDELL:  Can we approach, Your Honor?

13          THE COURT:  Yes, you may approach.

14

15              --------------------------

16      (Bench Conference held and filed under separate sealed

17  volume in Sealed Bench Conferences Volume I of I.)

18              --------------------------

19

20      (The following took place in the hearing of open court.)

21  Q.   (By Mr. Cogdell)  Let me go a different way to some

22  extent.  After the first tranche of proceeds from the

23  $5,000,000 loan from IBC, you received a bonus?

24  A.   Yes, I did.

25  Q.   And how much was the bonus that you received?

1    A.   25,000.

2    Q.   And I think you indicated that Mr. Reinhart likewise

3    received a bonus after the tranche, $5,000,000 tranche?

4    A.   Yes, he did.

5    Q.   And how much was that?

6    A.   5,000.

7    Q.   I think you said Rachel Reagor received a bonus?

8    A.   Correct.

9    Q.   How much was that?

10   A.   That was 5,000.

11   Q.   John Thompson, who is the Wall Street fellow that you

12   discussed earlier on your direct examination, he received a

13   bonus?

14   A.   Yes, he did.

15   Q.   Did any of y'all turn those back in and say, whoa, I

16   don't want any of this?

17   A.   No.

18           MR. COGDELL:  Give me just a minute, Your Honor.

19           THE COURT:  You may take as much time as you need.

20           MR. COGDELL:  Thank you.

21       (Pause.)

22   Q.   (By Mr. Cogdell)  Back when you were interviewing with

23   Bart Reagor, and I guess Mr. Dykes, back in 2008, did either

24   one of them indicate that going to work for Reagor-Dykes

25   would entail anything unseemly, improper, criminal, wrong?

1    A.    No, sir, not that I recall.

2    Q.    Well, again, probably one of those things you'd recall

3    if it happened, right?

4    A.    I guess.

5    Q.    Mr. Smith, when you, for lack of a better description,

6    were orchestrating -- and I know that's a lawyer word and

7    offensive to you, but I don't know any other way to ask it.

8          When you were orchestrating the floor-plan fraud and the

9    check-kiting fraud, you necessarily involved -- had to

10   involve others to help you get away with those frauds, right?

11   A.    Yes, sir.

12   Q.    How many other people did you involve?

13   A.    Related to the floor plan?

14   Q.    Yes, sir.

15   A.    Probably ten.

16   Q.    Names?

17   A.    Lindsay Williams.

18   Q.    I'm sorry?

19   A.    Lindsay Williams.

20   Q.    That's one.

21   A.    Pepper Rickman.

22   Q.    That's two.

23   A.    Brad Fansler, Paige Johnston, Kate Phillips, Lori

24   Honesto.

25   Q.    Spell the last name.

```
 1    A.   L-O-R-I, H-O-N-E-S-T-O, I believe.

 2    Q.   One more time.

 3    A.   H-O-N-E-S-T-O.

 4    Q.   Okay.

 5    A.   Tracy Sandstrom.

 6    Q.   Spell the last name.

 7    A.   S-A-N-D-S-T-R-O-M.

 8    Q.   Who else?

 9    A.   I'm trying to think of who else was working at those

10    stores.

11    Q.   And that's all on the floor-plan fraud, right?

12    A.   Yes, sir.  Sherri was a -- a lady named Sherri was at

13    the Plainview store.

14    Q.   You also orchestrated the check-kiting fraud?

15    A.   Yes.

16    Q.   How many people did you involve in that?

17    A.   Probably five, four or five.

18    Q.   Who were they?

19    A.   Sheila Miller.

20         THE COURT:  Mr. Cogdell?

21         MR. COGDELL:  Sir?

22         THE COURT:  Thank you for deactivating your

23    microphone when you're at the bench, but you'll need to turn

24    it back on --

25         MR. COGDELL:  Thank you, Your Honor.  I'm sorry.
```

```
 1            THE COURT:  -- now that you're on the floor.
 2            MR. COGDELL:  I apologize.  I'm sure they're
 3   devastated they couldn't hear me.
 4   Q.   (By Mr. Cogdell)  The check-kiting fraud was Sheila
 5   Miller.  Who else?
 6   A.   Diana Urias.
 7   Q.   Oh, how do you spell --
 8   A.   D-I-A-N-A.
 9   Q.   Diana?
10   A.   Yes.  D-I-A-N-A.
11   Q.   Okay.
12   A.   U-R-I-A-S.
13   Q.   Okay.
14   A.   Ashley Dunn.
15   Q.   Ashley Dunn?
16   A.   Uh-huh.  Brad Fansler and Lindsay Williams.  I believe
17   that's the only ones involved in that.
18   Q.   Steven Reinhart?
19   A.   No, I did not involve him in that.
20   Q.   Okay.  So if I'm getting it right, Mr. Smith, we've got
21   — one, two, three, four, five, six, seven, eight, nine, ten,
22   eleven, twelve — thirteen different individuals that you
23   involved in federal criminal conduct, right?
24   A.   Some of those are duplicates, but close to that, yes.
25   Q.   Okay.  You got to feel terrible about that at this
```

1    point, don't you?

2    A.   I do.

3    Q.   I understand.  Have you reached out to any of those

4    people and said, my God, I'm sorry for what I did?

5             MR. HAAG:  Your Honor, I would object to this line

6    of questioning as irrelevant, and I --

7             THE COURT:  Sustained.  And the Court does find

8    that it's irrelevant, and any probative value is

9    substantially outweighed by potential prejudice.

10            So the witness will be instructed not to answer.

11   The jury will be instructed to disregard the question.  And

12   you may move on to your next question.

13            MR. COGDELL:  Yes, sir.

14            THE COURT:  Sustained.

15            MR. COGDELL:  May we approach, Your Honor?

16            THE COURT:  You may approach.  And I'll just give a

17   brief instruction to the jury on the nature of these

18   conferences that you see at the bench.

19            Given the complexity of some of the facts and

20   issues in this case, this Court has coordinated closely with

21   counsel to make certain that they approach any time they need

22   a ruling from the bench on where they may proceed with

23   witnesses or with evidence.

24            You should not infer anything from that.  This is

25   like the Court's ruling on any other objection.  You'll hear

1    that in the instruction that I give to you about rulings from

2    the bench and from the Court, so this is just another

3    category of rulings and objections.

4            They're seeking this Court's counsel on the law and

5    where they may go, so this is in conformity with the Court's

6    instructions.  So I don't want you to infer any negativity

7    from these bench conferences.  We're trying to be careful,

8    and I want you to appreciate that.

9        **(The following took place at the bench and outside the**

10   **hearing of open court.)**

11           **MR. COGDELL:**  I wish to ask Mr. Smith if any of

12   these individuals have been charged with crimes.  I know that

13   they have, some of them, not all of them.

14           **THE COURT:**  I've sentenced --

15           **MR. COGDELL:**  Yes.

16           **MR. HAAG:**  Well, and that's -- I think that goes

17   outside into what's covered.  The limine order covered not

18   talking about criminal proceedings in unrelated matters, so I

19   agree it's fair game to say he involved them, but stop short

20   of going into that they were convicted or charged with crimes.

21           **MR. COGDELL:**  I disagree, because it goes to the

22   actions that this individual engaged in and the consequences

23   thereof.

24           **MR. HAAG:**  But he -- but you covered that.

25           **MR. COGDELL:**  No.

1          MR. HAAG:  You said you involved them.  Now, as far

2     as the consequences, they chose those consequences.

3          MR. COGDELL:  Well, we're probably not -- we're

4     probably not going to agree on this.

5          THE COURT:  Okay.  Ms. Burch, anything from the

6     appellate division?

7          MR. COGDELL:  Wait, that's you.

8          MS. BURCH:  Your Honor, I would just join with Mr.

9     Haag.  He's very capable of handling these.

10          THE COURT:  Okay.

11          MS. BURCH:  But I would note that, when he asks the

12     Court to permit him to ask these types of questions, all of

13     these individuals have independently admitted their conduct,

14     including their intent, so any suggestion that he's the cause

15     of their conduct, he may have engaged them, but -- invited

16     them to participate, but they have all pled guilty and

17     admitted criminal intent of their very own.  That did not

18     come from him.  That is the only issue.

