<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT  OF TEXAS
 2                      AMARILLO DIVISION

 3   UNITED STATES OF AMERICA      §
                                   §         CRIMINAL ACTION
 4   VS.                           §
                                   §      NO. 2:21-CR-025-Z (01)
 5   BART WADE REAGOR              §

 6   ============================================================

 7           TRANSCRIPT OF CRIMINAL TRIAL BY JURY
           BEFORE THE HONORABLE MATTHEW J. KACSMARYK
 8                UNITED STATES DISTRICT JUDGE

 9                    OCTOBER 13, 2021

10                    VOLUME II OF IV

11                    AMARILLO, TEXAS

12   ============================================================

13                  A-P-P-E-A-R-A-N-C-E-S

14
     FOR THE GOVERNMENT:      MR. JEFFREY R. HAAG and
15                            MS. AMANDA R. BURCH
                              Assistant United States Attorneys
16                            1205 Texas Ave., 7th Floor
                              Lubbock, Texas  79401
17
                                      AND
18
                              MR. JOSHUA FRAUSTO
19                            Assistant United States Attorney
                              500 South Taylor, LB 238
20                            Amarillo, Texas  79101-2442

21

22   FOR THE DEFENDANT:       MR. DAN L. COGDELL and
                              MR. NICHOLAS HAMILTON NORRIS
23                            Jones Walker, LLP
                              811 Main Street, Suite 2900
24                            Houston, Texas  77002

25                                    AND
</pre>

```
 1   ALSO FOR DEFENDANT:          MR. DARREN TRAY PAYNE and
                                  MR. MATTHEW DANE POWELL
 2                                Payne, Powell & Truitt Law Group
                                  2529 74th Street
 3                                Lubbock, Texas  79423

 4

 5   COURT REPORTER:             MS. STACY MAYES MORRISON
                                  Official Court Reporter
 6                                205 E. 5th, LB #F13263
                                  Amarillo, Texas  79101
 7                                (806) 672-6219

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer.
```

```
 1                    VOLUME II (PAGES 347 - 543)

 2

 3                PROCEEDINGS FOR OCTOBER 13, 2021

 4                                                         PAGE
```

```
 5   CAPTION/APPEARANCES..................................  347

 6   INDEX...............................................  349

 7   PROCEEDINGS FOR OCTOBER 13, 2021....................  351

 8   HOUSEKEEPING MATTERS (OUTSIDE JURY'S PRESENCE)......  351

 9   COURT'S LIMITING INSTRUCTION TO THE JURY...........  353

10

11
                    GOVERNMENT'S EVIDENCE (CONTINUED)
12
     WITNESSES:          DIRECT   CROSS  REDIRECT  RECROSS  VOIR DIRE
13
     STEVEN REINHART      355     365     373      374
14
     JOHN WHITWORTH       377     408     420
15

16   COURT'S INSTRUCTIONS TO THE JURY....................  430

17
                    GOVERNMENT'S EVIDENCE (RESUMED)
18
     WITNESSES:          DIRECT   CROSS  REDIRECT  RECROSS  VOIR DIRE
19
     STEVEN DAWSON        433     447     458
20

21

22   GOVERNMENT RESTS.....................................  459

23   DEFENDANT'S MOTION, JUDGMENT OF ACQUITTAL (OUTSIDE JURY'S PRESENCE).  461

24   GOVERNMENT'S RESPONSE (OUTSIDE JURY'S PRESENCE)....  462

25   COURT DENIES DEFENDANT'S MOTION (OUTSIDE JURY'S PRESENCE)..........  463
```

1                                                                    PAGE

2   HOUSEKEEPING MATTERS (OUTSIDE JURY'S PRESENCE).....................   464

3   COURT'S INSTRUCTIONS TO THE JURY..................................   466

4
    SEALED MOTIONS HEARING HELD AND FILED UNDER SEPARATE SEALED          467
5   VOLUME IN SEALED HEARING VOLUME I OF I, 10/13/2021.................

6

7                          DEFENDANT'S EVIDENCE

8
    WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE
9
    FRANKLIN SNYDER            479     504     511
10
    STEVEN FRIED              513     520     521
11
    CHARLES DARTER            524     534
12

13

14  DEFENDANT RESTS...................................................   538

15  EVIDENCE CLOSED...................................................   538

16  COURT'S INSTRUCTIONS TO THE JURY..................................   539

17  DEFENDANT RENEWS MOTION OF ACQUITTAL (OUTSIDE JURY'S PRESENCE) .....   540

18  GOVERNMENT'S RESPONSE (OUTSIDE JURY'S PRESENCE)....................   541

19  COURT'S RULING ON MOTION (OUTSIDE JURY'S PRESENCE).................   541

20

21  CHARGE CONFERENCE HELD AND FILED UNDER SEPARATE VOLUME IN TRIAL      543
    VOLUME III OF IV..................................................
22

23  REPORTER'S CERTIFICATE............................................   543

24

25

(Outside of the Jury's Presence)

| | |
|---|---|
| 1 | <u>PROCEEDINGS FOR OCTOBER 13, 2021</u> |
| 2 | **(The following took place in open court with the** |
| 3 | **defendant present, but without the jury present.)** |
| 4 | **THE COURT**:  Please be seated.  The Court is back on |
| 5 | the record in Criminal Action No. 2:21-CR-25, United States |
| 6 | of America versus Bart Wade Reagor. |
| 7 | My law clerks have left a helpful note on the |
| 8 | chambers door:  Don't forget the jury. |
| 9 | **(Laughter.)** |
| 10 | **THE COURT**:  It's a little bit like that sticky note |
| 11 | that they put on the button in the *Apollo 13* movie, not to |
| 12 | jettison the other astronauts. |
| 13 | Okay.  So we won't forget the jury.  I wanted to |
| 14 | give the parties this Court's time so they can make use of |
| 15 | what remains.  So, by our calculations, the Defendant has |
| 16 | used 196 minutes, or three hours and sixteen minutes.  The |
| 17 | Government has used 142, or two hours and twenty-two minutes. |
| 18 | So we are making good progress.  The attorneys are |
| 19 | making efficient use of the time allotted.  And if you need |
| 20 | another time check midday or at the end of the day, we're |
| 21 | able to do that as well. |
| 22 | Now, Mr. Haag, I anticipate your next witness is |
| 23 | Mr. Reinhart; is that correct? |
| 24 | **MR. FRAUSTO**:  That's correct, Your Honor. |
| 25 | **THE COURT**:  Okay.  And, Mr. Frausto, you'll be |

(Outside of the Jury's Presence)

 1   taking this witness?

 2           MR. FRAUSTO:  Yes, Your Honor.

 3           THE COURT:  Okay.  So we'll follow the same pattern

 4   from yesterday because of the anticipated impeachment

 5   evidence.

 6           I'll give the instruction to the jury before you

 7   call the witness.  I'll explain how some of that may seem

 8   atypical, but it's within the rules, and I'll give them the

 9   limiting instruction on how it is to be considered.

10           If the parties think it's advisable, I can repeat

11   that after the witness completes his testimony.

12           Is there anything else we need to do before you

13   call your witness?

14           MR. FRAUSTO:  No, Your Honor.

15           THE COURT:  Okay.  At this point -- oh, yes?

16           MR. COGDELL:  I might add that we have made the

17   decision not to call Mr. Dykes, so that -- I just wanted to

18   give the Court that heads-up.

19           THE COURT:  Okay.  And I'm also cognizant of your

20   conference in your other pending matter, so it's my intention

21   to take a break at 11:30 --

22           MR. COGDELL:  Great.

23           THE COURT:  -- to give you bandwidth to do that,

24   and if you need to use our facilities, we have multiple land

25   lines available.

```
 1          MR. COGDELL:  And I spoke to your clerk earlier, if
 2   I could get a land line number to e-mail to Judge Lake's case
 3   manager.
 4          THE COURT:  Okay.  I'll work through my courtroom
 5   deputy and make sure you have all of that.
 6          MR. COGDELL:  Thank you so much.
 7          THE COURT:  Okay.  So we'll call in the jury at
 8   this point.
 9          COURT SECURITY OFFICER:  All rise for the jury.
10      (The jury returned to the courtroom.)
11          THE COURT:  And please be seated.  Members of the
12   Jury, similar to the witness testimony yesterday, I
13   anticipate that the following witness will make reference to
14   prior convictions and some criminal records.  That would not
15   typically be admissible, but here it is being used for
16   impeachment purposes only, so I will give you the instruction
17   on how you are to consider that evidence, whether elicited
18   through testimony or any court documents that -- I'm sorry,
19   any documents that the Court admits relevant to those prior
20   convictions.
21          You will hear testimony and questions about Steven
22   Reinhart's prior conduct, some of which is criminal in
23   nature.  You are instructed only to consider information
24   about other crimes and conduct in weighing the credibility of
25   this witness.
```

1          The defendant has not been charged in the same

2     schemes or crimes as this witness.  This case is not about

3     those same crimes or acts.

4          His prior history and current criminal charges are

5     only relevant to the witness' credibility and should only be

6     considered for those limited purposes.  You should not

7     consider Steven Reinhart's prior criminal conduct as evidence

8     of Bart Reagor's guilt or his innocence.  So, again, this

9     goes to credibility.

10         This is based on Federal Rule of Evidence 609(a)

11    and 608, and that instruction is based on the Fifth Circuit

12    Pattern 1.12.

13         At this point, Mr. Frausto, you may call your next

14    witness.

15         **MR. FRAUSTO**:  Call Steven Reinhart, Your Honor.

16       **(Pause.)**

17         **THE COURT**:  Mr. Reinhart, you may approach the

18    witness chair.  Please remain standing for administration of

19    the oath.  My courtroom deputy will do the oath.

20       **(The witness was sworn by the courtroom deputy.)**

21         **THE COURT**:  Please be seated.  You may remove your

22    mask if you are comfortable doing so.  Please speak clearly

23    into the microphone, and you may pull that microphone closer,

24    if necessary.

25         Mr. Frausto, you may proceed.

1           MR. FRAUSTO:  Thank you, Your Honor.

2                    STEVEN REINHART,

3      having been first duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5      BY MR. FRAUSTO:

6      Q.   Can you please state your name for the record.

7      A.   Steven Anthony Reinhart.

8      Q.   And can you describe your educational background for the

9      jury.

10     A.   I attended high school and graduated high school from

11     Eldorado High School in Albuquerque, New Mexico.

12          I attended and graduated with a Bachelor's Degree from

13     Texas Tech University in public relations, and I received a

14     Juris Doctorate from Texas Tech University in the spring of

15     1992.

16     Q.   And did you pass the bar exam in New Mexico in 1992?

17     A.   Yes, I did.

18     Q.   And how long did you practice law?

19     A.   I practiced law in New Mexico, in Albuquerque from '92

20     through about '96, and then again from 2011 through March

21     of 2014.

22     Q.   And between the gap of you practicing law, where did you

23     work from '96 to 2011?

24     A.   My dad and I had a construction company, New Mexico

25     Metal Systems, and I ran that for fifteen years.

1   Q.   And how are you currently employment?

2   A.   I'm employed at Fibertex, LLC.

3   Q.   And what's your position there?

4   A.   I am the special projects coordinator.

5   Q.   And who owns that business?

6   A.   Rick Dykes owns the business.  Bart Reagor -- I mean,

7   excuse me, Brandon Peters and Bruce Boyd run the business.

8   Q.   And how do you know Rick Dykes?

9   A.   He's my first cousin.

10  Q.   And was Rick Dykes one of the owners of RDAG?

11  A.   Yes.

12  Q.   Now, let's turn your attention to when you were employed

13  at RDAG.  When did you go work for RDAG?

14  A.   In March of 2014.

15  Q.   And why did you decide to move to Lubbock, Texas and

16  work for RDAG?

17  A.   I got a call from Rick in January of 2014 saying that

18  they were growing substantially quick, and they needed some

19  help with the business.

20       So my wife and I went out there in March of -- well,

21  February of 2014 and met with Mr. Dykes, Mr. Reagor, Shane

22  Smith, and after discussion with my family decided that that

23  would be a good move for me.

24  Q.   And do you --

25  A.   For us.

1    Q.   I apologize.

2    A.   And for us.  Excuse me.

3    Q.   And do you know Bart Reagor?

4    A.   Yes.

5    Q.   Do you see him in the courtroom today?

6    A.   I do.

7    Q.   Can you point him out and describe an article of

8    clothing he is wearing.

9    A.   He is on the end of the defense table wearing a gray

10   suit and black tie.

11           **THE COURT**:  Let the record reflect that the witness

12   has identified the defendant.

13   Q.   **(By Mr. Frausto)**  What was your title and position at

14   RDAG?

15   A.   When I was hired in March of 2014, I was the legal/

16   compliance manager.

17   Q.   And were you later promoted?

18   A.   Yes.  In February 2016, I became the legal/compliance

19   director, the facilities director, and the new construction

20   manager.

21   Q.   And what were your duties at RDAG at the end?

22   A.   When I was at the end, I was overseeing as the director

23   of facilities between 45 and 50 rooftops, and then we had up

24   to nine new construction projects ongoing at that time.

25           And then I was also directing, supervising a couple of

1    attorneys working for the group.

2    Q.   Did you serve as -- did you serve as an attorney for

3    RDAG?

4    A.   No, I did not.

5    Q.   And were you even licensed in Texas to practice law?

6    A.   No, never have been.

7    Q.   And did the defendant and Dykes know you were not

8    licensed in Texas when they hired you?

9    A.   Yes, they did.

10   Q.   And was your law license in New Mexico active during

11   your employment at any point at RDAG?

12   A.   No, it was not.  I put it on inactive status when I

13   moved to Lubbock.

14   Q.   What was your role when legal issues occurred at RDAG?

15   A.   I would work as a liaison between the group and outside

16   counsel.

17   Q.   And who was your immediate supervisor at RDAG?

18   A.   Shane Smith.

19   Q.   And you stated you supervised two attorneys.  Who else

20   did you supervise?

21   A.   I supervised Troy Nicholson, who was an attorney

22   licensed in the State of Texas, and Rachel Reagor, also an

23   attorney licensed in the State of Texas.

24        And then I supervised my facilities crew, which included

25   a manager and anywhere from 10 to 15 workers.

 1   Q.   Before we go through the rest of your testimony, let's

 2   first discuss your pending case that's -- that's pending.

 3   Were you charged for Misprision of a Felony by an

 4   information?

 5   A.   Yes, I was.

 6   Q.   And did you plead guilty to that charge on

 7   February 24th, 2021?

 8   A.   Yes, I did.

 9   Q.   And have you been sentenced yet?

10   A.   No, I have not.

11   Q.   And you're facing up to three years in prison; is that

12   right?

13   A.   That is correct.

14   Q.   Now, I'm not going to go through each document, but your

15   Factual Resumé, did you provide auditors at the Lubbock

16   Mitsubishi store with false sales dates on buyer orders to

17   make Ford Motor Credit and its auditors believe that such

18   vehicles were not sold out of trust?

19   A.   Yes, I did, on wholesale units.  They were intercompany

20   cars.  Yes, I did do that, yes.

21   Q.   And, as part of your plea and as described in your Plea

22   Agreement Supplement, did you agree to cooperate with the

23   United States and provide truthful and complete information?

24   A.   Yes, I did.

25   Q.   And did the agreement also provide that, if you provide

```
 1   full, complete, and truthful information and testimony, then
 2   the United States would not pursue any other charges against
 3   you that are related to your current charge?
 4   A.   That is correct, yes.
 5   Q.   And do you understand that, based on your truthful
 6   testimony, the United States may ask this Court for a lesser
 7   sentence for you?
 8   A.   Yes.
 9   Q.   But do you understand that ultimately your sentence is
10   solely up to this Court, Judge Kacsmaryk, as to whether to
11   give you a lesser sentence for your testimony and as to what
12   your ultimate sentence will be?
13   A.   I fully understand that, yes.
14   Q.   Now, I'd like to turn your attention to a working
15   capital loan that RDAG received from IBC.
16        Were you present at a meeting in April 2017 when IBC
17   representatives traveled to Lubbock, Texas to meet with RDAG?
18   A.   No, I was not.
19   Q.   When did you first become aware that RDAG was trying to
20   get a working capital loan from IBC Bank?
21   A.   When Shane Smith asked me to review documents related to
22   the loan.
23   Q.   And did you have a role in obtaining that loan?
24   A.   Yes, I did.
25   Q.   And what was your role?
```

1    A.   With regard to the working capital loan, I reviewed

2    documents, and there was also a consolidation of property

3    loan, and I worked a little bit more diligently on that one

4    due to the fact that I was the facilities director and had

5    knowledge about all of the facilities that were held as

6    collateral under that loan.

7    Q.   And who served as the main point of contact from RDAG

8    with IBC Bank?

9    A.   Shane Smith.

10   Q.   Did you ever meet or talk to IBC loan officers during

11   this process?

12   A.   No, I did not.

13   Q.   And did you review all or a majority of the loan

14   documents?

15   A.   Yes.

16   Q.   And who was the loan agreement between?

17   A.   It was between D and R Acquisitions, LLC and

18   International Bank of Commerce.

19   Q.   And, based on your understanding and review of the loan

20   documents, what was the purpose of the loan?

21   A.   It was to consolidate the property debt as well as

22   working capital for the company.

23   Q.   Now, can you turn to Government's Exhibit 2.  And this

24   has already been pre-admitted into evidence.

25   A.   Okay.  Yes.

```
 1              THE COURT:  And, Mr. Cogdell, do you have your copy
 2     of Government's Exhibit 2?
 3              MR. POWELL:  Your Honor, we do.
 4              THE COURT:  Okay.
 5     Q.   (By Mr. Frausto)  What is this?
 6     A.   This is the loan agreement between D and R Acquisitions,
 7     LLC and International Bank of Commerce.
 8     Q.   And did you review this loan agreement?
 9     A.   Yes, I did.
10     Q.   Do you know if the defendant read this loan agreement?
11     A.   I do not know if he read it.
12     Q.   In the past, did you have to provide construction and
13     facility loan documents to the defendant to sign?
14     A.   Yes, I have.
15     Q.   And did he read those loan documents prior to signing?
16     A.   Very rarely, if at all, no.
17     Q.   Now, did the defendant e-mail what has been called as
18     the RDAG deal team, including yourself, prior to the IBC loan
19     closing?
20     A.   Yes.
21     Q.   Now, did the defendant ever tell you or e-mail you that
22     he planned to take a distribution from the working capital
23     loan proceeds and place it in his personal banking account?
24     A.   No, he did not.
25     Q.   Did the defendant ever ask you or e-mail you if he could
```

```
 1    take some of the working capital loan proceeds based on your

 2    review of the loan documents?

 3    A.   No, he did not.

 4    Q.   Now, I'd like to show you -- or can you turn to

 5    Government's Exhibit 41.

 6         THE COURT:   And Exhibit 41 is pre-admitted.

 7    A.   Excuse me, I'm having a hard time with the binder here.

 8    Q.   (By Mr. Frausto)   It should be on your screen, Mr.

 9    Reinhart.

10    A.   Okay.  It is, yes.

11    Q.   And are you copied on this e-mail?

12    A.   No, sir, I am not.

13    Q.   When was the first time you saw this e-mail?

14    A.   The first time I saw this e-mail was during the criminal

15    investigation.

16    Q.   And have you read this e-mail since then?

17    A.   Yes, I have.

18    Q.   If you would have received this e-mail on May 31st,

19    2017, what, if anything, would you have told the defendant?

20    A.   I would have told him that you can't move the proceeds

21    of that loan into personal or private accounts.

22    Q.   Because it was supposed to be used for working capital?

23    A.   That's correct.

24    Q.   When did you first learn that the defendant diverted a

25    portion of the IBC loan proceeds to his personal bank
```

1    account?

2    A.    It was sometime after the -- I'm going to call it D-Day,

3    the day that the dealerships kind of imploded.

4    Q.    Okay.  And -- but prior to the loan closing, did you

5    know the defendant intended or planned to divert those funds?

6    A.    No, I did not.

7    Q.    Did you get compensated for reviewing the loan documents

8    and for your help in securing this loan?

9    A.    Yes.

10   Q.    Now, Government's Exhibit 45 and 46, I won't go through

11   them in detail, but are those e-mails that the defendant sent

12   you --

13         Well, let me backtrack.  Do you recall the defendant

14   sending you an e-mail saying he's going to give you a bonus

15   for your help on securing the loan?

16   A.    Yes, I do.  And those are those e-mails, yes.

17   Q.    And that was after each closing ⸺ is that correct ⸺ or

18   prior to each closing?

19   A.    The e-mails were prior to each closing, and the bonuses

20   were paid out after each closing.

21   Q.    And how much were you ultimately paid?

22   A.    $10,000.

23   Q.    And, again, in either of those e-mails where the

24   defendant told you that you were going to receive an

25   e-mail -- receive a bonus, did the defendant inform you that

1    he intended to take a portion of the loan proceeds for

2    himself?

3    A.   No.

4    Q.   Do you know if that bonus came out of the IBC loan

5    proceeds?

6    A.   I do not know.  No.  No, I don't know.

7    Q.   Was it common for you to receive a bonus after helping

8    close a deal like this?

9    A.   Yes, it was.  I received bonuses occasionally.

10   Q.   And how was your bonus treated on your wages?

11   A.   It was -- it was taxed as compensation.  It was -- it

12   came as a full amount, the $5,000 each closing.  I got a

13   $5,000 check each closing, but, subsequently, the taxes were

14   taken out of my payroll checks.

15          MR. FRAUSTO:  I'll pass the witness.

16          THE COURT:  And, Mr. Powell, you may proceed with

17   cross-examination.  I'll just instruct you to identify any

18   exhibits by number for record purposes.

19          MR. POWELL:  Yes, Your Honor.

20                  CROSS-EXAMINATION

21   BY MR. POWELL:

22   Q.   Good morning, Mr. Reinhart.

23   A.   Good morning.

24   Q.   I don't think you and I have had an opportunity to meet

25   before; is that correct?

1    A.   We might have met a couple of times at some events way

2    back.

3    Q.   Okay.

4    A.   I think they were social events way back.

5    Q.   All right.  I want to talk to you where you left off.

6    You were talking about these bonuses that you got.

7         Have you ever been informed that those bonuses came from

8    that distribution that was taken by Mr. Reagor and Mr. Dykes?

9    A.   No, sir.  I've never been informed that, no.

10   Q.   Okay.  You were shown Government's Exhibit 41 where it

11   talks about those distributions, but they never talked to you

12   about that part of that distribution was to pay those

13   bonuses?

14   A.   No, they did not.

15   Q.   And I guess you never gave that money back?

16   A.   No, sir, I did not.

17   Q.   Okay.  Let's talk a little bit about your role.  Tell me

18   again what your job description -- at the end of your

19   employment with Reagor-Dykes, what was your job employment?

20   What did you do?

21   A.   I was the legal/compliance director; I was the

22   facilities director, and the new construction manager.

23   Q.   Okay.  And I think you testified on direct examination

24   that part of that was getting new contracts for buildings,

25   for properties, and things of that nature; is that correct?

1  A.   Yes, sir, that is correct.  Yes, sir.

2  Q.   And would you present those documents to Mr. Reagor for

3  his purview?

4  A.   Yes, I would.

5  Q.   Would he read those documents?

6  A.   Very rarely.  I would point out things that were -- that

7  he needed to look at if there was something in there.

8  Typically, they were standard, so he would not look at them.

9  He would just sign them.

10  Q.   Like, what would you point out to him?

11  A.   Oh, if there was a situation like in construction

12  documents for -- if there were any penalties that were going

13  to be due, something along those lines, I'd discuss it with

14  him.  It was very rare.  They're typically standard

15  contracts.

16  Q.   He trusted you to do the right thing on those documents,

17  correct?

18  A.   Yes, sir.

19  Q.   And he had great faith in you to handle those

20  construction documents, those loan agreements, and everything

21  else; that's why he hired you?

22  A.   Yes.

23  Q.   I think you testified that you -- you weren't licensed

24  to practice law in the State of Texas; is that correct?

25  A.   That is correct.

1   Q.   And you weren't hired as an attorney.  You didn't give

2   legal advice to Bart, did you?

3   A.   No, I did not.

4   Q.   Did you ever give legal advice to Rick?

5   A.   No, sir, I did not.

6   Q.   Did you give legal advice to anybody?

7   A.   No, sir.

8   Q.   Okay.  But you're coming in here talking as an expert in

9   what working capital is, is that what I understand?

10          **MR. FRAUSTO**:  Your Honor, I'll object because

11   that's misquoting.  He is not testifying as an expert, just

12   as a lay witness.

13          **THE COURT**:  Just for purposes of clarification, I

14   will sustain that objection.  The parties have worked

15   diligently to identify and pre-admit experts.

16          This is a fact witness, so just -- you may go into

17   the content, of course, of his factual knowledge, but he is

18   not a designated expert in this case.

19          **MR. POWELL**:  That's what I was trying to point out,

20   Your Honor.  I agree.  Thank you, sir.

21   Q.   **(By Mr. Powell)**  Mr. Reinhart, you're certainly not a --

22   as the Court has said and everybody has said, you're not

23   designated as an expert on what working capital is or

24   anything of that nature?

25   A.   No, sir, I'm not.

1   Q.   You're just giving your opinion as a layperson?

2   A.   Yes, sir.

3   Q.   What is your opinion as to what working capital is?

4   A.   Working capital is the day-to-day funds necessary to --

5   for operations of an entity.

6   Q.   Okay.  Do you know what the definition of working

7   capital is?

8   A.   Not the -- not the Webster's definition, no, sir, I

9   don't.

10   Q.   Okay.  Do you know what the accounting definition of

11   working capital is?

12   A.   No, sir, I don't.

13   Q.   Do you know what the business definition of working

14   capital is?

15   A.   No, sir.

16   Q.   When -- you talk about these -- as far as the financial

17   stuff is that concerned, I think you were asked who was the

18   point person between Reagor-Dykes and IBC.  Who was that

19   point person again?

20   A.   Shane Smith.

21   Q.   Based on your personal observations, did Mr. Reagor and

22   Mr. Dykes have tremendous trust and faith in Shane Smith?

23   A.   Yes, sir.

24   Q.   Did they rely on him to take care of the finances of the

25   business?

1    A.    Yes, sir.

2    Q.    Did they have -- not unlike you, did they have great

3    faith in what he was presenting to them was the truth?

4    A.    As far as I know, yes, sir.

5    Q.    Based on your observations?

6    A.    Based on my observation, yes.

7    Q.    You reported to Shane Smith; is that correct?

8    A.    That is correct, yes.

9    Q.    And was he kind of -- I don't want to talk about -- I

10   don't want to give -- I think it's been brought up as far as

11   what plea you're here for.  You pled guilty to what again?

12   A.    To misprision of a felony.

13   Q.    Okay.  And what does that mean under your -- based on

14   your understanding?

15   A.    That I knew or should have known that a felony was being

16   committed and did not do anything to stop it or report it.

17   Q.    The reason you knew that is because you were committing

18   a felony?

19   A.    Yes, sir.  I passed on some -- some bad dates on some

20   audits, yes.

21   Q.    Which you understand is fraud?

22   A.    Yes.

23   Q.    What -- do you understand as being an attorney what a --

24   if you commit like a fraud, there's a -- there's a term of

25   art called a crime of moral turpitude.  Have you ever heard

1     that before?

2     A.   No, sir, I have not.

3     Q.   In all of your legal training, you don't know what that

4     is?

5     A.   It's been a long time since I've practiced law, and I

6     never practiced criminal law.

7     Q.   Okay.  Do you remember it being -- remember hearing

8     anything about it being something that involves deception?

9     A.   I don't recall.

10    Q.   And, certainly, the crime that you have been convicted

11    of or that you performed there at Reagor-Dykes was a crime of

12    deception?

