```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT  OF TEXAS
 2                     AMARILLO DIVISION

 3    UNITED STATES OF AMERICA      §
                                    §
                                    §        CRIMINAL ACTION
 4    VS.                           §
                                    §      NO. 2:21-CR-025-Z (01)
 5    BART WADE REAGOR              §

 6    ============================================================

 7            TRANSCRIPT OF CRIMINAL TRIAL BY JURY
          BEFORE THE HONORABLE MATTHEW J. KACSMARYK
 8               UNITED STATES DISTRICT JUDGE

 9                  OCTOBER 14 & 15, 2021

10                     VOLUME IV OF IV

11                     AMARILLO, TEXAS

12    ============================================================

13                   A-P-P-E-A-R-A-N-C-E-S

14
      FOR THE GOVERNMENT:      MR. JEFFREY R. HAAG and
15                             MS. AMANDA R. BURCH
                               Assistant United States Attorneys
16                             1205 Texas Ave., 7th Floor
                               Lubbock, Texas  79401
17
                                        AND
18
                               MR. JOSHUA FRAUSTO
19                             Assistant United States Attorney
                               500 South Taylor, LB 238
20                             Amarillo, Texas  79101-2442

21

22    FOR THE DEFENDANT:       MR. DAN L. COGDELL and
                               MR. NICHOLAS HAMILTON NORRIS
23                             Jones Walker, LLP
                               811 Main Street, Suite 2900
24                             Houston, Texas  77002

25                                      AND
```

```
1    ALSO FOR DEFENDANT:          MR. DARREN TRAY PAYNE and
                                  MR. MATTHEW DANE POWELL
2                                 Payne, Powell & Truitt Law Group
                                  2529 74th Street
3                                 Lubbock, Texas  79423

4

5    COURT REPORTER:             MS. STACY MAYES MORRISON
                                  Official Court Reporter
6                                 205 E. 5th, LB #F13263
                                  Amarillo, Texas  79101
7                                 (806) 672-6219

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer.
```

1        VOLUME IV (PAGES 608 - 737)

2

3        PROCEEDINGS FOR OCTOBER 14, 2021

4                                                    PAGE

5    CAPTION/APPEARANCES...............................................    608

6    INDEX............................................................    610

7    PROCEEDINGS FOR OCTOBER 14, 2021.................................    613

8    FINAL JURY CHARGE DISCUSSIONS (OUTSIDE OF JURY'S PRESENCE)........    613

9    HOUSEKEEPING MATTERS (OUTSIDE OF JURY'S PRESENCE)................    614

10   READING OF THE FINAL JURY CHARGE.................................    617

11   CLOSING ARGUMENT OF THE GOVERNMENT...............................    637

12   CLOSING ARGUMENT OF THE DEFENDANT................................    650

13   FINAL CLOSING ARGUMENT OF THE GOVERNMENT.........................    677

14   COURT'S INSTRUCTIONS TO ALTERNATE JURORS.........................    683

15   ALTERNATE JURORS EXCUSED.........................................    685

16   COURT'S FINAL INSTRUCTIONS TO THE JURY...........................    685

17   JURY DELIBERATIONS AT 10:17 A.M. ................................    687

18   VERIFICATION OF TRIAL EXHIBITS (OUTSIDE OF JURY'S PRESENCE).......    687

19   JURY NOTE NO. 1 AT 2:56 P.M. (OUTSIDE OF JURY'S PRESENCE)........    692

20   JURY NOTE NO. 2 AT 4:44 P.M. (OUTSIDE OF JURY'S PRESENCE)........    701

21   JURY NOTE NO. 3 AT 5:38 P.M. (OUTSIDE OF JURY'S PRESENCE)........    705

22   COURT'S INSTRUCTIONS TO THE JURY.................................    708

23   JURY RECESSED FOR THE DAY........................................    709

24   HOUSEKEEPING MATTERS (OUTSIDE OF JURY'S PRESENCE)................    709

25

PROCEEDINGS FOR OCTOBER 15, 2021

|  |  | PAGE |
|---|---|---|
| PROCEEDINGS FOR OCTOBER 15, 2021................................... | 711 |
| COURT'S INSTRUCTIONS TO JURY....................................... | 712 |
| JURY DELIBERATIONS AT 10:11 A.M.................................... | 713 |
| HOUSEKEEPING MATTERS (OUTSIDE OF JURY'S PRESENCE).................. | 713 |
| JURY NOTE NO. 4 AT 11:57 A.M. (OUTSIDE OF JURY'S PRESENCE)......... | 715 |
| JURY NOTE NO. 5 AT 1:57 P.M. (OUTSIDE OF JURY'S PRESENCE).......... | 720 |
| DEFENDANT'S MOTION FOR MISTRIAL (OUTSIDE OF JURY'S PRESENCE)....... | 721 |
| GOVERNMENT'S RESPONSE (OUTSIDE OF JURY'S PRESENCE)................. | 721 |
| COURT RESERVES JUDGMENT ON MOTION (OUTSIDE OF JURY'S PRESENCE)..... | 722 |
| DEFENDANT OBJECTS TO ADDITIONAL SENTENCE ADDED TO ALLEN CHARGE (OUTSIDE OF JURY'S PRESENCE)........................................ | 723 |
| COURT OVERRULES DEFENDANT'S OBJECTION (OUTSIDE JURY'S PRESENCE).... | 725 |
| COURT READS MODIFIED ALLEN CHARGE TO THE JURY..................... | 725 |
| JURY DELIBERATIONS CONTINUED AT 2:07 P.M.......................... | 727 |
| JURY VERDICT AT 3:44 P.M.......................................... | 728 |
| VERDICT PUBLISHED................................................. | 729 |
| POLLING OF THE JURY............................................... | 730 |
| COURT'S CONCLUDING INSTRUCTIONS TO THE JURY....................... | 731 |
| JURY EXCUSED...................................................... | 732 |
| DEFENDANT RENEWS MOTION FOR JUDGMENT OF ACQUITTAL................. | 732 |
| GOVERNMENT'S RESPONSE............................................. | 733 |
| COURT DENIES MOTION FOR JUDGMENT OF ACQUITTAL..................... | 733 |
| NOTICE OF FORFEITURE.............................................. | 733 |

1        PROCEEDINGS FOR OCTOBER 15, 2021 (CONTINUED)

2                                                                    PAGE

3    COURT DEFERS RULING ON NOTICE OF FORFEITURE........................   733

4    SENTENCING SCHEDULE...............................................   734

5    CUSTODY DISCUSSIONS OR PRETRIAL RELEASE DISCUSSIONS...............   735

6    COURT'S FINDING ON DEFENDANT'S TERMS AND CONDITIONS OF PRETRIAL
     RELEASE..........................................................   736
7
     REPORTER'S CERTIFICATE...........................................   737

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Outside of the Jury's Presence)

1        <u>**PROCEEDINGS FOR OCTOBER 14, 2021**</u>

2        **(The following took place in open court with the**

3   **defendant present, but without the jury present.)**

4             **THE COURT**:  Please be seated.  The Court calls

5   Criminal Action No. 2:21-CR-025-Z-BR-1, United States of

6   America versus Bart Wade Reagor.

7             And we will now, outside the presence of the jury,

8   will finalize what we worked on yesterday during the Charge

9   Conference.

10            Are the parties in receipt of what has been marked

11  as Document 90, the Court's Order on the final remaining

12  element of the proposed jury charge?

13            **MR. HAAG**:  Yes, Your Honor.

14            **THE COURT**:  And does the Defense have a copy of

15  that Document 90?

16            **MR. COGDELL**:  Yes, sir.

17            **THE COURT**:  Okay.  Does the Government need to make

18  any objections on the record based on that final ruling or on

19  any other part of the Final Jury Charge as it was submitted

20  to the parties last night?

21            **MR. HAAG**:  No objection, Your Honor.

22            **THE COURT**:  Does the Defense need to make any

23  objections on the record outside the presence of the jury

24  relevant either to that order or the Final Jury Charge as

25  submitted last night?

(Outside of the Jury's Presence)

```
 1            MR. NORRIS:  No further objections, Your Honor.

 2            THE COURT:  Okay.  And the Court does find that you

 3    have preserved those objections at the Charge Conference for

 4    appellate purposes.

 5            MR. NORRIS:  Thank you, Your Honor.

 6            THE COURT:  So, at this point, it's my

 7    understanding from the Pretrial Conference that the parties'

 8    preference is for the Court to read the charge to the jury,

 9    and then we'll proceed with closing arguments after that.

10            Is that the protocol that the parties have agreed

11    to?

12            MR. HAAG:  Yes --

13            MR. COGDELL:  Yes.

14            MR. HAAG:  -- Your Honor, it is.

15            THE COURT:  Okay.  Mr. Cogdell, that's your

16    preference as well?

17            MR. COGDELL:  It is, Your Honor.

18            THE COURT:  Okay.  So under the rules, I'll read

19    aloud the charge.  We will then have the Rule 30 conference

20    at the bench.  Any objections to the reading of the charge

21    will be taken there.

22            I'll just reiterate that counsel should speak

23    directly into the microphones.  Without any objections to the

24    reading, then you'll return.  We'll distribute the copies,

25    and then I'll allow you to begin your closing arguments.
```

(Outside of the Jury's Presence)

```
 1              And, refresh my recollection, you do or do not want
 2     the jury to have copies of the charge during closing?  I
 3     can't recall what we decided on that.
 4              MR. COGDELL:  I'm fine either way, Your Honor.
 5              THE COURT:  Okay.  Does the Government have a
 6     preference?
 7              MR. HAAG:  My preference would be that they get the
 8     jury charge after closing argument just so that they're not
 9     distracted reading it, but --
10              THE COURT:  Okay.  That's my typical practice, but
11     I was amenable to parties' agreement on that, so I think
12     that's what we'll do.
13              We'll be making copies of those charges once all
14     the objections are on the record and once it's read aloud and
15     work diligently to make sure that those are ready after
16     closing arguments, at which point they'll be distributed.
17              Is that okay, Mr. Cogdell?
18              MR. COGDELL:  Yes, that's fine.
19              THE COURT:  Is that okay, Mr. Haag?
20              MR. HAAG:  Yes, Your Honor.
21              THE COURT:  Okay.  Please bring in the jury.
22              MR. COGDELL:  Judge, could I have 90 seconds?
23              THE COURT:  Yes.  Well, let's have 90 seconds, and
24     then bring in the jury.
25              MR. HAAG:  Your Honor, and I'm not sure if we
```

(Outside of the Jury's Presence)

```
1   covered this, but Mr. Cogdell and I are both requesting 45
2   minutes total for closing arguments.
3               THE COURT:  And are you going to distribute that
4   30, 15, or some sort of holdback?
5               MR. HAAG:  Yes, Your Honor.
6               THE COURT:  Okay.
7               MR. HAAG:  Thirty for my closing argument, and then
8   15 for rebuttal, and then I assume Mr. Cogdell uses his 45.
9               THE COURT:  For efficiency reasons, I understand
10  that you have the absolute right under the rules to make an
11  objection to the reading.  As presented to the parties last
12  night, are there any scrivener errors, any typographical
13  errors, anything that you caught in that Final Jury Charge
14  before we go to print press?
15              MR. HAAG:  No, Your Honor.
16              THE COURT:  Okay.  I'll start running the printing
17  press for the copies for the jury at this point, anticipating
18  that there won't be any final changes to that.
19              Any objections from the Defense?
20              MR. NORRIS:  No, Your Honor.
21              THE COURT:  Okay.  And, as soon as the 90 seconds
22  are expired, we'll call in the jury.
23          (Pause.)
24              COURT SECURITY OFFICER:  All rise for the jury.
25          (The jury returned to the courtroom.)
```

1          **THE COURT**:  Please be seated.  And the Court has

2     excused Mr. Cogdell very briefly for final preparations.

3          In the interim, I'm going to explain what will

4     happen next.  So the parties have closed their case.  We are

5     now entering into the phase where you will hear their closing

6     arguments on this case, but, before they do that, I will read

7     aloud the jury charge in this case.

8          This will be the document distributed after closing

9     arguments.  This will be your guide as to the law to be

10    applied to the facts in this case as you find it.  So after I

11    read this Final Jury Charge, the parties will move into

12    closing arguments.

13         The Government will begin.  They've requested

14    30 minutes; that will be followed by Defendant's closing

15    argument 45 minutes, and then the Government has requested

16    15 minutes for rebuttal, so that will be the order of

17    operation.

18         At this point, I will read you the Final Jury

19    Charge that you will later receive in hard copy form, so

20    please pay attention closely to this, but you will have a

21    hard copy after closing arguments.

22              **READING OF THE FINAL JURY CHARGE**

23         **THE COURT**:  Final Jury Charge.

24          1.03 Introduction to Final Instructions

25          Members of the Jury:

1       In any jury trial, there are, in effect, two

2  judges.  I am one of the judges; the other is the jury.  It

3  is my duty to preside over the trial and to decide what

4  evidence is proper for your consideration.  It is also my

5  duty at the end of the trial to explain to you the rules of

6  law that you must follow and apply in arriving at your

7  verdict.

8       First, I will give you some general instructions

9  which apply in every case such as, for example, instructions

10  about the burden of proof and how to judge the believability

11  of witnesses.  Then I will give you some specific rules of

12  law about this particular case, and, finally, I will explain

13  to you the procedures you should follow in your

14  deliberations.

15          1.04 Duty to Follow Instructions

16       You, as jurors, are the judges of the facts.  But

17  in determining what actually happened — that is, in reaching

18  your decision as to the facts — it is your sworn duty to

19  follow all of the rules of law as I explain them to you.

20       You have no right to disregard or give special

21  attention to any one instruction, or to question the wisdom

22  or correctness of any rule I may state to you.  You must not

23  substitute or follow your own notion or opinion as to what

24  the law is or ought to be.  It is your duty to apply the law

25  as I explain it to you, regardless of the consequences.

1        It is also your duty to base your verdict solely

2   upon the evidence, without prejudice or sympathy.  That was

3   the promise you made and the oath you took before being

4   accepted by the parties as jurors, and they have the right to

5   expect nothing less.

6                 1.05 Presumption of Innocence,

7              Burden of Proof, Reasonable Doubt

8        The indictment or formal charge against a defendant

9   is not evidence of guilt.  Indeed, the defendant is presumed

10  by the law to be innocent.  The defendant begins with a clean

11  slate.  The law does not require a defendant to prove his

12  innocence or produce any evidence at all, and no inference

13  whatever may be drawn from the election of a defendant not to

14  testify.

15       The Government has the burden of proving the

16  defendant guilty beyond a reasonable doubt, and if it fails

17  to do so, you must acquit the defendant.  While the

18  Government's burden of proof is a strict or heavy burden, it

19  is not necessary that the defendant's guilt be proved beyond

20  all possible doubt.  It is only required that the

21  Government's proof exclude any reasonable doubt concerning

22  the defendant's guilt.

23       A "reasonable doubt" is a doubt based upon reason

24  and common sense after careful and impartial consideration of

25  all the evidence in the case.  Proof beyond a reasonable

1    doubt, therefore, is proof of such a convincing character

2    that you would be willing to rely and act upon it without

3    hesitation in making the most important decisions of your own

4    affairs.

5        1.06 Evidence - Excluding What is Not Evidence

6            As I told you earlier, it is your duty to determine

7    the facts.  To do so, you must consider only the evidence

8    presented during the trial.  Evidence is the sworn testimony

9    of the witnesses, including stipulations, and the exhibits.

10   The questions, statements, objections, and arguments made by

11   the lawyers are not evidence.

12            The function of the lawyers is to point out those

13   things that are most significant or most helpful to their

14   side of the case, and in so doing, to call your attention to

15   certain facts or inferences that might otherwise escape your

16   notice.  In the final analysis, however, it is your own

17   recollection and interpretation of the evidence that controls

18   in the case.  What the lawyers say is not binding upon you.

19            During the trial I sustained objections to certain

20   questions and exhibits.  You must disregard those questions

21   and those exhibits entirely.  Do not speculate as to what the

22   witness would have said if permitted to answer the question

23   or as to the contents of an exhibit.  Also, certain testimony

24   or other evidence has been ordered removed from the record,

25   and you have been instructed to disregard this evidence.  Do

1    not consider any testimony or other evidence which has been

2    removed from your consideration in reaching your decision.

3    Your verdict must be based solely on the legally admissible

4    evidence and testimony.

5         Also, do not assume from anything I may have done

6    or said during the trial as stating that I have any opinion

7    concerning any of the issues in this case.  Except for the

8    instructions to you on the law, you should disregard anything

9    I may have said during the trial in arriving at your own

10   verdict.

11                1.08 Evidence - Inferences - Direct

12                     And Circumstantial

13        In considering the evidence, you are permitted to

14   draw such reasonable inferences from the testimony and

15   exhibits as you feel are justified in the light of common

16   experience.  In other words, you may make deductions and

17   reach conclusions that reason and common sense lead you to

18   draw from the facts which have been established by the

19   evidence.

20        Do not be concerned about whether evidence is

21   direct evidence or circumstantial evidence.  You should

22   consider and weigh all of the evidence that was presented to

23   you.

24        "Direct evidence" is the testimony of one who

25   asserts actual knowledge of a fact, such as an eyewitness.

1    "Circumstantial evidence" is proof of a chain of events and

2    circumstances indicating that something is or is not a fact.

3          The law makes no distinction between the weights to

4    be given either direct or circumstantial evidence, but the

5    law requires that you, after weighing all of the evidence,

6    whether direct or circumstantial, be convinced of the guilt

7    of the defendant beyond a reasonable doubt before you can

8    find him guilty.

9              1.09 Credibility of Witnesses

10          I remind you that it is your job to decide whether

11   the Government has proved the guilt of the defendant beyond a

12   reasonable doubt.  In doing so, you must consider all of the

13   evidence.  This does not mean, however, that you must accept

14   all of the evidence as true or accurate.

15          You are the sole judges of the credibility or

16   believability of each witness and the weight to be given to

17   the witness' testimony.  An important part of your job will

18   be making judgments about the testimony of the witnesses who

19   testified in this case.  You should decide whether you

20   believe all, some part, or none of what each person had to

21   say, and how important that testimony was.  In making that

22   decision, I suggest that you ask yourselves a few questions:

23          Did the witness impress you as honest?

24          Did the witness have any particular reason not to

25   tell the truth?

1          Did the witness have a personal interest in the

2     outcome of the case?

3          Did the witness have any relationship with either

4     the government or the defense?

5          Did the witness seem to have a good memory?

6          Did the witness clearly see or hear the things

7     about which he testified?

8          Did the witness have the opportunity and ability to

9     understand the questions clearly and answer them directly?

10          Did the witness' testimony differ from the

11     testimony of other witnesses?

12          These are a few of the considerations that will

13     help you determine the accuracy of what each witness said.

14          Your job is to think about the testimony of each

15     witness you have heard and decide how much you believe of

16     what each witness had to say.  In making up your mind and

17     reaching a verdict, do not make any decisions simply because

18     there were more witnesses on one side than on the other.  Do

19     not reach a conclusion on a particular point just because

20     there were more witnesses testifying for one side on that

21     point.  You will always bear in mind that the law never

22     imposes upon a defendant in a criminal case the burden or

23     duty of calling any witnesses or producing any evidence.

24          1.11 Impeachment By Prior Inconsistencies

25          The testimony of a witness may be discredited by

1    showing that the witness testified falsely, or by evidence

2    that at some other time the witness said or did something, or

3    failed to say or do something, which is inconsistent with the

4    testimony the witness gave at this trial.

