```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT  OF TEXAS
 2                    AMARILLO DIVISION

 3   UNITED STATES OF AMERICA      §
                                   §
 4   VS.                           §     CRIMINAL ACTION
                                   §
                                   §     NO. 2:21-CR-25-Z (01)
 5   BART WADE REAGOR              §

 6   ===========================================================

 7            TRANSCRIPT OF SENTENCING HEARING
         BEFORE THE HONORABLE MATTHEW J. KACSMARYK
 8              UNITED STATES DISTRICT JUDGE

 9
                     MARCH 10, 2022
10
                    AMARILLO, TEXAS
11
     ===========================================================
12

13                 A-P-P-E-A-R-A-N-C-E-S

14

15   FOR THE GOVERNMENT:       MR. JEFFREY R. HAAG and
                               MS. AMANDA R. BURCH
16                             Assistant United States Attorneys
                               1205 Texas Ave., 7th Floor
17                             Lubbock, Texas  79401

18                                    AND

19                             MR. JOSHUA FRAUSTO
                               Assistant United States Attorney
20                             500 South Taylor, LB 238
                               Amarillo, Texas  79101-2442
21

22   FOR THE DEFENDANT:       MR. JOHN J.E. MARKHAM, II
                               Markham Read Zerner, LLC
23                             Attorneys At Law
                               1 Commercial Wharf West
24                             Boston, Massachusetts  02110

25                                    AND
```

Stacy Mayes Morrison
Official Court Reporter

```
 1   ALSO FOR DEFENDANT:        MS. NATALIE ARCHER
                                Archer Law Firm
 2                              Attorneys at Law
                                801 S. Fillmore, Suite 710
 3                              Amarillo, Texas  79101

 4
     COURT REPORTER:            MS. STACY MAYES MORRISON
 5                              Official Court Reporter
                                205 E. 5th, LB #F13263
 6                              Amarillo, Texas  79101
                                (806) 672-6219
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer.
```

VOLUME I (PAGES 1 - 140)

PAGE

CAPTION/APPEARANCES.................................................   1

INDEX..............................................................   2

SENTENCING PROCEEDINGS.............................................   6

CORONAVIRUS ANNOUNCEMENT...........................................   7

SENTENCING EVIDENTIARY STANDARDS...................................   7

COURT'S TENTATIVE ANNOUNCEMENT ON MOTIONS FOR VARIANCE.............   9

CASE CHRONOLOGY....................................................  10

PRESENTENCE REPORT/ADDENDA.........................................  10

GOVERNMENT'S FACTUAL CLARIFICATION OBJECTIONS MOOT.................  12

DEFENDANT'S FACTUAL CLARIFICATION OBJECTIONS MOOT..................  13

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
FLOOR-PLAN FRAUD AS RELEVANT CONDUCT...............................  15

COURT'S FINAL FINDING ON DEFENDANT'S OBJECTION TO FLOOR-PLAN
FRAUD AS RELEVANT CONDUCT..........................................  24

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
RELEVANT CONDUCT, LOSS AMOUNT......................................  24

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
SOPHISTICATED MEANS ENHANCEMENT....................................  27

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
ABUSE OF TRUST ENHANCEMENT.........................................  29

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
AGGRAVATING ROLE ENHANCEMENT.......................................  32

COURT'S TENTATIVE DETERMINATION ON DEFENDANT'S OBJECTION TO
RESTITUTION AMOUNT.................................................  35

RESTITUTION AMOUNT CLARIFICATION...................................  36

DEFENDANT'S ARGUMENT...............................................  37

PAGE

COURT'S RULING ON MODIFICATION OF RESTITUTION...................... 38

COURT'S FINAL FINDING ON DEFENDANT'S OBJECTION TO RESTITUTION
AMOUNT............................................................. 39

COURT ADOPTS PRESENCE REPORT/ADDENDA............................ 39

APPLICABLE STATUTORY MAXIMUMS..................................... 41

GUIDELINES CALCULATION............................................ 41

COURT'S TENTATIVE DETERMINATION ON VARIANCES...................... 42

GOVERNMENT'S EXHIBIT 1 ADMITTED, CD WITH VIDEOS................... 50

GOVERNMENT'S VARIANCE ARGUMENT.................................... 50

DEFENDANT'S VARIANCE ARGUMENT..................................... 64

CHARACTER STATEMENTS ADMITTED..................................... 75

DR. BRION REAGOR CHARACTER STATEMENT.............................. 76

ANNETTE REAGOR CHARACTER STATEMENT................................ 82

RACHEL ESLICKER CHARACTER STATEMENT............................... 85

RYAN REAGOR CHARACTER STATEMENT................................... 90

KATRINA SMITH CHARACTER STATEMENT................................ 105

DANIEL RILEY CHARACTER STATEMENT................................. 106

RILEY REAGOR CHARACTER STATEMENT................................. 109

ALLOCUTION OF THE DEFENDANT...................................... 115

GOVERNMENT'S SENTENCING ARGUMENT................................. 118

DEFENDANT'S REQUESTED FACILITY RECOMMENDATION.................... 119

DEFENDANT'S SENTENCING ARGUMENT.................................. 119

PRONOUNCEMENT OF SENTENCE........................................ 121

COURT DENIES MOTIONS FOR VARIANCE................................ 121

|  | PAGE |
|---|---|
| FORFEITURE | 122 |
| RESTITUTION | 122 |
| SUPERVISED RELEASE CONDITIONS | 123 |
| COURT'S STATEMENT OF REASONS | 126 |
| DEFENDANT'S REQUESTED MEDICAL TREATMENT RECOMMENDATION | 130 |
| COURT'S MEDICAL TREATMENT RECOMMENDATION | 132 |
| COURT'S FACILITY RECOMMENDATION | 132 |
| COURT'S VOCATIONAL/EDUCATIONAL RECOMMENDATION | 133 |
| RIGHT TO APPEAL | 134 |
| VOLUNTARY SURRENDER DISCUSSION | 136 |
| COURT'S FINDING ON RELEVANT DANGER AND FLIGHT RISK | 137 |
| VOLUNTARY SURRENDER | 138 |
| COURT'S FINDING ON CONDITIONS OF RELEASE | 139 |
| REPORTER'S CERTIFICATE | 140 |

| | |
|---|---|
| 1 | <u>**PROCEEDINGS FOR MARCH 10, 2022**</u> |
| 2 | **(The following took place in open court with the** |
| 3 | **defendant present.)** |
| 4 | **THE COURT**:  Please be seated.  The Court calls |
| 5 | Criminal Action No. 2:21-CR-25-Z-BR (01), United States of |
| 6 | America versus Bart Wade Reagor for sentencing. |
| 7 | Are the parties ready to proceed? |
| 8 | **MR. HAAG**:  Jeffrey Haag on behalf of the United |
| 9 | States.  We're ready to proceed, Your Honor. |
| 10 | **MR. MARKHAM**:  Good morning, Your Honor.  John |
| 11 | Markham for Bart Reagor, who is present, along with Natalie |
| 12 | Archer, our local counsel.  We're ready to proceed. |
| 13 | **THE COURT**:  And, Mr. Markham, if at any point a |
| 14 | different person will speak from your team, just notify the |
| 15 | Court, and I will permit that at sentencing.  So just make a |
| 16 | signal that another member of your team will be speaking, and |
| 17 | I'll be lenient on granting latitude for that. |
| 18 | **MR. MARKHAM**:  Thank you, Your Honor. |
| 19 | **THE COURT**:  Okay.  Now, Mr. Reagor, please |
| 20 | acknowledge your presence in court today by stating your full |
| 21 | name for the record. |
| 22 | **THE DEFENDANT**:  Bart Wade Reagor. |
| 23 | **THE COURT**:  And, Mr. Reagor, you may participate in |
| 24 | this hearing seated or standing, whatever you find most |
| 25 | comfortable and whatever is consistent with the advice of |

1   counsel.

2            THE DEFENDANT:  Thank you.

3            THE COURT:  The Court will make a necessary finding

4   regarding coronavirus, and then we'll proceed with

5   sentencing.

6            The Court is holding this sentencing hearing in the

7   midst of the COVID-19 Coronavirus Pandemic.  The court is

8   open to the public, along with an overflow room, consistent

9   with social-distancing protocols.

10           Pursuant to the Seventh Amended Special Order

11   No. 13-9, this Court expressly concludes and hereby finds

12   that this felony sentencing hearing may be conducted in

13   person without seriously jeopardizing public health and

14   safety and cannot be further delayed without serious harm to

15   the interests of justice.

16           And, Mr. Markham, does your client agree to proceed

17   in person notwithstanding coronavirus concerns?

18           MR. MARKHAM:  He does, Your Honor.

19           THE COURT:  Okay.  Thank you.  Now, because of the

20   volume of objections and written work product in this case, I

21   want to lay the groundwork for the evidentiary standards that

22   will be applied.  I know those are different than trial

23   standards.

24           The Court reminds the parties of those relaxed

25   standards at sentencing.  Here, the Court is guided by *Witte*

1   *versus United States*, 515 U.S. 389, and 18 U.S.C.

2   Section 3661.

3         Additionally, under Section 6A1.3, the Court may

4   consider information if it bears sufficient indicia of

5   reliability to support its probable accuracy, including

6   reliable hearsay evidence that might not appear at a trial.

7   So keep that in mind when you're making objections to

8   anything that may be elicited from witnesses in this case or

9   character statements.  It's a much more relaxed standard.

10        Additionally, out-of-court declarations by an

11   unidentified informant may also be considered where there is

12   good cause for the nondisclosure and sufficient corroboration

13   of the declarations by other means.  So if that comes up,

14   this Court will be guided by *United States versus Rodgers*,

15   1 F.3d 341.

16        And, finally, for sentencing purposes, the district

17   court need only find that the elements of an uncharged

18   offense are satisfied by a preponderance of the evidence.

19   Here, the Court will be guided by *United States versus*

20   *Nguyen*, N-G-U-Y-E-N, 854 F.3d 276.

21        And this standard of preponderance would apply to

22   sentencing enhancements, which may be proven by a

23   preponderance-of-the-evidence standard.

24        Now, finally, because the Presentence Report

25   elicited objections and responses and a lot of paperwork,

1    I'll remind counsel that this Court may adopt the facts

2    contained in a PSR without further inquiry if those facts

3    have an adequate evidentiary basis with sufficient indicia of

4    reliability and the defendant does not present rebuttal

5    evidence to otherwise demonstrate that the information is

6    unreliable.  And if that comes up, this Court will be guided

7    by *United States versus Cabrera*, 288 F.3d 163.

8              Now, before we begin with the usual recitation of

9    the Indictment and the procedural history of this case, I do

10   want to make a tentative announcement regarding the pending

11   motions for variance.

12             The Court has reviewed the Government's Conditional

13   Motion for Upward Variance —— this is in Document No. 142 ——

14   and Defendant's Motion for Downward Variance set forth in

15   Documents No. 144 and 145.

16             Based on those documents and information contained

17   in the PSR and the addenda, this Court has tentatively

18   determined that neither a non-guidelines upward variance to

19   300 months' imprisonment nor a non-guidelines downward

20   variance to sentence below the guidelines range are

21   appropriate under the Section 3553(a) factors that are

22   applied to the facts of this case.

23             This Court has made this tentative determination

24   out loud so that the parties have an adequate opportunity to

25   respond with information or argument for or against variance

1     or departure.  The correct time to make those arguments is

2     after the Court calculates and announces the advisory

3     guidelines range.  So I consider these motions carried

4     forward until such time as we adjudicate the Government's

5     Motion for Upward Variance, Defendant's Motion for Downward

6     Variance, and that will come after the Court calculates the

7     advisory guidelines range.

8              Now, Mr. Reagor, you were named in a three-count

9     Indictment charging you with two counts of Bank Fraud, in

10    violation of 18 U.S.C. Section 1344(2), and one count of

11    False Statement to a Bank, in violation of 18 U.S.C.

12    Section 1014.

13             You appeared before this Court for a criminal trial

14    on October 11, 2021.  And then on October 15, 2021, you were

15    convicted by a jury of your peers on the third count, False

16    Statement to a Bank, in violation of 18 U.S.C. Section 1014.

17             At this time, we will turn to the Presentence

18    Report and the addenda, and then also the written objections

19    and responses filed by both the Government and Defendant.

20             First, Mr. Haag, did the Government receive a

21    timely copy of the PSR and the addenda?

22             **MR. HAAG**:  Yes, Your Honor, it did.

23             **THE COURT**:  Other than the written responses, which

24    are set forth in sealed Documents No. 120 and 130, does the

25    Government have any objections or factual clarification

1    responsive to the PSR and the addenda?

2            MR. HAAG:  None other than those filed in writing,

3    Your Honor.

4            THE COURT:  Okay.  Does the Government adopt the

5    facts and conclusions set forth in the PSR as modified by the

6    first and second addenda?

7            MR. HAAG:  Yes, Your Honor, it does.

8            THE COURT:  Okay.  Mr. Markham, did your client

9    receive a timely copy of the PSR and the addenda?

10           MR. MARKHAM:  He did, Your Honor.

11           THE COURT:  Did you have a full and complete

12   opportunity to review the PSR and the addenda with your

13   client?

14           MR. MARKHAM:  Yes, we did, Your Honor.

15           THE COURT:  And did you explain to your client how

16   the PSR and the addenda intersect with this sentencing

17   hearing?

18           MR. MARKHAM:  I did.  And he understands that, Your

19   Honor.

20           THE COURT:  And you're confident that your client

21   fully understands how the PSR and the addenda work as we

22   adjudicate various enhancements and objections?

23           MR. MARKHAM:  I am, Your Honor.

24           THE COURT:  Okay.  Now, because there are so many

25   written responses, objections, and requested factual

1  clarification, the Court has grouped those objections as

2  follows:  We'll take up what I have categorized as factual

3  clarifications, and then we will move to the substantive

4  objections.

5          And, as always, the Court will announce its

6  tentative determination on each objection and then invite

7  argument from counsel, but only if the argument is not

8  cumulative of information or written material already before

9  the Court.

10         So let's address the factual clarifications first.

11         Mr. Haag, here, the Government filed six objections

12 requesting factual clarifications to the following PSR

13 Paragraphs:  31, 33, 53, 55, 103, 104, 205, and 211.  And

14 those are arguably rendered moot by the combined addenda.

15         Does the Government agree with the Court that the

16 combined addenda corrected the information discussed in the

17 Government's six objections seeking factual clarification?

18         **MR. HAAG**:  Yes, Your Honor, it did.

19         **THE COURT**:  Okay.  Now, at this point, does the

20 Government have any untimely objections or requested factual

21 clarifications that are not addressed by the addenda?

22         **MR. HAAG**:  No, Your Honor.

23         **THE COURT**:  Okay.  Now, Mr. Markham, by the Court's

24 inventory, Defendant filed seven objections requesting

25 factual clarifications to the following PSR Paragraphs:  13,

1  15, 42, 64, 66, and 93 through 104 that are arguably rendered

2  moot by the combined addenda.

3          Does the Defendant agree with the Court that the

4  addenda corrected the information discussed in Defendant's

5  seven objections seeking factual clarifications such that

6  those objections are rendered moot?

7          **MR. MARKHAM:**  We do, Your Honor, as to the factual

8  recitations.

9          **THE COURT:**  Okay.  And, Mr. Markham, if at any

10 point you need a ruling from the Court on any of those

11 paragraphs that is substantive in nature, we can adjudicate

12 it at that time.

13         **MR. MARKHAM:**  Thank you.

14         **THE COURT:**  Okay.  But as to the factual

15 clarification, the Court agrees with Defense Counsel that

16 those seven objections relevant to PSR Paragraphs 13, 15, 42,

17 64, 66, and 93 through 104 are mooted by the addenda.

18         Okay.  Now, does the Defendant continue to urge his

19 remaining objections affecting the advisory guidelines range?

20 I have grouped these as the substantive objections.

21         **MR. MARKHAM:**  We do, Your Honor.

22         **THE COURT:**  Okay.  As I explained at the outset, I

23 will enter a tentative finding objection by objection, and

24 then I'll afford the parties an adequate opportunity to

25 respond with information or argument as long as it is not

1    cumulative.

2          So, here, the Court will address Defendant's

3    written objections in the following sealed documents:

4    No. 126 and 131.  Those will be adjudicated alongside

5    Government's written responses set forth in sealed Documents

6    No. 127 and 134.  I'd just ask that counsel have those at the

7    ready, and, of course, those will be considered alongside the

8    addenda.

9          Now, regarding guidelines range, this is the first

10   category of substantive objection, and, here, Defendant's

11   written objection to the guideline range set forth in PSR

12   Paragraph 195 will be addressed as the Court further

13   litigates the other objections on downward departure,

14   relevant conduct, intended loss.  So I'm going to carry

15   forward that first objection to PSR Paragraph 195.

16         After the other objections are adjudicated, the

17   parties will be provided an opportunity to object to those

18   calculations.  So I'm carrying forward Defendant's timely-

19   filed written objection to PSR Paragraph 195.

20         Next, regarding Defendant's objection to the PSR

21   Paragraph 209 and its alleged failure to include grounds for

22   downward departure, the Court will address that when

23   adjudicating Government's pending Conditional Motion for

24   Upward Variance and Defendant's Motion for Downward Variance

25   after determining the appropriate guidelines calculations.

1          So those first two relevant to PSR Paragraph 195

2     and guidelines range and PSR Paragraph 209 will be finally

3     resolved after we take up the objections on particular

4     enhancements or deductions.

5          Now, the first of that series the Court has deemed

6     the floor-plan fraud objections, so, here, Defendant's

7     written objections to the inclusion of the floor-plan fraud

8     as relevant conduct is relevant to PSR Paragraphs 22 through

9     38.  The Court tentatively determines as follows:

10          In light of the plain text of

11     Section 1B1.3(a)(1)(B), and in accordance with the application

12     notes thereto, and applicable Fifth Circuit precedent, and

13     the following fact-based determinations, the Court has

14     tentatively determined that it should sustain Defendant's

15     objections to PSR Paragraphs 22 through 38 in part.  And I'll

16     now set forth the reasons and the facts that apply.

17          First, Section 1B1.3(a)(1)(B) defines relevant

18     conduct for the sentencing court as follows, quote:  "In the

19     case of a jointly-undertaken criminal activity (a criminal

20     plan, scheme, endeavor, or enterprise undertaken by the

21     defendant in concert with others, whether or not charged in

22     the conspiracy), all acts and omissions of the others that

23     were (i) within the scope of the jointly-undertaken criminal

24     activity, (ii) in furtherance of that criminal activity, and

25     (iii) reasonably foreseeable in connection with that criminal

1   activity may be counted as relevant conduct as long as they

2   occurred during the commission of the offense of conviction,

3   in preparation for that offense, or in the course of

4   attempting to avoid detection or responsibility for that

5   offense."

6          So that is the relevant guideline standard.

7          The application note to that section provides

8   further instruction and guidance regarding the limits of

9   relevant conduct.

10          Specifically, Application Note 3 reiterates the

11   three factors the Court must find to determine that

12   defendant's relevant conduct in the case of a

13   jointly-undertaken criminal activity.  It states, quote:

14   "When the conduct of others does not meet any one of the

15   criteria set forth in subdivisions (i) through (iii), the

16   conduct is not relevant conduct."

17          The application note further specifies that the

18   Court must determine the scope of the criminal activity the

19   defendant agreed to jointly undertake, and, in doing so, the

20   Court may consider any explicit agreement or implicit

21   agreement fairly attributable or fairly inferred from the

22   conduct of the defendant and others.  The accountability of

23   the defendant for the acts of others is limited by the scope

24   of his or her agreement to jointly undertake the particular

25   criminal activity.  Acts of others that were not within the

1    scope of the defendant's agreement are not relevant conduct.

2           Now, looking to the Fifth Circuit caselaw relevant

3    to that section, the Fifth Circuit has re-emphasized time and

4    again that determinations of relevant conduct must be based

5    on the sentencing court's findings that the acts were within

6    the scope, that they were in furtherance of the criminal

7    activity, and that they were reasonably foreseeable.

8           Additionally, mere knowledge that criminal activity

9    is taking place is not enough for the sentencing enhancement

10    under Section 1B1.3.  That is a direct quote from *United*

11    *States versus Evbuomwan*.  That is spelled E-V-B-U-O-M-W-A-N

12    and may be found at 922 F.3d [*sic*] 70.

13           Relevant here, the scope prong of relevant conduct

14    looks to whether there was a jointly-undertaken criminal

15    activity, and whether the defendant agreed to undertake that

16    criminal activity, and whether the conduct of others was

17    within the scope of defendant's agreement.  So, here, the

18    Court is focusing most of its analysis on the agreement

19    element and is guided by *United States versus Allen*, 533

20    F.Appx. 406.

21           In summary, it is insufficient that the subject

22    conduct was merely foreseeable to defendant; rather, in order

23    to constitute a jointly-undertaken criminal activity, the

24    defendant must agree to undertake that activity.  That is a

25    direct quote from *United States versus Smith*, 13 F.3d 860.