19          And so I think that's outside the scope of direct.

20     That's outside of -- and it's clearly hard for the jury.

21          THE COURT:  Yeah.  So based on the -- based on the

22     Court's prior ruling from the bench on check-kiting,

23     floor-plan fraud, and wire fraud, which are now open to the

24     Defendant with this witness --

25          MR. COGDELL:  Yes, sir.

1          THE COURT:  -- I'll allow you to make reference to

2    those terms, but not their criminal convictions, because I

3    don't want to open up any 403 problems on potential

4    confusion.

5          So, in that limited way, I do sustain the

6    Government's objection.  You may reference those terms.  They

7    do appear in the Government's exhibits and the Plea Agreement

8    and the Supplement, and you may even inquire if he invited

9    them to participate in check-kiting, floor-plan fraud, and

10   wire fraud, but I don't want to crack open every

11   sentencing --

12          MR. COGDELL:  Okay.

13          THE COURT:  -- file that's been before this Court.

14          MR. COGDELL:  That's fine.

15          THE COURT:  Okay.

16   **(The following took place in the hearing of open court.)**

17   Q.   **(By Mr. Cogdell)**  Mr. Smith, just so I -- just so I'm

18   clear, and the jury is clear, you didn't pull a gun on these

19   people and make them participate in these crimes, right?

20   A.   No, I did not.

21   Q.   But you certainly requested their help in perpetuating

22   these crimes?

23   A.   I did.

24          MR. COGDELL:  If we could look at Government's

25   Exhibit -- in fact, if I can just use -- what do we call this

1    the door, the ELMO?

2            **THE COURT**:  I think it -- it was an ELMO back in

3    the day, but I don't know what it's called now.  We'll just

4    call it the ELMO.  And it will project here.  Just give us a

5    moment to connect the technology.

6            **MR. COGDELL**:  I need to -- having me with anything

7    technology is dangerous.

8    Q.   **(By Mr. Cogdell)**  All right.  I'm showing you, Mr.

9    Smith, what's in evidence as Government's Exhibit 34, and

10   that is what's known as a Factual Resumé, right?

11   A.   Yes, sir.  Yes, sir.

12   Q.   And this is a document that is very specifically gone

13   over between the Government and your lawyer, Mr. Morris, and

14   you, right?

15   A.   That's correct.

16   Q.   And you agree, actually you stood in front of a District

17   Judge at some point, pled guilty, and agreed to these

18   specific items in this Factual Resumé; agree with me?

19   A.   Yes, I did.

20   Q.   And it goes into the floor-plan loan fraud.  It goes

21   into the check-kiting fraud.  It talks about one of the

22   situations I asked you about earlier about RDAG getting

23   advanced notice on the audits and so forth.

24        And the actual loss on the floor-plan fraud is

25   $27,000,000, correct?

1    A.   Yes, sir, that's what it says.

2              THE COURT:  And, just for record purposes, this is

3    Government's Exhibit 34, and it is pre-admitted.

4              MR. COGDELL:  Correct.

5    Q.   (By Mr. Cogdell)  It goes into some of the e-mails, some

6    of the very specifics, where, for example, in Paragraph 23,

7    an RDAG employee e-mailed Smith and stated:  Are we fake

8    flooring again on Monday?

9         I mean, I guess I'm pointing that out, Mr. Smith, to get

10   you to agree with me that what you were doing was pretty

11   flagrant in terms of your involving other employees; you'd

12   agree with me?

13   A.   Yes, sir.

14   Q.   And in terms of the check-kiting on the last page, it's

15   23,000,000, so it's a grand total of 50,000,000 in fraud that

16   you caused and that you admit you caused, right?

17   A.   Yes, I agree to that.

18   Q.   Now, are you generally familiar -- and I don't want to

19   go into anything that you have discussed with your lawyer,

20   but are you generally familiar with the sentencing practice

21   in Federal Court?

22   A.   Somewhat.

23   Q.   Well, let me see if I can guide you there.  It is this

24   Judge who will ultimately sentence you for your misconduct,

25   right?

```
1    A.   Yes, sir.

2    Q.   And you have pled guilty to an offense that has, I

3    think, a maximum of twenty-year exposure, right?

4    A.   Yes, sir.

5    Q.   And you are -- you are aware, are you not, Mr. Smith,

6    that twenty years in the federal system is twenty years?

7         There's no probation.  You're going to serve 85 percent

8    or thereabouts of whatever the Judge assesses.  It's not

9    going to be like the old days, if you got a life sentence,

10   you were out in six years.

11        If you get twenty years, you're going to serve eighteen

12   calendar before you're out; you understand that generally

13   speaking?

14   A.   I don't.  I have never been in prison before.

15   Q.   You've never been explained that the sentence that you

16   will receive will -- you'll be required to serve 85 percent

17   of it?

18   A.   It could be up to twenty years is what I've been told.

19   Q.   Okay.  And the only reason I'm digging down a little

20   deeper is sometimes the sentence imposed bears little

21   resemblance to the sentence served.

22        And what I'm trying to see if you understand is, what --

23   let's just say the Judge gives you ten years.  You would

24   serve eight and a half of those ten years.  Are you aware of

25   that?
```

1    A.   As I said, I would just assume whatever I get I have to

2    serve.  I don't know how it works.

3    Q.   Okay.  Well, you would agree with me, Mr. Smith, that

4    this is the one and only time that you have to reduce your

5    sentence; this is it, your testimony today?

6    A.   That's my understanding.

7    Q.   And only the Government can file a motion for downward

8    departure?

9    A.   Yes, sir.

10   Q.   And it is their sole discretion to file or not that

11   motion for downward departure.  You can't make them file a

12   motion for downward departure if they don't want to?

13   A.   I do understand that.

14   Q.   They have the complete and total discretion of effecting

15   literally your zip code for the next twenty years based upon

16   that power that they have; would you agree with me on that?

17   A.   Yes, sir.

18   Q.   How many times approximately, Mr. Smith, have you met

19   with either the FBI or the prosecutors in this case?

20   A.   Um, probably at least ten over the last three years.

21   Q.   The last time you met with them was, I assume,

22   relatively recently?

23   A.   Yes, sir.

24   Q.   When?

25   A.   Last night.

1   Q.   Um, was your lawyer present when you met with them last
2   night?
3   A.   No, sir.
4   Q.   Why not?
5   A.   It wasn't necessary, I guess.
6   Q.   Well, is it fair to say right now, Mr. Smith, that
7   really your lawyer can't help you much on whether or not they
8   file this motion for downward departure; the only people that
9   can really help you on that are the people at this table to
10  my left?
11  A.   I don't know that to be true.  I don't know if he can or
12  not.  We'll find out.
13  Q.   Well, he wasn't there when you met with them last night,
14  and he's not here today?
15  A.   No, he's not.
16  Q.   Correct.  I think we're agreeing.  He's not here today?
17  A.   I agree.
18          MR. COGDELL:  Can I have just a minute, Your Honor?
19          THE COURT:  Yes, you may.  And, during this
20  interval, I will explain to the jury, as you may recall from
21  my voir dire instructions, how federal sentencing does differ
22  from some of the state, county, municipal systems you're
23  familiar with or may be familiar with.
24          The United States Sentencing Commission promulgates
25  guidelines.  There are a series of Supreme Court cases that

 1    explain how those guidelines intersect with the Court's

 2    discretion to sentence.

 3         There is a provision —— and you'll see this

 4    reflected in the plea paperwork from Mr. Smith —— whereby the

 5    Government can, in its discretion, move for a downward

 6    departure or variance.  Actually, it's a straight departure,

 7    a downward departure pursuant to 5K1.1.  That's a particular

 8    provision.

 9         And so if you look in those plea paperworks, you

10    will see reference to that.  I want you to understand that.

11    Mr. Cogdell is correct, but I wanted you to understand

12    because this represents a fundamental distinction.

13         Also, I anticipate I will give you an instruction

14    on punishment.  Because of this distinction, this Court will

15    determine any punishment if that is necessary in this case.