13    A.   Yes.

14    Q.   And you pled guilty to that when?

15    A.   February of this year.

16    Q.   Okay.  And you haven't been sentenced yet?

17    A.   No, sir, I have not.

18    Q.   So we're going on about eight, nine months that that has

19    been pending, correct?

20    A.   Yes, sir.

21    Q.   What is your understanding of why you haven't been

22    sentenced?

23    A.   My understanding is because I was testifying in this

24    proceeding.

25    Q.   Okay.  Your homework is getting graded today, right?

1   A.   I have no idea.  I honestly don't know.

2   Q.   You were asked by the Government that, if you testify

3   what they consider to be truthful, then you're not going to

4   have any other charges charged against you?

5   A.   Yes, that is correct.

6   Q.   And you may get a motion filed by them asking that you

7   get less time than the maximum?

8   A.   Yes.

9   Q.   So it's real important today as far as that's concerned,

10  correct?

11  A.   Yes, sir.

12  Q.   When you -- and you gave a statement to the FBI in this

13  case; is that correct?

14  A.   I did.

15  Q.   Do you remember telling them that Bart wasn't a

16  financial guy?

17  A.   I may have said that.  I don't specifically recall

18  saying that, but --

19  Q.   And that's a true statement, is it not?

20  A.   That is a true statement.  He's not a financial guy.

21  Q.   He relied on Shane to do that?

22  A.   Yes.

23  Q.   And who -- how did you know how to do this fraud

24  involving the floor fraud; how did you know how to do that?

25  A.   I was instructed how to do it by Shane and Brad Fansler.

1    Q.    Okay.  He was orchestrating all of that, correct?

2    A.    Yes.

3    Q.    Did you ever tell Mr. Reagor about that?

4    A.    No, I did not.

5    Q.    Did you ever tell Mr. Dykes about that?

6    A.    No.

7    Q.    And I think in your statement to the FBI, in hindsight,

8    you wish you would have?

9    A.    Yes, sir.

10   Q.    Because they would have done something about it?

11   A.    I would think so.  I would hope so.

12   Q.    And I think you also said in your statement that you

13   were even physically intimidated by Mr. Smith?

14   A.    Yes, sir.

15   Q.    He had thrown fits of rage involving you, correct?

16   A.    Yes.

17            MR. POWELL:  Thank you, sir.  I pass the witness,

18   Your Honor.

19            THE COURT:  Redirect?

20                    REDIRECT EXAMINATION

21   BY MR. FRAUSTO:

22   Q.    Just a couple of follow-up questions, Mr. Reinhart.  Did

23   you personally review the IBC loan documents?

24   A.    Yes.

25   Q.    Including the IBC loan documents related to the

1    $10,000,000 working capital loan?

2    A.   Yes, I did.

3    Q.   And even though you didn't serve as an attorney for RDAG

4    or provide legal advice, you were in charge and you

5    supervised two attorneys that worked for RDAG?

6    A.   Yes.

7              MR. FRAUSTO:  I'll pass the witness.

8              THE COURT:  Recross?

9                         RECROSS-EXAMINATION

10   BY MR. POWELL:

11   Q.   Were you practicing law without a license?

12   A.   No, sir.

13   Q.   But you're reviewing documents and giving legal

14   opinions?

15   A.   No, sir.

16   Q.   Well, what were you doing?

17   A.   I was reviewing documents, and I was -- with regard to

18   these documents, I was reviewing to make sure that the

19   collateral was correct and listed correctly, descriptions

20   were listed.

21        With regard to the working capital, my primary goal was

22   to make sure that the names were right and everything

23   factually with regard to the documents was correct.

24   Q.   The things that lawyers do?

25   A.   I was not providing any legal advice.

1   Q.   Okay.  Did you ever -- and you've seen a series of

2   e-mails that you were cc'd involving these IBC loan

3   documents, correct?

4   A.   Yes, sir.

5   Q.   Did you ever one time say anything about any of those

6   documents in any of those e-mails?

7   A.   I think we might have had some grammar corrections, some

8   misspelled words.  I think that there were a couple of times

9   that the names were not quite right.  I think they had

10  R and D a couple of times instead of D and R, something along

11  those lines.

12  Q.   Anything of any substance?

13  A.   No, sir.

14  Q.   Did you see in that document -- you said to -- during

15  direct examination that you reviewed that document.  Did you

16  see where working capital was in there?

17  A.   I don't specifically recall.  I did review it, but it's

18  been many years ago.

19  Q.   Do you remember any definition of working capital in

20  that document?

21  A.   I don't remember seeing a definition of working capital.

22  Q.   Do you remember anything about it?

23  A.   No, sir, not really, not today.

24          **MR. POWELL**:  Okay.  I pass the witness, Your Honor.

25          **MR. FRAUSTO**:  No further questions, Your Honor.

1        THE COURT:  May this witness be excused?

2        MR. FRAUSTO:  Yes, Your Honor.

3        THE COURT:  Does the Defense object to this witness

4    being excused?

5        MR. POWELL:  No, sir.

6        THE COURT:  You may step down.  You are excused.

7    **(Witness excused.)**

8        THE COURT:  Mr. Frausto, you may call your next

9    witness.

10        In the interim, I will readmonish the jury on my

11   instructions regarding prior convictions and criminal

12   conduct.  Please follow the Court's instructions and how you

13   should give weight to that regarding credibility, but not

14   otherwise.

15        At this point, I've instructed the attorneys that

16   we will return to the Court's prior orders in limine and

17   rules, and I don't anticipate the next witnesses will elicit

18   impeachment questions.  So, in a way, we're going back to the

19   prior rules with the subsequent witnesses.

20        So, Mr. Frausto, you may proceed.

21        MR. FRAUSTO:  Call John Whitworth.

22        THE COURT:  Mr. Whitworth, you may approach the

23   witness chair.  Please remain standing for the administration

24   of the oath.

25   **(The witness was sworn by the courtroom deputy.)**

```
 1          THE COURT:  Please take your seat, and remember to
 2   speak clearly into the microphone, and you may pull it closer
 3   if that helps.
 4          And, again, Mr. Frausto, I'll admonish you to
 5   identify exhibits by number for record purposes.
 6          MR. FRAUSTO:  May I proceed, Your Honor?
 7          THE COURT:  You may proceed.
 8                    JOHN WHITWORTH,
 9     having been first duly sworn, testified as follows:
10                    DIRECT EXAMINATION
11   BY MR. FRAUSTO:
12   Q.   Can you please state your name for the record.
13   A.   John Whitworth.
14   Q.   And what is your educational background?
15   A.   I have a Bachelor's Degree in mechanical engineering
16   from the University of Tulsa.
17   Q.   And how are you currently employed?
18   A.   Currently I am a senior financial investigator with
19   Chenega Worldwide Support, and it is through that company
20   that I work on a contract basis for the Federal Bureau of
21   Investigation, or FBI.
22   Q.   And how long have you been employed there?
23   A.   A little over two years.
24   Q.   And prior to your employment as a senior financial
25   investigator, where were you employed?
```

```
 1    A.    I was -- prior to this job, I was employed as a special

 2    agent with the FBI for a little less than twenty-three years.

 3    Q.    And why did you leave the FBI?

 4    A.    I retired in 2019.

 5    Q.    And during your twenty-two to twenty-three years as a

 6    special agent with the FBI, what types of crimes did you

 7    investigate?

 8    A.    Primarily white-collar crimes, and that would include

 9    things such as healthcare fraud, mail and wire fraud schemes,

10    public corruption, investment fraud, and bank fraud.

11    Q.    And did you receive training and education from the FBI

12    in investigating fraud cases, in particular bank fraud?

13    A.    Yes, I did.

14    Q.    And, prior to your retirement from the FBI in June 2019,

15    did you serve as the lead case agent for the FBI in the FBI's

16    investigation into RDAG?

17    A.    Yes.

18    Q.    And after you retired from the FBI and came back as a

19    contract financial investigator, did you continue to assist

20    with the investigation?

21    A.    Yes.

22    Q.    And, as part of your investigation into RDAG, what did

23    you do?

24    A.    I interviewed subjects and witnesses, and then I also

25    collected, reviewed, and analyzed records such as bank
```

1    records and other business documents.

2    Q.   Now, I'd like to turn your attention to the $10,000,000

3    working capital loan that IBC provided to D and R

4    Acquisitions, LLC.

5         Did you look into where the loan proceeds went?

6    A.   Yes.  I traced those loan proceeds.

7    Q.   And can you explain to the jury what is tracing.

8    A.   In the context of fraud investigations, tracing is just

9    the term that is used to describe the process of keeping

10   track of specific funds that you're interested in, and that

11   usually is typically the proceeds of fraud that are deposited

12   into a bank account.

13   Q.   And what is the goal of tracing?

14   A.   So the goal of tracing is simply to determine what

15   happened to the funds that you are interested in.  And you

16   could -- that could include finding that the funds were spent

17   on some goods or services.  That could also include finding

18   that the funds were transferred to a different account or

19   returned to the original source, or you could also find that

20   the funds are still sitting in the original account into

21   which they were deposited.

22   Q.   And have you conducted tracing in other fraud

23   investigations?

24   A.   Yes.

25   Q.   What is the simplest example of tracing?

1   A.   The simplest possible scenario of tracing would be where

2   the funds you're interested in or the fraud proceeds are

3   deposited into an empty bank account where there's no money

4   in it, and, in addition to that, no funds are added to it

5   afterwards either.

6        And that's the best or simplest possible scenario,

7   because, in that case, in order to determine what happened to

8   the funds, it's simply a matter of looking at the withdrawals

9   from the account to determine how the funds were spent, and

10  that would be the checks, the outgoing wire transfers, the

11  cash withdrawals, et cetera.

12  Q.   And what would you call it if the funds you are tracing

13  get deposited into another account that already has funds in

14  that account?

15  A.   We call that commingling.

16  Q.   And what would you call it if the funds from other

17  sources get deposited into an account once the funds you are

18  tracing were already in there?

19  A.   That's also called commingling.

20  Q.   And so how do you distinguish commingled funds or

21  dollars in a bank account?

22  A.   You can't.  Cash sitting in a bank account is fungible,

23  which is just a fancy word for interchangeable.  That means

24  that all the dollars are identical.  They don't have serial

25  numbers, so you cannot tell them apart from each other.

1    Q.    So when a dollar gets withdrawn from an account with

2    commingled funds, how do you know where it came from?

3    A.    So in a situation with commingling, the person

4    conducting the tracing analysis has to use a tracing method,

5    a logical tracing method and analyze every single withdrawal

6    from that account.

7          And the method that they use will dictate whether or not

8    that withdrawal consists of the funds you're tracing, which

9    is the funds you're interested in, or funds from some other

10   source or even possibly a combination or mixture of the two.

11   Q.    Now, in this case, did you trace the working capital

12   loan proceeds that IBC Bank provided to D and R Acquisitions,

13   LLC?

14   A.    Yes, I did.

15   Q.    And, as part of your investigation, did you obtain

16   records from several banks?

17   A.    Yes.

18   Q.    When tracing the working capital loan proceeds that IBC

19   provided to D and R Acquisitions, did you review and analyze

20   records that IBC Bank provided to the FBI?

21   A.    Yes, I reviewed and analyzed IBC records.

22   Q.    And would that include Government's Exhibits 1 through

23   15?

24   A.    Yes.

25   Q.    When tracing the same working capital loan proceeds, did

1    you also review and analyze records that FirstCapital Bank of

2    Texas provided to the FBI?

3    A.    Yes, FirstCapital Bank records as well.

4    Q.    And would that include Government's Exhibits 16 through

5    23?

6    A.    Yes.

7    Q.    Again, when tracing the same working capital loan

8    proceeds that IBC Bank provided to D and R Acquisitions, did

9    you review and analyze bank records that Prosperity Bank

10   provided to the FBI?

11   A.    Yes.

12   Q.    And would that include Government Exhibits 24 through

13   30?

14   A.    That is correct.

15   Q.    Generally, can you tell the jury, what did you find by

16   reviewing all of these bank records?

17   A.    Generally, I found that some of the working capital loan

18   proceeds went from IBC Bank to FirstCapital Bank of Texas to

19   Prosperity Bank.

20   Q.    Did some of those accounts contain money from sources

21   other than the IBC working capital loan?

22   A.    Yes, they did.

23   Q.    So what did you do to trace the working capital loan

24   proceeds?

25   A.    Well, because of the commingling, I used logical tracing

1   methods.  In this case, I used designated tracing and the

2   float method of tracing.

3   Q.   And using those tracing methods, what did you ultimately

4   find?

5   A.   Ultimately, I found that of the $10,000,000 working

6   capital loan proceeds that were issued or advanced to D and R

7   Acquisitions, over $1.7 million of that went into the

8   defendant's account, personal account at Prosperity Bank.

9   Q.   Now, I'd like to turn your attention to Government's

10  Exhibit 31.  This has been pre-admitted as demonstrative

11  evidence only.

12          **THE COURT**:  And I'll just briefly explain to the

13  jury.  So a demonstrative exhibit may be used by counsel; it

14  may be referenced through witness testimony, but it will not

15  go to the jury room as evidence.

16          You may review it, and they may publish it to you

17  during this presentation, but it is not evidence, and it will

18  not be an exhibit that is submitted to you in the jury room,

19  but you may use it for reference purposes.

20          You may proceed.

21          **MR. FRAUSTO**:  And if we could go ahead and pull it

22  up, Mr. Haag.

23  Q.   **(By Mr. Frausto)**  What is Government's Exhibit 31?

24  A.   Government's Exhibit 31 is a chart I created that

25  summarizes what I observed from reviewing the bank records

1     that I collected in this case.

2           **MR. FRAUSTO**:  And can we highlight the top half.

3     Q.   **(By Mr. Frausto)**  Looking at Government's Exhibit 31,

4     what does the green and blue represent on this chart?

5     A.   So on the left half of the chart, which is the green

6     font and the green arrows, that represents Tranche 1, which

7     was the first $5,000,000 advanced to D and R Acquisitions in

8     2017.

9           And then the -- on the right half of the chart, that

10    represents Tranche 2, which is the second $5,000,000 that was

11    advanced to D and R Acquisitions in February 2018.

12    Q.   And, again, is tranche just a fancy word for

13    disbursement?

14    A.   Yes, that's correct.

15    Q.   Now, let's focus on the green first, Tranche 1.  Looking

16    at the chart, how much was the first tranche of the IBC

17    working capital loan in July 2017?

18    A.   It was $4,967,555.54.

19    Q.   And, looking at your chart, when was that amount

20    disbursed?

21    A.   On July 14th, 2017.

22    Q.   When was the closing for the first $5,000,000 loan?

23    A.   It was one day before that, on July 13, 2017.

24    Q.   Now, were you here through the testimony of Shane Smith

25    where he walked the jury through the flow of the loan

1    proceeds from the IBC loan to the defendant, Bart Reagor?

2    A.    Yes.

3    Q.    And did Shane Smith accurately describe the movement of

4    the funds up to the point where he issued the check to the

5    defendant?

6    A.    Yes, he did.

7    Q.    Now, I'd like to discuss what happened to the loan

8    proceeds once it went to the defendant.  What happened to the

9    $766,277.77 in IBC working capital loan proceeds that were

10   paid to the defendant?

11   A.    Those loan proceeds were deposited into Prosperity Bank

12   into an account ending in 7569.

13   Q.    And how did you determine that?

14   A.    I determined that from records we obtained from

15   Prosperity Bank.

16   Q.    Now, let's turn to Government's Exhibit 26, which has

17   been pre-admitted.  What is Government's Exhibit 26?

18   A.    26 is a series of monthly statements for this account we

19   just referenced, Prosperity bank account ending in 7569.

20   Q.    And what does Government's Exhibit 26 show?

21   A.    It shows that on -- under the section that's labeled

22   deposits/other credits, it shows that on July 17th, 2017

23   there was a deposit for $816,993.15.

24   Q.    Now, let's turn to Government's Exhibit 27.  This has

25   been pre-admitted.  What is this document?

1   A.   This is the deposit detail for that deposit we just

2   spoke about, the $816,000 deposit, which occurred on

3   July 17th, 2017.

4   Q.   And what does it show at the top of Government's

5   Exhibit 27?

6   A.   So this first line or this first item at the top is the

7   actual deposit ticket, and it shows the account number

8   towards the bottom, the 7569, and then over on the right-hand

9   column, there's a series of numbers, and it lays out what

10  this deposit was made up of.

11  Q.   And was it made up of two checks?

12  A.   Two checks and a $1,500 cash withdrawal at the same

13  time.

14  Q.   And was one of those checks the $766,000 check from the

15  IBC loan proceeds?

16  A.   That is correct, it was.

17  Q.   Now, going to the bottom of Government's Exhibit 27,

18  what does this show?

19  A.   This is the check in question, No. 6332, the $766,000

20  check from D and R Acquisitions real estate account to the

21  defendant.

22  Q.   And this was from the IBC loan proceeds?

23  A.   Correct.

24  Q.   And is this $766,000 check that was deposited into the

25  Prosperity bank account reflected on your flow chart on

1    Government's Exhibit 31?

2    A.    Yes.

3              MR. FRAUSTO:   If we could go back to Government's

4    Exhibit 31.

5    Q.    (By Mr. Frausto)  And can you tell the jury where it is

6    reflected on Government's Exhibit 31.

7    A.    It's on the upper left of that screen shot right there

8    (indicating).

9    Q.    And is that Check No. 6332?

10   A.    Yes.

11   Q.    Now, let's focus on the Prosperity bank account that

12   received these working capital loan proceeds from Tranche 1.

13   In that Prosperity bank account, that's where ultimately the

14   check went into --

15   A.    Correct.

16   Q.    -- correct?

17   A.    Yes, sir.

18   Q.    Did you obtain a signature card for Prosperity bank

19   account ending in 7569?

20   A.    I did.

21   Q.    Now, let's turn to Government's Exhibit 25.  And,

22   generally, can you tell the jury what this is.

23   A.    This is the signature card for Prosperity bank account

24   ending in 7569.

25   Q.    And what did you learn from reviewing this signature

```
1    card?

2    A.   This is an account, a consumer account, not a business

3    account.

4    Q.   And when was this account opened?

5    A.   July 26, 1994.

6    Q.   And right here on the signature card, account purpose is

7    consumer?

8    A.   Correct.

9         MR. FRAUSTO:   If we could go to the left side, Mr.

10   Haag.

11   Q.   (By Mr. Frausto)  Why does the signature card say

12   American State Bank if we're talking about Prosperity Bank?

13   A.   Because the account was originally opened at American

14   State Bank, but then American State Bank and Prosperity Bank

15   merged in 2012, but the account number remained the same, and

16   then the merged entity took on the name Prosperity Bank.

17   This is a record we still got from Prosperity Bank.

18   Q.   And who is the account holder of this account?

19   A.   The defendant, Bart W. Reagor.

20   Q.   And it says, POD.  What does that mean?

21   A.   That's a pay-on-death designation.

22   Q.   And who is the beneficiary of the pay-on-death

23   designation?

24   A.   The defendant's wife, Annette Reagor.

25   Q.   Is Annette Reagor also an authorized signer on this
```

1    account?

2    A.    No, she's not.

3    Q.    Who is the sole authorized signer on this account?

4    A.    Just the defendant.

5    Q.    Was the account opened with the defendant's social

6    security number or with a tax ID number from one of the RDAG

7    entities?

8    A.    This account was opened with the defendant's social

9    security number.

10   Q.    And you stated this account was opened in '94.  Based on

11   your investigation, when was the first RDAG dealership

12   created?

13   A.    Not until 2003.

14   Q.    What did you ultimately conclude or determine after

15   reviewing Government's Exhibit 25 and other Prosperity Bank

16   records?

17   A.    Based on this signature card and other records from

18   Prosperity, I concluded that this is the defendant's personal

19   account, not a business account.

20   Q.    And was it an account that the defendant used for his

21   personal use?

22   A.    Yes.

23   Q.    Now, going back to when the $766,000 in loan proceeds

24   were deposited into the defendant's personal bank account at

25   this Prosperity bank account, at the time of that deposit,

1    were there already funds from other sources in this account?

2    A.    Yes.   When the $766,000 check was deposited into this

3    account in July of '17, there was already a little over

4    $1.2 million sitting in that account at the time.

5    Q.    And what were the sources of the other deposits going

6    into the defendant's personal banking account at Prosperity

7    Bank?

8    A.    The other sources of funds going into this account

9    primarily were checks from RDAG entities, such as Reagor Auto

10   Mall.

11   Q.    So since the loan proceeds were commingled with money

12   from other sources, how did you trace the loan from here?

13   A.    Here, I used the float method of tracing.

14   Q.    And can you describe to the jury, what is the float

15   method?

16   A.    So the float method assumes that the funds you are

17   tracing — in this case, the 766,000 — they float to the top

18   of the account.   So that with each withdrawal subsequent to

19   that, those are the funds that are taken first.   Regardless

20   of what was in the account before and regardless of what is

21   deposited afterwards, these funds are withdrawn first.

22   Q.    And why did you use the float method of tracing here?

23   A.    Because this float method is the most straightforward

24   tracing method that I'm aware of.

25   Q.    And when you used the float-tracing method, what did it

1   show?

2   A.   Based on that tracing method, it showed that the entire

3   $766,000 that was deposited into this account was spent or

4   withdrawn within the next six-week period, so from July 17th,

5   2017 to August 28th, 2017.

6   Q.   And, based on your review of the Prosperity Bank records,

7   how was it -- how did the defendant spend the proceeds?

8   A.   Those funds were spent on personal expenses, personal

9   investments, and payments to family members.

10  Q.   Now, let's turn to Government's Exhibit 29.

11        THE COURT:   And Exhibit 29 is pre-admitted.

12  Q.   (By Mr. Frausto)   And, Investigator Whitworth, what is

13  Government's Exhibit 29?

14  A.   These are records we obtained from Prosperity Bank, and

15  these are some of the checks.   This is a multipage exhibit,

16  but these are some of the checks.   These are some of the

17  checks that were written on the defendant's personal account

18  at Prosperity from July 2017 through about mid

19  September 2017.

20  Q.   And looking on the first page of Government's

21  Exhibit 29, the fourth check down, what is that?

22  A.   That's a check written from the defendant's personal

23  account at Prosperity on July 17th, 2017.

24  Q.   And who is the check made out payable to?

25  A.   To True Blue Pool Solutions.

```
 1   Q.   And what is the amount?
 2   A.   $805.22.
 3   Q.   And do you know what True Blue Pool Solutions is?
 4   A.   It's a swimming pool cleaning service in Lubbock.
 5        MR. FRAUSTO:  Now, Mr. Haag, if we could go to the
 6   second page, third check down.
 7   Q.   (By Mr. Frausto)  Investigator Whitworth, what is this?
 8   A.   This is a check written from the same account, the
 9   defendant's personal account at Prosperity on July 17th,
10   2017.
11   Q.   And was that the same day that the $766,000 check of
12   loan proceeds were deposited into the defendant's personal
13   account?
14   A.   Yes, it's the same day that those funds were posted, and
15   the check was deposited.
16   Q.   And who is this check made payable to?
17   A.   The defendant's adult son, Riley Reagor.
18   Q.   And what was the memo line?
19   A.   It says, gift, mom and dad.
20   Q.   And the amount?
21   A.   $50,000 even.
22        MR. FRAUSTO:  Now, Mr. Haag, if we could go to the
23   third page, first check at the top.
24   Q.   (By Mr. Frausto)  Investigator Whitworth, what is this?
25   A.   This is a check written from the same account we've been
```

1    talking about, the defendant's personal account at Prosperity

2    on July 20th, 2017.

3    Q.   And is that three days after the defendant deposited

4    766,000 in loan proceeds into his personal account?

5    A.   Correct.

6    Q.   And who is this check made payable to?

7    A.   This one is made payable to New York Life Securities.

8    Q.   And what does the memo line say?

9    A.   It says, investment.

10   Q.   And what was the amount?

11   A.   This one was for $500,000 even.

12   Q.   And, based on your investigation, what was the nature of

13   this investment?

14   A.   These funds went into a brokerage account at New York

15   Life Securities.

16   Q.   And was it a brokerage account in the name of one of the

17   RDAG entities?

18   A.   No.  It was a brokerage account in the defendant's name

19   and his wife's name.

20   Q.   So did this payment to New York Life Securities appear

21   to be the defendant's personal investment?

22   A.   Yes.

23         MR. FRAUSTO:  Now, if we could go to the fourth

24   page, Mr. Haag, first check at the top.

25   Q.   (By Mr. Frausto)  Investigator Whitworth, what is this?

1   A.   This is a check written from the same account, the

2   defendant's personal account at Prosperity on August 2nd,

3   2017.

4   Q.   And who is this check made payable to?

5   A.   The defendant's wife, Annette Reagor.

6   Q.   And what was the amount?

7   A.   $13,000 even.

8   Q.   And what did the memo line say?

9   A.   It says, August, and then a space, and then it says, RA

10   2500, RY 1300, RI 1200.

11   Q.   And, based on your review of all of the bank records at

12   Prosperity Bank, what did that mean to you?

13   A.   During my review of these bank records, I noticed checks

14   very similar to this at the beginning of every month.  They

15   were all made payable to the defendant's wife for similar

16   amounts and with similar notations on the memo line, and

17   those were all indicators to me that this was some sort of

18   monthly allowance check to the defendant's wife and adult

19   children.

20   Q.   Besides checks, did you see other types of withdrawals

21   from the Prosperity bank account after the 766,000 was

22   deposited into the defendant's personal account?

23   A.   Yes.  In addition, to the checks we've been discussing,

24   I also saw electronic withdrawals from this account as well.

25        MR. FRAUSTO:  Now, Mr. Haag, if we could go back to

1    Government's Exhibit 26.

2    Q.   **(By Mr. Frausto)**  And, Investigator Whitworth, can you

3    tell the jury, again, what is Government's Exhibit 26?

4    A.   Again, this is a multipage exhibit, but these are

5    monthly statements for the defendant's personal account at

6    Prosperity ending in 7569.

7            **MR. FRAUSTO**:  And let's zoom in on the bottom half.

8    Q.   **(By Mr. Frausto)**  Using Government's Exhibit 26, can you

9    provide the jury with an example of an electronic withdrawal

10   that occurred after the defendant deposited the 766,000 in

11   loan proceeds into his personal account.

12   A.   So on the second transaction from the bottom there,

13   which is July 18th, 2017, is an electronic payment to LP&L,

14   which is the acronym for Lubbock Power & Light, which is the

15   electricity provider down in Lubbock.  And that one is in the

16   amount of $1,107.76.

17   Q.   And what's underneath that payment?

18   A.   The last transaction on that page is on July 21st, 2017.

19   It's an electronic payment to American Express in the amount

20   of $7,627.92.

21           **MR. FRAUSTO**:  And, Mr. Haag, if we could go to

22   Page 2 at the very top, the top two lines.

23   Q.   **(By Mr. Frausto)**  And, Investigator Whitworth, what is

24   shown on the screen?

25   A.   So continuing on July 21st, 2017 from the first page,

1  these are two more electronic payments made from this

2  account.  The first one being to American Express in the

3  amount of $8,192.17, and the next one being an electronic

4  payment to Chase credit card for $12,151.32.

5  Q.   And, based on your investigation, were these payments

6  for the defendant's personal credit cards or company credit

7  cards?

8  A.   Personal.

9  Q.   So, based on your tracing analysis, the checks and the

10 electronic payments we just discussed, are those some of the

11 examples of how the defendant spent some of the 766,000 in

12 loan proceeds from his personal account?