5         Earlier statements of a witness were not admitted

6    in evidence to prove that the contents of those statements

7    are true.  You may not consider the earlier statements to

8    prove that the content of an earlier statement is true.  You

9    may only use earlier statements to determine whether you

10   think the earlier statements are consistent or inconsistent

11   with the trial testimony of the witness and therefore whether

12   they affect the credibility of that witness.

13        If you believe that a witness has been discredited

14   in this manner, it is your exclusive right to give the

15   testimony of that witness whatever weight you think it

16   deserves.

17        1.13 Impeachment By Prior Convictions (Witness)

18        You have been told that the witness, Shane Smith,

19   was convicted in 2019 of Wire Fraud, and that the witness,

20   Steven Reinhart, was convicted in 2021 of Misprision of a

21   Felony.  A conviction is a factor you may consider in

22   deciding whether to believe that witness, but it does not

23   necessarily destroy the witness' credibility.  It has been

24   brought to your attention only because you may wish to

25   consider it when you decide whether you believe the witness'

1     testimony.  It is not evidence of anything else.

2                    1.18 Expert Opinion Testimony

3            If scientific, technical, or other specialized

4     knowledge might assist the jury in understanding the evidence

5     or in determining a fact in issue, a witness qualified by

6     knowledge, skill, experience, training, or education may

7     testify and state an opinion concerning such matters.

8            Merely because such a witness has expressed an

9     opinion does not mean, however, that you must accept this

10    opinion.  You should judge such testimony like any other

11    testimony.  You may accept it or reject it and give it as

12    much weight as you think it deserves, considering the

13    witness' education and experience, the soundness of the

14    reasons given for the opinion, and all other evidence in this

15    case.

16                        1.19 On or About

17           You will note that the Indictment charges that the

18    offense was committed on or about a specific date.  The

19    Government does not have to prove that the crime was

20    committed on that exact date, so long as the Government

21    proves beyond a reasonable doubt that the defendant committed

22    the crime on a date reasonably near July 14, 2017 as to

23    Count One, February 28, 2018 as to Count Two, and October 22,

24    2016 to in or about February 2018 as to Count Three, the

25    dates stated in the Indictment.

1.21 Caution - Consider Only the Crimes Charged

You are here to decide whether the Government has proved beyond a reasonable doubt that the defendant is guilty of the crime charged.  The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you called upon to return a verdict as to the guilt of any other person or persons not on trial as a defendant in this case, except as you are otherwise instructed.

1.22 Caution - Punishment

If a defendant is found guilty, it will be my duty to decide what the punishment will be.  You should not be concerned with punishment in any way.  It should not enter your consideration or discussion.

1.23 Single Defendant - Multiple Counts

A separate crime is charged in each count of the Indictment.  Each count, and the evidence pertaining to it, should be considered separately.  The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

1.32 Similar Acts

You have heard evidence of acts of the defendant which may be similar to those charged in the Indictment, but which were committed on other occasions.  You must not consider any of this evidence in deciding if the defendant

1    committed the acts charged in the Indictment.  However, you

2    may consider this evidence for other, very limited, purposes.

3         If you find beyond a reasonable doubt from other

4    evidence in this case that the defendant did commit the acts

5    charged in the Indictment, then you may consider evidence of

6    the similar acts allegedly committed on other occasions to

7    determine:

8         Whether the defendant had the state of mind or

9    intent necessary to commit the crime charged in the

10   Indictment; or

11        Whether the defendant had a motive or the

12   opportunity to commit the acts charged in the Indictment; or

13        Whether the defendant acted according to a plan or

14   in preparation for commission of a crime; or

15        Whether the defendant committed the acts for which

16   he is on trial by accident or mistake.

17        These are the limited purposes for which any

18   evidence of other similar acts may be considered.

19                     1.40 Materiality

20        As used in these instructions, a representation,

21   statement, pretense, or promise is material if it has a

22   natural tendency to influence, or is capable of influencing,

23   the decision of the person or entity to which it is

24   addressed.  The Government can prove materiality in either of

25   two ways.  First, a representation, statement, pretense, or

1    promise is material if a reasonable person would attach

2    importance to its existence or nonexistence in determining

3    his choice of action in the transaction in question.  Second,

4    a statement could be material, even though only an

5    unreasonable person would rely on it, if the person who made

6    the statement knew or had reason to know his victim was

7    likely to rely on it.

8            In determining materiality, you should consider

9    that naivety, carelessness, negligence, or stupidity of a

10   victim does not excuse criminal conduct, if any, on the part

11   of the defendant.

12                   1.41 Knowingly - To Act

13           The word "knowingly," as that term has been used

14   from time to time in these instructions, means that the act

15   was done voluntarily and intentionally, not because of

16   mistake or accident.

17                   2.58B Bank Fraud

18           With regard to Counts One and Two of the

19   Indictment, Title 18, United States Code, Section 1344(2)

20   makes it a crime for anyone to knowingly execute a scheme or

21   artifice to obtain any money, funds, assets, securities, or

22   other property owned by or under the custody or control of an

23   insured financial institution by means of false or fraudulent

24   pretenses, representations, or promises.

25           For you to find the defendant guilty of Counts One

1  or Two, you must be convinced that the Government has proved

2  each of the following beyond a reasonable doubt:

3           First:  That the defendant knowingly executed a

4  scheme or artifice;

5           Second:  That the scheme or artifice was executed

6  to obtain money or other property from a financial

7  institution, as alleged in the Indictment;

8           Third:  That the scheme or artifice was executed by

9  means of false or fraudulent pretenses, false or fraudulent

10  representations, or false or fraudulent promises; and

11          Fourth:  That the false or fraudulent pretenses,

12  representations, or promises were material.

13          A "scheme or artifice" means any plan, pattern, or

14  course of action intended to deceive others in order to

15  obtain something of value, such as money, from the

16  institution to be deceived.  It is not necessary that the

17  Government prove all of the details alleged in the Indictment

18  concerning the precise nature of the alleged scheme or

19  artifice, or that the alleged scheme or artifice actually

20  succeeded.  What must be proved beyond a reasonable doubt is

21  that the accused knowingly executed a scheme that was

22  substantially similar to the scheme alleged in the

23  Indictment.

24          A scheme or artifice is executed by means of false

25  or fraudulent pretenses, representations, or promises when

1    the false or fraudulent pretenses, representation, or promise

2    were the mechanism inducing the bank to part with the money,

3    funds, assets, securities, or other property under its

4    control.

5          A representation, pretense, or promise is false if

6    it is known to be untrue or is made with reckless

7    indifference as to its truth or falsity.  A representation is

8    also false when it constitutes a half truth, or effectively

9    omits or conceals a material fact, provided it is made with

10   intent to defraud.

11         "Financial institution" means an insured depository

12   institution insured by the Federal Deposit Insurance

13   Corporation.

14              2.47 False Statements to a Bank

15         With regard to Count Three of the Indictment,

16   Title 18, United States Code, Section 1014 makes it a crime

17   for anyone to knowingly make a false statement to a federally

18   insured bank for the purpose of influencing the lending

19   activities of a federally insured bank.

20         For you to find the defendant guilty of Count

21   Three, you must be convinced that the Government has proved

22   each of the following beyond a reasonable doubt:

23         First:  That the defendant made a false statement

24   to International Bank of Commerce as charged;

25         Second:  That the defendant knew the statement was

1   false when the defendant made it;

2           Third:  That the defendant did so for the purpose

3   of influencing a lending action of the institution,

4   convincing the bank to give the defendant a loan for working

5   capital; and

6           Fourth:  That International Bank of Commerce was

7   federally insured.

8           It is not necessary, however, to prove that the

9   institution involved was, in fact, influenced or misled.

10  What must be proven is that the defendant intended to

11  influence the lending decision of the bank by the false

12  statement.  To make a false statement to a federally insured

13  bank, the defendant need not directly submit the false

14  statement to the institution.  It is sufficient if the

15  defendant submits the statement to a third party, knowing

16  that the third party will submit the false statement to the

17  federally insured bank.

18                  2.04 Aiding and Abetting

19              18, United States Code, Section 2

20          The guilt of a defendant in a criminal case may be

21  established without proof that the defendant personally did

22  every act constituting the offense alleged.  The law

23  recognizes that, ordinarily, anything a person can do for

24  himself may also be accomplished by him through the direction

25  of another person as his or her agent, or by acting in

1    concert with, or under the direction of, another person or

2    persons in a joint effort or enterprise.

3           If another person is acting under the direction of

4    the defendant or if the defendant joins another person or

5    performs acts with the intent to commit a crime, then the law

6    holds the defendant responsible for the acts and conduct of

7    such other persons just as though the defendant had committed

8    the acts or engaged in such conduct.

9           Before any defendant may be held criminally

10   responsible for the acts of others, it is necessary that the

11   accused deliberately associate himself in some way with the

12   crime and participate in it with the intent to bring about

13   the crime.

14          Mere presence at the scene of a crime and knowledge

15   that a crime is being committed are not sufficient to

16   establish the defendant either directed or aided and abetted

17   the crime unless you find beyond a reasonable doubt that the

18   defendant was a participant and not merely a knowing

19   spectator.

20          In other words, you may not find any defendant

21   guilty unless you find beyond a reasonable doubt that every

22   element of the offense as defined in these instructions was

23   committed by some person or persons, and that the defendant

24   voluntarily participated in its commission with the intent to

25   violate the law.

1          For you to find the defendant guilty of aiding and
2    abetting bank fraud, you must be convinced that the
3    Government has proved each of the following beyond a
4    reasonable doubt:
5          First:  That the offense of bank fraud was
6    committed by some person;
7          Second:  That the defendant associated with the
8    criminal -- I'm sorry, let me read that, reread that.
9          Second:  That the defendant associated with the
10   criminal venture;
11         Third:  That the defendant purposefully
12   participated in the criminal venture; and
13         Fourth:  That the defendant sought by action to
14   make that venture successful.
15         For you to find the defendant guilty of aiding and
16   abetting false statement to a bank, you must be convinced
17   that the Government has proved each of the following beyond a
18   reasonable doubt:
19         First:  That the offense of false statement to a
20   bank was committed by some person;
21         Second:  That the defendant associated with the
22   criminal venture;
23         Third:  That the defendant purposefully
24   participated in the criminal venture; and
25              Fourth:  That the defendant sought by action to

1    make the venture successful.

2            "To associate with the criminal venture" means that

3    the defendant shared the criminal intent of the principal.

4    This element cannot be established if the defendant had no

5    knowledge of the principal's criminal venture.

6            "To participate in the criminal venture" means that

7    the defendant engaged in some affirmative conduct designed to

8    aid the venture or assist the principal of the crime.

9            1.26 Duty to Deliberate - Verdict Form

10           To reach a verdict, whether it is guilty or not

11   guilty, all of you must agree.  Your verdict must be

12   unanimous.

13           It is your duty to consult with one another and to

14   deliberate in an effort to reach agreement if you can do so.

15   Each of you must decide the case for yourself, but only after

16   an impartial consideration of the evidence with your fellow

17   jurors.  Do not let any bias, sympathy, or prejudice that you

18   may feel toward one side or the other influence your decision

19   in any way.  In particular, do not let racial, ethnic,

20   national origin, or other bias influence your decision in any

21   way.  During your deliberations, do not hesitate to reexamine

22   your own opinions and change your mind if convinced that you

23   are wrong.  But do not give up your honest beliefs as to the

24   weight or effect of the evidence solely because of the

25   opinion of your fellow jurors, or for the mere purpose of

1    returning a verdict.

2              Remember at all times, you are judges - judges of

3    the facts.  Your duty is to decide whether the Government has

4    proved the defendant guilty beyond a reasonable doubt.

5              When you go to the jury room, the first thing that

6    you should do is select one of your number as your

7    foreperson, who will help to guide your deliberations and

8    will speak for you here in the courtroom.

9              A verdict form has been prepared for your

10   convenience.

11             The foreperson will write the unanimous answer of

12   the jury in the space provided, either guilty or not guilty.

13   At the conclusion of your deliberations, the foreperson

14   should date and sign the verdict.

15             If you need to communicate with me during your

16   deliberations, the foreperson should write the message and

17   give it to the Court Security Officer.  I will either reply

18   in writing or bring you back into the court to answer your

19   message.

20             Bear in mind that you are never to reveal to any

21   person, not even to the Court, how the jury stands,

22   numerically or otherwise, on the Indictment until after you

23   have reached a unanimous verdict.

24             And the foreperson at the appropriate time will

25   receive a copy of this verdict form, and they are responsible

1   for executing that document when you complete the

2   deliberation process, but there will only be one copy of this

3   verdict form.

4           All of you will receive copies of the jury charge

5   that I just read, and then there will be one copy of the

6   verdict form that will be maintained by the foreperson.

7           At this point, I will invite counsel to the bench

8   for a brief conference regarding the reading of the jury

9   charge, and then we will proceed to closing arguments.

10      **(The following took place at the bench and outside the**

11  **hearing of open court.)**

12          **THE COURT:**  Okay.  So under Rule 30, are there any

13  objections to the Court's reading of the jury charge --

14          **MS. BURCH:**  No, Your Honor.

15          **THE COURT:**  -- from the Government?

16          **MS. BURCH:**  No, Your Honor.

17          **THE COURT:**  Okay.  No objection.

18          Okay.  The Defendant, any objections to the Court's

19  reading of the jury charge?

20          **MR. COGDELL:**  No, sir.

21          **THE COURT:**  Okay.  We may proceed to closing

22  arguments.

23      **(The following took place in the hearing of open court.)**

24          **THE COURT:**  At this time, I've instructed the

25  attorneys that they may proceed to closing arguments.  I ask

 1    that you pay close attention.

 2            Mr. Haag, Mr. Cogdell, you can proceed according to

 3    the time intervals you presented to the Court.

 4            <u>**CLOSING ARGUMENT OF THE GOVERNMENT**</u>

 5        **MR. HAAG**:  Good morning, Ladies and Gentlemen.

 6            In a federal case, there's a tendency for the case

 7    to quickly become more complex than it needs to be.  When you

 8    layer on top of that that the case is a white-collar case,

 9    the complexity quickly can spin out of control.

10            You saw a lot of that over the last three days as

11    we've talked about Latin terms, cats and dogs and leases, had

12    a contracts professor, various sorts of topics.

13            What I want to do with my closing argument is try

14    and reorient us as to why we're here today and what we are

15    here to decide.  With that in mind, let's talk about what's

16    at issue here.

17            Counts One and Two each charge Bank Fraud.  These

18    are the elements.  I'm not going to read them out loud.  They

19    are listed in the jury charge.  You may at your leisure

20    review those and read those.

21            Count Three is Making a False Statement to a Bank.

22            In accordance with the theme here of simplifying,

23    I'm going to try and condense those down into just a couple

24    of concepts and point out what you're looking for.

25            First, before we do that, let's talk about what's

1   not at issue.  This is a stipulation.  For both of these

2   counts, there has to be what's called a federal nexus.  In

3   other words, the bank has to be insured by the Federal

4   Deposit Insurance Corporation.  There's no question of that

5   here.  You don't need to worry about that.

6          This is a fraud case.  If you forget everything

7   else that I say here this morning, I ask you to please

8   remember and write down that statement.  This is a fraud

9   case.  A fraud case means, in short, a plan, pattern, or

10   course of action intended to deceive others, and that plan

11   involves a false representation, which includes the omission

12   or concealment of a material fact if it is made with the

13   intent to defraud.

14          Continuing with the simplification, if I had to sum

15   up this case in one sentence, it would be that the defendant

16   falsely represented to IBC Bank that the purpose of the loan

17   was money for the Reagor-Dykes Auto Group to operate when, as

18   he then and there well knew, he omitted the material fact

19   that he fully intended to divert $1.766 million of the money

20   from his business to himself for his personal use and

21   benefit.

22          So the salient question, the relevant question why

23   you twelve are here today is to decide:  Did the defendant

24   defraud IBC Bank?

25          In order to answer that question, we need to talk

1   about the time period.  To assess that, we need to determine

2   the defendant's intent from early April 2017 when he and

3   other Reagor-Dykes Auto Group members met with IBC Bank up

4   until the time when they signed the loan agreement on

5   July 13th of 2017.

6          We've talked a lot about Government's Exhibit 4,

7   and that was the loan memorandum prepared by William

8   Woodring.  And you've heard a lot from the Defense about,

9   well, Reagor-Dykes didn't sign it; the defendant didn't sign

10  it.  That's not the point.  It's not a contract.

11         The point is this:  The loan memorandum was

12  prepared April 14th, 2017.  The relevance and the key to

13  Government's Exhibit 4 is IBC Bank representatives went to

14  Lubbock.  They met with the defendant.  They met with

15  Reagor-Dykes representatives.  They come back, and about a

16  week later, they write a document, almost contemporaneous

17  with that meeting, that sets out all of the representations

18  that were made to them.  It is this jury's best evidence of

19  exactly what representations were made and exactly what the

20  defendant told IBC Bank when it made the decision to extend

21  the loan.

22         What was represented?  Feel free when you go back

23  to the jury room to look at Government's Exhibit 4.  This is

24  what's called the use of funds section.  This is what we've

25  been referring to as the purpose of the loan.  This is what

1    the defendant told IBC Bank as to why Reagor-Dykes needed a

2    loan.

3           What was represented?  The entirety of the proposed

4    $10,000,000 loan will be used to inject equity, or money,

5    into the Reagor-Dykes Auto Group.  There were discussions

6    from the defendant about the remarkable growth of

7    Reagor-Dykes; that they were on pace for $800,000,000 in

8    sales; that they had this new vision of sales; that they were

9    growing so fast, they needed money to keep up with that

10   extraordinary growth.

11          Due to the enormous growth, the borrower has been

12   forced to operate with a working capital position it believes

13   to be inadequate as company growth has eaten up excess cash

14   flow to that point.  In plain English, the company is growing

15   so fast it needs cash for the company.

16          The proposed equity term loan —— and that's what

17   we've been calling the working capital loan —— provides an

18   immediate cash injection to RDAG, to Reagor-Dykes Auto Group,

19   for what?  To sustain growth goals over the next 18 to

20   24 months and provides each entity with a sizeable cash

21   cushion.

22          In summary, what did the defendant tell IBC Bank?

23   Our company's sales are off the charts.  We are growing so

24   fast that we have to have more money to sustain that growth,

25   to continue that growth, and to keep the company operating

1    with cash so that it can continue this extraordinary growth.

2            To further reinforce what was told in the meeting,

3    if you go to Page 25 of Government's Exhibit 4, they talk

4    about the actions that Reagor-Dykes took in order to improve

5    the cash flow or the actions it took to keep cash in the

6    company.  One of those actions, the owners have eliminated

7    all withdrawals as of March 2017.  In other words, what they

8    told IBC Bank is, the owners aren't taking money out of

9    Reagor-Dykes.

10           And here is why we're all here today, what was not

11   represented.  What did the defendant not tell IBC Bank?

12   Didn't tell IBC Bank that he was only going to inject

13   6.67 million into Reagor-Dykes Auto Group, and that he was

14   going to pocket $1.67 million of that loan for himself.

15           That information that's contained in Government's

16   Exhibit 4 was confirmed by IBC President and CEO Bill

17   Schonacher, former IBC President Will Woodring, and the

18   testimony of CFO Shane Smith.

19           Let's get to the next step in the fraud.  May 31st,

20   2017, about six weeks before the closing of the working

21   capital loan on July 13th.  So six weeks before that, before

22   anyone signed any contracts, this is where the defendant sets

23   out his plan to divert the proceeds intended for his business

24   to himself and to hide that fact from others at Reagor-Dykes

25   and to hide it from the bank.  Government's Exhibit 41, one

1   of the documents that you should first look to, I suggest,

2   when you go back to the jury room because it very clearly and

3   very succinctly lays out the fraud scheme.