1           Here, the Government has failed to carry its burden

2     of proving by a preponderance of the evidence that the

3     floor-plan fraud scheme was within the scope of any

4     jointly-undertaken criminal activity.

5           In its document to this Court, No. 127, the

6     Government argues that defendant's ability to separate -- I'm

7     sorry, his inability to separate himself from the

8     corporation, his win-at-all-costs mentality, and his approval

9     of the phrase "other people's money" (OPM) reflects a

10    willingness to defraud lenders so long as it made RDAG, and

11    by extension defendant himself, money.

12          And the Court will make additional reference to

13    some of these terms throughout the hearing.  When the Court

14    uses the abbreviation OPM, I'm referring to other people's

15    money, and then RDAG is a reference to the Reagor-Dykes Auto

16    Group.

17          But a determination that the floor-plan fraud

18    scheme is relevant conduct attributable to the defendant

19    requires a showing that there was some agreement, explicit or

20    implicit, between defendant and another person.

21          The Government argues with some force that the

22    agreement was implicit between Defendant Shane Smith and

23    other RDAG employees, as illustrated by defendant's

24    deliberate ignorance toward the floor-plan scheme, and the

25    Government cites various paragraphs in the PSR and trial

1    record that reflects some evidence towards that conclusion.

2           For example, multiple PSR paragraphs reflect

3    defendant's deliberate ignorance and refusal to hear any

4    negative information.

5           PSR Paragraph 69 recalls an RDAG employee's

6    recollection that defendant would return financial reports to

7    Shane Smith and then, quote, "instruct him to try again" if

8    they were not where he wanted them.

9           Additionally, PSR Paragraph 70 reports that

10   defendant was overheard telling Shane Smith that he could

11   never show a loss on a financial statement.  He would tell

12   Smith that he, quote, "had not yet worked his magic" and

13   would advise Smith if financial reports were acceptable or

14   not.

15          Additionally, the Court finds additional evidence

16   of defendant's willingness to lie, cheat, steal, and feign

17   ignorance in additional PSR paragraphs.

18          In PSR Paragraph 17, quote:  "Some of our managers

19   say cars were on a test drive, and then they found out they

20   weren't on a test drive; they were sold.  I guess they are

21   getting a little bit smarter, because the trick I used as a

22   manager doesn't work anymore."  That is a quote directly

23   attributable to the defendant.

24          In the following PSR Paragraph 18, defendant is

25   quoted as saying:  "I have a selective memory.  I remember

1    what I f'ing want to remember, and anything else doesn't

2    f'ing matter."  I don't think I need to state for the record

3    what f'ing stands for as an abbreviation.

4              PSR Paragraph 19:  "OPM, other people's money.

5    That's how I did it.  When you don't have money, you talk

6    other people into giving you their money, so you can use

7    their money to increase your net worth."

8              PSR Paragraph 35:  In January 2018, Brian Bruce

9    e-mailed defendant to explain that the claimed 100 to 120

10   trades or sales would be reasonable for a quarter at that

11   relevant dealership, but not the claimed seven-day period.

12             That paragraph further states that Bruce did not

13   continue the e-mail conversation with defendant, quote,

14   "because he did not feel Reagor was receptive or open to that

15   information."

16             And, finally, PSR Paragraph 50:  On February 19,

17   2018, defendant sends an e-mail to RDAG employees

18   recommending "power booking" —— and that's a direct quote ——

19   as a way to overstate and inflate inventory value, and, in

20   response, is rebuffed by his own daughter, in-house counsel

21   Rachel Reagor, who is reported to have said in an e-mail,

22   quote:  "We're committing fraud.  Fraud is not okay.  You've

23   got to stop rationalizing why fraud on our part is the bank's

24   fault."

25             So there is significant PSR and evidentiary support

1    for Government's argument on this enhancement or the

2    application of Section 1B1.3(a)(1)(B), but the guidelines and

3    all Fifth Circuit precedent requires an agreement, and

4    neither the trial evidence nor the PSR reflect by a

5    preponderance of the evidence that defendant entered an

6    agreement with Shane Smith, Steven Reinhart, or other RDAG

7    employees to perpetuate the floor-plan fraud against Ford

8    Motor Company; although, it is a close call.

9         Specifically, the Court finds that Shane Smith

10   testified at trial that, as far as he knew, defendant was

11   unaware of both the floor-plan fraud and check-kiting

12   schemes.  That is Trial Transcript, Volume I, Page 270, and

13   that matches PSR Paragraph 59.

14        Second, Smith wrote a letter to his attorney

15   regarding the floor-plan fraud following its uncovering that

16   stated, quote, "Bart Reagor had absolutely no idea or any

17   knowledge of the actions taken that resulted in this

18   situation."  That letter was admitted as Government's

19   Exhibit 57 and published to the jury.

20        Third, Steven Reinhart's testimony also belies the

21   existence of any agreement.  When asked whether he ever

22   expressly told defendant about the floor-plan fraud, he

23   stated, quote:  "No, I did not."  That is found at Trial

24   Transcript, Volume II, at Page 373.

25        The Government has also failed to carry its burden

1   of proving by a preponderance of the evidence that the

2   floor-plan fraud scheme was reasonably foreseeable in

3   connection with defendant's criminal activity.

4         Here, the Government's argument is based on the

5   assertion that, by the date of March 2017, defendant knew

6   about the floor-plan fraud, and this assertion is based in

7   part on statements made by the defendant at various RDAG team

8   meetings, ECF No. 127, Exhibits B, C, and D.

9         But, as the Court stated and quoted from Fifth

10   Circuit precedent, mere knowledge is not enough for a finding

11   of relevant conduct under Guideline Section 1B1.3(a)(1)(B).

12         Though the floor-plan fraud information contained

13   in PSR Paragraphs 22 through 38 will not be applied as

14   Section 1B1.3(a)(1)(B) relevant conduct when the Court

15   calculates the advisory guidelines range, this Court will not

16   order the USPO to remove, amend, or modify those paragraphs.

17         Federal Rule of Criminal Procedure 32(d)(2)(G)

18   requires inclusion of, quote, "any information that the Court

19   requires, including information relevant to the factors under

20   18 U.S.C. Section 3553(a)."

21         So though not counted as Section 1B1.3(a)(1)(B)

22   relevant conduct for purposes of calculating the advisory

23   range, PSR Paragraphs 22 through 38 are necessary to fully

24   understand the background facts culminating in the false

25   statements underlying Count Three and defendant's attendant

1  conviction.

2       For these reasons, the Court sustains Defendant's

3  objection in part, but will not instruct the probation

4  officer to remove, amend, or modify PSR Paragraphs 22 through

5  38.

6       Now, Mr. Haag, I know that was a lengthy tentative

7  determination.  Does the Government have any information

8  responsive to that tentative determination?

9       **MR. HAAG:**  Your Honor, from the Court's preliminary

10  determination and has thoroughly analyzed and reviewed these

11  issues, all the evidence that the United States did have to

12  support including that floor-plan fraud was submitted in

13  writing and in the video exhibits and has nothing further to

14  add.  Thank you.

15       **THE COURT:**  Okay.  And to be clear, Mr. Haag, as I

16  stated, Defendant's objection is sustained in part, but I am

17  not striking those paragraphs.  They may be referenced in

18  other arguments and other parts of the sentencing proceeding,

19  because I do think it qualifies for inclusion under FRCP

20  32(d)(2)(G), so this is without prejudice to the Government's

21  ability to reference those PSR paragraphs.  They are not

22  stricken or modified in any way.

23       **MR. HAAG:**  Thank you, Your Honor.

24       **THE COURT:**  Okay.  Now, Mr. Markham, does the

25  Defendant have any responsive information or argument that is

1   not cumulative?

2           **MR. MARKHAM**:  No, Your Honor.

3           **THE COURT**:  Okay.  The Court hereby adopts this

4   tentative determination as its final finding and will not

5   count the floor-plan fraud scheme PSR Paragraphs 22 through

6   38 as Section 1B1.3(a)(1)(B) relevant conduct in calculating

7   the advisory guidelines range, but does not strike those

8   paragraphs from the PSR for other purposes.

9           Now, if you thought that tentative determination

10  was long, now we move to relevant conduct and loss amount.

11  So regarding Defendant's written objection to the loss amount

12  attributed to defendant under Section 2B1.1 of the guidelines

13  and as reflected in PSR Paragraph 82, the Court tentatively

14  determines as follows:

15          In light of the commentary to Section 2B1.1,

16  applicable Fifth Circuit precedent, and the following

17  fact-based determination, the Court overrules Defendant's

18  objection to PSR Paragraph 82.

19          First, Application Note 3 applies to the

20  determination of loss under subsection (b)(1) of

21  Section 2B1.1.  It provides that, quote, "loss is the greater

22  of actual loss or intended loss."

23          An actual loss means, quote, "the reasonably

24  foreseeable pecuniary harm that resulted from the offense."

25  In contrast, intended loss, quote, "means the pecuniary harm

1    that the defendant purposely sought to inflict, and includes

2    intended pecuniary harm that would have been impossible or

3    unlikely to occur."

4            Second, in loan application cases, the court

5    determines intended loss by discerning the defendant's actual

6    intent.  And that is a summary of the Fifth Circuit's holding

7    in *United States versus Morrow*, 177 F.3d 272.  The Court is

8    guided by that case.

9            Here, if the defendant intended to cause the loss

10   of the entire loan amount or was consciously indifferent or

11   reckless as to the repayment of those loan amounts, then the

12   intended loss is the full amount of the loan.  And that is

13   from that *Morrow* case.

14           Here, the Court agrees with the Government that the

15   loss amount attributable to defendant as relevant conduct

16   should be $10,000,000, the amount of the working capital loan

17   received from IBC Bank, not only the 1.76 million defendant

18   diverted from the loan.

19           Defendant was consciously indifferent or reckless

20   as to the repayment of the loan.  This is highlighted in PSR

21   Paragraph 44 where defendant e-mailed Shane Smith and Rick

22   Dykes instructing Smith to transfer 33.3 percent of every

23   dollar borrowed to defendant and Dykes, and knowing that RDAG

24   was in desperate need of working capital to continue

25   operations, it was reasonably foreseeable that this diversion

1    of the loan proceeds would jeopardize RDAG's operations and

2    hinder its ability to repay the working capital loan.

3          Defendant also argues that the $7,000,000

4    bankruptcy settlement between IBC Bank and RDAG should

5    constitute the loss amount.  Defendant made this argument in

6    Document No. 131, and they're relevant to Defendant's

7    objections to PSR Paragraph 55 and the Addendum.

8          However, this argument ignores Application Note 3's

9    explicit instruction that the loss is the greater of actual

10   or intended loss.  And, here, the intended loss of

11   $10,000,000, the full amount of the working capital loan, is

12   greater than the purported actual loss of 7,000,000 or so.

13   Consequently, $10,000,000 is the correct loss amount.

14         For these reasons and reasons set forth in the

15   Addendum, the Court overrules Defendant's objection.

16         Mr. Haag, does the Government have any information

17   or argument responsive to this tentative determination that

18   is not cumulative?

19         **MR. HAAG**:  No, Your Honor.

20         **THE COURT**:  And, Mr. Markham, does the Defendant

21   have any additional information or argument to this tentative

22   determination that's not cumulative?

23         **MR. MARKHAM**:  No, Your Honor, nothing that we've

24   already not told the Court.

25         **THE COURT**:  Okay.  Thank you.  And I do want to

1  compliment counsel for the Government and counsel for the

2  Defendant for excellent briefing on all of these objections.

3         I know application of the sentencing manual can

4  feel like calculus at times, and most attorneys went to law

5  school to avoid math.  So I appreciate the excellent briefing

6  from both the Government and the Defendant in this case.

7  That definitely assisted the Court in resolving these

8  objections.

9         Now, regarding the sophisticated means enhancement,

10  here, Defendant's written objection to the application of

11  Section 2B1.1(b)(10)(C), the two-level sophisticated means

12  enhancement corresponds to PSR Paragraph 83.  The Court

13  determines as follows:

14         In light of the plain text of

15  Section 2B1.1(b)(10)(C), the definition of sophisticated

16  means that appears in Application Note 9(B), and the

17  Sentencing Commission's Commentary on Page 105 of the 2018

18  Supplement to Appendix C, the Court sustains Defendant's

19  objection.

20         Section 2B1.1(b)(10)(C) provides for a two-level

21  increase if, quote, "the offense otherwise involved

22  sophisticated means and the defendant intentionally engaged

23  in or caused conduct constituting sophisticated means."

24         The Application Note 9(B) describes sophisticated

25  means as follows, quote:  "An especially complex or

especially intricate offense conduct pertaining to the
execution or concealment of an offense.  Conduct such as
hiding assets or transactions, or both, through the use of
fictitious entities, corporate shells, or offshore financial
accounts ordinarily indicates sophisticated means."

But Amendment 792, which became effective on
November 1st, 2015, states that the enhancement is focused on
defendant's own intentional conduct, not the sophistication
of the overall scheme.

And, here, the PSR's application of the
sophisticated means enhancement is based entirely on the
floor-plan fraud scheme.  The Court has already determined
that the floor-plan fraud does not constitute relevant
conduct attributable to the defendant in calculating the
advisory guidelines range.  And because the floor-plan fraud
scheme is not conduct in which the defendant intentionally
engaged or caused, the Court will not apply the sophisticated
means enhancement.

For those reasons and facts, the Court sustains
Defendant's objection.

Mr. Haag, does the Government have any information
or argument responsive to this tentative determination?

**MR. HAAG:**  No.  Thank you, Your Honor.

**THE COURT:**  And does the Defendant have any
information or argument responsive to this tentative

1    determination?

2              MR. MARKHAM:  No, Your Honor.

3              THE COURT:  Okay.  Now, the next category of

4    objection applies to the abuse of trust enhancemen --

5    enhancement.  This correlates to PSR Paragraph 86.

6              And the Court here will consider Defendant's

7    Memorandum in Support of Downward Variance in Document No.

8    145, and I will invite argument from the Government and

9    Defendant after making the Court's tentative determination.

10             Here, Section 3B1.3, Application Note 1, public or

11   private trust refers to a position of public or private trust

12   characterized by professional or managerial discretion (that

13   is, substantial discretionary judgment that is ordinarily

14   given considerable deference).

15             As noted in *United States versus Ollison*, 555 F.3d

16   152, the term "position of trust" is, quote, "a term of art

17   that must be defined through reference to the guidelines

18   commentary and Fifth Circuit caselaw.  The district court is

19   instructed that it must be careful not to be overly broad in

20   imposing the Section 1B1.3 [*sic*] enhancement."

21             In fact, the district court should conduct a

22   two-step inquiry looking at professional or managerial

23   discretion, and comparing that to the minimal supervision

24   reflected in the facts.  And as held in *United States versus*

25   *Brown*, 7 F.3d at 1161, quote, "the primary trait that

distinguishes a person in a position of trust from one who is
not is the extent to which the position provides the freedom
to commit a difficult-to-detect wrong."

Here, defendant clearly occupied a position of
trust in title and deed; as CEO of RDAG, defendant exercised
professional or managerial discretion over subordinate
employees who directed the finances of the company, including
Shane Smith.  Consequently, defendant bears no resemblance to
the mere bank teller, clerk, or secretary discussed in the
*Ollison* opinion.

Second, defendant clearly abused his position of
trust to significantly facilitate the commission or
concealment of the offense.  In his position as CEO,
defendant ordered the CFO to divert one-third of the working
capital loan proceeds to his personal account, in violation
of the representations made to the IBC Bank.

The PSR and filings of the Government are replete
with references to defendant's status as CEO and his bullying
manner of my-way-or-the-highway attitudes.

As described in PSR Paragraph 66, despite Shane
Smith's belief that the use of the loan for personal reasons
was deceitful, unacceptable, and contrary to the loan's
purpose, he followed instead defendant's instructions
nonetheless because of defendant's demands, actions, and
attitude as CEO.

1          And in his instructions to Shane Smith, defendant

2     ordered that the plan to distribute one-third of the capital

3     loan between him and Rick Dykes was to be highly

4     confidential, and the banks were not to know.

5          Applying the two-step test required by the Fifth

6     Circuit, the Court finds by a preponderance of the evidence

7     that, No. 1, defendant occupied a position of trust, and,

8     No. 2, defendant used his position as CEO to significantly

9     facilitate the commission or concealment of the offense.

10         For these reasons and facts identified, the Court

11    overrules Defendant's objection to the abuse of trust

12    enhancement as set forth in his Memorandum for Downward

13    Variance.

14         Does the Government have any information or

15    argument responsive to this tentative determination?

16         **MR. HAAG**:  No.  Thank you, Your Honor.

17         **THE COURT**:  And, Mr. Markham, does the Defendant

18    have any information or argument responsive to this tentative

19    determination?

20         **MR. MARKHAM**:  Nothing further, Your Honor.  Thank

21    you.

22         **THE COURT**:  Next, the aggravating role enhancement.

23    This correlates to PSR Paragraph 87.

24         Regarding Defendant's written objection to the

25    application of the four-level Section 3B1.1 aggravating role

1   enhancement, the Court determines as follows:

2           In light of the plain text of Section 3B1.1, the

3   Court's ruling on relevant conduct, and the following

4   fact-based determination, the Court overrules Defendant's

5   objection in part.

6           First, Section 3B1.1 provides for a four-level

7   enhancement, quote, "if the defendant was an organizer or

8   leader of a criminal activity that involved five or more

9   participants or was otherwise extensive;" a three-level

10  enhancement, quote, "if the defendant was a manager or

11  supervisor (but not an organizer or leader);" and, finally, a

12  two-level enhancement, quote, "if the defendant was an

13  organizer, leader, manager, or supervisor in any criminal

14  activity other than described in (a) or (b)."

15          That is followed by Application Note 4, which

16  provides a non-exhaustive list of factors that the Court may

17  consider, including the exercise of decision-making

18  authority, the nature in participation in the commission of

19  the offense, the recruitment of accomplices, the claimed

20  right to a larger share of the fruits of the crime, the

21  degree of participation in planning or organizing, the nature

22  and scope of the illegal activity, and, finally, the degree

23  of control and authority exercised over others.

24          Here, based on the Court's previous ruling that the

25  floor-plan fraud is not relevant conduct attributable to

1    defendant in calculating the advisory range, there was no

2    criminal activity involving five or more people which

3    defendant organized or led.

4           Therefore, the Court will not apply the four-level

5    enhancement under Section 3B1.1(a).  So Defendant's objection

6    is sustained to that extent.

7           But the Court will apply the two-level enhancement

8    under Section 3B1.1(c) for his organizing, leading, and

9    supervision of the bank-loan fraud against IBC Bank.

10          Evidence at trial, and reflected in the PSR, reveal

11   that defendant ordered Shane Smith to divert loan proceeds of

12   the IBC working capital loan into his personal account.

13          Additionally, PSR Paragraphs 39 through 56 recount

14   the facts of defendant's false statements to IBC and his

15   leadership and organization in support of that effort.  PSR

16   Paragraphs 41 and 43 relates how RDAG, via defendant and

17   Shane Smith, represented to IBC its extraordinary growth, its

18   performance above competition, and its successful management

19   in order to secure that $10,000,000 working capital loan, and

20   they stated that it would be utilized to, quote, "sustain

21   growth goals" and provide each RDAG equity in a sizeable cash

22   cushion.

23          Finally, PSR Paragraph 45 records the e-mail sent

24   from defendant to Shane Smith and Rick Dykes, instructing

25   Shane Smith to allocate, quote, "33.3 percent of every dollar

1    we borrow" to the persons identified, the defendant and Rick

2    Dykes.

3            That e-mail goes on to instruct Smith, quote:  "How

4    we are going to manage this capital is 100,000,000 percent

5    confidential.  It is between us, and it is not anyone else's

6    business.  No bankers or anyone else.  Our business.  Game

7    on," end quote.

8            Based on this evidence, which the Court observed at

9    trial and reviewed through the PSR, the Court finds by a

10   preponderance of the evidence that defendant was an organizer

11   and leader of the loan fraud committed against IBC Bank.

12   Consequently, this Court will apply the Section 3B1 point --

13   3B1.1(c) two-level aggravating role enhancement.

14           So for those reasons, the Court overrules

15   Defendant's objection, but will apply the two-level

16   enhancement, not the four- or three-level enhancements.

17           Does the Government have any argument or

18   information responsive to this tentative determination?

19           MR. HAAG:  No.  Thank you, Your Honor.

20           THE COURT:  Does the Defendant have any argument or

21   information responsive to this tentative determination?

22           MR. MARKHAM:  No, Your Honor.

23           THE COURT:  Okay.  Next, regarding restitution

24   amount, here, Defendant objected to the restitution amount

25   set forth in PSR Paragraph 205 through 211.  The Court

1  tentatively determines as follows:

2          In light of Fifth Circuit precedent, Section 5E1.1,

3  and the following fact-based determination, the Court

4  overrules Defendant's objection in part.