16         And, again, you are not here to decide punishment,

17    nor should you reach your verdict in determination on how

18    punishment is meted out using those sentencing guidelines and

19    the federal sentencing process.  We will talk about that more

20    after I confer with counsel during the Jury Charge

21    Conference, but I want you to recall those boundaries as we

22    discuss the nature of Mr. Smith's Plea Agreement with the

23    Government.

24         And, Mr. Cogdell, you may proceed.

25         **MR. COGDELL:**  Yes, sir.

1  Q.   **(By Mr. Cogdell)**  Let me finish up this way, Mr. Smith.

2  I want to walk you through these just to make sure that I

3  have your word that I haven't misquoted or misinterpreted

4  anything you've said.  Okay?

5  A.   Yes, sir.

6  Q.   Thing No. 1 is you never told Bart Reagor about the

7  floor-plan fraud, agreed?

8  A.   Agree.

9  Q.   Reagor never read the loan agreement that brings us here

10 today, as far as you're aware?

11 A.   As far as I know, he did not.

12 Q.   You never told Bart Reagor about the check-kiting scheme

13 that you were involved in?

14 A.   No, sir.

15 Q.   That Bart Reagor looked and relied on you and trusted

16 you?

17 A.   Yes.

18 Q.   You violated that trust?

19 A.   I did.

20 Q.   Bart Reagor never asked you to submit any false

21 documents to IBC?

22 A.   No, sir.

23 Q.   He did not, correct?

24 A.   No, he did not.

25 Q.   Bart Reagor was never told by you that he couldn't use

1  the funds in the way that he used them, meaning he was never

2  told by you you can't use these disbursements from the loan

3  in the way that he told you he was going to use them?

4  A.   That's correct.

5  Q.   You lied about floor-planning fraud.  You lied about

6  check-kiting.  You lied about the true condition of the books

7  and records at RDAG, right?

8  A.   Yes, sir.

9  Q.   You lied to Ford Motor Credit, FirstCapital Bank and

10  Trust, AimBank, FirstBank and Trust, Vista Bank; you lied to

11  Bart Reagor; you lied to Rick Dykes; you lied to more than

12  ten employees; you lied to friends and family, some by

13  omission, and you lied to your wife and your child?

14  A.   Yes, sir.

15  Q.   You involved Lindsay Williams; Pepper Rickman; Brad

16  Fansler; Paige Johnston; Kate Phillips; Lori Honesto; Tracy

17  Sandstrom; Sherri, last name unknown; Sheila Miller; Diana

18  Urias; Ashley Dunn; Brad Fansler?

19       And we've got Lindsay Williams down there one too many

20  times, don't we?  Well, she's engaged in both, so I guess

21  we'll leave her.

22       This is your one and only chance in testifying; in other

23  words, you don't anticipate testifying in any other cases?

24  A.   Not unless I'm needed.

25  Q.   Sir?

1   A.   Not unless I'm needed.

2   Q.   But you don't have any information that you will be

3   testifying in any other cases?

4   A.   No, sir, I do not.

5   Q.   So this is your one and only chance to reduce your

6   sentence if you can?

7   A.   That is my understanding, yes, sir.

8   Q.   Only the Government can file the motion for downward

9   departure; no one can force the Government to file them.

10       You sent Bart Reagor inaccurate bank balances on a

11   weekly basis, and you never told him about the bank balances

12   being inaccurate, right?

13   A.   Correct.

14   Q.   And the actual loss is in the $50,000,000 range?

15   A.   Yes, sir.

16   Q.   Mr. Smith, I -- I appreciate your time and your

17   patience.  I'm sorry you're going through what you're going

18   through.

19           **MR. COGDELL**:  I'll pass the witness, Your Honor.

20           **THE COURT**:  Yes.  Mr. Haag, any redirect at this

21   point?

22           **MR. HAAG**:  Yes, Your Honor, I do.  I expect it may

23   take ten to fifteen minutes.  I'll indulge the Court and the

24   jury as to --

25           **THE COURT**:  Okay.  Let me allow you to approach the

1   podium for redirect.  I'll ask that you limit that to

2   anything elicited during cross-examination.

3        I do want to add one more instruction to the jury

4   just from the bench.  Having served just two years and

5   presided over nearly 440 sentencing hearings, I'm a bit of a

6   sentencing specialist, so I want to be clear to the jury how

7   this process works.

8        Any defendant convicted of a felony and appearing

9   before this Court at sentencing will have an opportunity to

10  allocute.  They may not be forced to allocute.  They may

11  voluntarily and knowingly waive that right, but, as a slight

12  modification to some of the testimony that you heard in the

13  line of questioning, defendants are afforded an opportunity

14  to allocute at sentencing.  They do not have to and cannot be

15  forced to.

16       I just want you to -- I just want to make sure you

17  understand how sentencing hearings work.  Of course, you will

18  be instructed to disregard punishment as you decide guilt or

19  innocence in this verdict and your verdict deliberations, but

20  I wanted you to understand how federal sentencing works a

21  little bit better.

22       **MR. HAAG**:  Sure.

23       **THE COURT**:  Mr. Haag, you may proceed with

24  cross-examination [*sic*] subject to the Court's instructions

25  and orders, and then also please try to focus carefully on

1    only that which was elicited during cross.

2             MR. HAAG:  Yes, Your Honor.

3                    <u>REDIRECT EXAMINATION</u>

4    BY MR. HAAG:

5    Q.   All right.  Let's -- we're going to talk about a few

6    things that Mr. Cogdell talked to you about, Mr. Smith.

7             MR. HAAG:  Let's turn first to Government's 57, if

8    we can pull that up, please.

9             THE COURT:  And this exhibit is pre-admitted.  You

10   may proceed.

11   Q.   **(By Mr. Haag)**  Okay.  All right.  Government's

12   Exhibit 57, I just want to clarify.  When you said that the

13   defendant had no knowledge of the fraud, were you discussing

14   the floor-plan fraud in Government's 57?

15   A.   Yes, I was.

16   Q.   All right.  Let's talk about, you said earlier on cross

17   that you didn't intend to commit a crime, and I want to tease

18   out the distinction between intending to commit a crime and

19   intending to hurt someone.

20        Would it be fair to say you intended to commit a crime;

21   you intended to lie?

22             MR. COGDELL:  Objection, leading.

23             THE COURT:  Response, Mr. Haag?

24             MR. HAAG:  I'll rephrase the question, Your Honor.

25             THE COURT:  Please rephrase.

1   Q.   **(By Mr. Haag)**  Did you intend to lie?

2   A.   Yes, I intentionally lied.  Yes, yes.

3   Q.   Did you intend to hurt people with your lies?

4   A.   No, I did not.

5   Q.   Mr. Cogdell asked you if you were ever directed to

6   commit any crimes.  Do you recall that?

7   A.   Yes.

8   Q.   Were you directed in how to distribute the working

9   capital loan proceeds?

10  A.   Yes, I was.

11  Q.   And who gave you those directions?

12  A.   Bart Reagor.

13  Q.   At the time that he gave you those instructions, did you

14  know it was wrong to distribute the working capital loan

15  proceeds that way?

16  A.   I didn't know it was illegal.

17  Q.   Did you know it was wrong?

18  A.   Yes.

19  Q.   Did you know that it was wrong in that you had

20  represented to IBC Bank that you were going to use that money

21  for the company?

22          **MR. COGDELL**:  Objection, leading.

23          **THE COURT**:  Okay.  Again, Mr. Haag, I will sustain

24  that objection.  I will ask you to rephrase with focus on

25  defendant's personal knowledge, what he knows, and let's

1    avoid some of the leading preamble.

2           **MR. HAAG:**  Yes, Your Honor.

3    Q.   **(By Mr. Haag)**  Did you know -- well, let me ask it this

4    way:  You were there during the meetings with IBC Bank,

5    correct?

6    A.   Yes, that's correct.

7    Q.   Do you know -- or during those meetings, what was the

8    only purpose the loan was discussed?

9           **MR. COGDELL:**  Objection, asked and answered, and

10   beyond the scope.  I didn't ask a single question about the

11   IBC meetings.

12          **THE COURT:**  Okay.  Sustained.

13          **MR. HAAG:**  All right.  We'll go ahead and move on.

14          **THE COURT:**  I'll instruct the -- I'll instruct the

15   jury to disregard that particular question and instruct the

16   witness not to answer.