13 A.   Yes, those are some examples.

14 Q.   Now, I'd like to turn your attention to Tranche 2 of the

15 working capital loan now.  When was the second closing of the

16 IBC working capital loan?

17 A.   February 27th, 2018.

18 Q.   And, again, were you here through the testimony of Shane

19 Smith where he walked the jury through the flow of the loan

20 proceeds from Tranche 2 all the way to when he gave a check

21 to the defendant?

22 A.   Yes.

23 Q.   And did Shane Smith accurately describe the movement of

24 those funds up to the point where he issued a $1,000,000

25 check to the defendant from the loan proceeds?

1    A.   Yes, he did.

2    Q.   What happened to this $1,000,000 in loan proceeds that

3    were paid to the defendant?

4    A.   These loan proceeds were also deposited into the

5    defendant's Prosperity bank account ending in 7569.

6    Q.   And did you determine that based on your review on

7    records you received from Prosperity Bank?

8    A.   That is correct.

9    Q.   And is it shown -- is that deposit shown on Government's

10   Exhibit 31, which is your flow chart?

11   A.   Yes, sir.

12   Q.   And is that Check 7247?

13   A.   That is correct, yes.

14   Q.   Now, is this the same Prosperity bank account --

15        MR. FRAUSTO:  If we could just highlight that

16   bottom account, Mr. Haag.

17   Q.   **(By Mr. Frausto)**  Is this the same Prosperity account

18   ending in 7569 that you testified about earlier when we were

19   talking about Tranche 1?

20   A.   Yes, sir.

21   Q.   Again, what type of account is this?

22   A.   This is a consumer account.

23   Q.   And whose consumer account?

24   A.   The defendant's.

25   Q.   And who was the sole account holder?

1    A.   The defendant.

2    Q.   Who was the only authorized signer?

3    A.   The defendant.

4    Q.   Now, at the time of the deposit, were there already

5    funds from other sources present in the Prosperity bank

6    account ending in 7569?

7    A.   Yes.  At the time that $1,000,000 check was deposited,

8    there was already a little over $400,000 present in that

9    account.

10   Q.   Now, you testified earlier that the defendant already

11   put 766,000, but at the time the $1,000,000 was placed in

12   there, there was only 400,000?

13   A.   Correct.

14   Q.   What, if anything, was significant to you about the

15   $400,000 balance at the time of the $1,000,000 deposit?

16   A.   Since the balance was $400,000 and the 766,000 in loan

17   proceeds had previously been deposited into this account, I

18   concluded from that that at this point in time, no matter

19   what tracing method I would have used, float or otherwise, I

20   would have came -- come to the same conclusion that some of

21   the working capital loan proceeds had been spent or withdrawn

22   from this account.

23   Q.   Now, since the loan proceeds were commingled with money

24   from other sources, the $1,000,000 coming in with 400,000,

25   how did you trace the loan proceeds from there?

1   A.   Here, I used the float method again.

2   Q.   And, again, can you tell the jury what the float method

3   is.

4   A.   Yes.  Once again, the float method assumes that the

5   funds that you're interested in float to the top of the

6   account, and those are the ones that get withdrawn first

7   before any funds that were there before and before any funds

8   that get deposited afterwards.

9   Q.   And why did you use the float method of tracing here?

10  A.   Same reason as before.  The float method is the most

11  straightforward tracing method that I'm aware of.

12  Q.   And when you used that tracing method, what did it show?

13  A.   In this case, it showed that the entire $1,000,000 in

14  working capital loan proceeds were spent or withdrawn from

15  this account over the following nine-week period from

16  March 2nd, 2018 to May the 4th, 2018.

17  Q.   And, based on your review of the Prosperity Bank

18  records,  how did the defendant spend the $1,000,000 in loan

19  proceeds?

20  A.   These funds were spent on personal expenses, personal

21  investments, payment to family members, and political

22  contributions.

23  Q.   Now, let me turn your attention to Government's

24  Exhibit 30.  And, Investigator Whitworth, what is

25  Government's Exhibit 30?

1    A.   These are records -- these are records we obtained from

2    Prosperity Bank, and these are copies of the checks that were

3    written from the defendant's personal account ending in 7569

4    from February 23rd of '18 through May 1st of 2018.

5    Q.   Now, let's first turn to Page 3, the check at the top.

6    What is that?

7    A.   This is a check written from the defendant's personal

8    account at Prosperity on March the 3rd, 2018.

9    Q.   And who is the check made payable to?

10   A.   The defendant's wife, Annette Reagor.

11   Q.   And in what amount?

12   A.   $13,200.

13   Q.   And what's the memo line?

14   A.   It says A, R, R, R.

15   Q.   And, again, based on your review of the bank records,

16   what did that mean to you?

17   A.   I believe those are the first initials for his wife and

18   three adult children.

19            MR. FRAUSTO:   Now, let's go to Page 4, the fifth

20   check down, Mr. Haag, the very bottom, the very bottom.

21   Q.   (By Mr. Frausto)   Investigate Whitworth, what is this?

22   A.   This is an account written on -- from the defendant's --

23   excuse me.   This is a check written from the defendant's

24   personal account at Prosperity on March the 19th, 2018.

25   Q.   And who was this check made payable to?

1  A.   Eagle Strategies.

2  Q.   And in what amount?

3  A.   $100,000.

4  Q.   And what was the memo line?

5  A.   It says, open account invest.

6  Q.   And, based on your investigation, was this a personal

7  investment by the defendant?

8  A.   Yes, sir.

9  Q.   Now, what did you learn during your investigation about

10 the defendant's mansion in Lubbock, Texas?

11 A.   It was located on 19th Street, and the defendant was

12 spending money renovating, remodeling it around this time.

13 Q.   And you said "around this time."  Based on your

14 investigation, was the defendant spending a lot of money on

15 this mansion on 19th Street at the time the loan proceeds

16 were coming in?

17 A.   That is correct.

18         MR. FRAUSTO:  Now, if we could go back to Page 1,

19 Mr. Haag, second check.

20 Q.   (By Mr. Frausto)  Investigator Whitworth, what is this?

21 A.   This is a check written from the defendant's personal

22 account at Prosperity on February the 26th, 2018.

23 Q.   And who is the check made payable to?

24 A.   Salyer Homes.

25 Q.   And what is Salyer Homes?

1    A.   They're a custom home builder in Lubbock.

2    Q.   And what is the amount?

3    A.   $207,083.45.

4    Q.   And what does the memo line say?

5    A.   It says, draw 14.

6    Q.   And for people like me who didn't know what that meant,

7    what does that mean?

8    A.   Home builders usually get paid in draws, which is just

9    installments basically.

10   Q.   So this was the 14th draw for Salyer Homes?

11   A.   According to that memo line, yes, sir.

12        **MR. FRAUSTO**:  Now, if we could go to Page 5, the

13   fourth check down.  No, back, back, Mr. Haag.  Right here

14   (indicating).  Let's blow this one up.

15   Q.   **(By Mr. Frausto)**  Investigator Whitworth, what is this?

16   A.   This is a check written from the defendant's personal

17   account at Prosperity on March 26th, 2018.

18   Q.   And who's the check made payable to?

19   A.   Magical Gardens.

20   Q.   And what is Magical Gardens?

21   A.   It's a landscaping company in Lubbock.

22   Q.   And what was the amount written for this check?

23   A.   $7,000 even.

24   Q.   And what did the memo line say?

25   A.   Landscaping 19th.

1        **MR. FRAUSTO**:  Now, if we could go to Page 6, Mr.

2   Haag, third check down from the top.

3   Q.  **(By Mr. Frausto)**  And, Investigator Whitworth, what is

4   this?

5   A.  This is a check written from the defendant's personal

6   account at Prosperity on April 3rd, 2018.

7   Q.  And who is the check made payable to?

8   A.  The defendant's wife, Annette Reagor.

9   Q.  And what was the amount?

10  A.  200,000 even.

11  Q.  And what did the memo line say?

12  A.  It says, for house stuff.

13  Q.  Now, based on your analysis and review of all the bank

14  records, are those examples of some of the checks that the

15  defendant wrote out after he deposited the $1,000,000 in loan

16  proceeds into his personal bank account?

17  A.  Yes, sir.

18  Q.  Now, did the FBI ultimately seize any funds from the

19  defendant's personal bank account that we've been talking

20  about at Prosperity Bank?

21  A.  Yes.

22  Q.  And how much was seized from that account?

23  A.  $950,951.18.

24  Q.  And when did the FBI seize these funds from the

25  defendant's personal bank account?

1    A.   November 2nd, 2018.

2    Q.   Now, let's go to Government's Exhibit 32.  And,

3    Investigator Whitworth, what is Government's Exhibit 32?

4    A.   This is a graph that I created that shows two sets of

5    data.  One is the balance in the defendant's personal account

6    at Prosperity, and the other is the total amount of working

7    capital loan proceeds that had been deposited into the

8    account.

9    Q.   Now, again, this is only entered for demonstrative

10   purposes only.  But did you use the defendant's bank records

11   from his personal account at Prosperity Bank to create this

12   graph?

13   A.   Yes.

14   Q.   Now, what is on the axis -- on each axis of the graph?

15   So let's start with the Y or the vertical axis.  What is

16   that?

17   A.   So on the vertical axis or the Y axis, that's simply

18   dollars.

19   Q.   So it starts with zero and goes up to 3.5 million?

20   A.   Yes.

21   Q.   Now, let's talk about the X axis, or what's horizontal.

22   What is relayed on the X axis?

23   A.   That is time.  So it begins on January 1st, 2017, and it

24   goes all the way to January 1st, 2019.

25   Q.   Now, Investigator Whitworth, let's talk about, what does

1  the blue line show, this squiggly blue line?

2  A.   So the blue line is the balance in the defendant's

3  personal account at Prosperity.

4  Q.   And does this blue line show when the working capital

5  loan proceeds from each tranche were deposited into the

6  defendant's personal bank account?

7  A.   Yes.  You can see little bumps.  The first one is at, in

8  July of 2017 when he deposited the 766,000.  There's a bump

9  there.

10      And then the next one is a little harder to see because

11  of the orange line.

12          **MR. FRAUSTO**:  Go ahead and zoom in right here

13  (indicating), Mr. Haag.

14  A.   So this one's a little harder to see because the orange

15  line overlaps the blue line, but there's also a bump here in

16  February of '18 when he deposited the $1,000,000 check.

17  Q.   **(By Mr. Frausto)**  And, Investigator Whitworth, is it

18  right here (indicating), the second one?

19  A.   Yes, sir.

20  Q.   And the first $766,000 you were talking about earlier,

21  this is the bump right here (indicating)?

22  A.   Correct.

23  Q.   Now, let's talk about the orange line.  What does this

24  orange line represent?

25  A.   So the orange line is the amount of loan proceeds that

1   were deposited into this account.  So for the first

2   six months of 2017, it's at zero because the working capital

3   loan had not been advanced yet.

4       But then you have the $766,000 check being deposited in

5   the middle of July, so the orange line bumps up to 766, and

6   it remains there until late February, early March 2018 when

7   he deposits the $1,000,000 check, and then that line jumps up

8   to 1.76 million because it is the combined total of the two

9   checks together.

10  Q.   What did you ultimately learn or discover from comparing

11  the two lines on this graph?

12  A.   When he first deposited the first check of 766,000, for

13  a few months his account balance exceeded that amount.  But

14  then, in September 2017, and, from that point forward, by and

15  large, the account balance remained below the amount of

16  working capital loan proceeds that were -- that had been

17  deposited into that account.

18  Q.   And does this graph show where the FBI seized the 900

19  some-odd thousand?

20  A.   Yes.  It's kind of hard to see, but there is a little

21  gray dot over to the right end of the blue line.  That

22  represents the seizure.

23  Q.   So, after your review of all the bank records and

24  inputting all the data to make this graph, what, if anything,

25  did this graph tell you about the tracing method that you

1    used?  Whether it was the float method or any other method,
2    what did it tell you?
3    A.   Once again, it told me that, regardless of what tracing
4    method I would have used, I still would have come to the same
5    conclusion that some of the working capital loan proceeds
6    that had been deposited into this account were removed from
7    this account, and it's apparent by, especially at the end of
8    the data where there was only $950,000 available for seizure,
9    and, at that time, 1.76 million in working capital loan
10   proceeds had been deposited into it.
11   Q.   Last question, Mr. -- Investigator Whitworth.  Now, you
12   dove and reviewed all the bank records involving this
13   Prosperity bank account, which is the defendant's personal
14   account.
15        Did you see any evidence of the defendant transferring
16   the 1.76 million in loan proceeds that he deposited into his
17   personal account go back into any RDAG entity?
18   A.   No, not the 1.76 million.  I looked at the -- I looked
19   closely at the records from the time he first deposited the
20   working capital loan proceeds into this account up through
21   the end of our data there in October of '18.
22        And, during that entire time frame, I only saw a single
23   check going from his personal account back to an RDAG entity,
24   and it was somewhere around $2,800.
25            MR. FRAUSTO:  Your Honor, I'll go ahead and pass

1    the witness.

2         **THE COURT**:  Mr. Payne, you may approach for

3    cross-examination.  I'll just admonish you to identify

4    exhibits by number for record purposes, and you may begin.

5                   <u>CROSS-EXAMINATION</u>

6    **BY MR. PAYNE**:

7    Q.   Special Agent, you spent a lot of time investigating and

8    going through documents and e-mails on this case; would that

9    be a fair statement?

10   A.   Yes, sir.

11   Q.   And you have a background in mechanical engineering.

12   And I'm assuming with twenty-five years plus in this business

13   you're very detailed; would that be a correct statement?

14   A.   I try to be.

15   Q.   All right.  So it's uncontroverted — and I guess in a

16   nutshell everything that the prosecutor just went over with

17   — that he took these funds, and he used them for personal

18   expenses, correct?

19   A.   Yes, sir.

20   Q.   I mean, all the tracing, all of the documents,

21   everything that they had up, he took the money, it went into

22   his personal account, and then he used it for personal funds,

23   correct?

24   A.   That is correct.

25   Q.   You're not suggesting, are you, to the jury that using

1    your personal funds for a remodel of a house is illegal, are
2    you?
3    A.   It depends on where the personal funds came from.
4    Q.   Well, let's just stick with personal funds.  If it's
5    your personal bank account, there's nothing wrong with you
6    using your personal funds for a swimming pool, correct?
7    A.   There is if they were obtained by fraud, yes, sir.
8    Q.   I know, but, again, I'm saying if they're your personal
9    funds for purposes of cross-examination, and you're using
10   your personal funds, you're not suggesting that using your
11   personal legal funds for a home remodel is illegal, are you?
12   A.   Not -- yes, thank you for adding the word "legal,
13   personal legal funds."  Absolutely, there is nothing wrong
14   with that.
15   Q.   And there's nothing wrong with making investments; would
16   you agree?
17   A.   Not with legally-obtained funds, correct.
18   Q.   Okay.  For these next few questions, let's just assume
19   that it's legal funds.  Okay?
20   A.   Yes, sir.
21   Q.   All right.  Thank you.  You're not telling this jury and
22   suggesting that making political contributions is illegal,
23   are you?
24   A.   No, sir.
25   Q.   We saw multiple checks of money going to Mr. Reagor's

1   spouse.  That's not illegal, is it?

2   A.   No, sir.

3   Q.   And making check payments to your children for maybe

4   gift purposes, that's not illegal if it's with legal funds;

5   would you agree?

6   A.   I would agree.

7   Q.   So you're not suggesting that someone that takes legal

8   funds and has a legal business and is doing very well and

9   following the American dream and growing a business and

10  making money, that making money is illegal, are you?

11  A.   No, sir.

12  Q.   So when we look at this bank account, it was Bart

13  Reagor, POD to Annette Reagor, agree?

14  A.   Yes, sir.

15  Q.   What does POD mean?

16  A.   It means pay on death.

17  Q.   So would you agree with me that a lot of times bank

18  accounts are set up, especially for estate-planning purposes,

19  that, when someone dies, a death certificate is presented,

20  and it's payable on death to the person named, correct?

21  A.   Yes.  It prevents you from having to go through probate,

22  is my understanding.

23  Q.   Much like a beneficiary of a 401(k) or some type of

24  other beneficiary, agreed?

25  A.   I believe so.

1    Q.    And so all this means when we say POD, that the name is
2    his -- in his name, the bank account is in Mr. Reagor's name,
3    his social security is in his name, if he died, then it will
4    be payable on death to his wife, correct?
5    A.    Correct.
6    Q.    Very common for people to name PODs in bank accounts;
7    would you agree?
8    A.    I've seen it many times.
9    Q.    Also, let's talk just a little bit -- besides the bank
10   account, let's talk about LLCs.  Are you familiar with the
11   difference between an LLC and a corporation?
12   A.    In a general sense.  I'm not an attorney, not a
13   specialist in corporate law, but some -- some differences,
14   yes.
15   Q.    Well, you testified to the prosecutor that all of these
16   funds came from a business account and then went into a
17   personal account, correct?
18   A.    That is correct.
19   Q.    If you're a member of an LLC, and there's a two-member
20   LLC, do you understand that you take money from distributions
21   or allocations?
22   A.    I've never heard the word "allocation," but I've heard
23   the word distribution.
24   Q.    All right.  And so when a business entity is set up, if
25   it goes into your LLC and you're a member, that's your money;

1    would you agree with that?

2    A.   After -- after the --

3           MR. FRAUSTO:  Your Honor, I'm going to object,

4    outside the scope of the direct.

5           THE COURT:  I'll allow a few more questions.  This

6    witness isn't designated as an expert in corporate law, and

7    he can speak to his experience as an investigator in

8    reviewing accounts, but if he repeats again that he doesn't

9    profess a knowledge of the difference between LLCs and

10   corporations and how those are legally organized and how

11   disbursements work, we'll just move on to the next line of

12   questions.

13          So, sustained, but I'll allow one or two follow-up

14   questions, but the witness is not designated as an expert for

15   purposes of these corporate formations and corporate law.

16          MR. PAYNE:  Thank you, Your Honor.

17   Q.   (By Mr. Payne)  You testified -- your testimony was that

18   the funds went from a business account into a personal

19   account, and that all of these checks that were just shown

20   for personal expenses came from a personal account, correct?

21   A.   That is correct.

22   Q.   Do you understand that those checks could have been

23   written on an LLC account, and it would have been out as a

24   distribution for tax purposes the same as if it had gone into

25   a personal account?  Do you understand that?

1    A.   That, I do not know.

2         **THE COURT**:  And, with that, I'll sustain the

3    Government's objection.  The witness is not an expert on

4    corporate law, and, at this point, no further questions on

5    that line.

6         **MR. PAYNE**:  Well, and I understand, Your Honor,

7    he's not an expert, and I don't think my questions were to

8    his expertise other than the fact that he testified that

9    those funds went from a business account to a personal

10   account.

11        **THE COURT**:  Okay.  And you may continue with lines

12   of questions, but let's remember the designations in this

13   case, who is and is not an expert, and the limits of direct

14   [*sic*] examination.  So please proceed.

15        **MR. PAYNE**:  Thank you, Your Honor.

16   Q.   **(By Mr. Payne)**  In other words, if it's your money, and

17   it's your legal money, to nutshell all of this, you can do

18   whatever you want in American with your money; isn't that

19   correct?  And I prefaced that with legal.

20   A.   Legal, yes.

21   Q.   And it's not the government's or the FBI's business to

22   tell someone what to do with their personal legal money;

23   would you agree?

24   A.   Well, you can't go buy drugs with it, but, yeah, if

25   you're going to use it legally, yes.  If it was legally

1    obtained and you use it legally, yes.

2    Q.   Did we see any checks written for illegal drugs?

3    A.   No.

4    Q.   Did we see any impropriety that he did anything with

5    these funds if we consider that those are -- if we take the

6    assumption that they're legal funds?

7         Did you see any checks written to any entities, any

8    organizations for illegal purposes?

9    A.   No, sir.

10   Q.   So you're not suggesting that a monthly allowance to his

11   wife would be illegal?

12   A.   Not if the funds were obtained legally.

13   Q.   So let's talk about the funds being legal.  You

14   testified, and you said that some of the working capital loan

15   proceeds were used no matter what method you would have used

16   in the tracing.  That was your testimony?

17   A.   Correct.

18   Q.   Can you give me a definition of working capital.

19   A.   The accounting definition, my understanding, is current

20   assets minus current liabilities.

21   Q.   Okay.  Were you involved in any way with the contract

22   negotiations between RDAG and IBC?

23   A.   Of course not.

24   Q.   Have you ever been involved in your twenty-five years in

25   breach-of-contract type cases involving bank entities and

```
 1   private businesses?
 2          MR. FRAUSTO:  Your Honor, I'm going to object to
 3   this line of questioning.  He testified about the tracing of
 4   funds, nothing about the contract.
 5          THE COURT:  Okay.  Again, for the same reason, the
 6   objection is sustained.  The witness did testify to accounts,
 7   and you are free to go through accounts, who's designated
 8   POD, any of those lines of questions, but this witness isn't
 9   designated to speak to the contract.
10          We have experts that the jury will hear from on
11   those points, but, right now, we're talking about accounts
12   and tracing.  So orient your questions to respond to direct.
13          MR. PAYNE:  I understand, Your Honor, but his
14   testimony was specifically that some of the working capital,
15   and he specifically referenced the contract and working
16   capital.
17          THE COURT:  Okay.  And he did that by identifying
18   account numbers and accounts, and I'll allow you to go slide
19   by slide, exhibit by exhibit on that, but he did not testify
20   to the legal definition of working capital.
21          So I'll sustain the objection.  Please reorient
22   your question.  I'll give you wide latitude into anything
23   that was educed during direct.
24   Q.   (By Mr. Payne)  As far as the Government's exhibits, we
25   saw money paid to a pool company, to the -- Mr. Reagor's wife
```

1  and to his children.
2      Did you also mention that he had charitable donations
3  that were paid out of that?  Did we see any of those slides?
4  A.   No, sir.
5  Q.   Did we see any of the political contribution slide --
6  checks written up here that they showed as slides?
7  A.   No, sir.
8  Q.   So the only thing we saw on the slides that were
9  presented were ones that showed to home building and to pool
10  and to his family, correct?
11  A.   Correct.
12  Q.   The documents -- and you mentioned earlier in your
13  testimony that there were many documents that you reviewed.
14  Would you say thousands of documents that you went over --
15  A.   Yes.
16  Q.   -- in this investigation?
17      The documents that you received, those were under
18  subpoena, and those are provided by Mr. Reagor; is that
19  correct?
20  A.   Which documents are you referring to?
21  Q.   The documents, the bank records, all the documents that
22  you received, all the audio, and all of that was received by
23  subpoena, correct?
24  A.   Received by subpoena from banks, yes.
25  Q.   And did you receive much of that documentation from the

1    attorney for Mr. Reagor?

2    A.    No.

3    Q.    None?  Your testimony is you didn't receive any

4    documents that you reviewed from a subpoena to Mr. Reagor

5    that was provided by his attorney?

6    A.    We received some recordings of videos from his previous

7    attorney.

8         And, yes, we did subpoena D and R Acquisitions for,

9    like, journal entries, but they did not give us what we asked

10   them for, but they were documents, yes.

11   Q.    So almost seven terabytes worth of documentation that

12   you received under subpoena from Mr. Reagor's attorney; is

13   that correct?

14   A.    Those were the videos, yes.

15   Q.    So seven terabytes is a lot of information; would you

16   agree?

17   A.    It is.

18   Q.    And how many thousands of e-mails did you review?

19   A.    I don't recall how many.  It was thousands.  I don't

20   remember how many thousand.

21   Q.    I want to reference the Indictment.  Your graph —— I

22   believe it was Exhibit 32 —— showed where you took a

23   forfeiture from the proceeds of Mr. Reagor's personal

24   account, correct?

25   A.    Correct.

1   Q.   Would you agree with me that, if the jury does not find

2   Mr. Reagor guilty, then the Government doesn't get those

3   proceeds?

4         **MR. HAAG**:  Objection, Your Honor.  Calls for a

5   legal conclusion.

6         **THE COURT**:  Sustained.  I'll instruct the jury to

7   disregard.  The witness is also instructed to not answer.

8         If you can reformulate the question so that it

9   doesn't call for a legal conclusion, I will allow it.

10        **MR. PAYNE**:  Well, could I just read directly from

11  the Indictment, Your Honor, that's admitted --

12        **THE COURT**:  Yes.

13        **MR. PAYNE**:  -- in front of the jury.

14        **THE COURT**:  You may read from the Indictment.

15  Q.   **(By Mr. Payne)**  Would you agree that it says:  Upon

16  conviction for any of the offenses alleged in Counts One,

17  Two, or Three of this Indictment, Bart Wade Reagor,

18  defendant, shall forfeit to the United States of America,

19  pursuant to Title 18 U.S.C. Section 982, any property, real

20  or personal, which constitutes or is derived from proceeds

21  traceable to the respective offense, including, but not

22  limited to, and then it mentions $950,951.18?

23        And that's what you took as the forfeiture, correct?

24  A.   Yes, sir.

25  Q.   And, again, nutshelling your testimony with the

1  prosecutor, everything that you showed this jury, every one

2  of those checks, your testimony is those were illegal

3  funds --

4  A.   So that for --

5  Q.   -- is that correct?

6  A.   That last part again.

7  Q.   Your testimony is all of those checks that he wrote was

8  proceeds that were from illegal funds?

9  A.   Correct.

10  Q.   And if those were not illegal funds, then it doesn't

11  matter what he did with his money, correct?

12  A.   Correct.

13          MR. PAYNE:  Can I have one moment, Your Honor?

14          THE COURT:  Yes, please.  And I'll instruct the

15  courtroom deputy to disable the microphones if you need to

16  have attorney/client conversations.

17      (Defense Attorneys' sotto-voce conference.)

18          MR. PAYNE:  Judge, I'll pass the witness.

19          THE COURT:  Okay.  At this point, redirect, Mr.

20  Frausto?

21          And, again, I'll admonish you as well to limit your

22  redirect to anything that was elicited during

23  cross-examination.

24          MR. FRAUSTO:  Thank you, Your Honor.  Let's zoom in

25  at the bottom, Mr. Haag, of Government's Exhibit 31.

1        REDIRECT EXAMINATION

2   BY MR. FRAUSTO:

3   Q.   Now, Investigator Whitworth, the Defense asked that --

4   stated that you didn't go over payments to charity or

5   political contributions, but that was included as some of the

6   expenses on your summary flow chart in Government's

7   Exhibit 31?

8   A.   Correct.

9   Q.   And is the reason why the other checks were shown was

10  because those were the larger amounts that were paid out of

11  the defendant's personal account?

12  A.   Correct.

13  Q.   Now, the Defense talked about discovery or items, seven

14  terabytes of discovery you received from the Defense.  That

15  was pursuant to a subpoena?

16  A.   Correct.

17  Q.   And that was only the management meetings or Skype

18  videos?

19  A.   That was the bulk of the storage, what took up the

20  storage space, yes.  There were some other miscellaneous

21  items on there, but yes.

22  Q.   But you received all the bank records, including from

23  Prosperity Bank, FirstCapital Bank of Texas, and all the

24  other bank records you talked about in conducting your

25  tracing analysis, you received those records from the banks

1   themselves?

2           MR. PAYNE:  Object to leading, Your Honor.

3           MR. FRAUSTO:  I'll rephrase, Your Honor.

4           THE COURT:  Please rephrase.  Yeah.  Sustained.

5   And I'll allow counsel to rephrase.

6   Q.   (By Mr. Frausto)  The Prosperity Bank records, where did

7   you receive those from?

8   A.   From Prosperity Bank.

9   Q.   And did you use those bank records to conduct your

10  tracing analysis?

11  A.   Yes, sir.

12  Q.   Did you use any of these Skype videos you received from

13  the defendant to do your tracing analysis?