4          Again, much like Government's Exhibit 4, is the

5   most powerful evidence that you've heard in this case because

6   it was written six weeks before the signing of the loan

7   agreement.  In other words, if you're trying to decide

8   someone's intent at a specific point in time, the best

9   evidence of that intent is, what did they write just prior to

10  the loan closing.

11         The first fact that I would ask you to look at was:

12  Who got Government's Exhibit 41?  It went to Shane Smith and

13  Rick Dykes.

14         Shane Smith, I'm sure that after I'm done speaking

15  you're going to hear a lot about Shane Smith.  Shane Smith is

16  the person that the defendant knew would follow his

17  instructions without question.  Rick Dykes had 1.766 million

18  reasons not to question the defendant's instructions.

19         I'm going to bring up Government's Exhibit 42.  As

20  I read this portion of the e-mail, I would ask, if in your

21  personal life you're a supervisor, think of it from this

22  point, or if you have a supervisor, think of it from that

23  perspective, but I want to read something, and, just as you

24  hear it, think about whether that's indicative of a normal

25  employee/supervisor relationship.

        All I have worked toward, since you brought me
onboard day one, was to enrich your lives, build your net
worth, and have your back.  I would protect you and my
family -- I'm sorry, you and your families with my life.

        For whatever reason, Shane Smith had this
relationship with the defendant where he would do anything
for him, and, as you heard, he did.

        Perhaps just as important as who got the e-mail,
who didn't get the e-mail?  The e-mail didn't include Steve
Reinhart, Rachel Reagor, or John Thompson.  Now, all those
three people are part of what's in Government's Exhibit 44 as
the Reagor-Dykes Automotive deal team, the one that the
defendant says, hey, we need to communicate openly, open
communication about this IBC loan.

        And who importantly does he omit?  Steve Reinhart
and Rachel Reagor, who are both in the legal and compliance
division of the Reagor-Dykes Auto Group.  And, for sure, he
didn't include the IBC representatives to tell him what his
plan was.

        And what could we draw from this?  The defendant
shared his plan with the person he knew would blindly obey,
unquestionably obey, and the person who would not object.  He
purposely omitted anybody who might at that point in time
come up to him and say:  Hey, whoa, stop.  You can't do that.
You've been telling the bank all along you need $10,000,000

1    for your company.  You can't suck that money out and use it

2    for yourself.

3            Diversion.  You heard during opening statement that

4    the justification for the diversion was that the evidence

5    would show the defendant invested millions of dollars of his

6    own money into Reagor-Dykes, and he believed that he could

7    reimburse himself with the working loan.

8            What did the evidence and the truth show you?  The

9    evidence that you heard from Shane Smith, who is responsible

10   for the capital raise, the defendant in March 2017 invested

11   $500,000 of his own money.  The defendant took 1.766 million.

12   And, more important, there's this argument that somehow the

13   defendant was repaying himself because Reagor-Dykes owed him

14   for personal money.  It was the exact opposite.  The

15   defendant owes Reagor-Dykes entities about $5.4 million.  The

16   proposed justification that he somehow needs to repay himself

17   is a sham, completely bogus.

18           Finally, perhaps the most impart the concealment.

19   How we are going to manage this capital is 100,000,000

20   percent, or whatever that is, confidential between us and is

21   not anyone else's business.  Nobody's.  No bankers, or anyone

22   else's.  Our business.  Game on.  It's the only portion of

23   the e-mail that was bold.  When you read Government's

24   Exhibit 41, you will readily see how it stands out.  There's

25   a few key things to look at.

1          In voir dire, when we were talking about
2   determining intent, I gave you an example of a principal, and
3   one of the scenarios I gave you is, you know, what if the
4   person that allegedly punched the other student in the face
5   had told another classmate, hey, I'm going to go confront
6   this guy in the bathroom, but don't tell anybody.  And it
7   encapsulates this common-sense principle that everybody in
8   this box understands, if you got to hide it, you probably
9   shouldn't be doing it.

10         What we are doing, what I am doing, how I am
11  telling you to divert the loan proceeds stays with us three;
12  nobody else; nobody else at Reagor-Dykes; nobody in legal;
13  nobody in compliance.  Most important, no bankers.

14         Folks, he specifically points out no bankers.  Ask
15  yourself this:  If he really thought he could do it, why did
16  he need to point out, hide it from the bankers?  He needed to
17  point out, hide it from the bankers, because he knew it was
18  wrong.  He knew he had told the bankers the whole time, I
19  need money for the Reagor-Dykes Auto Group.  And he knew that
20  taking a loan meant for the Reagor-Dykes Auto Group and
21  putting it into his mansion on 19th Street was a lie.

22         I'm going to play a couple of clips here.  As I
23  play this next clip, I want you to just listen to it, and
24  then we're going to talk about some of the inferences and
25  conclusions that you can draw from what is said here.

1    (Government's Exhibit 51 played.)

2         MR. HAAG:  The key portions of that audio tell you

3    the defendant's intent and his motive.  For the defendant,

4    his self worth, his view of himself, how he sees himself is

5    directly tied to his wealth.  Not just his wealth, but

6    showing that wealth, showing other people how wealthy he is.

7    In the defendant's mind, the more wealth that he has and

8    shows others, the better of a person he is, the better of a

9    salesperson he is.  His self worth is locked to wealth and

10   the show of wealth.

11        And when you make wealth, when you make that beast

12   drive what you do, you have to feed that beast.  That beast

13   is hungry, and that beast requires a lot of money, and it's

14   the motive for why the defendant diverted the money from the

15   IBC loan to himself.

16        The next clip that you're going to see is from

17   January 26th of 2018.  This is -- the first IBC loan closing

18   was July of 2017.  The second closing is February 26, 2018,

19   so this is going to be just about a month prior.

20        And there's no indication in the video that he's

21   specifically talking about the IBC loan, but I ask that you

22   listen to it and see, would it make sense if he was?  I mean,

23   everything that he's saying here, is that really what we've

24   got?

25        (Government's Exhibit 48 played.)

1      **MR. HAAG**:  People in that meeting may not have any

2  comprehension of what the defendant has pulled off, but you

3  certainly do.  He convinces other people, IBC Bank, to give

4  him their money, so he can use their money to increase his

5  net worth.

6          For my final slide, I want to talk about

7  materiality.  And I've saved this for the last slide because

8  I have a feeling it will come back on the rebuttal argument.

9          Materiality in plain English means:  Did the lie

10  matter?  And, just to be clear, the lie has to matter to IBC.

11  Okay.  So you've heard a little bit of argument about, you

12  know:  Hey, well, Reagor-Dykes, or Mr. Reagor, was the

13  guarantor, so, hey, who cares if he defrauded them out of the

14  money?  That twists it, right?

15          The key is:  Did it matter to IBC Bank, right?  In

16  other words, would they have made the loan if they had known

17  he was going to use it for himself?  It's not whether Mr.

18  Reagor is on the hook for the money.  It's would they have

19  made the loan.

20          So Mr. Schonacher and Mr. Woodring were clear and

21  unequivocal.  Mr. Woodring:  I wouldn't even present this

22  loan if I had known he was going to take 1.76 million.  Bill

23  Schonacher:  That proposal, if it ever came to me, would have

24  been crushed; would not even have gone to the executive

25  committee, period, full stop.

```
1              And we'll go back to voir dire, right?  Common

2    sense.  In voir dire, I talked to you about a scenario where

3    your child had asked you for money, and your child said:

4    Hey, can I borrow $20,000 to educate myself, perhaps get a

5    good job at Bell Helicopter, enrich my life, set myself up

6    for a future life of earnings?  Well, that's a good

7    investment, right?  That makes sense.

8              Your child comes to you and says:  Can I have

9    $20,000 to go to Vegas and live it up, see what happens,

10   whoo-hoo?  No, not making that loan, right?  You make the

11   first loan because there's a benefit, and you'll probably get

12   your money back.  You don't make the second loan because

13   you're probably never going to get your money back, right?

14             You had the opportunity to observe Mr. Schonacher,

15   and I want you to recall at the end when I asked him, you

16   know:  How did that loan default affect you?  And you may

17   recall, his face turned red, and you could tell he was

18   agitated, and he told you, he said:  You know, I'm the

19   president of that bank, and the depositors, the people just

20   like you that put money into the bank, they expect me to be

21   careful stewards with their money.  They want me to be smart

22   with their money.  They want me to make loans that make

23   sense, and I feel terrible because I got cheated.  I made a

24   loan that didn't make any sense, and now I'm out $22,000,000

25   that my depositors put in my trust.
```

1       Ladies and gentlemen, if you will look at what's

2   relevant here, fraud, you will find the evidence supports one

3   conclusion, and that is guilty.  Thank you.

4       **THE COURT:**  Mr. Cogdell, you may approach for your

5   closing argument and connect any technology.

6       **MR. COGDELL:**  Yes, sir.  May we approach on another

7   matter?

8       **THE COURT:**  Yes, you may approach.

9   **(The following took place at the bench and outside the**

10  **hearing of open court.)**

11      **MR. COGDELL:**  Mr. Haag, in his final argument,

12  argued that Mr. Dykes had 1.66 million reasons to not

13  question this transaction.  He has clearly opened the door to

14  my being able to argue that Dykes received the exact same

15  amount of money.

16      **MR. HAAG:**  I'm okay with that, Your Honor, because

17  it's -- I mean, it's in -- it's in Government's 41.  I just

18  would ask Mr. Cogdell not to steer towards, well, why isn't

19  Mr. Dykes sitting next to Mr. Reagor?

20      **THE COURT:**  So as long as you abide the other

21  paragraphs in the motion in limine --

22      **MR. COGDELL:**  Yes, sir.

23      **THE COURT:**  -- I'm fine, because they are business

24  partners, and his name was reflected in the loan agreement.

25  There are documents that the jury is going to have to review

```
1    that includes that partnership relationship, but please steer

2    clear of the Court's instructions on the allegations of

3    prosecution, non-prosecution, selective prosecution, and the

4    rest.

5              MR. COGDELL:  I'll do my best (chuckles).

6              THE COURT:  Okay.

7              MR. HAAG:  You better.

8              THE COURT:  All right.  There you go.

9         (The following took place in the hearing of open court.)

10             THE COURT:  Mr. Cogdell, you may proceed.

11                 CLOSING ARGUMENT OF THE DEFENDANT

12             MR. COGDELL:  Thank you.  Good morning.

13             THE JURY:  Good morning.

14             MR. COGDELL:  Thank you.  A verdict of not guilty

15   is not a dirty word.  It does not mean that you like Bart

16   Reagor.  It does not mean that you like the way he may have

17   treated people.  It does not mean that you would have done

18   the same thing as he did.

19             What it does mean is that you believe that the

20   Government has failed to prove its case and each element

21   beyond a reasonable doubt.  Nothing more, nothing less.

22             Let's begin at the beginning.  This whole thing

23   called presumption of innocence.  We tend to forget that

24   sometimes when we see emotional things played in court or

25   drama playing out in court, but every person charged in this
```

 1    country is presumed by law to be innocent.  The Indictment or

 2    formal charge against Mr. Reagor is not evidence of his

 3    guilt.  Indeed, he's presumed by the law to be innocent.  The

 4    defendant begins with a clean slate.

 5         The burden of proof is on the Government.  We have

 6    no proof.  I could sit over there and go to sleep.  It is not

 7    my nature.  It is not what I do, but I have no burden to

 8    prove to you anything.  They have the burden, and they have

 9    the burden completely.  The Government has the burden of

10    proving the defendant's guilty beyond a reasonable doubt, and

11    if it fails to do so, you must acquit the defendant.

12         A verdict of not guilty is not a leftist plot.

13    It's not a socialist uprising.  It's the right thing to do

14    when the Government has failed to prove the allegations

15    beyond a reasonable doubt.

16         Proof beyond a reasonable doubt is defined.  A

17    reasonable doubt is a doubt based upon reason and common

18    sense after a careful and impartial consideration of all the

19    evidence in the case.  Proof beyond a reasonable doubt,

20    therefore, is proof of such a convincing character that you

21    would be willing to rely and act upon it without hesitation

22    in the most important of your daily affairs.

23         I flashed this up for you on Tuesday.  It seems

24    like three weeks ago; it does not seem like Tuesday.  And I

25    didn't really walk you through it, but the standard for

Case 2:21-cr-00025-Z-BR    Closing Argument (Defendant - Mr. Cogdell)    Document 168    Filed 09/22/22    Page 45 of 130    PageID 2258

652

1    getting pulled over by the police is reasonable suspicion or

2    probable cause.

3            Preponderance of the evidence is that standard by

4    which civil cases are determined.  When you hear about these

5    civil verdicts of hundreds of millions or billions of

6    dollars, it is preponderance of the evidence.

7            Clear and convincing evidence is the type and the

8    quantity and the sufficiency of evidence that, if CPS was

9    trying to take your child away or your grandchild away in my

10   case, they would have to prove by clear and convincing

11   evidence that I was an unfit grandparent.

12           Proof beyond a reasonable doubt is literally the

13   top of the heap.  There is no higher standard.  It is the

14   same standard, quantity, quantum of proof to convict somebody

15   of capital murder.  It's as high as it gets.

16           Working capital isn't defined for you.  Isn't that

17   ironic?  The two most important things we have in this case,

18   one is not defined, working capital, and one is.  Proof

19   beyond a reasonable doubt is defined for you.  Proof beyond a

20   reasonable doubt is not a four-letter word.  There's nothing

21   wrong with saying it, and a verdict of not guilty is not a

22   four-letter word.  There's nothing wrong with saying it.  If

23   they haven't convinced you, it should give you no problem in

24   returning a two word verdict.  It's not a bad thing.  In

25   fact, it's exactly the right thing when the Government has

1    failed to produce the evidence that convinces you beyond a

2    reasonable doubt.

3          Reasonable doubt.  Again, this definition:  Proof

4    of such a convincing character that you would be willing to

5    rely and act upon it without hesitation in making the most

6    important decisions of your daily affairs.

7          Let me walk you through a few examples.  Let's just

8    say you are considering getting on a Southwest Airlines,

9    Southwest Airlines flight, and you walked up and you heard:

10   Good afternoon, ladies and gentlemen, your pilot today is

11   Shane Smith.  Would you hesitate to get on that plane?  I bet

12   you would.

13         You're trying to see if a parent, a loved one needs

14   care at a director of -- at an Alzheimer's facility, and you

15   were informed that Shane Smith was the director of the

16   Alzheimer's facility.  You think you would have some

17   hesitation before you put your parent there?  I think you

18   would.

19         Shane Smith's -- you needed a cardiologist

20   appointment.  You had -- let's just say last Monday you were

21   at your home, and you thought you had a cardiac event, and

22   you went to your cardiologist, and you saw that Shane Smith

23   was an assistant to your cardiologist.  Do you think you

24   might find another cardiologist?  I think you might.

25         There are two ways to try cases.  They tried it one

```
 1    way; we tried it another way.  We learned back in law school
 2    that, if you don't have the facts, try it on emotion.  If you
 3    do have the facts, try it on the facts.
 4            Now, why do you think one of the first things we
 5    see is this e-mail about, don't tell anyone; keep it between
 6    us, oh, my God?  It gets you emotionally stirred up.  Why do
 7    you think we just heard in his final argument -- he's a good
 8    lawyer.  I respect him.  I'm not begrudging him for engaging
 9    in theatrics.  That's what lawyers do.  But what difference
10    does it make in terms of whether or not Bart Reagor committed
11    fraud if he's a pompous braggart?  He either committed bank
12    fraud or he didn't.  It's pretty binary.
13            If he pumps himself up and says, look at my
14    mansion, look at my planes, look at what a bad ass I am, that
15    may make him somebody that's -- you're going to sit at the
16    far end of the dinner table on Thanksgiving, but that doesn't
17    mean he committed bank fraud.
18            In fact, if you listen to the words closely in that
19    emotional speech, he says over and over:  I don't need to
20    cheat.  I do things the right way.  But they're not playing
21    it for that purpose.  They're playing it to get you upset.
22    It's their right.  It's their choice.  It's their decision.
23            But him telling the world -- and he knew these
24    things were being recorded.  Okay?  This was not a secret
25    recording where they caught him unprepared or unsuspecting.
```

1    He was the one making these recordings.  Okay?  And,

2    generally speaking, if you're planning to commit fraud, you

3    don't record yourself bragging about committing fraud.

4            They think he's more financially astute than I do,

5    but you'd have to be — no offense, my friend — dumber than

6    a bucket of hair to record yourself bragging about intending

7    to commit fraud.  That's beyond guilt.

8            I'm a bad mother-f'er.  I'm so good I don't need to

9    cheat.  You know how I got rich?  By making other people

10   rich.  OP money.  Other people's money.  When you don't have

11   money, you talk the other people into giving you their money.

12           You know, as I said the other day, if I sold you my

13   watch and you paid me, I'd be getting paid with other

14   people's money.  If I sold you my car and you paid me, I'd

15   get paid with other people's money.  When my law firm writes

16   me a check — hopefully, they will when I get back to town —

17   I will be getting paid with other people's money.

18           That's nothing evil.  That's nothing dire.  That's

19   nothing hateful.  That's just a slang word for, that's how

20   you get money.  That's not evidence of bank fraud.  That's

21   not evidence of intending to commit a crime.  That is not

22   evidence of engaging in scheme.  That's a salesman pumping up

23   his troops.

24           The checks we saw for 207,000 to Annette Reagor

25   for -- hold on, 132,000.  There's been an inference all along

1    that he had to have this money to live his lifestyle.  One of

2    the last slides I'm going to show you is, this was just

3    another day at the office in terms of when he deposited these

4    funds into his personal account.  He was not a man of lacking

5    in means.  We'll show you their exhibits where his annual or

6    his monthly average in his checking account was somewhere

7    between a half a million and a million dollars.  He's not

8    living on the street hand to mouth.

9            But they show you these checks because you and I

10   don't get checks like this.  I don't get to write my wife a

11   check for $132,000.  I don't get to write a check to the home

12   company for $200,000.  Those are big boy checks that most of

13   us don't ever see.  Does that mean he committed bank fraud?

14   No.

15           Once again, they want you to get angry; they want

16   you to get upset; they want you to get jealous; they want you

17   to think, you know, he must have done something wrong because

18   he can write those big checks.  That's why they are showing

19   you those checks.

20           They have had three years to investigate this case,

21   three years.  And this is the sort of proof we see?  I'm a

22   bad MF?  This is their proof?  Checks that were obtained,

23   funds that were obtained legitimately and appropriately.

24   This is the proof?  This is the sort of stuff that's supposed

25   to convince you beyond a reasonable doubt?  Nonsense.

1   Problem, yeah.

2          We don't convict people in this country because we

3   dislike them.  You may dislike Bart Reagor.  That is your

4   prerogative.  You may find him to be an overbearing braggart.

5   He's not.  Pretty decent man when you get to know him, but if

6   you don't want to like him, totally cool.  He's not on trial

7   for being likeable or not.

8          But you may not convict him simply because you

9   dislike him.  That is not the law.  That is not this country.

10  That is not Amarillo, by God, Texas.  We don't convict people

11  of federal felonies because we don't like them, because we

12  find them offensive, because we find them a braggart, because

13  we find them a know-it-all.  We convict them only if, and

14  only if, the Government has proved its case beyond a

15  reasonable doubt, and it has completely failed to do so in

16  this case.