5          First, the general rule is that a district court

6  can award restitution to victims of the offense, but the

7  restitution award can encompass only those losses that

8  resulted directly from the offense for which the defendant

9  was convicted.  This is from *United States versus Burns* [*sic*],

10 740 F.3d 370.

11         Here, defendant was convicted of making a false

12 statement to IBC Bank and was not convicted on anything

13 related to the floor-plan fraud scheme perpetuated against

14 Ford Motor Credit Company.  Therefore, restitution should be

15 paid only to IBC Bank, not to Ford Motor Credit Company.

16         Second, Section 5E1.1(a)(1) instructs, quote, "in a

17 case of an identifiable victim, the court shall enter a

18 restitution order for the full amount of the victim's

19 losses."

20         Additionally, a restitution award is limited to

21 that amount that is reasonably foreseeable to the defendant.

22 And that's from *In re Fisher*, 640 F.3d 645.

23         As noted by the Government in their response to

24 Defendant's objections, IBC has confirmed their actual loss

25 from the loan fraud at nine million, three hundred and

1    seventy-eight dollars and eighty-seven -- I'm sorry,

2    $9,378,871.28.  I'll read that number by number 9378871.28.

3    And the Addendum concurs with this restitution amount.

4           As explained previously, the amount of the working

5    capital loan was a reasonably foreseeable loss because

6    defendant knew that RDAG needed capital and could reasonably

7    foresee that a diversion of one-third of these loan proceeds

8    could severely hinder RDAG's operations and hinder the

9    ability to pay off that working capital loan.

10          For these reasons, the Court overrules Defendant's

11   objection in part and will not order restitution to be paid

12   to Ford Motor Credit Company, but the Court will order

13   restitution in the amount of $9,378,871.28, the actual

14   amount, the actual loss amount, to IBC Bank rather than

15   Defendant's argued 1.76 million.

16          Does the Government have argument or information

17   responsive to this tentative determination?

18          MR. HAAG:  Your Honor, we have one clarification.

19   I believe the loss amount for restitution purposes should be

20   $9,378,817 as opposed to $871.

21          THE COURT:  And 28 cents?

22          MR. HAAG:  Yes, Your Honor.

23          THE COURT:  For purposes of the tentative

24   determination and the Court's analysis, the Court accepts the

25   Government's reading of the file.  And I believe it was just

1  a scrivener error the Court wrote 871.  It should be 817.  So

2  that the final number is $9,378,817.28.

3    With that modification, does the Government have

4  any additional argument or information responsive to that

5  restitution determination?

6    **MR. HAAG**:  No.  Thank you, Your Honor.

7    **THE COURT**:  And, Mr. Markham, does the Defendant

8  have any information or argument responsive to that tentative

9  determination?

10    **MR. MARKHAM**:  Two very minor points.  First, I

11  agree with the correction made for the record.

12    Also, Your Honor, there is a bankruptcy proceeding

13  going on that could result in additional payments to Ford

14  Motor Company, and that in the future could reduce the

15  restitution.  IBC, I apologize, IBC.

16    And because IBC is in that bankruptcy and there

17  could be a reduction, we would reserve the right to come back

18  and make a proper motion for a reduction if we can show that

19  that happened, and I -- that's the only comment I'd like to

20  make.

21    **THE COURT**:  Okay.  The Court enters its finding

22  subject to that reservation of right and that preservation of

23  right for appellate review.

24    Here, 18 U.S.C. Section 3663(a)(1) states that,

25  notwithstanding any other provision of law, when sentencing a

1    defendant convicted of an offense described in subsection

2    (c), the Court shall order the defendant make restitution to

3    the victim of the offense.  Thus, restitution is mandatory in

4    this case.

5          But this ruling and any judgment to follow is

6    without prejudice to a Motion to Reconsider pursuant to

7    18 U.S.C. Section 3582(c).  That relates to modification of

8    an imposed term of imprisonment, or, more precisely, a Motion

9    Seeking Correction, Appeal, Modification, Amendment or

10   Adjustment pursuant to 18 U.S.C. Section 3664(o)(1).  So I

11   believe that's the restitution section that permits

12   correction, appeal, modification, amendment, or adjustment of

13   a restitution award.

14         So this Court's ruling on this particular objection

15   is without prejudice to his right to seek motions under

16   Section 3582(c) and Section 3664(o)(1).

17         Does that satisfy the finding that you need for the

18   record?

19         **MR. MARKHAM**:  It's the one I wanted.  Thank you,

20   Your Honor.  Yes, it does.

21         **THE COURT**:  Okay.  And the Court does agree with

22   Defense Counsel's adroit assessment of restitution law and

23   how it intersects with other proceeding, and I agree that

24   that finding should be made for the record.

25         So with that -- with that finding reserved, the

1    Court adopts the tentative determination as its final finding

2    and does adopt the findings and conclusions set forth in the

3    relevant Addendum paragraphs and the relevant restitution

4    amounts.

5            Okay.  That felt like algebra and calculus.

6            Does the Government have any untimely objections or

7    requested factual clarifications relevant to the PSR or the

8    addenda?

9            **MR. HAAG**:  No.  Thank you, Your Honor.

10           **THE COURT**:  Okay.  Having adjudicated all those

11   motions and enhancements, does the Defendant have any

12   untimely objections or requested factual clarifications

13   relevant to the PSR or addenda?

14           **MR. MARKHAM**:  The Defense does not.

15           **THE COURT**:  Okay.  Having ruled on the parties'

16   timely-filed written objections and requested factual

17   clarifications, the Court adopts the remaining findings and

18   conclusions of the PSR and the addenda in their entirety.

19           And now we will calculate the advisory guidelines

20   range pursuant to the federal statutes and the 2021

21   Guidelines Manual.

22           Here, the Court is applying the brand-new maize and

23   blue 2021 Guidelines Manual.  We've used the 2018 Guidelines

24   Manual for almost three years, so we now have to determine

25   whether application of this new manual presents any *ex post*

1  *facto* problems or any constitutional infirmities.

2         Does the Government agree with the Court that there

3  are no *ex post facto* problems or constitutional reasons not

4  to apply the 22 -- 2021 Guidelines Manual to this case?

5         **MR. HAAG:**  The Government agrees, Your Honor.

6         **THE COURT:**  Does the Defendant agree with that

7  assessment as well?

8         **MR. MARKHAM:**  Yes, Your Honor.

9         **THE COURT:**  Okay.  We will apply the 2021

10  Guidelines Manual.

11         And, Mr. Markham, you should get your fresh copy.

12  I know it's been awhile since we've had a new manual, so

13  we're on to the blue manual.

14         **MR. MARKHAM:**  Your Honor, the one that I saw in the

15  law offices was the same date, but it was blood red, which

16  Defense kind of thinks is the appropriate color.

17     **(Laughter.)**

18         **THE COURT:**  Well, when I was an AUSA, I had an

19  entire shelf filled with multicolored sentencing guideline

20  manuals.  And then they just stopped producing them for about

21  three or four years, so I just wanted to be clear that we're

22  using this new 2021 manual.

23         Okay.  Before entering the Court's calculations of

24  the advisory guidelines range, I want to note the applicable

25  statutory maximums that were reflected in the PSR and that

1   could be applied in this case.

2          Here, the statutorily-authorized maximum sentence

3   is thirty years, and the statutorily-authorized maximum fine

4   is up to $1,000,000.

5          But having considered the probation officer's

6   calculations and conclusions and having ruled on Defendant

7   and Government's objections thereto, the Court determines

8   that the correct advisory guidelines range is as follows:

9   Total Offense Level 33.  Criminal History Category I.  An

10  imprisonment range of 135 to 168 months.  A supervised

11  release range of two to five years.  A fine range of 35,000

12  up to $1,000,000.  And restitution in the amount of

13  $9,378,817.28.

14         Mr. Haag, is that the correct number?

15         **MR. HAAG**:  Yes, Your Honor, it is.

16         **THE COURT**:  Okay.  Now, does the Government have

17  any objection to the Court's calculation of the advisory

18  guidelines range?

19         **MR. HAAG**:  No, Your Honor.

20         **THE COURT**:  Does the Defendant have any objections

21  to the Court's calculation of the advisory guidelines range?

22         **MR. MARKHAM**:  No, Your Honor, other than previously

23  stated.

24         **THE COURT**:  Okay.  But Defendant does not think the

25  Court has miscalculated the advisory guidelines range as a

1    starting point?

2            MR. MARKHAM:  I do not, Your Honor.

3            THE COURT:  Okay.  The other objections that were

4    filed, those are preserved for appellate review, and I find

5    that those were timely filed, and they have been adjudicated,

6    and they are preserved for appellate review.

7            MR. MARKHAM:  Your Honor's arithmetic was correct,

8    yes.

9            THE COURT:  Okay.  Got it.  Now, as announced, the

10   Court has tentatively determined that neither a

11   non-guidelines upward variance to 300 months' imprisonment

12   nor a non-guidelines downward variance to a sentence below

13   the advisory range is appropriate pursuant to the 3553(a)

14   factors the Court is to apply to this case.

15           Now, in simultaneously adjudicating the

16   Government's Motion for Upward Variance and Defendant's

17   Motion for Downward Variance, I will recite the 3553(a)

18   factors one by one and the facts related to those factors.

19   And then at the end of that, I will allow counsel to argue

20   any factor or any fact as long as those arguments are not

21   cumulative.

22           First, pursuant to Section 3553(a)(1), which

23   requires the Court to consider the history and

24   characteristics of the defendant, which does include no prior

25   criminal convictions.

1          However, the sentencing file is replete with

2    instances and events reflecting defendant's character as a

3    self-aggrandizing bully, whose wanna-win-more-than-you-wanna-

4    live mentality, and deliberate ignorance, at worst, or

5    dereliction of duty, at best, resulted in the collapse of his

6    RDAG empire, the unemployment of over 600 employees, and

7    financial harm to many customers, many of whom defendant

8    called friends.

9          Though the Offense Level Computation included zero

10   enhancement, levels, or adjustments for floor-plan fraud,

11   bank fraud, or check-kiting, the trial record and multiple

12   PSR paragraphs reflect that his intimidating and verbally

13   abusive leadership style pressured myriad RDAG employees to

14   lie, cheat, and steal on his behalf.

15         PSR Paragraph 66:  Defendant, quote, "did not want

16   to hear negative news," and further instructed Shane Smith

17   to, quote, "find a way" to make the numbers work.

18         PSR Paragraph 68:  Despite Shane Smith's repeated

19   reports of, quote, "financial hardships," defendant demanded

20   growth, with religious zeal.

21         PSR Paragraph 69:  If the financial reports were

22   not where defendant wanted them, quote, "he would return them

23   to Smith and tell him to try again."

24         PSR Paragraph 70:  Defendant stated that, quote,

25   "RDAG could never show a loss on a financial statement."

1          PSR Paragraph 72:  Defendant told Shane Smith,

2    quote:  "I want this f'ing number, and you find a way to make

3    it happen.  I don't care how you do it, just make it f'ing

4    work."

5          Additionally, various PSR paragraphs and sentencing

6    exhibits illustrate that defendant was a bully in the

7    workplace, specifically PSR Paragraph 72.  Those bullying

8    tactics created a hostile work environment where employees

9    must lie to maintain the myth.

10          In PSR Paragraph 70, one employee described

11    defendant's intense emotion during meetings, and on one

12    occasion he punched a whiteboard and threatened to F anyone

13    up who came between him and his company.

14          In another meeting, defendant stated, quote:  "I

15    guarantee they don't want to get in my f'ing way, because

16    they know they will get f'ed up.  You get in the path of me,

17    you get in the path of your life -- you get in the path of

18    me, you get in the path of your life is in danger.  Don't try

19    to stop me."  That's a direct quote from PSR Paragraph 14.

20          Additionally, Shane Smith described defendant as

21    intimidating and verbally abusive to staff, which often made

22    them cry.  That is from PSR Paragraph 59.

23          Finally, as an exhibit to the Government's Response

24    to written objections, defendant compared those who could

25    sell only five cars a month as lepers in the Bible, who would

1    be, quote, "put off on an island with all the other lepers"

2    to die together, and in addressing new employees, said, if

3    you're a dumbass, and you're stupid, and you're weak, get the

4    F out of here.

5              Consequently, for these reasons and facts, RDAG

6    employees were made responsible for delusional business

7    growth, told that losses were unacceptable, and tasked with

8    making the numbers work, and therefore pressured to

9    perpetuate one of the largest frauds in the history of the

10   American automobile industry.

11             Defendant's mismanagement, mistreatment, and

12   malfeasance ensnared fifteen subordinate employees who

13   planned and executed the lies and deception, culminating in a

14   combined 453 months' imprisonment for the participating RDAG

15   office managers, accounting controllers, and administrators.

16             Shane Smith, 84 months;

17             Steven Reinhart, 6 months;

18             Diana Herrera Urias, 24 months;

19             Mistry Canady, 24 months;

20             Sheila Evans Miller, 27 months;

21             Lindsay Claire Williams, 27 months;

22             Paige Anna Johnston, 27 months;

23             Whitney Erin Maldonado, 27 months;

24             Elaina Marie Cabral, 27 months;

25             Ashley Nicole Dunn, 30 months;

1          Sherry Lynn Wood, 30 months;

2          Wesley Todd Neel, 30 months;

3          Brad William Fansler, 42 months; and

4          Pepper Lay -- Laray Rickman, 48 months.

5          Next, pursuant to Section 35 -- pursuant to

6     Section 3553(a)(2)(A), which requires the Court to consider

7     the nature and circumstances of the offense, to reflect the

8     seriousness of, and to provide just punishment for the

9     offense, here, defendant made a false statement to IBC Bank

10    regarding the purpose of a $10,000,000 working capital loan.

11         As reflected in PSR Paragraph 39, defendant and

12    Shane Smith represented to IBC that the purpose of the

13    working capital loan was to provide working capital funds to

14    RDAG.  Specifically, defendant represented to IBC that RDAG

15    needed a working capital loan because of the company's

16    alleged rapid growth and undercapitalization.  That is

17    referenced in PSR Paragraph 44.

18         That same paragraph reflects that, during those

19    conversations and meetings with IBC, defendant failed to

20    disclose any intent to use any part of the loan for personal

21    reasons.

22         At trial, William Schonacher, President and CEO of

23    IBC Bank, testified that the loan would not have been awarded

24    had the bank been aware of any intent to use part of the loan

25    for defendant's personal use.  That is further reflected in

1    PSR Paragraph 57.

2              Here, defendant instructed Shane Smith, his CFO, to

3    distribute 33.3 percent of every borrowed dollar to the

4    defendant and Rick Dykes.  This management of capital, he

5    instructed, was to be confidential and not the business of

6    any bank or anyone else.

7              When RDAG collapsed and defaulted on the note, IBC

8    filed a civil lawsuit against defendant and RDAG, and the

9    final judgment in that suit awarded IBC Bank $23,865,778.48.

10   At the time, this was the largest loss of default suffered by

11   that bank in its history.  That's reflected in PSR

12   Paragraph 55.

13             Next, pursuant to Section 3553(a)(2)(C), which

14   requires the Court to promote respect for the law, to afford

15   adequate deterrence to criminal conduct, and to protect the

16   public from further crimes of the defendant, who at this

17   point has not accepted responsibility for his criminal action

18   and is blaming everyone but the person truly responsible,

19   himself.

20             Instead, defendant referred to the jury verdict as

21   nonsensical, describing it as a, quote, "compromise" because

22   there was no proof of any wrongdoing, including making false

23   statements.  Those comments are reflected in PSR

24   Paragraph 110.

25             He further decried the banks for their greed,

1    rather than his own.  That's reflected in PSR Paragraph 117.

2          He alleged that the Government prosecuted him to

3    protect Ford Motor Credit Company, without evidence or proof.

4    That's reflected in PSR Addendum Paragraph 129(a).

5          He further lambasted this Court for denying his

6    motions of acquittal.  That's reflected in PSR Paragraph 129.

7          And he additionally exclaimed that the justice he

8    received was not the, quote, "freedom and justice we deserve"

9    for which our forefathers fought.  That's in PSR

10   Paragraph 125.

11         And, most bold of all, he has now painted himself

12   as a victim, claiming that his family, quote, "was defrauded

13   more than anyone else involved."  That's reflected in PSR

14   Paragraph 117.  He insisted that his victims, they were,

15   quote, "the biggest losers in this situation."  That's a

16   statement recorded in PSR Paragraph 128, despite the combined

17   453 months of imprisonment doled out to his former

18   associates.

19         In summary, defendant claimed credit for every RDAG

20   accomplishment when times were good, but then denied

21   responsibility when RDAG collapsed under the weight of all

22   the lies, deception, and dishonesty.

23         If not for the collapse of RDAG and the

24   investigative efforts of the FBI, defendant would have

25   continued in the false belief that the banks and lenders were

1    the fraudsters, not defendant himself, and he likely would

2    have continued in the criminal enterprise but for the

3    intervention of law enforcement.

4         So each of those 3553(a) factors and related facts

5    the Court considers aggravating factors.

6         But these 3553(a) factors and facts must be

7    balanced alongside the following mitigating factors:  No. 1,

8    defendant's manifest and evident love and care for his

9    family.  That is reflected in the PSR statements and the 93

10    character statements filed on his behalf and submitted to

11    this Court.

12         For these reasons, the Court has tentatively

13    determined that a non-guidelines upward variance to

14    300 months' imprisonment is not necessary, but that a

15    non-guidelines downward variance to a sentence below the

16    advisory guidelines range is insufficient.

17         And, with that, the Court is adjudicating the

18    Government's pending Motion for Upward Variance, the

19    Defendant's pending Motion for Downward Variance, and I will

20    invite argument with specific attention to the 3553(a)

21    factors the Court must apply.

22         We will begin with the Government, and then, Mr.

23    Markham, you will be allowed a full opportunity to argue for

24    or against variance.  But we'll begin with Mr. Haag.

25         **MR. HAAG**:  Thank you, Your Honor.  Your Honor, the

1   United States has a sentencing presentation that's prepared

2   on a PowerPoint.  If this would be the appropriate time, we

3   are prepared with that presentation now.

4           THE COURT:  Any objection from the Defense?

5           MR. MARKHAM:  Not to the presentation, Your Honor,

6   but we would comment on it afterwards, yes.

7           THE COURT:  Yes.  And, Mr. Haag, you understand if

8   you use it, Defense Counsel may make reference to it and

9   argue against it as well, as it is a demonstrative.  Is that

10  correct?

11          MR. HAAG:  Yes, sir.

12          THE COURT:  Okay.  You may proceed accordingly.

13  And I'll just instruct court staff and IT personnel to be

14  prepared to play any relevant media.

15          MR. HAAG:  Your Honor, if I may, I'm going to move

16  into evidence at this time Government's Exhibit No. 1.

17  That's the CD with the videos on it from the sentencing

18  exhibit.

19          MR. MARKHAM:  No objection.

20          THE COURT:  Okay.  They are admitted without

21  objection.  They'll be marked as Exhibit 1 to this sentencing

22  hearing and made a part of the record on appeal.

23          MR. HAAG:  In looking at the defendant's beginning

24  social media posts, he put a quote that reads as follows, and

25  it's captured in PSR Paragraph 115:  And you will know the

1    truth, and the truth will set you free.

2           For today's presentation, I want to talk about the

3    truth.  I want to talk about the truth and play some clips of

4    the defendant's version of the truth, and then present to the

5    Court what the truth actually is.

6        **(CD clip played and transcribed as follows:)**

7           **MR. REAGOR**:  "I said these customers are not going

8    to get their cars registered.  These customers are not going

9    to get their trades paid off.  I mean, I was throwing a cow

10   about it because my customers are my friends, and they always

11   have been, even like those people out there, and I don't want

12   to let them down, but, I mean, I didn't have any choice.  I

13   didn't have the money.  All of -- I mean, all the money I

14   had, everybody had -- took from me.  So, I mean, there was

15   nothing I could do."

16       **(CD paused.)**

17          **MR. HAAG**:  In this clip, the defendant does a

18   television interview after the trial and leaves the viewers

19   with the impression that, after the collapse of RDAG, he was

20   penniless.  He had no money left at all.

21          But the truth is, the defendant on December 31st,

22   2016 claimed total assets of about $31,000,000.

23          More recently, when we look at 2021, in the first

24   bond report, the defendant claimed $1.88 million in assets.

25   About four days later, his wife was able to help him remember

 1  additional assets, which increased that number to

 2  $3.4 million.

 3         In short, Your Honor, the truth is, the defendant

 4  had money.  The defendant has plenty of money, but he kept it

 5  for himself.  He did not give that money to the RDAG

 6  entities.  He did not give that money to the bankruptcy

 7  estate to help his customers.  He kept it, and he kept it for

 8  one simple reason, greed.

 9         **(CD clip resumed and transcribed as follows:)**

10         **MR. REAGOR:**  "You know, I mean, I'm an honest guy.