17          Please move on with focus on what was addressed at

18   cross-examination.

19   Q.   **(By Mr. Haag)**  All right.  Mr. Cogdell asked you to

20   stand up, and he tried to point out the distinction between

21   your stature and Mr. Reagor's stature.  Do you recall that?

22   A.   Yes.

23   Q.   Let's talk about how the defendant spoke with people.

24   During the meetings, how did he speak to people?

25   A.   During the sales meetings?

```
1    Q.   Yes.

2    A.   Was very boisterous, very charismatic.

3    Q.   Did he ever get verbally abusive?

4    A.   Yes.

5    Q.   Did he ever berate the employees?

6    A.   Yes, sir.

7    Q.   How would he berate the employees?

8              MR. COGDELL:  Objection, relevancy, Judge.

9              THE COURT:  I'm --

10             MR. HAAG:  Your Honor, he tried -- I'm sorry.

11             THE COURT:  Yeah.  I'm going to find that this is

12    relevant.  Defendant addressed stature and potential

13    intimidation, so I'll allow this, but let's be brief, Mr.

14    Haag.

15             MR. HAAG:  Yes, Your Honor.

16    Q.   (By Mr. Haag)  How was he verbally abusive with

17    employees?

18    A.   He would yell at them in front of everyone.

19    Q.   Would he embarrass them?

20    A.   Yes, sir, sometimes.

21    Q.   Did he ever bring employees to tears with his verbal

22    abuse?

23             MR. COGDELL:  Again --

24    A.   Yes.

25             MR. COGDELL:  -- Judge, relevancy.
```

1          **THE COURT**:  Overruled.  You have addressed stature,

2     acts of intimidation.  This is relevant to that line of

3     testimony on cross.  I will allow it on recross.

4          **MR. COGDELL**:  To be clear, I addressed his

5     intimidation, not Mr. Reagor's intimidation.

6          **THE COURT**:  Okay.  So response, Mr. Haag?

7          **MR. HAAG**:  Yes, Your Honor.  So he was talking

8     about the defendant --

9          **THE COURT**:  Well, I think -- I think Mr. Cogdell's

10    awaiting a ruling.  A response to whether this was opened on

11    cross-examination or whether my ruling should be limited to

12    Mr. Smith's acts of intimidation and verbal abuse?

13         **MR. HAAG**:  Yes, Your Honor.  It is my -- the way I

14    understood the questioning is, the only reason he had the

15    defendant stand up was to point out that Mr. Smith was not

16    intimidated by the defendant, and if he wanted to, he could

17    have confronted him about Government's 41, which was the

18    e-mail, and that's the way I took the cross-examination.

19    Otherwise, there's no reason for the defendant to stand up.

20         If he wanted to point out just Mr. Smith's physical

21    intimidation, he would have just had Mr. Smith stand up.

22         **THE COURT**:  Correct, and that's the Court's

23    recollection as well as there were two people standing up

24    during that colloquy, and because relative acts of

25    intimidation and physicality was addressed on

1    cross-examination, in very limited scope, I will allow this

2    on recross.

3          MR. COGDELL:  And, again, to be specific without

4    arguing with the Court's --

5          THE COURT:  I'm sorry, redirect.

6          MR. COGDELL:  Yeah.  It's also beyond the scope of

7    my cross.  I didn't ask anything about how Reagor treated

8    employees and belittled, berated, praised or otherwise.

9          THE COURT:  There was multiple testimony, both on

10   direct and cross, about verbal outrage by both this witness

11   and the defendant.

12         I will tolerate maybe one more question on these

13   acts of physicality and some of the verbal abuse.  We have

14   exhibits that are pre-admitted that have been referenced by

15   multiple witnesses.  At this point, it may approach something

16   like cumulative evidence.

17         MR. HAAG:  That was actually my last question, Your

18   Honor, so --

19         THE COURT:  Okay.  Understood.

20   Q.   (By Mr. Haag)  All right.  Mr. Cogdell asked you

21   whether, to your knowledge, the defendant read the loan

22   agreement.  Do you recall that?

23   A.   Yes.  Yes, sir.

24   Q.   To your knowledge, was the defendant present and did he

25   tell IBC Bank the purpose of the loan and why he needed the

```
 1   loan?
 2   A.   Yes, he did.
 3        MR. COGDELL:  Again, excuse me, that's beyond the
 4   scope of my cross.
 5        MR. HAAG:  Your Honor, I'm referencing the exact
 6   portion of Mr. Cogdell's cross where he talked about it.
 7        MR. COGDELL:  No.  I never questioned him about any
 8   representations that Reagor made to IBC.  I never asked him a
 9   single question about that.
10        THE COURT:  Okay.  Mr. Haag, I'll ask -- I do
11   recall a line of questioning regarding the defendant's
12   knowledge or reading of various documents.
13        I will ask you to limit your questions to those
14   documents that were referenced both in direct and
15   cross-examination.
16        MR. HAAG:  Yes, Your Honor.
17        THE COURT:  And if the Court is -- if the Court's
18   recollection is incorrect and I'm missing a document that was
19   referenced during examination, direct or otherwise, please
20   direct me to that line, and I can amend the ruling from the
21   bench.
22        MR. HAAG:  Yes, Your Honor.
23   Q.   (By Mr. Haag)  Let me ask it this way, Mr. Smith, and
24   we'll see if this cures it:  Based upon your personal
25   knowledge, is it your belief the defendant knew the purpose
```

1    of the working capital loan?

2    A.   Yes, sir.

3         **MR. COGDELL**:  Excuse me.  Objection, speculation.

4    He can't know what he knows.  Mr. Smith can't know what Mr.

5    Reagor's belief is.

6         **MR. HAAG**:  I said, Your Honor, based upon your

7    personal knowledge; in other words, him being there and --

8         **THE COURT**:  Understood.  Here, I'll just direct the

9    -- sustained.  I'll direct the Government to reference that

10   testimony elicited as to statements made by a party opponent

11   to this witness.

12   Q.   **(By Mr. Haag)**  Mr. Cogdell talked to you also about the

13   defendant focusing just on sales.  Do you recall that line of

14   questioning?

15   A.   Yes, I do.

16   Q.   And he also brought out that you did not discuss

17   financials as much with the defendant.  Do you recall that

18   line of questioning?

19   A.   Yes, sir.

20   Q.   Did you ever try to discuss financials with the

21   defendant?

22   A.   Yes, sir.

23   Q.   And how did he react when you tried to discuss

24   financials with him?

25   A.   When we got into the balance sheet and the ratios and

1    the items that the banks looked at, he did not want to talk

2    about that if it wasn't a positive situation.

3    Q.   Did he get angry when you tried to talk about it?

4    A.   Yes, sir.

5    Q.   Did you at some point give up trying to discuss

6    financials with the defendant?

7    A.   I did.

8             MR. COGDELL:  Objection, leading.  It's also beyond

9    the scope.

10            THE COURT:  Okay.  I will sustain the objection as

11   to leading, but I disagree on scope.

12            You may reframe the question again with emphasis to

13   what this particular witness knew or observed.

14            MR. HAAG:  Yes, Your Honor.

15   Q.   **(By Mr. Haag)**  After observing the defendant's reactions

16   to you approaching him about financials, what course of

17   action did you decide to do?

18   A.   I decided to give up approaching him about those.

19   Q.   Along that same line of questioning about the defendant

20   being unsophisticated with financials, let's pull up

21   Government's 42.  I'm sorry, 41.

22            THE COURT:  And this exhibit is pre-admitted.  You

23   may proceed.

24   Q.   **(By Mr. Haag)**  All right.  Let's go down here to the

25   bottom, and we'll do just this first part where it says,

1  "here's what it will look like."

2          MR. COGDELL:  Judge, that was asked and answered on

3  direct.  I never questioned him on cross about that.

4          THE COURT:  But it's been placed in issue by almost

5  the entirety of your cross-examination, so I will allow

6  latitude here.  Overruled.

7  Q.   (By Mr. Haag)  All right.  So in Government's 41, if you

8  would, please read starting with "here's what it looks like,"

9  and we'll go all the way down through here (indicating)?