14  A.   No, sir.

15  Q.   Now, I want to clarify one thing.  There is a forfeiture

16  notice in the Indictment, but that's -- is it your

17  understanding that that's only the forfeiture of the

18  defendant's interest; that money does not go to the

19  government?

20  A.   I'm not sure I understand the question.

21  Q.   Okay.  When you forfeit that, that money doesn't come

22  straight to the United States; it ultimately gets delved out

23  to other people.

24          MR. PAYNE:  Judge, I'm going to object.  First of

25  all, that's leading.

1          **THE COURT**:  Yes, sustained on leading, but, also,

2    at this point, the Court will instruct the jury on

3    punishment.  This will be reflected in the jury charge as

4    well.

5          I know we're tracing funds, and we're seeing where

6    proceeds go, and I understand the line of questioning, but on

7    the law, this jury is not to consider punishment when

8    deciding guilt or innocence during their verdict

9    deliberations.

10         So I am still coordinating with counsel on the form

11   of the jury charge, but it will contain in substance

12   something like this, and this is the Fifth Circuit Pattern on

13   punishment.  If a defendant is found guilty, it will be my

14   duty to decide what the punishment will be.  You should not

15   be concerned with punishment in any way.  It should not enter

16   your consideration or discussion.

17         And although there is a forfeiture count in this

18   case, how that is meted out through administrative forfeiture

19   or a judgment from this Court, that will be this Court's

20   responsibility to decide.

21         So there is a forfeiture count, and I understand

22   why it was referenced periodically, but I want you to

23   understand, as far as the law and as far as the charge that

24   you will receive, it is this Court's responsibility to

25   determine judgment on forfeiture, whether administrative or

Bench Conference

1    through a ruling from this Court in the form of a judgment.

2          You may proceed with that instruction.

3          **MR. FRAUSTO:**  No further questions, Your Honor.

4          **MR. HAAG:**  Your Honor, if I may, I would like to

5    just clarify one thing, because I do believe there's a

6    misconception about forfeiture.  Forfeiture is completely --

7          **MR. PAYNE:**  Judge, this is a speaking objection,

8    and I do --

9          **THE COURT:**  Okay.  We can -- we can briefly excuse

10   the jury.

11         **MR. HAAG:**  Your Honor, if I may, it's not

12   necessary.  It's not an objection.  I just wanted to clear up

13   any misunderstandings, because I think --

14         **THE COURT:**  Okay.  Let's do this at the bench

15   though before it's presented before the jury.

16         I've instructed them on the pattern that they're

17   likely to receive on punishment.  I want to make certain that

18   they --

19      **(The following took place at the bench and outside the**

20   **hearing of open court.)**

21         **THE COURT:**  Okay.  So yesterday, yesterday at the

22   close of business, the Court spent some time entering

23   findings on disclosure and discovery in this case, because

24   there were initial allegations of prosecutorial misconduct.

25   Those have since been withdrawn.  I confirmed on the record

 1    with counsel for the Government and Defendant present that

 2    there are no allegations of misconduct in that process.

 3           Defendant stated in written form through the NDTX

 4    portal that's now withdrawn.  The Court has also received an

 5    oral confirmation from counsel that that allegation is now

 6    withdrawn.

 7           The reason for that is, I don't want a lot of

 8    confusing testimony about the discovery in this case because

 9    it was so voluminous.

10           MR. HAAG:  I agree, Your Honor.  And I --

11           THE COURT:  And I understand in any tracing case,

12    you're going to go into proceeds.  There are going to be

13    complicated charts about where funds did and didn't go.

14           I'm fine to allow latitude on accounts identified

15    by account numbers, but whether certain persons are made

16    whole through forfeiture, whether those proceeds go back to

17    victims, this Court will decide all of those questions

18    through the forfeiture process.

19           In fact --

20           MR. HAAG:  I know.

21           THE COURT:  -- as the AUSAs at this table know,

22    there's an asset forfeiture money laundering section that

23    takes care of this because it's so irrelevant.

24           MR. FRAUSTO:  That's what we want clarified --

25           MR. PAYNE:  But that's clearly --

1          MR. FRAUSTO:  -- so the jury doesn't think that

2    money is just going straight to us.  That's what we're trying

3    to clarify.  As you say, it's ultimately up to you.

4          MR. HAAG:  Okay.  Here's my proposal, Your Honor.

5    I think this --

6          THE COURT:  Let me let Mr. Payne respond to the

7    Court, and then I'll let you reply.

8          MR. PAYNE:  And, Judge, that's why I just read from

9    the Indictment.  If there's a speaking objection as to

10   clarify, they can do that through closing arguments, or they

11   can somehow do it through the Court's instruction, but it

12   was -- I read directly from the Indictment.  That was it.

13         THE COURT:  And I permitted that.

14         MR. PAYNE:  Right.

15         THE COURT:  I permitted that.

16         MR. PAYNE:  So I don't understand why they're

17   trying to clarify a closing argument through a speaking

18   objection that should be done through the Court and through

19   closing argument.

20         THE COURT:  Because on the elements, it's not

21   relevant to how people are or are not made whole, whether

22   it's victims, whether it's the government, whether it's the

23   IRS.

24         MR. PAYNE:  Correct.

25         THE COURT:  That procedure will be handled by this

1   Court --

2              MR. PAYNE:  Correct, and that's the instruction.

3              THE COURT:  -- should we have a verdict.

4              MR. HAAG:  And that's all I ask, Your Honor.  Just

5   to clear up any misconception, just say to this jury --

6              THE COURT:  I can say it.

7              MR. PAYNE:  Yes.

8              MR. HAAG:  Yes.  Just say -- from the Court, say, I

9   want to instruct the jury that the disbursement or the final

10  disposition of the $950,000 seized is something that will be

11  adjudicated by this Court.  That money does not go to the

12  United States Government.

13             MR. PAYNE:  But I don't agree with that.

14             THE COURT:  We don't know.

15             MR. PAYNE:  Right.

16             MR. HAAG:  Well, it doesn't.

17             THE COURT:  Should there be IRS tax liens,

18  liabilities, we don't --

19             MR. PAYNE:  We don't know.  You can't say that.

20             MR. HAAG:  Yeah, I can, because it only forfeits

21  your client's interest, that's it.  And in 32 point

22  whatever, there's an ancillary proceeding where everybody

23  else who has a claim to that money files --

24             MR. PAYNE:  Right, but you --

25             MR. HAAG:  -- a claim to it.

1          MR. PAYNE:  -- can't say the Government doesn't get

2     the money.  You can't say that.

3          MR. HAAG:  Well, I'm going to tell you because

4     we're going to put it in an interpleader and let everybody

5     fight it out.

6          MR. PAYNE:  I know, but that's only if there's a

7     conviction.

8          MR. HAAG:  Well, yes.

9          MR. PAYNE:  Right.  And that's straight from the

10    Indictment.

11         THE COURT:  Listen, listen.  Don't --

12         MR. HAAG:  We won't --

13         THE COURT:  -- crosstalk --

14         MR. HAAG:  -- crosstalk.

15         THE COURT:  -- for the court reporter.

16         COURT REPORTER:  Right.

17         THE COURT:  I will give the instruction.

18         MR. PAYNE:  That's all I'm asking.

19         THE COURT:  And Defendant's objection is sustained

20    as to a speaking objection that would take the form of

21    argument.  If it comes from the bench --

22         Now, could you reference the forfeiture provision?

23    You may not know this, but every AUSA just dumps this work on

24    the AFML section.

25         MR. HAAG:  If I might see that, Your Honor.

 1            THE COURT:  And most of us are not experts.

 2            MR. PAYNE:  But I think this is a closing argument

 3    issue and I think it's an instruction issue, not a speaking

 4    objection issue.

 5            THE COURT:  Okay.  Well, we can take that up at the

 6    jury charge or prior -- prior to closing.  But we've done --

 7    and the Court does off the record reflect that counsel --

 8            MR. PAYNE:  You kept me from everything else I

 9    wanted to go through.

10            THE COURT:  So --

11            MR. HAAG:  Your Honor, I would just say this, how

12    about this --

13            THE COURT:  Counsel have worked very hard to keep

14    parallel proceedings out of this case so that nobody is

15    convicted or nobody is deemed not guilty because of what

16    happened in bankruptcy, what happened in a civil case or a

17    civil tort action.

18            We've all worked together very hard, and that's the

19    reason why I think a separate instruction is due here,

20    because I don't want people doing research about bankruptcy

21    proceedings, civil actions that may be in play.

22            MR. FRAUSTO:  Or what happens to forfeiture.

23            THE COURT:  Or what happens --

24            MR. PAYNE:  That's why I merely read from the

25    Indictment.

1          MR. HAAG:  Yes, Your Honor.

2          THE COURT:  And I don't find that you did anything

3     inappropriate, and I allowed the question for that reason.

4          MR. PAYNE:  Yes, sir.

5          THE COURT:  Because it was tailored to the law of

6     the case and then also the Indictment, so --

7          MR. PAYNE:  I don't have any other questions of

8     John.

9          THE COURT:  Criminal forfeiture.  Where am I

10    looking in --

11         MR. HAAG:  I think --

12         THE COURT:  -- Rule 32.2?

13         MR. HAAG:  -- if you just say, I instruct the jury

14    that forfeiture will be handled under Rule 32.2 of the rules

15    and --

16         THE COURT:  And it is a separate proceeding.

17         MR. HAAG:  Yes.

18         THE COURT:  And you should not infer for or against

19    the defendant for those reasons.

20         MR. HAAG:  Exactly.

21         MR. FRAUSTO:  Or for or against the government.

22         THE COURT:  Okay.

23         MR. PAYNE:  Well, maybe.

24       **(The following took place in the hearing of open court.)**

25         THE COURT:  Okay.  Do you like the white-noise

1  machine?

2        **(Laughter.)**

3        **THE COURT:**  So I have five children.  I'm used to

4  that sound in various bedrooms throughout the house.

5        Okay.  So I've reached accord with counsel so that

6  I can properly instruct you on how the law works in this

7  area.

8        So pursuant to Rule 32.2, which designate the

9  post-conviction procedures for criminal forfeiture should

10  this case go that far without making any commentary on how

11  you should decide guilt or innocence, but should there be a

12  conviction in the case, there will be a separate forfeiture

13  procedure and protocol that this Court follows, that this

14  Court decides.

15        So I am governed by that Rule 32.2 of Criminal

16  Procedure.  There are a series of notices that must be issued

17  and posted as those funds are identified and subject to

18  forfeiture.

19        This Court will decide those questions, and you

20  should not decide this case for or against the defendant

21  based on forfeitures and where funds go or where they may

22  end.  You should not decide this case for or against the

23  government for reasons of forfeiture and where those funds go

24  and where they terminate.

25        We've also worked very diligently with counsel to

```
 1   make sure we don't have reference to parallel civil or
 2   bankruptcy proceedings that are not relevant to the case that
 3   you will receive through the jury charge.
 4           So, on that point, this Court -- using the Rules of
 5   Criminal Procedure, there are multiple forms of forfeiture.
 6   This Court will decide that question, and you should not
 7   decide this case based on forfeiture and where those funds
 8   will ultimately terminate.
 9           Is that acceptable to the Government?
10           MR. HAAG:  Yes, Your Honor.
11           THE COURT:  Is that acceptable to the Defense?
12           MR. PAYNE:  Yes, Your Honor.
13           THE COURT:  Okay.  And, at this point, may this
14   witness be excused or are we on --
15           MR. PAYNE:  I have no further questions, Your
16   Honor.
17           THE COURT:  Okay.  Was that recross?
18           MR. PAYNE:  Yes, Your Honor.
19           THE COURT:  Okay.  At this point --
20           MR. FRAUSTO:  No.
21           THE COURT:  -- now that we've gone through direct,
22   cross, redirect and recross, at this point, may this witness
23   be excused?
24           MR. FRAUSTO:  Yes, Your Honor, subject to recall,
25   and he's the case agent.
```

1        THE COURT:  Oh, and he's the case agent, that's

2   right.  So, subject to recall and understanding that you are

3   the case agent and you are exempt from the rule, you may

4   return to your seat.

5        **(Witness leaves the stand.)**

6        THE COURT:  And, again, as I've instructed the jury

7   before, you should not infer anything from even impassioned

8   deliberations at the bench, because the attorneys are

9   vigorously arguing the law to the Court and then requesting a

10  ruling from this Court.

11       So you should not infer anything from the fact that

12  attorneys are zealously advocating for their side at this

13  bench.  I've issued multiple orders in this case that require

14  them to approach and seek ruling if we're approaching a type

15  of evidence or testimony that requires a legal ruling,

16  because this is my job, to define the law and instruct it to

17  you.

18       They are doing their jobs in approaching the bench

19  to argue legal points so that they can get the ruling and

20  then proceed.  So you should not infer anything from these

21  various bench conferences and even some heated argument at

22  times.  The attorneys are simply doing their job.

23       Okay.  Mr. Haag, you may call your next witness.

24       MS. BURCH:  Your Honor, the Government calls its

25  last witness for its case-in-chief, Steve Dawson.

```
 1              THE COURT:  Okay.  Ms. Burch, you may approach the
 2    podium.  I'm admonish you to reference exhibits by number for
 3    record purposes.
 4              And, Mr. Dawson, you may approach the witness
 5    chair.  Please remain standing for administration of the
 6    oath.  My courtroom deputy will administer the oath.
 7         (The witness was sworn by the courtroom deputy.)
 8              THE COURT:  And, Mr. Dawson, you may take your
 9    seat.  I'll request that you speak clearly and loudly into
10    the microphone.  If you need to pull it closer, you may do
11    so.
12              And, Ms. Burch, you may proceed.
13              MS. BURCH:  Thank you, Your Honor.
14                        STEVEN DAWSON,
15         having been first duly sworn, testified as follows:
16                       DIRECT EXAMINATION
17    BY MS. BURCH:
18    Q.   Please state your name.
19    A.   Steven Lane Dawson.
20    Q.   How are you employed?
21    A.   I'm the president of the Dawson Forensic Group.
22    Q.   How long have you been employed in that capacity?
23    A.   Ten years.
24    Q.   What does the Dawson Forensic Group do?
25    A.   We do forensic investigations, fraud investigations of
```

1    internal fraud, the type of fraud that occurs within an

2    organization, within a company.

3    Q.    What did you do before you operated the Dawson Forensic

4    Group?

5    A.    For twenty-six years, I was with the accounting firm

6    Bolinger, Segars, Gilbert & Moss in Lubbock, Texas and

7    serving as a CPA.  For the last about fifteen years of that,

8    I was one of the partners, and for about the last seven years

9    of that I was managing partner.

10   Q.    And you indicated you're a CPA.  What is your

11   educational background?

12   A.    I have a Bachelor's in accounting from Texas Tech

13   University, and then a certified public accountant

14   certificate and a certified fraud examiner certificate.

15   Q.    What does a -- when you say CPA, does that mean

16   certified public accountant?

17   A.    Yes.

18   Q.    All right.  And what does a certified public accountant

19   do generally?

20   A.    Generally, it is services that report to the public,

21   such as financial statement audits, the preparation of income

22   tax returns.  In some cases, we do what we call client

23   write-up or bookkeeping for clients.

24   Q.    What does a certified fraud examiner do?

25   A.    A certified fraud examiner has a different set of

1    skills, kind of a specialized set of skills that relates to
2    document examination, interviews, application of forensic
3    tracing methodologies, and we also do a lot of data analysis
4    on the capture and analysis of hard drives, computer hard
5    drives.
6    Q.   All right.  And is that all within sort of the umbrella
7    of accounting and financial things?  You're not doing
8    forensics on fingerprints and guns; is that fair?
9    A.   That's correct, we do not.
10   Q.   All right.  Do you have continuing education
11   requirements to maintain those certifications?
12   A.   Yes, we do.
13   Q.   Do you have any professional memberships?
14   A.   Yes.  I'm a member of the American Institute of
15   Certified Public Accountants, the Texas Society of Certified
16   Public Accountants, and the Association of Certified Fraud
17   Examiners.
18   Q.   Have you lectured or presented topics on forensic
19   accounting in the past?
20   A.   Yes.
21   Q.   And, in the past several years, have you been retained
22   to review financial documents and other type records in legal
23   proceedings?
24   A.   Yes.
25   Q.   In civil cases?

```
1    A.   Yes.

2    Q.   For both plaintiffs and defendants?

3    A.   Yes.

4    Q.   For third parties?

5    A.   Yes.

6    Q.   And also in criminal cases?

7    A.   Yes.

8    Q.   And, in fact, have you been a defense witness before in

9    a criminal case?

10   A.   Yes, I have.

11   Q.   At some point were you contacted by the United States to

12   conduct a review and analysis of the financial documents and

13   other documents related to the Reagor-Dykes Auto Group?

14   A.   Yes.

15   Q.   And did you agree to conduct that review?

16   A.   I did.

17   Q.   Did the United States agree to pay you for the time you

18   spent conducting that review?

19   A.   Yes.

20   Q.   Did the United States also agree to pay you for the time

21   that you spend doing other things related to the case, such

22   as traveling, listening to the testimony, testifying, things

23   like that?

24   A.   Yes.

25   Q.   And is the pay that you're receiving tied in any way to
```

1  giving a particular opinion?

2  A.   No, it's strictly by the hour.

3  Q.   How much are you being paid by the hour, you or your

4  group?

5  A.   Our rates range from $50 an hour to $350 an hour,

6  depending on the staff assigned to the engagement.

7  Q.   All right.  So maybe the person with the most expertise

8  is getting more per hour than the person that's making

9  copies; is that fair?

10  A.   That's correct.

11  Q.   All right.  Is that -- are those prices or those hourly

12  rates, is that commensurate with the fair market value of

13  your services?

14  A.   Yes.

15  Q.   About how many hours have you spent working on this,

16  this case so far?

17  A.   Approximately 560 hours.

18  Q.   All right.  And when I say "this case," I want to be

19  clear.  That's not solely limited to Mr. Reagor; that's the

20  larger Reagor-Dykes Auto Group investigation?

21  A.   Correct.

22  Q.   All right.  Now, what has that time been spent doing?

23  A.   It's document examination, which includes bank records.

24  It includes looking at transcripts of the interviews.  It

25  includes data analysis on e-mails.

Stevens - Darron - Direct - Burns

1  Q.  And, as of today, approximately how much money has the

2  United States paid you for your services?

3  A.  About $87,000.

4  Q.  And I know that may seem like a large amount, but were

5  you asked to analyze a company with multiple components?

6  A.  Yes.

7  Q.  Multiple locations?

8  A.  Yes.

9  Q.  And sales of approximately $800,000,000?

10  A.  Yes.

11  Q.  Now, you referenced a few minutes ago some of the

12  documents that you've reviewed in this case.  Have there been

13  few documents or many documents?

14  A.  Many.

15  Q.  And you mentioned e-mails and some other things.  Have

16  you also reviewed -- in addition to the e-mails and reports,

17  have you also reviewed financial documents?

18  A.  Yes.

19  Q.  From your review, did you learn that there were several

20  different companies operating under the general umbrella of

21  Reagor-Dykes Auto Group?

22  A.  Yes.

23  Q.  Did you learn about a company known as D and R

24  Acquisitions?

25  A.  Yes.

1  Q.   And was Mr. Reagor a 50-percent owner of that company?

2  A.   Yes.

3  Q.   Did D and R Acquisitions primarily hold the real estate

4  assets for RDAG?

5  A.   Yes.

6  Q.   And, based on your review of the documents, was there a

7  time when the Ford Motor Credit Company conducted an audit of

8  RDAG that had a negative outcome?

9  A.   Yes.

10  Q.   Did that negative audit place RDAG in a weak cash

11  position?

12  A.   Yes.

13  Q.   How?

14  A.   By the need to make good on the negative FMCC audit,

15  amounts that were going to have to be paid, that naturally

16  reduces cash.

17  Q.   When a company has a weak cash position, what do they

18  need to do to stay afloat?

19  A.   Get working capital.

20  Q.   And how might they do that?

21  A.   The owners can put more money into the company.  They

22  can cut expenses or they can borrow.

23  Q.   Did you review documents related to a $10,000,000

24  working capital loan between RDAG or —— I should be more

25  precise —— between D and R -- D and R Acquisitions and IBC?

```
 1   A.   Yes.
 2   Q.   Or International Bank of Commerce?
 3   A.   Yes.
 4   Q.   What was the purpose of that loan?
 5   A.   The loan agreement purpose stated working capital.
 6   Q.   And, based on your background and your experience in
 7   accounting, can you define working capital?
 8   A.   Yes.  It's current assets minus current liabilities.
 9   Q.   That sounds like a mouthful to me.  Can you give the
10   jury an example of working capital in a way that might make a
11   little more sense for a regular person like me.
12   A.   Yes.  From a -- from a personal standpoint, if you
13   have -- just as an example, if you've got $500 in your
14   checking account, and next week you owe your electric bill
15   for $200, then you've got current assets, the $500 that's in
16   your checking account, and you've got current liabilities,
17   the $200 that's due next week, so the 500 minus 200 equals
18   300, and the $300 would be the -- the working capital.
19   Q.   So, in that example, that $300, would that be like kind
20   of your cushion for operating your life?
21   A.   Yes.
22   Q.   And are current liabilities the things that you
23   generally need to pay to keep the business going, if we're
24   going back to the business example?
25   A.   Yes.
```

1    Q.   Would you expect working capital to go into a business

2    account?

3    A.   Yes, I would.

4    Q.   Would you expect working capital to cover business

5    expenses?

6    A.   Yes.

7    Q.   Can working capital pay the electric bill?

8    A.   Yes.

9    Q.   Water bill?

10   A.   Yes.

11   Q.   Pay for regular employee salaries?

12   A.   Yes.

13   Q.   Regular employee bonuses even?

14   A.   Yes.

15   Q.   Now, based on your review of the financial documents,

16   did you see where a portion of the proceeds of each of those

17   two $5,000,000 disbursements that we've been talking about ——

18   I can't even say that fancy word —— but those -- those two

19   $5,000,000 disbursements that we've been talking about in

20   court, did you see in your review of the financial documents

21   where a portion of those landed in Mr. Reagor's personal

22   account?

23   A.   Yes.

24   Q.   And, in your capacity as an expert witness for this

25   case, did you sit in on an interview of Mr. Reagor's CPA,

1    Chuck Darter, with attorneys for the United States?

2    A.   Yes.

3    Q.   And how did Mr. Reagor's CPA classify the disbursements

4    of the IBC working capital loan proceeds to Mr. Reagor's

5    personal account?

6              MR. COGDELL:  Objection, hearsay.

7              MS. BURCH:  May I respond?

8              THE COURT:  Sustained.  I'll allow you to respond.

9              MS. BURCH:  Your Honor, this is an expert witness.

10   He's allowed to rely on hearsay under the rules, and he was

11   allowed to sit in on that interview and analyze what was --

12   what was said by Mr. Reagor's CPA.

13             THE COURT:  He can -- he can speak to matters in

14   his report and what he learned through those interviews, but

15   I will not permit recitation of actual statements.  So the

16   objection is sustained.

17   Q.   **(By Ms. Burch)**  At some point did you come to learn that

18   Mr. Reagor's -- that those -- that portions of the loan

19   proceeds have been classified as owner distributions?

20   A.   Yes.

21   Q.   What is an owner distribution?

22   A.   An owner distribution is the use of company funds being

23   given back to the owner or returned to the owner.

24   Q.   How would an owner distribution affect working capital?

25   A.   Whenever the money is written from the bank account for

1  the distribution, the bank account is less, and the bank

2  account is a current asset, and so the working capital would

3  decline.

4  Q.   Is an owner distribution consistent -- it's -- is an

5  owner distribution a consistent use of working capital

6  proceeds, or I should say loan proceeds for working capital?

7  A.   No.

8  Q.   Why not?

9  A.   Working capital loan proceeds, based on the definition

10 of working capital, is to provide for current operations of

11 the business, which includes those daily expenses associated

12 with keeping the lights on.

13 Q.   Is an owner distribution a current liability?

14 A.   No.

15 Q.   Now, prior to coming to court today, did I ask you to

16 review Government Exhibit 41?

17 A.   Yes.

18 Q.   And you have the exhibit book, if you would like to turn

19 to No. 41.

20        THE COURT:  And, Ms. Burch, just to anticipate

21 further objections, I do want to clarify the Court's ruling

22 there.

23        Defendant [*sic*] may reference hearsay that he

24 relied upon in forming his opinion and certainly anything

25 reflected in the report, so I'll allow for the sorts of

 1   conclusions and analysis and things of that sort, but not,

 2   you know, vague recollections of what was said here or there.

 3          So let's formulate it that way, and then I'll allow

 4   Mr. Cogdell to object as we move forward.

 5          MS. BURCH:  Understood, Your Honor.  Thank you.

 6   Q.   (By Ms. Burch)  On Government Exhibit 41 --

 7          MS. BURCH:  And can you blow up the portion that

 8   refers to personal equity offset reserve, please.

 9   Q.   (By Ms. Burch)  All right.  Do you remember reviewing

10   this e-mail outside of court?

11   A.   Yes.

12   Q.   All right.  And this personal equity offset reserve that

13   the loan proceeds were supposed to represent, what does that

14   mean to you?

15   A.   I -- I really have no idea what that term is.

16   Q.   Now, are you familiar with acceptable methods for the

17   financial tracing of funds through accounts?

18   A.   Yes.

19   Q.   And were you here in court today when Former Special

20   Agent Whitworth -- I can't call him Investigator Whitworth.

21   He'll always be Special Agent Whitworth to me.  Can you --

22   were you here when he went through the tracing of that?

23   A.   Yes.

24   Q.   And have you reviewed his tracing analysis prior to

25   court today?

```
 1   A.   Yes.
 2   Q.   Does his analysis and his tracing of those funds, does
 3   that comport with standing accounting principles?
 4   A.   Yes.
 5            MS. BURCH:  Your Honor, I'll pass the witness.
 6            THE COURT:  And cross-examination for the
 7   Defendant, Mr. Cogdell?
 8            MR. COGDELL:  I tell you what, if we could have the
 9   morning break, it might allow me to shrink my cross down.
10            THE COURT:  Okay.
11            MR. COGDELL:  I was expecting to go further, but
12   given what happened, I may go less, so --
13            THE COURT:  Okay.  And I'm loathe to sort of break
14   up testimony if it would potentially disadvantage either
15   side, but if that would actually help --
16            MR. COGDELL:  I think it will.
17            THE COURT:  -- you reformulate, we'll take our
18   morning break at this point.
19            And, as a reminder to counsel, I am anticipating an
20   11:30 break for the attorneys to do some legal work.
21            MR. COGDELL:  Yes, sir.
22            THE COURT:  So I'll instruct the Court Security
23   Officers, the Marshals and staff to escort the jury for the
24   morning break.  We will take fifteen minutes and be back at
25   roughly 10:25, anticipating to restart at 10:30.  We do stand
```

(Outside of the Jury's Presence)

1    in recess from this point until 10:30.

2              **COURT SECURITY OFFICER**:  All rise.

3         **(Recess taken; after which, the following took place in**

4    **open court with the defendant present but without the jury.)**

5              **THE COURT**:  Please be seated.  The Court is back on

6    the record in United States of America versus Bart Wade

7    Reagor, Case No. 2:21-CR-025-Z.

8              Before we bring the jury in, and I did not forget

9    the jury, I just want to reiterate that we're back under the

10   Court's previous Order in Limine instructions on that.

11             There is a section in Paragraph G about Government

12   resources.  Here, Ms. Burch, there was testimony elicited as

13   to compensation received.

14             Is it your understanding that that was personal

15   compensation as anticipated by the Order in Limine?

16             **MS. BURCH**:  Your Honor, that that was compensation

17   related to his expert designation that the Government paid

18   him, and that that was an exception to the Court's limine

19   order, was my understanding.