17         Facts?  Professor Snyder yesterday.  And he wants

18  to make this complicated.  Actually, Professor Snyder made it

19  uncomplicated.  He sat there on that stand -- and I'll give

20  you, he's a little bit of a quintessential, absent-minded

21  professor.  You know, that's the way he rolls.  But he wants

22  to make a deal about how much money Frank Snyder got paid,

23  $600 an hour, maybe have 24 hours.

24         They paid their expert, Mr. Dawson, $120,000.

25  Their expert will be get paid three or four times -- twice

1    what -- three or four times what both of our experts will get

2    paid for.

3            But if you believe what Frank Snyder told you,

4    Professor Snyder told you —— good God, you're an Aggie law

5    professor —— you have no choice but to acquit Bart Reagor,

6    because what he told you —— went through his qualifications;

7    he observed the entire trial —— there was no evidence that

8    there was a default.  Unless taking those funds under the

9    contract triggered a default, there was no crime.  No

10   evidence that Bart taking the funds would trigger a default.

11           Working capital.  And I'm going to go to, oh, Bart

12   told them working capital; he was going to use it for working

13   capital.  Guess what?  Working capital can be used to pay the

14   owners for their investments.  It is a recognized use of

15   working capital.  That's what that man swore to under oath.

16   If you believe Frank Snyder, it's over.  Frankly, even if

17   Frank Snyder only raises a reasonable doubt, the game is

18   over, and you have a duty to acquit Mr. Reagor.

19           7.12 is a specific consent by the bank to utilizing

20   the distributions to pay the owners.  That's legally

21   gobbledygook for the contract said he can do it.

22           My favorite question just opened the door yesterday

23   and was prompted by a question raised by Mr. Haag.  You

24   didn't recognize [*sic*] Mr. Reagor back in 2017, did you,

25   Professor Snyder?  No, I did not.  And my -- my large Robin

1    to my Batman, Mr. Norris, said:  Well, professor, if you had

2    advised Mr. Reagor back in 2017 about taking the

3    distributions, would you have told him to take them?  And

4    what did he say?  Go ahead.

5          Now, I don't know if you saw the reaction to the

6    Government, but that was a kill shot right between their eyes

7    when the professor said that, absolute kill shot, game over.

8          Steven Fried, the older fellow, did thirty years of

9    banking in the LA area, usually assisting the banks, saw the

10   entire trial testimony, saw Schonacher, Hutchison, and

11   Woodring.  From a banker's perspective, he agreed with

12   Snyder's conclusions.  There were no negative covenants, and

13   he -- it's not that hard, but we have every right to put on a

14   defense, and we did.  There were no negative covenants that

15   precluded using the funds in this manner.  And on the day

16   that the funds were deposited in the RDAG account, they had

17   the discretion to use the funds as they desired.  Acceptable

18   to use the funds as working capital to reimburse

19   contributions.  And we'll get to the contributions.

20         You know what happened yesterday after we rested

21   our case?  Nothing.  You know why that's important?  Because

22   after -- we don't have to put on a defense, but after the

23   Defense puts on a defense and we rest, they have a right to a

24   thing called rebuttal.  And what rebuttal means, they can put

25   on anyone, everyone, and anything, and everything from this

1    witness stand to rebut what we just put on in the defense.

2         What did you see yesterday after we rested our

3    case?  You saw, in the words of Paul Simon, the sounds of

4    silence.  They put on nothing.  That's a clue, because Mr.

5    Dawson, one of their experts, was sitting right behind Mr.

6    Haag.  If Mr. Dawson had a contrary position or if any

7    witness in the entire world had a contrary position to the

8    testimony of Mr. Snyder and Mr. Fried, the Government could

9    have had not only the right, but the obligation, because they

10   have the burden of proof to put on the rebuttal witness.

11   They put on their coat and went home.

12        That right there is a huge moment.  They're going

13   to belittle.  They're going to say, it doesn't matter.  These

14   are paid prostitutes of witnesses, and they're stupid.  He

15   said stupid things.  You can't believe -- you know what?  If

16   that's your position, Mr. Haag, you have the burden of proof,

17   where's Waldo?  Where was your rebuttal witness?  There was

18   no Government rebuttal witness.

19        Dawson was in the courtroom sitting right behind

20   the Government.

21        Nick, I'm at nineteen minutes.  Would you give me

22   just in five-minute in -- he can't talk.  In five-minute

23   increments, give me one at twenty-five, thirty, and so on.

24   Okay?

25        **MR. NORRIS:**  Okay.

1    **MR. COGDELL**:  The bottom line:  If you even have a

2    reasonable doubt that working capital can be used to repay

3    owners for their investment, you must return a verdict of not

4    guilty.  Let me say that again.  Even if you have but a

5    reasonable doubt under this contract that working capital can

6    be used to repay owners for their investment, you must return

7    a verdict of not guilty.

8         Better yet, if you have even a reasonable doubt

9    that Bart Reagor believed he could use the proceeds of this

10   loan to repay himself with working capital, you must return a

11   verdict of not guilty.

12        He keeps going on about the lie, the lie, the lie.

13   He made an application to the bank knowing that he was going

14   to use some of the proceeds to pay himself back.  It's not a

15   lie.  There is absolutely no proof that Bart Reagor did not

16   believe that he could use portions of those loan proceeds to

17   pay himself back.

18        In fact, he sent an e-mail to Rick Dykes, who I

19   suggest to you, also, it's pretty clear Mr. Reagor's not the

20   only one that got the 1.66 million.  Who else do you think

21   did?  Who else?  Rick Dykes.  Let me say that again.  Mr.

22   Dykes got the exact same amount of money as Bart Reagor; Rick

23   Dykes.

24        Mr. Reagor believed that he could, in fact, repay

25   himself; presumably so did Mr. Dykes.  He believed that he

 1    could repay himself with some of these funds, not all, but

 2    some of these funds.

 3            In my opening statement, I told you the IBC loan

 4    language actually allowed for these distributions.  They did.

 5    Reagor took distributions to reimburse himself for the money

 6    he put into his company.  He did.  That's what the evidence

 7    has shown.

 8            Reagor was personally liable on the note, is what I

 9    told you in opening statement.  He was.

10            The Government's loan witnesses, my favorite was

11    Schonacher, president of the IBC Bank.  He was humiliated.

12    He was upset, understandably so.

13            Guess who never read the loan agreement that

14    they're prosecuting Mr. Reagor for?  Yeah, that guy.  And

15    what Mr. Schonacher told you from that witness stand in my

16    last couple of minutes with him was:  Did you ever read the

17    loan agreement?  No.  Now, how in the world does that make

18    any sense?

19            They are trying to prosecute him for a federal

20    felony for committing loan fraud, and one of their very first

21    witnesses, the victim, has never even read the very loan

22    agreement that he's being prosecuted for.  It just makes you

23    scratch your head.

24            Woodring, he couldn't even articulate a common-

25    sense explanation as to why the loan distributions weren't

1    allowed.  Well, they told me it was for working capital.

2    Okay.  Okay.  Because Mr. -- Mr. Reagor believed that the

3    loan allowed him to reimburse himself.  And we'll get to why

4    exactly he believed that.

5           In fact, their star witness, what star he was,

6    Shane -- Shane Smith gave him every reason to believe it.

7           Dawson, he didn't even comment on the particulars

8    of the loan agreement.  I don't even know what he -- it was

9    yes, yes, yes, yes, yes.  He's been paid $120,000 to give

10   monosyllabic responses to questions by the Government that

11   really don't move the needle, move the ball either way.

12          What the evidence has shown?  Bart Reagor committed

13   no crimes.

14          How much time, Nick?

15          MR. NORRIS:  Twenty-five.

16          MR. COGDELL:  Left?

17          MR. NORRIS:  Twenty left.

18          MR. COGDELL:  Twenty left.

19          Bart Reagor committed no crimes and is, in fact,

20   not guilty of these charges.  He did not commit bank fraud.

21   He did not make any false statements to anyone at IBC Bank.

22   He always believed he could use the funds exactly as he did,

23   and Bart's CFO replied awesome when he sent him the

24   instructions.

25          There's no evidence of anyone telling Reagor, you

 1   can't do this.  Let me repeat.  There is no evidence, none,

 2   of anyone telling Bart Reagor, you can't do this.

 3          The all-cap e-mail.  Even Shane Smith told you, he

 4   always uses all caps.  Let's go to lunch, exclamation point.

 5   Today is Wednesday.  The Texas Tech Raiders are playing.

 6   Everything is used in all caps.  There's nothing unusual

 7   about that.

 8          He first sent an e-mail to his capital partner,

 9   Rick Dykes, stating his intention.  Reagor believed Dykes

10   agreed with him.  Reagor then sent the directions to Smith.

11   And Reagor wanted privacy for business reasons.  Don't tell

12   anybody does not mean I am committing a crime.  If I'm

13   committing a crime, I'm not going to put it in an e-mail.  He

14   wanted privacy, because he didn't want the word out with

15   everybody in Lubbock and with everybody in his company and

16   with all the other bankers.

17          Don't tell the bankers.  How many bankers do you

18   think he has?  Dozens.  Why in the world would he want one

19   banker to know what he's doing with another banker?  Again,

20   that's dumber than my third marriage.  There is no reason in

21   the world why you would want one banker to know what you're

22   doing with another banker.  It makes no sense.  I'm happily

23   married now.

24          Reagor had no reason to believe that RDAG was in a

25   poor state.  In fact, his dealerships were selling cars at

1    astronomical rates, unbelievable rates.  The RDAG dealerships

2    were in the top ten in the country, sometimes higher in

3    multiple categories.  He had received numerous awards.

4            Shane Smith told us essentially all of that.  They

5    were rocking and rolling.

6            Reagor-Dykes personally invested their own funds

7    into RDAG after the '17 audit.  This is before the funding of

8    the IBC loan.  Bart believed the dealerships were still in

9    great shape based on Smith's representations.  Reagor

10   believed that by so investing his personal funds he had the

11   right under the loan agreement to reimburse himself for these

12   funds.

13           If he believed this, he's not guilty.  There is no

14   bank fraud.  If he believed he could do this under the loan

15   agreement, there was no bank fraud.  It's their burden to

16   prove to you he didn't believe it.  He couldn't believe it.

17   There is no evidence of that.  The evidence is to the

18   contrary.

19           Bart and Rick put significant personal money into

20   RDAG.  Mr. Haag showed you a $1,000,000 number.  If you'll

21   look further -- what e-mail is that?

22           MR. NORRIS:  41, Government's 41.

23           MR. COGDELL:  Government's Exhibit 1?

24           MR. NORRIS:  41.

25           MR. COGDELL:  41, which he didn't go down, Reagor

 1   describes much more money.  3.1 being -- or 3,000,000 being

 2   deposited from his Zurich account.  2,000,000 from an RDAG

 3   entity.

 4          The suggestion by Mr. Smith that these weren't

 5   personal funds, Reagor and Dykes owned the businesses

 6   50 percent.  If I own the business and I take money out of

 7   that business, it's my money.  2,000,000 taken to be used at

 8   RDAG, another 1,000,000, and that left 2,000,000 for usage at

 9   RDAG.  There was a lot more money than you were led to

10   believe were deposited.

11          All right.  So here it is.  As an offset for our

12   risk and equity dilution and to keep reserves off the table,

13   Rick and I have decided -- Rick and I, same guy that got the

14   same amount of money, have decided to pay ourselves the first

15   third of every dollar we borrow against equity for capital,

16   so we maintain strong personal leverage.  33 percent of all

17   loan proceeds will be split between Bart Reagor and Rick

18   Dykes as a personal equity offset reserve.  Doing this will

19   help us replenish already injected capital and will also

20   reward us for personal guaranties, which dilute our personal

21   equity in the RDAG.

22          What does that mean?  They are personally on the

23   line.  If any of these loans fail, they are personally

24   liable.  It is not just the banks.  I'm sorry.  It is just

25   not the car dealerships that are on the line.  It is

```
 1    literally their wallet.  Reagor is not a banker.  He's not a
 2    lawyer.  He's not an accountant.
 3         He heavily relied on Smith.  He's a car salesman,
 4    not a -- he built a 700-person company on trust and
 5    delegation.  He expected his employees to do their job.  He
 6    trusted Smith expressly on finance matters.  Smith betrayed
 7    Reagor's trust in the worst possible ways.
 8         How much time?
 9         MR. NORRIS:  Fifteen.
10         MR. COGDELL:  Fifteen.
11         MR. NORRIS:  Remaining.
12         MR. COGDELL:  Oh, the irony.  Here you are sitting
13    as Bart Reagor.  You don't have to bake him a cake or send
14    him one for Christmas, but just put yourself in his position.
15    He's worked for more than a decade developing one of the
16    strongest car dealerships on the planet, and one man that he
17    relied upon most, in fact, probably relied upon more than
18    anyone else, who single-handedly -- I think it's pretty clear
19    to you; it was not the conduct of Bart Reagor that caused the
20    implosion of Reagor-Dykes.  It was the conduct of their star
21    witness, Shane Smith.
22         So here you are watching your former best friend,
23    who has not only destroyed your company that was worth many,
24    many, many, many millions of dollars, astronomically more
25    than the 1.6 we're discussing here today, you watched the man
```

1  who's destroyed your company come in and testify against you

2  to reduce his possible sentence.

3           I mean, where are we in this country when that's

4  the right process?  Look at who he lied to.  Ford Motor

5  Credit, FirstCapital Bank & Trust, AimBank, FirstBank.  He

6  lied to anybody and everybody.  He lied to his friends and

7  his family, his wife, his family, his child.

8           Reagor trusted him.  He got up there and said, Bart

9  trusted me exclusively.  I'm not suggesting to you that he

10  was entirely untruthful, but I am suggesting to you that you

11  cannot base your conviction based upon what the Government

12  wants him to say.

13           After they send this e-mail, what does he reply?

14  This is the CFO that he sends, hey, I want to do this.  He

15  gets up on the stand and says, oh, I was at home, and I was

16  frustrated, and I wanted more of the money.  Awesome.

17  Awesome.  Awesome.  He's the CFO.  It is the CFO's job

18  description to say:  You can't do that, dude.  No.  You can't

19  do that.  And you know why he didn't say, no, you can't do

20  that?  Because he had been engaging in a massive fraud scheme

21  with the floor plan and the check-kiting, and he couldn't

22  tell Bart no, not because he was afraid of Bart.  That's

23  nonsense.  Not because he was afraid to disappoint Bart.

24  That's nonsense.

25           If he told him no, Bart would have said:  Why not?

1    We're in a great capital position.  Let me see the documents.

2    Let me see the papers.  If he would have told him no, it

3    would have come unwound right then and there to a man who's

4    making $800,000 a year.

5         Do you think he puts all this sugar and love

6    because he's following the command of a man he's afraid of?

7    Nonsense.  He puts this sugar and love to continue to sucker

8    punch the very man that put him in the position to make

9    $800,000 a year.  And they want you to rely on that man.

10        Dykes and Reagor enter into a loan agreement.  They

11   absolutely believe the financial disclosures were accurate.

12   Smith is the person who led the discussions.  At no time did

13   Reagor ever ask Smith to submit false financials.  Even Smith

14   tells you that.

15        They want you to convict him of bank fraud and

16   submitting false financials when even their star witness

17   says:  Bart Reagor never asked me to submit false documents

18   to IBC.  That's their witness.  Their witness disproves

19   Bart's guilt.  Unless they submitted perjury, which I'm not

20   accusing them of, their witness acquits Reagor.

21        Bart did not knowingly lie to IBC, make a false

22   financial statement or commit bank fraud.

23        The facts.  The IBC loan actually allows the

24   distributions.  Reagor took the distributions to reimburse

25   himself for money he put into his company.  He was personally

 1    liable on the note.  Dykes did exactly the same thing.  Again,

 2    Rick Dykes got the exact same amount of money as Bart Reagor.

 3          Wild success, twenty-one dealership rooftops, 700

 4    full-time employees, multiple franchises, exponential growth,

 5    740,000,000, $800,000,000 all destroyed, all destroyed by

 6    this guy.  Just blew it up like dynamite, and he's their

 7    witness.

 8          Where are we in this country when that is the

 9    process we go through, honestly?  When did we start rewarding

10    people for that kind of mayhem, that kind of financial

11    cancer, that kind of hellish activity that we reward him for

12    trying to convict Mr. Reagor who built a company, and the man

13    who destroyed it is trying to benefit off of it?  That's just

14    as wrong as it can possibly be.

15          Again, you may not dislike -- or you may not like

16    Bart Reagor, but that whole pyramid is turned upside down for

17    the Government to seek to benefit effectively a career

18    criminal who has destroyed my client's business

19    single-handedly by testifying falsely against him.  Nonsense.

20    Nonsense.

21          Smith lied to everyone, every single person on the

22    planet.  Look, can you imagine the cancer he has caused?

23    What do we have?  One, two, three, four, five, six, seven,

24    eight, nine, ten, eleven, twelve, thirteen.  I'm not going to

25    tell you whether these people were criminally prosecuted or

1    not.  I'll leave that up to you.  I think you could make a

2    reasonable deduction that some of them were.

3            But to inject and infect and corrupt that many

4    people tells you all you need to know, not only about Shane

5    Smith, but about this process.  It's simply wrong.  It ain't

6    right.  It ain't right.  He's a horrible human being, who

7    Reagor, bless his heart, relied on for Smith's financial

8    reports.

9            How much time, Nick?

10           **MR. NORRIS:**  You've got seven minutes.

11           **MR. COGDELL:**  He relied and IBC relied on those

12   financial statements.  And the Government will ask you to

13   rely on him.

14           Every entity or person that has relied on Shane

15   Smith has gotten cancer one way or the other, has been burned

16   one way or the other.  He was burned by him.  Those fourteen,

17   eighteen people I just discussed were burned by him.  Ford

18   Motor Credit Company, all the banks were burned by him.  Bart

19   Reagor sure as heck was burned by him.  And if you rely on

20   him, you're going to get burned by him too.  That's not the

21   way we prosecute people in this country.  It's just not.

22           That process, that ask or that request by the

23   Government should give you pause.  It should cause you to

24   hesitate to act in the most important of your daily affairs.

25           If you look at it through the window of reasonable

 1  doubt and the definition of proof beyond a reasonable doubt,

 2  that alone, Shane Smith is walking reasonable doubt.  Those

 3  were fake.  The financials were fake.  The Government's going

 4  to ask you to rely on him.

 5      The loan agreement, again, I'm not going to beat

 6  this up because you've seen it, but this loan agreement

 7  allowed for the distributions unless there was a default or

 8  event of default would exist.  It had always allowed

 9  distributions.

10      I put battle of the experts for this reason:  They

11  put on some experts.  We put on some experts.  Guilt in

12  criminal cases or innocence in criminal cases shouldn't come

13  down to a battle of the experts.  They do unfortunately,

14  because if the Government puts on an expert, I'm probably

15  going to get sued for malpractice if I don't put on an

16  expert.  But when four different experts have very different

17  opinions, how in the world is a car salesman, albeit God's

18  own car salesman down there, how in the world is he supposed

19  to figure it out?

20      Frank Snyder, again, no evidence that Bart's

21  taking the funds would trigger default.  Working capital,

22  funds are received into the company paying for the owners for

23  their investments, a recognized use of working capital.

24  7.12, a specific intent.  If he had been asked by Reagor back

25  in 2017 if he could use the funds, he would have told him, go

 1    ahead.  Steven Fried same, same, same, same, same.

 2           Knowingly.  Two counts of bank fraud, one count of

 3    making false financial statements.  Both require specific

 4    mental requirements.  The Government has the burden of

 5    proving the corrupt intent of Bart Reagor beyond a reasonable

 6    doubt.  The Government has failed.  It's not close.  This is

 7    not a close question.