11  I mean, this -- I didn't have anything to do with any of this

12  fraud."

13         **(CD paused.)**

14         **MR. HAAG:**  Later in the interview, he claims he has

15  absolutely no knowledge of the fraud.  And the Court's

16  discussed that a little bit already, but I think some videos

17  are important because they capture better than any written

18  product could capture exactly what he knew.

19         **(CD clip resumed and transcribed as follows:)**

20         **MR. REAGOR:**  "That means I don't want anybody

21  fabricating documents for an audit."

22         **(CD paused.)**

23         **MR. HAAG:**  Now, in this statement, the defendant

24  says, "I don't want anybody fabricating documents for an

25  audit."  And undoubtedly Defense Counsel will point out

1    defendant said don't do it, but that misses the mark.

2           The point is, the defendant doesn't have to tell

3    his employees don't fabricate documents for an audit unless

4    he knows they're doing it.

5           And I want to give an example that might hit a

6    little closer to home for this Court and what it would see.

7    This would be like a narcotics lieutenant walking into a

8    meeting with his narcotics officers and saying:  Internal

9    Affairs is coming around.  That means I don't want anybody

10   planting evidence on suspects.

11          Any rational person's reaction would be, wait,

12   what?  You're planting evidence?  That's not a hey, don't do

13   it.  That is a badges on the table; everybody's on

14   administrative leave; and we get to the bottom of it.

15          It gets worse.

16   **(CD clip resumed and transcribed as follows:)**

17        **MR. REAGOR**:  "We had some of our managers say that

18   cars were on a test drive, and then they found out that they

19   weren't on a test drive; they were sold.  And, you know, I

20   guess they're getting a little bit smarter, because that old

21   trick that I learned when I was a manager don't work

22   anymore."

23        **(CD paused.)**

24        **MR. HAAG**:  In this clip, the defendant acknowledges

25   that his managers are lying to auditors, lying to their

1    faces, saying cars are on a test drive when, in fact, those

2    cars were sold.  And how does he react to that?  He laughs.

3    Laughs it off as an old trick.

4        **(CD clip resumed and transcribed as follows:)**

5        **MR. REAGOR**:  "Some of our stores were not operating

6    very well.  Okay?  It's not because we had an audit.  It's

7    because we didn't pass the audit.  You know, if we had an

8    audit -- I mean, if we were doing our job, the audit wouldn't

9    be a problem.  You see what I'm saying?

10       "I mean, so the truth of the matter is, is that

11   Ford Motor Credit might have saved me and Rick Dykes a lot of

12   money by doing an audit, and they might have protected us

13   from a big ass fucking disaster by doing an audit.  Okay?

14       "So what I need you dipshits to do, some of y'all,

15   is clean the fucking shit up and let's roll.  Okay?  You guys

16   that's running it clean, thank you.  You guys that aren't,

17   clean it up."

18       **(CD paused.)**

19       **MR. HAAG**:  This video was from March 2017 after one

20   of the failed audits with Ford, and it demonstrates to the

21   Court that the defendant had full knowledge, not only of the

22   fraud that was going on, but the scope of that fraud.

23       We didn't ask that this be included in relevant

24   conduct, but it certainly comes into play for sentencing

25   purposes.  In addition to the floor-plan fraud, Reagor-Dykes

1   was engaged in a massive check-kiting scheme.  And here in

2   this e-mail from the President of Vista Bank, he writes

3   directly to the defendant and alerts him that there's a

4   negative balance of $1,018,504 -- I'm sorry, eighteen

5   million -- $1,018,504.03.

6           The defendant's response to that e-mail is, I just

7   read this e-mail, and I don't ever want to get an e-mail like

8   that again.

9           Moving towards the bottom, I don't want any red

10  flags ever.  We are doing too good to ever have any red

11  flags.

12          What this demonstrates to the Court is what it's

13  already alluded to.  The defendant had full knowledge of what

14  was going on at his company, but he didn't want to hear about

15  it.

16      (CD clip resumed and transcribed as follows:)

17      MR. REAGOR:  "So don't have any skeletons, see.  I

18  don't have any, and if I had any, I already forgot them.  I

19  got a selective memory.  I remember what I fucking want to

20  remember, and everything else doesn't fucking matter."

21      (CD paused.)

22      MR. HAAG:  What the defendant is talking about in

23  this clip is what the law recognizes as a concept called

24  deliberate ignorance.

25          And from the Fifth Circuit Pattern Jury

1    Instructions, deliberate ignorance is:  You may find the

2    defendant had knowledge of a fact if you find that the

3    defendant deliberately closed his eyes to what would

4    otherwise have been obvious to him.  While knowledge on the

5    part of the defendant cannot be established merely by

6    demonstrating that the defendant was negligent, careless, or

7    foolish, knowledge can be inferred if the defendant

8    deliberately blinded himself to the existence of a fact.

9          And that is exactly what the defendant did here.

10         **(CD clip resumed and transcribed as follows:)**

11         **MR. REAGOR:**  "We had a bad audit in Lamesa.  I

12   mean, nothing like millions of dollars.  It was 400,000 back

13   then because it was small.  But, I mean, that was a lot to me

14   back then, and I was like what's going on, you know?

15         "And so I made Shane start giving me a bank balance

16   report.  Back then, we had only about five accounts.  By the

17   time all of this happened at Reagor-Dykes Auto Group, I had

18   five pages of accounts.  You know, we probably had 250

19   accounts, banking accounts."

20         **(CD paused.)**

21         **MR. HAAG:**  And, again, turning to the deliberate

22   ignorance, the logical takeaway from this segment of the

23   video clip is:  Why do I have five bank accounts when we

24   start, and why do I now have 250 accounts?  If my company is

25   doing so well, how am I $1,000,000 overdrawn in my bank

```
1    account?
2            And these questions that any reasonable, rational,
3    ethical chief executive officer would have been alerted to
4    would have delved further, would have found the answers, but
5    the defendant didn't want to hear any of this and
6    deliberately blinded himself to it.
7        (CD clip resumed and transcribed as follows:)
8        MR. REAGOR:  "If anything, I probably -- I mean, I
9    had these five disciplines and these twelve rules of the
10   Reagor-Dykes Auto Group, and both of them -- I mean, it was
11   for salespeople, for managers, I mean, and never misrepresent
12   any -- anything to a lender.
13           "I mean, when you sell the number of cars we have
14   and you have the number of employees we have, there's always
15   a temptation for people that are -- you know, we dealt with a
16   lot of lenders and say, you know -- and there's always a
17   temptation for the people that are submitting these car deals
18   to these lenders to try to help people out, but you just
19   can't do it.  You don't misrepresent anything to a lender.
20   And that went for everybody, you know.
21           "And so, I mean, the only one way -- there's only
22   one way to do things, and that's the right way, you know.  If
23   you're going to win, and you're going to win for a long time,
24   and you're going to build something big and something great,
25   you gotta do things right and -- or eventually it's going to
```

1    catch up to you."

2         (CD paused.)

3         MR. HAAG:  So here this clip, the defendant tells

4    in the interview after his trial that I said not to lie to

5    lenders.

6         Let's look at the truth.  This is a lengthier

7    description of power booking, but this illustrated model is

8    perhaps easier to understand.

9         So here on the left, this is what the customer is

10   actually buying.  And just for example, the customer is

11   buying a Ford F-150 base model pickup truck.  The bank is not

12   going to loan the full purchase price of that car.  They're

13   going to loan a percentage.

14        Well, some customers, they can't afford, unless the

15   bank finances the full purchase price.  So what the unethical

16   car dealer does is, they tell the bank the customer is

17   purchasing a Ford F-150 King Ranch Edition loaded with all

18   the options, so that the bank loans an amount to cover the

19   car on the left.  In fact, that's not what the customer is

20   getting.

21        And the problem happens when that customer defaults

22   on paying that auto loan, and the bank repossesses the

23   vehicle.  And when it's thinking it's going to sell an F-150

24   King Ranch and get its money back, it's stuck with a base

25   model F-150.

1          In the e-mail that the Court referenced earlier,

2     this was the defendant's take on that situation.  In the

3     scenario talked about, everybody above wins.  The bank wins;

4     they get the loan they want.  The customer wins; they get the

5     car they want.  The sales team wins.

6          And I applaud counsel for the Reagor-Dykes Auto

7     Group for being so candid in her assessment of what the

8     defendant was saying.  We are committing fraud and creating

9     massive liability.  We don't win.  Fraud is not okay.  You've

10    got to stop rationalizing why fraud on our part is the bank's

11    fault.  It's certainly not okay.

12          In the investigation and the prosecution of this

13    case, the investigative team and the prosecution team has

14    come up with four reasons why RDAG collapsed, and they are

15    all inextricably intertwined with the defendant.

16          First, he instituted a win-at-all-costs mentality.

17    Second, his metric for winning was material wealth.  Third,

18    he knew and deliberately ignored the massive and glaring

19    warning signs that his company was committing massive fraud.

20    And, fourth, he promoted those who committed fraud and

21    bullied those who brought up any problems at Reagor-Dykes.

22          Let's talk about win at all costs.

23       **(CD clip resumed and transcribed as follows:)**

24        **MR. REAGOR**:  "You gotta want -- you gotta want to

25    win more than you want to live.  I do.  I'll fucking die to

1    win.  I want to win every fucking day, every fucking day,

2    every fucking deal."

3         **(CD paused.)**

4         **MR. HAAG:**  The logical takeaway from his

5    instructions to his sales force is winning is the only thing.

6    It's more important than ethics.  It's more important than

7    doing things the right way.  It's more important than being

8    honest.

9         The metric for winning, material wealth.

10        **(CD clip resumed and transcribed as follows:)**

11        **MR. REAGOR:**  "If you don't understand what I'm

12   talking about, fuck you.  Change your fucking mind or get the

13   fuck out of my dealership.

14        "I'm not changing my mind because my fucking mind

15   is right, motherfucker.  Show me your shit.  Let's compare

16   net worth.  Let's compare houses.  Let's compare planes.  I

17   got two of them, one jet, one twin prop.  What do you got?

18   I'm building a fucking mansion right now on 19th Street.

19   Where do you live?

20        "You know why I live there?  You know why I have

21   that?  You know why I got my jet?  'Cause I'm a fucking bad

22   motherfucker, and I don't play around.  I work my ass off."

23        **(CD paused.)**

24        **MR. HAAG:**  If you were to ask most people, what

25   have you got, they would tell you:  I've got my faith.  I've

1    got my family.  Myriad of other answers.  Probably last, if

2    it even makes the list, would be wealth, what kind of house I

3    live in, what kind of car I drive, but for the defendant that

4    was all that mattered.

5           This Court has seen and read the Presentence

6    Reports for these three people.  They were promoted to

7    high-level positions within the Reagor-Dykes Auto Group, and

8    they were all committing fraud on a massive scale.

9           We're going to look at a clip here about how the

10   defendant handled one of the managers in Plainview who didn't

11   do well on an audit.

12       **(CD clip resumed and transcribed as follows:)**

13       **MR. REAGOR:**  "Get the fucking deals in the office

14   in Plainview.  You guys fucked us on this audit.  Get your

15   fucking head out of your ass, land, grow a pair, and manage

16   that fucking deal."

17       **(CD paused.)**

18       **MR. HAAG:**  This Court has already discussed the

19   defendant's lack of remorse or contrition.  As it's noted,

20   the defendant has blamed the jury; he's blamed Ford Motor

21   Credit Company; he's blamed the banks; he's blamed the

22   Government; he's blamed this Court.  In fact, he's blamed the

23   entire American justice system.

24           Perhaps most egregiously, he's completely

25   transposed his position with those of his victims and claimed

1    that he's the victim in all of this.

2         **(CD clip resumed and transcribed as follows:)**

3         **MR. REAGOR:** "I think everybody should be treated

4    fairly and have a fair opportunity, and I don't think just

5    because you have a lot of money or you own a big company that

6    you should get any less justice in the courtroom than anybody

7    else. And I don't feel like I've gotten my share of justice

8    in the courtroom so far."

9         **UNIDENTIFIED REPORTER:** "Anything else?"

10        **(CD concluded.)**

11        **MR. HAAG:** And yet another example of this complete

12   transposition, the defendant is arguing that somehow, because

13   he's rich, he didn't get a fair share of justice in this

14   courtroom.

15        And that completely goes against what is the

16   typical critique of the American justice system, which is

17   capsulated from a Bryan Stevenson quote: "We have a system

18   of justice that treats you better if you're rich and guilty

19   than if you're poor and innocent."

20        And the defendant here certainly enjoyed several

21   advantages that most in the criminal justice system do not

22   enjoy. He's been on bond this entire time. He's had a legal

23   defense dream team. And, Mr. Markham, I apologize, you had

24   not come in at this point, but I'll add you to that list as

25   well. But he has had the best of the best in terms of

1    attorneys.

2         In looking at the bank records — and this is prior

3    to even hiring his main defense team — he has spent over

4    $400,000 in hiring attorneys.  It would be reasonable to

5    estimate in this case he likely spent well over $1,000,000

6    hiring the best of the best to defend him in this case.

7         The United States is asking for justice in this

8    case.  The justice that we are asking for is holding Bart

9    Reagor accountable for the culture of corruption and greed

10   that he instituted at the Reagor-Dykes Auto Group and all the

11   harm that flowed from it even if he won't hold himself

12   accountable.

13        We are asking for justice for IBC Bank.  We're

14   asking for justice for the Reagor-Dykes Auto Group customers,

15   several of whom were stranded with cars that they had traded

16   in but were not paid off.  We're asking for justice for the

17   Reagor-Dykes Auto Group employees who were subjected to

18   bullying on a daily basis and who lost their jobs.

19        We're also asking for justice for West Texas

20   values.  One of the very special things about living out here

21   and practicing out here is that honesty and integrity are

22   part of the fabric of this area.  In West Texas, when you

23   look another person in the eye and you shake their hand and

24   you tell them you're going to do something, that is your

25   bond; that is your word.  You don't lie.  You don't cheat,

1    and you don't steal.

2          The defendant and the way the defendant ran his

3    company was completely antithetical to all of those values.

4    Thank you, Your Honor.

5          THE COURT:  Thank you, Counselor.  The Court will

6    give that argument appropriate weight in adjudicating the

7    pending motions for variance and the final sentencing

8    decision.

9          Mr. Markham, you may proceed.  And I'd just ask

10   that you also focus on the 3553(a) factors the Court is to

11   apply and keep in mind that there are pending motions for

12   variance.

13         MR. MARKHAM:  Yes, Your Honor.

14         THE COURT:  Please proceed.

15         MR. MARKHAM:  I will focus on the presentation

16   we've just heard from the Government.  It's new to me;

17   although, he did provide adequate time for me to look at

18   these.

19         I want to start with probably what is the most

20   awkward part for me as somebody from Boston.  I'm not from

21   West Texas.  I've been here for depositions before and for a

22   couple of cases.

23         I cannot tell this Court about the values of West

24   Texas, but I do know this:  They are nationwide values.

25   Everybody adheres to those values.  And among the most

1    important reasons why we have the great West Texas United

2    States, as well as the Massachusetts United States, is we are

3    allowed to speak our mind.

4             I would not have spoken the way Bart Reagor spoke.

5    Had I been his puppet master, he would have said things

6    differently.  The same for Dan Cogdell; there's no question.

7    But he said what he said openly, and it is his belief.

8             The guidelines build in a component to reward

9    people who accept responsibility, and it's three points off.

10   And three points at the high end where Your Honor has placed

11   him with the guidelines that you've calculated means a whole

12   lot of time, so he's getting a whole lot of time not -- not

13   knocked off because he has spoken his mind in a way that

14   fairly obviously means he does not accept responsibility.

15            But I ask this Court to consider whether taking his

16   comments beyond that and into the realm of a general

17   disrespect for authority, as Mr. Haag sees it, goes too far

18   and is dangerous to one of our fundamental liberties.

19            They're fighting in Europe right now for one

20   country to protect the liberty to speak its way and not to

21   let a government over-impose its view.

22            Mr. Haag has done an incredible job with the

23   prosecution, a successful job.  He -- my client stands to

24   lose at least a decade of his life.  That seems to me to be

25   punishment enough, particularly weighing against adding on

1   more time or giving a variance at all because he spoke out

2   the way it's not politic to do.  Not politic may cost an

3   election; it may cost a friend, but it shouldn't cost a day

4   of liberty unless it embodies criminal conduct, and for that,

5   he's already been punished.

6          With that having been said, Your Honor, I'd like to

7   go through the videos that Your Honor heard.  I don't have to

8   have them replayed.  I'll refer to them by a key word or so

9   in them, and I'm sure Your Honor will know what I'm talking

10  about.

11         The first tape, the first thing he says is, he

12  regrets what happened to his customers, and he has said that

13  many times.  He regrets the loss of his business.  He regrets

14  the loss to his family, and the shame, and he's paying a big

15  price.

16         And the assets that Mr. Haag says that they found

17  that he had, I don't know that they've been authenticated or

18  challenged.  I accept the fact that Mr. Reagor had money.  I

19  don't -- I don't think it's been proven that Mr. Reagor had

20  money that was available for him to infuse the money that was

21  needed to rectify the huge fraud that was perpetrated by his

22  underlings.

23         I just don't know that he had that money.  I don't

24  think it's been shown.  It certainly hasn't been shown in a

25  way that would meet a jury trial standard, and I don't even

1   think it's been shown by any evidence beyond a preponderance

2   of the evidence.  I don't think it's been there.

3            Now, in the second tape, what I heard Mr. Reagor

4   say was that he did not want fabrication.  This is not -- he

5   says, I don't want anybody to fabricate.

6            And then the Government says to you that what he

7   means by I don't want to fabricate, that you should

8   fabricate; that this is what the mob does.

9            Your Honor, this is not the *Godfather*.  We deal

10   with evidence.  And if Reagor gets up and yells and screams

11   — and I believe that's in the second tape — that I don't

12   want anybody to fabricate, I think he has to be taken at his

13   word unless there's some showing that he's winking or

14   nodding, rather than this being a Hollywood script.

15            I believe it was in the fourth tape where he

16   complains that an early audit may have -- may have saved us.

17   In other words, he was telling his staff, if Ford Motor

18   Company had only come in early, we would have been saved.

19            Well, that is literally true, Your Honor, because

20   if Ford Motor had found out earlier what Shane Smith was

21   doing, Ford Motor Company would have stopped it earlier by

22   not feeding more cars or doing whatever Ford Motor Company

23   with its massive capabilities to defend itself can do.

24            But the fact that he says, if they'd have come in

25   earlier, we might have a saved company means that some of

1    that 35,000,000 may not have been lost.  That is not a

2    statement -- however inartfully he may have said it with his

3    boisterousness and his bullying, that is not a statement

4    that's applauding the fraud.  It's saying, if they'd have

5    come in earlier, it could have been accepted.

6            Now, it is true, that is, he blaming other people,

7    that's true.  He doesn't get acceptance of responsibility.

8    In fact, he's about as far away from it as anybody I've ever

9    seen.  That's clear, but that's really I respectfully submit

10   all the Court should consider that as meaning.

11           In another tape, he says:  Those who did right,

12   thank you.  Those would did wrong, get your head out of

13   whatever, or something like that.  Again, at his word, that

14   means he was lambasting the people who did wrong.

15           And I have to say, Your Honor, that while we did

16   not object to the admission of the tapes, under even the

17   relaxed standard on preponderance of the evidence and the

18   more loose standard for sentencing, that doesn't mean we --

19   we agreed with all the gloss that the Government was putting

20   on it.  Like saying, oh, well, this is -- when the godfather

21   does that, that means go out and kill somebody.

22           That's not what this could be taken to mean without

23   proof.  He's sitting there yelling at people who didn't do

24   the audit right and thanking the people who did it right.

25           Now, in the e-mail where he's quoted as speaking

1   back to a banker about, I don't want any more red flags,

2   there are two ways to interpret that.  One is, don't send me

3   any more; I'm not interested in seeing our failings, which is

4   an unreasonable thing to say to a bank.  They're never going

5   to do it that way.  They're going to send you if you're

6   overdrawn.  That's been my experience when I was a college

7   kid that that's what they do.

8          All right.  But it could also mean:  I don't want

9   any more red flags.  Darn it, I'm going to go to my company,

10  and I'm going to make sure that the books balance.  And we do

11  remember that Shane Smith said during the trial under oath,

12  Shane Smith, the Government witness, that he was doctoring

13  the statements that he was sending over to Bart Reagor.  He

14  said that, and that's in the record.

15         And that's the Government witness, and he was

16  sentenced to seven years for a very large fraud.  And I don't

17  know because I wasn't there, Your Honor, but I have not heard

18  that the Government took any issue with the truthfulness of

19  his testimony at trial, at Mr. Reagor's trial.