10 A.   Here is what it will look like on the two current

11 pending loans for capital.  Zurich $3,000,000, deposited in

12 D and R tomorrow.  2.0 million to be used in RDAG.

13 1.0 million, Bart and Rick personal.

14      This leaves 2.0 million for use in RDAG.  Bart, Rick,

15 and Shane decide.

16      I recommend, based on what we discussed yesterday, that

17 we open another $2,000,000 CD at Vista against another

18 $2,000,000 line of credit ($800,000 limits, 600,000 -- or

19 600,000 Plainview Ford, 600,000 Plainview Toyota) or whatever

20 configuration you like best, Shane.  We will leave the

21 current 2,000,000 CD line in place.

22 Q.   Let's go to the next page, the top page.  We'll go all

23 the way here (indicating).  If you would continue reading.

24 I'm sorry, starting here (indicating) at the top of Page 2.

25 A.   5,000,000 (we can [sic] pay off line to deposit,

1  5,000,000 question mark).  1.667 million, 50 percent Bart and

2  50 percent Rick personal.  3.33 million for use in the RDAG.

3      This will put us at 5.333 million in new capital and

4  will give us 333,000 more to use in the dealerships than you

5  represented in the sheet you gave me yesterday, Shane.  When

6  we get the FMCC money, we will decide together exactly how we

7  want to manage that.

8      IBC 5.0 million, deposited in the next couple of weeks.

9  1.667, Bart and Rick; 3.333, RDAG.

10  Q.   Based upon what you read in Government's Exhibit 41, do

11  you believe the defendant had a firm grasp on the finances of

12  Reagor-Dykes?

13  A.   Yes, sir.

14  Q.   Mr. Cogdell asked about whether the defendant relied on

15  you for financial information.  Do you recall that line of

16  questioning?

17  A.   Yes, sir.

18  Q.   Let's talk about the roles within the company.  Are you

19  a lawyer?

20  A.   Am I a lawyer?  No, sir.

21  Q.   Do you give legal advice for Reagor-Dykes Auto Group?

22          MR. COGDELL:  Judge, beyond the scope.

23          THE COURT:  No, there was -- there was multiple

24  lines of questions regarding -- from you regarding this

25  defendant's certifications, his chief financial officer

```
 1    status, his degrees in finance relative to the defendant's

 2    degrees and diplomas, so I will allow this as redirect.

 3              You may continue.  That objection is overruled.

 4    Q.   (By Mr. Haag)  Did you provide -- did you provide legal

 5    advice to the defendant on behalf of the Reagor-Dykes Auto

 6    Group?

 7    A.   No, sir.

 8    Q.   Who at the Reagor-Dykes Auto Group provided legal

 9    advice?

10              MR. COGDELL:  Objection, beyond the scope.

11              MR. HAAG:  Your Honor, he -- he wrote out a

12    definition of the responsibilities of CEO -- CFO, read them

13    to Mr. Smith, and had Mr. Smith agree that that's the

14    responsibilities of the CFO.  If he's going to talk about the

15    responsibilities of people at the company, I think it's fair

16    game to get in the responsibilities of other people at the

17    company.

18              THE COURT:  Okay.  Overruled for those reasons.

19    Q.   (By Mr. Haag)  Who at the Reagor-Dykes Auto Group was

20    responsible for providing legal advice?

21    A.   The employees at the Reagor-Dykes Auto Group who

22    provided legal advice were Steve Reinhart and Rachel Reagor.

23    Q.   Let's finally -- we're going to clear up one last topic,

24    and then I don't have any further questions after this.  But

25    let's clear up a little bit about this conception about your
```

1   testifying today.

2       Do you recall Mr. Cogdell had a long line of questioning

3   about the reduction or potential reduction of your sentence.

4   Do you recall that?

5   A.   Yes, sir.

6   Q.   All right.  Let's go ahead and pull up Government's

7   Exhibit 38, which is the actual agreement between the

8   parties.

9           **THE COURT**:  And Exhibit 38 is pre-admitted.  You

10  may proceed.

11          **MR. HAAG**:  We're going to go to the second page of

12  38.  All right.  Well, I'm sorry.  Go back one page.

13  Q.   **(By Mr. Haag)**  Let's go ahead and read here

14  (indicating).  All right.  If you'll start with the word "if"

15  and read the remainder of that paragraph.

16  A.   The word "if"?

17  Q.   Yes, sir, I'm sorry?

18  A.   Okay.

19  Q.   Which is going to be the second line up from the bottom.

20  A.    If, in the opinion of the United States Attorney, the

21  defendant has met all of the defendant's obligations under

22  the plea --

23          **MR. HAAG**:  Go to the next page, please, top.

24  A.   -- agreement and provided full, complete, and truthful

25  information and testimony.  However, nothing revealed by the

```
 1   defendant during the defendant's debriefings and testimony
 2   would preclude the defendant's prosecution for any violent
 3   crime.
 4   Q.   (By Mr. Haag)  Do you understand --
 5            MR. HAAG:  Oh, I'm sorry, 35, my bad.  35.  I was
 6   wondering why the lines didn't match up.
 7            THE COURT:  And, Mr. Haag, if you're going to have
 8   attorney confidential communications, we can disable the
 9   microphones.  I'm just --
10            MR. HAAG:  No, that's fine --
11            THE COURT:  -- giving you a heads-up.
12            MR. HAAG:  -- Your Honor.  My stupidity is well
13   known.  I don't think that's any secret.  All right.  Here we
14   go.
15   Q.   (By Mr. Haag)  All right.  Let's take a look at some of
16   these sections.
17       Mr. Cogdell brought out that the United States has to
18   file the motion to reduce your sentence; is that correct?
19   A.   Yes, sir.
20   Q.   And do you understand that whether the United States
21   files that motion is based solely upon your truthful
22   testimony here today?
23   A.   Yes, sir, that's correct.
24   Q.   And, as we discussed earlier, you understand that, if
25   you testify falsely or omit material facts, the United States
```

 1   will not file that motion?

 2          MR. COGDELL:  Objection, asked and answered, and

 3   leading.

 4          THE COURT:  Mr. Haag, your response?

 5          MR. HAAG:  Well, Your Honor, it in some ways is

 6   impeaching the witness, so I believe direct -- or leading

 7   questions are allowed in impeachment.

 8          THE COURT:  Okay.  The Court overrules.  This Court

 9   finds that during cross-examination this Court was generous

10   in allowing references to plea documents, the Government's

11   exhibits, and it was all subject to cross-examination.

12          The Court finds that it's relative and probative,

13   and, for those reasons, overrules Defendant's objection.

14          You may proceed.

15          MR. HAAG:  Thank you, Your Honor.

16   Q.   (By Mr. Haag)  Mr. Cogdell also intimated that somehow

17   the United States was the sole entity that would decide the

18   sentence reduction.  Do you recall that?

19          MR. COGDELL:  Actually, I did not.  That's a

20   mischaracterization.

21          THE COURT:  Okay.  I will sustain that objection.

22   Mr. Haag, if you will rephrase to --

23          MR. HAAG:  Absolutely.

24          THE COURT:  -- reflect -- I think the Court's

25   recollection is that this is the only opportunity, and even

1    the Court provided a limiting instruction to the jury on

2    federal sentencing and how that works.

3          So, with that testimony in mind on cross, I'll

4    allow you to rephrase.

5          **MR. HAAG:**  Yes, Your Honor.  Let me move forward.

6    Q.   **(By Mr. Haag)**  Mr. Smith, do you understand that, even

7    if the United States asks the Court to reduce your sentence,

8    it is the Court's discretion and the Court's decision whether

9    to reduce your sentence?

10   A.   Yes, sir, I understand that.

11   Q.   Did you understand the Judge who will make that decision

12   is the one that is sitting approximately six feet to your

13   left?

14   A.   Yes, sir, I do understand.

15         **MR. HAAG:**  No further questions.

16         **THE COURT:**  Okay.  Recross, Mr. Cogdell?

17         **MR. COGDELL:**  Yes, sir.  Judge, we need to approach

18   on 41.

19         **THE COURT:**  Okay.  You may approach.