20             **THE COURT**:  Yeah.  I say here, however, both

21   Defendant and Government may inquire as to the personal

22   compensation received by any expert who testifies at trial.

23             So it's within that exception.

24             **MS. BURCH**:  Yes, Your Honor.

25             **THE COURT**:  Okay.  That's my understanding.  And,

Stacy Mayes Morrison
Official Court Reporter

1    of course, you may make reference now that that door is open

2    to that compensation.  I just wanted to make sure we're on

3    the same page.

4              I'll now instruct the CSOs and Marshals to bring in

5    the jury.

6              **COURT SECURITY OFFICER**:  All rise for the jury.

7          **(The jury returned to the courtroom, and the following**

8    **took place in open court with the defendant and jury present.)**

9              **THE COURT**:  Please be seated.

10             At this point, Mr. Cogdell, you may begin your

11   cross-examination of this witness.

12             **MR. COGDELL**:  Thank you.

13                        <u>CROSS-EXAMINATION</u>

14   BY MR. COGDELL:

15   Q.   Mr. Dawson, I had a chance to introduce myself to you

16   briefly outside the presence of the jury, but I'll do it now

17   in their presence.

18        My name is Dan Cogdell.  You've probably figured out

19   that I'm one of the lawyers that represents Bart Reagor.

20   It's nice to meet you, sir.

21   A.   Nice to meet you.

22   Q.   I expect to have you for fifteen or twenty minutes, but

23   not much longer.  Is that fair?

24   A.   That's fair.  Thank you.

25   Q.   I want to start out by talking about, of course, a

```
 1   lawyer's favorite thing, money, in terms of how -- how you're
 2   getting paid.
 3        You indicated that you -- your firm was getting paid
 4   anywhere from $50 to $350 an hour?
 5   A.   Yes, sir.
 6   Q.   And that, in response to counsel's question, you said
 7   that you had spent 560 hours on the case?
 8   A.   Yes, total 560.
 9   Q.   Is that -- is that your hours or the total of your
10   firm's?
11   A.   The total of the firm.
12   Q.   Okay.  Because if you do 560 times 350, that's 200 or
13   196, and you said you've been paid 87,000 to date?
14   A.   That's correct.
15   Q.   How much are you owed?
16   A.   Right now, I haven't billed for anything else.  I'll be
17   owed for this week.
18   Q.   Okay.  And so you came here.  You've been here through
19   the entirety of this trial?
20   A.   Yes.
21   Q.   And I say the entirety of this trial.  Maybe I'm the
22   only one in the room that feels like it's been longer than
23   one day, but the trial actually just started yesterday,
24   right?
25   A.   Yes, sir.
```

1   Q.   And you heard all the witnesses?

2   A.   Yes.

3   Q.   You were sitting, I think, back row somewhere?

4   A.   Yes.

5   Q.   You heard Mr. Smith testify, and I won't -- I won't bore

6   you with all of the things that I wrote out for the jury, but

7   you heard his testimony, right?

8   A.   Yes.

9   Q.   And you heard his response or the response that he gave

10  Mr. Reagor when Mr. Reagor directed him to utilize the

11  proceeds — and it's Government's Exhibit 42 — awesome.  Had

12  you seen that before yesterday?

13  A.   I don't remember seeing this.

14  Q.   Okay.  Now, you prepared a preliminary report back

15  sometime ago, right?

16  A.   Yes.

17  Q.   December 20, something like that?

18  A.   Around that time frame.  I believe it was November.

19  Q.   Okay.  And, in preparing that report, you relied on a

20  number of interviews and so forth, right?

21  A.   Yes, sir.

22  Q.   And you also relied on the loan agreement itself, right?

23  A.   Yes, I had the loan agreement in place.

24  Q.   And you've studied the loan agreement pretty carefully?

25  A.   Yes.

1   Q.   You feel like you've got -- as a CPA and with your
2   investigative and other training, you feet like you've got a
3   good hand on what the contract says and what it allows and
4   what it doesn't allow, right?
5   A.   I -- I believe that I've got a good understanding of the
6   purpose.  I don't necessarily opine or get into legal
7   determinations as to allowance or not allowance.
8   Q.   Okay.
9   A.   But I understand the document.
10  Q.   Well, you will obviously agree with me that Mr. Reagor
11  is on trial, not for breaching a loan agreement, but for bank
12  fraud.  This is not a civil dispute.  This is a criminal
13  accusation, right?
14  A.   Yes, sir.
15  Q.   Now, in reviewing the loan agreement, would you agree
16  with me that it doesn't define the term "working capital"?
17  A.   Other than stating working capital, there's not a
18  definition provided.
19  Q.   Right.  And there are definitions of -- I think there
20  are seven pages of definitions of everything from dollar to
21  mortgage to debt, business day, and so forth, but they don't
22  define working capital?
23  A.   Correct.
24  Q.   And working capital is one of the most fundamental terms
25  we're dealing with in terms of whether or not this contract

1  was violated or whether or not bank fraud occurred, right?

2  A.   Yes, sir.

3  Q.   So the most important term, or a very important term,

4  working capital is not defined in the very document that this

5  jury has to ultimately analyze and understand and make their

6  decision based in part on; agree with me?

7  A.   Correct.

8  Q.   And, certainly, with lawyers that -- well, banks are in

9  business like most of us, I guess, to make money, right?

10  A.   Yes.

11  Q.   And IBC is a recognized bank with, I think he said, 100

12  locations, something like that, right?

13  A.   A lot, yes.

14  Q.   A significant financial institution.  They didn't fall

15  off a turnip truck last week.  They're a significant

16  financial player, right?

17  A.   Yes.

18  Q.   And they have -- they have resources, and they have

19  lawyers that can draft these agreements to their satisfaction

20  and to best protect them, right?

21  A.   Yes.

22  Q.   And we saw I think at least one of the lawyers testify

23  yesterday about his crafting and his work and his effort and

24  so forth in the construction of the loan agreement itself,

25  right?

1   A.   Yes.

2   Q.   And, again, working capital is not defined in that loan

3   agreement; agree with me?

4   A.   Correct.

5   Q.   I want to ask you a question about Section 2.1(b) [*sic*].

6   And if this feels like a pop quiz, I apologize.

7        **THE COURT**:  And just briefly, Mr. Cogdell, could

8   you identify the exhibit number so that everybody can be on

9   the same page?

10       **MR. COGDELL**:  I certainly can.  It is the loan

11  agreement, which is Government's Exhibit --

12       **MR. HAAG**:  2.

13       **MR. COGDELL**:  -- 2.

14       **THE COURT**:  2.  Okay.  You may proceed.

15  Q.   **(By Mr. Cogdell)**  Let's see if I can zoom in.  Here,

16  this says, sir, purpose.  Borrower shall use the proceeds of

17  the advancing term loan to provide working capital to

18  borrower group.  Borrower shall not use any advancing term

19  loan proceeds, directly or indirectly, for purposes of

20  purchasing or carrying any margin security or margin stock

21  within the meaning of Regulation U of the Board of the

22  Governors of the Federal Reserve system.

23       Now, it doesn't take much to be smarter than me, and

24  I'll suggest to you that you probably are, but, at least, in

25  my simple reading of that, that is a plain exclusion of what

1   the borrower can't use the funds for.  In other words, it

2   says you can't use them for that, right?

3   A.   Correct.

4   Q.   Now, does that exclusion, in your opinion, support an

5   argument that utilizing the distributions to pay back a

6   capital investment, does this exclusion support an argument

7   that they could be used to repay an investor or owner for

8   their capital contributions?

9   A.   This exclusion is silent as to repayment through

10  distributions of capital contributions.

11  Q.   Right.  Here's where I'm going, and I think you heard an

12  analogy kind of like this yesterday.  If this was an

13  apartment lease, and they said no pets, you couldn't bring a

14  cat, right?

15  A.   Correct.

16  Q.   But if that apartment lease said, no dogs, specifically

17  excluded no dogs over 65 pounds, you could have a dog under

18  65 pounds, right?

19  A.   Yes.

20  Q.   So my question to you is, by this specific exclusion,

21  does that, in your expert opinion, allow an argument that, as

22  long as they are not being used for this specific exclusion,

23  they can be otherwise used by the borrowers?

24          MS. BURCH:  Objection, Your Honor.  This is asking

25  for a legal conclusion about a contract that he didn't even

1  testify about on direct, and also the Court specifically

2  asked us to not get into contact -- contract interpretation

3  as far as ultimate conclusions.

4       **THE COURT**:  That objection is sustained.  Mr.

5  Cogdell, you'll recall the witness qualifications and

6  purposes for his expert designation.

7       This expert is pre-admitted as an expert in all of

8  the matters reflected in his report as to accounting and

9  forensic accounting, and everything relevant to that is fair

10  game to the Defendant, but I will not allow you to elicit

11  conclusions about legal terminology from a non-lawyer and a

12  non-expert in that field.

13       **MR. COGDELL**:  I --

14       **THE COURT**:  That objection is sustained.

15       **MR. COGDELL**:  I appreciate that.  Perhaps the

16  reason I was going there, Your Honor, is his preliminary

17  opinion — I suppose, that in deference to counsel, I guess

18  you didn't go there on direct — he issued a preliminary

19  opinion where he opined as to whether these actions were

20  consistent or inconsistent with the contract, and he gave

21  some -- some examples of why.

22       **THE COURT**:  Okay.  Response, Ms. Burch, since it

23  was your direct examination?

24       **MS. BURCH**:  I believe his opinion was that it was

25  inconsistent with or consistent with the proceeds of the

1    working capital loan and the working capital.

2            THE COURT:  Okay.  I'll ask you to speak into the

3    microphone.

4            MS. BURCH:  I'm sorry, Your Honor.  That it was

5    consistent or inconsistent with the concept of working

6    capital and not specifically regarding this idea of contract

7    interpretation that is the exclusionary principle that I

8    think counsel is trying to get to.

9            THE COURT:  Okay.  The objection is sustained.

10   I'll allow you to go into that direct testimony, but in terms

11   of canons of interpretation and the exclusio unius that came

12   out prior, we do have contract --

13           MR. COGDELL:  You're so good with those terms.

14           THE COURT:  Yeah, well, I try.  So we do have

15   experts who are designated to speak to contractual terms and

16   that terminology.  It's just not this expert.

17           So please redirect your line of questioning to what

18   the witness is designated to testify to and also what he did

19   testify to on direct.

20           MR. COGDELL:  I'll do that.  And that might have

21   shortened my cross-examination even more significantly than I

22   had planned on.

23   Q.   (By Mr. Cogdell)  But, to this point, we don't have a

24   definition of working capital, right, in the contract?

25   A.   In the contract.

1  Q.   Your position is that utilizing these funds in the

2  fashion that they were utilized was not consistent with

3  working capital, correct?

4  A.   Correct.

5  Q.   But whether or not at the end of the day those funds were

6  or were not properly used is going to be defined by the terms

7  of the contract?  It's the contract that controls, right?

8  A.   Yes.

9  Q.   And if there was earlier testimony about what an IBC

10  banker believed or thought or wanted from a -- from your

11  analysis of the contract, it doesn't matter what anybody said

12  or thought; it's what the contract said.  That's the Bible in

13  terms of the disposition of the funds in this case; agree

14  with me?

15  A.   Yes.

16        MR. COGDELL:  May I have one quick question or

17  sidebar with counsel, Your Honor?

18        THE COURT:  Yes.  I'll direct the courtroom deputy

19  to disable the microphones for purposes of that conversation.

20        And, in the interim, because the phrase has come up

21  a couple of times, I'll provide the Court's legal definition

22  of this Latin phrase that you've heard.  It's expressio unius

23  est exclusio alterius.

24        That is a mouthful of Latin that means -- it's a

25  principle of contract construction or statutory construction

1    where things are listed in a class, things that are expressly

2    mentioned; then the things that are not expressly mentioned

3    are thereby excluded.

4              So lawyers use a separate body of authority called

5    canons to interpret contracts, statutes, things of that sort,

6    so I anticipate that you'll hear expert testimony later in

7    the case from a law professor who teaches contracts.  So I

8    didn't want anybody to be potentially confused by this

9    shorthand expressio unius that you've heard throughout the

10   trial.

11             So I do anticipate that you'll get greater

12   definition of the rules and the canons that we apply to

13   contracts, but, here, this witness is an expert in forensic

14   accounting, and, as you saw during direct, that's the purpose

15   of that.

16             So I don't want you to infer that you will not ever

17   learn this mystery word, but the Court will instruct you that

18   that is the definition that has been referred to throughout

19   testimony.  It's just a canon of interpretation that lawyers

20   may or may not use or courts may or may not use in

21   interpreting contracts.  And I do anticipate that you'll hear

22   from a contract professor who teaches these things.

23             Is that -- is that an acceptable clarification on

24   this Latin that's been hanging around the room?

25             MR. COGDELL:  Not only is that -- that's a -- not

1    only is that an acceptable explanation, it's a perfect segue

2    because I was going to ask Mr. Dawson:

3    Q.   **(By Mr. Cogdell)**  Do you know who Frank Snyder is?  He's

4    a -- if I told you he was a professor of law at Texas A&M

5    University, would that name ring a bell to you?

6    A.   No, sir.

7    Q.   Do you know who a Steven Fried is, who is a banking

8    expert from California?

9    A.   No, sir.

10   Q.   Would you agree with me, Mr. Dawson, that it is not

11   uncommon, both in criminal cases and civil cases, for the

12   plaintiffs to have experts, for the defense to have experts

13   and in criminal cases for the government to have experts and

14   for the defense to have experts?  That's kind of as normal as

15   the wind blowing in West Texas, is it not?

16   A.   Yes, that's common.

17          MR. COGDELL:  Okay.  With that, I'll pass the

18   witness.  Thank you.

19          THE COURT:  And redirect by the Government,

20   Ms. Burch?

21          MR. COGDELL:  Let me get out of your way.  I'm

22   sorry.

23                  <u>REDIRECT EXAMINATION</u>

24   BY MS. BURCH:

25   Q.   Mr. Cogdell asked you about your hours and things like

```
 1   that related to this case.  Do you recall that line of
 2   questioning?
 3   A.   Yes.
 4   Q.   When did you first get hired by the United States?
 5   A.   It was May of 2020.
 6          MS. BURCH:  No further questions.
 7          THE COURT:  Okay.  At this point, the Government
 8   may call its next witness; although, I think we're at the end
 9   of the witness list.
10          MR. HAAG:  Yes, Your Honor.  The United States of
11   America rests.
12          THE COURT:  Okay.  So, Members of the Jury --
13          At this point, I should ask, may this witness be
14   excused?
15          MR. HAAG:  Yes, Your Honor.
16          THE COURT:  And, Mr. Cogdell, any objection to
17   excusing this witness?
18          MR. COGDELL:  No, sir.
19          THE COURT:  And you are excused.  You may step
20   down.  Of course, subject to the parties' application of the
21   rule, you may remain in the gallery.  You are not subject to
22   the rule.
23          MR. HAAG:  Yes, Your Honor.  And for the Court's --
24   we may call this witness for rebuttal.  I'm not sure at this
25   time, but --
```

1          **THE COURT:**  So, subject to callback, you are

2      excused.  And you have also been exempted from the rule by

3      agreement of the parties, so you may remain in the gallery.

4          **(Witness leaves the stand.)**

5          **THE COURT:**  And, Mr. Haag, did I hear another

6      witness, or did I hear -- I'm sorry, I may have forgot.  Did

7      the Government rest its case?

8          **MR. HAAG:**  Yes, Your Honor, we did.

9          **THE COURT:**  Okay.  Members of the Jury, the

10     Government rests its case.  There is a matter that I must

11     take outside the presence of the jury.

12          I'm going to instruct the CSOs and Marshals to

13     escort you back to the jury room.  I will then inquire with

14     the attorneys about their time limits, and the Defendant's

15     case-in-chief.  I'll try to figure out the lunch schedule,

16     their anticipated order of witnesses, and then when you

17     return, I'll give you an update on the plans for lunch and

18     then the remainder of the afternoon.

19          But we do have a motions practice that must be

20     taken up outside the presence of the jury.  You'll be excused

21     for that, and when you return, you'll know your lunch plans

22     and your afternoon plans.

23          So, at this point, I'll instruct the Court Security

24     Officers and Marshals to escort the jury.

25          **COURT SECURITY OFFICER:**  All rise.

Case 2:21-cr-00025-Z-BR Document 163 Filed 03/22/22 Page 115 of 197 PageID 2049
Defendant's Motion for Judgment of Acquittal
461

(Outside of the Jury's Presence)

```
 1        (The jury leaves the courtroom.)

 2            THE COURT:  Please be seated.  Mr. Cogdell, does

 3   the Defendant now move for a Judgment of Acquittal pursuant

 4   to Federal Rule of Criminal Procedure 29(a)?

 5            MR. COGDELL:  He does, Your Honor.  And, in

 6   specific, the false statement to a financial institution

 7   count.  I would point the Court out to Mr. Smith's testimony

 8   yesterday that it's unquestioned that he was the lead, that

 9   is, Mr. Smith was the lead.

10            THE COURT:  And I'll ask -- I'll ask you to mike

11   up --

12            MR. COGDELL:  Yes, sir.

13            THE COURT:  -- for the court reporter's benefit.

14            MR. COGDELL:  Sure.  I'm sorry.  It's unquestioned

15   that Mr. Smith was taking the lead on behalf of the

16   negotiations for the Reagor-Dykes Auto Group in the loan

17   application with IBC, and that he was the person

18   communicating and the lead during the communications.

19            And Mr. Smith testified yesterday that Bart Reagor

20   never asked me to submit any false documents to IBC.  That

21   testimony was brought out through their witness.  There is no

22   testimony or suggestion that Reagor asked anyone else to

23   submit false loan applications or false documents to IBC.

24            So, on that basis, I believe the Government has

25   failed to prove its case to where a rational --
```

Defendant's Motion for Judgment of Acquittal
(Outside of the Jury's Presence)

1      MR. NORRIS:  You want this on the screen?

2      MR. COGDELL:  Sure.  We're going to get into the

3  jury charge real quick, but --

4      MR. POWELL:  You need to take the ELMO off.

5      MR. COGDELL:  Yeah.  Can you take the ELMO off.  It

6  is not on yet.

7      **(Technical difficulties.)**

8      MR. COGDELL:  On the proposed jury instructions, in

9  order to find him guilty, the proof would have to satisfy a

10  rational finder of fact beyond a reasonable doubt that he

11  knowingly executed a scheme, and the scheme or artifice was

12  executed to obtain money, and it was executed by means of

13  false or fraudulent pretenses or representations, and that

14  the false, fraudulent pretenses or representations were

15  material.

16      There is no evidence that anyone other than --

17  there is no evidence that anyone other than Shane Smith

18  submitted documents to IBC, so, on that basis, I believe the

19  Government has failed specifically on the false statement

20  case to IBC.

21      THE COURT:  Okay.  At this time, I'll invite

22  response from the Government on Defendant's Motion for a

23  Judgment of Acquittal.

24      MR. HAAG:  Yes, Your Honor, as I understand, the

25  Defendant's motion is predicated on there not being a false

Defendant's Motion for Judgment of Acquittal
(Outside of the Jury's Presence)

1  statement in this case.

2      The testimony that this Court heard was that in

3  April 17, 2017, the defendant, Shane Smith, and Mr. Dykes

4  were all present in a meeting with IBC representatives.  Mr.

5  Schonacher, Mr. Woodring both testified that the defendant

6  and the other representatives of the Reagor-Dykes Auto Group

7  said that they needed a working capital loan, and that was

8  the sole purpose of the loan mentioned in that meeting.  That

9  purpose is reflected throughout this case, through the

10  signing of the documents on July 13th of 2017.

11      As this Court is well aware, a false statement not

12  only includes a false statement, but an omission of a

13  material fact.  Here, the material fact that was omitted was,

14  in fact, the purpose of the loan was not solely working

15  capital.  The purpose of the loan was to enrich the

16  defendant, and, therefore, we believe that the Court should

17  deny the motion.

18      **THE COURT**:  Okay.  The motion is denied for the

19  reasons stated in the Government's response, and the Court's

20  separate and independent determination that the evidence

21  presented is sufficient to sustain a conviction on all four

22  [*sic*] counts in the Indictment as required by Federal Rule of

23  Criminal Procedure 29(a).

24      I'll remind Defense Counsel, there is an

25  opportunity to renew that motion at the close of Defendant's

Hornberger Matters
(Outside of the Jury's Presence)

 1  case-in-chief.

 2          At this point, I want to discuss timing.  I know

 3  that I need to dismiss the attorneys for essentially an

 4  ancillary proceeding at 11:30.  I have full intentions of

 5  doing so.

 6          I don't want to interrupt your witness lineup in

 7  any way, Mr. Cogdell.  What are your proposals for the next

 8  thirty minutes?

 9          MR. COGDELL:  We didn't -- well, I asked the Court

10  yesterday -- I asked the Court yesterday if we could have

11  until after lunch to present -- to begin presenting our

12  witnesses, and the Court granted me that.

13          THE COURT:  Okay.  I did not recall that.  I think

14  you -- yes, that is my recollection as well.

15          Do we need to take up any of the pending motions

16  that were filed under seal regarding witnesses who may or may

17  not appear?

18          MR. COGDELL:  I don't believe so, Your Honor.

19          THE COURT:  Okay.  This is what we'll do.  I will

20  bring the jury back.  I'll instruct them that they will

21  receive an early lunch break.  Although, I'll need to

22  coordinate with the timing of catering and the rest, but

23  we'll stand in recess until the conclusion of that lunch

24  break.

25          Do we think a 1:00 start time works for the defense

(Outside of the Jury's Presence)

1   team?

2           MR. COGDELL:  I think that should be fine, Your

3   Honor.

4           THE COURT:  Okay.  So let's do a lot of

5   housekeeping and cleanup in those intervening moments.  And

6   good news, like everything in West Texas, we start early, and

7   lunch has arrived.  So I think I'll be able to announce to

8   the jury that they'll go straight into an early lunch.

9           I do want to make some findings just for the

10  record.  We have a lot of motions practice that hasn't

11  received rulings from the Court specific to some of those

12  sealed documents.

13          I'll instruct the CSOs and Marshals to seal this

14  courtroom for that proceeding.  This Court will just make

15  some findings as to that motions practice.  That will

16  adjudicate those motions that are pending.  And, after that,

17  the parties will be free to move into the Defendant's

18  case-in-chief, move into the lunch hour, and then we'll

19  reconvene at 1:00.  So that's -- that's the itinerary for the

20  next two hours.

21          So I'll instruct the CSOs and Marshals to bring in

22  the jury.

23          COURT SECURITY OFFICER:  All rise for the jury.

24      (The jury returned to the courtroom.)

25          THE COURT:  Okay.  Please be seated.  After

1    conferring with the counsel in this case and confirming that

2    catering has arrived early, it's the Court's determination

3    that the best use of judicial resources is to recess for an

4    early lunch, beginning at 11:00, and then to stand in recess

5    through 1:00.  So you'll begin your lunch break at this

6    point.

7            I will admonish you to follow the Court's prior

8    instructions on not discussing this case, even amongst

9    yourselves.  Please do not discuss this case with friends or

10   family members, and please do not use independent means of

11   research to access information about this case, its

12   participants, the defendant.  We don't allow for Google or

13   Internet researching of any kind as we have discussed at

14   multiple breaks.

15           Everything you need to know about this case is

16   within the four walls of this courtroom.  So I'll just

17   admonish you to follow those instructions.  If I missed any

18   of the admonishments I'll incorporate by reference what I've

19   told you before.

20           When we return, the Defendant will present his

21   case-in-chief, so, from that point forward, it will be the

22   Defendant's case.  I'm advised by counsel that 1:00 is the

23   best start time, and you will be essentially in break until

24   1:00.

25           So keep your jury badges on.  Do not talk to any --

Housekeeping Matters
(Outside of the Jury's Presence)

1  anybody in the courtroom.  That jury badge identifies you as

2  a juror, so it will keep court staff away and attorneys away,

3  so just use your badge.

4         You may leave any notes, notepads in your seats.

5  We'll place those under secure lock and key, and they will be

6  there when you return to your seat.

7         So, at this point, I am dismissing you for your

8  lunch break.

9         COURT SECURITY OFFICER:  All rise.

10     (The jury leaves the courtroom.)

11              --------------------------

12

13     (Sealed Motions Hearing held and filed under separate

14     sealed volume in Sealed Hearing Volume I of I, 10/13/2021.)

15

16              --------------------------

17     (The following took place in open court with the

18     defendant present, but without the jury.)

19         THE COURT:  Please be seated.  Okay.  Just very

20  briefly, some housekeeping.  We are working diligently to

21  prepare a consolidated Word document version of the proposed

22  jury charge that includes requested and disputed language

23  from both parties.  You'll have that shortly.

24         I wanted to flag one case relevant to unanimity.

25  I'll expect the parties to be prepared to argue that case on

1  requested unanimity language.  *United States versus Sila*,

2  S-I-L-A, 978 F.3d 264.  And that's a 2020 case.  The parties

3  have cited cases that predate that newer case, and so I think

4  you should add that to your inventory.

5       We will argue that at the Charge Conference, and

6  that might control our discussion of that particular

7  instruction.

8       Mr. Cogdell, are you prepared to present your

9  case-in-chief?

10       **MR. COGDELL**:  We are prepared --

11       **THE COURT**:  We, okay.

12       **MR. COGDELL**:  -- to present our case-in-chief, yes,

13  sir.

14       We do have an issue we probably ought to approach

15  on regarding Mr. Darter.

16       **THE COURT**:  Okay.

17       **MR. COGDELL**:  He's not going to be our first

18  witness, but --

19       **(The following took place at the bench and outside the**

20  **hearing of open court.)**

21       **THE COURT**:  And, again, I will just instruct you to

22  be careful to speak into the microphone.

23       **MR. COGDELL**:  Yes, sir.  There is a motion in

24  limine that prevents each side from discussing Mr. Reagor's

25  net worth.  That said, it's important for the jury to

1    understand that that -- sort of a general picture of Mr.

2    Reagor's wealth at the time of this loan, meaning Mr. Darter

3    is prepared to testify that Mr. Reagor had substantial

4    capital in addition to the 1.6 or 7 that he got out of this.

5    In other words, he could have done the same thing out of his

6    other money, and I think the jury needs to understand that.

7         THE COURT:  Okay.  Response from the Government?

8         MR. HAAG:  Yes, Your Honor.  The Defense filed a

9    motion in limine asking that we not get into personal net

10   worth.  We agreed to that.  The Court ordered that.

11        It is extremely unfair and improper to switch after

12   the Government has rested and change the rules now that the

13   Government has rested.

14        THE COURT:  Well, it's an Order in Limine, so the

15   instruction is to approach on the point.  This is where we

16   hear argument on that.  I do agree we have now redacted

17   exhibits to omit references to net worth.

18        MR. COGDELL:  And if we need to indact that to go

19   back and make it fair to the Government, that's fine.  But

20   what I wish --

21        THE COURT:  And remind me again.  I'm sorry,

22   refresh my recollection.  Chuck Darter is who?

23        MR. COGDELL:  Mr. Reagor's CPA.

24        THE COURT:  Okay.  Not an expert.  I think your

25   experts are Franklin Snyder --

1          **MR. COGDELL:**  He's not listed as an expert, that's

2     correct.  Yes, sir.

3          **THE COURT:**  Okay.  I don't think I'm going to allow

4     it at this point because this deep into the trial, all the

5     redactions have been made based on the Defendant's own motion

6     that references to net worth are potentially prejudicial.