 8           Bank fraud.  The defendant knowingly executed a

 9    scheme or artifice.  Bank fraud.  Knowingly is done

10    voluntarily, intentionally, and not because of mistake or

11    accident.

12           You may find that Bart was wrong.  I don't think

13    you should.  I don't think you will.  But you may find that

14    Bart was wrong when he believed, as he did, that he could

15    repay himself with some of these loan proceeds, but even if

16    he was wrong about it, he's still entitled to a verdict of

17    not guilty.  There is no evidence, none --

18           How much time?

19           MR. NORRIS:  Three minutes.

20           MR. COGDELL:  There is no evidence that Bart

21    knowingly submitted a false statement.  There's no evidence

22    that Reagor intended to fraud anyone.

23           All the evidence is that Bart believed he had the

24    right to take the loan proceeds to reimburse himself.  Based

25    upon his reliance on Shane Smith, Bart believed he had the

 1    right to do what he do -- he had a right to do what he did,
 2    and keep it a secret is far different than committing a
 3    crime.  He didn't want the entire world to know.  He didn't
 4    want the other bankers to know.  He has a right to keep
 5    financial decisions private, just like you do, just like I
 6    do, just like you do.  The world doesn't need to know about
 7    my finances.  The world doesn't need to know about your
 8    finances.  You have a right to keep them private, period.
 9              False statement to a bank; he knew the statement
10    was false.  There is no evidence that the loan application
11    contains false statements.  He never submitted the statements
12    to IBC.  Shane Smith did.  Even Shane Smith said Reagor never
13    asked him to submit false financials.
14              Reasonable doubt.  Proof of such a convincing
15    character that you would be willing to rely upon it and act
16    without hesitation in the most important of your daily
17    affairs.  Reasonable doubt as to each offense.  There's no
18    evidence of intent to defraud a bank.  There's no evidence of
19    submitting false statements to financial institutions.
20    There's no evidence that Reagor lied, was knowingly involved
21    in a scheme to defraud.  All credible evidence is to the
22    contrary.
23              He needed money for his mansion.  That's been an
24    unspoken theme.  This is Government's what, 50?
25         MR. NORRIS:  32.

1          MR. COGDELL: 32. Okay. Here's the spike. We got

2     the money back in March. He's a million, a million five, two

3     and a half, a million five, three, half million, half

4     million, half million, half million, a million. He got more

5     money than I got. Got a lot more money than I got.

6          He didn't do this because he was living hand to

7     mouth. Their own exhibits show it. That is one exhibit

8     concerning their checking account.

9          I suggest to you a reasonable deduction from the

10    evidence is they had money in other resources other than that

11    one checking account.

12         Would I have done what Reagor did? Monday morning

13    quarterback. You might get back --

14         How much time, Nick?

15         MR. NORRIS: One.

16         MR. COGDELL: Oh, this is not a Monday morning

17    quarterback deal where you go back there and say, well, I

18    would have done it differently. What has the evidence shown?

19    Reagor is not guilty on all counts.

20         It does not mean you like Bart Reagor. It does not

21    mean you like the way he may have treated people. It does

22    not mean you would have done the same thing. It does mean

23    that you believe that the Government has failed to prove its

24    case beyond a reasonable doubt. Nothing more, nothing less.

25         Bart Reagor, his dealerships have imploded because

 1   a man he trusted and loved, the same man that has caused

 2   horrific damage to countless people, has been charged with a

 3   federal offense for a crime the evidence shows he didn't

 4   commit.

 5         I'm going to sit down now, and in a couple of

 6   minutes, the prosecutor, I'm sure, is going to make some fine

 7   remarks.  And, as a lawyer, you always make mistakes, and I

 8   know I've made a number of mistakes in this case, and if I

 9   have, you hold them against me.

10         But I am giving you a father, a grandfather, a

11   husband, and a man who created great opportunity for, oh, so

12   many people.  I've done all I could have done.  So has Nick,

13   so has Matt, so has Tray.  We have done all we can do for Mr.

14   Reagor.

15         I'm going to give him to you now.  I'm giving him

16   to you, and to you, and to you, and to you, and to you, and

17   to you, and to you.  You two, I can't because you're

18   alternates.  To you, you, you, you, and you.  Give him back

19   to me.  He is not guilty of these crimes.  He's not guilty.

20   Give him back to me.  Thank you for your time.

21         **THE COURT**:  Okay.  Mr. Haag, you may begin your

22   rebuttal, and then I will afford you two extra minutes just

23   because I let it run a bit long.

24         **MR. HAAG**:  Yes, Your Honor.  May I have just one

25   minute to set some things up?

1          **THE COURT**:  Absolutely.

2      (Pause.)

3          **THE COURT**:  Mr. Haag, you have seventeen minutes.

4          <u>**FINAL CLOSING ARGUMENT OF THE GOVERNMENT**</u>

5          **MR. HAAG**:  Thank you, Your Honor.  This is going to

6  be really anticlimactic.  It's hard to follow that.

7          The Defense's strategy in this case is something

8  that I like to think of kind of like when you were a child,

9  and you used to do those mazes.  You remember those?  And the

10 way I see it is, the jury, you're right over here, and as

11 with all juries, you are trying to find a path to the truth.

12         And what the Defense in this case is, is they want

13 to send you down here (indicating), maybe over here

14 (indicating), maybe in here (indicating).

15         **MR. COGDELL**:  Excuse me.  I object to attacking the

16 character of the --

17         **THE COURT**:  Overruled.  I allowed for aggressive

18 and zealous advocacy in your closing and much voice

19 modulation.  I will allow it in the rebuttal.  So overruled.

20         Please proceed, Mr. Haag.

21         **MR. HAAG**:  Over here (indicating), over here

22 (indicating), over here (indicating), because there's a

23 tendency to equate confusion with reasonable doubt.

24         And the Defense's strategy is if they can confuse

25 you enough, then you'll come back not guilty.

1          **MR. COGDELL**:  Same -- for the record, same

2     objection, Your Honor.

3          **THE COURT**:  Okay.  I will grant you a standing

4     objection on this point, but I didn't permit interruptions in

5     either of the closing arguments, and I'm not going to

6     tolerate many more interruptions in Mr. Haag's rebuttal.

7          **MR. COGDELL**:  I did not intend to interrupt.  I

8     intended to preserve objection, Your Honor.

9          **THE COURT**:  Okay.  It is preserved.  You may

10    proceed.

11         **MR. HAAG**:  Thank you.  And let me give you an

12    example of what I'm talking about.  Shane Smith can't be

13    trusted.  You probably heard ten minutes of the Defense

14    talking about Shane Smith.

15         I mean, let's put Shane Smith in context.  From the

16    Defense's opening, you would think he was the only witness

17    that was going to testify in this trial.  As far as his

18    testimony, that is completely within your purview.  I'll let

19    you evaluate his testimony and whether you believe that

20    testimony or not.

21         But let's be fair about really what relevance did

22    it have in this trial.  Candidly, it's supplemental to the

23    fraud charge.

24         As to the fraud, Bill Schonacher, Will Woodring,

25    the IBC loan memorandum, and the defendant's e-mail,

```
1    Government's 41, that's the center of our case.  That's the

2    key witness.  That's the key evidence.  Shane Smith's role,

3    he executed the plan that the defendant devised.  That's it.

4              The Defense wants to paint him as some sort of the

5    centerpiece of our case or the key witness.  He just did what

6    the defendant told him to do.  That's it.

7              So Professor Snyder.  And I'll talk briefly about

8    rebuttal.  Mr. Cogdell suggested that that was a key moment

9    that the Government didn't do rebuttal.  And kind of going

10   back to the maze, there was no rebuttal because I didn't want

11   to follow Defense down the rabbit holes or off into the side

12   or off into all of these matters that are irrelevant, so I

13   didn't.

14             So let me explain to you what I mean by that.

15   Professor Snyder, he talked about contract interpretation for

16   the loan agreement.  I would love to summarize his testimony,

17   but, candidly, I didn't understand it very well, but I think,

18   in general, he was saying the loan agreement allowed it.

19             And you remember during opening I told you, if

20   you'll please just remember two things, this is a fraud case.

21   This a fraud case.

22             Two, materiality.  So here is why really whatever

23   Professor Snyder said is just, I mean, candidly not relevant

24   as to why you are here.  The fraud occurred from April 2017

25   up until they signed the loan agreement.  Whether it violated
```

1   the terms of the loan agreement, that's a breach of contract

2   issue, completely irrelevant to fraud; it has no bearing at

3   all.

4           In fact, the Government's position is, because of

5   the fraud, there never should have been a loan agreement.

6   The only reason the defendant got that loan was by fraud.  He

7   told IBC Bank he needed money to operate his dealerships.

8   That was a lie because it omitted the material fact that he

9   intended to take the money for himself.  And we talked about

10  materiality.  Bill Schonacher told you:  This never should

11  have happened.

12          Whatever Professor Snyder, Mr. Fried want to talk

13  about on the contract, it's irrelevant.  It has nothing to

14  do.  The fraud was in obtaining the loan from the beginning.

15          So, regardless of what the loan agreement says, the

16  United States' position is, there never should have been a

17  loan agreement.  If the defendant had been honest and told

18  IBC Bank how he was truthfully going to use the money,

19  there's nothing for Professor Snyder to interpret.  There's

20  no agreement.

21          Same thing with Mr. Fried.  Now, I will say his

22  testimony was somewhat unique.  His opinion was that, once

23  the bank loans you money for working capital, you can do

24  whatever you want with it.  You can even take 10,000,000 and

25  go to Vegas, if you want.  I'm not sure what banks he worked

 1    for.  Not the banks that I've ever been to, but that was his

 2    testimony.

 3           Chuck Darter, Mr. Darter's testimony, it actually

 4    supported the fraud case.  He testified that in March 2017

 5    the audit -- after the audit, he told the defendant that

 6    Reagor-Dykes needed money, working capital, to keep the

 7    business healthy.  This is one month before they meet with

 8    the IBC representatives, and it is wholly consistent with

 9    what the defendant told them that, hey, we need money to

10    operate our dealerships.

11           So as far as not doing any rebuttal because we

12    didn't have anything to say or we were devastated, there was

13    some sort of kill shot?  No.  They just didn't talk about

14    anything relevant in the Defense's case.  The only thing they

15    talked about helped show that it was fraudulent.  What's

16    there to rebut?

17           I talked a little bit about simplicity.  I want to

18    walk you through just sort of the common-sense truth about

19    the IBC loan.  And, hopefully, as I walk through this, I'll

20    make it relatable to something that each of you here in this

21    jury box have been through.  The defendant didn't need to

22    look at one document, a shred of paper, or an e-mail, he

23    didn't need to look at anything to know that this was wrong.

24           And let's relate.  If any one of you go to the bank

25    and you tell the bank, I need a loan to buy a home, the bank

1    expects, demands that you use the money to buy a home.  If

2    you tell the bank you want to borrow money to buy a car, you

3    have to use that money to buy the car.  If you tell the bank

4    you want to borrow money to use in your business, you have to

5    use the money in your business.

6         The truth here is very simple.  It's very

7    straightforward.  The defendant lied to IBC Bank about the

8    purpose of the loan.  That lie was material because IBC Bank

9    never would have made the loan if it had known the truth.

10   The defendant devised a scheme with the CFO to hide it from

11   the Reagor-Dykes Auto Group and the banks.  The defendant had

12   Shane Smith execute the scheme, and the defendant is guilty

13   of bank fraud and making a false statement to a bank.

14        Hopefully, the presentation that I've made in

15   opening and here on rebuttal has flattened that maze line a

16   little bit and allowed you to move in a straight line to the

17   truth, because it really is a straight line.

18        Look at the e-mails during the relevant time

19   period.  Look at the testimony from the relevant time period.

20   Focus on what's at issue here.  Fraud, not breach of

21   contract; not a peripheral player, Shane Smith.  Fraud.

22        The evidence that the defendant defrauded IBC Bank,

23   lied to IBC Bank, overwhelming well beyond any reasonable

24   doubt.

25        I ask you to render a verdict that is consistent

1    with the truth, and that is guilty.

2              THE COURT:  Okay.  At this time, I'll instruct Mr.

3    Cogdell and Mr. Haag, please remove all the demonstratives

4    that are blocking lines of sight between counsel table and

5    the bench.  And we'll begin to give the case to the jury.

6              Now, the parties have completed their closing.  At

7    this time, I'll ask the two alternate jurors to please stand.

8              And, Mr. Haag, is there any objection from the

9    Government to dismissing the alternates at this point?

10             MR. HAAG:  No, Your Honor.  I guess I'm sorry.

11             THE COURT:  Subject to --

12             MR. HAAG:  I know it's anticlimactic for y'all too

13   but --

14             THE COURT:  Subject to recall --

15             MR. HAAG:  Yes, Your Honor.

16             THE COURT:  -- in the event of some emergency, is

17   there any objection from the Government to dismissing these

18   two alternates?

19             MR. HAAG:  No, Your Honor.

20             THE COURT:  Mr. Cogdell, does the Defendant have

21   any objection to dismissing these two alternates?

22             MR. COGDELL:  We share the same sentiments as Mr.

23   Haag.

24             <u>COURT'S INSTRUCTIONS TO ALTERNATE JURORS</u>

25             THE COURT:  Okay.  And now let me share my

 1  sentiment.  I do not want you to feel as if your time were

 2  wasted, and I want to give you a real-world example from my

 3  dear friend in Fort Worth, Judge Reed O'Connor, who had a

 4  trial with just twelve jurors in a criminal case, and then

 5  someone slipped and fell in the stairwell.  And they had to

 6  declare a mistrial because no alternates were available after

 7  about three or four days of hard work by the attorneys, the

 8  court staff, and the personnel involved with that case.

 9        Your role is essential, especially, in a criminal

10  case where you must have twelve jurors, so please do not look

11  upon this time as lost or wasted.  You were essential to this

12  criminal process, especially in these cases where we have to

13  have twelve jurors to reach a verdict.

14        So, at this point, I am going to dismiss you.  I

15  will continue to admonish you to not discuss anything about

16  this case until you receive word of the verdict or the

17  resolution of this case.

18        Again, if there is an emergency during

19  deliberations and a juror needs to leave for some excusable

20  reason, you may need to step in and fill that role.  So I'll

21  just ask that you follow the Court's admonitions about

22  researching the case and discussing the case with family and

23  friends until you learn about the result in this case.

24        At this point, I will excuse you.  I'll instruct

25  you to follow the Court Security Officers and the Marshals to

 1    collect your belongings.  And then also please leave

 2    identifying information with jury services, either the

 3    District Clerk's Office or the Marshals.  Make sure we have a

 4    contact number for you, an e-mail, any identifying

 5    information where we may reach you in the event of such

 6    emergency.

 7              But I know I speak for the Government and the

 8    Defendant in this case that your time was appreciated.

 9    You've fulfilled your civic duty, and you are essential to

10    this process.  So, with that, you are dismissed at this point

11    with the instructions of the Court.

12              **COURT SECURITY OFFICER**:  All rise.

13         **(Alternate jurors excused and left the courtroom.)**

14              <u>**COURT'S FINAL INSTRUCTIONS TO THE JURY**</u>

15              **THE COURT**:  Now, be seated.  For the jurors, at

16    this point, as I mentioned, the parties have completed

17    closing.  My law clerk will distribute the copy of the Final

18    Jury Charge.  Again, this is the work product of a Charge

19    Conference with both attorneys for the Government and the

20    Defendant.  We have now reduced to finality the jury charge

21    that will instruct your deliberations.

22              I will remind you that, when you return to the jury

23    room, you must first designate a foreperson.  So you alone

24    decide the protocol for that, but you should first designate

25    a jury person to begin your deliberations.

1          Also, this is an instruction at the deliberation

2    phase that is slightly different from the repeated admonition

3    I have given you about discussing this case outside these

4    four corners.

5          Now that you are entering deliberations, all twelve

6    of you must be present when deliberations occur.  So you are

7    now allowed to begin discussing the case, the facts, the

8    evidence, your opinions, but all twelve must be present for

9    those deliberations.

10         So, similar to the admonitions I have been giving

11    you throughout the week, do not discuss this case if you're

12    alone for lunch reasons or restroom reasons or away from the

13    jury deliberation room.  The deliberations need to take place

14    in that room with all twelve present.  And you should stop

15    your deliberations until any removed member returns back to

16    that room.

17         Now, you have the jury charge in place.  Does every

18    juror have a copy of the jury charge?  Please raise your hand

19    if you have your copy.

20         **(Jurors' hands raised.)**

21         **THE COURT**:  All right.  There should be just one

22    copy of the verdict form.  Once you have selected the

23    foreperson, that verdict form will be held until you reach

24    your result.

25         At this moment, I now instruct the Marshals to

Housekeeping Matters

(Outside of the Jury's Presence)

1  retire you to the jury room, and you may begin your

2  deliberations.

3          **COURT SECURITY OFFICER:**  All rise.

4      **(The jury left the courtroom for deliberations at 10:17**

5  **a.m.)**

6          **THE COURT:**  Please be seated.  So, at this point,

7  we'll just do housekeeping as to the exhibits in evidence.

8  Please check the Court's inventory.  And then once that

9  process is complete, I'll ask you to execute the

10  Certification of Trial Exhibits for both sides.

11          By the Court's inventory, the following exhibits

12  are in evidence and may go back to the jury:

13          From the Government, 1 through 30, 33 through 39,

14  41 through 47, 48, 51, 56 through 57, and No. 51, which is a

15  video excerpt subject to the redaction order of the Court at

16  the Pretrial Conference.

17          For the Defendant, Exhibits 1 through 3, 5, 7

18  through 15, 20 through 35, and 47.  And Defendant's Exhibits

19  which were conditionally admitted subject to authentication,

20  6, 16, 18, and 19 are not in evidence.

21          Mr. Haag, does the Government concur with the

22  Court's inventory of the exhibits, which may go back to the

23  jury?

24          **MR. HAAG:**  Yes, Your Honor, it does.  And we'll

25  work with the Defense.  We have the exhibits loaded onto a

(Outside of the Jury's Presence)

1    thumb drive, so we will work to make sure that those are --

2         THE COURT:  Okay.  I just wanted to make sure there

3    was no disagreement about what was or was not presented into

4    evidence.

5         Now, Mr. Cogdell, does the Defendant agree with the

6    Court's inventory of the exhibits that may go back to the

7    jury?

8         MR. COGDELL:  Judge, Your Honor, we had 19, the

9    capital injection documents as being agreed to.

10        THE COURT:  Okay.  And, Mr. Haag, on Defendant's

11   Exhibit No. 19 --

12        MR. HAAG:  That was subject to authentication, Your

13   Honor.  That was -- that, again, I believe was prepared by

14   Mr. Kirkendall, who was Rick Dykes' attorney, so that was --

15   that exhibit was unable to be authenticated.

16        THE COURT:  Okay.  And that is the Court's

17   recollection as well.  That wasn't presented for purposes of

18   authentication, and I don't recall that it was authenticated.

19   So it unless -- unless my recollection is incorrect about the

20   trial and how it --

21        MR. COGDELL:  I'm not suggesting it is.  I do --

22   unfortunately, it sparks some memory with me that I needed to

23   show it with -- to Smith, and I didn't, so --

24        MR. HAAG:  Can I see what 19 is?  I may be

25   confused.