20         There's a Plea Agreement between Shane Smith and

21  the Government saying he's got to tell the truth.  His

22  principle telling of the truth or not was in this courtroom

23  against Mr. Reagor.  I didn't hear anybody take any points

24  away from him because he was lying about the fake statements

25  or he was lying about not having told Mr. Reagor.

1          So the fact that this man says, I don't want any

2    more red flags, is probably more likely he wanted to fix it

3    so it never happened, but, in any event, the Government

4    hasn't proved that it has that sinister meaning that they

5    thought it had.

6          Next, Your Honor, is a tape where he says:  Don't

7    have skeletons in your closet; I don't have skeletons in my

8    closet.  I mean, that is interpretable equally with innocence

9    as with guilty, if not more so with innocence.

10         And I respectfully submit that the man's hyperbole

11    when he's in these meetings and he gets fired up and pretends

12    that he's the Texas Tech's football coach and he's yelling at

13    the sideline because they're down two touchdowns at the start

14    of the fourth quarter and that maybe is the way to inspire

15    people, that clearly was not what most people would want.

16         Although, I will tell you, I have some people who

17    are -- who wish to tell this Court that they were in those

18    meetings, and they were not troubled; they understood it was

19    Bart being the way Bart is, but, in any event, however

20    artful, this does not have the sinister view or the sinister

21    interpretation that the Government has glossed onto it.

22         In the Mesa [*sic*] fraud that -- the Mesa audit

23    where there was a $450,000 shortfall, they're quoting -- the

24    quote that I heard was Mr. Reagor yelling at people and

25    saying, do things right; I don't want that again.  That

1    simply isn't encouraging that kind of fraud.  It's not a

2    statement that suggests that Mr. Reagor was endorsing those

3    kinds of bad actions.  Do things right.

4         The quote that seems to me to be the most striking

5    is where Mr. Reagor says, I would rather die than lose.  I

6    would rather die than lose, he says, at the top of his voice.

7    Just following that, the Government said that means I would

8    rather win -- I would rather win than do it right.  That's

9    what he said.  That's on this record.  That is not what the

10   tape said.  The tape was a hyperbole.  I'd rather die than

11   win.

12        I respectfully submit we all know that's not true.

13   Mr. Reagor is here, and he's lost big.  And if -- if dying

14   was better than losing, we would not have him here, but he's

15   here; he wants to fight on his appeal, which is his right.

16   He never said, I would rather win than do right.  That's not

17   what he said.

18        I agree with Mr. Haag that bragging about riches,

19   it's certainly not something that we do up in New England,

20   and it's certainly not something that I would suspect the

21   good people of West Texas do.  And some people would call it

22   obnoxious.

23        Mr. Reagor meant it as a way to inspire people.  I

24   don't know what effect it had, but it is not within I sus --

25   I respectfully submit the fair range of what this Court

1    should take into consideration, which is the -- his entire

2    life and his actions, and what he said in sales meetings,

3    despite the hyperbole, simply cannot be, I respectfully

4    submit, interpreted the way the Government interprets it, as

5    being a shameless complete disrespect for everything good

6    about everything.

7             After all, he said it on a tape.  If it was all

8    that bad, he's smart enough not to have said it on a tape.

9    This was the way he believed he could inspire people.

10   However wrong that was, it's cost him greatly.  It's cost him

11   a lot of his liberty.  It's cost him shame, disgrace, loss of

12   his family, his grandchildren for a long time, and I

13   respectfully submit that that is enough.

14            I think that's -- I know that's all the comments I

15   have on the -- on the Government's response to variance.

16            The only thing I would add that I have not point --

17   and I probably pointed it out in my papers.  I just want to

18   emphasize it very briefly.  There is a massive outpouring of

19   support for Mr. Reagor here in court.  That tells a lot.  If

20   he were the shameless bully, and that's all he was, and

21   people were putting up with him and smiling because he was

22   their boss, they would be long gone, but they're here.

23            **THE COURT**:  Yes.  And the Court -- and the Court

24   will note for the record the outpouring of support

25   represented in the galley today; that it is nearly full.

1    Many of those persons are here to support the defendant.

2           And then also the Court will take judicial notice

3    of the 93 character statements that were filed with this

4    Court in a timely manner.

5           So, yes, I do believe that the record reflects at

6    least that community support.

7           **MR. MARKHAM**:  Yes, Your Honor.  Thank you.  And I

8    would just say that just a brief analysis of that massive

9    showing in writing talks about virtually every aspect of his

10   life with multiple people coming in.

11          Pastors:  He gave to the church.  He was there on

12   Sunday.  He coached the team.  He helped a widow, widows.  He

13   helped the widows.

14          Family members, workers, people who he's given a

15   second chance, who he's rehired over a course of thirty years

16   of life since he's been in a position to do this.

17          All of that says much more about a man than what he

18   says on hyperbolic tapes where he in a bad, misjudgment-like

19   way tries to inspire people.

20          And I ask the Court to consider that in its

21   entirety by people who volunteered to do this and to get this

22   in on time, and it says volumes.

23          I would only say this with respect to the variance

24   I seek of a downward departure, it's a lot of time.  Whatever

25   the Court gives him is a lot of time.  He will never be in a

1    position to do anything like this again.  He'd be lucky to

2    get a credit card from any bank, much less do something like

3    this.  The deterrence is there.

4          There was a recitation by the Government of the

5    400-and-some-odd months that the other people got for being

6    in these ranges.  That sounds like a great deal, but I think

7    the highest sentence was Shane Smith's, and his loss was

8    25 -- was 35,000 [*sic*], which he fully admitted that he did,

9    and said that Bart wasn't involved with.

10         So in terms of proportionate sentences, certainly

11   within the guideline range, or even lower, accomplishes the

12   goal of having equal sentences, adequately punishes Mr.

13   Reagor so that at some point he can have a life, come home to

14   his family, and have something to live for.  Thank you for

15   hearing me, Your Honor.

16         **THE COURT**:  Okay.  Thank you.  The Court will give

17   appropriate weight to that argument in adjudicating the

18   pending motions for variance and then also the final

19   sentencing decision.

20         At this time, the Court will turn to statements,

21   final arguments, and allocution.

22         Mr. Markham, because of your unfamiliarity with

23   this Court, I'll let you know that I provide Defense Counsel

24   their preferred order of operation, allocution to be followed

25   by final argument or vice versa.

1          Do you have a preference on argument and

2     allocution?

3          MR. MARKHAM:  I'd like to argue after allocution if

4     I may.

5          THE COURT:  Okay.  So we'll do it in that order.

6     We'll turn to statements, allocution, and then final

7     arguments.

8          Mr. Haag, did the Government comply with any and

9     all statutory obligations to identify and consult victims in

10    this case?

11         MR. HAAG:  Yes, Your Honor, it --

12         THE COURT:  Does the --

13         MR. HAAG:  -- did.

14         THE COURT:  -- Government intend to present any

15    victim impact statements at this time?

16         MR. HAAG:  No, Your Honor.

17         THE COURT:  Okay.  Now, Mr. Markham, as already

18    noted by the Court and reflected in the sentencing file, this

19    defendant has received 93 character statements.  Those are

20    all admitted as exhibits to the sentencing hearing.  They

21    were all reviewed by this Court.

22         Do you intend to present any of these character

23    statements in the form of additional live testimony?

24         MR. MARKHAM:  I do, Your Honor.  It won't be a

25    repeat of those.  It will be something that they've said, in

1  part what they've said, but they would like to address the

2  Court.  There's some family members and some former employees

3  that would like to address the Court briefly.

4         I've told them that they should limit it to about

5  three minutes.  The Court will get the point in that time.  I

6  believe there's seven of them.

7         **THE COURT**:  Okay.  At this point, Mr. Markham, you

8  may call your first character statement.

9         **MR. MARKHAM**:  I'd like to call —— come on up ——

10  Mr. --

11         **DR. BRION REAGOR**:  Brion, Brion.

12         **MR. MARKHAM**:  -- Brion Reagor, who is the brother

13  of Mr. Reagor.  Would you --

14         **THE COURT**:  Mr. Reagor --

15         **MR. MARKHAM**:  Your Honor, would you like them to

16  come to the podium?

17         **THE COURT**:  Yes.  Mr. Reagor, you may approach the

18  center podium.  And I'd just ask that you begin with a full

19  statement of your name, and then you may take as much time as

20  you need, and you may read aloud a prepared written

21  statement.  Please approach.

22         And just, again, if you'll state your full name for

23  the record so the court reporter can record it.

24         **DR. BRION REAGOR**:  My name is Dr. Brion Reagor.

25  B-R-I-O-N, W. Reagor.  I'm just going to read a statement

1   that I wrote for my brother.

2        **THE COURT**:  And, again, I know this can be an

3   intimidating process.  You may take as much time as you need,

4   and you can just read aloud or do whatever you find most

5   comfortable.

6        **DR. BRION REAGOR**:  Thank you.  Dear Honorable

7   Matthew J. Kacsmaryk, I am Dr. Brion W. Reagor, the younger

8   brother to Bart Reagor, and I am grateful for the opportunity

9   to share with you a small glimpse of my brother's importance

10   to me, our family, and his community.

11        My brother and I were raised in North Dallas with a

12   very traditional value and a strong ethical conduct.  Raised

13   within fifteen minutes to extended family, a successful

14   educated mentorship was never absent.  My sister-in-law,

15   Annette, was raised about five minutes away from our home.

16        I have been friends with Annette since junior high

17   school.  Her family raised her in similar fashion.

18   Therefore, collaboratively, my brother and sister-in-law have

19   raised their children with respect for themselves, their

20   family, and their community.  We all were raised to do things

21   correctly the first time, and then one cannot develop a self

22   worth without having any integrity.

23        We all have used my brother as a sense of fuel,

24   inspiration, mentor, friend, and collaborator.  My brother

25   has proven time and time again he will be present, that he

1    will show up, that he will improve the situation.  Our

2    intimate and extended family, as well as our last set of

3    family friends, has benefited multiple times from Bart's

4    ability to assist.

5           I'm not writing solely about fiscal assistance.

6    I'm writing about the deeper human qualities which matter.

7    He can be depended upon.  He can be approached.  And he can

8    certainly network for someone effectively.

9           Our family requires doing the right thing.  Trust

10   me, the irony of the last four years has not been lost on any

11   of us.  My brother was actively making positive change in his

12   family in Lubbock, Texas and all of West Texas and on the

13   Texas Tech University campus.

14          Shamefully, all of his well-intended, contagious,

15   community-minded forward progressive action has been stifled

16   in an instant.

17          Mine and Bart's parents are a young tragedy.  Our

18   parents were next-door neighbors in North Dallas while in

19   junior high school.  This is where their love story began.

20   Sadly, at the age of 47 in the peak of his professorial

21   career, after 29 years of marriage to our mother, our father

22   suffered a debilitating brain hemorrhage.  My devastated

23   mother, with her two boys, did everything we could to save

24   our dad.

25          Naively at the time, we were not thinking too well

1    on the long-term disability aspects of these heroics.  This

2    long-term disability maintenance responsibility for our

3    father has fallen solely on Bart Reagor, Annette Reagor, and

4    Brion Reagor.

5         Our family crisis did not end with our father's

6    sudden dependency.  We lost our mother ten years later.

7    After 39 years of marriage and after ten years of caring for

8    our father, our mother died by the exact same brain

9    hemorrhage defect our father had.

10        Bart and I still have our kind, appreciative dad.

11   The responsibility of his care is an astounding $150,000 a

12   year non-tax deductible.  The last four years has made this

13   incredibly difficult to manage, with legal fees, emptying of

14   bank accounts, as well as the mental anguish we've all

15   endured.

16        My brother, sister-in-law, and I over the last

17   20 years have successfully and collaboratively assisted four

18   generations of our family simultaneously.  Mine and Bart's

19   dad was the sole child of our grandparents, with the mental,

20   financial, and emotional well-being to take care of his own

21   parents.  With the sudden loss of his ability, the financial

22   care and safe placement of our aging grandparents became our

23   responsibility.  The Reagor family was forced to skip a

24   generation in ability to provide.  While raising their own

25   children to the success story which they had become, Bart and

1    Annette, with assistance from me, also provided for both my

2    grandparents and our parents on the Reagor side.  I'm sure

3    you know the exorbitant costs financially and the emotional

4    toll for senior care in the United States.

5            We have also been present for assistance to young

6    cousins with university costs to help break former Reagor

7    cycles within our family siblings.

8            I hope this enlightens the Court to Bart Reagor's

9    importance to our family as a leader by example and a

10   confidant of trust and a provider of security.

11           Lubbock, Texas, and all of West Texas, as well as

12   Texas Tech University, have benefited by Bart's flourishing

13   business ownership.  He has constantly given back to his

14   community.  The entire revitalization of the once-forgotten

15   Lubbock downtown was started by Reagor-Dykes Auto Group.

16           Two well-known philanthropic organizations were

17   allowed to office in their RDAG building downtown rent free.

18   CASA and Make-a-Wish Foundation were located in the building

19   and were openly visited and supported by Bart daily.

20           The new Buddy Holly Hall -- the new Buddy Holly

21   Hall of Performing Arts in Lubbock was funded largely by Bart

22   and Annette Reagor.

23           The slogan, the Friendliest City in America, for

24   Lubbock was pitched by Bart Reagor.  Bart annually donated to

25   all local elementary school, junior high school, and high

1   school sporting leagues.

2          He supported Christmas for Kids, United Way, the

3   East Side Concert, and was made Trumpeter Award Man of the

4   Year for his support of Lubbock hotels and motels.

5          Texas Tech University donations from Bart and

6   Annette Reagor seemed endless.  He provided all university

7   vehicles, including an airplane.  He dedicated time and

8   financials to the Diversity Group, Fellowship of Christian

9   Athletes, every athletic program, alumni association, and the

10  campus library.

11         These are a few mentions of his active enrollment

12  in the maintenance of the education and continued development

13  of his community.

14         I know intimately the toll of the last four years

15  has taken on my brother physically and emotionally.

16  Unfortunately, there is no one in our two small families, the

17  Reagors and the Rileys both, which has been excluded from the

18  anguish.

19         My brother is a strong example of not losing faith.

20  He has remained quiet, against his every natural fiber and

21  his core as advised.  He was navigate -- he has navigated

22  great physical illness and challenges, both cancer and

23  Parkinson's disease, solely exacerbated by the stress of the

24  last four years with confidence and assuredness.  I am and

25  will remain proud of Bart Reagor.

1          **THE COURT**:  Thank you, Dr. Reagor.  And I will

2     consider that alongside your letter, which was marked as

3     Page 067 in the written documents submitted as character

4     statements.  You may return to the gallery and your family.

5          **DR. BRION REAGOR**:  Okay.

6          **THE COURT**:  And, Mr. Markham, you may call your

7     next character statement.

8          **MR. MARKHAM**:  Annette.

9          **THE COURT**:  Ms. Reagor, I'd just ask that you begin

10    with the statement of your full name, and then you may take

11    as much time as you need.

12          **MS. ANNETTE REAGOR**:  My full name is Annette

13    Reagor.

14          Your Honor, my name is Annette Reagor.  I'm Bart's

15    wife.  I've known Bart since I was 14 years old.  I've been

16    married to him for 34 years.

17          We have been blessed with three incredible children

18    that we have had the honor to raise together.  We have an

19    amazing son-in-law and daughter-in-law and now we've been

20    blessed with two beautiful eight-month-old granddaughters.

21          Bart has always been a huge role model and positive

22    influence in raising our children.  As our kids were growing

23    up, he always -- we always had a house full of kids that Bart

24    always made to feel welcome and at all times had a huge

25    impact on all of their lives as well.  A lot of those kids

1  consider Bart a second father to them and still love him to

2  this day.

3          Bart has also taken care of his dad, who is

4  disabled, and his elderly grandparents with love, care, and

5  compassion, as well as many of his extended family.  He's

6  always gone out of his way to help people in need and has

7  taught my kids this by leading by example countless times in

8  their lives.  They are so lucky to have witnessed their

9  father being so generous to so many people.

10         Our family has been blessed with an incredibly

11  loyal and supportive husband and father.  I have watched Bart

12  do everything in his life with faith, integrity, character,

13  honesty, and passion.  He has always done the right thing and

14  insists that others do the same.  He does not lie, cheat, or

15  steal, and he would never ask anyone else to.

16         He is the most generous person I know.  He is the

17  strongest person I know.  I love, trust, and respect him with

18  all of my heart.

19         It's been extremely hard to watch Bart lose so much

20  over the last three and a half years.  He has lost his

21  business that he worked so hard to build.  He's fought

22  cancer, and he's been diagnosed with Parkinson's disease.

23  But he somehow still keeps a positive attitude and most

24  importantly his faith.

25         Bart was diagnosed with Parkinson's in May of 2020.

1    I'm extremely concerned about his health and the negative

2    impact that a prison sentence would have on him.  We have

3    been very fortunate to find a neurologist that, not only has

4    taken great care of him medically, but also truly cares about

5    him as a person.

6            Parkinson's disease impact Bart's life on a daily

7    basis physically, mentally, and emotionally.  There are many

8    things we have to do to manage his Parkinson's, including

9    monitoring his diet, the times that he eats, managing the

10   side effects of the medications, which include extreme

11   nausea, managing his sleep, and also exercising on a daily

12   basis.  I believe that any time in prison would be

13   detrimental to Bart's health.

14           Bart has been my husband, my best friend, and my

15   rock my entire adult life.  Our family needs him (crying)

16   with us, and I want our granddaughters to know him and grow

17   up with him in their lives.  I truly believe that it's a huge

18   injustice for Bart to spend even one day away from his

19   family.  Thank you.

20           **THE COURT**:  Thank you, Mrs. Reagor.  You may return

21   to the gallery.

22           Mr. Markham, you may call your next character

23   statement.

24           **(Pause.)**

25           **THE COURT**:  You may approach the center podium.

1    Just begin with the full statement of your name for record

2    purposes, and you may take as much time as you need.

3         **MS. RACHEL ESLICKER:**  Okay.  Rachel Eslicker.

4    Sorry.  (Chokes up.)  Make me go right after my mom.

5         Good morning, Your Honor.  I would like to speak on

6    behalf of Bart Reagor.  Thank you for hearing from me.

7         I am Bart's daughter, Rachel.  I'm his oldest child

8    and a relatively new mother to his first grandchild.

9         It seems that others are trying to portray my

10   father as a cruel person and a bully who is driven by greed.

11   It is very clear to me that these people do not know my

12   father.  In fact, they've likely never spoken to or

13   interacted with him personally.

14        I can confidently say that the picture they're

15   painting is irreconcilable to the man I've known my entire

16   life.

17        The best way to sum up my dad's character is

18   through one statement.  Bart is a man who cares about people,

19   namely, his family, his former employees, and his community.

20   He is not someone who delights in tearing others down but who

21   lives for building them up.

22        There are countless examples.  I'll start with the

23   personal ones.

24        I was a very shy little girl.  My dad worked

25   six days a week, and Sundays were his only days off.  One

1   weekend when I was three or four years old, my mom was having

2   a garage sale, so to entertain me, my dad walked with me up

3   and down the block and pointed out houses with Sunday papers

4   sitting in the street.  As we approached each of these

5   houses, he mentioned that the family who lived there would

6   probably be very thankful if I would knock on their door and

7   hand them their paper.

8           Delivering papers became our little Sunday morning

9   tradition, something special that was just for me and my dad

10  when he could have been sleeping in or resting after a

11  70-hour work week.  This ritual helped build my confidence in

12  approaching and speaking to others.

13          That deliberate encouragement carried into my adult

14  life.  When I was twenty-two, I moved to the East Coast where

15  I had no support network to attend law school.  I really

16  struggled with the stress.  By Thanksgiving, I had lost

17  twenty pounds, was barely sleeping, and when I did manage to

18  sleep, I woke up after a few hours in a sweat with my heart

19  pounding.

20          Unsurprisingly, my first final did not go well.  I

21  absolutely tanked.  I went home and called my mom crying,

22  which, of course, meant my dad also heard how upset I was.

23  Five hours later, my parents were walking through my

24  apartment door all the way from Lubbock.  I took two days off

25  from studying while my parents built me up and made me laugh.

1    I got a 4.1 on my next final.

2           My dad also cared about his former employees.  I

3    understand that the audio you've heard did not paint a

4    flattering picture.  However misguided some of these

5    motivating performances were, they do not reflect who my dad

6    is as a man or as a boss.

7           I used to say that he spent the rest of his day

8    making up for those thirty-minute morning meetings.  If he

9    spoke at a dealership, he spent his time before and after the

10   meeting encouraging and checking in with employees.  He knew

11   what was going on in every back-office worker's life because

12   he walked their floor every afternoon and asked each one of

13   them about it.

14          When my dad had to fire one particular employee, he

15   was still brainstorming months later how he could hire him to

16   do something else at the company, such as work at the gym,

17   because he couldn't stop worrying about him and his family.

18          My dad gave people countless chances and constantly

19   rehired employees who he fired for good cause simply

20   'cause -- simply because they asked him to and promised to do

21   better.