20

21              -------------------------

22     **(Bench Conference held and filed under separate sealed**

23   **volume in Sealed Bench Conferences Volume I of I.)**

24              -------------------------

25

Stacy Mayes Morrison
Official Court Reporter

1    (The following took place in the hearing of open court.)

2         THE COURT:  And, again, I want to instruct the

3    jury — and you'll see some of this concept reflected in the

4    pattern and in the charge that I give you — you should not

5    infer from bench conferences that there's anything afoot that

6    you should concern yourself with.

7         This is simply the attorneys being diligent and

8    deliberate in seeking this Court's legal ruling on where the

9    evidence is heading, so you should not infer anything from

10   that either way, pro or con.

11        You may proceed, Mr. Cogdell.

12              <u>RECROSS-EXAMINATION</u>

13   BY MR. COGDELL:

14   Q.   One last question, Mr. Smith.  Mr. Haag asked you an

15   area of question, did you -- did you discontinue discussing

16   financial issues with Mr. Reagor after he got mad at you or

17   words to that effect?

18   A.   Yes.  Some of the financial information, I did.

19   Q.   Okay.  Well, I've got to ask you.  What good would it

20   have done to have continued discussions with him on financial

21   matters if you're sending him inaccurate financial

22   information?

23   A.   The information I would have provided him would not have

24   been inaccurate.

25   Q.   Well, how do we know that?

1    A.   I don't know.

2    Q.   Yes, sir.  Neither do I.

3              **MR. COGDELL:**  Thank you, sir.

4              **THE COURT:**  And, Mr. Haag, I've lost track of where

5    we are in the process.  Is this redirect?

6              **MR. HAAG:**  Yes, Your Honor.  No questions.  Thank

7    you.

8              **THE COURT:**  Okay.  And, Mr. Cogdell, at one of the

9    bench conferences and without divulging anything that should

10   be confidential or sealed, I did tell Defense Counsel that I

11   would allow inquiry about inventory reports that were

12   discussed during Defendant's direct examination of Mr. Will

13   Woodring.

14             If you recall from that bench conference, I gave

15   you the prerogative to ask any questions about the inventory

16   reports that were referenced.  They're specific to Mr. Smith,

17   and I told both the Government and Defense Counsel that the

18   appropriate witness for that line of questioning is now in

19   the chair.

20             So I want to be good and honor that.  So you may

21   ask that line of questions now, and the Government, of

22   course, may respond.

23             **MR. COGDELL:**  Sure.

24   Q.   **(By Mr. Cogdell)**  After the IBC loan --

25             **MR. COGDELL:**  Thank you for the reminder, Your

1    Honor.

2    Q.   **(By Mr. Cogdell)**  After the IBC loan was funded, Mr.

3    Smith, did you continue to send information to IBC about

4    vehicle inventory at the Reagor-Dykes automobile dealerships?

5    A.   The first funding?

6    Q.   Yes, sir.

7    A.   After the first funding, yes.  A couple of times I

8    forwarded the e-mail from our general -- or I guess he'd be

9    our sales director.

10   Q.   So a couple of times, you think?

11   A.   Yeah.  I just sent -- forwarded what he sent the whole

12   group.  I did not create those reports.

13   Q.   Okay.  So I'm probably missing a shift because it's late

14   in the day.  Did you send information to Mr. Woodring about

15   the inventory at Reagor-Dykes after the first funding?

16   A.   Yes.  He requested those reports until the second

17   funding.

18   Q.   Got you.  And was the information that you sent him,

19   that is, Mr. Woodring, Mr. Smith, accurate or inaccurate?

20   A.   I assumed it was accurate.  I did not produce those

21   reports.  It came from our sales director.

22   Q.   Who was your sales director?

23   A.   Randon Blacklock.

24        **MR. COGDELL**:  Thank you.  That's all I have.  I

25   appreciate --

1          THE COURT:  Okay.  Any --

2          MR. COGDELL:  -- it.  Thank you.

3          THE COURT:  -- redirect on that point?

4          MR. HAAG:  No, Your Honor.

5          THE COURT:  Okay.  Understood.

6          All right.  At this point, it is now 5:30 in the

7     afternoon.  Any chance, Mr. Haag, that you can get another

8     witness up and down in thirty minutes?

9          MR. HAAG:  Your Honor, our next witness is very

10    short.  We anticipate fifteen to twenty minutes.  I don't

11    know how long Mr. Cogdell intends on cross, but I think so.

12         MR. COGDELL:  It's not me.  It's --

13         THE COURT:  And who is the next witness?

14         MR. COGDELL:  Reinhart.

15         MR. FRAUSTO:  Reinhart.

16         THE COURT:  Okay.  Mr. Cogdell, what do you -- what

17    do you anticipate your cross-examination taking?

18         MR. COGDELL:  It's not me.

19         MR. POWELL:  It's me, Your Honor.  I don't -- I

20    don't know.  It depends on what he says.

21         THE COURT:  Okay.

22         MR. POWELL:  It just -- it could be about fifteen

23    to twenty minutes.  I don't know.

24         MR. FRAUSTO:  Your Honor, I could confer with him

25    kind of --

1          THE COURT:  Okay.  Why don't we take a brief

2     five-minute break, so you can confer, and if you can agree

3     that this can be done by 6:00, and we can be done with this

4     witness, I'll allow it.

5          And I'll instruct the jurors to take a quick

6     refreshment break, and we'll be back in five minutes.  We are

7     trying to work until 6:00 to get this case completed.  So we

8     stand in recess for five minutes to allow the parties to

9     confer.

10          COURT SECURITY OFFICER:  All rise.

11     **(Recess taken; after which, the following took place in**

12     **open court with the defendant but without the jury present.)**

13          THE COURT:  Please be seated.  Mr. Haag, I was

14     advised by court staff that the parties conferred and agreed

15     that the next witness cannot be completed on direct, cross,

16     redirect, and recross within the next twenty minutes.  Is

17     that correct?

18          MR. HAAG:  Yes, Your Honor.

19          THE COURT:  Okay.  And, at this point, do the

20     parties object to the Court excusing this jury for the

21     remainder of the day with instructions, of course, not to

22     research the case and the rest?

23          MR. HAAG:  No objection, Your Honor.

24          THE COURT:  Okay.  Bring the jury in.  We'll excuse

25     them, and then we'll do housekeeping.

1          **COURT SECURITY OFFICER**:  All rise.

2       **(The jury returned to the courtroom.)**

3          **THE COURT**:  Please be seated.  Members of the Jury,

4    congratulations, you have reached the end of another long

5    day.

6          In consultation with counsel, I have determined

7    that we cannot complete the examination of another witness,

8    and I don't want to break at midstream.

9          So we will begin tomorrow at 8:00.  You are now

10   excused for the remainder of the day.  I understand there's

11   also inclement weather approaching, so I want to let you out

12   a little early to get ahead of that.

13         Also, I will incorporate by reference my previous

14   instructions about your conduct outside of this courtroom and

15   courthouse.  I continue to admonish you under those

16   guidelines and those rules.

17         Do not discuss this case either with each other,

18   your friends, your family, anybody.  Follow those

19   instructions.  I know that you've seen new names and charts,

20   and there are different facts and people that you know

21   because of a day of testimony.  Please resist the temptation

22   to do any researching using Google or otherwise.  Do not

23   research this case in any way when you are away from this

24   courtroom.  This case is to be decided within the four

25   corners of this courtroom.

(Outside of the Jury's Presence)

1         I'll also admonish you to just stay off social

2    media and the Internet generally for the pendency of this

3    trial.  So please do not discuss this case with each other.

4    Do not discuss it with your friends or family, and do not do

5    any independent research.  Everything you need to know about

6    this case, you will hear in this courtroom.

7         With that, I will excuse you with instructions to

8    begin court tomorrow promptly at 8:00 a.m.

9         **COURT SECURITY OFFICER:**  All rise.

10         **(The jury excused for the day.)**

11         **THE COURT:**  Please be seated.  Okay.  Because

12    there's been multiple motions filed under seal dealing with

13    confidential information, we may be discussing some of this

14    motions practice.

15         Are there any persons that should be sealed for

16    purposes of this hearing and housekeeping?

17         **MR. COGDELL:**  I'm not sure what we're discussing.