7          I've instructed the Government to strike and redact

8     net worth statements exhibit by exhibit through all the

9     witnesses that we've had up to this point, and the Court does

10    find under 403 that whatever probative value resides in that

11    anticipated testimony is easily outweighed by the substantial

12    prejudice to the Government, but then also potential

13    confusion to the jury.

14          We've done this case strictly on the transactions

15    that the parties agreed to and working diligently to reduce

16    the list to agreed exhibits, agreed witnesses, and we've

17    omitted net worth up to this point.

18          So to pivot to a conversation about additional

19    accounts, all of which are outside the scope of anything the

20    Government was allowed to present, would be unfair prejudice

21    to the Government, but also potentially confusing to the

22    jury.

23          **MR. POWELL:**  Your Honor, can I offer somewhat of a

24    compromise?

25          **THE COURT:**  What?

 1          MR. POWELL:  Can I offer somewhat of a compromise?

 2          THE COURT:  As you have your A&M ring next to my UT

 3   mug.  Let me move that.

 4          MR. POWELL:  I know.  I know.  I mean, I was -- it

 5   was kind of --

 6          MR. COGDELL:  I'm with you on that.

 7          MR. POWELL:  -- burning me a little bit when I was

 8   sitting there, Your Honor.

 9          THE COURT:  Well, my wife's an Aggie, so it's okay.

10          MR. POWELL:  So, anyway, so I think -- and our

11   position is, there's been an inference made that Mr. Reagor

12   needed this 1.7 million to take care of his bills.  I think

13   that was with -- with the witnesses, that's been done quite a

14   bit.

15          If we could just when the accountant testifies ask

16   him some minor questions such as -- not ask what his net

17   worth is, but ask did he have -- was there a need for him to

18   get this 1.7 to pay his bills, to do the things that he

19   wanted to do, to pay the house remodels, and things of that

20   nature.  Did he need that money in order to pay those bills,

21   or did he have sufficient funds to take care of those issues

22   prior --

23          THE COURT:  I will allow you to make that argument

24   based on the pre-admitted exhibits that the parties have

25   agreed to.

1          So if Mr. Darter is familiar -- because we did the

2   redactions consistent with the Court's ruling that net worth

3   will not be a part of this case, but if you want to point out

4   these checks, these checks, these checks, this account

5   statement, which omits net worth statements, all reflect that

6   there were resources available, and if you total those --

7          MR. POWELL:  Yes, sir.

8          THE COURT:  -- that he had more ability to pay than

9   has been represented by the Government, if you do it on the

10  exhibits, I'm fine with that.  But just general statements

11  about net worth have not been a part of this case thus far.

12         MR. POWELL:  I'm not going to ask his net worth.  I

13  will not ask his net worth, I promise.

14         MR. HAAG:  I don't want to get into other accounts,

15  okay, because the only account that's at issue obviously is

16  the one that the IBC loan proceeds went into, and that's the

17  only one we've talked about.

18         THE COURT:  Oh, I'm speaking to exhibits, so --

19         MR. HAAG:  Exactly.

20         MR. FRAUSTO:  And the other ones are the business

21  accounts, so the only personal account he has is the one at

22  Prosperity Bank.

23         MR. COGDELL:  Surely, you're not going to preclude

24  Mr. Reagor from testifying as to, not necessarily his net

25  worth, but he had access to other funds.

 1          THE COURT:  No, I'm not going to make that ruling,

 2   no, but the idea that the accountant is going to state that

 3   he had a billion dollars.

 4          MR. COGDELL:  Oh, no --

 5          MR. POWELL:  He's not going to --

 6          MR. COGDELL:  -- he's not going --

 7          MR. POWELL:  -- say that.

 8          MR. COGDELL:  -- to state anything.

 9          MR. POWELL:  He's not going to say that.

10          MR. COGDELL:  He's not going to state anything.

11   He's not going to state his net worth.  He's not going to

12   state a billion dollars.  He's going to say --

13          MR. FRAUSTO:  That's two people talking to the

14   Court, so --

15          MR. COGDELL:  Sorry.  I'm sorry, my bad.

16          MR. POWELL:  Sorry.

17          THE COURT:  Mr. Cogdell, I'll announce each, and

18   then we'll move the microphone.  Mr. Cogdell?

19          MR. COGDELL:  He's not going to say he had X, Y, or

20   Z amount of money.  He's not going to state his net worth.

21   He's simply going to say that he had resources that allowed

22   him to maintain the lifestyle that he was maintaining without

23   the need for --

24          THE COURT:  Can he do that using the exhibits that

25   have been pre-admitted?

Bench Conference

1           MR. COGDELL:  I don't know if he's seen those

2    exhibits, but he's been Mr. Reagor's CPA for --

3           MR. POWELL:  The last --

4           MR. COGDELL:  -- twenty years.

5           MR. POWELL:  -- twenty years.

6           THE COURT:  Okay.  Mr. Haag?

7           MR. HAAG:  Yes, Your Honor.  Again, regardless of

8    whether he could have paid them with other funds doesn't

9    matter.  The point is, he used the working capital loan

10   proceeds to make these payments.

11          THE COURT:  Right.

12          MR. HAAG:  So, again, if Mr. Darter wants to talk

13   about anything in that bank account with Prosperity Bank, be

14   my guest, but we would object to him bringing up any other

15   accounts or outside wealth, because y'all didn't want it

16   coming in.

17          THE COURT:  Now, Mr. Powell?

18          MR. POWELL:  I'm sorry.  I know you're moving the

19   mike, Your Honor.

20          I guess the position goes back to the inference has

21   been made now that the reason that the loan payments via that

22   loan -- the reason that he took this money and committed

23   fraud is because he needed those assets to take care of his

24   house and --

25          THE COURT:  I don't think there's been an inference

1    as to his personal insolvency.  Now, insolvency may be an

2    event of default under the loan agreement.

3         But the reason the Government, as I understand it,

4    put on evidence of tracing is because that's specific to the

5    elements of the offense.  These funds originated in a loan

6    with particular strictures on their disbursement, and then

7    were disbursed into personal accounts.

8         Now, if it was for the reasons of a house, for the

9    reason of paying a pool boy, whatever, that's all fine, but I

10   have not discerned an inference that he was bankrupt; he was

11   going into insolvency.

12        They very carefully avoided reference of that

13   consistent to the Court's orders in limine and otherwise, so,

14   at this point, the Court will not allow references to net

15   worth.

16        **MR. POWELL**:  I'm not asking that, and, Your

17   Honor --

18        **THE COURT**:  But ability to pay --

19        **MR. POWELL**:  -- I want to make abundantly clear,

20   I'm not going to say, did he have 20 million in the bank, did

21   he have 5,000,000 in the bank.  I'm not going to ask him how

22   much money he had in the bank.

23        All I want to ask him is, outside of this $1.7

24   million, did he have the ability to make the payments to take

25   care of his daily affairs, and that included his house

1   remodel that he had going on at the time.  That's all I'm

2   going to ask him about.  That's it.

3         **THE COURT**:  Mr. Haag?

4         **MR. HAAG**:  Yes, Your Honor.  I mean, whether you

5   ask it that way, I mean, you're trying to do an end-around

6   around the limine order, I mean --

7         **MR. POWELL**:  That's why I'm standing in front of

8   the bench.

9         **MR. HAAG**:  No, what I'm saying -- but what I'm

10  saying is, the Court said we're not going to talk about net

11  worth.  We're just going to talk about this, so that's what

12  we talked about.

13        If you ask his accountant, did he have other money

14  somewhere he could have paid all of this, and he says, yes,

15  the jury is going to come away thinking he's got billions,

16  trillions, who knows how much they've got, but you just leave

17  them hanging with this wealth out there --

18        **THE COURT**:  Yeah.  I'm not going to allow it.  The

19  reason I have ordered in the limine, but then now will rule

20  that net worth is not relevant under 401, that it's

21  substantially prejudicial under 403, that it's potentially

22  confusing to the jury.  It's precisely because of the other

23  reasons reflected in the Court's Order in Limine relevant to

24  civil proceedings and also criminal proceedings.

25        I don't want this case tried on the macro

1   denominator of funds and civil litigation, who owes who in

2   this bankruptcy proceeding, this civil case, even some of the

3   ancillary criminal proceedings regarding RDAG employees.

4           This was charged, as you stated, in your own

5   Defendant's Amended Motion in Limine, ECF No. 46:  The

6   Government's allegations are specific.  In particular, the

7   Government claims Mr. Reagor:  No. 1.  Represented the IBC

8   loan was for working capital, which you're allowed to go into

9   that definition.  No. 2.  Deposited the IBC loan funds into

10  his personal account on two dates.

11          For that reason, running that far afield of that

12  and into other accounts the Government has not referenced and

13  was studious in avoiding reference to, at this point would be

14  prejudicial to the Government, and it would be confusing to

15  this jury.

16          So I will not allow references to net worth.

17  That's the Court's ruling, and you may proceed according to

18  that.

19          **(The following took place in the hearing of open court.)**

20          **THE COURT:**  Okay.  With that ruling from the Court,

21  is there any additional housekeeping the Court may attend to

22  before we call the jury back?

23          **MR. HAAG:**  No, Your Honor.

24          **THE COURT:**  Anything from the Defense?

25          **MR. COGDELL:**  No, sir.

1        THE COURT:  Okay.  At this point, I will instruct

2   the CSOs and Marshals to bring back the jury.

3        COURT SECURITY OFFICER:  All rise for the jury.

4        **(The jury returned to the courtroom, and the following**

5   **took place in open court with the defendant and jury present.)**

6        THE COURT:  At this point, Defendant will begin his

7   case-in-chief.

8        And, at this time, Mr. Cogdell, you may call your

9   first witness.

10                    <u>**DEFENDANT'S EVIDENCE**</u>

11        MR. NORRIS:  It's Mr. Norris, Your Honor.  We call

12   Frank Snyder.

13        THE COURT:  And, Professor Snyder, you may approach

14   the witness chair.  Please remain standing for administration

15   of the oath.  My courtroom deputy will do that at this time.

16        **(The witness was sworn by the courtroom deputy.)**

17        THE COURT:  Please take your seat.  And the Court

18   admonishes you to speak loudly and clearly into the

19   microphone.  You may pull that closer if that helps.

20        I'll go ahead and instruct the jury that the

21   parties have agreed that this witness is pre-admitted as an

22   expert, so this now is expert testimony.  You may treat it as

23   such.

24        And, Mr. Norris, you may proceed.

25        MR. NORRIS:  Thank you, Your Honor.

1             FRANKLIN SNYDER,

2        having been first duly sworn, testified as follows:

3                   DIRECT EXAMINATION

4    BY MR. NORRIS:

5    Q.    Mr. Snyder, could you state your full name for the

6    record, please.

7    A.    Franklin Gregory Snyder.

8    Q.    And how are you employed, sir?  Are you the professor,

9    law professor that we heard about earlier?

10   A.    I'm professor of law at Texas A&M University School of

11   Law in Fort Worth.

12   Q.    How long have you been a professor at Texas A&M?

13   A.    Well, I've been at the law school since 2000.  It became

14   part of Texas A&M in 2014, so I've been with A&M for

15   six years.

16   Q.    Specifically, what courses do you teach at Texas A&M Law

17   School?

18   A.    I teach contract law, which is the basic course on

19   contracts in American law schools.  I teach business

20   organizations, which is a class that involves corporations,

21   LLCs, and limited partnerships and things like that.  I teach

22   unfair competition, securities regulation and a class called

23   advanced business law.

24   Q.    Now, as part of being a professor, do you also write

25   books and papers about those same topics that you teach?

1    A.   I do.

2    Q.   And have you -- can you briefly tell us about some of

3    the books you've written on those topics, sir?

4    A.   Well, there's a casebook that I coauthored which is used

5    in the first year contract's course.

6         Then there are three guides that are used by

7    practitioners and law students in something called the

8    Hornbook Series, which is legal publications.  One is on

9    secured transactions, which are basically loans secured by

10   things like cars that are as implicated in this case.  One is

11   on payment systems, which is a lot of checks and credit cards

12   and electronics funds transfers, and one is on sales of

13   goods.

14   Q.   So, generally, sir, these topics that you teach and that

15   you write about, are those similar to the topics that we've

16   been discussing during this trial?

17   A.   Yes, they are.

18   Q.   Is it fair to say that you are -- well, I guess you've

19   already been recognized by the Court as an expert, but is it

20   fair to say that you're an expert in those topics that we've

21   been talking about in this trial?

22   A.   Yeah, with due modesty, yes.

23   Q.   I understand.  Okay.  And are you also a licensed

24   attorney in addition to just being a professor?

25   A.   Yes.  I'm licensed in the District of Columbia and

1  Maryland, licensed by the U.S. Supreme Court, the U.S. Court

2  of Appeals for the D.C. Circuit, the Court of Appeals for the

3  Federal Circuit, and the U.S. District Court for the District

4  of Columbia.

5  Q.   Did you spend any time in private practice before

6  becoming a professor?

7  A.   Before teaching, I was an associate and a partner at the

8  Washington office of a large international law firm called

9  Latham & Watkins.

10  Q.   Okay.  Now, let's transition to focusing on the topic at

11  hand.

12  A.   Uh-huh.

13  Q.   Can you give us a brief overview of what you've reviewed

14  for your testimony here today in this case.

15  A.   Well, I've reviewed all of the exhibits that have been

16  introduced in front of the jury, including, most importantly,

17  the loan agreement, and I've listened to all of the testimony

18  of the fact witnesses in the case.  I've been here

19  throughout.

20  Q.   So, to be clear, you've heard the testimony of all the

21  Government's witnesses?

22  A.   I have.

23  Q.   And you've reviewed the loan agreement that's at issue

24  in this case that was executed on July 13th, 2017?

25  A.   Yes.

1    Q.   Did you also review all of the prior versions back and

2    forth of that loan agreement?

3    A.   Yes, I did.

4    Q.   Now, bottom line up front, based on all of this evidence

5    that you've heard in this case so far and everything that

6    you've reviewed, have you heard anything from any of these

7    government witnesses that would have constituted a default

8    under this loan agreement, in your expert opinion?

9    A.   No, I've not.

10    Q.   A similar question.  Based on all the evidence you've

11    reviewed and all the testimony that you've heard from these

12    government witnesses, is there any evidence that this

13    distribution that was taken by Bart Reagor and Rick Dykes

14    would trigger an event of default under the terms of this

15    contract, in your expert opinion?

16         MR. FRAUSTO:  Your Honor, I'm going to object.  If

17    the Court would refer the Defense attorney to Section F of

18    the motion in limine, whether or not the -- Mr. Reagor

19    violated this contract agreement; it's part of the motion in

20    limine.

21         THE COURT:  Overruled.  This is the expert who was

22    designated, pre-admitted by agreement of the parties to

23    discuss contractual terms.  Thus far, this line of inquiry is

24    focused on legal terms that do appear in that loan document,

25    including event of default.

1           And, as long as we don't run afoul of contractual

2      terms and this professor's understanding of those as an

3      expert, I will allow it.  So that objection is overruled.

4      Q.   **(By Mr. Norris)**  You want me to re-ask it.

5      A.   I think I --

6           **THE COURT:**  Please re-ask the --

7      A.   -- can answer, but I want to --

8           **THE COURT:**  I'm sorry.  Please re-ask the question

9      since that was a lengthy ruling.

10          **MR. NORRIS:**  Yes, sir.  Thank you.

11     Q.   **(By Mr. Norris)**  Okay.  Mr. Snyder, Professor Snyder,

12     excuse me, one more time.  Have you, after listening to all

13     the Government's evidence, all of their witnesses, after

14     reviewing everything that you've reviewed, have you seen or

15     heard any evidence that this distribution that was taken by

16     Bart Reagor and Rick Dykes would trigger an event of default

17     under the terms of this contract, in your expert opinion?

18     A.   No.  None of the evidence that I've heard would, in my

19     opinion, have triggered an event of default as the -- again,

20     as the terms are used in the contract.

21     Q.   Okay.  Now, last of the big questions, and then we'll

22     get into the details.  Okay.

23          Even assuming that Mr. Reagor made the statements to IBC

24     Bank that the Government's witnesses for the last day and a

25     half or so claimed that he made, even assuming that, all of

1    that is true, regarding the purpose of a loan's proceeds,

2    does any of that change your opinion that you just stated at

3    all?

4    A.   No.

5    Q.   Why not?

6    A.   Because several reasons for that.  But the first reason

7    is that representations made by the parties before the

8    contract is signed are excluded by the contract from any

9    consideration in what it means.

10        So, therefore, if Mr. Reagor had said, I plan on using

11   this for working capital, that -- and the bank said, great,

12   that would be an agreement between them, an oral agreement,

13   and oral agreements are specifically barred under the merger

14   clause put into the contract by the bank.

15   Q.   And --

16   A.   And the merger clause -- the merger clause is that

17   provision that was quoted earlier, which says this is our

18   entire agreement; there are no other oral agreements.  I

19   forget what paragraph it is.

20        But that's a standard clause.  And what that means is,

21   Mr. Reagor's statements, the bank's statements, what the bank

22   thought, what the bank's lawyers thought, even what I think

23   actually is not relevant.  It's what the contract says that's

24   relevant.

25   Q.   Okay.  And just to refresh our --

1  A.   Oh, and -- I'm sorry, another point.  Representations

2  change during the course of a negotiation.

3  Q.   Is that common --

4  A.   It is --

5  Q.   -- in a negotiation?

6  A.   -- very common that something said at the initial

7  meeting is repeated or changed or something else happens over

8  the course of the negotiation.

9       You don't always get the same interest rate that they

10  told you you might get at the first meeting.  You don't

11  always get the same protections that you get at the second

12  meeting.

13      So that's why we exclude those things basically, because

14  they just -- they're not relevant to what the parties

15  actually agree on.

16  Q.   So am I getting you right when I say that basically the

17  only thing that matters between these parties is the loan

18  agreement?

19  A.   Between the parties and whether the distributions were

20  proper under the agreement, yes.  The only thing that matters

21  is what the contract says, in my opinion.

22  Q.   Okay.  Okay.  Well, let's talk about what the contract

23  says.  So let's take a step back and kind of look at this

24  loan agreement in the four corners of it.

25      How long is that entire loan agreement, Government

1    Exhibit 2?

2    A.    Oh, there's -- I think it's 27 pages of text, and then I

3    don't know how many pages of exhibits that are added to the

4    end.

5    Q.    Okay.  And we'll get more into the details of this in a

6    second, but out of all of those 27 pages of text that you've

7    reviewed, do you know how many times that loan agreement

8    mentions the term "working capital"?

9    A.    Yes, once.

10   Q.    Now, which parts, in your opinion, of this contract or

11   this loan agreement, excuse me, are the important parts,

12   generally speaking?

13   A.    The question's a little bit vague.  You mean important

14   parts for my opinion on this, or the important parts of the

15   contract in general?

16   Q.    Well, what is the most -- so in terms -- let's talk

17   about the covenants in the contract.

18   A.    Okay.

19   Q.    Can you explain what a covenant is.

20   A.    Yes.  Contract -- contracts with 27 pages in them have

21   lots of materials in them.  Some things are very important;

22   some things are much less important; some things are,

23   frankly, we being lawyers, are things that are in there

24   because they were in a form that we used twenty years ago.

25        So they're these very long complex documents.  The

1    important parts, the things that parties have to do like pay

2    the bills when it's due, keep insurance on the property,

3    provide title insurance, all of those sorts of things are

4    called affirmative covenants.  And there's a section of the

5    contract, Section 5, which lists a number —— I forget the

6    number —— a number of affirmative contracts, the important

7    promises that are made.

8         Then there are things that you can't do, like, you can't

9    sell the property to someone else.  You can't take out an

10   extra mortgage on it.  You can't make distributions.  Those

11   are what we call negative covenants.  And those are in

12   section -- or, I'm sorry, Article 6, I think it is, in the

13   contract.

14        So those are the two big -- everything that's important

15   to the parties, the part that they focus on in negotiations

16   is in those two parts.

17        There are other things.  We have different legal terms,

18   which are not important here, for the other kinds of things

19   that happen in contracts, but covenants are the big ones.

20   Q.   Okay.  So can I direct your attention to the actual loan

21   agreement, sir.

22   A.   Sure.

23   Q.   Okay.  So I'm showing you Government Exhibit 2 on the

24   ELMO here.  Is this the negative covenants section that you

25   were just mentioning?

1    A.    Yes.

2    Q.    Okay.  And can you explain -- let's start with

3    Section 7.11 here.  Can you explain to the jury what's

4    important and what this means, in your professional opinion?

5    A.    All right.  Well, we see -- you know, this -- again,

6    this is under the covenant section.  Transactions with

7    Affiliates.  No borrower will, nor will it permit any other

8    borrower group member to, sell, lease, or otherwise transfer

9    any property or assets to, or purchase, lease or otherwise

10   acquire any property or assets from, or otherwise engage in

11   any other transactions with any of its affiliates.

12        Okay.  So basically that's a covenant that none of the

13   affiliates will transfer anything of value between

14   themselves, and that would include cash.  All right.  So

15   that's there.

16        Now, affiliates is designed -- I'm sorry, is defined

17   under the definition section.  And affiliates, as its

18   defined, are not only the entities, the various RDAG entities

19   that I think are listed there, but it includes everybody who

20   controls them, which would be Mr. Reagor and Mr. Dykes.

21        So any transfers between Mr. Reagor and Mr. Dykes and

22   any of their entities would be barred by the first part of

23   Section 11 -- sorry, Section 7.11 unless there's an

24   exception.

25   Q.    I don't want to interrupt you, but can I point your

1   attention -- so this is saying -- if I'm getting you right,

2   this is saying you're not going to do these things, and then

3   I see this word "except" --

4   A.    Uh-huh.

5   Q.    -- colon, and then we skip down where I've helpfully

6   drawn an arrow for you, we skip down to subsection (f) here

7   where it says, except you can do any distribution permitted

8   by Section 7.12.  Am I getting that correct?

9   A.    Yes, you are.

10  Q.    Can you explain to the jury the significance of what

11  that says?

12  A.    Well, a distribution from an LLC to an owner of the LLC,

13  if both of them are defined as affiliates, would be barred by

14  Section 7.11.  So what this says is, a distribution permitted

15  by Section 12 is permitted.  Okay.  In other words, it's one

16  of the exceptions to the bar, so the contract says, so long

17  as the distribution fits under 7.12, it's fine.

18  Q.    Okay.  Can I move on to Section 7.12 then?

19  A.    Sure.

20  Q.    Okay.  Okay.  And I've -- again, I've highlighted, for

21  demonstrative purposes, Section 7.12 under Government's

22  Exhibit 2.  Talk to us about this paragraph or this provision

23  (indicating), Mr. Snyder.

24  A.    Okay.

25          MR. COGDELL:  Turn it the other way, Nick.  We're

1  getting seasick.

2          MR. NORRIS:  Sorry.

3  A.   All right.  7.12 is the section that was referred to in

4  7.11 as an exception to the ban on transfers.

5  Q.   **(By Mr. Norris)**  Is this the section -- just to be

6  clear, is this the Section 7.12 that we've been talking about

7  throughout this trial?

8  A.   Yes, it is.  Well, we've talked about some of them, but,

9  yes, this is one of them.  This is one of the main sections

10 that you've been talking about.

11 Q.   Okay.  And I see it says distributions.

12 A.   Yes, it's called distributions.

13 Q.   Walk us through the meaning of Section 7.12, in your

14 professional opinion.

15 A.   All right.  Well, without lender's prior written

16 consent, borrower will not -- and note this is -- this is the

17 borrower.  It doesn't -- it doesn't use the word

18 "affiliates," so here we're only talking about members of the

19 borrower group.

20     And the reason for that is that only the -- only LLCs

21 and other kinds of business will make distributions, so

22 they're very careful in using the correct language in these

23 particular paragraphs.

24     So without lender's prior written consent, borrower will

25 not, and will not permit any other borrower group member to,

1    declare, make, or pay any distributions, either in cash or

2    any other property, or redeem, retire, repurchase, or

3    otherwise acquire any of its equity interests, if a default

4    or event of default exists or would exist therefrom.

5        So when you untangle the legalese, it says, if your

6    distribution -- if the distribution, if the payment from the

7    entity out to the members, if that would -- if the company's

8    already in default, if the LLCs -- I'm sorry, if the

9    borrower's already in default, then the distribution is not

10   permitted.

11       And if the distribution itself would result in the LLC,

12   the borrower not being able to do one of the other things

13   it's supposed to do here under the agreement, under the other

14   covenants, then it's improper.

15       But so long as there's no existing default and it would

16   not itself trigger a default, then you're free to take the

17   money -- take the money, you're free to make a distribution.

18   Distributions -- I mean, distributions, of course, are just

19   like -- they're like the dividends that shareholders get from

20   companies.  You know, shareholders get cash on a regular

21   basis from the companies, and this is how owners take

22   interest out of things like LLCs.

23   Q.   So, based on your understanding of this contract and

24   also your understanding of the evidence that you've heard so

25   far, was there a default or an event of default in this

```
 1   scenario?
 2   A.    None of the -- none of the testimony suggested to me
 3   that, under the terms of this agreement, there was a default
 4   in existence at the time the distribution was made, and
 5   nothing in the evidence suggested to me that it was the
 6   distribution rather than something else that caused the
 7   default on this particular contract.
 8         So I guess the answer to that I think is no.  No or yes,
 9   I forget how you phrased it, but --
10   Q.    I phrased it as, from your understanding, was there a
11   default or event of --
12   A.    No.
13   Q.    -- default?  Okay.
14         Now, Professor Snyder, I'd like to shift gears a little
15   bit and talk about working capital.  So you've already
16   testified that there's only -- it's only been mentioned one
17   time in the loan agreement itself?
18   A.    Uh-huh.
19   Q.    And is it defined in the loan agreement?
20   A.    In my view, it is defined because it is a financial term
21   that's used in GAAP, and in my interpretation of the
22   contract, I think that's what would be used.
23         I heard Mr. Hutchison offer a different view, which, in
24   my view, is -- I hate to say somebody's -- something's
25   erroneous or something is wrong or whatever, but I don't
```

1    think it's correct.

2    Q.   Why don't you think it's correct?

3    A.   Um, I have a very short mental train, so your question.

4    What wasn't correct?

5    Q.   Why do you think Mr. Hutchison's --

6    A.   Oh, yes --

7    Q.   -- interpretation of working capital --

8    A.   -- Mr. Hutchison's interpretation of that.  Yes.  Um,

9    first off, with the --

10        Um, could you bring it up again.

11   Q.   Sure.

12   A.   Would you bring up the default section.

13   Q.   You think it would help if I displayed the actual

14   definition --

15   A.   Yeah, yeah.

16   Q.   -- of working capital --

17   A.   I'm trying to remember --

18   Q.   -- supposedly?

19   A.   You know, we kind of get hung up on the exact --

20   Q.   Okay.

21   A.   -- loans here.

22   Q.   So I'm displaying for the record Government's Exhibit 2.

23   A.   That's not it.  That's not 2.01(b).  The default

24   provision is 8.01.

25   Q.   I want you to help me out, Professor Snyder --

```
 1    A.   Okay.  I'm sorry.
 2    Q.   -- with the --
 3    A.   I got momentarily --
 4    Q.   -- definition --
 5    A.   -- confused.  Go ahead.
 6    Q.   Okay.  Help me out with the definition of working
 7    capital, from your interpretation of the loan agreement.
 8    A.   Okay.  Working capital -- so go to -- go to the
 9    definition section.  There's so many definitions of it so far
10    that I've gotten a little bit confused myself.  I apologize.
11    It's 8.01, you know, (g), (h), somewhere down there.
12    Q.   Okay.
13    A.   Oh, I may have it here.  Government's Exhibit 2, I
14    think.
15    Q.   Yes, sir.
16    A.   Oh, I'm sorry.  Um, oh, it's -- it's terrible getting
17    old.  1.02, I'm sorry.
18         Section 1.02, Construction.  Note, the first part
19    Section 1.02, the first part has a list of definitions.  I
20    think I counted some sixty things that are separately
21    identified.
22    Q.   Okay.
23    A.   You get down to 1.02 --
24    Q.   You want me to display it?
25    A.   Oh, yes, please.
```

1    Q.    Okay.

2    A.    There's a reason why people hate lawyers.  All right.

3    Construction.

4    Q.    Good.

5    A.    All right.  If we look at (g) -- okay, these are the

6    rules that within the contract the parties say you should use

7    in interpreting the contract.  We've had that list of

8    definitions.