(Outside of the Jury's Presence)

```
 1          THE COURT:  If the parties can reach agreement,
 2   I'll submit it to the jury.
 3        (Mr. Haag/Mr. Cogdell sotto-voce conference.)
 4          MR. COGDELL:  Never mind.
 5          MR. HAAG:  We did.  Your Honor, I'm sorry, I was
 6   thinking of another one.  19 is admitted.  We just asked for
 7   a cleaner copy that we gave them, so as long as it's a
 8   cleaner copy, yes.
 9          THE COURT:  Okay.  So, with those corrections, as
10   agreed to the parties, Defendant's Exhibit 19 will be
11   submitted to the jury.
12          With that correction, Mr. Cogdell, does the
13   Defendant agree with the Court's inventory of the exhibits
14   that should go to the jury?
15          MR. COGDELL:  Yes, sir.
16          THE COURT:  Okay.  And, again, once that process is
17   complete, I'll ask that both sides execute the Certification
18   of Trial Exhibits.
19          Regarding courtroom technology, the Dallas Division
20   has sent an IT professional.  His name is Oscar.  I assume
21   you have worked with him in your own courtroom technology.
22          We are providing a laptop for any audio or video
23   exhibits that should be played.  Our IT professional will be
24   available should there be any questions about playing the
25   audio, playing the video, and so we will provide the laptop
```

(Outside of the Jury's Presence)

 1  courtesy of the Court, and we'll also provide the IT support
 2  should there be any questions from that.
 3          And, at this point, I think we are ready to stand
 4  in recess and await the result.
 5          Just one final instruction on availability.  I
 6  understand, Mr. Cogdell, you have pending cases in the
 7  Southern District of Texas.  I am -- I will allow some
 8  substitution of counsel, if necessary, given the locality,
 9  but just make certain that there is a member of the defense
10  team who is within the geography and available.
11          **MR. COGDELL:**  Sure, yes.
12          **THE COURT:**  Okay.  And I ask that --
13          **MR. COGDELL:**  Is that a way of saying you would
14  like me to go?
15      **(Laughter.)**
16          **THE COURT:**  Mr. Cogdell, we've been in court
17  together before, and I'm always happy to see you.
18          So let me make sure there's no other housekeeping.
19  Please give all of your current contact information to my
20  courtroom deputy.  Let me make sure there's nothing I can
21  clear up before I recess and allow the attorneys to retire.
22      **(Court/courtroom deputy sotto-voce conference.)**
23          **THE COURT:**  Okay.  So it looks like we have all of
24  your contact information, which means we can trace and track
25  you.

(Outside of the Jury's Presence)

1          Please have at least one member of your team
2     responsible for questions within fifteen minutes of the court
3     should we receive a question.
4          Again, as we discussed at the Pretrial Conference,
5     if I deem that it is not substantive in any -- on any legal
6     point, doesn't require the contribution of counsel, I will
7     simply answer the question.  I will not call back attorneys
8     to answer questions about IT support and when lunch arrives
9     and things like that.
10          But if I deem it a substantive legal question
11     requiring the input of counsel, you may be subject to recall.
12     So please have a member of your team available and within
13     fifteen minutes of the courtroom.
14          And, with that, I think we can stand in recess and
15     await the result from the jury.
16          Is that correct, Mr. Haag?
17          **MR. HAAG**:  Yes, Your Honor.
18          **THE COURT**:  Is that correct, Mr. Cogdell?
19          **MR. COGDELL**:  Yes, sir.
20          **THE COURT**:  The Court stands in recess, and I thank
21     you for all of your hard work in moving this efficiently and
22     making good use of judicial resources.
23          **COURT SECURITY OFFICER**:  All rise.
24     **(Proceedings recessed for deliberations at 10:23 a.m.)**
25                   --------------------------

(Outside of the Jury's Presence)

1          <u>**JURY NOTE NO. 1**</u>

2      **(During deliberations, the jury sent out a note; the**

3  **following took place in open court with all parties present**

4  **at 2:56 p.m.)**

5          THE COURT:  Please be seated.  And I'll instruct

6  the courtroom deputy to turn on the sound machine to mute any

7  of this conversation from the deliberation room.

8          MR. COGDELL:  Do you wish us at the bench, Your

9  Honor?

10          THE COURT:  I think it will be okay.  The way the

11  audio system works, it should create a sound wall between

12  these two spaces, but if -- if counsel is more comfortable at

13  the bench addressing questions ── I know my court reporter is

14  not more comfortable with you at the bench ── but I'll allow

15  it.

16          Okay.  Let's make sure that their sound machine is

17  activated.  Okay.  So that's been activated, and we should be

18  sound-proofed at this point.

19          So the Court is back on the record in

20  No. 2:21-CR-25-Z-BR-1, United States of America versus Bart

21  Wade Reagor.

22          This is Jury Note No. 1, and I am holding the only

23  copy.  To Judge Kacsmaryk:  No. 1:  Clarification on aiding

24  and abetting?  No. 2:  Can we have the original Indictment?

25          So we will take those up in turn, and I'll begin

(Outside of the Jury's Presence)

 1   with the first question on clarification on aiding and

 2   abetting.

 3          Mr. Frausto, any response from the Government on

 4   how the Court should respond and what additional response is

 5   necessary?

 6          MR. HAAG:  Is that the -- does it just say

 7   clarification?

 8          THE COURT:  I am reading it verbatim, and I feel

 9   like Alex Trebek on "Jeopardy," and I wish it was formulated

10   in the form of a full question, but it is:  Clarification on

11   aiding and abetting, question mark.

12          And my inclination is to refer them back to the

13   pattern.  They have the charge.  They have two pages.  We

14   worked together as counsel in court to formulate that charge.

15   I'll just refer them back to the pages, and that they should

16   follow those instructions.

17          But I have pulled caselaw, Fifth Circuit caselaw on

18   the substantive law of aiding and abetting.  Sometimes

19   there's confusion about it as a separate count, or whether

20   it's part of the indictment or not, but, at this point, I'm

21   content to direct them back to the jury charge as it is

22   written and agreed to.

23          MR. HAAG:  I agree with that, Your Honor.

24          THE COURT:  Okay.  Mr. Cogdell?

25          MR. COGDELL:  Yeah.  We agree with that, with the

(Outside of the Jury's Presence)

1  additional reason, of course, we didn't feel like aiding and

2  abetting was raised by the evidence, so we certainly don't

3  think it should go further than what the Court's doing.

4       THE COURT:  Okay.  So we had an objection on that

5  obviously during the Charge Conference.

6       The Court found that there was no undue surprise

7  because it appeared in the very Indictment that served as the

8  charging instrument in this case.  I do find that that

9  objection has been preserved for appellate purposes.

10      But now that the jury has the instruction, I intend

11  to refer them back to that instruction.

12      Is that acceptable to the Government?

13      MR. HAAG:  Yes, Your Honor.

14      THE COURT:  Is that acceptable to the Defendant?

15      MR. COGDELL:  Yes, sir, as long as our position is

16  clear, and I think it is, that we don't -- we have --

17      THE COURT:  Okay.

18      MR. COGDELL:  -- not waived our objection to it in

19  the first place.

20      THE COURT:  Okay.  And, on that point, the Court

21  will further find that during the Charge Conference that the

22  parties did have a conversation and colloquy about the aiding

23  and abetting jury charge instruction and whether it was

24  appropriate here.

25      During that discussion, the Court did find that

(Outside of the Jury's Presence)

1   there was no unfair surprise.  The Indictment was filed on

2   April 22nd, 2021.  That Indictment begins with an

3   Introduction, followed by Count One and Two, beginning on

4   Page 4, which ends with the following language on Page 5:  In

5   violation of Title 18, United States Code, Sections 1344(2)

6   and 2.

7            And, of course, 18 U.S.C. Section 2 is the aiding

8   and abetting section.

9            Courts in the Fifth Circuit and elsewhere have also

10  held that it need not even appear in indictment because it's

11  in essence part of the corpus of federal criminal law.

12           But, here, it was actually included, and the

13  parties have been on notice since at least April 22nd, 2021.

14           Is there anything additional on aiding and

15  abetting?  The Court will just direct them to follow the

16  charge.

17           Mr. Haag, anything else that you can think of that

18  needs to be preserved for record purposes?

19           **MR. HAAG:**  No, Your Honor, not --

20           **THE COURT:**  Anything --

21           **MR. HAAG:**  -- at this time.

22           **THE COURT:**  -- from Mr. Cogdell?

23           **MR. COGDELL:**  Nothing other than what we've already

24  stated.

25           **THE COURT:**  Okay.  All right.  Now let's move to

(Outside of the Jury's Presence)

 1   Question No. 2.  Can we have the original Indictment?

 2            So I'll hear from the Government first and then the

 3   Defendant.

 4            **MR. HAAG:**  Your Honor, we would have no objection

 5   with the original Indictment being provided to the jury.

 6   It's been read to the jury.  I don't think it's a secret, so

 7   we would have no objection to the jurors being able to read

 8   it.

 9            **THE COURT:**  Okay.  And then I'll let Mr. Cogdell

10   respond in turn.

11            **MR. COGDELL:**  I object to them receiving a copy of

12   the Indictment, Your Honor.  It is not evidence, and I object

13   to them receiving a copy of it.

14            **THE COURT:**  So, here, based on a quick survey of

15   Supreme Court and Fifth Circuit law, I would refer counsel to

16   *United States versus Tucker*, 526 F.2d 279.  Since it is

17   permissible for a properly instructed jury to have copies of

18   the indictment during deliberation, that procedure is

19   permissible.  So, here, I'm summarizing from Page 283.  That

20   is a Fifth Circuit case.

21            And I also would reference a Supreme Court case

22   *Weeks versus Angelone*.  This is 120 S. Ct. 727 at Page 733.

23   A jury is presumed to follow its instructions.  Similarly, a

24   jury is presumed to understand a judge's answers to its

25   questions.

(Outside of the Jury's Presence)

1          So, at this point, were I to send it back to the

2    jury, I could reiterate multiple instructions from this Court

3    that the Indictment is not evidence, that it should not be

4    considered as evidence, but because the jury is at least

5    requesting it, they must consider it helpful to their

6    deliberations.

7          But I would just stand on a series of admonishments

8    that this Court has made from voir dire forward.  I think the

9    record will reflect multiple statements to this jury that the

10   Indictment is not in evidence.

11         They are also in possession of a jury charge, which

12   is not evidence.  So because juries are presumed to follow

13   this Court's instructions, I'm inclined to send it back

14   unless I hear additional persuasive argument.

15         **MR. COGDELL**:  Well, I'm not going to talk you out

16   of sending it back.  I would request that they be instructed

17   that it is not evidence, nor can they consider it as

18   evidence.

19         **THE COURT**:  Okay.  With that instruction, are the

20   parties in agreement that that plan will satisfy both of your

21   concerns?

22         **MR. HAAG**:  Yes, Your Honor.

23         **THE COURT**:  Okay.  And I'll just -- I'll make sure

24   that the form of that reiterates that you have been

25   repeatedly admonished from voir dire throughout the multiple

(Outside of the Jury's Presence)

1    days of this trial that an indictment is not evidence, and I

2    stand on those, and then I, again, admonish you that it is

3    not.

4              So, with that admonition, I will send the copy

5    back.  Are they -- they're requesting the original

6    Indictment.  Do we have that on file?

7         **(Court/courtroom deputy sotto-voce conference.)**

8              **THE COURT:**  I'm not sure if this is like a best

9    evidence request from the jury that we produce the original.

10             All parties are agreed on what the operating charge

11   instrument is in this case.  I'm intending to just send a

12   copy.

13             I'm assuming there's no objection from the

14   Government, as long as it is the Indictment that we have all

15   looked at for months and months and months.

16             **MR. HAAG:**  No, Your Honor.

17             **THE COURT:**  Even though they're requesting original

18   Indictment, I think this is just maybe some confusion about a

19   sequence of like how things are charged by a grand jury, but

20   if it's a copy that we've all seen before, any objection to

21   sending a copy?

22             **MR. HAAG:**  No, Your Honor.

23             **THE COURT:**  Any objection to sending a copy?

24             **MR. COGDELL:**  None that I --

25             **THE COURT:**  Okay.

1          **MR. COGDELL**:  -- haven't already raised.  I mean,

2     we've only had one.  There hadn't been a Superseding

3     Indictment.  It hasn't changed.

4          **THE COURT**:  Right.  That's exactly right.  So I

5     think, even though the jury may be using different

6     terminology, it will be the same document that everyone has

7     been operating from for months.

8               Now, one additional finding for the record, we'll

9     call this the smoke-break finding.  So before we recess and

10    allow the jury to return to deliberations with the Court's

11    instructions, the Court will make a finding on the record.

12              During the one-hour lunch break, the Defense

13    attorney, Mr. Payne, did notice that a jury [*sic*] was in the

14    parking lot to smoke a cigarette.  Court Security at all

15    times were aware of this cigarette break.  It was in

16    conjunction with an early lunch break.

17              So, again, the Court has repeatedly admonished the

18    jurors that they are not to discuss this case during

19    deliberations without all twelve persons present.  I

20    emphasized that with force at the close of business today.

21              And that was an approved break.  There are no

22    allegations of juror misconduct.  Absent further allegations

23    of evidence, the Court finds no cause to further investigate

24    the juror smoke break.

25              Anything from the Government on the smoke break?

(Outside of the Jury's Presence)

1          **MR. HAAG:**  No, Your Honor.

2          **THE COURT:**  Anything from the Defense?

3          **MR. COGDELL:**  No, sir.

4          **THE COURT:**  Okay.  And it might have confused

5    Defense Counsel, because the lunch break was early today, and

6    they requested that that one person be excused.

7          And this Court does find that the jury can follow

8    the Court's repeated admonition and instruction that they not

9    deliberate without all twelve present.

10          So I will formulate the Court's response to Jury

11    Question No. 1.  That will be made a part of the record.  And

12    then we will allow them to continue their deliberation.

13          If we receive any other news, you will be contacted.

14          Mr. Cogdell?

15          **MR. COGDELL:**  Yes, sir.  Depending upon a

16    conversation I have with Mr. Frausto, I may leave.  I've got

17    to be in Houston at 10:00 in the morning, and it's a 10-hour

18    drive.  I may leave Mr. Powell in charge just depending upon

19    the conversation I have with Mr. Frausto.

20          But if you don't see me, I appreciate your

21    professionalism and candor throughout this trial.

22          **THE COURT:**  Okay.  Well, and I do want to find for

23    the record this defendant has received capable and effective

24    representation by Mr. Cogdell, who has undertaken Herculean

25    logistical efforts to prepare for this case, then to prepare

(Outside of the Jury's Presence)

```
 1  also for a simultaneous pending case in the Southern District
 2  of Texas, and, at all times, he's been available to this
 3  Court and ready, prompt, on time, even with an early start
 4  time of 8:00.
 5           So I don't know how you have achieved by location
 6  in two districts, but you have effectively taken care of this
 7  case, and now I understand that you -- you have obligations
 8  in that pending case.
 9           So thank you for all of that effort.  You went
10  above and a bond -- above and beyond to be efficient and to
11  work hard on extremely tight deadlines, so I appreciate that.
12           MR. COGDELL:  Thank you.
13           THE COURT:  Okay.  The Court stands in recess, and
14  the jury will return to deliberate.
15           COURT SECURITY OFFICER:  All rise.
16        (Recess at 3:08 p.m.; deliberations continued)
17               --------------------------
18                   JURY NOTE NO. 2
19        (During deliberations, the jury sent out a note; the
20   following took place in open court with all parties present
21   at 4:44 p.m.)
22           COURT SECURITY OFFICER:  All rise.
23           THE COURT:  Please be seated.  So the Court's back
24  on the record in United States versus [sic] America versus
25  Bart Wade Reagor, Criminal No. 2:21-CR-25-Z-BR-1, now, on
```

Stacy Mayes Morrison
Official Court Reporter

(Outside of the Jury's Presence)

1    hearing to address Jury Note No. 2 where the following words

2    are written to Judge Kacsmaryk.  We are deadlocked.

3            And so, at this point, I will hear recommendations

4    from both parties.

5            I'll state at this moment I am disinclined to go

6    directly into an Allen Charge.  I'm leaning towards either

7    sending a note back or bringing in the jury and just giving

8    them an admonition to continue the work done in the typical

9    form that we've seen, but I'm open to persuasion and argument

10   of the parties.

11           Mr. Haag?

12           **MR. HAAG**:  Yes, Your Honor.  I believe at least at

13   this stage the appropriate resolution would be to send a note

14   back to the jurors asking them to please continue their

15   deliberations.

16           **THE COURT**:  Okay.  And is it the Government's

17   position that we do not need to do that from the bench or

18   with the jury present in the courtroom?

19           **MR. HAAG**:  I think so, Your Honor.  I think a

20   written note would be sufficient, at least for this at this

21   point.

22           **THE COURT**:  Okay.  From the Defendant?

23           **MR. POWELL**:  Your Honor, we're okay with that as

24   well.  I don't think it's appropriate to -- or I don't think

25   it's necessary to bring them out.

Stacy Mayes Morrison
Official Court Reporter

(Outside of the Jury's Presence)

1          THE COURT:  Okay.  So, at this point, I'll -- I'm

2     using -- there's a Fifth Circuit case that summarizes some of

3     the pitfalls in sending instructions back where we receive a

4     deadlock notice.  It's the *Lindell* case, and I'm missing the

5     case citation.

6          But it's essentially collecting the Fifth Circuit

7     instructions on that.  Avoid references to numerical

8     divisions.  That should not be communicated at any point.

9     Set no deadlines.  Give no hard coercive language about

10    continuing.

11         So I won't do any of those things.  I'll just

12    encourage them, you know, consistent with the jury charge and

13    the Court's instructions, to continue deliberating.

14         I was going to add a note about how much work the

15    attorneys and the parties have put into this case and how

16    they should anticipate a final result in the form of a

17    verdict, if possible, unless the Government or the Defendant

18    disagree with that and would find that coercive.

19         **(Mr. Powell/Mr. Haag sotto-voce conference.)**

20         **MR. HAAG:**  Your Honor, I guess in the silent

21    consultation with Mr. Powell, that we are of the opinion

22    that, at this point, just the simple one sentence:  Please

23    continue your deliberations at this point.

24         Should that progress further, then perhaps it might

25    be more appropriate, but I think the first one is just --

(Outside of the Jury's Presence)

1              THE COURT:  Okay.  We'll use a note again this
2     time.
3              I want to prepare counsel for the Court's next
4     step, if necessary.  The Court is reviewing the Fifth Circuit
5     Criminal Pattern Charge 1.53 on the modified Allen Charge, so
6     should we get another note on deadlock, you should anticipate
7     some discussion and my consultation with the parties on the
8     appropriateness of that modified Allen Charge.  So I believe
9     that's a potential next step should we receive a similar
10    note.
11             But, at this point, we will send a similar note
12    back to the jury encouraging them to further their
13    deliberations consistent with the jury charge and encourage
14    them to reach a final result.
15             Is that acceptable to the Government?
16             MR. HAAG:  Yes, Your Honor.
17             THE COURT:  Acceptable to the Defendant?
18             MR. POWELL:  It is, Your Honor.
19             THE COURT:  Okay.  And you will receive copies of
20    those by e-mail.
21             All right.  The Court stands in recess, and we'll
22    send the note.
23             COURT SECURITY OFFICER:  All rise.
24         (Recess at 4:48 p.m.; deliberations continued)
25                   -------------------------

Stacy Mayes Morrison
Official Court Reporter

(Outside of the Jury's Presence)

1            <u>JURY NOTE NO. 3</u>

2        **(During deliberations, the jury sent out a note; the**

3    **following took place in open court with all parties present**

4    **at 5:38 p.m.)**

5            **THE COURT**:  Please be seated.  And the Court is

6    back on the record in United States of America versus Bart

7    Wade Reagor, Criminal Action No. 2:2O-CR-25-Z-BR-1 [*sic*], for

8    a hearing on Jury Note No. 3.