22          Finally, my dad cared deeply about the West Texas

23   community.  He raised money for countless deserving nonprofit

24   organizations, like Make-a-Wish, the American Heart

25   Association Go Red for Women event, CASA, the Walk for

1   Diabetes, and numerous others.  What's more, he was endlessly

2   generous with his time and was fantastic at inspiring others

3   to give what they could, whether that was time or money.

4          My dad was extremely passionate about helping

5   Lubbock to grow and evolve.  He was a huge advocate and

6   sponsor for revitalizing downtown, not just through

7   investment and real estate, but through promotion of the

8   culture there.  He recreated the historic Christmas windows

9   for the first time in decades and sponsored a new outdoor

10  plaza stage for the LHUCA, a center for the arts.

11         All of his community involvement sounds really

12  impressive, but what truly showed my dad's character were the

13  small acts of kindness I continually witnessed over the

14  years.  Small things like running after a man who looked

15  hungry to give him his leftovers after a meal, inviting a

16  shelter to bring their residents to the headquarter's coffee

17  shop for coffee on him.  Bart's activism in the community was

18  not limited to the times that people were watching.

19         Your Honor, I respectfully request that you bear

20  Bart's many acts of kindness and compassion in mind when you

21  decide his sentence.  My dad is a resilient man, but losing

22  his presence will be an unbearable blow to our family.  We

23  all worry, as any family would, but with the added fears

24  associated with the progression of his Parkinson's disease

25  and how sick he becomes when he takes his medicine, a place

1    without proper care is unthinkably devastating.

2              Thank you for your consideration.

3              That was the end of what I wrote.  I did just want

4    to address what we saw up there.  I didn't have the benefit

5    of reading the full e-mail that my dad sent about power

6    booking.

7              I can tell you I very clearly remember from memory

8    in meetings him presenting that situation as a warning to his

9    employees, that bankers would try to do that to get people

10   approved, and he was trying to tell them not to do that.  And

11   that, you know, I mean, an inexperienced salesperson might be

12   confused by when a banker is on the other line telling them,

13   are you sure that car doesn't have a DVD player and X sound

14   system, and explaining what power booking was, and that that

15   was not okay.  That is what I remember from meetings.

16             I also know that there was a situation where it got

17   bigger, and we lost a lender because of it, and I think -- my

18   interpretation of that e-mail is that I thought maybe Bart

19   was going too far in defending his employees, but I --

20   genuinely, I would never want to misrepresent anything to

21   this Court.

22             I haven't seen that whole e-mail.  They just showed

23   a snip, but I genuinely never remember him telling anybody

24   that power booking was okay.  I remember the opposite.

25             **THE COURT**:  Okay.  Thank you, Ms. Eslicker.  I will

1    add to your live testimony the character statement submitted

2    in Pages 25 and 26 of Defendant's group of character

3    statements.

4         Is there anything else you would tell the Court at

5    this time?

6         **MS. RACHEL ESLICKER:**  That's it.  Thank you, Your

7    Honor.

8         **THE COURT:**  And you may return to the gallery.  Mr.

9    Markham, you may proceed with your next character statement.

10        **MR. MARKHAM:**  We have two brothers who I think are

11   going to come up for very short statements.  Could they come

12   up together, Your Honor?  Would you --

13        **THE COURT:**  I tend to do them in sequence, but if

14   one is going to speak for both, I'll allow them both to stand

15   there.

16        **MR. MARKHAM:**  No, they'll both speak very shortly.

17   Ryan.  And then, Riley, you're on deck.

18        **MR. RYAN REAGOR:**  Your Honor, my name is Ryan Wade

19   Reagor, and I'm Bart and Annette Reagor's middle child.

20        Does it need to be really brief, because mine -- I

21   think I might be a little confused, because mine is not

22   really brief.

23        **THE COURT:**  Okay.  You can -- why don't you go

24   first, Mr. Reagor, and then you can take as much time or as

25   little time as you need.  I understand that the one -- the

1    next character statement may fill in some of the gaps.

2         **MR. RYAN REAGOR:** Absolutely.  Would you like me to

3    read my statement that I prepared first, or I, kind of like

4    my sister, have personal experience of a couple things that

5    were shown on --

6         **THE COURT:**  Why don't you do both.  If you took the

7    time to prepare a written statement and you want that made

8    part of the record, do that, and then you can follow with

9    any --

10        **MR. RYAN REAGOR:** Yes, sir.

11        **THE COURT:**  -- verbal response to what was

12   presented.

13        **MR. RYAN REAGOR:** Okay.  I would like to first

14   express my thankfulness for the opportunity for me to come up

15   here today and tell the truth about who my dad is to me and

16   countless others.

17        Also, I'd like to thank everyone that is here today

18   to show your support for my dad and our family.  That means

19   the world to us.  And I would describe everyone over here as

20   West Texans, so, um, just one quick thing from what Mr. Haag

21   said.

22        I have the best parents and the best dad.  There

23   are tons of ways to describe how he was as a dad to me, but

24   the biggest one for me is that he believes in -- in me even

25   more than I believed in myself at every turn of my life.  He

1   is my biggest fan, but he is so much more than that.

2          Growing up, my friends loved to be at my house.  We

3   had so much fun.  My parents made sure of it.  My parents

4   care about making sure that those that they are responsible

5   for have fun and anything that they ever need.  There's

6   absolutely no doubt of that.  I have the personal experience

7   of 29 years.

8          You know, just one quick example is just -- just

9   not very long ago at all, I saw some friends I hadn't seen in

10  awhile, and they asked me if I ever still went -- if my dad

11  ever still did car dancing and just because that's just --

12  what that was is, like, if we were ever coming back or, like,

13  getting onto our cul-de-sac, we'd turn the music up loud, and

14  he would just hit the brakes to the beat of the song, and

15  everybody just thought it was the funnest thing, and all my

16  friends still remember it.

17         Um, my dad worked at least 70 to 80 hours a week

18  when I was growing up, sometimes a lot more than that.

19  Sometimes he would have to show up to family vacations a

20  couple of days late after my mom, my sister, and my brother

21  had already got there.  I think that's a great example to

22  show that he's a man of the highest work ethic.

23         That work ethic was instilled in me from seeing

24  that and having that as my example.  That trait has helped me

25  in my life infinitely, and I'm very grateful to both of my

1    parents for that.

2          Even with as much time as he spent working, my dad

3    still coached me in just about every single game that I

4    played, in soccer, football, and baseball, from the time that

5    I was four years old playing soccer, and I didn't want to

6    play, and so he'd motivate me with a Power Ranger for each

7    goal that I scored, until the time I was fifteen winning a

8    National Championship in baseball with a torn ligament in my

9    thumb and a massive blister on my push-off foot from the

10   mound that he doctored personally for me before every game.

11   You know, if you have Bart Reagor in your corner, you will

12   believe that you can do it no matter what the circumstances

13   are.

14         My dad is the best, and he was there for me, and he

15   was work -- he was there for me at all times, and he was

16   working himself to the max day in/day out.  Those two things

17   never changed.  I can tell this Court it is a fact that I'm

18   very lucky to have the dad that I do.

19         Everyone who has ever coached on one of those teams

20   of my brother and I's growing up, or on the Lady Raiders'

21   soccer team of my sister's, loves my dad.  A lot of those

22   people are here today.  He was no doubt about it the best

23   coach that I've ever had, and I've had a lot.

24         He's had -- he -- the reason primarily, Your Honor,

25   that I would like to say that he is the best coach I've ever

```
 1    had is because he knows what positive motivation is versus
 2    negative motivation.  You know, I've had -- I've had times in
 3    my life that I've had coaches make me completely doubt
 4    myself, but my dad knows -- my dad primarily -- I understand
 5    there's parts of it, but 99 percent of what he told me in my
 6    whole entire life was positive, was positive.  He positively
 7    motivated me, you know.
 8             And that's -- that's all kinds of different things,
 9    but, like, we had a thing on all of my different teams that
10    he coached where he wanted us to go to the championship, so
11    we'd have a chant.  He'd say:  Where we going?  We'd say:
12    All the way.  And he'd say:  How are we going to get there?
13    And on the Raiders, which was a football team, he said on a
14    trolley.  He said:  I'll get y'all a trolley.  We'll go to
15    the game on a trolley.  On the 76ers basketball team, he said
16    in a limo.
17             Every single time he came through with what he said
18    and how we were going to go there.  That was positive
19    motivation.
20             On the Bombers in baseball, he said:  We're going
21    to bat around this inning for triple scrupes -- for triple
22    scoops or cheeseburgers.  I'll buy them for you guys after
23    the game.
24             You know, he made things fun.  He's a positive
25    motivator.  There's no doubt about it, no doubt about it.
```

1          As I got older, I learned that my dad had that same

2   adoration that I had for him as a son and a coach by so many

3   people that worked for him as well.  I know that as a fact to

4   this Court because I was there, and I witnessed it, and I've

5   been told personally by the people countless times.  And I

6   know it from my own experience because he made me feel the

7   same way about him as a boss, as a -- as a dad, a coach, and

8   a mentor.

9          Before my senior year of college in 2014, I would

10   not have thought that I was going to be in the car business,

11   but my dad told me that they were going to be starting an

12   e-commerce department and wanted me to come intern that

13   summer selling some cars online.

14          After about five days of not selling a car and

15   having a meeting where my brother was reporting more car

16   deals than I was and -- my little brother, and I was just

17   sitting there, I was like, man, I'm not very good at this,

18   but, you know, he taught me not to quit.  So I walked over to

19   my dad's office, which was the best thing I could think of,

20   and at that time it was just right across the street.  And I

21   said:  Dad, I need some help.  Here are the deals that I'm

22   working on.  He said:  Sure.  What are their names and

23   numbers?  He proceeded to call every single one of them

24   himself, and by the end of that day, I had sold three cars.

25          I can tell Your Honor that I have seen some very

1    talented people in this business, but I've never seen someone

2    do it the way that my dad did it.  It wasn't complicated; it

3    wasn't tricky; it wasn't a power struggle.  It was honest and

4    heartfelt making sure that that customer knew that he was

5    someone they could trust and be proud to give their business

6    to.

7            When my dad went in the car business, he had

8    massive suc -- massive success.  He was the Michael Jordan of

9    the car business.  I know because I was there, and I

10   witnessed it.

11           I cannot imagine someone better because he is

12   completely authentic about wanting the customer to have a

13   great experience, and I think everyone in this court knows

14   how hard that is to find in service, especially when it is

15   marketed to all, not just an elite bunch.  He is the best.

16   Plus, if you're going to buy a car from him, you're going to

17   have fun doing it.

18           An example of how he was at the Reagor-Dykes Auto

19   Group that sticks out to me from that same day where he

20   called my customers and I sold my first three cars is, one of

21   the customers I'd been working on the longest came in for a

22   test drive, and he was going to leave without making a deal.

23   My dad walked up in perfect timing as he was leaving, and

24   said:  Sir, I just want you to know that we want to make sure

25   that you are happy, and that you have the best experience

1    buying a truck from us.

2            We worked well past hours that night and found our

3    customer's dream truck.  That customer was so happy that I

4    sold a vehicle to his wife and his daughter before my

5    internship summer was over.  That story is who my dad was to

6    the Reagor-Dykes Auto Group.

7            Throughout my internship, I saw that my dad was

8    looked at by so many of the RDAG's as a -- RDAG employees as

9    a hero, a mentor, and a second dad type and still is to this

10   day.

11           I was so excited after my internship that I decided

12   to take all of my remaining full year of hours in one

13   semester, so I could come join the Reagor-Dykes Auto Group

14   full-time after the Christmas break with my degree.

15           All my friends who were a part of that internship

16   decided to join the Reagor-Dykes Auto Group full-time as soon

17   as they could as well.  I ended up having multiple other

18   friends come to join the auto group later, all because of

19   their love and trust for my dad and my family.

20           And I did want to include some quotes from those --

21   from those people just briefly.  They wrote letters, but they

22   wanted to say something in here too.

23           This is from Chas Quisenberry.  Bart Reagor has

24   been like a second dad to me since I was eight years old.

25   Growing up, Bart's giving and serving nature was something I

1   looked up to.  After college, Bart gave me the opportunity to

2   work for him.

3        Under his guidance and teachings, I learned the

4   following:  Every day improve on at least one skill.  Always

5   try to be as professional as possible.  Treat everyone you

6   meet with utmost respect.  Always show God in your day-to-day

7   work.  Bart has been a major influence on me and so many

8   other lives, and he is truly a great man.  I'll continue to

9   use the lessons I've learned from Bart for the rest of my

10  life.

11       From Turner Madison (phonetic):  Bart is like a

12  second dad to me.  He is always looking out for others.  He

13  has never overlooked anyone thinking he's better than them.

14  I'm so blessed to have Bart and his family in my life.  I

15  love Mr. Reagor.

16       From Philip Armendariz:  I love your family.  I see

17  your family as my own.  A lot of that has to do with your

18  dad.  Ever since we were kids, he made sure that we all knew

19  he'd do anything for us, like we were all his own.  His heart

20  and his passion for others has always been noticeable, and

21  that's why everyone loved getting to hang out at the Reagors.

22  I'm so blessed and thankful to be able to call you guys my

23  family.

24       And then a story from Doug Anderson.  You know, at

25  one point -- I won't go into details, but at one point, Doug

1    is one of my best friends, and he was not at the best point

2    in his life, and I told -- I was able to call my dad and tell

3    him, say -- and my dad replied simply by saying, have him

4    come see me.

5            And the story that my dad tells is that Doug pulled

6    onto the lot, and you can see the metal in his tires.  And so

7    the first thing that they did was, they took Doug's truck

8    over to the service department and bought four new tires for

9    him, and had them put on while they went and met.

10           And in that meeting, he offered Doug a job.  And in

11   that job -- from that job, turned into a job in management

12   and turned into him marrying his wife and turned into them

13   having their first kid and then now having their second kid,

14   and now the current career that he's in, even though the

15   Reagor-Dykes Auto Group is gone, things that he learned at

16   the Reagor-Dykes Auto Group and from my dad now has him as a

17   general sales manager of two stores.

18           So there is no doubt about it that there are tons

19   and tons and tons of examples that --

20           **THE COURT**:  Mr. Reagor --

21           **MR. RYAN REAGOR**:  -- I could give you.

22           **THE COURT**:  And, Mr. Reagor, I do want you to

23   appreciate that the 93 character statements on file reflect

24   many --

25           **MR. RYAN REAGOR**:  That was my last one.

1          **THE COURT**:  -- stories like that.

2          **MR. RYAN REAGOR**:  That was my last one of that.

3          **THE COURT**:  Okay.  I am familiar with the many acts

4    of spontaneous generosity and compassion that are reflected

5    in those character statements.

6          **MR. RYAN REAGOR**:  Yes, sir.

7          **THE COURT**:  And, as a former AUSA and a current

8    Article III judge, I know that no defendant is defined solely

9    by whatever deeds are reflected in an indictment or a

10   conviction.  I know many of us are a mix of things, and all

11   of those acts of generosity and compassion are reflected in

12   those character statements and in your testimony today, and

13   the Court will give it appropriate weight.

14         **MR. RYAN REAGOR**:  Yes, sir.  I just have a little

15   bit left, but I'm done with the -- with the stories of --

16         **THE COURT**:  Okay.  Please proceed.

17         **MR. RYAN REAGOR**:  -- with the stories of that,

18   so --

19         As you can see, Your Honor, my dad was looked at as

20   a dad, a coach, and a mentor by so many, including those that

21   worked for him.

22         I know that we are trying to see -- we were looking

23   at clips, and that kind of addresses what you just said, so

24   I'm just going to take what you said right there, and just

25   say that I agree with what you said.

1           But one more example that I can give this Court
2     about what the people who worked for my dad thought of his
3     meetings and if they were a positive thing or not was my most
4     recent job.  I work for the Premiere Automotive Group in
5     their Texas platform, which is pretty much exclusively
6     ex-Reagor-Dykes' employees, and I can tell you the exact
7     morning, the exact schedule, the exact time, the exact core
8     of the messages, we do it the exact same way.  And it just
9     wouldn't make any sense for something that we felt like we
10    were all just getting bullied and hated for us to go create
11    the exact same thing, so I did want to tell you that as well.
12           And, finally, my dad does not deserve to be treated
13    as a criminal.  He's a hero.  He's someone you want in your
14    life in all of his many roles.  He's someone who believes in
15    you and is always both willing and capable to help.
16           He is so important to people as a grandson, a son,
17    a brother, a husband, a dad, a granddad now, or Pops, a
18    friend, an in-law, a cousin, a nephew, every role that he's
19    served people in, as a donor.  You know, I'd be honestly --
20    I'd honestly be interested to see if I was able to get the
21    information to put together, but I would -- from my own
22    experience, I would guess that he gave away probably more
23    than he kept for himself.
24           He had a great vision for our community and our
25    downtown.  He's a great leader, boss, and mentor, a great

1    fundraiser, but most importantly probably a great caretaker

2    of the forgotten.  And I want to tell one brief story there.

3            A man named Bobby whenever I was home -- whenever I

4    was a student in college in Abilene, I was going by the same

5    Subway a lot, and I kind of noticed the same couple sitting

6    there, obviously homeless.  And so one day, I walked up and

7    offered to buy them a sandwich and have lunch with them, and

8    they kind of told me their story.  And Bobby had been -- he's

9    a carpenter, and he had very, very serious vision problems,

10   and he had not been able to find work from it.

11           And so the only thing I could think to do was to

12   call my dad, and so I did.  And I called my dad, and he said:

13   All right.  Hey, put it on the -- put it on the family card.

14   Get them a hotel for a few days.  I'll make some arrangements

15   here, and then I'll have you put them on a bus down to

16   Lubbock.  And I said, okay.

17           And so what I realized what those arrangements

18   were, was a job for Bobby, a house that had him -- a house

19   for him and his wife Sandy, a truck for him to drive, and

20   most importantly in his role to Bobby a friend to a man who

21   really, really needed one.

22           Bobby improved in circ -- his circumstances so much

23   due to my dad's help that his son ended up being able to come

24   and live with them, from homeless to having his son back.

25           Even though my dad is not in the position to pay

1   for Bobby's house or his truck anymore, he can still call my

2   dad if he really needs anything, or a friend to talk to, and

3   my dad still answers, which is something that I cannot say

4   about myself, you know.  He's -- that's the kind of person he

5   is.

6          Finally, I want to talk about my dad's living with

7   Parkinson's for which there's no cure, and I just wanted to

8   include a brief quote from the Brian Grant Foundation for

9   your consideration.  People with Parkinson's may experience

10  physical, mental, and emotional issues that impact lifestyle,

11  and lifestyle -- lifestyle also has a big impact on your

12  physical, mental, and emotional health.  Adopting healthy

13  behaviors can support your overall health to help -- to help

14  you continue living a fulfilling life.

15         A healthy lifestyle may include staying active;

16  eating a healthy diet; developing and maintaining

17  relationships; participating in hobbies; managing employment

18  and finances; engaging in self care to reduce stress and

19  improve mood; getting enough sleep; living a mindful,

20  purposeful, and fulfilling life; and feeling good about

21  yourself.

22         As you can see from those suggested treatments from

23  the Brian Grant Foundation, time in prison will not be what

24  is best for my dad's health, and there is nothing that I

25  heard from the prosecutor's case that would come anywhere

1   near convincing me that he does not deserve to have his

2   health valued and placed as the highest priority.

3        I'm so proud to be my dad's son.  I would ask that

4   you treat him with the most positive way that you're allowed,

5   Your Honor.  He will not make you regret that.  He will make

6   you proud that you did that, and he deserves it.

7        **THE COURT**:  Thank you, Mr. Reagor.  You --

8        **MR. RYAN REAGOR**:  Yes, sir.

9        **THE COURT**:  -- may return to the gallery.  And I do

10  want Defense Counsel and those who have submitted character

11  statements to understand that recommendations for continued

12  medical care are part of the sentencing process, and at least

13  in this court, I give wide latitude to Defense Counsel to

14  make very particularized requested recommendations on

15  pharmaceutical interventions, diagnostic review.  You can

16  request possible placement in a federal medical center.

17       I know, Mr. Markham, this is the first time in my

18  court, but I don't give short shrift to those requests, and

19  so there will be a time where we will go through your

20  requested recommendations on medical care, residence,

21  facility, things like that.  So that will come later in the

22  hearing, and I do give wide latitude for that.

23       Now, Mr. Markham, you may call your next character

24  statement.

25       **MR. MARKHAM**:  Katrina.

1          **THE COURT**:  And, ma'am, I'll just remind you to

2     state your full name for the record, and then you may take as

3     much time as you need.

4          **MS. SMITH**:  Your Honor, my name is Katrina Smith.

5     It's been an honor knowing you, Bart, or been knowing you.

6          Bart, you have taught me so much more than the

7     business, and these last —— oh, God —— three lessons that I

8     have never -- I will never forget:  Have faith in God, take

9     good care of my family, and give back to others.