18         **THE COURT:**  Okay.  Well, it's the motions filed in

19    ECF Document No. 64 and sealed ECF No. 67.  This is

20    Defendant's Memorandum in Support of Opposition.  There's

21    various documents about the proposed testimony and how to

22    deal with that.

23         We can take this up when we anticipate the witness

24    being present with counsel.

25         **MR. COGDELL:**  That's what I would recommend, and I

Morning Session Matters
(Outside of the Jury's Presence)

1    will give this ampersand.  It is possible that we will not be

2    moving forward on that request to have he whose name we won't

3    speak testify.  I haven't made that decision, but it's --

4    it's more open now.

5           Did you hear what I just said, Your Honor?

6           THE COURT:  I did, but I want to make sure my court

7    reporter does.

8           It's the Court's recollection that this potential

9    witness appeared on the Defendant's list; is that correct?

10          MR. COGDELL:  He did.

11          THE COURT:  Mr. Haag, does the Government have any

12   intention of calling the witness?

13          MR. HAAG:  No, Your Honor.

14          THE COURT:  Okay.  Well, let's do this:  Let me

15   take care of some housekeeping in the next fifteen minutes.

16   It may touch upon that witness, and I do want to give you a

17   preview of what the Court has found on the jurisprudence.

18          As every Assistant United States Attorney knows,

19   the Georgetown Law Journal on criminal law is the

20   encyclopedia of citations on every matter of criminal law.

21   So we've been digging into that the last two nights, and I do

22   want to give you a preview of where the Court is leaning on

23   the proposed testimony.

24          I also want to make some findings on some of --

25   some of the memoranda that was before the Court.  And this

(Outside of the Jury's Presence)

1    may get into discovery, *Brady*, *Giglio*, *Bruton*, and the rest,

2    and the Court is prepared to make findings and confer with

3    counsel about whether the Government has met those

4    responsibilities.

5           I was reminded of the need to make some findings

6    there after the reference to inventory reports.  They were a

7    bit of surprise to counsel for both sides.

8           Any reason to seal this proceeding for purposes of

9    discussing the discovery in this case?

10          **MR. COGDELL**:  Not from my perspective, Your Honor.

11          **MR. HAAG**:  No, Your Honor, I think just as long as

12   we don't go into the Fifth Amendment, Sixth Amendment issue,

13   then that's fine.

14          **THE COURT**:  It's like FISA.  You can trace mail,

15   but you need a warrant to open it.

16          Okay.  Now, Mr. Haag, does the Government confirm

17   that it has complied with all discovery and disclosure

18   obligations arising under the following:  *Brady*, *Giglio*,

19   *Bruton*, Jencks Act, Department of Justice, or NDTX Memoranda

20   on discovery?

21          **MR. HAAG**:  Yes, Your Honor.

22          **THE COURT**:  There are multiple notices on file, but

23   I wanted to update that in light of everything that happened

24   pretrial.

25          Okay.  Now, on October 7, 2021, the Government and

(Outside of the Jury's Presence)

1    Defendant submitted a proposed order denying witness motion.

2    This was submitted by the NDTX portal.  It doesn't appear on

3    PACER.  For that reason, I want to make it part of the

4    record.  It was marked as Hearing Exhibit No. 1 from

5    yesterday.

6           So, there, the parties agreed to the following:

7    Bart Reagor has agreed to withdraw his allegations of

8    prosecutorial misconduct by the Government, truthfully

9    informing Dykes counsel of his potential criminal liability.

10   That is a direct quote.

11          Since that proposed order, has the Defendant

12   learned of any prosecutorial misconduct that alters that

13   withdrawal statement?

14          **MR. COGDELL**:  No, sir.

15          **THE COURT**:  Okay.  At this point, the Court does

16   find that the Government has, in fact, complied with its

17   obligations under the aforementioned authority, memoranda,

18   and notices and notice requirements.  And the Court does make

19   record on that proposed order and does find that the parties

20   have complied with discovery up to this point.

21          Now, as a preview of the witness -- this is subject

22   of much motions practice, I want the attorneys to know what

23   the Court has found.  You have my order on the intersection

24   of Defendant's Sixth Amendment right to compel versus

25   potential invocation of Fifth Amendment right.  I wanted to

(Outside of the Jury's Presence)

```
 1   give you basically my anticipated itinerary of how that would
 2   play out so that you can check the caselaw should the witness
 3   be called.
 4          The Court will inquire into the legitimacy and
 5   scope of the witness' assertion of Fifth Amendment privilege.
 6   This Court is guided by United States versus Salgado-Palma,
 7   551 Fed.Appx. 776.  That is a Fifth Circuit case from 2014.
 8   United States versus Goodwin, 625 F.2d 693.  That is a Fifth
 9   Circuit opinion of later vintage, 1980.  And United States
10   versus Melchor Moreno.  That is 536 F.2d 1042, and that is a
11   Fifth Circuit case from 1976.
12          So, there, that unbroken chain of authority directs
13   this Court to make a particularized inquiry into each
14   specific area that the defendant wishes to explore.
15          At this point, Mr. Cogdell, I would allow the
16   Defendant wide latitude for whatever colloquy we can do to
17   particularize a finding question by question, and then we can
18   address the invocation.  At that point, the Court would need
19   to determine if the invocation is well founded, so those are
20   the magic words that we would make.
21          After that point, the Court will make its findings,
22   and then I'll make a ruling on how that should be addressed
23   to the jury, if necessary.
24          It's the Court's understanding that the Government
25   does not think any of this Fifth Circuit -- I'm sorry, any of
```

 1   this Fifth Amendment colloquy should take place in the

 2   presence of the jury; is that correct?

 3            MR. HAAG:  Yes, Your Honor.

 4            THE COURT:  And does the Defendant agree as it did

 5   at Pretrial Conference that that Fifth Amendment colloquy

 6   should not take present -- take place within presence of the

 7   jury?

 8            MR. COGDELL:  Absolutely.

 9            THE COURT:  Okay.  For that reason, I don't

10   anticipate that there is anything further to be said if the

11   Court determines that the Fifth Amendment privilege is well

12   founded, but I'm amenable to any instruction that the parties

13   might anticipate to explain, you know, that there was

14   anticipated testimony.

15            I don't know what form it would take there, but I'm

16   prepared to make the necessary findings if the parties

17   need -- need to develop the record on that further, but

18   that's how I anticipate addressing the witness that we have

19   and have not been discussing for the duration of this trial.

20            I think Mr. Cogdell referred to the witness as he

21   who shall not be named.  Obvious Hogwartz and Harry Potter

22   reference.  But that's -- that's the order of operation.

23            I will note, in reviewing various crim law sources

24   on this, there is a potential misalignment of interests in

25   this case.  As the career attorneys here understand,

(Outside of the Jury's Presence)

1    typically these Fifth Amendment witness scenarios involve a

2    witness who is potentially inculpatory to the defendant and

3    is a co-defendant/co-conspirator, unindicted co-conspirator,

4    and it is the Government presenting the witness, and then the

5    invocation of the Fifth.  And, for reasons of taint to the

6    Defendant, that is all done outside the presence of the jury.

7            Here, there's a potential misalignment with that

8    typical fact pattern because I believe it's Defendant's

9    theory of the case that it's potentially exculpatory.  So I

10   want to afford Defense Counsel an opportunity to noodle on

11   that, the Government to noodle on that.

12           We typically do all of this outside the presence of

13   the jury, but there is this misalignment with the typical

14   fact pattern where we are dealing at the intersection point

15   of the Sixth Amendment and the Fifth Amendment.

16           The Court discerns that and has searched like hell

17   for Westlaw authority or cases that involve exactly that

18   factual scenario.  I just imagine it doesn't come up that

19   often.  I see the AUSA from the appellate division shaking

20   her head.  It just doesn't happen that frequently.

21           So I am amenable to any additional briefing on

22   that.  If we need to revisit whether this should be done in

23   the presence of the jury because there is this potential

24   exculpatory theory of the case, I'm open to the argument.  I

25   just cannot find any authority for this being done in the

 1   presence of the jury, but I am persuadable because I do

 2   perceive that this apple and orange problem that we have and

 3   have discussed ad nauseam at the bench does -- does misfit a

 4   lot of the authority that we're all relying on to argue this.