9          And then when you get down to (g), it says, accounting

10   and financial terms used by but not otherwise defined with

11   respect to borrower's financial statements and financial

12   position have the meanings provided under GAAP, which is the

13   generally accepted accounting principles.  And then there's

14   the UCC term.  But that says to me that we use GAAP.

15         Now, Mr. Hutchinson -- Hutchison, excuse me, Mr.

16   Hutchison said that, in his view, that sentence means that

17   only when the term -- the terms are used in the supporting

18   documents, in the financial statements and things, do they

19   carry the meaning in GAAP.

20         My problem with that is, if that's not the definition,

21   then there is no definition in the contract of what has been

22   said to be the most -- one of the single most important terms

23   in the agreement, and then we're left with a term that is

24   entirely ambiguous.

25         And as a transactional lawyer, you don't assume that the

1    parties have intentionally left an important term undefined.

2          So if there is an actual list of definitions, and it's

3    in there, great.  Then it falls under the backup provision,

4    but you try to figure out what the parties meant by it.

5          And if the default is, we have no idea what they meant,

6    then any one of the definitions used by anyone in this room

7    might be the one that Mr. Reagor thought, or Mr. Dykes

8    thought, or Mr. Smith thought, or the bank president thought,

9    or the FBI agent thought.  Any of those might be what they

10   thought, and that leaves us in a situation where we have no

11   idea.

12         So I think the interpretation that I am putting on that

13   provision -- I know it sounds complicated, but I think it's

14   the better approach, because it means that the parties at

15   least thought about what working capital meant.

16         If that's not the definition, they didn't think about

17   what working -- I'm sorry, I shouldn't say that they didn't

18   think about.  I would take from the document that the parties

19   had no agreement on what working capital meant.

20   Q.   So, if I'm getting this right, what you're saying is,

21   there was either no agreement on what working capital

22   meant --

23   A.   Uh-huh.

24   Q.   -- or essentially Mr. Hutchison's interpretation was

25   wrong, and what the contract actually says is that the

1    definition of working capital is how we define it under GAAP?

2    A.    Um, restate that.  I followed you until the second part.

3    Q.    So there's either no definition of working capital, or

4    it's the definition under the generally accepted accounting

5    principles GAAP?

6    A.    Yes.

7    Q.    Okay.

8    A.    That's where we are.

9    Q.    Okay.

10   A.    And, again, when you're interpreting a contract, you try

11   to find what evidence there is of what the parties probably

12   meant.

13         And since working capital is a financial term, and it's

14   used here, although not in the financial statements, as a

15   financial term, I think that the GAAP definition, which is

16   how much ready cash -- oh, sorry, how much ready cash and

17   things you have minus how much you owe in the near future, I

18   think that's the definition that I would use in interpreting

19   this.

20   Q.    Okay.  Well, let's go -- let's go there to the

21   accounting definition.  So if we're using that accounting

22   GAAP definition of working capital, what does it mean?  How

23   can that be used?

24   A.    Um, well, it's not useful particularly because to the

25   extent that it's important, there's so many -- the GAAP

1    definition simply says, okay, again, it's sort of what you

2    have handy and readily turnable into cash minus what you're

3    going to owe in the near future.

4         Both of those, in certain transactions, can be very

5    important, and the working capital number that you get, um,

6    can often be fought over.

7         I mean, I understood Mr. Hutchison to say that he hasn't

8    run across situations in which there's a dispute over what

9    working capital is, but those disputes are quite common in

10   many situations, and in situations in which a definition of

11   what counts as working capital is important, you tend -- I

12   mean, lawyers fight over what is and isn't in there, and they

13   battle over the terms.

14        So my assumption would be -- I shouldn't have said --

15   never mind.  Let me skip that.

16   Q.   So let's break it down for a second.

17   A.   Uh-huh.

18   Q.   The GAAP definition is current assets less current

19   liabilities --

20   A.   Uh-huh.

21   Q.   -- equals working capital?

22   A.   Right.  And that's the definition used on balance

23   sheets.  You know, any company that you look at online, you

24   can find out what their current working capital is.

25   Q.   But that definition -- sorry to cut you off.  That

1    definition is effectively just a number on an accounting

2    statement of some kind; is that fair to say?

3    A.    Yes.

4    Q.    And my question, I think, is:  Once you have that

5    number, that money under your interpretation of the

6    agreement, what can you then do with it, or what could a

7    borrower then do with it?

8    A.    Oh, I'm sorry, yes.  The working capital, once it comes

9    into the company, is used for any of the purposes, any

10   business purpose of the company.

11       And when I say "business purpose," paying the owners of

12   the company for their investment is one of the recognized

13   legitimate business purposes for using working capital.  All

14   distributions, any distribution like any other payment comes

15   out of working capital.

16       Now, there are some other -- there are -- again, there

17   are a number of uses -- let me be clear.  There are a number

18   of ways people use the term working capital.  I've heard at

19   least seven of them in this classroom, and none of them --

20   classroom.

21   Q.    In the courtroom?

22   A.    In this courtroom.

23   Q.    I got it.

24   A.    I've heard about seven of them in this courtroom, and

25   none --

1          **THE COURT**:  Although, it's starting --

2     A.   -- of them are --

3          **THE COURT**:  -- to feel like a classroom.

4     A.   -- wrong particularly because they're colloquial uses of

5     the term.

6     Q.   **(By Mr. Norris)**  Right.

7     A.   But they're all different.  I mean, for example, if

8     we're going to take -- well, no.  You can ask me about --

9     Q.   Well, how about this, Professor Snyder.  Let's --

10    A.   Sure.

11    Q.   -- just be very clear here.  So can you use working

12    capital to make a distribution to owners of a company?

13    A.   You necessarily use working capital to make

14    distributions to a company --

15    Q.   Okay.

16    A.   -- because any payment out of cash lowers current assets

17    and therefore affects working capital.

18         Now, I heard a definition, for example, that it's the

19    money that you use on a day-to-day basis to run the business.

20    Some people use that as a colloquial, but that's wrong,

21    because it's also the money you use to buy a new division.

22    It's the money that you use to make other investments.  It's

23    the money you make to upgrade your equipment.  Anything

24    that -- to rent a box at a Texas Tech football game, to

25    entertain banking, right?

1    Q.   All of those --

2    A.   All of those --

3    Q.   -- can be legitimate?

4    A.   -- are business expenses, and working capital is used

5    for any of them.

6         Now, if you don't use that definition, well, then you

7    could say, well, my view of working capital is that it means

8    what we call -- I'm blank on the term.  There's a thing

9    called permanent working capital —— all right —— which is the

10   sort of base amount that you should always have on hand to

11   make sure you can pay your bills.  All right?  That's just

12   like what we call the cash cushion.

13        But the -- whether it goes above -- if it goes below

14   that number, you may have a problem, but above it any of that

15   money is free to use for whatever you want to do.

16        And it is -- large companies take out loans to pay

17   dividends to their shareholders, and the money they receive

18   goes into working capital, and then it gets sent out and

19   deducted from working capital.

20   Q.   Okay.  Let's talk about an LLC situation because --

21   A.   Uh-huh.

22   Q.   -- that's the situation we have here; is that fair?

23   A.   Sure.

24   Q.   Okay.  Now, did you also examine the operating agreement

25   for D and R Acquisitions?

1    A.   Yes, I did.

2    Q.   And is it your understanding, based on your review of

3    the loan agreement, that D and R Acquisitions was the

4    borrower here?

5    A.   Maybe -- should I explain what an operating agreement

6    is?

7    Q.   If we can do it briefly.

8    A.   Oh, yeah, it's briefly, but an operating agreement is

9    like the articles of incorporation of a corporation.  It's

10   the document that sets up the structure of the limited

11   liability company and governs who owns it.

12        So, yes, it's a 50-percent ownership between Mr. Reagor

13   and Mr. Dykes.

14   Q.   Okay.  So, to be clear, D and R, LLC is the borrower,

15   but D and R, LLC really is Bart Reagor and Rick Dykes; am I

16   getting that right?

17   A.   Yes.  In a -- in a practical sense, that's exactly

18   right.

19   Q.   Let's talk practically for now.

20   A.   Okay.  Sure.

21   Q.   Okay.  Now, are you saying that a distribution to two

22   co-owners of an LLC was a legitimate use of the working

23   capital under this loan agreement, according to your

24   interpretation?

25   A.   Yes.  It's one of the standard recognized things that

1    you use working capital for.  Working capital in what I think

2    is the contract definition.

3         Again, if you want to use a different -- something

4    that's not mentioned in here as a term, then we might argue

5    about whether it is or isn't, but certainly under this

6    contract and under 99 percent of the cases and situations,

7    yes, it's what you do.  It's the only way you can pay it.

8    Q.   Okay.

9    A.   It's the only way to pay distributions is out of working

10   capital.

11   Q.   I want to go back to 7.12 just one time.  Okay?

12   Distributions.  So, to be clear, do you see anything in that

13   Section 7.12 that prevents that distribution to the members

14   of D and R Acquisitions, LLC?

15   A.   No.  This is specific consent -- I'm sorry, dropping

16   into my lecture voice, I'm sorry.  This is consent by the

17   lender to distributions to the owners so long as they meet

18   those two requirements.

19        If they don't meet the two requirements, which is if a

20   default or event of default exists or it would result, then

21   it's not proper.  If we don't have that ― and I've heard no

22   evidence that that's the case ― then this is in my view

23   specific consent on the part of the bank to make those

24   distributions.

25            MR. NORRIS:  Professor Snyder, I appreciate your

1    time.  Let me go ahead and pass the witness.

2              THE COURT:  Cross-examination, Mr. Haag?

3              MR. HAAG:  Thank you, Your Honor.

4              THE COURT:  And, again, because there are a lot of

5    documents and clauses and sections flying around, just start

6    by identifying the exhibit, and then we'll be able to protect

7    the record that way.  You may proceed.

8                        <u>CROSS-EXAMINATION</u>

9    BY MR. HAAG:

10   Q.   Good afternoon, Professor Snyder.

11   A.   Good afternoon.

12   Q.   How are you doing today?

13   A.   I'm very well.  Thank you.

14   Q.   All right.  We're going to talk a little bit about just

15   a few things.  Mr. Norris took --

16             MR. COGDELL:  Your Honor, can I move so I can see

17   this?

18             THE COURT:  Oh, yeah.  Let's -- is there a better

19   way to reorient that so that Defense Counsel --

20             MR. COGDELL:  I don't mind standing over here as

21   long as I don't get in the box.

22             THE COURT:  Okay.  You and the case agent can sit

23   next to each other.

24   Q.   **(By Mr. Haag)**  All right.  Let's clear up just a few

25   things, and this is going to be very short, I promise you.

```
 1              THE COURT:  Very, very briefly, Mr. Haag.  Who will
 2    be making objections?  I assume Mr. Norris still has the
 3    witness.
 4              MR. COGDELL:  Yes.
 5              THE COURT:  Okay.  So you being outside of range of
 6    the microphone is not a problem, so are you miked up, Mr.
 7    Norris?
 8              MR. NORRIS:  I am, Your Honor.
 9              THE COURT:  Okay.  All right.  You made proceed,
10    Mr. Haag.
11    Q.   (By Mr. Haag)  All right.  Mr. Norris talked to you a
12    bit about D and R Acquisitions as an LLC; is that correct?
13    A.   Yes, sir.
14    Q.   That LLC is comprised of two partners, correct?
15    A.   The term is not partners.  The term is members, but they
16    are functionally like partners, yes.
17    Q.   All right.  So an LLC has two members.  Do you have to
18    keep the LLC separate from the two members?
19    A.   No.
20    Q.   You don't?
21    A.   No.  Incorporation, you must keep the corporate accounts
22    separate from the accounts of the individual shareholders.
23         LLCs are extremely flexible in that commingling of funds
24    among the owners and the entity are fine.  And, if you're
25    about to ask why, it's because the owners pay tax on the
```

1    income whether it goes in their personal account or whether

2    it goes into the company account.  So if they put money into

3    the business or take money out of the business, there's no

4    requirement that it be kept separate because the tax will be

5    exactly the same.

6         And so one of the -- in fact, the Texas Supreme Court in

7    a --

8    Q.   Well, let me stop you --

9    A.   I'm sorry.

10   Q.   -- there before we get too far down this rabbit trail.

11   Is it advisable to keep an LLC's business separate from that

12   of its owners for liability purposes?

13   A.   For liability purposes, yes.

14   Q.   Because it --

15   A.   I'm sorry, can I rethink that?  Can you --

16   Q.   I'm not trying to trick you, I promise.

17   A.   No, I know you're not trying to trick me.  I'm trying to

18   explain this in a way that doesn't confuse me.

19   Q.   Let me just say it this way.

20   A.   Okay.

21   Q.   Is it advisable to keep the LLC separate from the

22   partners because, if there's too close a connection between

23   them, someone that sues the LLC can pierce the corporate veil

24   and go directly after its members?

25   A.   No, I don't think that's correct.

1    Q.   All right.  What about taxation?

2    A.   No, no.  What you're talking about is something called

3    piercing the corporate veil; is that --

4    Q.   Yes.

5    A.   -- the idea?  Okay.  Am I losing you?

6    Q.   Well, let's just go on, but let's --

7    A.   I might be able to --

8    Q.   In general, let me ask it this way.

9    A.   Sure.

10   Q.   In practice, do most LLCs keep their businesses separate

11   from their personal?  In other words, does the LLC and its

12   members all have just the same bank account that they pay out

13   of, or do they keep it separate?

14   A.   I don't know the numbers, but a very significant number

15   of LLCs use the personal bank accounts of the owners because

16   the taxation is the same, and it's quite convenient.

17        Larger LLCs will separately keep, for a variety of

18   purposes, separate accounts, but I think what you're

19   asking -- I don't want to try to --

20   Q.   Well, and, Professor Snyder, I just went off of what I

21   read on Bank of America's website when they were talking

22   about the advisability of LLCs having separate from their

23   members, because, number one, liability purposes and taxation

24   purposes because you can track expenses.

25   A.   Oh, okay.  All right.  Let me -- let me clarify that.

1  Q.   And, again, we're going down a rabbit trail.  I don't
2  want to go down it.
3  A.   No, no, I know, but it depends on the state you're in.
4  In some states in the union, Texas -- commingling of personal
5  and corporate assets can result in something called piercing
6  the corporate veil, which allows creditors to ignore the
7  corporation, ignore the LLC and come and take all of your
8  money.
9       Texas does not have that doctrine.  In fact, Texas,
10 almost unique among the states, has a very different
11 doctrine, and the doctrine says, as long as you have not used
12 the LLC to commit actual fraud — actual fraud means a
13 knowing lie that you made money off of, and I know that your
14 claim is that there was fraud here — but except for that,
15 you don't take that into account.  The LLC provides you with
16 the same liability.
17 Q.   Okay.  Fair enough.
18 A.   All right.
19 Q.   Let's go on to the relevant portions.  All right.  When
20 were you hired on this case?
21 A.   A couple of weeks ago.  I think it was the day after the
22 Government designated an expert, so whatever day that was, I
23 got a telephone call.
24 Q.   So if today is October 13th, so ballpark?
25 A.   Oh, I don't know.  Has it been a month?  I --

```
1    Q.   Thirty days, fourteen to thirty days?

2    A.   I would -- I would say probably about three weeks.  I

3    mean, I would just have to look at the date.

4    Q.   Okay.

5    A.   But it's not been very long, no.  There was no expert

6    contemplated, I think, until the Government designated one,

7    and then I got a telephone call.

8    Q.   All right.  How much are you being paid for your

9    testimony?

10   A.   I'm paid -- being paid $600 an hour.  Is that what we

11   agreed?  600.  Yeah.

12   Q.   How much have you billed so far?

13   A.   None.

14   Q.   Okay.  Ballpark, how many hours have you spent?

15   A.   If you'd let me have my iPad, I could tell you exactly.

16   I would say probably twenty-four at this point.

17   Q.   Okay.  There's a difference between fraud and breach of

18   contract, isn't there?

19   A.   Yes, sir.

20   Q.   What is the additional requirement for fraud, or not

21   even additional, how is fraud different from breach of

22   contract?

23   A.   Are you talking about criminal fraud or civil fraud?

24   Q.   Criminal.

25   A.   I would really -- well, fraud, in general, means an
```

1    intentionally false statement made to another knowing that it

2    was false, knowing that the other party would rely on it, and

3    getting money on behalf -- as a result, yes.  I think that's

4    what I recall from a while back.

5    Q.   All right.

6    A.   And, again -- and if that's different from what the jury

7    instruction is going to say fraud is, I apologize.

8    Q.   No, sir.  Would it be fair to say that it requires some

9    sort of false statement or material omission and an intent to

10   deceive?

11   A.   I'm not an expert in fraud, but I'm happy to state --

12   Q.   In general terms?

13   A.   Yes, in general, yeah.

14   Q.   Okay.  Breach of contract, does it require a false

15   statement?

16   A.   I didn't quite catch that, I'm sorry.

17   Q.   Does breach of contract require a false statement?

18   A.   No.  It's strict liability.

19   Q.   Does intent -- does it require an intent to deceive?

20   A.   No, it does not.

21   Q.   All right.  We're going to talk about the relevant dates

22   here.  Did you provide any advice to the defendant on

23   May 31st, 2017?

24   A.   No, I did not.

25   Q.   Did you provide any advice to the defendant on July 13th

1  of 2017?

2  A.   I did not.

3  Q.   Did you provide any advice to the defendant on

4  February 28th of 2018?

5  A.   No.  I never provided any advice to the defendant.

6       MR. HAAG:  No further questions.

7       THE COURT:  And, Mr. Haag, if we could move that to

8  reorient the lines of sight here.

9       Redirect, Mr. Norris?

10                REDIRECT EXAMINATION

11 BY MR. NORRIS

12 Q.   Let's pick up where Mr. Haag left off.  Knowing what you

13 know now, reviewing the contracts, listening to all of the

14 evidence, if you had provided advice to the defendant about

15 taking a distribution in accordance with what we've been

16 discussing, what would the advice have been?

17 A.   I would say you're fine.  Under that agreement and with

18 the facts that I've heard so far, I would say it's your

19 decision.  I'm sorry, it's yours and Mr. Dykes' decision.  It

20 would have to be a joint decision to make a distribution, but

21 yes.

22       MR. NORRIS:  Thank you, Professor Snyder.  Nothing

23 further.

24       THE COURT:  Recross by the Government?

25       MR. HAAG:  No questions, Your Honor.

```
1            THE COURT:  Okay.  And the Defendant -- does the --
2    is the Defendant content to excuse the witness at this time
3    subject to recall?
4            MR. NORRIS:  We're good with excusing him, Your
5    Honor.
6            THE COURT:  Okay.  Does the Government object to
7    this witness being excused, understanding that he is -- he
8    has been omitted from the rule and may remain present in the
9    gallery?  Is the Government okay to excuse the witness with
10   that understanding?
11           MR. HAAG:  Yes, Your Honor.
12           THE COURT:  Professor Snyder, you may return to the
13   gallery.  You are excused.
14           THE WITNESS:  Thank you, Your Honor.
15        (Witness leaves the stand.)
16           THE COURT:  And the Defendant may call his next
17   witness.
18           MR. NORRIS:  I don't have my mike, Your Honor, but
19   we call Steven Fried.
20           THE COURT:  Okay.  Mr. Fried, you may approach the
21   witness chair.  Please remain standing for the administration
22   of the oath.  And you may remove your mask for purposes of
23   testimony and the oath if you feel comfortable doing so.
24   Please raise your right hand.
25        (The witness was sworn by the courtroom deputy.)
```

```
 1              THE COURT:  Please be seated, and please be careful
 2    to speak directly into the microphone, and you may pull the
 3    microphone closer, if necessary.
 4              Mr. Norris, you may begin.
 5              MR. NORRIS:  I'm sorry, Your Honor, I don't know
 6    why I took this mike off.  That was foolish of me.
 7              THE COURT:  Well, everybody was moving about in
 8    this last episode, so it's understandable.
 9              You may proceed either from the podium or with that
10    microphone.
11              MR. NORRIS:  Thank you.
12                        STEVEN FRIED,
13        having been first duly sworn, testified as follows:
14                     DIRECT EXAMINATION
15    BY MR. NORRIS:
16    Q.   Mr. Fried, can you state your name for the record,
17    please.
18    A.   Steven Fried.
19    Q.   Now, briefly, Mr. Fried, what is your background?
20    A.   Where do you want me to start?
21    Q.   How many years did you spend in the banking industry,
22    sir?
23    A.   Thirty-three.
24    Q.   And, again, I guess briefly an overview of the positions
25    that you've held.
```

1    A.    I'm sorry, an overview of --

2    Q.    The positions you've held.

3    A.    Oh, I started in 1968 with a company called the Bankers

4    Trust Company at 16 Wall Street.  I worked there for

5    approximately seven years.

6          Then I moved to Union Bank of Los Angeles.  I worked for

7    Union Bank as a vice president and team leader, let's see,

8    for about -- about five years.

9          Following Union Bank, I went into independent banking as

10   sort of a turnaround specialist for banks that were in

11   trouble, and I worked for — I don't remember the exact

12   number right off the top of my head — but probably about

13   five banks between 1979 and 2000, and that's plus or minus my

14   banking experience.

15   Q.    Okay.  So, to be clear, you've worked for banks?

16   A.    Yes.

17   Q.    Okay.  Now, did you -- were you also -- like Professor

18   Snyder, were you also in the room for all of the Government

19   witnesses' testimony?

20   A.    Yeah, I've been here for the full trial.

21   Q.    So that would include Mr. Thomas Hutchison's testimony?

22   A.    Yes.

23   Q.    Would that also include Mr. Bill Schonacher's testimony,

24   the president of the bank?

25   A.    Yes.

```
1   Q.   And then what about William Woodring's testimony?
2   A.   Yes.
3   Q.   Now, is it true, Mr. Fried, that in these working
4   capital loan situations, are there a lot of ways for a bank
5   to protect itself in these agreements in these negotiations?
6   A.   Sure.
7   Q.   Now, you've also reviewed the -- have you also reviewed
8   the loan agreement that we've been talking about?
9   A.   I have.
10  Q.   So just give us a general overview.  Based on your
11  professional banking experience, what could this bank, IBC,
12  have done to essentially protect themselves or limit the uses
13  of this working capital if they were so concerned about that?
14          MR. HAAG:  Objection, Your Honor, calls for a legal
15  conclusion as to the drafting of the contract.
16          THE COURT:  Okay.  Sustained.  This is not the
17  witness who was designated for purposes of contract
18  construction or expert in contracts.  But if you want to
19  limit your questioning to his banking expertise, you may do
20  so.
21          MR. NORRIS:  Your Honor, if I may, it is -- he is
22  going to speak purely from the perspective of his experience
23  in actually seeing these contracts.
24          THE COURT:  If you --
25          MR. NORRIS:  I'm happy to --
```

1           **THE COURT**:  If you reformulate the question in a

2   more general form --

3           **MR. NORRIS**:  Sure.

4           **THE COURT**:  -- not specific to the legal counsel

5   that he might have provided defendant, but what do banks do

6   in his experience to protect working capital.

7           **MR. NORRIS**:  Certainly, Your Honor, I apologize.

8   Q.   **(By Mr. Norris)**  So, Mr. Fried, in your experience --

9   well, let me back up.  Have you seen working capital loans

10  get negotiated in your professional banking experience?

11  A.   Well, that's most of what I did for thirty-three years,

12  was working capital loans.

13  Q.   So a lot of them?

14  A.   A lot.

15  Q.   Okay.  In your experience, what did you see banks do to

16  protect themselves in this working capital loan situation?

17  A.   Well, you -- normally, if the loan is anything longer

18  than a very short-term loan, the bank will require financial

19  statements, which they did in this case, on an annual basis,

20  on an interim basis, maybe once a quarter; sometimes they

21  even require it once a month.

22       And if it's anything more than a short-term loan, they

23  will put together some sort of a loan agreement.  The loan

24  agreement, as Professor Snyder pointed out, has affirmative

25  and negative covenants.  Okay.  And two of the covenants that

1  did --

2         **MR. HAAG**:  Your Honor, I apologize for objecting,

3  but, again, we are drifting into contract interpretation,

4  which this expert is supposed to be an economist and express

5  opinions on financial matters.

6         **MR. NORRIS**:  Your Honor, no one claimed that he was

7  an economist.  He's a banking expert basing his experience

8  off of, it sounds like, hundreds potentially of these loan

9  negotiations and what he saw based on his experience.

10        **THE COURT**:  I will allow this line of questioning,

11  and just steer clear of any contract construction.

12        You, of course, can recall your expert on

13  contracts, but the witness is instructed to limit his

14  testimony to what was designated in the expert designations,

15  his report and any material that he relied upon in generating

16  his expert opinion.  You may proceed.

17  Q.   **(By Mr. Norris)** So, Mr. Fried, let's back up.  In your

18  personal experience, what kinds of things can a bank do to

19  protect itself in a loan agreement?

20  A.   There are two that I thought were pretty important that

21  were not included in the loan agreement.

22        There's a covenant called the debt-to-net-worth ratio,

23  and just to explain that in very simple terms, if my net

24  worth is a dollar, and I owe $5 to creditors, I have a debt-

25  to-net-worth ratio of five.  If the bank didn't want me to

1   become that leveraged, all they had to do was put in a

2   covenant that says, the debt-to-net-worth ratio will not

3   exceed, fill in the blank, whatever number they're talking

4   about.  That wasn't in the agreement.

5       Even more on point is, the same kind of a covenant with

6   respect to working capital.  They could have put in a ratio

7   in the loan agreement that says, working capital will not go

8   below a certain dollar amount or will not go below a certain

9   percentage or a ratio, and that wasn't in the agreement

10  either.

11      Those two things probably would have protected the bank

12  completely, but they weren't in the loan agreement.

13      **(Defense Attorneys' sotto-voce conference.)**

14  Q.  **(By Mr. Norris)**  So, Mr. Fried, you listened to

15  Professor Snyder's testimony.  Are you in agreement

16  ultimately that using this working capital money under this

17  loan agreement as a distribution was consistent with what the

18  bank put into this loan agreement?

19  A.  Yeah.  And I think maybe the perfect example is what Mr.

20  Dawson had to say earlier.  If you have cash in the bank of

21  $500, and you've got a current liability of -- for an

22  electric bill of $200, the working capital is $300.

23      On the day that the bank deposited the proceeds of the

24  first or the second loan, on the day they deposited that, it

25  went into the company's cash account.  By definition, it went

1    into working capital.

2    Q.   And, by definition, once it goes into their account and

3    is working capital, are you saying that they're then free to

4    use it in this way as a distribution?

5    A.   In my experience, bankers, when they make a loan for

6    so-called working capital, it's used at the discretion of the

7    company's management.  Whatever the company decides to do

8    with that money, that's part of work -- it's an adjustment on

9    working capital.

10        And if they had had those two other provisions in there,

11   they might have been precluded from doing that, but they

12   didn't have those two provisions.  So, in my opinion, it's

13   purely at the discretion of management.