9            And I'll read that aloud, and then I'll ask the

10   attorneys for their recommendations on moving forward.

11           To Judge Kacsmaryk, quote:  There is no way we can

12   be unanimous.  Can we at least be dismissed for the day?

13           So it's the Court's intention, unless I hear

14   persuasive argument from either side, to dismiss them for the

15   day, and then because we have some jurors who are traveling

16   extreme distances, I'm going to order a 10:00 start time for

17   the morning.  I know we have at least one juror who's

18   approximately two hours away.

19           So after the pace that we've set for this case

20   throughout this week, if I can give them a break this evening

21   and then also on the front end, given some of the travel

22   distances involved for some of these jurors, maybe cooler

23   heads can prevail.  They can restart refreshed.

24           Is there any objection to that game plan from the

25   Government?

(Outside of the Jury's Presence)

1          **MR. HAAG**:  No, Your Honor.

2          **THE COURT**:  Is there any objection to that game

3    plan from the Defendant?

4          **MR. POWELL**:  No, Your Honor.  And I'm sure the

5    Court is going to do this, but as long as they can get a lot

6    of very strict admonishments about watching news reports

7    and --

8          **THE COURT**:  Absolutely, and especially approaching

9    reporters and things like that.

10         So let me -- let me make sure that I've got my

11   notes ready for those admonitions.  I intend to tell them the

12   following:

13         Let me know if either of the career prosecutors in

14   the room have additional admonitions that you would request.

15         But I intended to tell them the following at the

16   close of today before they're dismissed:

17         Members of the Jury, thank you so much for your

18   diligence today.  In a moment, we're going to be recessing

19   until 10:00 a.m. in the morning.

20         I remind you not to talk about the case with

21   anyone.  If you will please, leave your notepads in the jury

22   room.  They will be available for you when you return

23   tomorrow morning.  If you'll be here a little before 10:00 in

24   the morning, we'll start shortly after everyone arrives.

25         Once again, please do not read or watch news media

(Outside of the Jury's Presence)

1    stories or conduct independent research on the events of this

2    case or the people involved.

3           Additionally, if you are contacted by any third

4    parties, such as the media, about this case, please notify

5    the Court immediately.

6           Members of the Jury, you are dismissed for the

7    evening.

8           And then I thought about giving a little pep talk

9    about how hard they've been working and how hard the

10   attorneys and parties in the case have been working.

11          Is there any other particular instruction that you

12   would request, Mr. Haag?

13          **MR. HAAG**:  No, Your Honor.

14          **THE COURT**:  Is there any particular instruction

15   that you would request, Mr. Powell?

16          **MR. POWELL**:  No, sir, Your Honor.

17          **THE COURT**:  So I'll leave them with that, and then

18   I want to bring them in as quick as we can so that they can

19   be dismissed as requested.

20          I'll paper this with, again, a response to Jury

21   Note 3.  You'll receive it by e-mail, but we'll do that

22   later.  We'll do this on the record with the jury present.

23          So, at this point, I'll instruct the Marshals and

24   CSOs to bring in the jury.

25          **(The jury returned to the courtroom at 5:41 p.m.)**

1    **COURT SECURITY OFFICER**:  All rise for the jury.

2    **THE COURT**:  Okay.  Please be seated.  Members of

3    the Jury, thank you so much for your diligence today.

4         In a moment, in response to Jury Note 3, we are

5    going to be recessing until 10:00 a.m. tomorrow morning.  So,

6    in response to the note, I've consulted with the parties and

7    the attorneys in this case, and we're agreed, after the pace

8    of this case and the work effort that's been put in by you

9    and also the attorneys, we think we're ready to break, and

10   you'll soon be dismissed.

11        During that time, I will remind you not to talk

12   about the case with anyone.  If you will please, leave your

13   notepads in the jury room.  They will be available for you

14   when you return tomorrow morning.  If you'll be here a little

15   bit before 10:00 a.m. in the morning, we'll start shortly

16   after everyone arrives.

17        Once again, please do not read or watch news media

18   stories or conduct research on the events of the case or the

19   people involved.  So it's very important, given some of the

20   high profile names and events that circulate around this

21   case, that you don't do your own independent research.  And

22   if you are contacted by any third party, including the news

23   media, about this case, please immediately notify the Court,

24   and I'll coordinate with the counsel to make sure that we

25   have a correct response to that.

1        And, as with today, lunch will be provided.  The

2  Court will take care of those needs.

3        And I do want to thank you for the deliberation

4  that you've already done and the hard work that you've put

5  into this case.  I know that we've been working at a very

6  fast pace.

7        At this point, we are prepared to dismiss you, and

8  we want to give you a later start time, so that you don't

9  continue at this breakneck pace any further.  So you are

10  dismissed for the remainder of the evening.

11        Follow my instructions on jury badges, your notes,

12  and the rest, and we will reconvene tomorrow at 10:00, and

13  you are dismissed, and you are excused.

14        **COURT SECURITY OFFICER**:  All rise.

15     **(Jury recessed for the day and leaves courtroom at 5:44**

16  **p.m.)**

17        **THE COURT**:  Okay.  Please be seated.

18        And I'll instruct my courtroom deputy to make sure

19  that the sound barrier is on in that deliberation room.

20        Again, as I discussed, it's the Court's intention,

21  not when the jury arrives tomorrow, but if we receive another

22  note, at that point to proceed to the modified Allen Charge

23  that I identified earlier.

24        If you have any legal arguments that you would make

25  on the phrasing of that, I intend to track pretty closely

1    with the pattern on that.  If you have any recommendations,

2    I'll hear them before I instruct on the modified Allen

3    Charge.

4              When they arrive tomorrow, I intend to encourage

5    any additional notes in the form of questions that would help

6    clarify anything that can be clarified by the Court unless

7    the Government or Defendant object to that.

8              I -- you know, the first question was substantive.

9    I don't want to end any inquiries into substantive legal

10   questions that the Court may ask, but, at the same time, I'm

11   amenable to the idea that we don't want a lot of back and

12   forth on that.  The jury charge should be sufficient.

13             But I'll hear your recommendations on that, Mr.

14   Haag?

15             MR. HAAG:  Your Honor, I guess my recommendation

16   will be just to allow the jurors to come tomorrow at 10:00,

17   begin their deliberations and see how things play out.

18             THE COURT:  Okay.

19             MR. HAAG:  Again, hopefully, maybe taking a break,

20   you know, a good night's sleep, and perhaps they can reach a

21   verdict.

22             THE COURT:  Okay.  And Mr. Powell?

23             MR. POWELL:  We're in agreement with that, Your

24   Honor.

25             THE COURT:  Okay.  Well, then I won't invite any

(Outside of the Jury's Presence)

1   further inquiries into questions of law, or anything like

2   that.  I'll just let them begin their deliberations promptly

3   with minimal instructions, just the standard instructions on

4   how they move about the space and the courtroom and the rest.

5           So we'll do that beginning promptly at 10:00.  I'll

6   encourage counsel to be immediately available around 9:30

7   should any emergencies erupt.

8           So we will see you sometime between 9:30 and 10:00.

9   The Court stands in recess.  You are dismissed.

10          **COURT SECURITY OFFICER**:  All rise.

11      **(Proceedings recessed at 5:46 until 10:00, 10/15/2021.)**

12

13                  --------------------------

14

15              <u>**PROCEEDINGS FOR OCTOBER 15, 2021**</u>

16      **(The following took place in open court with the**

17  **defendant present, but without the jury.)**

18          **THE COURT**:  Please be seated.

19          The Court calls United States of America versus

20  Bart Wade Reagor, No. 2:21-CR-25-Z for continued jury

21  deliberations.

22          At this point, the Court is prepared to call in the

23  jury.

24          Does the Government have any housekeeping before we

25  do that?

 1          MR. HAAG:  No, Your Honor.

 2          THE COURT:  Does the Defendant have any

 3   housekeeping before we do that?

 4          MR. POWELL:  No, Your Honor.

 5          THE COURT:  At this point, we will call in the

 6   jury.

 7        **(The jury returns to the courtroom 10:09 a.m.)**

 8          COURT SECURITY OFFICER:  All rise for the jury.

 9          THE COURT:  Please be seated.

10          Members of the Jury, I'm hopeful that a bit of a

11   break this morning allowed you to recuperate on any sleep

12   that you've lost through this long process.

13          At this point, I'm going to allow you to retire to

14   the jury room to continue your deliberations.

15          All the same instructions apply.  Just be very

16   careful that all twelve are present when you're doing those

17   deliberations.  If you do require any breaks, please

18   coordinate with our Court Security Officer on breaks so that

19   our personnel are aware if anybody is exiting or leaving the

20   room.

21          If there's anything you need in the terms of -- or

22   I should say in terms of refreshments, anything that would

23   ease this long and hard process, please let us know.  Our

24   court staff stands ready to give you what you need to

25   complete this process.

1          So, at this point, I'm going to encourage you to

2     keep going, to continue these jury deliberations.  As always,

3     you should be guided by that jury charge.  And if you need

4     any additional copies or materials that are not yet

5     available, if you're struggling with IT technology, anything

6     like that, just know that our court staff is at the ready to

7     make that process as comfortable as possible.

8          So, at this point, I'm going to instruct you to

9     retire to the jury room to continue your deliberations.  And

10    please let my staff know if there's anything else we can do

11    to help that process move forward, and we'll send in IT

12    support, we'll send in refreshments, and, of course, you'll

13    get your lunch break as usual.  We will do whatever it takes

14    to make that process as comfortable as possible, so we are

15    happy to help, and don't hesitate to ask.

16         So, at this point, I'll instruct you to retire for

17    further deliberation.

18         **COURT SECURITY OFFICER**:  All rise for the jury.

19    **(The jury leaves the courtroom for deliberations at**

20    **10:11 a.m.)**

21         **THE COURT**:  Please be seated.  So the Court will

22    give both parties the usual instructions to have at least one

23    member of your team within 15 miles of the courthouse.  We

24    have your contact information.  Keep your cell phones close.

25    Check your e-mail.

Morning Session Matters
(Outside of the Jury's Presence)

1          I am going to send out the official copy of this
2    Court's response to Juror Question No. 3.  We did that orally
3    yesterday, but I'll just memorialize that in a document.
4    That will be sent to your e-mails, but just have at least one
5    member of your team ready and accessible.  We don't have any
6    hearings in this courtroom.  We've cleared the deck.

7          So as soon as we get a question or we get a verdict
8    or we get anything responsive from the jury, I'll notify you.
9    We'll reconvene in this room.

10         And I know this has been a long week, but everybody
11   has worked diligently, and I want to compliment counsel both
12   for the Government and the Defendant for an extremely
13   efficient use of judicial resources.  This is one of the most
14   efficient cases I've ever seen, and it's really because both
15   sides have worked very hard on this case.

16         It's Friday.  I know it's exhausting, but bear with
17   us a little bit longer, and please let my court staff know if
18   there's anything that the attorneys need on this case.  We'll
19   be responsive to that as well.

20         The Court stands in recess until further notice.

21         **COURT SECURITY OFFICER**:  All rise.

22      **(Recess at 10:12 a.m.; deliberations continued)**

23

24             --------------------------

25

(Outside of the Jury's Presence)

1           JURY NOTE NO. 4

2       **(During deliberations, the jury sent out a note; the**

3   **following took place in open court with all parties present**

4   **at 11:57 a.m.)**

5           **THE COURT:**  Please be seated.  The Court is back on

6   the record in United States of America versus Bart Wade

7   Reagor, Criminal Action No. 2:21-CR-25-Z-BR-1 to convene a

8   hearing with the parties regarding Jury Note No. 4, which

9   reflects the following text to Judge Kacsmaryk.

10          Quote:  May we have court transcripts?

11          So neither party requested, and this Court did not

12  issue, a preliminary instruction on note-taking during voir

13  dire or in the jury charge, but I will use the following

14  pattern, which is most frequently used as a preliminary

15  instruction during voir dire, but can be converted in the

16  past tense.

17          It's the Fifth Circuit Criminal Pattern Jury

18  Instruction 1.02, Note-Taking By Jurors, and I'm using

19  alternate -- Alternative B, so I do allow for note-taking so

20  that's the correct language.

21          I will simply convert this to the past tense and

22  then send this back in note form, as long as I don't hear

23  disagreement or argument from the parties.

24          Quote:  Your notes should be used only as memory

25  aids.  You should not give your notes precedence over your

(Outside of the Jury's Presence)

1    independent recollection of the evidence.  If you do not take

2    notes, you should rely upon your own independent recollection

3    of the proceedings.  And you should not be unduly influenced

4    by the notes of other jurors.  Notes are not entitled to any

5    great weight, greater weight than the memory or impression of

6    each juror as to what the testimony may have been.

7            Whether you take notes or not, each of you must

8    form and express your own opinion as to the facts of the

9    case.

10           Then most relevant here:  You will note that we do

11   have an official court reporter making a record of the trial.

12   However, we will not have typewritten transcripts of this

13   record available for your use in reaching a decision in this

14   case.

15           So the Fifth Circuit has repeatedly held whether

16   jurors take notes in a matter is a matter of discretion of

17   the trial judge, and that's from the *Fortenberry* case, 644

18   [*sic*] F.2d 1288, and the *Rhodes* case, 631 F.2d 43.

19           This Court did permit the jurors notepads and

20   note-taking, but did not include a separate instruction

21   either in the preliminary form or in the charge.

22           At this point, I'll just convert this language to a

23   response unless I hear a reasoned legal objection from either

24   the Government or the Defendant.

25           Mr. Haag?

(Outside of the Jury's Presence)

 1        **MR. HAAG:**  Yes, Your Honor.  I'm good with that

 2   instruction.  I'm wondering -- and I'm speaking just sort of

 3   pondering out loud, I'm wondering if it might be helpful to

 4   add a sentence at the end.  I know in past trials, if there

 5   is a specific isolated portion of the transcript, then we

 6   have provided that to the jurors.

 7             And I'll defer to Mr. Powell's opinion.  But, you

 8   know, for example, if they want to say, we want to hear what

 9   such and such said about such and such, we've given that

10   portion of a transcript.

11             But I'll defer to Mr. Powell as to whether he

12   thinks that's helpful or not.

13        **MR. POWELL:**  And I certainly have seen that as

14   well, Your Honor.  When there is a certified dispute as to

15   testimony from a witness, as far as their recollection is

16   concerned, I have seen that.

17             However, in this case, it doesn't appear to be the

18   situation, or at least we don't know if that's the situation.

19        **THE COURT:**  No.  This jury has struggled with

20   specificity in their questions.

21        **(Laughter.)**

22        **MR. POWELL:**  Yeah.  Yes, sir.  And so -- no

23   question.  And so I would object to including that sentence

24   that Mr. Haag is suggesting and just do what the Court has

25   proffered.

1          **THE COURT**:  And, Mr. Frausto, I know Jeff Haag is

2     lead here, but it seems that you had an idea.

3          **MR. HAAG**:  I think my suggestion, Your Honor, would

4     be, and, again, but perhaps add one sentence that, if there

5     is a specific portion of the trial transcript, then you may

6     request that portion, but I'll defer to Mr. Powell if he --

7          **THE COURT**:  I think at this point we're going to --

8     I think because we did not -- neither party requested the

9     preliminary instruction on note-taking, I think it's

10    important that I give that at this time.

11         **MR. HAAG**:  Okay.

12         **THE COURT**:  And then follow with this final

13    paragraph, that written transcripts are not available, and --

14         **MR. HAAG**:  That's fine, Your Honor.

15         **THE COURT**:  This is the Court's rationale for

16    considering an admonishment to this jury when they were

17    present that the forms of their jury notes should require

18    additional specificity to help the Court work with counsel to

19    formulate, you know, greater particularity in their response.

20         Like, thus far, you know, we've had Kafkaesque

21    brevity in the notes to the Court.  So if we -- you know, at

22    the next opportunity when the jury is present, at this time

23    it may be appropriate -- I won't force it on the parties, but

24    it may be important to give that instruction that the Court

25    discussed yesterday, that they should be more particular and

(Outside of the Jury's Presence)

1    really focus on the specific thing or question or item of

2    evidence that they have a question about instead of general

3    questions about transcripts, aiding and abetting.  You know,

4    these have come in very general forms, and so the Court is

5    struggling to give particular and specific responses.

6           We're all trying to abide the patterns and instruct

7    them to follow the charge, but, at this point, the questions

8    are so vague that I'm concerned that we might not be giving

9    them the content they need to reach a result.

10          So I'm going to send back this 1.02 form, and if

11   that produces another question, I am then going to call them

12   in at this point and admonish them to state their questions

13   with greater particularity because the attorneys will work

14   with the Court to give a more particularized response.

15          So far, I've been sending back pattern language and

16   form language.  It doesn't really relate to any particular

17   caselaw or any particular fact or element of the trial, but

18   if they give us more particularity in response to that

19   instruction, then we can take up transcript excerpts and

20   things like that.

21          Is that acceptable to the parties?

22          **MR. HAAG**:  Yes, Your Honor.  I'm good with the

23   pattern.  No additional language.

24          **THE COURT**:  Okay.  We'll send the pattern one more

25   time.  If we get another generalized and vague question, I'll

(Outside of the Jury's Presence)

1    call the jury in.  I'll give them the instruction, from this

2    point forward, we're going to request greater particularity

3    in the form of the question so the parties can work together

4    to give a more particular response.

5         But, right now, I'm just going to send the form

6    back.

7         MR. HAAG:  Yes, Your Honor.

8         THE COURT:  Understood?  Okay.  Court stands in

9    recess.  You will receive your electronic copy, and we'll

10   notify you if we have any additional paperwork from the jury.

11        COURT SECURITY OFFICER:  All rise.

12        (Recess at 12:04 p.m.; deliberations continued)

13        --------------------------

14        JURY NOTE NO. 5

15   (During deliberations, the jury sent out a note; the

16   following took place in open court with all parties present

17   at 1:57 p.m.)

18        THE COURT:  Please be seated.  The Court calls

19   Criminal Action No. 2:21-CR-25-Z-BR-1, United States of

20   America versus Bart Wade Reagor for continued jury

21   deliberations and to convene a hearing on Jury Note No. 5,

22   which I'll now read aloud, addressed to Judge Kacsmaryk.

23        Quote:  We are still deadlock with no agreement.

24   We have been through all evidence.  All jurors say they will

25   not reconsider their vote.

(Outside of the Jury's Presence)

1         At this point, as previously discussed, the Court

2    is inclined to call back the jury and read aloud the Allen

3    Charge as it appears in the Fifth Circuit Pattern 1.53.  I

4    have provided counsel with a copy of that pattern and ask

5    that you review that at this time and state any objections to

6    any portion of that pattern.

7         **MR. POWELL:**  Your Honor, before we -- may I address

8    the Court?

9         **THE COURT:**  Yes.

10        **MR. POWELL:**  Before we get into the Allen Charge,

11   the Defense feels it's necessary at this time to move for a

12   mistrial.

13        The jury has deliberated, by my calculations, in

14   the neighborhood of ten and a half to eleven hours total

15   time.  That has even surpassed the amount of time that it

16   took to present the evidence.

17        This is now the third note that the jury has sent

18   to the Court stating that they are deadlocked, and it doesn't

19   appear that they're going to be able to reach a verdict.  So,

20   at this time, we would move for a mistrial, Your Honor.