10          I can't stress how much of an impact that you've

11     made to our community.  Just to name a few:  CASA, the United

12     Way, Child Protective Services, the Youth Scholarship Fund.

13          I admire your -- I admire your leadership and

14     friendship that you have blessed me with and so many others.

15     You have been a great teacher and a mentor.  I've always

16     believed you have an extra gift from God.

17          You have always encouraged me to do the right

18     thing, never lie, never cheat, never steal.  I've always --

19     you have always been my go-to person, never gave me a

20     negative response, not one time, and you never gave up on me.

21          Your energy and passion inspired me to do -- your

22     energy and passion inspired me to never be outworked and to

23     be your number-one salesperson.  I don't know another man

24     that works harder than you do to help others be successful.

25     Thank you for always giving the extra encouragement I needed.

1        Your Honor, it's my hope today that you would set

2   Mr. Reagor free and send him home.  Not to mention --

3      **(Pause.)**

4           **THE COURT**:  Okay.

5           **MS. SMITH**:  -- I know it must be a burden to hold

6   his -- this man's -- hold this man's fate in your hands.

7        The version of Bart Reagor that -- who was

8   portrayed to me by the prosecutors in this trial is not

9   yet -- he's not the -- that's not the true Bart.  The true

10  Bart that I know -- I know all about the truth of Bart.

11  Let's roll, hurricane.

12          **THE COURT**:  Thank you.  And I believe that was the

13  fifth character statement by live testimony.  Mr. Markham,

14  you have two more, I believe?

15          **MR. MARKHAM**:  Yes.

16          **THE COURT**:  Okay.  You may call your next character

17  statement.

18       And the Court does anticipate recessing after

19  character statements for a brief break.

20     **(Pause.)**

21          **THE COURT**:  And you may approach and use the

22  microphone at the center podium.  I'd just ask that you state

23  your full name for the record, and then you may take as much

24  time as you need.

25          **MR. RILEY**:  My name is Daniel Joseph Riley.  I am

 1    Bart Reagor's father-in-law.  Annette is my daughter.

 2            I'm a retired senior partner with Baker Botts, and

 3    I have known Bart --

 4            **THE COURT**:  I am -- I am familiar with the firm.

 5            **MR. RILEY**:  Hopefully everyone is.

 6            **THE COURT**:  You know, I believe we worked in

 7    different offices.  I was in the Dallas office.

 8            **MR. RILEY**:  I was in the Dallas office briefly.

 9            **THE COURT**:  Okay.

10            **MR. RILEY**:  Then moved to the Washington office.

11            **THE COURT**:  Okay.  All right.  Then you know Jamie

12    Baker.

13            **MR. RILEY**:  Very well.

14            **THE COURT**:  Okay.  All right.  We have -- we have

15    some friends in common, so, anyway, I hope that eases the

16    tension of the moment, and you may take as much time as you

17    need.

18            **MR. RILEY**:  I want to say that I've known Bart for

19    an awful lot of years.  His -- he and my daughter dated

20    during high school and college, and I knew their parents,

21    Bart's parents well.  We socialized together.  We were

22    skiers.  So I've known Bart for a long time, known his dad.

23            I think Bart -- Bart's attributes come from his

24    dad.  His dad is very, very high character, would not do

25    anything dishonest, and is very open about conveying that to

 1   those around him.  And I think Bart has learned from that,

 2   learned heavily.

 3        I've known his attributes that he's passed on to

 4   his kids very well.  He has raised a great family with the

 5   help of my daughter.  They are as high character as he is.

 6        His daughter related to you his experience -- her

 7   experience with her discouragement in beginning to law

 8   school, and I think that's a good example of what Bart -- the

 9   effect Bart has on people.

10        I think everyone who has dealt with him has respect

11   for -- contrary to what you've heard in these proceedings,

12   has respect for how he treats people and how honestly he

13   treats people.  As long as I've known him, I would endorse

14   Bart's character to the ultimate degree, and I say that with

15   a great deal of experience in seeing both types of

16   characters.  Thank you, Your Honor.

17        **THE COURT**:  Thank you, Mr. Riley.  And I will add

18   that to the written character statement you submitted in

19   Page 073 of Defendant's character statements.

20        At this time, Mr. Markham, you may call your last

21   character statement.

22        **MR. MARKHAM**:  Yes.

23      **(Pause.)**

24        **THE COURT**:  And a reminder to state your full name

25   for the record, and then you may take as much time as you

1    need.

2                MR. RILEY REAGOR:  Riley Reagor.

3                THE COURT:  Please proceed.

4                MR. RILEY REAGOR:  Your Honor, my name is Riley

5    Reagor, the youngest of Bart and Annette Reagor's kids.  I

6    appreciate the time to speak.

7                My dad has always been the person I look up to most

8    for many reasons.  He's a man of the highest integrity and

9    puts others before himself.  I can tell you countless stories

10   to back that up; so can many others.

11               My dad has always helped people even when he wasn't

12   always in the position to help.  If he sees someone

13   struggling more than him, he does what he can to help that

14   person.

15               My dad's my hero.  From the time I remember, I've

16   always wanted to be just like him, and still do.  There's

17   never been an obstacle that's too big for Bart

18   Reegor (phonetic) -- Bart Reagor, and not even this one.

19               My dad has always made everything fun and people

20   around him have fun.  My parents loved hosting mine and my

21   siblings' friends growing up.  I had a close group of about

22   eight friends that would stay the night every Saturday night,

23   and my dad would take us to drive around and for midnight

24   snacks any time we wanted.  He would beat us all in ping pong

25   and was basically a part of our friend group.

1          He coached our baseball team, The Storm, in middle

2     school, and all my friends -- all of my friends loved riding

3     to the games with my dad.  He would blare rock music and get

4     us into the right mindset to beat whoever we were playing.

5     Losing wasn't a common thing on that team, but when we did,

6     he always had the right words to say -- always had the right

7     words to say to get us to bounce back and be ready to fix

8     things that needed to be fixed.

9          He was a great dad and a great leader and a huge

10    part of me and some of my closest friends.  My dad is the

11    most courageous person I know.  He is a fearless leader and

12    will outwork anyone.

13         The proof to this is him coming to Lubbock to walk

14    on to the Texas Tech football team.  He was an undersized

15    defensive back that was at the bottom of the depth chart at

16    his first practice.  He went on to be one of the four

17    walk-ons to make the varsity as a freshman and earned a

18    scholarship.

19         His senior year he won the Dell Morgan Award.  This

20    award was presented to the player displaying the most courage

21    on the team.  This award was decided by the players on the

22    team voting for that player each year.  I think that's a true

23    testament to my dad's character.  He was also -- he also

24    became the first to graduate from his side of the family from

25    college.

1          That sit -- this situation has been a true test of

2     my dad's character.  Not only was his company taken from him,

3     but he was also diagnosed with Parkinson's and cancer.  When

4     all of this stuff happens, I'd say the common response for

5     someone is to get negative and feel sorry for themselves.  My

6     dad has done the exact opposite.  His faith has grown

7     stronger, and he fought every step of the way with a positive

8     outlook.

9          I know my dad, and I know that if he had truly done

10     these things, he would have owned up to it.  My dad's not a

11     liar, and he's not a thief, and he's not a cheater.  Those

12     are the three principles that he instilled in us growing up

13     and to his team at work.

14          The Government has pulled the negatives out of the

15     morning meetings, but I can assure you they aren't showing

16     you the 99.9 percent of positivity that were in those

17     meetings.

18          We had a meeting every single morning, and the

19     things he taught us are who Bart Reagor is.  Never

20     misrepresent anything to any bank; never sacrifice your

21     integrity to make money; always treat your clients with

22     respect and honesty; do everything right; have PMA, which

23     meant a positive mental attitude; no excuses, which meant

24     don't let yourself off the hook and hold yourself

25     accountable; rock and roll, which meant always bringing high

1    energy, and being someone that people wanted to be around.

2            My dad trusted someone that had too much control in

3    his company.  Shane earned that trust with his hard work

4    ethic and what my dad thought was to be loyalty.

5            When I was around eight or nine years old playing

6    little league, there was always a man dressed in a full

7    baseball uniform walking around the ballpark asking everyone

8    for money.  Sure -- sure enough, he walked up to my dad, and

9    my dad treated him just like he'd treat one of his best

10   friends.  He'd take him to the concession stand, got him

11   whatever he wanted, and gave him twenty bucks for later.

12   Every -- every time we went to the ballpark, my dad did the

13   same thing over and over.  Most people would probably do it

14   one time or a few times, but not my dad.

15           Eventually that turned into him being at all mine

16   and my brother's games, my dad driving him to and from the

17   ballpark.  Later down the line, that turned into an awesome

18   friendship.  My dad took time -- took him out to eat and shop

19   at the mall for every birthday and every Christmas.  He

20   always made sure that Eugene had new clothes, enough food in

21   his frig, and money in his pocket.

22           Eugene became a part of our family.  As I got older

23   and understood, Eugene was mentally handicapped, and my dad

24   took the time to really be his friend.  When Eugene passed,

25   my dad was the one that spoke at his funeral, and when he got

1   the news, it's one of the few times I've seen my dad choked

2   up and truly sad and emotional.  That story right there is

3   who Bart Reagor is.

4          My wife and I had our first child, Harper, last

5   July.  My wife's dad passed in October, which absolutely

6   devastated our family.  It kills me that she won't get to

7   know my wife's dad because he was such an awesome man.  Now I

8   worry that she will not -- not get to know my dad.

9          My sister had her first child, Anna, in July as

10  well.  Those two little girls deserve their grandfather, and

11  they will be positively influenced by Bart's presence in

12  their lives.

13         The same fact applies for everyone else.  I believe

14  the world would be positively influenced and a better place

15  with him in it.  Thank you for the opportunity to get to

16  share some words on behalf of my hero.

17         **THE COURT**:  Thank you, Mr. Reagor.  And the Court

18  will add that to the written statement you submitted as

19  Page 069.

20         At this point, Mr. Markham, does the Court need to

21  do any additional record work in identifying the character

22  statements submitted?

23         The Court did find that they were timely, that they

24  should be admitted as exhibits to the sentencing hearing.  I

25  typically read aloud the names of all of those character

1    statements, but, here, there is a document that you supplied

2    entitled "Index of Character Letters Submitted on Behalf of

3    Defendant Bart Wade Reagor."

4           If the Court deems admitted everything by reference

5    to that index, is that sufficient?

6           **MR. MARKHAM**:  Yes, Your Honor.  That's perfectly

7    sufficient, and we have nothing to add to what's been

8    submitted.

9           **THE COURT**:  Okay.  At this point, the Court will

10   recess for a lunch break and to allow the Government and

11   Defense Counsel opportunity to regroup.

12          We'll return for the defendant's allocution.  That

13   will be followed by final argument and then the sentencing

14   decision of the Court.

15          The Court stands in recess until 1:30.  Counsel are

16   instructed to keep their phones at the ready and to remain in

17   the proximity of the courthouse.  We stand in recess.

18          **COURT SECURITY OFFICER**:  All rise.

19       **(Recess.)**

20          **THE COURT**:  We are back on the record in Criminal

21   Action No. 2:21-CR-25-Z-BR-01.

22          At this point, we will move to defendant's

23   allocution.  Let me first explain to the defendant the nature

24   of allocution and your rights related to allocution, and then

25   you will be afforded a full and complete opportunity to

1 | exercise that right if you choose to do so.

2 |      Allocution means that you may tell this Court any

3 | information you think the Court should hear and consider

4 | before it decides and imposes sentence.  You may read aloud a

5 | prepared written statement.  You may make an argument.  You

6 | may draw attention to facts in the sentencing file in the

7 | case.  You may make any statement you deem necessary to this

8 | Court's sentencing decision, but you may not be compelled to

9 | allocute.  You cannot be forced to exercise your right to

10 | allocution.

11 |      Mr. Markham, does your client intend to exercise

12 | his right of allocution at this time?

13 |      **MR. MARKHAM**:  He does, Your Honor.

14 |      **THE COURT**:  Okay.  Mr. Reagor, you may proceed, and

15 | you may do so from counsel table or the podium, whatever you

16 | find most comfortable.

17 |      **THE DEFENDANT**:  I'll go up there if that's all

18 | right.

19 |      **THE COURT**:  Yes.  Please approach.

20 |      **THE DEFENDANT**:  Yes, sir.  How are you doing?

21 |      Your Honor, thank you for the opportunity to say a

22 | few words on my own behalf.

23 |      First off, I want to thank God, my family, and the

24 | many loyal friends for their love and support, but most of

25 | all for their belief in me.  I am very thankful for that.

1    God has been walking beside me as I've advanced my

2 career for my family and my team.  I'm very thankful for that

3 too.  He has also been with me and my family every day since

4 this situation began.

5    I know I'm far from perfect, but I'm a very

6 thankful person and a man of great faith in God.  My favorite

7 Bible verse is Mark 9:23:  All things are possible for those

8 that believe.

9    I've been blessed in many ways.  I've always

10 dreamed big and been able to accomplish big things.  In the

11 Bible, Jesus says in Mark 9:23, if I can, when somebody asked

12 him if he could do something, and then he says:  All things

13 are possible for those that believe.

14    It might surprise you that every day when I got to

15 my office the first thing that I did is I got my notepad out,

16 and I wrote down G and J, which stood for God and Jesus.

17 Then I wrote down TY for thank you.  And then I wrote down

18 UM, and it was use me, guide me, protect me, love me, inspire

19 me, teach me, bless me, anoint me, energize me, and empower

20 me.  I always wanted God to guide me every day.

21    Your Honor, I'm also very empathetic, sympathetic,

22 and truly very, very sorry for any sorrow, any pain, any

23 hardship, any grief, any financial burden, any hassle, any

24 waste of time, any job loss, any money loss, or anything

25 negative that the Reagor-Dykes sudden collapse in 2018 has

1   caused any innocent person who had nothing to do with

2   creating this disaster.  My own family and I have seen how

3   this situation has been a very heavy weight to bear.

4           As Your Honor knows, I have maintained my innocence

5   of the crime for which I'm convicted.  I know from my lawyers

6   that I could -- that I could, and they think I should, take a

7   different approach, but it is my honest view that I am not

8   guilty.

9           But by saying that, I mean no disrespect to this

10  Court.  If I have said anything to offend the Court, please

11  forgive me.  And sentence me -- in sentencing me, I ask Your

12  Honor take my whole life into consideration.  I've been

13  generous and kind.  I've never physically hurt anyone.  I'm

14  not a danger to anyone.  And while I know I talk tough and

15  loud, I would never physically harm anyone.

16          I plan to change -- challenge my conviction on

17  appeal, as is my right.  I will know that, if I try to flee

18  and not show up to prison, I would lose that chance, and

19  given what that appeal means to me and because I do not run

20  from anything and because of how badly that would hurt so

21  many people who believe in me, I would never do that.

22          Thank you for hearing from me.

23          **THE COURT**:  Thank you.  And you may return to

24  counsel table, and the Court will give appropriate weight to

25  that allocution.

1          At this time, I will invite final argument by the

2     Government and the Defendant.

3          The Court has carried forward the pending motions

4     for variance, both for upward variance by the Government and

5     downward variance by the Defendant.  You may make any final

6     arguments to those pending motions, and then, as always, any

7     arguments relevant to the Section 3553(a) factors that the

8     Court is tasked with applying to this case.

9          Mr. Haag, you may begin.

10         **MR. HAAG**:  Thank you, Your Honor.  I'll be brief

11     with my final argument, Your Honor.

12         We have put before the Court in written form and

13     with the presentation here this morning all of our reasons

14     for recommending an upward departure in this case, and we

15     have no further briefing on that.

16         Should the Court follow through with its intent to

17     deny our Motion for Upward Departure, we would respectfully

18     recommend a sentence of 168 months, which would be the top of

19     the advisory guideline range.

20         Second, in light of the many statements as to the

21     defendant's health conditions that were made here this

22     morning, the United States would not oppose a recommendation

23     to FMC Fort Worth.  That is the federal medical center in

24     Fort Worth.  That is the closest medical center to Lubbock

25     and to West Texas, and that facility would be able to treat

1    Parkinson's disease as well as any other health conditions

2    that the defendant may have.

3           No further evidence, Your Honor, or argument, Your

4    Honor.  Thank you.

5           **THE COURT**:  And thank you, Mr. Haag.  I will give

6    appropriate weight to that argument and also the arguments

7    made in the Government's motions, which were timely filed and

8    will be incorporated as well.

9           Mr. Markham, you may proceed with any final

10    argument you deem necessary.

11          **MR. MARKHAM**:  Thank you, Your Honor.  Let me start

12    by the area of agreement.  I thank the Government.  He talked

13    about it, about the Fort Worth recommendation for medical

14    treatment.  I think that's very appropriate, and that would

15    be the good thing to do given the illnesses and its proximity

16    to his family with whom, as you've seen, he remains very,

17    very close.

18           Your Honor, I gave my argument when I was

19    responding to the variance points and to the points that the

20    Government made in the slide, and I won't repeat them.

21           The only thing I can leave the Court with is a

22    final thought, is that by way of measuring a man for his

23    life, for his 57 years, a lot more of it is reflected in the

24    stories of the people who came to the podium and of all the

25    people who didn't come to the podium but who are here, and

1   the additional people who couldn't be here and who gave the

2   statements, which are compelling.

3          Those speak louder than any lawyer's words, so I

4   won't try to better them.  I submit those as my final

5   argument for a downward variance.

6          And if the Court were to vary downward, it would be

7   in the Court's discretion as to an appropriate sentence.  If

8   the Court does not vary downward, then I would urge that the

9   low end of this guideline range is over a decade in prison.

10  It gives him a life.  It certainly deters.  It certainly

11  punishes.  It sends a message.

12         It is proportionate with the higher of the

13  sentences, assuming you thought that the consideration was

14  that the people who got the lesser sentences for their

15  activity at Reagor-Dykes deserved less.  This is higher by

16  any measure, but it will give him a life to come back to,

17  hope, hope for his family, and be adequate.

18         Of course, I'm arguing for lower, but that would be

19  my argument within the guideline range.  Thank you, Your

20  Honor, for hearing from us.

21         **THE COURT**:  Thank you, Mr. Markham.  And the Court

22  thanks you for your capable and effective representation in

23  this matter.

24         I find that the Court benefited from exceptional

25  briefing both by the Government and by the Defendant in this

1    case, and for that reason, the Court was well apprised of all

2    the issues, the guidelines, the application notes, and the

3    caselaw that the Court needed to make the sentencing decision

4    today.

5         MR. MARKHAM:  Thank you, Your Honor.  As a strange

6    place, this is a nice place to be.  Thank you.

7         THE COURT:  Okay.  Okay.  At this point, Mr. Haag,

8    does the Government know of any reason why this Court should

9    not and cannot impose sentence at this time?

10        MR. HAAG:  No, Your Honor.

11        THE COURT:  Does Counsel for the Defendant know of

12   any reason why the Court should not and cannot impose

13   sentence at this time?

14        MR. MARKHAM:  No, Your Honor.

15        THE COURT:  Having considered the permissible

16   factors set forth at 18 U.S.C. Section 3553(a), the advisory

17   sentencing guidelines, the conduct admitted in the Factual

18   Resumé, the capable and effective and, in fact, impeccable

19   assistance of counsel that the defendant received, and all

20   mitigating and aggravating factors, it is the judgment of the

21   Court that the defendant, Bart Wade Reagor, is hereby

22   committed to the custody of the Federal Bureau of Prisons for

23   a period of 168 months.

24        This represents a sentence within the advisory

25   guidelines range, and the Court thereby denies the pending

 1     motions for variance, Government's Conditional Motion for

 2     Upward Variance set forth in ECF Document No. 142, and

 3     Defendant's Motion for a Downward Variance set forth in ECF

 4     Documents No. 144 and 145.

 5           The Court does not order a fine because the

 6     defendant lacks the financial resources or future earning

 7     capacity to pay a fine.

 8           The Court does order a mandatory special assessment

 9     of $100, which is due and payable immediately.

10           Regarding forfeiture, pursuant to 18 U.S.C.

11     Section 924(d) and 28 U.S.C. Section 2461(c), and subject to

12     the provisions of 21 U.S.C. Section 853(n), it is hereby

13     ordered that defendant's interest in the following property

14     is hereby condemned and forfeited to the United States:

15           $1,760,000 in the form of a money judgment.

16     Pursuant to 21 U.S.C. Section 853(p), defendant shall forfeit

17     the $950,951.18 in United States currency seized by the FBI

18     on November 2nd, 2018 from Prosperity Bank account numbers

19     ending in 569 as a substitute asset.

20           Regarding restitution, the Court does order

21     defendant to pay restitution in the total amount of

22     $9,378,817.28.

23           Restitution is payable to the United States

24     District Clerk, 205 Southeast Fifth Avenue, Amarillo, Texas

25     79101 for disbursement as follows:  IBC Bank in the amount of

1   $9,378,817.28.