 5          So I'm persuadable.  Should -- should this witness

 6   present, and we go through this process, I'm amenable to

 7   argument that it should be done in the presence of the jury

 8   for the reasons identified by the Court, but I am struggling

 9   to find authority on that.  So I just wanted you to have an

10   absolute outline of the Court's intentions, the authority I

11   have found.

12          I'll give you a couple cases for the appellate

13   geeks on each team.  So this is, of course, mere persuasive

14   authority because they're all out of circuit.  But *Caroli*

15   *versus Saxl*, S-A-X-L, 192 Misc. 887.  That's M-I-S-C period

16   887.  This is a New York Superior Court case.  *McWhorter* —

17   M-C-W-H-O-R-T-E-R — *versus Com,* 191 Virginia 857.

18   Obviously, a Virginia Supreme Court case.

19          And then there's some citation to these cases in

20   *U.S. versus Rickenbacker*.  And this is as close to circuit

21   authority I think as we can -- we can find at this point, 309

22   F.2d 462, Second Circuit 1962.

23          I'd also direct counsel on the concept of one

24   person's criminality having some rational basis on the

25   non-prosecution of another.  *Roy versus State*, 87 Nevada 517,

(Outside of the Jury's Presence)

1   1971.  Again, this is a Nevada Supreme Court case, obviously

2   not binding, but potentially persuasive.  And then *State*

3   *versus Smith*, 422 S.W.2d 50.  This is a Missouri Supreme

4   Court case.  Also, finally, *State versus Krueger*, 124 N.W.2d

5   at 468.  This is a North Dakota Supreme Court case, 1963.

6            So that's about as good as we could do on several

7   days of research.  I wanted you to have the benefit of that

8   research should you want to make argument about this peculiar

9   misalignment of facts to the, you know, sort of headnote

10  cases that we all know.

11           I am persuadable.  So if it -- if it becomes

12  necessary for this witness to present and we go through this

13  process, I wanted you to have the benefit of those cases.

14  You may argue from those.  You may persuade me.  I haven't

15  yet decided, but, in particular, on this question of whether

16  it should be done in the presence of the jury.  I'm open to

17  argument on that.

18           Now, it is 5:58.  We have two minutes.  What else

19  can we accomplish today?  Mr. Haag?

20           **MR. HAAG**:  Your Honor, I think we're ready to go

21  bright and early at 8:00 a.m.  I'm not sure if there's

22  anything else to cover for this evening.

23           **THE COURT**:  And you anticipate your next witness

24  being Steve Reinhart.

25           **MR. HAAG**:  Yes, Your Honor.  We have Steve

(Outside of the Jury's Presence)

 1    Reinhart, and we've got John Whitworth, and Steve Dawson

 2    left.  I expect in total -- I mean, depending on the extent

 3    of cross-examination, I expect to close or, sorry, rest by

 4    noon tomorrow, is my hope.

 5         THE COURT:  Okay.  Thank you again.  Both Defendant

 6    and Government have worked very hard to get us this far ahead

 7    of schedule.

 8         Any issues with witness availability?  Does that

 9    need to be done by Wednesday?  Like if you don't finish, are

10    you going to lose a witness or --

11         MR. HAAG:  No, Your Honor, not at all.

12         THE COURT:  Okay.  All right.  And, Mr. Cogdell,

13    anything we can do for the Defendant to help prepare for

14    tomorrow?

15         MR. COGDELL:  No, sir.  I would remind the Court,

16    who I think the Court's already been reminded of, that I have

17    my 11:45 audio hearing with Judge Lake in Houston.  That

18    being the case, I would request that we be able to start

19    presenting our case after the lunch break tomorrow as opposed

20    to before.

21         THE COURT:  Okay.  Absolutely.  We'll work with

22    that.  I want you to make that meeting, and, if necessary,

23    you can avail yourself of some courtroom technology or at

24    least in the building.  Please confer with my staff.  If

25    you're pressed for time, and you need to use our facilities,

Morning Session Matters

1     we can definitely make accommodations for that VTC.

2              MR. COGDELL:  No, it's not a VTC.  It's calling.

3     The only issue I might have -- and I've not tried to make a

4     call from my cell phone, but if I need a ground line to call

5     Judge Lake's courtroom, I might ask for assistance on that,

6     but I don't think I'll need one because I've got a cell

7     phone.

8              THE COURT:  You're kidding me; you have IT issues

9     in the Amarillo Division?  I'm -- that's a total inside joke

10    with my staff, but I find it very, very plausible that you

11    have information technology issues in this ancient

12    courthouse.

13             Please let us know if we can help anything,

14    adapters, screens, whatever.  We'll do what we can.

15             MR. COGDELL:  And I will apologize to the -- again,

16    to the Court for my tone at the end of the day.  I was less

17    than respectful as I should have been, so please accept my

18    apology.

19             THE COURT:  Well, you approached with full

20    charitable interpretation, because I think the attorneys in

21    this case have done an excellent job on approaching with

22    order-in-limine questions.  You have abided this Court's

23    instructions on that.

24             As we discussed at the Pretrial Conference, it's

25    one of those rules that's observed in the breach more often.

Morning Recess; Matter

(Outside of the Jury's Presence)

 1    Somebody drops a bomb, and then they beg for forgiveness.

 2            That has not much happened on this proceeding.  The

 3    attorneys have abided the strictures of the Order in Limine.

 4    You have approached with those questions, sought a ruling.

 5    It's limine done the right way.  So I understand it might get

 6    late in the day at some point.

 7            But, on balance, I think defendant has received

 8    capable and effective representation, and the Government too,

 9    and the Order in Limine has been mostly abided in good faith

10    from start to finish.

11            Regarding Mr. Reinhart, I do anticipate, because of

12    the impeachment nature of the testimony and the exhibits to

13    follow, the same protocol.  I will give a jury instruction.

14    It will be patterned on 1.12.  I anticipate doing the same

15    thing with Mr. Reinhart that you saw with Mr. Smith.

16            Is there any objections from the Government to that

17    same order of operation?

18            **MR. HAAG**:  No, Your Honor.  And, in conformance

19    with the Court's limine order, I just want to make the Court

20    aware, we will follow that same procedure that we did with

21    Mr. Smith with Mr. Reinhart tomorrow morning.  We'll go into

22    his plea agreement, talk about his guilty plea in that case.

23            **THE COURT**:  Okay.  And, Mr. Cogdell, any objection

24    to that same order of operation?

25            **MR. COGDELL**:  No, sir.

(Outside of the Jury's Presence)

```
 1           THE COURT:  Okay.  You can anticipate that.  You
 2   can plan for that, prepare your responses.
 3           Also, we will put the genie in the bottle after
 4   Reinhart, and we'll be done with this category of impeachment
 5   evidence, these limiting instructions.  We'll go back to the
 6   order of limine at that point.
 7           From that point forward, after Mr. Reinhart, we
 8   will be back on the Court's original Order in Limine as to
 9   some of those categories and paragraphs, specifically
10   Paragraph C on criminal proceedings, Paragraph H on fraud
11   prosecutions, and Paragraph L on selective prosecutions.
12           So after Mr. Reinhart and after the anticipated
13   impeachment questions and testimony, we will go back to the
14   Order in Limine, and we will restart with those rules in
15   effect.
16           Is that understood by the Government?
17           MR. HAAG:  Yes, Your Honor.
18           THE COURT:  Is that understood by the Defendant?
19           MR. COGDELL:  Yes, sir.
20           THE COURT:  Okay.  You are dismissed.  The Court
21   stands in recess for the remainder of the evening.  Please
22   get out of the hailstorm.
23           COURT SECURITY OFFICER:  All rise.
24       (Proceedings recessed until 8:00 a.m., 10/13/2021.)
25       (Further proceedings held in Trial Volume II of IV.)
```

1                    *   *   *   *   *   *

2        I certify that the foregoing is a correct transcript

3   from the record of proceedings in the above-entitled matter.

4   I further certify that the transcript fees format comply with

5   those prescribed by the Court and the Judicial Conference of

6   the United States.

7

8   s/Stacy Mayes Morrison          11/10/2021
    Stacy Mayes Morrison            Date
9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25