14   Q.   And, in this case, the discretion of management was to

15   take this as a distribution, or, excuse me, to take part of

16   it as a distribution.  In your opinion, is that an acceptable

17   or legitimate use of the money?

18   A.   Yes.

19             THE COURT:  Mr. Haag, are you taking

20   cross-examination?

21             MR. HAAG:  Yes, Your Honor.

22             MR. NORRIS:  I'm sorry, Your Honor.  I pass the

23   witness.

24             THE COURT:  Okay.  You may approach.

25             MR. HAAG:  Thank you, Your Honor.

1        <u>CROSS-EXAMINATION</u>

2    BY MR. HAAG:

3    Q.   Mr. Fried, I have just a few questions.  When did you

4    get hired in this case?

5    A.   About three weeks ago.

6    Q.   How much are you being paid?

7    A.   $500 per hour.

8    Q.   How many hours have you put into this case?

9    A.   About twenty-five.

10   Q.   How much have you billed out so far?

11   A.   None.

12   Q.   Are you going to bill out at the end of the case?

13   A.   Yes.

14   Q.   All right.  The way I understand your testimony —— and

15   correct me if I'm wrong —— but once the loan proceeds for

16   working capital went to the business account, it's your

17   testimony that the business can do whatever it wants with it?

18   A.   Well, except for the loan agreement, if it's prohibited

19   by the loan agreement, other than that, they can do whatever

20   they want.

21   Q.   Okay.  Could they take the $10,000,000 and go to Las

22   Vegas and gamble it?

23   A.   I imagine they could, yes.

24            MR. HAAG:  No further questions.

25            THE COURT:  Redirect by the Defense?  And limit it

Stacy Mayes Morrison
Official Court Reporter

1    to subjects discussed on cross.

2                    **REDIRECT EXAMINATION**

3    BY  MR. NORRIS:

4    Q.   Mr. Fried, let's pick back up where the Government left

5    off.  So, staying with that hypothetical, is that, in fact,

6    what happened in this case; the owners took the money, the

7    proceeds to Las Vegas and gambled with it?

8    A.   Absolutely not.

9    Q.   Now, again, staying with Mr. Haag's example, had they

10   taken a distribution and gone to Las Vegas and gambled with

11   the money, as long as they paid back the loan on time, in

12   your professional experience, would there ever have been any

13   issue with the bank?

14   A.   Well, as long as there's no default and they're paying

15   on time, it's not a problem.

16   Q.   And is it also your opinion that once those

17   distributions -- or, excuse me, once the loan proceeds go

18   into the working -- into the company's account, and then they

19   come out as distributions, what are they then?

20   A.   Well, I mean, subject to whatever Professor Snyder said

21   about, you know, commingling of assets, my -- my professional

22   experience, once they take the distributions, that's Mr.

23   Reagor's money; he can do what he wants with it.

24   Q.   So, in other words, at that point, as long as he took

25   the distribution lawfully under the loan agreement and

1  consistent with what Professor Snyder said, whatever Mr.

2  Reagor did with the money after that really isn't relevant?

3  A.   Yes.

4           MR. NORRIS:  Thank you, Mr. Fried.

5           THE COURT:  Recross, Mr. Haag?

6           MR. HAAG:  No, Your Honor.

7           THE COURT:  Okay.  Mr. Norris, may this witness be

8  excused subject to recall and understanding that he is exempt

9  from the rule by agreement of the parties?

10          MR. NORRIS:  Yes, Your Honor.

11          THE COURT:  Okay.  And, Mr. Fried, you may step

12  down.  You may remain in the gallery.  The parties have

13  agreed to exempt you from the rule.

14      **(Witness leaves the stand.)**

15          THE COURT:  And the Defendant may call his next

16  witness.

17          MR. POWELL:  Your Honor, given the Court's previous

18  ruling, may we have just a couple of minutes to discuss where

19  we want to go from here?

20          THE COURT:  Okay.  Absolutely.  It is now 2:21.

21  Should we just dismiss until 3:00 -- I mean, I'm sorry, 2:30?

22  I'm not going to give you that much time.

23          MR. POWELL:  That would be plenty of time, Your

24  Honor.

25          THE COURT:  To 2:30.  That will allow both sides to

1    get organized for the next line of witnesses.  It will allow

2    for a refreshment break.

3         Court stands in recess until 2:30.  The parties are

4    instructed to reappear at that time.

5         **COURT SECURITY OFFICER:**  All rise.

6     **(Recess taken; after which, the following took place in**

7    **open court with the defendant but without the jury present.)**

8         **THE COURT:**  Please be seated.  And, before we bring

9    in the jury, I wanted to give the Defense an opportunity to

10   reassemble and reorganize.  Do you have a better idea of your

11   itinerary from this point forward?

12        **MR. POWELL:**  We do, Your Honor.

13        **THE COURT:**  Okay.  We'll call in the jury at this

14   time.

15        **COURT SECURITY OFFICER:**  All rise for the jury.

16    **(The jury returned to the courtroom.)**

17        **THE COURT:**  You may be seated.  And, Mr. Powell,

18   you may call your next witness.

19        **MR. POWELL:**  Thank you, Your Honor.  We call

20   Charles Darter.

21        **THE COURT:**  Mr. Darter, you may approach the

22   witness chair.  Please remain standing for administration of

23   the oath.

24        **MR. POWELL:**  He's still outside, Your Honor.  Sorry

25   about that.

```
 1              THE COURT:  I guess I could say it louder.
 2         (Laughter.)
 3              MR. POWELL:  I've never been accused of not doing
 4    that, Your Honor.
 5              THE COURT:  Mr. Darter, please remain standing near
 6    the witness chair for the administration of the oath, and my
 7    courtroom deputy will do that at this time.
 8         (The witness was sworn by the courtroom deputy.)
 9              THE COURT:  You may be seated, and I'll just
10    admonish you to speak clearly into the microphone.  If you
11    need to pull anything closer, you may do so.
12              And, Mr. Powell, you may proceed.
13              MR. POWELL:  Thank you, Your Honor.
14                         CHARLES DARTER,
15         having been first duly sworn, testified as follows:
16                        DIRECT EXAMINATION
17    BY MR. POWELL:
18    Q.   Sir, would you please introduce yourself to the jury.
19    A.   My name is Charles Darter.  I'm a CPA from Lubbock,
20    Texas.
21    Q.   Okay.  You said you live in Lubbock.  How long have you
22    lived in Lubbock?
23    A.   Since 1979.
24    Q.   Okay.  I want to get right into it, why you're here
25    today.  Do you know Bart Reagor?
```

1    A.   Yes, sir.

2    Q.   How do you know Bart?

3    A.   I've been Bart's CPA for -- since Bart was a senior in

4    college.

5    Q.   Okay.  There at Tech?

6    A.   Yes.

7    Q.   All right.  And so you've done his personal taxes since,

8    I guess, he was about 20, 21, 22 years old?

9    A.   Yes, sir.

10   Q.   I want to talk to you about a couple of different things

11   regarding that.  What's been your impression as far as Bart's

12   financial prowess, for lack of a better word?

13   A.   Bart is an excellent car salesman, financial prowess on

14   putting car deals together, he does really well.  As far as

15   being an expert in reading financial statements and doing

16   numbers, okay, but not great.

17   Q.   Okay.  How about documents; does he rely on you to do

18   his taxes and trust you in order to do those?

19   A.   Yes.

20   Q.   And that's for him and his wife and his family; is that

21   correct?

22   A.   That is correct.

23   Q.   Does he -- has it been your experience that he usually

24   reads those documents, or you just get him to sign, or how

25   does that work?

1    A.   We will usually go through the documents and show them

2    to him, and then he signs them and moves on down the road.

3    Q.   So the key factor is, he trusts you to take care of

4    them?

5    A.   Correct.

6    Q.   Your personal observations as far as his business is

7    concerned, have you seen and been a part of the Reagor-Dykes

8    Auto Group as it's come from its inception to where it was

9    when it was dissolved?

10   A.   Yes, sir.

11   Q.   Did you even take part of some of the organization of

12   the companies that were involved in that?

13   A.   Yes, sir.  We helped him structure the businesses in the

14   format that they ended up being.

15            **THE COURT**:  And I'll instruct the witness just to

16   be a little bit louder in projecting your voice and --

17            **THE WITNESS**:  Okay.

18            **THE COURT**:  -- also using the microphone.

19            **THE WITNESS**:  Sure.

20            **THE COURT**:  I have the same problem, so --

21            **MR. POWELL**:  Thank you, Your Honor.

22   Q.   **(By Mr. Powell)**  Mr. Darter, you're kind of soft-spoken,

23   so can I get you to keep your voice up.  Okay?

24   A.   Okay.

25   Q.   I want to talk to you about a couple of different things

1  as far as the Reagor-Dykes Auto Group is concerned.

2       Way back when, in 2013, 2014, was there some discussion

3  about the capital needed in the Reagor-Dykes Auto Group?

4  A.   Yes, sir.  We had several meetings with Bart and Shane

5  Smith, and Rick Dykes was a part of at least one of them that

6  I know of.

7  Q.   Okay.  And I don't want to talk to you -- I don't want

8  you to say what anybody said or anything like that.  But what

9  was the general purpose of having those meetings?

10 A.   Basically as the organization was growing, the business

11 needed to retain additional capital inside there to make it

12 financially healthy.

13 Q.   Okay.  And you've already stated that you were a part of

14 the inception of Reagor-Dykes Auto Group.  Was it your

15 understanding that Bart Reagor and Rick Dykes were 50-percent

16 owners of that -- of that company?

17 A.   Correct.

18 Q.   And were they taking monies from the company every

19 month?

20 A.   They took a distribution out from the company each month

21 out of a portion of the profits.

22 Q.   Okay.  Which is certainly their right to do?

23 A.   Uh-huh.

24 Q.   And I need you to say yes or --

25 A.   Yes, sir.

1    Q.    -- no on that.

2         And so were they -- were they taking a certain amount of

3    percentage as far as the profits were concerned, to your

4    knowledge?

5    A.    If I recall correctly, they were taking a 40 percent of

6    the profits that came out on a monthly basis.

7    Q.    And was the purpose of this meeting to maybe lower that

8    amount that they were taking from the company every -- every

9    month?

10   A.    We had the meeting, yes.  We discussed the need to

11   reduce the amount of the -- the percentage of capital that

12   was being withdrawn on the profits on a monthly basis.

13        At the last meeting we had, they agreed to do that, and

14   they did reduce the amount they were drawing.

15   Q.    Okay.  And what did they reduce the amount to, if you

16   recall?

17   A.    If I recall, it was 30 percent.

18   Q.    Okay.  So they seemed to understand what the need was to

19   put some more capital into the business and do that; is that

20   correct?

21   A.    That is correct.

22   Q.    And did that continue?  Was that their practice?  I

23   mean, you did his taxes.  Was that their practice, or Bart's

24   practice throughout that time until 2017, 2018?

25   A.    Yes, sir.

1    Q.   I want to talk to you about some of these events that
2    took place.
3         And, Mr. Darter, I think I know the answer to this
4    question, but I'll ask it anyway since you're his guy that
5    prepares his taxes.  Did Mr. Reagor pay his taxes and have
6    any issues regarding any of those times during those years
7    that you've known him?
8    A.   No.  Always paid his taxes on a timely basis in full.
9    Q.   With whatever profits he was taking out of the company?
10   A.   Yes, sir.
11   Q.   The same thing with this distribution that was taken
12   there, there was taxes paid on that; is that correct?
13   A.   Well, on a partnership, you pay taxes on the profits on
14   it regardless of whether you take it out of the business or
15   not, so he was paying -- paying it on the total profits of
16   what the business were.
17   Q.   So every time?
18   A.   Uh-huh.
19   Q.   I need you to say yes or no.
20   A.   Yes, sir.
21   Q.   I'm sorry.
22   A.   Yes, sir.
23   Q.   In this part of the world, we shake our head and say
24   uh-huh and all that, but you have to say yes or no, so we can
25   get it down.  Okay?

1    A.    Got it.

2    Q.    When you first heard -- and we've called -- it's been

3    called an implosion.  It's been called several different

4    things that there were some issues involving a bad audit in

5    2017 at the Reagor-Dykes Auto Group.  Are you aware of that?

6    A.    Yes, sir.

7    Q.    And did you -- how did you hear about that, or how did

8    you learn of that?

9    A.    Shane contacted me.  Shane Smith contacted me and said:

10   Hey, we've had a bad audit.  We need to raise some capital.

11   We need to talk with Bart and Rick about getting some

12   additional money into the business.

13   Q.    Okay.  Did he tell you why that had happened?

14   A.    He said they had a bad audit and had some employees that

15   were not doing things in a timely fashion.

16   Q.    Certainly didn't disclose to you all the things that

17   have subsequently came out --

18   A.    No, sir.

19   Q.    -- about what happened?

20   A.    No.

21   Q.    Did Mr. Smith make some type of comment to you about

22   going to the dark side?

23   A.    On the --

24         **MR. HAAG**:  Objection, Your Honor, calls for

25   hearsay.

1          **MR. POWELL**:  Your Honor, we would say that it's an

2     exception to the hearsay, his state of mind at the time that

3     he did it and a statement against interest.  We would say

4     it's an exception to the hearsay rule.

5          **THE COURT**:  I'm going to sustain it.  You might

6     find another way to ask the question, but it's sustained at

7     this point.

8          **MR. POWELL**:  Yes, sir.

9     Q.    **(By Mr. Powell)**  Did -- without going specifically into

10    what Mr. Smith said, did he take some responsibility for what

11    had gone on?

12    A.    Yes, sir.  I met with him the Monday following the

13    implosion on Friday, and I asked him what happened, and he

14    said --

15    Q.    I don't want you to say what he said, but did he

16    take responsibility --

17    A.    He took --

18    Q.    -- for what had happened?

19    A.    -- responsibility for it, said that Bart --

20          **MR. HAAG**:  Your Honor, objection.

21          **MR. FRAUSTO**:  Objection.

22          **MR. POWELL**:  Hold on.  Okay.

23          **MR. HAAG**:  Double objection, Your Honor.

24          **THE COURT**:  Okay.  It's just -- I'll -- and we're

25    trying to move efficiently.

 1          **MR. POWELL**:  Yes, sir.

 2          **THE COURT**:  The attorneys in this case have worked

 3     extremely hard to be efficient with the court resources and

 4     the jury's time.

 5          Let's slow down.  If there's an objection, you'll

 6     usually see it when an attorney rises.  Please give me time

 7     to hear both sides of that objection to make a ruling, and

 8     then I'll instruct you, if necessary, to not answer.

 9          So, at this point, the Government's standing

10     objection to hearsay statements in this category is

11     sustained.

12          I'll instruct you to follow that instruction, to

13     not answer that question, but I'll allow you to reformulate,

14     Mr. Powell.

15          **MR. POWELL**:  Yes, sir.  Thank you, Your Honor.

16     Q.   **(By Mr. Powell)**  Mr. Darter, how many times have you

17     ever had to testify?

18     A.   Six times.

19     Q.   Six times?

20     A.   Yes, sir.

21     Q.   All right.  You're not used to doing this very often,

22     are you?

23     A.   Not very often.

24     Q.   Okay.  Listen to my specific question if you would.

25     Okay?

1   A.   Okay.

2   Q.   Without going into what anybody said, you stated that,

3   we'll call it this implosion, all of the bad things that took

4   place as the result of Mr. Smith took place on a Friday; is

5   that correct?

6   A.   That is correct.

7   Q.   And you spoke to him the following Monday?

8   A.   Yes, sir.

9   Q.   Without -- again, without going into anything he said,

10  did he take responsibility for what had happened?

11  A.   Yes, sir.

12  Q.   Did he also, again, without going into what he said,

13  ever implicate Bart Reagor or Rick Dykes in what had

14  happened?

15  A.   No, sir.

16  Q.   Just the opposite?  Just the opposite?

17  A.   Yes, sir, just the opposite.

18  Q.   The last couple of questions, Mr. Darter.  Based on this

19  audit that had taken place, did -- what did Mr. Reagor do in

20  response to that?

21  A.   On the first audit where it was bad, he and Mr. Dykes

22  injected capital into the business.

23  Q.   Okay.  Was that their personal -- their personal --

24  A.   Yes, sir.

25  Q.   -- finances?

1    A.   Yes, sir.

2    Q.   Okay.  So they -- when you say they injected money into

3    the business, what do you mean?

4    A.   They pulled money out of the personal bank accounts and

5    put it into the company's bank accounts.

6    Q.   We talked a little bit -- and this is the last question

7    I have for you.  We talked a little bit about Mr. Reagor

8    relying upon you to take care of his taxes, take care of his

9    finances, and those things on his personal level.

10         Was it your experience that Bart's habit, his custom,

11   his practice, whatever you want to call it, was to delegate

12   the financial parts of Reagor-Dykes Auto Group to Shane Smith?

13   A.   One hundred percent.

14   Q.   And that's based on your personal observations?

15   A.   Yes, sir.

16        MR. POWELL:  All right.  Thank you, Your Honor.  I

17   pass the witness.

18        THE COURT:  Cross-examination by the Government?

19        Mr. Frausto, you may approach, and, as always,

20   please limit your cross-examination to anything that was

21   elicited on direct.

22        You may proceed.

23                    CROSS-EXAMINATION

24   BY MR. FRAUSTO:

25   Q.   Mr. Darter, do you consider the defendant your friend?

1    A.   Yes, sir.

2    Q.   And you didn't handle his financial, just -- financials;

3    you just handled his personal taxes?

4    A.   That is correct.

5    Q.   And did you also handle the taxes prepared by

6    Reagor-Dykes Auto Group?

7    A.   Yes, sir.

8    Q.   And about how much did RDAG or Reagor-Dykes Auto Group

9    pay you each year to do those taxes?

10   A.   It depended on which one of the entities.  Each one was

11   billed out separately.  It was probably thirty, thirty-two

12   thousand a year.

13   Q.   Now, Mr. Powell asked you if you had conversations with

14   the defendant about working capital.  Shane Smith invited you

15   to describe the need for working capital to the defendant; is

16   that right?

17   A.   That is correct.

18   Q.   Now, let's go to your knowledge of the IBC loan.  Do you

19   have personal knowledge of this particular IBC loan?

20   A.   No, sir.

21   Q.   Have you ever read the IBC loan agreement?

22   A.   I've not seen the agreement, period.

23   Q.   Do you know the specifics, such as the purpose of the

24   loan?

25            MR. POWELL:  Judge, I'm going to object.  The

1    witness has testified he doesn't know anything about the IBC

2    document, and to continue asking him questions about the IBC

3    document is irrelevant.

4              THE COURT:  Response, Mr. Frausto?

5              MR. FRAUSTO:  Your Honor, I asked if he read it.  I

6    want to know if he knew the purpose of the loan.

7              MR. POWELL:  And it's outside the scope of direct

8    examination, Your Honor.  I didn't ask him one thing about

9    the IBC contract.

10             THE COURT:  Okay.  So I'll sustain the objection,

11   and the witness will be instructed not to answer.  Because

12   the witness says he has no familiarity with that particular

13   loan agreement, we won't take any other questions, and it

14   wasn't elicited on direct.  So please onto your next

15   question.

16   Q.    (By Mr. Frausto)  As the person that does taxes for the

17   defendant, were you asked -- just were you asked how to

18   structure the money that the defendant received?

19   A.   No, sir.

20             MR. POWELL:  Again, Judge, outside the scope of

21   direct examination.  The Court just ruled on that issue, and

22   Mr. Frausto just asked him another question.

23             THE COURT:  He didn't mention the loan agreement.

24   Here, as his accountant, he does review financial statements,

25   other records that is relevant, and it is within the scope of

1    his personal knowledge, so I will allow it.

2              But I will instruct the Government to keep it clean

3    between the loan agreement and this witness' testimony as an

4    accountant.

5              MR. POWELL:  Yes, sir.

6    Q.   **(By Mr. Frausto)**  As far as the $1.7 million that the

7    defendant received from IBC, do you know how it was treated

8    for tax purposes for the defendant?

9    A.   It was treated as a distribution of capital.

10             MR. FRAUSTO:  Pass the witness.

11             THE COURT:  And redirect, Mr. Powell?

12             MR. POWELL:  No, Your Honor.  We pass the witness.

13             THE COURT:  Okay.  Any additional examination by

14   the Government?

15             MR. FRAUSTO:  No, Your Honor.

16             THE COURT:  Mr. Powell, may this witness be

17   excused?

18             MR. POWELL:  Yes, Your Honor.

19             THE COURT:  And does the Government object to this

20   witness being excused?

21             MR. FRAUSTO:  No, Your Honor.

22             THE COURT:  Mr. Darter, you are excused, and please

23   return the microphone.

24        **(Witness leaves the stand.)**

25             THE COURT:  At this point, the Defendant may call

```
 1    his next witness.
 2              MR. COGDELL:  Mr. Reagor stands on the presumption
 3    of innocence and rests, Your Honor.
 4              THE COURT:  Okay.  So you will receive repeated
 5    instructions from this Court on various inferences and the
 6    rest that should be inferred.  That will be in the jury
 7    charge.
 8              At this moment, the Defendant has rested his case.
 9    I'll now afford Government an opportunity for rebuttal
10    evidence, and that will be the last phase of this trial.  So
11    we're turning now to that phase.
12              Does the Government intend to present any rebuttal
13    evidence?
14              MR. HAAG:  Your Honor, the United States of America
15    closes.
16              THE COURT:  Okay.  And does the Defendant close his
17    case?
18              MR. COGDELL:  We do, Your Honor.
19              THE COURT:  Okay.  At this point, we will take a
20    break to do additional motions practice and a Charge
21    Conference with the attorneys.  And, at that point, we
22    anticipate giving the jury the case unless anything develops
23    during those conversations with counsel that would require
24    additional time.
25              MR. HAAG:  Your Honor, if I may, just to conserve
```

1    the jury's time, I've spoken with Mr. Cogdell, and I think it

2    might be in the best interest of all parties if we do the

3    jury charge for the rest of the day, and then we will do

4    closing arguments at 8:00 tomorrow morning, if that's

5    agreeable with the Court.

6              THE COURT:  Okay.  So the hour is almost 3:00.  Mr.

7    Cogdell, is that your assessment of the best use of resources

8    and time?

9              MR. COGDELL:  It is, Your Honor.

10             THE COURT:  Okay.  So good news.  You will be

11   dismissed early today.  You have worked long hours from voir

12   dire through testimony and evidence yesterday and thereby

13   earned a hall pass at 3:00 on the second day.

14             So I -- everything from this point forward will be

15   attorney work with the Court.  It's related to the law, not

16   the facts.

17             And so, at this point, I'll instruct the Court

18   Security Officers, the Marshals, and court staff to excuse

19   you for the remainder of the day, but I will give you the

20   instruction that I've been giving you since the outset of

21   this case.

22             You're now into day two.  You've heard additional

23   names.  You've heard additional accounting terminology, legal

24   terminology.  You've heard from a law professor.  It's a

25   menagerie of personalities, terms.

(Outside of the Jury's Presence)

1      Please resist the impulse to research this case

2   independently.  Everything you need to know, again, is within

3   these four corners of this courtroom, so please resist that

4   urge.  I know it's a natural temptation in the age of Google

5   and Internet searching.

6      Also, please do not speak about this case with one

7   another, your family, your friends as you go home for the

8   evening.  Let's take this thing to closing argument, and then

9   you will have the case in short order tomorrow.

10     So with those instructions and incorporating by

11  reference the instructions that I gave you earlier, you are

12  dismissed.  Please keep your jury badge on as you're moving

13  throughout the building.  And you may leave your notes and

14  pens.  I will instruct court staff to secure those.  They

15  will be in your chair when you return tomorrow.  You are

16  dismissed.

17          **COURT SECURITY OFFICER**:  All rise.

18       **(The jury recessed and leaves the courtroom.)**

19          **THE COURT**:  And please be seated.  Okay.  At this

20  point, Mr. Cogdell, I anticipate that the Defense will

21  re-urge or I should say renew it's Rule 29 Motion for

22  Judgment of Acquittal.

23          **MR. COGDELL**:  You are, as always, correct.  We move

24  pursuant to Rule 29(b) of the Federal Code of Criminal

25  Procedure for a Motion for Judgment of Acquittal on all

(Outside of the Jury's Presence)

1    counts based upon the reality that, at the conclusion of all
2    the evidence, there's not sufficient evidence for a rational
3    jury to conclude the elements of each offense has been
4    committed beyond a reasonable doubt.
5         **THE COURT**:  Okay.  I have your motion.  And, Mr.
6    Haag, a response from the Government?
7         **MR. HAAG**:  Yes, Your Honor.  The United States will
8    incorporate the arguments that are set forth in its trial
9    brief, and we believe the motion should be denied.
10        **THE COURT**:  Okay.  And, here, the Court denies the
11   Defendant's Motion for Judgment of Acquittal pursuant to
12   Federal Rule of Criminal Procedure 29(a), and the Court does
13   separately and independently determine that the evidence
14   presented is sufficient to sustain a conviction on all four
15   counts of the Indictment, as required by those rules, and
16   that this case may proceed to the jury.
17        And, at this point, is there any housekeeping
18   before we go into a Charge Conference, or do the attorneys
19   want a break, given that I dropped a new Westlaw case on you
20   at the last conference.
21        **MR. COGDELL**:  I'd like a break, Your Honor, and,
22   beyond that, with the permission of the Court and my client,
23   Mr. Reagor, I'm going to let our competent team, more than
24   competent team handle the jury charge issues.  I'm going to
25   retire to my hotel to begin working on my final argument.

1    I'm pretty slow at creating those things.  So with the

2    Court's permission?

3           THE COURT:  Yes, it's your prerogative.  Who will

4    take lead from this point forward into the Charge Conference?

5           MR. COGDELL:  Mr. Norris.  He's the biggest guy

6    here.

7           THE COURT:  Okay.  All right.  Mr. Norris, I'll

8    look for you at the Charge Conference.

9           We're also going to take time to print copies.

10   We've combined the requested instructions from both parties.

11   As promised, there will be one consolidated copy.  We're

12   well ahead in that process.

13          I will admonish both sides to be prepared to argue

14   unanimity.  So here we go again.  I know at least three of us

15   have been in this courtroom arguing jury charge before, and

16   so we'll do that process.  Just be prepared to make those

17   arguments.

18          Is thirty minutes sufficient for everybody to

19   prepare for the Charge Conference and any other cleanup and

20   housekeeping that we need to do before we go to closing

21   arguments tomorrow morning?

22          MR. COGDELL:  Could you give forty-five, Your

23   Honor?

24          THE COURT:  I'll give you an hour.  We will return

25   to court at 4:00.  I actually don't anticipate the Charge

(Outside of the Jury's Presence)

1    Conference taking that long.

2              I'll also inquire about any other findings the

3    Court needs to make before we go into closing arguments

4    relevant to the Fifth Amendment, any witnesses, things like

5    that.  I think we can actually get that done easily within

6    two hours.

7              So I'll instruct the parties, counsel, to return at

8    4:00.  And, Mr. Cogdell, from this point forward, you are

9    excused until tomorrow morning.

10             MR. COGDELL:  Thank you, Your Honor.

11             MR. HAAG:  Thank you, Your Honor.

12             COURT SECURITY OFFICER:  All rise.

13        (Recess.)

14

15                   -------------------------

16

17        (Charge Conference held and filed under separate volume

18    in Trial Volume III of IV)

19                       *   *   *   *   *   *

20

21        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
22   I further certify that the transcript fees format comply with
     those prescribed by the Court and the Judicial Conference of
23   the United States.

24   s/Stacy Mayes Morrison          11/10/2021
     Stacy Mayes Morrison            Date
25   Official Court Reporter

Stacy Mayes Morrison
Official Court Reporter