21        **THE COURT:**  Okay.  And a response from the

22   Government?

23        **MR. HAAG:**  Your Honor, we would object to a

24   mistrial at this time.  We think the more prudent course of

25   action would be to give the Allen Charge and then proceed

(Outside of the Jury's Presence)

1    from there.

2         THE COURT:  Okay.  So this Court will reserve

3    judgment on the pending Motion for Mistrial.

4         And, at this moment, the Court will instruct --

5    unless I hear objections to the particular modified Allen

6    Charge that appears in the pattern, I think the more prudent

7    course is to allow the jury to hear that Allen Charge, and

8    then we'll discuss the additional instruction on

9    particularized questions in the jury form.

10        So I will carry forward and reserve judgment on

11   that motion.  I will allow you to re-urge it at the next

12   interval where we get a jury note, but, at this point, I

13   think the best course of action is to present the Allen

14   Charge language that the Fifth Circuit has patterned, and

15   then I'll hear your recommendations on an additional

16   instruction for particularized questions and inquiry.

17        So I will deem that motion pending, and I will

18   reserve judgment until the next time the Court convenes a

19   hearing with counsel and the parties present.

20        MR. POWELL:  Thank you, Your Honor.

21        THE COURT:  Understood.  Okay.  So any objections

22   to the 1.53 Fifth Circuit Criminal Pattern on the modified

23   Allen Charge?

24        MR. HAAG:  No, Your Honor.

25        THE COURT:  Any objections to the 1.53 modified

(Outside of the Jury's Presence)

 1    Allen Charge as it appears in that Fifth Circuit Pattern?

 2           **MR. POWELL:**  No, Your Honor.

 3           **THE COURT:**  Okay.  Let's move now to one additional

 4    paragraph on specificity in questions.

 5           So the parties did work through the break to try to

 6    reach agreement on a form of an explanation that's

 7    acceptable.  It's my understanding that the parties are close

 8    to something resembling this language, but that the Defendant

 9    may still object.

10           Quote:  For any further notes from the jury, if you

11    can be more specific in your question or request, then the

12    Court and the parties will be better able to respond to that

13    question or request.

14           So is this the form that the Government is

15    requesting?

16           **MR. HAAG:**  Yes, Your Honor, it is.

17           **THE COURT:**  And does the Defendant object to this

18    one additional sentence added to the modified Allen Charge?

19           **MR. POWELL:**  We do at this time, Your Honor, just

20    for the mere fact that the jury hasn't specified that there

21    is a particular disagreement that they need to have some

22    clarification on.  I know they've given some ambiguous notes

23    to the Court.

24           But we don't think -- it seems like over the last

25    couple of hours of deliberation, that doesn't seem to be the

(Outside of the Jury's Presence)

1    issue anymore, and so we would object that it's not proper;

2    that it's not necessary at this time, Your Honor.

3         If the Court does -- excuse me, Your Honor.

4         **THE COURT**:  Well, and I would say, looking across

5    the five, there have been references to -- there have --

6    there have been notes requesting clarification on aiding and

7    abetting.  There have been questions about the availability

8    of transcripts.  There have been questions on the Indictment

9    and request to see that.

10        So, to date, I think we have had three questions

11   that identified a category, but not stated with

12   particularity.  So I'm inclined to give this, and that's the

13   reason I'm still considering it.  But I'll allow you to

14   preserve your objection.

15        **MR. POWELL**:  Thank you, Your Honor.  We would just

16   object on that, that it's premature; that there hadn't been a

17   specific issue.

18        I understand the Court's reasoning that that --

19   that it does seem that they have some confusion maybe about

20   some of the issues, but I don't know if that's dissipated or

21   it seems to be.  It's just one man's opinion.

22        As far as that particular sentence, if the Court

23   overrules our objection, we have no problem with that

24   language.  Mr. Haag and I have visited about that particular

25   sentence, and we're fine with that sentence.  We just don't

1  think it's necessary at this time.

2       THE COURT:  Okay.  So the Court overrules the

3  objection to that sentence.  And it's the Court's

4  understanding now that the Court has entered its ruling

5  there's no further objection to the phrasing of the question;

6  is that correct?

7       MR. POWELL:  That's correct, Your Honor.

8       THE COURT:  Okay.  At this point, I'll instruct

9  Court Security Officers and Marshals to bring in the jury.

10       COURT SECURITY OFFICER:  All rise for the jury.

11     **(The jury returns to the courtroom at 2:03 p.m.)**

12       THE COURT:  Please be seated.  Okay.  Very briefly,

13  after consulting with the attorneys, I will instruct you in

14  what the Fifth Circuit has termed a modified Allen Charge.

15  The name "Allen" just refers to a famous Supreme Court case.

16  I'll give you this instruction, and then we'll move forward

17  from there.

18       Members of the Jury, I am going to ask that you

19  continue your deliberations in an effort to agree upon a

20  verdict and dispose of this case, and I have a few additional

21  comments I would like for you to consider as you do so.

22       This is an important case.  If you should fail to

23  agree on a verdict, the case is left open and may be tried

24  again.

25       Any future jury must be selected in the same manner

1    and from the same source as you were chosen, and there is no

2    reason to believe that the case could ever be submitted to

3    twelve men and women more conscientious, more impartial, or

4    more competent to decide it, or that more or clearer evidence

5    could be produced.

6            Those of you who believe that the Government has

7    proved the defendant guilty beyond a reasonable doubt should

8    stop and ask yourselves if the evidence is really convincing

9    enough, given that other members of the jury are not

10   convinced.

11           And those of you who believe that the Government

12   has not proved the defendant guilty beyond a reasonable doubt

13   should stop and ask yourselves if the doubt you have is a

14   reasonable one, given that other members of the jury do not

15   share your doubt.

16           Remember at all times, that no juror is expected to

17   yield a conscientious opinion he or she may have as to the

18   weight or effect of the evidence, but remember also that,

19   after full deliberation and consideration of the evidence in

20   the case, it is your duty to agree upon a verdict if you can

21   do so without surrendering your conscientious opinion.

22           You must also remember that, if the evidence in

23   this case fails to establish guilt beyond a reasonable doubt,

24   the accused should have an unanimous verdict of not guilty.

25           You may be as leisurely in your deliberations as

1  the occasion may require and should take all the time which

2  you may feel is necessary.

3          I will ask now that you retire once again and

4  continue your deliberations with these additional comments in

5  mind to be applied, of course, in conjunction with all of the

6  instructions I have previously given to you.

7          For any future notes from the jury, if you could be

8  or can be more specific in your question or request, then the

9  Court and the parties will be better able to respond to that

10  question or request.

11          And I notice that some people are wearing jackets.

12  If we need to adjust the thermostat, things as simple as HVAC

13  convenience, again, our court staff stands ready to assist

14  you.  So if it's too cold, let us know, and we can make that

15  adjustment to make these deliberations more comfortable.

16          So, with that, I'll instruct you to retire for

17  further deliberations consistent with these instructions.

18          **COURT SECURITY OFFICER**:  All rise.

19      **(The jury left the courtroom for deliberations at 2:07**

20  **p.m.)**

21          **THE COURT**:  Please be seated.  And, at this point,

22  I'll instruct court staff, CSO, and Marshals to confer with

23  the jurors about the temperature in the room.  It does appear

24  that a couple of people are breathing smoke as they exit the

25  jury room.

1      (Laughter.)

2          THE COURT:  So if it's too cold, we definitely need

3   to make that accommodation.

4          Is there anything further from the Government?

5          MR. HAAG:  No, Your Honor.  Thank you.

6          THE COURT:  Is there anything further from the

7   Defendant?

8          MR. POWELL:  No, Your Honor.

9          THE COURT:  Okay.  As we've done with these various

10  questions, I will document the Court's response, and you'll

11  receive those in your e-mail.

12         Please continue to abide the Court's instructions

13  to have at least one member of your team within 15 minutes of

14  the courtroom, and we'll continue to communicate as we have

15  done so up to this point.  You are excused.

16         COURT SECURITY OFFICER:  All rise.

17      (Recess at 2:07 p.m.; deliberations continued)

18          --------------------------

19                  <u>JURY VERDICT</u>

20      **(The following took place in open court with the**

21  **defendant present, but without the jury present at 3:43 p.m.)**

22         THE COURT:  Please be seated.  Okay.  So I received

23  word from the jury that they have reached a verdict in this

24  case.  And, at this point, consistent with Rule 43(b), I will

25  call in the jury, and we will go through the reading of the

 1    verdict and the process to follow.

 2           At this point, I'll instruct the Court Security

 3    Officers and Marshals to bring in the jury.

 4        **(The jury returns to the courtroom at 3:44 p.m.)**

 5           **COURT SECURITY OFFICER**:  All rise for the jury.

 6           **THE COURT**:  Please be seated.  Members of the Jury,

 7    I understand that you have reached a unanimous verdict in

 8    this case.

 9           At this point, I will hand the verdict form to my

10    courtroom deputy.  And these are the procedures that we're

11    going to follow from this point forward.

12           So in a moment, my courtroom deputy will read aloud

13    the verdict.  After the verdict is read, I'm going to ask

14    each of you individually if this is your verdict.  This is

15    called polling the jury.  And the purpose of polling is to

16    make sure that it is a unanimous verdict.

17           So as I ask each of you if this is your verdict,

18    I'll just ask you to raise your hand and say, yes, if this is

19    the case.

20           At this time, if the defendant will please stand

21    with counsel.  My courtroom deputy will now read aloud and

22    publish the verdict.

23           **COURTROOM DEPUTY**:  In the United States District

24    Court for the Northern District of Texas, Amarillo Division,

25    United States of America versus Bart Wade Reagor.

```
 1                  Verdict of the Jury
 2              We, the jury, find the defendant, Bart Wade Reagor,
 3    on Count One of the Indictment - Bank Fraud, not guilty.
 4              Count Two of the Indictment - Bank Fraud, not
 5    guilty.
 6              Count Three of the Indictment - False Statement to
 7    a Bank, guilty.
 8              THE COURT:  And now, as I discussed, the Court will
 9    poll the jury.
10              Juror No. 1, is this your verdict?
11              JUROR NO. 1:  Yes, Your Honor.
12              THE COURT:  And Juror No. 2, is this your verdict?
13              JUROR NO. 2:  Yes, Your Honor.
14              THE COURT:  Juror No. 3, is this your verdict?
15              JUROR NO. 3:  Yes, sir.
16              THE COURT:  Juror No. 4, is this your verdict?
17              JUROR NO. 4:  Yes, Your Honor.
18              THE COURT:  Juror No. 5, is this your verdict?
19              JUROR NO. 5:  Yes, Your Honor.
20              THE COURT:  Juror No. 6, is this your verdict?
21              JUROR NO. 6:  Yes, Your Honor.
22              THE COURT:  Juror No. 7, is this your verdict?
23              JUROR NO. 7:  Yes, Your Honor.
24              THE COURT:  Juror No. 8, is this your verdict?
25              JUROR NO. 8:  Yes, Your Honor.
```

1          **THE COURT**:  Juror No. 9, is this your verdict?

2          **JUROR NO. 9:**  Yes, sir.

3          **THE COURT**:  Juror No. 10, is this your verdict?

4          **JUROR NO. 10:**  Yes, Your Honor.

5          **THE COURT**:  Juror No. 11, is this your verdict?

6          **JUROR NO. 11:**  Yes, sir.

7          **THE COURT**:  Juror No. 12, is this your verdict?

8          **JUROR NO. 12:**  Yes, sir.

9          **THE COURT**:  Okay.  And, at this point, I will

10   direct my courtroom deputy to file and record the verdict.

11         And I will soon discharge you from your duties as

12   jurors, but I do want to provide some final instructions on

13   what you do from this point forward.

14         <u>**COURT'S CONCLUDING INSTRUCTIONS TO THE JURY**</u>

15         **THE COURT**:  First of all, you are excused from the

16   jury now that you have returned a verdict, and you are now

17   free to talk about this case with anyone.  You are also free

18   to decline to discuss this case if you wish.  As the Court's

19   Charge has explained, your deliberations are secret, and you

20   never have to explain this verdict to anyone.

21         Under the rules of our court, no one associated

22   with this case —— a lawyer, a litigant, or anyone acting on

23   their behalf —— is permitted to contact you, any member of

24   your family or any associate of yours about your

25   deliberations.  And that is a specific rule for the Northern

Case 2:21-cr-00025-Z-BR Document 166 Filed 08/22/22 Page 125 of 130 PageID 2338
Defendant Renews Motion for Judgment of Acquittal
Jury Excused
732

1    District of Texas.

2         I want to thank you sincerely on behalf of the

3    Court and staff and everyone associated with the case for

4    your tireless service.  We began early every day.  We worked

5    late every day.  And you were working long hours through

6    deliberations and many follow-up questions, so I commend you

7    on your diligence and your service to this Court and your

8    sense of civic responsibility to work this difficult case to

9    a conclusion.

10        Now, some housekeeping.  As a reminder, please hand

11   any notes that you took during trial, and your copy of the

12   jury charge to the CSO or Marshal.  You may not take it home

13   with you.  When you remove your personal belongings from the

14   jury room, please leave all of the exhibits and flash drives

15   and computer materials in the jury room.  We will need those

16   for other court procedures and record purposes.

17        At this point, I know it's been a long process, so

18   I'm just going to let you go.  Members of the Jury, thank you

19   for your service.  You are excused.

20        **COURT SECURITY OFFICER**:  All rise.

21     **(Jury is excused and leaves the courtroom at 3:48 p.m.)**

22        **THE COURT**:  Okay.  Please be seated.  At this time,

23   Mr. Powell, does the Defendant wish to renew his Motion for

24   Judgment of Acquittal?

25        **MR. POWELL**:  We do, Your Honor.

1          **THE COURT**:  Okay.  And I'll incorporate by

2     reference any arguments you made and any additional arguments

3     you would make at this time for record purposes.

4          **MR. POWELL**:  Nothing that we haven't already

5     offered to the Court.

6          **THE COURT**:  Okay.  Those are deemed incorporated by

7     reference.  The Court will give them appropriate weight.

8          Mr. Haag, a response from the Government?

9          **MR. HAAG**:  Your Honor, for the reasons stated in

10    the United States of America's trial brief, we respectfully

11    ask the Court to deny the motion.

12         **THE COURT**:  Okay.  The motion is denied for the

13    reasons stated in that brief and reasons previously argued by

14    the Government.

15         Regarding forfeiture in this case, I know the

16    Government represented that there would be a parallel

17    proceeding to adjudicate the forfeiture issues.

18         Pursuant to Rule 32.2, the Court will now address

19    Notice of Forfeiture.  The Court will hear any objections to

20    a Notice of Forfeiture that was issued in this case.

21         Is there any objection to the Notice of Forfeiture?

22         **MR. HAAG**:  None from the United States, Your Honor.

23         **MR. POWELL**:  No, Your Honor.

24         **THE COURT**:  Okay.  Based on the parties' responses,

25    the Court will defer ruling on any forfeiture and subject to

1    those parallel proceedings without any prejudice to whether

2    those assets and those things subject to forfeiture are

3    deemed administratively forfeited or judicially so.

4            I will anticipate filings from the United States

5    Attorney's Office specific to forfeiture, and I anticipate

6    that will come from the Asset Forfeiture/Money Laundering

7    Section.

8            And the Court will issue preliminary orders as

9    appropriate in response to those forfeiture filings.

10           Now, regarding sentencing, in the coming days, this

11   Court will enter an order setting schedule for sentencing,

12   which requires the relevant United States Probation Officer

13   to prepare a Presentence Report and sets forth the relevant

14   deadlines for objections, responses, and addendum.

15           During that Presentence Report process, the United

16   States Probation Officer may request to meet with the

17   defendant, who has an ongoing and continuing right to counsel

18   and to have counsel present throughout that presentence and

19   sentencing process.

20           So, Mr. Powell, I'll just admonish you to advise

21   your counsel of that presentencing process and his right to

22   counsel throughout that process.

23           **MR. POWELL**:  We will, Your Honor.

24           **THE COURT**:  Okay.  And the Court's order will also

25   include an anticipated date for the sentencing hearing

Custody 168   Pretrial Release 128 of 130

1    itself, and most of the deadlines will then back up from that

2    date.

3             Now, regarding custody.  After a defendant has been

4    convicted for a federal offense, there is a presumption that

5    defendant will be remanded into the custody of the

6    Government, specifically the United States Marshal.

7             Defendant must rebut the presumption by clear and

8    convincing evidence that, No. 1, defendant is not a flight

9    risk; and, No. 2, defendant is not a danger to any person.

10            Mr. Powell, are you prepared to make an argument,

11   or do you need a break to prepare those arguments?

12            **MR. POWELL:**  Can I have just a moment, Your Honor?

13            **THE COURT:**  Yes, and I'll instruct my courtroom

14   deputy to disable the microphones for purposes of that

15   attorney communication.

16        **(Mr. Powell/Mr. Haag sotto-voce conference.)**

17            **MR. POWELL:**  Your Honor, it's my understanding in

18   talking to the Government counsel that they were not going to

19   move to detain him today.  That was an agreement that was

20   reached with Mr. Cogdell and the Government a couple of days

21   ago now, and that's still my understanding from visiting with

22   them, that they are not going to move to detain him today.

23            **THE COURT:**  Okay.  So the Court will make a series

24   of findings in response to that.  I know that's the

25   agreement of parties, but I have a separate independent

1    obligation to weigh those concerns.

2           So regarding flight risk, although there are travel

3    items that appear in the Pretrial Service Report, which is

4    filed under seal, travel to Bermuda and other areas like

5    that, defendant has forfeited his passport, and it's my

6    understanding that he has been compliant with conditions of

7    pretrial release.  Is that correct, Mr. Haag?

8           **MR. HAAG:**  That is correct, Your Honor.

9           **THE COURT:**  Okay.  Now, regarding danger to any

10   person — this would also include danger to self — here, the

11   Pretrial Service Report does reflect that although -- and I'm

12   quoting directly, although this instant offense and this

13   experience has been emotionally taxing on his family and

14   especially on his wife, he has a strong and stable support

15   system in his family.

16          I want to make certain that the Government agrees

17   that by their assessment that continues to be true?

18          **MR. HAAG:**  It is, Your Honor.

19          **THE COURT:**  And, Mr. Powell, would you agree with

20   that initial Pretrial Service Report assessment of the

21   support and family network available to this defendant

22   through the sentencing process?

23          **MR. POWELL:**  We do, Your Honor.

24          **THE COURT:**  Okay.  Based on those representations

25   and also the findings set forth in the Pretrial Service

1   Report, the Court does find defendant is not a danger to any

2   person, and, in summary, the Court finds defendant has

3   proved, by clear and convincing evidence, that he is not a

4   flight risk or a danger to any person.

5        The terms and conditions of defendant's pretrial

6   release remain in effect, so, Mr. Powell, I'll have you

7   explain those to the defendant.

8        He is to remain on those conditions of pretrial

9   release and then expect an order setting sentencing schedule

10  in the coming weeks.  Do you understand that?

11       **MR. POWELL**:  Yes, sir.

12       **THE COURT**:  Okay.  The Court stands in recess.  We

13  are adjourned in this matter.  And I thank you for all of

14  your hard work and time.

15       **COURT SECURITY OFFICER**:  All rise.

16   **(End of trial by jury.)**

17                 *  *  *  *  *  *

18   I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  I further certify that the transcript fees format comply with

21  those prescribed by the Court and the Judicial Conference of

22  the United States.

23

24  s/Stacy Mayes Morrison        11/10/2021
    Stacy Mayes Morrison          Date
25  Official Court Reporter