2          Restitution shall be payable immediately, but, if

3   upon commencement of the term of supervised release, any part

4   of the $9,378,817.28 ordered by this judgment remains unpaid,

5   the defendant shall make payments on such unpaid balance at

6   the rate of at least $1,500 per month.

7          Payment shall begin no later than sixty days after

8   the defendant's release from confinement and another payment

9   to be made on the same day of each month thereafter until the

10  restitution is paid in full.

11         Now, regarding supervised release, the Court

12  further orders that, upon release from imprisonment, the

13  defendant shall be placed on supervised release for a term of

14  five years.

15         While on supervised release, defendant shall comply

16  with the mandatory conditions which are listed at 18 U.S.C.

17  Section 3583(d) and Section 5D1.3(a) of the Guidelines

18  Manual, the standard conditions which are listed at

19  Section 5D1.3(c) of the Guidelines Manual, and the following

20  discretionary, special, and additional conditions which are

21  derived from Sections 5D1.3(b), (d), and (e) of the

22  Guidelines Manual:

23         No. 1.  The defendant shall not be self-employed or

24  employed by, affiliated with, own or control, or otherwise

25  participate, directly or indirectly, in the business of

1     automobile sales without the probation officer's approval.

2            No. 2.  You must not incur new credit charges or

3     open additional lines of credit without the approval of the

4     probation officer until restitution is paid in full.

5            No. 3.  You must provide the probation officer with

6     access to any requested business or personal financial

7     information and authorize the release of any financial

8     information.  The probation office may share financial

9     information with the United States Attorney's Office until

10    restitution is paid in full.

11           No. 4.  Pursuant to 18 U.S.C. Section 3663A, the

12    defendant shall immediately pay restitution to the following

13    victim:  IBC Bank in the amount of $9,378,817.28.

14           Restitution is payable to the U.S. District Clerk,

15    205 Southeast Fifth Street, Amarillo, Texas 79101 for

16    disbursement.

17           If, upon commencement of the term of supervised

18    release, the defendant has not paid the restitution in full,

19    the defendant shall make payments on such unpaid balance

20    beginning sixty days after release from custody at a rate of

21    at least 1500 per month until the restitution is paid in

22    full.

23           No. 5.  The defendant shall not transfer, sell,

24    give away, or otherwise convey any asset with a value of $500

25    or more without the approval of the probation officer.

 1          And No. 6.  The above drug-testing condition is

 2   suspended based on the Court's determination that the

 3   defendant poses a low risk of future substance abuse.

 4          Mr. Markham, the conditions of supervised release

 5   were set forth in the written Notice of Intent to Impose

 6   Condition -- Conditions of Supervised Release.  Did you

 7   receive a timely copy of that notice?

 8          **MR. MARKHAM**:  I did, Your Honor, and I believe my

 9   client, Mr. Reagor, and I both executed it after we read it

10   and discussed it.

11          **THE COURT**:  Okay.  Are you confident that your

12   client fully understands the conditions of supervised release

13   set forth in that written notice and pronounced orally by the

14   Court today?

15          **MR. MARKHAM**:  I am, Your Honor.

16          **THE COURT**:  And, Mr. Reagor, I will ask you

17   directly, do you agree to be bound by the conditions of

18   supervised release set forth in this written notice and

19   pronounced orally by the Court today?

20          **THE DEFENDANT**:  Yes, sir.

21          **THE COURT**:  Okay.  And, Mr. Haag, did the

22   Government receive an advanced timely copy of that Notice of

23   Intent to Impose Conditions of Supervised Release?

24          **MR. HAAG**:  Yes, Your Honor, it did.

25          **THE COURT**:  Does the Government have any objections

1   to the conditions of supervised release stated in that

2   written notice and pronounced aloud in court today?

3           **MR. HAAG**:  No, Your Honor.

4           **THE COURT**:  The Court did receive and did review a

5   fully executed copy of the notice.  It is dated March 16,

6   2022.  It bears the signature of the defendant, Defense

7   Counsel, and this Court.  It is made a part of the record in

8   this case and in any record on appeal.

9           The notice and conditions of supervised release

10  stated therein are hereby adopted, imposed, and ordered as

11  just pronounced by the Court.

12          Now, pursuant to 18 U.S.C. Section 3553(c)(1),

13  because the defendant's advisory guidelines range exceeded

14  twenty-four months, the Court will state its reasons for

15  imposing sentence within a particular point in that range.

16          The sentence is sufficient, but not greater than

17  necessary, to comply with the statutory purposes set forth at

18  18 U.S.C. Section 3553(a), specifically the aforementioned

19  3553(a) factors and facts relied on by the Court when it

20  adjudicated the motions for upward and downward variance.

21  The Court incorporates those reasons here as well as the

22  aforementioned mitigating factors balanced against the

23  aggravating factors and facts.

24          Regarding supervision, the Court did impose a term

25  of supervised release because it will provide an added

1    measure of deterrence and protection.

2         In light of the Fifth Circuit's recent opinion in

3    *Diggles*, this Court expressly adopted, imposed, and ordered

4    the discretionary conditions of supervised release because

5    they are consistent with 18 U.S.C. Sections 3583(d)(1),

6    (d)(2), and (d)(3).

7         And this Court expressly states that the

8    conditions -- the discretionary conditions set forth in the

9    notice and pronounced orally by the Court involve no greater

10   deprivation of liberty than is reasonably necessary, as

11   required by Sections 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D).

12        Now, the Court has now stated the sentence and its

13   reasons therefor.

14        Does the Government have any objection to the

15   sentence as stated by the Court?

16        **MR. HAAG:**  No, Your Honor.

17        **THE COURT:**  Does the Defendant have any objections

18   to the sentence as stated by the Court?

19        **MR. MARKHAM:**  No, Your Honor, other than already in

20   the record.

21        **THE COURT:**  Okay.  Any timely-filed written

22   objections were admitted into this sentencing hearing.  I

23   find that they are preserved for appellate review.

24        And is there any other finding I need to make on

25   any --

1          MR. MARKHAM:  Your Honor, no objections.

2          THE COURT:  Okay.  Understood.  So no objections to

3     the procedural or substantive reasonableness of the sentence?

4          MR. MARKHAM:  None, Your Honor.

5          THE COURT:  Okay.  Now, the Court has stated

6     sentence at this point.

7               And with the clarification from counsel on the

8     objections that are preserved for appellate review, does the

9     Government know of any reason why sentence may not be

10    imposed?

11         MR. HAAG:  No, Your Honor.

12         THE COURT:  And does Defendant know of any reason

13    why the sentence should not be imposed?

14         MR. MARKHAM:  No, Your Honor.

15         THE COURT:  The Court hereby orders the sentence

16    imposed as stated.

17              Finally, even if the correct advisory guidelines

18    range was not considered, the Court would have imposed the

19    same sentence had it not made the error, and it would have

20    done so for the same reasons given during the sentencing

21    hearing regardless and irrespective of the applicable

22    advisory guidelines range.

23              To be pellucidly clear and consistent with the

24    Supreme Court's guidance in *Molina-Martinez versus United*

25    *States*, 578 U.S. 189, the Court is not silent on what it

1    might have done had the guidelines range been correct and the

2    starting point different.

3          Even had defendant prevailed on his objections to

4    relevant conduct loss amount, abuse of trust enhancement,

5    aggravating role enhancement, or had the Government persuaded

6    the Court to apply Section 1B1.3(a)(1)(B) relevant conduct to

7    the floor-plan fraud, and the sophisticated means enhancement

8    pursuant to Section 2B1.1(b)(10)(c), this Court would have

9    imposed the same sentence for its same reasons, 168 months'

10   imprisonment, followed by a five-year term of supervised

11   release.

12         Now, as I promised Mr. Reagor's family, Mr.

13   Markham, I will provide maximal latitude for requested

14   recommendations on continued medical care, any diagnostic

15   medical work that needs to be done.  I will consider possible

16   recommendations for placement in a federal medical center, or

17   FMC.

18         PSR Paragraphs 158 through 166 report a number of

19   physical health conditions.  Some were referenced during the

20   sentencing today.  I'm inclined to recommend an initial

21   medical diagnostic review to identify those treatments that

22   should continue and the BOP facility that is most available

23   and appropriate to those treatments.

24         What medical recommendations or rehabilitation

25   recommendations would you request?

1          **MR. MARKHAM**:  Your Honor, I would request that

2     review that you have suggested, because the doctors could say

3     better what you do.  I do know he has Parkinson's disease.

4          I have heard -- I haven't seen the medical records,

5     but I have heard from his family that it's progressive and

6     not getting better, and that he has reactions to the medicine

7     when he takes it; then he calms down, and he gets through the

8     day.  He has to take the medicine four times a day.

9          What my recommendation would be, is to adopt the

10    Court's suggestion that -- or the Court's inclination as

11    stated, that the Court would allow for a diagnostic so that

12    he could get a good recommendation.

13         We have yet to discuss whether he will be on

14    release pending his surrender, but were he to be on release,

15    we would go to his doctor he's had for a long time that's got

16    him on a protocol to get a written suggestion of a protocol

17    that would meet the realities of prison, which would be

18    different.  That would be one reason to allow him to stay

19    out.  I would ask for that.

20         And, other than that, I think if he gets something

21    from his doctor, and then he goes to a diagnostic, they will

22    know where to best put him given the options that are

23    available within the Bureau of Prisons.

24         **THE COURT**:  Given his anticipated security

25    classification and eligibility, I imagine he would be

1    eligible for the lowest possible setting, satellite prison

2    camp, things of that nature, but I will make a recommendation

3    for FMC or a federal medical consider [*sic*] if you think that

4    should be prioritized against any other considerations, like

5    proximity to family or -- or any other concerns involving his

6    diagnostic review, his medical treatment, and his

7    rehabilitation.

8              And I -- as a lifelong resident of Fort Worth, I'm

9    happy to grant FMC Fort Worth as a requested recommendation.

10   It seems that the Government is unopposed to that.  That

11   might satisfy all of the concerns that are reflected in PSR

12   Paragraphs 158 through 166.

13             **MR. MARKHAM:**  May I --

14             **THE COURT:**  Do you want --

15             **MR. MARKHAM:**  -- confer just for one second with --

16             **THE COURT:**  Yeah.  And the question to counsel is,

17   do you want me to combine the residential recommendation with

18   the medical recommendation and recommend that FMC Fort Worth

19   be the correct facility?

20             **MR. MARKHAM:**  Yes, Your Honor, that's -- that's

21   good.

22             **THE COURT:**  Okay.

23             **MR. MARKHAM:**  Thank you.

24             **THE COURT:**  Because, in essence, that kills two

25   birds with one stone, addresses some of the medical

1    conditions, and then also the requested proximity to family

2    and friends?

3             MR. MARKHAM:  Yes.

4             THE COURT:  Okay.  Any objection from the

5    Government?

6             MR. HAAG:  No, Your Honor.

7             THE COURT:  This Court does recommend in sequence

8    that the defendant be allowed to participate in a full

9    medical diagnostic review to address the serious physical

10   conditions which are reflected in PSR Paragraph 158 through

11   165, with particular attention to the Parkinson diagnosis and

12   treatments reflected in PSR Paragraph 160.

13             The Court further recommends that the defendant be

14   allowed to continue the medication regimen that's reflected

15   in that PSR paragraph and the pharmaceutical drugs that are

16   listed therein and in consultation with his doctor and

17   physician.

18             The Court recommends that the Bureau of Prisons

19   consider placement in a federal medical center, or FMC, to

20   address his significant medical and physical conditions, and,

21   if possible, and deemed consistent with his security

22   classification and eligibility, FMC Fort Worth.

23             Now, that leaves, Mr. Markham, your requested

24   recommendation on continued vocational training and

25   education.

1          The defendant is manifestly intelligent.  He has

2     college degrees.  He's managed large enterprises and

3     business.  I'm inclined to grant any requested education or

4     continued course work that you would request from this Court

5     and to include even post-graduate work if it's available.

6          **(Attorney/client sotto-voce conference.)**

7          **MR. MARKHAM**:  Your Honor, I -- we don't have any

8     request in that regard.

9          **THE COURT**:  Okay.  I'll just make a general

10    recommendation that he be allowed to participate in any

11    continuing education consistent with his security

12    classification and eligibility.

13         **MR. MARKHAM**:  Thank you, Your Honor.

14         **THE COURT**:  Any objection from the Government?

15         **MR. HAAG**:  No, Your Honor.

16         **THE COURT**:  That is the Court's recommendation on

17    continued vocational and educational care.

18         Now, Mr. Haag, the Court notes that there is a

19    three-count indictment in this case.  The jury acquitted

20    defendant on Counts One and Two and found him guilty on Count

21    Three.

22         I don't imagine that there are any pending

23    indictments or charges that need to be dismissed, but I want

24    to give you the opportunity to do so, if necessary.

25         **MR. HAAG**:  The Court is correct, Your Honor.  There

1    is no additional charges to be disposed of.

2              **THE COURT**:  Thank you for that clarification.

3              Now, Mr. Reagor, I do want to discuss and explain

4    your remaining rights of appeal.  During your allocution, you

5    said that this was an important process and that you do

6    intend to exercise that right, so I want you to be well

7    apprised of your remaining appellate rights.

8              **THE DEFENDANT**:  Thank you.

9              **THE COURT**:  If you do exercise that right to

10   appeal, your Notice of Appeal must be filed with this Court

11   within 14 days of the date judgment is entered in your case

12   or within 14 days of the Government entering its Notice of

13   Appeal.

14             If you do elect to appeal, you have the absolute

15   right to apply for leave to appeal in forma pauperis, or IFP.

16   This may mean that you are allowed to prosecute your appeal

17   at a cost to the government, if you are unable to pay the

18   cost of that appeal.

19             And, Mr. Markham, did you and your client receive

20   the Notice of Right to Appeal prior to this hearing?

21             **MR. MARKHAM**:  We did, Your Honor.  We discussed it,

22   and we have both signed a copy of it and given it back to

23   your courtroom deputy.

24             **THE COURT**:  Okay.  If you'll approach, I believe

25   the copy may still be on your desk, not my desk.  If you can

1    approach with the executed copy, we'll make that part of the
2    record.
3         MR. MARKHAM:  You're right.  Sorry.  I take that
4    back.
5         THE COURT:  Mr. Markham, I know you are new to this
6    court, but the answer always is that Victoria is correct if
7    you want to get anywhere with my chambers.
8         (Laughter.)
9         THE COURT:  Okay.  Mr. Haag, did the Government
10   receive a timely copy of this Notice of Right to Appeal?
11        MR. HAAG:  Yes, Your Honor, it did.
12        THE COURT:  And does the Government have any
13   objections to the remaining appellate rights described in
14   that notice and arising under the Plea Agreement?
15        MR. HAAG:  No, Your Honor.
16        THE COURT:  The Court did receive and did review a
17   fully executed copy of that Notice of Right to Appeal.  It is
18   dated March 10, 2022.  It bears the signature of the
19   defendant, Defense Counsel, and this Court.  It is made a
20   part of the record in this case and in any record on appeal.
21        Now, Mr. Reagor, I want to finally admonish you
22   that the Notice of Right to Appeal explains and summarizes
23   your remaining appellate rights.  It is not the Notice of
24   Appeal.  When you elect to exercise that right, there's a
25   separate filing.  It's called a Notice of Appeal.

1          Please consult with your attorney, and he'll

2     explain the deadlines and deliverables, but be careful that

3     that happens within that 14-day period that we discussed.  Do

4     you understand?

5          **THE DEFENDANT**:  Yes, sir.  Thank you.

6          **THE COURT**:  Okay.  Now, I requested briefing from

7     the parties regarding the relevant danger and flight risk

8     factors set forth at 18 U.S.C. Section 3143(b)(1)(A).

9     Defendant complied in Document No. 150, and the Government

10    complied in Document No. 151.

11         On balance, the Court finds that the Defendant has

12    the stronger arguments, but this Court does have one

13    follow-up question for Defense Counsel.

14         Though Section 3143(b)(1)(A) references any other

15    person, DOJ and Bureau of Prisons data reflect that white-

16    collar defendants are at greater risk for self harm.

17         I just want to make certain that you don't perceive

18    that the danger contemplated by that statute includes any

19    danger of self harm or that the defendant may harm himself in

20    any way, not because I've seen anything in the file or in his

21    countenance today to reflect that, but I want to be

22    absolutely certain that that's not a concern.

23         **MR. MARKHAM**:  Your Honor, I have seen nothing, and

24    admittedly I've not known Mr. Reagor for very long, but I've

25    had very intimate, lengthy conversations with him.  I've had

1    conversations with his loved ones.

2         I give it no chance that he would harm himself, and

3    I've seen nothing that would indicate to that.  I know what

4    he's going to do.  He's going to start bugging me about the

5    appeal right away, and that's going to be his focus until the

6    day that he has to go to Fort Worth or wherever they

7    designate him.

8         **THE COURT**:  Okay.  I detected the same during

9    defendant's allocution.

10        Mr. Haag, is the Government persuaded that the

11   defendant has the necessary support systems in place to

12   prevent self harm, the necessary family, friends, church, and

13   community so that that's not a concern for the Government?

14        **MR. HAAG**:  That is correct, Your Honor.

15        **THE COURT**:  Okay.  With that assurance stated on

16   the record from both Defense Counsel and the Government, the

17   Court finds by clear and convincing evidence that the

18   defendant is not likely to flee or pose a danger to the

19   safety or any other person or the community if released.

20        At this point, we'll turn now to a reporting date

21   and time.  The Bureau of Prisons and Marshals typically

22   request 45 days for processing.  So looking at the calendar,

23   I tentatively selected April 25th, 2022, but I am amenable to

24   a later date, if necessary, to accommodate medical treatment

25   or any family events.

1          MR. MARKHAM:  Your Honor, if -- we appreciate that.

2     If we could get, not 45, but 60 days to make sure we can get

3     all the medical testing done that we need to get, get to the

4     doctor about the medical record, get a whole package, which I

5     believe it's a package he can take when he reports.  Just

6     that extra cushion.

7          Obviously, it's almost extra time in prison,

8     because he knows what he has to face, and he's not even

9     starting it, so it's not really much of a benefit, except

10    medically it would be helpful to have that cushion.  Thank

11    you.

12         THE COURT:  Okay.  Any objection from the

13    Government?

14         MR. HAAG:  No, Your Honor.

15         THE COURT:  And, Mr. Markham, do you agree that

16    Monday, May 9, would provide that additional cushion for

17    medical treatment and care?

18         MR. MARKHAM:  I do, Your Honor.

19         THE COURT:  I believe that gives you the

20    approximate effect of fifteen days, so Monday, May 9?

21         MR. MARKHAM:  Yes, Your Honor, I agree.

22         THE COURT:  Okay.  And does the Government have any

23    objection to that proposed reporting date?

24         MR. HAAG:  No, Your Honor.

25         THE COURT:  The defendant shall surrender for

1   service of sentence at the institution designated by the

2   Bureau of Prisons before 2:00 p.m., Central Daylight Time, on

3   Monday, May 9th, 2022, as notified by the United States

4   Marshal or as notified by the pretrial office at his own

5   expense.

6           Mr. Reagor, I admonish you that failure to appear

7   or report for service of sentence is a separate criminal

8   offense under 18 U.S.C. Section 3146(a)(2), so please closely

9   coordinate with your Defense Counsel to arrive at the

10  designated institution on the right date at the right time.

11  Do you understand?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Okay.  Now, does the Government object

14  to the defendant remaining on the present conditions of

15  release until he self-surrenders for sentence?

16          MR. HAAG:  No, Your Honor.

17          THE COURT:  The Court hereby orders that the

18  defendant must abide by the present conditions of release

19  until he surrenders for service of sentence at the designated

20  institution at the appointed date and time.

21          And this is consistent with the statement of the

22  United States Probation Officer that defendant is on bond and

23  has complied with the conditions of pretrial supervision.

24  That officer also found that defendant does not appear to be

25  a risk of danger.

1          So, for those reasons, the Court does order the

2     current conditions of release to be continued until service

3     of sentence.

4          Is there anything further from the Government?

5          **MR. HAAG**:  No.  Thank you, Your Honor.

6          **THE COURT**:  Is there anything further from the

7     Defendant?

8          **MR. MARKHAM**:  No, Your Honor.  Thank you.

9          **THE COURT**:  We are adjourned in this case.  The

10    parties and counsel are excused, and the Court stands in

11    recess for the remainder of the day.

12          **COURT SECURITY OFFICER**:  All rise.

13      **(End of Sentencing Proceedings for 03/10/2022.)**

14

15

16                    *   *   *   *   *   *

17

18      I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.

20    I further certify that the transcript fees format comply with

21    those prescribed by the Court and the Judicial Conference of

22    the United States.

23

24    s/Stacy Mayes Morrison          5/9/2022
       Stacy Mayes Morrison             Date
25     Official Court Reporter

Stacy Mayes Morrison
Official Court Reporter